# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE AMERICAN REALTY CAPITAL
PROPERTIES, INC. LITIGATION

This Document Relates To:

ALL ACTIONS

Civil Action No.: 1:15-mc-00040

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
DEFENDANTS AMERICAN REALTY CAPITAL PROPERTIES, INC.,
ARC PROPERTIES OPERATING PARTNERSHIP, L.P., AMERICAN REALTY
CAPITAL TRUST III, INC., AMERICAN REALTY CAPITAL TRUST IV, INC.,
AND COLE REAL ESTATE INVESTMENTS, INC.**

MILBANK, TWEED, HADLEY & McCLOY LLP
Scott A. Edelman
George S. Canellos
Antonia M. Apps
Jed M. Schwartz
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: 212-530-5000

*Counsel for American Realty Capital Properties,
Inc., ARC Properties Operating Partnership, L.P.,
American Realty Capital Trust III, Inc., American
Realty Capital Trust IV, Inc., and Cole Real Estate
Investments, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF AUTHORITIES ............................................................................................. v

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 5

      A.     The Parties ....................................................................................................... 5

      B.     The October 29 Disclosure ............................................................................. 6

      C.     McAlister's Defamation Complaint................................................................. 7

      D.     The March 2 Disclosures ................................................................................. 8

      E.     Plaintiffs' Loss Causation Allegations............................................................ 10

ARGUMENT ..................................................................................................................... 11

I.      PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION ............................................... 11

II.     THE SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED
       WITH RESPECT TO REPORTING PERIODS BEFORE 2014 AND ERRORS NOT
       DISCLOSED IN THE OCTOBER 29 DISCLOSURE BASED ON A FAILURE TO
       ADEQUATELY PLEAD SCIENTER ............................................................................. 16

      A.     Applicable Legal Principles............................................................................ 16

      B.     Plaintiffs Fail To Plead Scienter With Respect To Pre-2014 Misstatements
            And Errors Not Disclosed On October 29, 2014 .................................................... 17

           1.     Plaintiffs Fail To Allege Strong Circumstantial Evidence Of
                  Conscious Misbehavior Or Recklessness By Defendants Pre-2014 Or
                  For Errors Not Disclosed In The October 29 Disclosure......................... 18

           2.     Plaintiffs Fail To Plead Motive With Respect To Pre-2014 Statements
                  And Statements Or Errors Not Disclosed On October 29 ....................... 22

III.   ALLEGEDLY MISLEADING FORWARD-LOOKING STATEMENTS ARE
       PROTECTED UNDER THE PSLRA SAFE HARBOR .................................................. 27

           1.     Plaintiffs Fail Adequately To Allege That Defendants Had Actual
                  Knowledge Of The Falsity Of Forward-Looking Statements Made In
                  2011, 2012, Or 2013 ................................................................................ 29

i

2.     Defendants' Forward-Looking Statements Were Identified As Such and Accompanied By Meaningful Cautionary Language........................ 29

IV.     PLAINTIFFS' "CONTROL PERSON" CLAIMS SHOULD BE DISMISSED.............. 33

CONCLUSION.................................................................................................................... 35


APPENDICES

Protected Forward-Looking Statements in Amended Class Action Complaint

DECLARATIONS

Declaration of Jonathan Ohring, dated May 29, 2015

EXHIBITS

Articles of Merger by and between ARCT III and Tiger Acquisition, LLC, dated February 27, 2013 ................................................................................................... A

Articles of Merger by and between ARCT IV and Thunder Acquisition, LLC, dated January 2, 2014 ................................................................................................. B

Articles of Merger by and between Cole Inc. and Clark Acquisition, LLC, dated February 6, 2014 ................................................................................................... C

ARCP's Form 10-K/A filed with the SEC on March 2, 2015 ...................................... D

ARCP press release dated October 29, 2014 ................................................................. E

Verified Complaint filed with the Supreme Court of the State of New York on December 18, 2014, in the action titled *Lisa Pavelka McAlister v. American Realty Capital Properties, Inc., et al.* ....................................................... F

ARCP press release filed as Exhibit 99.1 to its Form 8-K filed with the SEC on March 2, 2015 .................................................................................................. G

ARCP's Registration Statement on Form S-4/A filed with the SEC on December 3, 2013 .......................................................................................................... H

ARCP's and ARCT III's Joint Proxy Statement/Prospectus filed with the SEC on January 22, 2013 ................................................................................................ I

Excerpt from an ARCP press release dated May 6, 2013 ............................................. J

Excerpt from an ARCP press release dated May 28, 2013 ........................................... K

Excerpt from ARCP's Form 10-K filed with the SEC on March 19, 2012 ...................................L

Excerpt from ARCP's Form 10-Q filed with the SEC on May 9, 2012 ........................................M

Excerpt from ARCP's Form 10-Q filed with the SEC on August 1, 2012 ....................................N

Excerpt from ARCP's Form 10-Q filed with the SEC on October 29, 2012...............................O

Excerpt from ARCP's Form 10-K filed with the SEC on February 28, 2013.................................................................................................................................P

Excerpt from ARCP's Form 10-Q filed with the SEC on May 6, 2013 .......................................Q

Excerpt from ARCP's Form 10-Q filed with the SEC on August 6, 2013 ...................................R

Excerpt from ARCP's Form 10-Q filed with the SEC on November 7, 2013.................................................................................................................................S

Excerpt from an ARCP press release dated March 19, 2012.......................................................T

Excerpt from an ARCP press release dated May 8, 2012.............................................................U

Excerpt from an ARCP press release dated July 31, 2012 ..........................................................V

Excerpt from the transcript of an ARCP investor call held on August 1, 2012.................................................................................................................................W

Excerpt from an ARCP press release dated October 29, 2012 ....................................................X

Excerpt from an ARCP press release dated December 17, 2012..................................................Y

Excerpt from an ARCP press release dated February 28, 2013, regarding the ARCT III merger.................................................................................................Z

Excerpt from an ARCP press release dated February 28, 2013, regarding ARCP's 2012 financial results.............................................................................AA

Excerpt from the transcript of an ARCP investor call held on February 28, 2013...............................................................................................................................BB

Excerpt from the transcript of an ARCP investor call held on May 6, 2013 ..............................CC

Excerpt from the transcript of an ARCP investor call held on May 28, 2013...............................................................................................................................DD

Excerpt from an ARCP press release dated July 2, 2013 ..........................................................EE

Excerpt from the transcript of an ARCP investor call held on July 2, 2013...............................FF

Excerpt from ARCP's Investor and Analyst Day presentation dated July 24, 2013.................................................................................................GG

Excerpt from an ARCP press release dated August 6, 2013.......................................HH

Excerpt from the transcript of an ARCP investor call held on August 6, 2013.....................................................................................................II

Excerpt from an ARCP press release dated October 23, 2013 ....................................JJ

Excerpt from the transcript of an ARCP investor call held on October 23, 2013....................................................................................................KK

Excerpt from an ARCP press release dated November 7, 2013 .................................. LL

Excerpt from the transcript of an ARCP investor call held on November 7, 2013.................................................................................................. MM

Excerpt from an ARCP shareholder presentation, dated November 12, 2013..................................................................................................NN

Excerpt from an ARCP press release dated January 3, 2014......................................OO

Excerpt from an ARCP press release dated February 7, 2014....................................PP

Excerpt from an ARCP press release dated February 27, 2014...................................QQ

Excerpt from the transcript of an ARCP investor call held on February 27, 2014...................................................................................................RR

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.,*
   47 F.3d 47 (2d Cir. 1995) .................................................................................24

*In re Aegon N.V. Sec. Litig.,*
   2004 WL 1415973 (S.D.N.Y. June 23, 2004) .......................................................28

*Amorosa v. AOL Time Warner Inc.,*
   409 F. App'x 412 (2d Cir. 2011) .......................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007).................................................................5, 16, 34

*In re Avon Products, Inc. Sec. Litig.,*
   2009 WL 848017 (S.D.N.Y. Feb. 23, 2009)............................................................31

*Backhaus v. Streamedia Commc'ns, Inc.,*
   2002 WL 1870272 (S.D.N.Y. Aug. 14, 2002)..........................................................28

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)........................................................................................16

*Chill v. Gen. Elec. Co.,*
   101 F.3d 263 (2d Cir. 1996)......................................................................20, 23

*In re China N. E. Petroleum Holdings Ltd. Sec. Litig.,*
   2015 WL 223779 (S.D.N.Y. Jan. 15, 2015) .........................................................22

*City of Brockton Ret. Sys. v. Avon Products, Inc.,*
   2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)........................................18, 21, 22

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.,*
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................19

*Coronel v. Quanta Capital Holdings Ltd.,*
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .........................................................22

*DeMaria v. Andersen,*
   153 F. Supp. 2d 300 (S.D.N.Y. 2001)................................................................33

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)..............................................................................12, 13

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...................................................................................... *passim*

*Ellison v. American Image Motor Co.*,
    36 F. Supp. 2d 628 (S.D.N.Y. 1999)....................................................................34

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................32

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012)..................................................................19

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. 2005)....................................................................32

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)..................................................................32

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................18, 25, 26

*Goplen v. 51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006)..................................................................20

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)..................................................................................27

*Hart v. Internet Wire, Inc.*,
    145 F. Supp. 2d 360 (S.D.N.Y. 2001)..................................................................18

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ........................................................21

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)..................................................................31

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. March 30, 2012) .......................................13, 19, 20

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................24

*Ladmen Partners, Inc. v. Globalstar, Inc.*,
    2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008)....................................................33

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)..................................................................................16

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
    650 F.3d 167 (2d Cir. 2011).............................................................34

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)........................................................12, 13

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)..........................................12, 13

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278, 289 (S.D.N.Y. 2014).....................................16

*In re Molycorp, Inc. Sec. Litig.*,
    2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ..............................19

*Monroe County Emps. Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336, 354, 358 (S.D.N.Y. 2014).............................14

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
    2013 WL 1188050 (D. Conn. Mar. 23, 2013) ...............................32

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)..........................................32

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..........................................................12

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013)...........................................20

*P. Stolz Family P'ship, L.P. v. Daum*,
    166 F. Supp. 2d 871 (S.D.N.Y. 2001)...........................................33

*Parkside Terrace Apartments, Inc. v. Lindner*,
    252 Md. 271 (Md. Ct. App. 1969) ..................................................1

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
    Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)...........................................22

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.
    Holdings Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012)...........................................13

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010)...........................................33

*In re PXRE Grp., Ltd., Sec. Litig.,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...................................................................18

*In re Refco, Inc. Sec. Litig.,*
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................................34

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) .......................................................................23, 27

*In re Sanofi Sec. Litig.,*
    2015 WL 365702 (S.D.N.Y. Jan. 28, 2015) ...........................................................27

*In re Satyam Computer Servs. Ltd. Sec. Litig.,*
    915 F. Supp. 2d 450 (S.D.N.Y. 2013) ..............................................................21, 34

*In re Sec. Capital Assur. Ltd. Sec. Litig.,*
    2011 WL 4444206 (S.D.N.Y. Sept. 23, 2011) .........................................................33

*In re Sec. Capital Assur., Ltd. Sec. Litig.,*
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) ...................................................................15

*Shemian v. Research in Motion Ltd.,*
    570 F. App'x 32 (2d Cir. 2014) ...........................................................................24

*Slayton v. Am. Exp. Co.,*
    604 F.3d 758 (2d Cir. 2010).......................................................27, 28, 29, 30

*Special Situations Fund III, QP LP v. Deloitte Touche Tohmatsu CPA Ltd.,*
    33 F. Supp. 3d 401, 437-38 (S.D.N.Y. 2014) .........................................................34

*In re Sturm, Ruger & Co., Inc. Sec. Litig.,*
    2011 WL 494753 (D. Conn. Feb. 7, 2011) ............................................................31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008)..............................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007).........................................................................................17

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.,*
    2013 WL 2154381 (S.D.N.Y. Mar. 29, 2013) .......................................................21

## Statutes

15 U.S.C. § 78u–5(i)(1) .....................................................................................28

15 U.S.C. § 78u–5(c)(1) .....................................................................................27

15 U.S.C. § 78u–5(c)(1)(A)(i) .............................................................................30

15 U.S.C. § 78u-4(b)(1) ........................................................................................................16

15 U.S.C. § 78u-4(b)(2) ........................................................................................................16

15 U.S.C. § 78u-4(b)(4) ........................................................................................................11

15 U.S.C. § 78u-5(i)(1) .........................................................................................................28

Md. Code, Corps. & Ass'ns § 3-114(b) ..................................................................................1

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................................1, 16

Fed. R. Civ. P. 12(b)(6).........................................................................................................1

Fed. R. Civ. P. 17(b) ............................................................................................................1

Defendants American Realty Capital Properties, Inc. ("ARCP" or the "Company"), ARC

Properties Operating Partnership, L.P. ("ARCP OP"), American Realty Capital Trust III, Inc.

("ARCT III"), American Realty Capital Trust IV, Inc. ("ARCT IV"), and Cole Real Estate

Investments, Inc. ("Cole Inc.") (collectively, the "Defendants"), by and through their attorneys,

respectfully submit this memorandum of law in support of their motion to dismiss the Amended

Class Action Complaint For Violations Of The Federal Securities Laws (ECF No. 30, the

"Amended Complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil

Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4

("PSLRA").[1]

## PRELIMINARY STATEMENT

ARCP is a real estate investment trust ("REIT") that acquires and operates

commercial properties for lease to high credit quality tenants.  On October 29, 2014, ARCP

announced that its Audit Committee had identified errors in its financial statements for the first

and second quarters of 2014 (the "October 29 Disclosure").  The Audit Committee based its

conclusions on the preliminary findings of an investigation it conducted with the assistance of

independent counsel and forensic experts.  The errors primarily related to a calculation of a non-

GAAP financial metric unique to REITs called Adjusted Funds From Operations or "AFFO,"

and the manner in which certain expenses were allocated between non-controlling interests

---

[1]     Plaintiffs have named ARCT III, ARCT IV, and Cole Inc., all Maryland corporations, as Defendants in the Amended Complaint.  Those entities, each of which ceased to exist upon their respective mergers into ARCP, *see* Exhibits A-C to the Declaration of Jonathan Ohring, dated May 29, 2015, filed herewith ("Ohring Declaration"), lack the capacity to be sued.  *See* Md. Code, Corps. & Ass'ns § 3-114(b) (upon the consummation of a merger, the "separate existence of each corporation . . . except the successor, ceases"); *Parkside Terrace Apartments, Inc. v. Lindner*, 252 Md. 271, 273 (Md. Ct. App. 1969) ("After a corporation has become effectively dissolved in any mode known to the law, its power to sue or be sued . . . in its corporate name is extinguished."); Fed. R. Civ. P. 17(b) (the law of the state of incorporation determines a corporation's capacity to sue or be sued).  Therefore, in addition to the other grounds discussed below, ARCT III, ARCT IV, and Cole Inc. should be dismissed from this litigation because they are not capable of being sued.

("NCI") held by investors other than ARCP in an ARCP subsidiary.  In the October 29 Disclosure, the Company stated that it had overstated AFFO for the three months ended March 31, 2014 by $0.03 per share, and for the three months ended June 30, 2014 by $0.01 per share; the Company also announced that it had understated its net loss for the three and six months ended June 30, 2014 by $0.01 per share.  As part of the October 29 Disclosure, ARCP self-reported that the error in compiling AFFO in the first quarter – the three-cent overstatement – was intentionally not corrected in connection with the filing for Q2 2014, and that other errors were intentionally made in Q2 2014, resulting in a one-cent overstatement of AFFO and one-cent understatement of net loss.  ARCP simultaneously announced that the Company's Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") had resigned.

The October 29 Disclosure did not identify errors, much less intentional conduct, as to any financial reporting period prior to 2014.  And ARCP has not subsequently reported any intentional accounting misstatements for any other period.  Defendants do not contest on this motion that Plaintiffs have, at this early stage, sufficiently pleaded Section 10(b) claims arising out of the four-cent overstatement of AFFO and the one-cent understatement of net loss announced in the October 29 Disclosure.  As discussed below, however, Plaintiffs are seeking to move forward with a Section 10(b) claim that is far broader – both as to duration and subject matter – than the one for which they have an adequate basis to do so.

On March 2, 2015, ARCP restated its financials back to 2011 (the "March 2 Disclosures").  The March 2 Disclosures identified, for the first time, accounting errors that related to ARCP's financial statements for 2011, 2012 and 2013.  Importantly, the Company did not announce any findings of intentional conduct as to any reporting period prior to the first quarter of 2014.  While ARCP's stock price dropped in response to the earlier October 29

2

Disclosure, the Amended Complaint ignores that ARCP's stock price *rose* in response to the subsequent March 2 Disclosures.

Thus, the Amended Complaint suffers from three defects. *First*, Plaintiffs' claims under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("1934 Act") – to the extent they are based on any of the alleged misstatements revealed in the March 2 Disclosures – should be dismissed because Plaintiffs have not adequately alleged loss causation as to those misstatements. Although Plaintiffs' 177-page complaint draws liberally from ARCP's March 2 Disclosures as the basis for its Section 10(b) and 14(a) claims, the Amended Complaint's loss causation allegations say nothing at all as to how any investor losses due to the October 29, 2014 stock price drop were caused by the accounting errors only later disclosed on March 2, 2015. The silence on the loss causation issue is not surprising, given that ARCP's stock *rose* in response to the March 2 Disclosures, and Plaintiffs have not – and cannot – plead that any investor suffered losses as a result of the alleged misstatements first disclosed to the investing public on March 2, 2015. In light of that pleading failure, Plaintiffs' claims under Sections 10(b) and 14(a) should be dismissed to the extent those claims are premised on the accounting errors first disclosed to the public on March 2, 2015. Accordingly, the only claims under the 1934 Act on which Plaintiffs should be permitted to proceed are those based on the alleged AFFO misstatement for Q1 and Q2 of 2014, and the net loss misstatement for Q2 2014.

*Second*, Plaintiffs have failed to meet their PSLRA-imposed burden to plead "with particularity facts giving rise to a strong inference" of scienter as to any alleged misstatements other than the AFFO misstatements for Q1 and Q2 of 2014, and the net loss misstatement for Q2 2014. The Amended Complaint is devoid of any information that would support Plaintiffs' allegations of scienter for earlier periods or other accounting errors; there is no

information from confidential witnesses or present or former employees in respect of these other misstatements, as often forms the basis for scienter in securities complaints alleging Section 10(b) claims.  Instead, Plaintiffs rely entirely on ARCP's own disclosure of errors, together with a complaint filed against ARCP and certain of its former executives by ARCP's former CAO, Lisa McAlister (the "McAlister Complaint"), which was subsequently withdrawn by McAlister.  But neither ARCP's self-disclosure nor the McAlister Complaint indicates that any of ARCP's accounting errors for 2011, 2012 or 2013, or errors not identified in the October 29 Disclosure, were intentional.  Given that those same documents refer to intentional conduct for certain errors in Q2 of 2014 (and awareness of the AFFO/NCI error in Q1 2014), they cannot possibly be said to support a strong inference of scienter for the prior periods as to which they disclose no intentional misbehavior.  Accordingly, Plaintiffs' Section 10(b) claims based on the financial statements for fiscal years 2011, 2012 and 2013 and errors not identified in the October 29 Disclosure should be dismissed on that basis as well.

*Third*, Plaintiffs' claims premised on forward-looking statements made prior to 2014 reporting periods, including ARCP's projections about future earnings and plans for future growth, are not actionable under the PSLRA's safe harbor for forward-looking statements because (1) Plaintiffs have failed to allege that Defendants spoke with "actual knowledge" that their words were "false or misleading," as required under the PSLRA; and (2) the statements were accompanied by meaningful cautionary language.  Thus, to the extent that Plaintiffs rely on forward-looking statements as a basis for liability under Sections 10(b) and 14(a) of the 1934 Act, as well as Sections 11 and 12 of the Securities Act of 1933 ("1933 Act"), those claims should be dismissed.[2]

---

[2]    In addition, Plaintiffs' control person claims under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act should be dismissed to the extent Plaintiffs fail to plead a primary violation or culpable participation.

## BACKGROUND

### A.    The Parties

ARCP was founded in 2010 and went public in 2011.  (¶¶ 3, 33, 42.)[3]  ARCP

owns and operates commercial properties that it leases to large public companies, and

governmental and non-profit entities.  (Ex. D at 11.)  ARCP's long-term business strategy has

been to acquire a diverse portfolio of long-term and medium-term leases.  (¶ 3.)  ARCP conducts

substantially all of its business through a subsidiary operating partnership, ARCP OP.  (¶¶ 33,

34.)  ARCP is the sole general partner of ARCP OP and owns 97.3% of its common units, with

the balance of ARCP OP being owned by NCI.  (¶¶ 33-34.)

Prior to January 8, 2014, ARCP was externally managed by Defendant ARC

Properties Advisors LLC ("ARC Advisors"), which is alleged to have been owned by Defendant

AR Capital LLC ("AR Capital").  (¶ 37.)  According to the Amended Complaint, both ARC

Advisors and AR Capital are "directly or indirectly owned and/or controlled by" individual

Defendants Schorsch, Kahane, Budko, Block, and Weil.  (¶¶ 37-38.)

Schorsch was Chairman of ARCP's Board of Directors, and he acted as ARCP's

Chief Executive Officer until October 1, 2014, when Defendant David Kay took over that

position.  (¶¶ 42-43.)  Kay had previously served as ARCP's President.  (¶ 43.)  Defendant Lisa

Beeson served as ARCP's Chief Operating Officer from November 4, 2013 and President from

---

[3]          Unless otherwise specified, "¶ _" refers to paragraphs in the Amended Complaint.  "Ex. _" refers to
exhibits to the Ohring Declaration.  Solely for purposes of this motion to dismiss, Defendants accept as true, as they
must, the well-pleaded allegations of the Amended Complaint.  In so doing, Defendants do not concede the truth of
any such allegations and specifically reserve their rights to contest the accuracy of any of the facts alleged in the
Amended Complaint.  Defendants also reference various SEC filings, public statements and the McAlister
Complaint, which are relied upon by Plaintiffs in the Amended Complaint.  *See ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (holding that the Court may consider on a motion to dismiss "any written
instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally
required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and
upon which it relied in bringing the suit").

October 1, 2014.  (¶ 49.)  Schorsch, Kay and Beeson stepped down from their posts on December 15, 2014.  (¶¶ 42, 43, 49.)

Subsequent to its IPO, ARCP acquired a number of entities.  Specifically, ARCP acquired ARCT III in the first quarter of 2013, ARCT IV in January 2014, and Cole Inc. in February 2014.  In addition to these acquisitions, from July 2013 through September 2014, ARCP issued debt and equity securities, including common stock, preferred stock, and convertible senior notes, which were underwritten by various third-party investment banks that have been named as defendants, as well as Realty Capital Securities, LLC ("RCS Securities"), which was controlled by Schorsch, among others. (¶¶ 39, 87, 88.)

### B.    The October 29 Disclosure

The October 29 Disclosure reported that ARCP's Audit Committee had commenced an internal investigation into "concerns regarding accounting practices" brought to its attention on September 7, 2014.  (Ex. E.)  The Audit Committee concluded, "based on the preliminary findings of the investigation," that:

> the Company incorrectly included certain amounts related to its ***non-controlling interests*** [in ARCP OP] in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

*Id.* (emphasis added).  As a result of these errors, ARCP disclosed that its AFFO per share number was overstated by $0.03 for the first quarter and $0.01 for the second quarter of 2014, and the Company's net loss was understated by $0.01 for the second quarter of 2014.

ARCP simultaneously announced the resignation of CFO Brian Block and CAO Lisa McAlister, and cautioned that its 2013 annual report and its quarterly reports for the first

and second quarters of 2014 "should no longer be relied upon."  The Company disclosed,

however, that it was not aware of any other, undisclosed errors in its accounting:

> Nothing has come to the attention of the Audit Committee that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013.

(*Id*.)  The Audit Committee explained that it had nonetheless "expanded its investigation to

encompass the Company's audited consolidated financial statements for the fiscal year ended

December 31, 2013 in light of the fact that the Company's former [CFO and CAO] had key roles

in the preparation of those financial statements."  (*Id.*)  The October 29 Disclosure is entirely

silent as to any years prior to 2013.

Following the October 29 Disclosure, ARCP's stock price declined from a close

of $12.38 per share on October 28, 2014 to a closing price of $10 per share on October 29, 2014.

(¶ 327.)

### C.   McAlister's Defamation Complaint

On December 18, 2014, former CAO Lisa McAlister filed a defamation lawsuit

alleging that ARCP and senior management had "issued a defamatory press release" – referring

to the October 29 Disclosure – "falsely blaming Ms. McAlister for the accounting and reporting

irregularities" cited therein.  (Ex. F ¶ 6; ¶¶ 345-53.)[4]  The McAlister Complaint alleged

intentional misconduct in connection with the Company's financial reporting for Q1 and Q2 of

2014 only.  (¶¶ 346, 350, 352-53.)  McAlister described an accounting error in the Company's

Q1 and Q2 2014 financial statements caused by the failure to pro-rate amounts added back to the

Company's net loss figure to arrive at the AFFO per share number between ARCP's interests

and the NCI in the operating partnership.  (¶ 347.)  The McAlister Complaint alleged that this

---

[4]       McAlister has since withdrawn her Complaint without prejudice.

error first became known to her (and others at ARCP, according to McAlister) after the 2013 10-K was filed on February 27, 2014.  (¶ 346.)  According to the McAlister Complaint, she first learned of the accounting error "in or around February 2014" when another ARCP employee (Ryan Steel) informed her that the error appeared in the Company's "10-K report for 2013." (Ex. F ¶ 30.)  The McAlister Complaint alleged that she knew that the error was not corrected in subsequent reporting periods and contended that she so advised ARCP's senior management, as well as ARCP's outside auditor, Grant Thornton.  (¶¶ 349-52.)  The McAlister Complaint did not allege any intentional misstatements by ARCP for the years 2011, 2012 or 2013.

     **D.**    **The March 2 Disclosures**

     On March 2, 2015, ARCP filed amendments to its annual report for 2013 and its first and second quarterly reports for 2014.  (Ex. G.)  For the first time, ARCP disclosed errors in connection with its financial statements for reporting periods prior to 2014.  The Audit Committee reported that "[n]et loss was understated for 2013 (including each quarter of 2013) and the second quarter of 2014" and "was overstated for the first quarter of 2014."  (*Id.*)  The Audit Committee further found that "AFFO was overstated for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014."  (*Id.*)  The Audit Committee, however, found no understatements for net loss for any period before 2013.  (*See id.*)

     The March 2 Disclosures reiterated the Audit Committee's previous finding of intentional conduct with respect to accounting errors in the second quarter of 2014, and added a finding that some members of senior management were aware of the NCI error in Q1:

> Prior to the filing of the Quarterly Report on Form 10-Q for the first quarter of 2014, some members of senior management were aware of NCI errors but allowed the report to be filed without completing an analysis of the errors.  In the Company's Quarterly Report on Form 10-Q for the second quarter of 2014, as previously reported in the October 29 8-K, the NCI errors in the first quarter were intentionally not corrected, and other

> AFFO and financial statement errors were intentionally made, resulting in
> an overstatement of AFFO and an understatement of the Company's net
> loss for the three and six months ended June 30, 2014.

(Ex. D at 3.)[5]  Importantly for purposes of this motion, the March 2 Disclosure revealed no

intentional misstatements for any other accounting errors or any periods prior to the first quarter

of 2014.

The March 2 Disclosures announced a number of new categories of errors not

previously identified by ARCP.  For example, the March 2 Disclosure reported that expenses

previously classified as "merger related" expenses should have been classified as "General and

Administrative" expenses, thereby causing ARCP's AFFO to be readjusted downwards for prior

years.  Additionally, the March 2 Disclosures reported that certain payments that ARCP made to

ARC Advisors and its affiliates were "not sufficiently documented or otherwise warrant

scrutiny."  (*Id*. at F-67.)  The Audit Committee also found that "the agreements relating to equity

awards made to Nicholas S. Schorsch and Brian S. Block in connection with the transition from

external to internal management of the Company contained provisions that, as drafted, were

more favorable to them than the Compensation Committee of [ARCP's] Board of Directors had

authorized" in 2013.  (*Id.* at 3; ¶ 144.)  Finally, the March 2 Disclosures stated that "[ARCP]'s

internal control over financial reporting and its disclosure controls [. . .] were not effective at

December 31, 2013."  (Ex. D at 6.)  The scope and magnitude of the non-intentional

misstatements identified for the first time in the March 2 Disclosures was significantly greater

---

5        Defendants do not concede that senior management's awareness of the NCI accounting error in advance of
the Q1 2014 filing suffices to establish scienter for purposes of Plaintiffs' Section 10(b) claim, which would require
an understanding of the magnitude and materiality of the error.  If anything, the Audit Committee's conclusion that
senior management allowed the report to be filed without completing any analysis of the errors gives rise to the
contrary inference, namely that senior management did not believe at the time that the errors were material.  In any
event, for purposes of this motion only, Defendants do not challenge that Plaintiffs have adequately pled their
Section 10(b) claim with respect to the first reporting period of 2014.

than the relatively small adjustment to AFFO and net loss statements for 2014 that the Company

previously disclosed on October 29, 2014.

      To the extent that ARCP's stock price reacted at all to the March 2 Disclosures,

the reaction was a favorable one.  Having closed the prior business day at $9.81 a share, on

March 2, 2015, ARCP's shares opened at $10.19 a share, reaching a high of $10.38 a share,

before closing at $9.90 a share (nine cents per share above the prior close).  On March 3, 2015,

ARCP shares rose to a closing price of $10.08 per share.  Every other ARCP security that

Plaintiffs include in their Amended Complaint, including the bond and preferred stock issuances,

increased in value following the March 2 Disclosures as well.[6]

### E.   Plaintiffs' Loss Causation Allegations

      Plaintiffs allege that, "in direct response to the October 29, 2014 disclosure,"

ARCP stock fell to a low of $7.85 on October 29 and continued to fall until the close of business

on November 3, 2014.  (¶¶ 8-10, 327-330, 374-381.)  According to the Amended Complaint,

"[t]he declines in the price of ARCP securities pled herein were a direct result of the nature,

extent and impact of defendants' prior false and misleading statements and omissions being

revealed to investors and the market."  (¶ 379.)  Other than graphs and charts showing the

October 29, 2014 stock price decline, these statements constitute the extent of Plaintiffs' loss

causation allegations.  Plaintiffs do not even attempt to plead loss causation as to the March 2

---

[6]     The Series F preferred stock had closed prior to the disclosure at $23.58, and opened on March 2 at $23.70 before closing the day at $23.90; the 2% 2017 debt notes had closed prior to the disclosure at $97.50, and opened on March 2 at $98.25 before closing at $98.25; the 3% 2018 notes had closed prior to the disclosure at $95.62, and opened March 2 at $98.00 before closing at $96.68; the 3% 2019 notes had closed prior to the disclosure at $96.62, and opened March 2 at $97.50, before closing at $97.00; the 3.75% 2020 notes had closed prior to the disclosure at $94.50, and opened March 2 at $98.00 before closing at $97.50; and, finally, the 4.6% 2024 notes had closed prior to the disclosure at $98.00, and opened March 2 at $98.50, before closing at $99.58. Not a single ARCP-related security ended March 2 lower than it had closed prior to the restatement.

Disclosures, in which the bulk of the accounting errors that form the basis of the Amended Complaint were disclosed.

## ARGUMENT[7]

### I.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

Plaintiffs do not adequately allege loss causation under Sections 10(b) or 14(a) of the 1934 Act for any alleged misstatements other than those described in the October 29 Disclosure.  That disclosure, which was limited to misstatements based on errors in the calculation of AFFO in the first and second quarters of 2014 and of net loss in the second quarter of 2014, was followed by a drop in the price of ARCP stock.  In contrast, the other misstatements alleged by Plaintiffs (involving alleged accounting errors relating to other subjects and an earlier time period, namely fiscal years 2011, 2012 and 2013) were first publicly reported on March 2, 2015, after which the price of ARCP stock increased.  Accordingly, the March 2 Disclosures and the alleged accounting errors identified therein cannot provide the basis of proper loss causation allegations.  Indeed, the March 2 Disclosures fall outside the putative class period and are not even pleaded as a corrective disclosure in the Amended Complaint.  For these reasons, Plaintiffs' Section 10(b) claim should be dismissed except to the extent that it is based on alleged misrepresentations disclosed in the October 29 Disclosure, and the Section 14(a) claim should be dismissed in its entirety.

Loss causation is an element of claims under both Sections 10(b) and 14(a) of the 1934 Act.  15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for

---

[7]   So as not to burden the Court with duplicative arguments, Defendants ARCP, ARCP OP, ARCT III, ARCT IV, and Cole Inc. hereby incorporate by reference the arguments of all other defendants moving to dismiss the Amended Complaint, to the extent those arguments are applicable to ARCP, ARCP OP, ARCT III, ARCT IV, or Cole Inc.

which the plaintiff seeks to recover damages."); *Amorosa v. AOL Time Warner Inc.*, 409 F.

App'x 412, 415 (2d Cir. 2011) (holding that a plaintiff has "the burden of pleading and proving

loss causation" for a Section 14(a) claim).

   To plead loss causation, a plaintiff must allege that "the defendant's

misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic

loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Allegations that a defendant's

misrepresentations or omissions caused the price at which plaintiffs purchased their stock to be

artificially inflated, standing alone, do not suffice; rather, a plaintiff must plead that "the truth

became known" and some kind of "corrective disclosure" entered the market, or that the risks

concealed by a defendant's omission materialized before the stock price drop from which the

plaintiff claims a loss. *Id.* at 346-47; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161,

173 (2d Cir. 2005) ("To establish loss causation, 'a plaintiff must allege . . . that the ***subject*** of

the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.*, that the

misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security.").

   As one court in this district has explained, in the wake of *Dura*, a statement does

not qualify as a "corrective disclosure" simply because it announces bad news and is followed by

a drop in stock price; it must actually reveal a prior statement's false or fraudulent nature. *See*

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006); *see also In re Omnicom*

*Group, Inc. Sec. Litig.*, 597 F.3d 501, 511-512 (2d Cir. 2010) (finding that an article inspiring

general concern over a company's accounting strategy does not constitute a corrective disclosure

if it does not expose a misrepresentation alleged in the complaint). A purportedly corrective

disclosure that does not reveal the falsity of the subject matter in the defendant's challenged

public statements cannot establish loss causation, a pleading failure that "is fatal under Second Circuit precedent." *Lentell*, 396 F.3d at 175.

Plaintiffs' Amended Complaint draws heavily from the alleged misstatements identified in the March 2 Disclosures for fiscal years 2011, 2012 and 2013 as the basis for their Section 10(b) and 14(a) claims, yet relies exclusively on the October 29, 2014 stock drop in support of the loss causation allegations.  (¶¶ 159-160.)  This is fatal to Plaintiffs' claims.  On its face, the October 29 Disclosure does not support any loss causation theory based on the subsequent disclosures: the October 29 Disclosure does not restate any financial information for 2011, 2012 or 2013.  In fact, the October 29 Disclosure does not mention 2011 or 2012 at all, and with respect to 2013, the October 29 Disclosure expressly disclaims any errors in the 2013 financial statements, stating "nothing has come to the attention of the Audit Committee that leads it to believe that there are any errors in the Company's previously issued . . . [10-K annual report for fiscal year 2013]."[8]  Against these facts, it simply is not the case that "the truth became known" in October 2014, thereby causing the stock to drop, with respect to any information contained in the 2011, 2012 or 2013 financials.  *See Dura*, 544 U.S. at 346-47; *Lentell*, 396 F.3d at 175; *Leykin*, 423 F. Supp. 2d at 245; *see, e.g., Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *16 (S.D.N.Y. March 30, 2012) (finding that a press release could not constitute a corrective disclosure for an alleged accounting misstatement because "the Complaint allege[d] that the Sunvalley revenue was recognized improperly in 3Q 2009, *not* the 4Q 2009 period covered by this press release").

---

[8]      As noted above, the October 29 Disclosure states that investors should not rely on the 2013 financials because they were prepared by the same individuals who had prepared the allegedly misstated 2014 quarterly reports, but did not identify any errors in those financials and expressly *disclaimed* that any errors had been identified.  This plainly does not meet the standard for pleading loss causation, which requires a disclosure on the same subject as the allegedly fraudulent statements.  *See Lentell*, 396 F.3d at 173; *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337-38 (S.D.N.Y. 2012).

Not only does Plaintiffs' loss causation theory necessarily fail for any alleged misstatements in 2011, 2012 and 2013, it also fails for the entirety of the putative class period for any alleged misstatements on subjects beyond those addressed in the October 29 Disclosure: the alleged miscalculation of AFFO and net loss.  In their Amended Complaint, Plaintiffs have added claims based on four categories of alleged "accounting tricks," including misclassified expenses, delayed expense recognition, unauthorized executive compensation, and use of goodwill from acquisitions for improper purposes.  (¶ 16.)  The Amended Complaint, however, does not plead loss causation for these various purported accounting errors because none of these errors were addressed in the October 29 Disclosure.  Rather, these purported errors were not discovered and disclosed until months later in the March 2 Disclosures, after which there was an *increase*, not a decrease, in ARCP's stock price.  For this reason, Plaintiffs have no viable causation theory that links the subject matter of the March 2 Disclosures to the October 29, 2014 stock drop.

Indeed, the only time ARCP addressed previously-released financial information from 2011, 2012 or 2013, or information beyond the scope of 2014 AFFO and/or certain net loss adjustments, was in the subsequent March 2 Disclosures.  The March 2 Disclosures were released months after the class period concludes and months after the alleged economic loss was suffered through the October 29 stock price drop.  It is clear that the stock drop in October 2014 could not have been caused by the new information contained in the March 2015 disclosures released five months later.  *See, e.g., Monroe County Emps. Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 354, 358 (S.D.N.Y. 2014) (dismissing claim for lack of loss causation and finding that a report published in June 2012 could not have caused a stock drop in April 2012).

Tellingly, Plaintiffs entirely ignore the stock price increase following the March 2 Disclosures.  Plaintiffs are required to identify a loss of value of their securities that is a direct and proximate result of the disclosure of the alleged misstatement, and Plaintiffs here—faced with a stock price increase following the March 2 Disclosures—have not pleaded such a loss because they cannot plead such a loss.  *See In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 601-602 (S.D.N.Y. 2010) (dismissing complaint for failure to plead loss causation where defendants "fail[ed] to offer any causal explanation for a stock price increase" after an analyst call that included damaging disclosures, and noting that plaintiffs' failure to mention the price increases "suggested Plaintiffs may be cherrypicking dates that suit their argument – that is, dates that produce drops in stock prices").

For these reasons, the Section 10(b) claim should be dismissed except to the extent that it arises from alleged misrepresentations relating to adjustments of the first and second quarter 2014 AFFO calculations and the second quarter 2014 net loss adjustment reported in the October 29 Disclosure.[9]  Plaintiffs' Section 14(a) claim should be dismissed for similar reasons.  It is based upon allegations limited exclusively to three proxy statements issued in 2013.  (¶ 425.)  Because Plaintiffs have alleged loss causation linked only to certain alleged misstatements in 2014, the Section 14(a) claim should be dismissed in its entirety.

---

[9]      Although Defendants do not move to dismiss Plaintiffs' Section 10(b) claim in its entirety on loss causation grounds, we note that the allegations fail to allege how Plaintiffs will establish that any meaningful portion of ARCP's stock price decline was attributable to a four cent restatement of ARCP's AFFO in 2014 and a one cent understatement of its net loss.

## II. THE SECTION 10(b) AND RULE 10b-5 CLAIMS SHOULD BE DISMISSED WITH RESPECT TO REPORTING PERIODS BEFORE 2014 AND ERRORS NOT DISCLOSED IN THE OCTOBER 29 DISCLOSURE BASED ON A FAILURE TO ADEQUATELY PLEAD SCIENTER

### A. Applicable Legal Principles

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Further, the court need not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 289 (S.D.N.Y. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Securities fraud claims are subject to heightened pleading requirements. Under Rule 9(b), Plaintiffs must (1) specify the statements they contend were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *ATSI Commc'ns*, 493 F.3d at 99. In addition, the PSLRA requires Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Plaintiffs must also plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). For Section 10(b) and Rule 10b-5 claims, the required state of mind is "an intent to deceive, manipulate, or

defraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553

F.3d 187, 198 (2d Cir. 2009) (citation and internal quotation marks omitted).  To qualify as a

"strong inference" of scienter, the inference "must be more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Plaintiffs must allege facts establishing either (1) strong circumstantial evidence of conscious

misbehavior or recklessness, or (2) that defendants had the motive and opportunity to commit

fraud.  *ECA*, 553 F.3d at 198.

      As demonstrated below, in addition to a failure to plead loss causation, Plaintiffs

fail to sufficiently plead the required "strong inference" of scienter to survive a motion to dismiss

with respect to reporting periods before 2014 and errors not disclosed in the October 29

Disclosure.

    **B.**    **Plaintiffs Fail To Plead Scienter With Respect To Pre-2014 Misstatements And Errors Not Disclosed On October 29, 2014**

      Plaintiffs allege that between September 7, 2011 and September 12, 2014,

Defendants ARCP, ARCP OP, Schorsch, Block, Beeson, Kay, McAlister, and Nemer made

misstatements concerning ARCP's AFFO and projected AFFO, financial performance,

compliance with GAAP, and the adequacy of its internal controls over financial reporting, in

violation of Section 10(b) and Rule 10b-5.  (Count Five, ¶¶ 197-321, 448).  However, the only

facts supporting their allegations of intentional conduct derive from ARCP's statements in the

October 29 Disclosure and the March 2 Disclosures, and the allegations in the McAlister

Complaint, none of which supports an inference of scienter as to pre-2014 statements or as to

errors not identified in the October 29 Disclosure.

1.  **Plaintiffs Fail To Allege Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness By Defendants Pre-2014 Or For Errors Not Disclosed In The October 29 Disclosure**

To allege strong circumstantial evidence of conscious misbehavior or recklessness,[10] Plaintiffs "must provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (citation and internal quotation marks omitted); *see also Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) ("plaintiffs must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question"), *aff'd*, 50 F. App'x 464 (2d Cir. 2002).

Here, Plaintiffs have failed to allege Defendants' knowledge of facts contradicting any statements they made prior to 2014 or relating to errors not disclosed on October 29, 2014. The only allegations suggesting intentional misstatements relate to the Company's statements regarding Q1 and Q2 of 2014.  Those allegations consist of (1) the Company's own disclosures about its Audit Committee's investigation, and (2) the McAlister Complaint.  In the case of the Company's disclosures about the Audit Committee's investigation, the Company volunteered that the Audit Committee believed that there were intentional misstatements made in connection with the Company's earnings reports for Q1 and Q2 of 2014.[11]  The "mere fact" that the March 2

---

[10]   "Conscious misbehavior encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 534 n. 27 (S.D.N.Y. 2009) (citation and internal quotation marks omitted), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).  Recklessness is, "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 198 (alterations in original) (citation and internal quotation marks omitted).

[11]   Plaintiffs suggest that the retention of outside advisors in connection with an investigation establishes scienter (¶¶ 176-77), but a number of courts have held to the contrary, concluding that "the fact that [the defendant] commenced an internal investigation tends to undermine any inference of scienter."  *City of Brockton Ret. Sys. v. Avon Products, Inc.*, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014) (citations omitted); *accord Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 214 (S.D.N.Y. 2012).

Disclosures included a restatement of prior financial results "does not support a strong or even a weak inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *14 (S.D.N.Y. Mar. 12, 2015) (dismissing complaint arising from restated financial statements for failure to plead scienter); *Janbay*, 2012 WL 1080306, at *14 (holding that, even where the company restated its financial results for Q4 2009, plaintiffs failed to allege scienter with respect to statements prior to November 11, 2009 where they did not "identify any act done by, or fact known to, anyone at [defendant] earlier than November 11, 2009").

Significantly, when the Company made its March 2 Disclosures, detailing accounting errors that had been identified for 2011, 2012 and 2013, the Company again reiterated that there were intentional misstatements for 2014 relating to the errors previously identified in the October 29 Disclosure, but expressed no similar concerns about intentional misstatements for the prior years or relating to other accounting errors. The only fair inference from the March 2 Disclosures is that the Audit Committee did not identify intentional misstatements in connection with the Company's prior years or other accounting errors.

The McAlister Complaint leads to the same conclusion. McAlister, ARCP's former CAO, filed a lawsuit alleging that she first learned about an error relating to AFFO that appeared in the Company's 2013 Annual Report on Form 10-K that had been filed on February 27, 2014. Thus, the McAlister Complaint's allegations establish that she did not know about that error prior to the Company's Form 10-K filing. It follows that neither the October 29 Disclosure nor the McAlister Complaint comes close to creating an inference of scienter with respect to the Company's financial statements for fiscal years 2011, 2012 and 2013 or accounting errors not identified in the October 29 Disclosure.

Nor do any of the Amended Complaint's other allegations meet the standard for pleading scienter.  Resignations by certain of ARCP's officers and directors in October and December 2014 do not justify an inference that Defendants made intentional misrepresentations or were reckless in 2011, 2012, or 2013.  *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 409 (S.D.N.Y. 2013) (holding that a board member's resignation from the company's board of directors in October 2012 "[did] nothing to indicate knowledge during the March 2010 Offering or any portion of the Class Period prior to that time").  Even if Plaintiffs' inference of a relationship between resignations and intentional conduct were accepted, it establishes nothing about intentional conduct for periods prior to 2014 in light of Plaintiffs' other allegations of conduct in the first and second quarters of 2014.

Likewise, it is well-settled that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *ECA*, 553 F.3d at 200 (alterations and citation omitted); *see also, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270-71 (2d Cir. 1996) (holding that complaint failed to plead strong circumstantial evidence of recklessness where allegations of GAAP violations were unaccompanied by sufficient allegations demonstrating fraudulent intent); *Janbay*, 2012 WL 1080306, at *11 (dismissing complaint for failure to plead scienter where allegations of GAAP violations were unaccompanied by particularized facts demonstrating fraudulent intent).

Similarly, that certain individual Defendants were high-level officers with access to the Company's financial information does not suffice to show a strong inference of scienter. *See, e.g.*, *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (holding that plaintiffs' "bare assertions" that the defendants, due to their high-level positions in the company,

had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, "without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements"); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook.").

Equally, Plaintiffs cannot establish scienter because government agencies are conducting investigations of the Company's reporting.  (¶¶ 176-77).  *See, e.g.*, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154381, at *1 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving [defendant] provides no evidence of scienter."); *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013) ("government investigations and charges may contribute to a strong inference of scienter . . . only if accompanied by facts supporting such an inference").  Thus, the pendency of investigations suggests nothing about scienter for prior years or accounting errors not disclosed on October 29, 2014.

Nor can Plaintiffs rescue their pre-2014 fraud claims based on the Audit Committee's conclusion that the Company failed to maintain adequate internal controls. (¶¶ 176-77, 179).  To plead scienter under a theory of inadequate internal controls, "Plaintiffs must demonstrate that Defendants knew or consciously disregarded the fact that [the Company's] compliance programs and internal controls were inadequate ***at the time they made the purportedly misleading statements***."  *City of Brockton*, 2014 WL 4832321, at *31-33 (holding that plaintiffs failed to plead scienter with respect to defendants' statements about the adequacy

21

of the company's internal controls where plaintiffs failed to allege facts showing that defendants

knew or disregarded information about deficiencies) (emphasis added). Here, Plaintiffs' scienter

allegations based on the inadequacy of the Company's internal controls are deficient because

Plaintiffs allege **no** particularized facts indicating that Defendants knew or consciously

disregarded evidence that the Company had inadequate internal controls in 2011, 2012, or 2013.

*See id.*; *In re China N. E. Petroleum Holdings Ltd. Sec. Litig.*, 2015 WL 223779, at *3 (S.D.N.Y.

Jan. 15, 2015) (holding that plaintiffs failed to plead scienter where they failed to allege facts

demonstrating that defendants knew, or should have known, about the company's internal

control problems prior to certifying Form 10-K); *Coronel v. Quanta Capital Holdings Ltd.*, 2009

WL 174656, at *30 (S.D.N.Y. Jan. 26, 2009) (holding that plaintiffs failed to plead scienter in

alleging that company had admitted to internal control problems where the allegations were not

coupled with evidence of corresponding fraudulent intent during the time period).

       In sum, Plaintiffs have failed to provide any specific evidence to create a strong

inference that Defendants acted with scienter for any period prior to 2014 or with respect to

errors not identified in the October 29 Disclosure. Accordingly, their allegations of scienter for

accounting errors prior to the first quarter of 2014, and errors not identified in the October 29

Disclosure, are inadequate. *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian

Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299-300 (S.D.N.Y. 2010) (dismissing

complaint for failure to plead scienter where plaintiff failed to "provide specific instances in

which Defendants received information that was contrary to their public declarations").

      **2.**     **Plaintiffs Fail To Plead Motive With Respect To Pre-2014 Statements
And Statements Or Errors Not Disclosed On October 29**

       To raise a strong inference of scienter through the "motive and opportunity"

prong, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way

from the purported fraud.  Motives that are common to most corporate officers, such as the desire

for the corporation to appear profitable and the desire to keep stock prices high to increase

officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at

198 (citation and internal quotation marks omitted).   Plaintiffs fail to meet this standard.

Plaintiffs allege that Defendants' motives were:  (1) disguising ARCP's "faltering

financial performance" (¶¶ 289(d), 296(d), 311(f)); (2) increasing incentive compensation

payments based on ARCP reaching certain targets under its Multi-Year Outperformance Plan

(the "OPP") (*e.g.*, ¶¶ 105-10, 210(d), 219(d), 236(h)); and (3) generating fees through an

"acquisition spree" of related-party transactions (*e.g.*, ¶¶ 7, 97-104, 210(d), 219(d), 229(c)).

Each of these alleged motives fails for the reasons discussed below, not the least of which

because each one is the type of "common" and general motives rejected by the Second Circuit in

*ECA*.

As to Plaintiffs' allegations that Defendants were motivated to disguise ARCP's

"faltering financial performance," the Second Circuit has repeatedly held that plaintiffs cannot

plead motive by alleging defendants' mere "desire for the corporation to appear profitable."

*ECA*, 553 F.3d at 198; *see also, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004)

("Action taken to maintain the appearance of corporate profitability, or of the success of an

investment . . . does not entail concrete benefits sufficient to demonstrate motive." (citation and

internal quotation marks omitted)); *Chill*, 101 F.3d at 268 ("[The defendant] obviously would

want to justify its investment . . . and have that investment appear profitable, but such a

generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is

not sufficiently concrete for purposes of inferring scienter.").

23

Nor does a desire to increase officer compensation through the OPP satisfy the pleading standard. "These types of incentives . . . are precisely those possessed by virtually all corporate insiders, and are not sufficient to plead scienter through motive and opportunity." *Shemian v. Research in Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014) (citation and internal quotation marks omitted) (holding that plaintiff failed to plead motive based upon "target annual incentive awards" for executives); *see also, e.g.*, *ECA*, 553 F.3d at 201 (holding that plaintiffs failed to plead motive with allegations that executives were incentivized to inflate the company's stock price due to bonuses based on increased corporate earnings); *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) (holding that plaintiff failed to plead motive based upon allegations that defendants were motivated to protect lucrative executive compensation agreements); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that plaintiffs failed to plead motive based upon allegations that defendants sought to increase the company's stock price to increase their personal compensation because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions").[12]

Here, moreover, Plaintiffs' argument is logically inconsistent. It posits that ARCP insiders engaged in a scheme to artificially inflate ARCP's share price so that they could then be compensated by greater numbers of those artificially inflated shares. Yet, the Amended Complaint contains no allegation that any Defendant sold his or her shares at a profit. *See ECA*, 553 F.3d at 198 (dismissing complaint alleging motive based on inflation of stock price where there was no allegation that insiders sold their shares for a profit).

---

[12]     Even if it were permissible for Plaintiffs to establish motive through Defendants' purported desire to increase officer compensation—which it is not—the only particularized allegations in the Amended Complaint regarding officer compensation are those relating to the OPP. (¶¶ 105-10). By Plaintiffs' own allegations, the OPP was not adopted until October 2013, (¶ 108), and the OPP therefore could not serve as a motive for allegedly false statements made prior to that date.

Finally, Plaintiffs fail to adequately allege motive based upon their generalized allegations regarding Defendants' purported desire to generate related-party transaction fees. First, as to Defendants Beeson, Kay, McAlister, and Nemer, who are not even alleged to have had interests in the related entities, Plaintiffs have alleged **no** facts detailing how these individuals benefitted from related-party transactions. Accordingly, Plaintiffs have not demonstrated how related-party transaction fees could possibly serve as a motive for these individuals.

Second, as to Defendants Schorsch and Block, Plaintiffs allege only that ARCP paid certain fees to ARC Advisors and RCS Securities, and that ARC Advisors and RCS Securities were "directly or indirectly owned and/or controlled by" Schorsch and Block (among others). (¶¶ 38-39, 100). Plaintiffs simply rely on the conclusory allegations that ARC Advisors and RCS Securities received payments, but offer no particularized facts describing what personal benefit, if any, Schorsch and Block received from those transactions. It is settled law that, where a plaintiff seeks to plead scienter through allegations that the defendant benefitted from the purported fraud, the "concrete and personal" benefit must *flow from* the purported fraud. *See ECA*, 553 F.3d at 201 & n.6 (plaintiffs must allege a "unique connection between the fraud and the [benefit]"); *Glaser*, 772 F. Supp. 2d at 586 ("[T]he particular fraud alleged must specifically enable the schemes or business plans plaintiffs contend conferred concrete and personal benefits on the defendants."). A plaintiff cannot, as here, simply allege that a defendant received a benefit without linking that benefit to the alleged fraud. *See Glaser*, 772 F. Supp. 2d at 591 (rejecting argument that allegations of "related party transactions" create an inference of scienter because the plaintiffs "merely list[] the transactions without articulating any connection [with the fraud] whatsoever").

25

Plaintiffs have failed to allege facts showing that any of the challenged fees were related to the alleged inflation of AFFO.  For example, Plaintiffs point to $176 million in "subordinated distribution fees" triggered by ARCP's acquisition of two non-traded REITs, ARCT III and ARCT IV, and allegedly paid to "ARCP insiders and their affiliates" as evidence of a "scheme" to sell ARCP securities "at artificially inflated levels."  (¶ 7.)  These "subordinated distribution fees," however, were not based upon the price of ARCP's securities.  Rather, they were payable because the purchase prices of ***ARCT III*** and ***ARCT IV*** were high enough to meet certain performance hurdles for ***those entities*** (*i.e.*, return to investors of their initial investment plus additional distributions) – not ARCP.  (*See* Ex. D at 76, 81, F-22, F-70-71; Ex. H at viii, 138; Ex. I at v, Appendix II-46.)  Thus, Plaintiffs have not alleged facts showing any link between the purported scheme to inflate the value of ***ARCP's securities*** and the subordinated distribution fees that are linked to the value of ***ARCT III and ARCT IV***.  Similarly, there are no facts linking the "$333 million in 'commissions and fees'" challenged by Plaintiffs, (¶ 7) to the alleged inflation of AFFO.  Rather, those commissions and fees were paid during the initial offerings of ARCT III and ARCT IV before they were acquired by ARCP.  (Ex. D at F-67.)  This failure to allege a connection between the benefits allegedly received by Defendants and the allegations of a fraudulent scheme pervades Plaintiffs' Amended Complaint.[13]

Because Plaintiffs have failed to plead motive as to the individual Defendants with respect to statements they made before 2014, and because their motive allegations rely entirely on the acts of the individual Defendants, Plaintiffs necessarily fail to plead motive as to

---

[13]      In addition to failing to adequately allege that related-party transaction fees served as a motive before 2014, Plaintiffs do not even attempt to allege that such a motive existed prior to December 17, 2012—the date of the announcement of the first alleged related-party transaction, the ARCT III merger.  "[A]s with the other scienter pleading requirements, mere conclusory allegations connecting fraud to benefits for purposes of motive are insufficient." *Glaser*, 772 F. Supp. 2d at 587 (citation and internal quotation marks omitted).

ARCP and ARCP OP.[14]  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

## III.   ALLEGEDLY MISLEADING FORWARD-LOOKING STATEMENTS ARE PROTECTED UNDER THE PSLRA SAFE HARBOR

The Amended Complaint includes multiple claims premised on earnings projections and plans for future growth that were made by ARCP.  Under the PSLRA safe harbor, a forward-looking statement will not give rise to liability under the securities laws if it is either (i) identified as such and accompanied by meaningful cautionary language, *or* (ii) made without actual knowledge that the statement is false or misleading.  15 U.S.C. § 78u–5(c)(1); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).[15]  This safe harbor precludes both Plaintiffs' 1934 Act claims (Sections 10(b) and 14(a)) and their 1933 Act claims (Sections 11 and 12) premised on ARCP's forward-looking statements.  *See In re Sanofi Sec. Litig.*, 2015 WL 365702, at *14 (S.D.N.Y. Jan. 28, 2015) ("The PSLRA amended both the Securities Act and the Exchange Act to provide a safe harbor for forward-looking statements.") (citing 15 U.S.C. § 77z–2 (1933 Act); 15 U.S.C. § 78u–5(e) (1934 Act)).

The first step in evaluating whether a statement qualifies for safe harbor protection is whether the statement was forward-looking.  The PSLRA includes a non-exhaustive

---

[14]    Plaintiffs fail to plead motive as to ARCP OP for another reason.  The only alleged misstatement attributed to ARCP OP is with respect to the September 2014 offering of senior notes.  (¶¶ 312, 392, 405).  However, the Amended Complaint contains no allegation that related-party transaction fees were paid in connection with this offering.  And, as discussed previously, Plaintiffs' motive allegations regarding the Company's "faltering financial performance" and purported desire to increase executive compensation are plainly inadequate.  Accordingly, Plaintiffs' motive allegations fail as to ARCP OP.

[15]    Forward-looking statements accompanied by adequate cautionary language are also not actionable under the "bespeaks caution" doctrine because no reasonable investor could have found the statements materially misleading.  *Rombach*, 355 F.3d at 173; *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

list of types of statements that could qualify as forward-looking.  15 U.S.C. § 78u-5(i)(1).  Here, the statements about ARCP's AFFO projections and earnings growth that are challenged in the Amended Complaint are classic forward-looking statements under the safe harbor.  *See* 15 U.S.C. § 78u-5(i)(1) (defining forward-looking statements as, *inter alia*, "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items" and "statement[s] of future economic performance").

So too, ARCP's statements regarding its plans and objectives for future operations, including acquisitions, qualify for safe-harbor protection as "forward-looking statements."  *See* 15 U.S.C. § 78u–5(i)(1) (defining forward-looking statements as, *inter alia*, "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *11 (S.D.N.Y. June 23, 2004) (stating that earnings forecasts were forward-looking statements); *Backhaus v. Streamedia Commc'ns, Inc.*, 2002 WL 1870272, at *4 (S.D.N.Y. Aug. 14, 2002) (statements based on company's current ideas and strategies for future growth and development were forward-looking statements).

The next step in evaluating whether a statement qualifies for safe harbor protection is to determine whether the statement was either (i) identified as forward-looking and was accompanied by meaningful cautionary language *or* (ii) was made without actual, contemporaneous knowledge of the alleged reasons the statement was false.  *Slayton*, 604 F.3d at 766.  As discussed below, at a minimum, those statements made prior to ARCP's announcement of its financial results for Q1 of 2014 qualify for safe harbor protection under either approach.

### 1. Plaintiffs Fail To Adequately Allege That Defendants Had Actual Knowledge Of The Falsity Of Forward-Looking Statements Made In 2011, 2012, Or 2013

"Because the PSLRA safe harbor specifies an 'actual knowledge' standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact.  Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."  *Slayton*, 604 F.3d at 773 (citation and internal quotation marks omitted).  As discussed above, Plaintiffs' allegations fail to meet the pleading standard for representations about current facts for reporting periods prior to 2014.  *A fortiori*, those allegations fail to meet the more demanding pleading standard imposed by the PSRLA for forward-looking statements.

### 2. Defendants' Forward-Looking Statements Were Identified As Such and Accompanied By Meaningful Cautionary Language

Consistent with the statute's requirements, ARCP's statements about its projections and future growth plans were explicitly identified as forward-looking.  (*See*, *e.g.*, Ex. J (May 6, 2013 Press Release stating "statements in this press release that are not historical facts may be forward-looking statements" and that "[t]he words 'anticipates,' 'believes,' 'expects,' 'estimates,' 'projects,' 'plans,' 'intends,' 'may,' 'will,' 'would,' and similar expressions are intended to identify forward-looking statements")); *Slayton*, 604 F.3d at 769 ("[T]he use of linguistic clues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement.").

Each of ARCP's forward-looking statements also was accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u–5(c)(1)(A)(i).

Under the safe harbor, cautionary language is "meaningful" when it identifies important factors that could cause results to differ materially; but the cautionary language need not identify *all* such factors.  *Slayton*, 604 F.3d at 771.  Indeed, to obtain safe harbor protection, a company "need not include the particular factor that ultimately causes its projection not to come true . . . ."  *Id.* at 773.  Rather, the cautionary statements must "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business."  *Id.* at 771 (citation and internal quotation marks omitted).  Here, as reflected in more detail in Appendix A attached hereto, each forward-looking statement was accompanied by cautionary language identifying important risk factors that could cause actual results to differ materially from those in the forward-looking statement.

For example, the May 28, 2013 press release relating to the announcement of the CapLease merger stated that "estimates of growth, including FFO and AFFO," were forward-looking statements, and that the following factors "could cause actual results to differ from those set forth in the forward-looking statements":

> (1) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement; (2) the inability to complete the proposed merger due to the failure to obtain CapLease stockholder approval for the merger or the failure to satisfy other conditions to completion of the merger, including that a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the merger; (3) risks related to disruption of management's attention from the ongoing business operations due to the transaction; (4) the effect of the announcement of the proposed merger on CapLease's or ARCP's relationships with its customers, tenants, lenders,

> operating results and business generally; (5) the outcome of any legal
> proceedings relating to the merger or the merger agreement; and (6) risks
> to consummation of the merger, including the risk that the merger will not
> be consummated within the expected time period or at all.

Ex. K.  This cautionary language identifies a number of specific contingencies that could cause

ARCP's actual results to differ from its projections.  The substantive information conveyed in

the disclosure goes well beyond what courts require to consider cautionary language

"meaningful."  *See, e.g., In re Avon Products, Inc. Sec. Litig.*, 2009 WL 848017, at *18

(S.D.N.Y. Feb. 23, 2009) (holding that cautionary language regarding "general economic and

business conditions in [Avon's] markets," "[Avon's] ability to implement its business

strategies," "[Avon's] ability to achieve anticipated cost savings and its profitability and growth

targets" and "[Avon's] ability to successfully identify new business opportunities" was sufficient

under the cautionary language prong of the PSLRA safe harbor), *report and recommendation

adopted*, 2009 WL 884687, at *1 (S.D.N.Y. Mar. 30, 2009); *In re Sturm, Ruger & Co., Inc. Sec.

Litig.*, 2011 WL 494753, at *6 (D. Conn. Feb. 7, 2011) (same for cautionary language regarding

company's "market demand" and "sales levels"); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.

Supp. 2d 574, 586 (S.D.N.Y. 2007) (same for cautionary language regarding "competition from

others" and "the risk that IAC's businesses will not be integrated successfully").

> Indeed, some of the cautionary language accompanying the challenged forward-

looking statements identified the very contingency that led to ARCP's restatements of its results

in March 2015.  For example, the section titled "Risk Factors" in ARCP's 10-Ks for 2011 and

2012 and 10-Qs for 2012 and 2013 stated:

> ***If we fail to implement proper overall business controls***, . . . ***our results
> of operations could be harmed*** . . . .  In addition, ***if we identify significant
> deficiencies or material weaknesses in our internal control over
> financial reporting*** . . . investors and others may lose confidence in the

reliability of our financial statements and **the trading price of our
common stock . . . could suffer**.

Furthermore, the design and effectiveness of our disclosure controls and
procedures and internal control over financial reporting **may not prevent
all errors, misstatements, or misrepresentations**.  Although management
will continue to review the effectiveness of our disclosure controls and
procedures and internal control over financial reporting, **there can be no
guarantee that our internal control over financial reporting will be
effective in accomplishing all control objectives all of the time**.
Deficiencies, including any material weaknesses, in our internal control
over financial reporting which may occur in the future **could result in
misstatements of our results of operations, restatements of our financial
statements, a decline in the trading price of our common stock**, or
otherwise materially adversely affect our business, reputation, results of
operations, financial condition, or liquidity.[16]

As noted above, safe harbor protection does not require that an issuer identify the specific risk

that ultimately turns out to undermine the forward-looking statement.  Where an issuer has done

so, however, the safe harbor standard is easily met.  *See NECA-IBEW Health & Welfare Fund v.
Pitney Bowes Inc.*, 2013 WL 1188050, at *21 (D. Conn. Mar. 23, 2013) (forward-looking

statements were protected where cautionary language in the company's Form 10-K "specifically

addresse[d] the problem areas which Plaintiff alleges to be [the company's] downfall"); *Gissin v.
Endres*, 739 F. Supp. 2d 488, 508 (S.D.N.Y. 2010) (forward-looking statements in press release,

conference call, and SEC filings were protected where cautionary language in company's 10-Ks

and 10-Qs "directly acknowledged the very risks plaintiffs fault for their losses"); *In re Nokia
Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 401-02 (S.D.N.Y. 2006) (forward-looking

---

[16]    This cautionary language appeared in ARCP's 10-Ks for the fiscal years ended December 31, 2011, and
December 31, 2012, and was incorporated by reference in ARCP's 10-Qs for each of its fiscal quarters through
2013.  Exs. L-S.  These cautionary statements, like all the others detailed in Appendix A, are deemed to
"accompany" the forward-looking statements described in the Amended Complaint for purposes of the PSLRA safe
harbor and bespeaks caution doctrine.  Because Plaintiffs rely on the "fraud on the market" presumption of reliance
(*see* ¶¶ 367-68), "[D]efendants' cautionary statements 'must be treated as if attached to every one of its oral and
written statements.'"  *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *13 & n.10 (E.D.N.Y. 2005) (citing
*Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 732 (7th Cir. 2004) (Easterbrook, J.)) ("Because the fraud-on-the-market
theory presumes that the stock market is informationally efficient and defendants' false statements are reflected in
the price of [the] stock, the plaintiffs must implicitly concede that the price of [the] stock also reflected all publicly
available cautionary statements."); *see also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 280 (S.D.N.Y. 2006)
(same).

statements in conference call were protected under the PSLRA safe harbor where cautionary language in the company's Form 20-F "specifically warned" investors about the risk that plaintiffs alleged had materialized). Accordingly, Plaintiffs' Section 10(b) and 14(a) claims under the 1934 Act, and their Section 11 and 12 claims under the 1933 Act, should be dismissed to the extent they rely on forward-looking statements made prior to ARCP's announcement of its financial results for Q1 of 2014.

## IV.   PLAINTIFFS' "CONTROL PERSON" CLAIMS SHOULD BE DISMISSED

Plaintiffs' Section 20(a) and Section 15 "control person" claims should also be dismissed for alleged misstatements pertaining to fiscal years 2011, 2012 and 2013, and for errors in Q1 and Q2 of 2014 not disclosed in the October 29 Disclosure.

To state a claim under Section 20(a) of the 1934 Act, a plaintiff must allege (1) a primary violation, (2) control of the primary violator by the defendant, and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108.  Similarly, to state a claim under the 1933 Act's parallel control person provision, Section 15, a plaintiff must allege (1) a primary violation, (2) control of the primary violator by the defendant, and (3) according to the better-reasoned decisions in this Circuit, culpable participation by the controlling person.  *In re Sec. Capital Assur. Ltd. Sec. Litig.*, 2011 WL 4444206, at *7 (S.D.N.Y. Sept. 23, 2011) (Batts, J.); *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (Rakoff, J.); *Ladmen Partners, Inc. v. Globalstar, Inc.*, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (Preska, J.); *P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 355 F.3d 92 (2d Cir. 2004); *DeMaria v. Andersen*, 153 F.

Supp. 2d 300, 314 (S.D.N.Y. 2001) (Pauley, J.); *Ellison v. American Image Motor Co.*, 36 F.

Supp. 2d 628, 642 (S.D.N.Y. 1999) (Chin, J.).[17]

   The control person claims should be dismissed for two reasons.  First, because

Plaintiffs fail to plead a primary violation for alleged misstatements that pre-date the Q1 2014

filing, and for misstatements regarding accounting errors not identified in the October 29

Disclosure, their Section 20(a) claims should be dismissed for those same misstatements.

Similarly, to the extent Plaintiffs' Section 15 claims are based on forward-looking statements in

filings before the first quarter of 2014, they should be dismissed because Plaintiffs have failed to

allege primary violations with respect to those forward-looking statements.

   The Section 20(a) and Section 15 claims should also be dismissed for the pre-

2014 misstatements and errors not identified in the October 29 Disclosure because Plaintiffs do

not allege facts showing that any Defendant culpably participated in the alleged fraud.  To

establish culpable participation, Plaintiffs must allege "particularized facts of the controlling

person's conscious misbehavior or recklessness."  *In re Satyam Comp. Servs.*, 915 F. Supp. 2d at

482-83 (citation omitted); *see also Special Situations Fund III, QP LP* v. *Deloitte Touche*

*Tohmatsu CPA Ltd.*, 33 F. Supp. 3d 401, 437-38 (S.D.N.Y. 2014) (holding that culpable

participation "must be pleaded with the same particularity as scienter").  Plaintiffs do not allege

particularized facts demonstrating any Defendant's conscious misbehavior or recklessness for

alleged misstatements prior to the filing of ARCP's Q1 2014 10-Q or for errors not identified in

the October 29 Disclosure for the same reasons as set forth with respect to the failure to plead

scienter for purposes of the Section 10(b) claim.

---

[17] *But see In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (not requiring culpable
participation under Section 15).  The Second Circuit has left open the question of whether a plaintiff alleging a
Section 20 claim must also demonstrate "culpable participation" by the alleged controlling person for purposes of
Section 15.  *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that Plaintiffs' Section 10(b) claim and control person liability claims (Counts Three, Five and Six) be dismissed as to conduct that pre-dates the first quarter of 2014 or relates to errors not disclosed on October 29, 2014, and that Plaintiffs' Section 14(a) claim (Count Four) be dismissed in its entirety, on the grounds that Plaintiffs have failed to adequately plead scienter, culpable participation and/or loss causation for those misstatements.  Additionally, Defendants respectfully request that Plaintiffs' Section 11 and 12 claims under the 1933 Act (Counts One and Two), their Section 10(b) and 14(a) claims under the 1934 Act (Counts Four and Five), and their control person liability claims under Section 15 of the 1933 Act and Section 20(a) of the 1934 Act (Counts Three and Six) based on those primary violations be dismissed to the extent they rely on forward-looking statements for the period that pre-dates 2014.  Finally, to the extent that the arguments advanced by the other defendants apply to Defendants, Defendants respectfully request dismissal on those grounds.

Dated:   May 29, 2015
       New York, New York

Respectfully submitted,

_____/s/_____

MILBANK, TWEED, HADLEY & McCLOY LLP
Scott A. Edelman
George S. Canellos
Antonia M. Apps
Jed M. Schwartz
1 Chase Manhattan Plaza
New York, NY  10005
Telephone: 212-530-5000

*Counsel for American Realty Capital Properties, Inc., ARC Properties Operating Partnership, L.P., American Realty Capital Trust III, Inc., American Realty Capital Trust IV, Inc., and Cole Real Estate Investments, Inc.*