# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re AMERICAN REALTY CAPITAL PROPERTIES, INC. LITIGATION | Civil Action No. 1:15-mc-00040-AKH |
| | CLASS ACTION |
| This Document Relates To:<br>ALL ACTIONS. | |
| ARCHER CAPITAL MASTER FUND, L.P., et al., | Civil Action No. 1:16-cv-05471-AKH |
| Plaintiffs, | |
| vs.<br>AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |
| ATLAS MASTER FUND, LTD., et al. | Civil Action No. 1:16-cv-05475-AKH |
| Plaintiffs, | |
| vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |

[Caption continued on following page.]

| | |
|---|---|
| BLACKROCK ACS US EQUITY TRACKER FUND, et al., | Civil Action No. 1:15-cv-08464-AKH |
|         Plaintiffs, | |
|   vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
|         Defendants. | |

| | |
|---|---|
| CLEARLINE CAPITAL PARTNERS LP, et al., | Civil Action No. 1:15-cv-08467-AKH |
|         Plaintiffs, | |
|   vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
|         Defendants. | |

| | |
|---|---|
| HG VORA SPECIAL OPPORTUNITIES MASTER FUND, LTD., | Civil Action No. 1:15-cv-04107-AKH |
|         Plaintiff, | |
|   vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
|         Defendants. | |

[Caption continued on following page.]

| | |
|---|---|
| JET CAPITAL MASTER FUND, L.P., et al., | Civil Action No. 1:15-cv-00307-AKH |
| Plaintiffs, | |
| vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |
| PENTWATER EQUITY OPPORTUNITIES MASTER FUND LTD., et al., | Civil Action No. 1:15-cv-08510-AKH |
| Plaintiffs, | |
| vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |
| PIMCO FUNDS:  PIMCO DIVERSIFIED INCOME FUND, et al., | Civil Action No. 1:15-cv-08466-AKH |
| Plaintiffs, | |
| vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |

[Caption continued on following page.]

| | |
|---|---|
| TWIN SECURITIES, INC., et al., | Civil Action No. 1:15-cv-01291-AKH |
| Plaintiffs, | |
| vs. | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| JOANNE WITCHKO, Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL PROPERTIES, INC., | Lead Case No. 1:15-cv-06043-AKH (Consolidated w/Case No. 15-cv-08563-AKH) |
| Plaintiff, | |
| vs. | |
| NICHOLAS S. SCHORSCH, et al., | |
| Defendants, | |
| – and – | |
| AMERICAN REALTY CAPITAL PROPERTIES, INC., | |
| Nominal Defendant. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF ARCP DEFENDANTS' MOTION FOR PROTECTIVE ORDER WITH RESPECT TO INVESTIGATION MATERIALS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    The Audit Committee's Internal Investigation ........................................3

    B.    The October 29, 2014 Disclosure ...........................................................5

    C.    Teneo's Work on Behalf of Weil ...........................................................6

    D.    Commencement of Civil Litigation and Regulatory Investigations .......................7

    E.    Continuation of the Internal Investigation and the Restatement of ARCP's Financial Statements ...........................................................................8

    F.    Grant Thornton's Role ...........................................................................8

    G.    Documents Over Which ARCP Has Claimed Privilege .........................9

        1.    ARCP Documents .......................................................................9

        2.    Weil and E&Y Documents ......................................................... 9

        3.    Teneo Documents ..................................................................... 10

        4.    Grant Thornton Documents ...................................................... 10

ARGUMENT ............................................................................................................... 10

I.    APPLICABLE LEGAL PRINCIPLES........................................................... 10

    A.    The Court Has Broad Discretion to Issue a Protective Order. ...............10

    B.    Attorney-Client Privilege.....................................................................11

    C.    Work Product Protection.......................................................................14

II.    DISCUSSION ................................................................................................ 18

    A.    The Weil and Audit Committee Materials Are Protected by the Attorney-Client Privilege and the Work Product Doctrine. ...................................18

        1.    The Materials Are Protected by the Attorney-Client Privilege. ............... 18

        2.    The Materials Are Protected by the Work Product Doctrine.................... 19

B.   The E&Y Documents Are Protected By the Attorney-Client Privilege and Work Product Doctrine. .........................................................................21

C.   Documents Prepared by, and Communications With, Teneo Are Also Protected By the Attorney-Client Privilege and Work Product Doctrine..............24

D.   ARCP Did Not Waive Work Product Protection With Respect to Documents Shared with Grant Thornton. ............................................25

CONCLUSION ...........................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Irish Banks v. Bank of America*,
  240 F.R.D. 96 (S.D.N.Y. 2007) ....................................................................21

*Banneker Ventures, LLC v. Graham*,
  2017 WL 2124388 (D.D.C. May 16, 2017) .................................................11

*Deangelis v. Corzine*,
  2015 WL 585628 (S.D.N.Y. Feb. 9, 2015) ..................................................22

*Fitzpatrick v. Am. Int'l Grp., Inc.*,
  2011 WL 335672 (S.D.N.Y. Jan. 28, 2011) ...........................................23, 24

*Florentia Contracting Corp. v. Resolution Tr. Corp.*,
  1993 WL 127187 (S.D.N.Y. Apr. 22, 1993) ...........................................14, 23

*Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*,
  2003 WL 21998674 (S.D.N.Y. Aug. 25, 2003) ...........................................25

*Hickman v. Taylor*,
  329 U.S. 495 (1947) .....................................................................................29

*In re Cardinal Health, Inc., Sec. Litig.*,
  2007 WL 495150 (S.D.N.Y. Jan. 26, 2007) ................................................23

*In re Copper Mkt. Antitrust Litig.*,
  200 F.R.D. 213 (S.D.N.Y. 2001) ............................................................15, 25

*In re Gen. Motors LLC Ignition Switch Litig.*,
  80 F. Supp. 3d 521 (S.D.N.Y. 2015) .................................................... *passim*

*In re Grand Jury Subpoena Dated Dec. 19, 1978*,
  599 F.2d 504 (2d Cir. 1979) ..................................................................13, 19

*In re Grand Jury Subpoenas Dated June 5, 2008*,
  329 F. App'x 302 (2d Cir. 2009) ..................................................................15

*In re Grand Jury Subpoenas Dated March 24, 2003*,
  265 F. Supp. 2d 321 (S.D.N.Y. 2003) ..........................................................25

*In re JDS Uniphase Corp. Sec. Litig.*,
  2006 WL 2850049 (N.D. Cal. Oct. 5, 2006) ................................................27

*In re Kellogg Brown & Root, Inc.*,
   756 F.3d 754 (D.C. Cir. 2014) ......................................................................14, 19

*In re Veeco Instruments, Inc. Sec. Litig.*,
   2007 WL 724555 (S.D.N.Y. Mar. 9, 2007) ........................................... *passim*

*In re Weatherford Int'l Sec. Litig.*,
   2013 WL 12185082 (S.D.N.Y. Nov. 5, 2013) .............................................21, 26

*Int'l Design Concepts, Inc. v. Saks Inc.*,
   2006 WL 1564684 (S.D.N.Y. June 6, 2006) .....................................................27

*Medinol, Ltd. v. Boston Scientific Corp.*,
   214 F.R.D. 113 (S.D.N.Y. 2002) ................................................................26, 30

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
   229 F.R.D. 441 (S.D.N.Y. 2004) ......................................................... 27, 28, 30

*Patel v. L-3 Commc'ns Holdings, Inc.*,
   2016 WL 4030704 (S.D.N.Y. July 25, 2016) ....................................... *passim*

*Perino v. Edible Arrangements Int'l, Inc.*,
   2015 WL 1442737 (D. Conn. March 27, 2015) .................................................23

*Roseman v. Bloomberg L.P.*,
   2016 WL 3866375 (S.D.N.Y. June 17, 2016) ...................................................11

*Schaeffler v. United States*,
   806 F.3d 34 (2d Cir. 2015) ...............................................................................15

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984) ............................................................................................10

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   2008 WL 199537 (S.D.N.Y. Jan. 22, 2008) .....................................................11

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) .............................................................. *passim*

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) .............................................................26, 28, 29

*United States v. Kovel*,
   296 F.2d 918 (2d Cir. 1961) ................................................................. *passim*

*United States v. Nobles*,
   422 U.S. 225 (1975) ..........................................................................................15

*United States v. Schwimmer,*
   892 F.2d 237 (2d Cir. 1989)...........................................................................14

*Upjohn Co. v. United States,*
   449 U.S. 383 (1981)................................................................................ *passim*

*Vacco v. Harrah's Operating Co.,*
   2008 WL 4793719 (N.D.N.Y. Oct. 29, 2008) ..............................................26, 27

*Wells Fargo & Co. v. United States,*
   2013 WL 2444639 (D. Minn. June 4, 2013).......................................................27

*In re Woolworth Corp. Sec. Class Action Litig.,*
   1996 WL 306576 (S.D.N.Y. June 7, 1996) ................................................ *passim*

## Other Authorities

Fed. R. Civ. P. 26(b)(3)(A) ..........................................................................14, 15

Fed. R. Civ. P. 26(c) ...........................................................................................10

Pursuant to the Court's Order dated May 18, 2017, Defendants American Realty Capital Properties, Inc. ("ARCP" or the "Company") and ARC Properties Operating Partnership, L.P. ("ARCP OP") (collectively, the "ARCP Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their motion for a protective order with respect to Plaintiffs' request for the production of documents relating to the internal investigation conducted by ARCP's Audit Committee with the assistance of the law firm Weil, Gotshal & Manges LLP. *See* Dkt. No. 391 (May 18, 2017); May 16, 2017 Hearing Tr. at 56:2-58:22.[1]

## PRELIMINARY STATEMENT

Following its receipt of a whistleblower email from an ARCP employee raising concerns regarding certain accounting practices, ARCP's Audit Committee promptly retained the law firm Weil, Gotshal & Manges LLP ("Weil") to assist the Audit Committee in conducting an internal investigation of the alleged misconduct and to provide legal advice. Based on the nature and source of the allegations in the whistleblower email, Weil anticipated regulatory investigations and civil litigations, and it conducted its investigation in a manner that took account of the prospect of such investigations and civil litigations.

Plaintiffs filed this putative class action the day after the Audit Committee's announcement of the preliminary findings of the investigation, which identified certain errors in ARCP's financial statements. Since commencing this litigation, Plaintiffs have received more than 3 million pages of documents from the ARCP Defendants alone. The ARCP Defendants have asserted privilege over documents related to the internal investigation (the "Investigation Materials"), representing a small fraction of the documents produced to Plaintiffs to date. The Investigation Materials fall broadly into three categories: (1) materials prepared by Weil and communications between Weil

---

[1] All docket references are to No. 15-mc-00040-AKH, unless otherwise noted.

and the Audit Committee and/or ARCP employees in furtherance of the investigation; (2) materials prepared by Ernst & Young LLP ("E&Y"), which was retained by Weil to provide forensic accounting services to assist Weil in conducting its investigation, as well as materials prepared by Teneo Strategy LLC ("Teneo"), a public relations firm hired by Weil to assist it in rendering legal advice to the Audit Committee regarding communications with the public and media in connection with the investigation; and (3) input and information provided by ARCP's outside auditor, Grant Thornton LLP, to Weil and E&Y in connection with the investigation, or materials prepared by Weil and/or E&Y that were provided to Grant Thornton in connection with the investigation.

The Court should enter a protective order preventing discovery of the Investigation Materials. The Investigation Materials are protected by the attorney-client privilege under *Upjohn Co. v. United States*, 449 U.S. 383 (1981), because they reflect confidential communications in furtherance of an investigation led by counsel. They are also protected from disclosure under the work product doctrine, as they were prepared "'because of' existing or expected litigation," *United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1998), given the likelihood that the issues under investigation would (and, in fact, did) result in civil litigation and regulatory investigations. That the Audit Committee might have conducted an investigation to determine whether to restate the Company's financial statements even in the absence of the threat of litigation is irrelevant: "the fact that some or even all of the documents at issue were created in part to ensure that [the company's] public disclosures were accurate does not remove them from the ambit of work product protection under *Adlman*." *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 724555, at *8 (S.D.N.Y. Mar. 9, 2007).

Moreover, under well-settled law, Investigation Materials reflecting communications with E&Y are also protected from disclosure by the attorney-client privilege. *United States v. Kovel*,

296 F.2d 918, 922 (2d Cir. 1961).  Under *Kovel*, the privilege also extends to communications with Teneo because Teneo assisted Weil in providing legal advice to the Audit Committee. Additionally, documents prepared by E&Y and Teneo are also protected work product because they were prepared in anticipation of litigation.

Finally, the Audit Committee did not waive work product protection with respect to communications between Weil and/or E&Y and Grant Thornton, either in connection with obtaining input and information from Grant Thornton so as to be able to conduct its investigation, or by providing documents to Grant Thornton.  As most courts have recognized, disclosure to an auditor does not waive work product protection, and the Audit Committee and Grant Thornton did not have the adversarial relationship required to effect a waiver—to the contrary, they coordinated on the appropriate scope of the investigation in furtherance of their common interest in uncovering the facts behind the whistleblower's allegations.

## BACKGROUND

### A.    The Audit Committee's Internal Investigation

On September 7, 2014, ARCP's auditor, Grant Thornton, alerted the lead independent director of ARCP's Audit Committee, Leslie Michelson, to an email sent by an ARCP employee to Grant Thornton the previous day raising concerns regarding accounting practices and other matters at ARCP.  (Garcia Decl. ¶ 4.)[2]  Specifically, the employee's email alleged that ARCP had improperly accounted for its bonus accrual in the first and second quarters of 2014; that ARCP's reported AFFO in Q2 2014 did not properly take account of non-controlling interests (in attempting to fix an error in reported AFFO for Q1 2014); that there may have been some incorrect

---

[2] "Garcia Decl." refers to the Declaration of Christopher L. Garcia, dated June 27, 2017, filed herewith.  Mr. Garcia is a partner with Weil who was one of the attorneys leading the investigation it conducted on behalf of the Audit Committee.

"judgments" about the way in which expenses were moved from general and administrative expenses to merger-related expenses in Q1 2014; that the expenses billed to ARCP for services rendered by other Nicholas Schorsch-controlled entities—AR Capital, LLC and RCS Capital, LLC—"don't feel right" as there was insufficient support for them; and that ARCP had spent too much money on office space for Schorsch and Brian Block in a building in Rhode Island called the "Audrain" building, which did not "feel right."  (Garcia Decl., Ex. A.)[3]  The ARCP employee who sent the email had familiarity with ARCP's accounting and access to ARCP accounting information.  (Garcia Decl. ¶ 4.)

The Audit Committee took immediate steps to address the concerns raised by the whistleblower.  On or about September 9, 2014, the Audit Committee retained Weil to assist the Audit Committee in conducting an internal investigation of the alleged misconduct and provide legal advice to the Audit Committee in connection therewith.  (*Id.* ¶ 5.)  Based on the nature and source of the allegations in the whistleblower email, Weil anticipated civil litigations and regulatory investigations arising from the allegations, and conducted its investigation in a manner to take account of the prospect of such civil litigations and regulatory investigations.  (*Id.* ¶ 6.)  Indeed, Weil conducted the investigation in the manner that it did, and the materials generated in connection with the investigation were prepared in the manner that they were, because of the prospect of such litigations and investigations.  (*Id.*)

In light of the complex accounting issues raised by the whistleblower's allegations, Weil retained E&Y to provide forensic accounting services in connection with Weil's representation of the Audit Committee.  (*Id.* ¶ 7; Garcia Decl., Ex. B at 1.)  The Statement of Work attached to the

---

[3] The employee continued: "[t]hen there's the stupid stuff.  Immaterial passed adjustments – the instruction is to book the pickups and to pass on the hits to earnings."  (Garcia Decl., Ex. A.)  The employee also complained about "tone at the top."  (*Id.*)

engagement letter between Weil and E&Y provided that E&Y would provide the services "in connection with [Weil's] provision of legal advice to the Audit Committee of ARCP with respect to a matter that involves an internal investigation as a result of whistleblower allegations" and acknowledged that the services would be performed "under [Weil's] direction." (Garcia Decl., Ex. B, Statement of Work ("SOW") at 1.) The Statement of Work expressly recognized the possibility of litigation or regulatory investigations relating to the internal investigation, requiring Weil to notify E&Y of "any suit in connection with" the subject matter of the investigation and allowing the parties to extend the agreement "[i]f a regulatory inquiry or civil litigation [was] initiated relating to the [m]atter during [the] period" of the agreement. (*Id.* at 1-2.) The Statement of Work "acknowledge[d] [Weil's] belief that the Services and Reports, or portions thereof, are or may be protected from disclosure by the attorney-client privilege, work product protection, or both," and stated that "[a]ccordingly, we shall treat our communications, work product and documentation (including the Reports) arising out of or relating to the Services in a manner consistent with the maintenance of any such privilege or protection[.]" (*Id.* at 1.) Pursuant to the agreement, documents and communications generated by E&Y or shared with E&Y during the investigation were kept confidential. (Garcia Decl. ¶ 8.)

With the assistance of E&Y, Weil began reviewing documents, communicating with ARCP employees, and conducting witness interviews. (*Id.* ¶ 9.) Throughout the investigation, which continued to March 2015, Weil provided regular oral updates to the Audit Committee regarding its findings and conclusions and continued to provide legal advice to the Audit Committee as to the appropriate steps to take with respect thereto. (*Id.* ¶ 10.)

## B.    The October 29, 2014 Disclosure

On October 28, 2014, Weil notified the U.S. Securities and Exchange Commission ("SEC") that ARCP planned to make a public disclosure the following day. (*Id.* ¶ 11.)

On October 29, 2014, ARCP filed a Form 8-K with the SEC (the "October 2014 Disclosure") announcing the Audit Committee's conclusion, based on the preliminary findings of its investigation, that ARCP had made errors in its calculation of AFFO for the first and second quarters of 2014 and, as a result, had overstated AFFO for these periods. (Garcia Decl., Ex. C.) The October 2014 Disclosure also indicated that the investigation was ongoing as "the Audit Committee ha[d] expanded its investigation to encompass the Company's audited consolidated financial statements for the fiscal year ended December 31, 2013." (*Id.*) The October 2014 Disclosure further announced that following completion of the internal investigation, ARCP would restate its financial statements "to the extent required." (*Id.*)

### C.      Teneo's Work on Behalf of Weil

Shortly before the October 29, 2014 public announcement of the preliminary findings, on or about October 27, 2014, Weil entered into an agreement on behalf of the Audit Committee with Teneo, under which Teneo agreed to provide advisory and strategic communications services in connection with the announcement and its aftermath. (Garcia Decl. ¶ 13; Garcia Decl., Ex. D at 1.) Specifically, Teneo was retained to manage ARCP's relations with the media and public in light of the applicable factual and legal framework, with the understanding that any statements by the Company might be used against the Company in future litigation. (Garcia Decl. ¶ 14.) Among other things, Teneo drafted and commented on statements for public release and talking points for internal dissemination within ARCP, and engaged in communications with Weil and the Audit Committee in this regard. (*Id.*) Weil's agreement with Teneo provided that Weil was "engag[ing] [Teneo] as [Weil's] agents in connection with [Weil's] provision of legal services to the Audit Committee," that Teneo would provide the services "subject to the supervision and direction of [Weil]," and that the "[e]ngagement contemplate[d] services of a character and quality that would necessarily be adjunct to and supportive of [Weil's] services as attorneys." (Garcia Decl., Ex. D

at 1.)  The agreement further provided that all communications between Teneo and Weil, the Audit

Committee, or ARCP employees would be "for the purpose of assisting [Weil] in rendering legal

advice and representation to the Audit Committee and [would] be confidential and subject to

attorney client privilege and/or attorney work product protection," and that "[a]ll written work of

[Teneo], including any reports, memoranda or status summaries, prepared in connection with the

[s]ervices [would] be confidential and subject to the attorney client privilege and attorney work

product protection."  (*Id*.)  Pursuant to the agreement, documents and communications generated

by Teneo or shared with Teneo during the investigation were kept confidential.  (Garcia Decl. ¶

15.)

### D.   Commencement of Civil Litigation and Regulatory Investigations

One day after the October 2014 Disclosure, the United States Attorney's Office for the

Southern District of New York contacted Weil regarding the matters discussed in the October 2014

Disclosure.  (Garcia Decl. ¶ 16.)  On that same day, the first putative class action complaint against

ARCP arising from the subject matter of the October 2014 Disclosure was filed.[4]  (*Id*.)  Over the

next three months, a number of other putative class actions were filed and eventually consolidated

into the instant putative class action.[5]  (*Id.* ¶ 17.)  In addition, on November 13, 2014, the SEC

provided notice to ARCP that it had commenced a formal investigation and issued a subpoena

calling for the production of documents.  (Garcia Decl. ¶ 18.)  Shortly thereafter, the Secretary of

the Commonwealth of Massachusetts requested the production of various documents.  (*Id*. ¶ 19.)

---

[4] *See* Compl., *Ciraulu v. Am. Realty Capital Props., Inc., et al.*, No. 14-cv-8659-AKH, Dkt. No. 2 (S.D.N.Y. Oct. 30, 2014).

[5] *See* Dkt. No. 1 (Feb. 13, 2015) (consolidating ten putative class actions); Dkt. No. 173 (Dec. 15, 2015) (consolidating *Wunsch* action transferred from District of Maryland with the consolidated class action).  A number of related individual actions and shareholder derivative actions were also filed against ARCP.  (Garcia Decl. ¶ 17.)

### E.      Continuation of the Internal Investigation and the Restatement of ARCP's Financial Statements

Weil's investigation on behalf of the Audit Committee continued following the October 2014 Disclosure.  (*Id*. ¶ 20.)  During the course of the investigation, Weil, with the assistance of E&Y, gathered, reviewed, and analyzed more than 200,000 documents, including emails, accounting data, and invoices; interviewed 43 witnesses; gathered documents from ARCP employees in furtherance of the investigation; coordinated with and received feedback from Grant Thornton in determining appropriate areas for investigation; and continued to provide legal advice to the Audit Committee.  (*Id*. ¶ 21.)  When interviewing witnesses, Weil informed the witnesses that it was representing the Audit Committee in connection with the Audit Committee's investigation of certain accounting practices at ARCP, that the purpose of the interviews was to collect information to assist in providing legal advice to the Audit Committee, and that the matters discussed were therefore privileged and confidential.  (*Id*. ¶ 22.)  The Investigation Materials with respect to which Plaintiffs seek discovery were and have been kept confidential and have not been disclosed to any person other than those included in the communication or involved in the preparation of the document or communication.  (*Id.* ¶ 24.)

On March 2, 2015, ARCP announced the completion of the Audit Committee's investigation, which identified errors and adjustments in the calculation of AFFO and other figures in ARCP's financial statements dating to 2011, and restated its financial statements in its annual reports for FY 2013 and 2012 and quarterly reports for the first and second quarters of 2014 and 2013.  (Garcia Decl., Ex. E.)

### F.      Grant Thornton's Role

In connection with the investigation, Weil engaged in communications with ARCP's auditor, Grant Thornton.  (Garcia Decl. ¶ 25.)  Soon after commencing the investigation, Grant

Thornton was informed that Weil was conducting the investigation, and thereafter provided periodic oral updates concerning the progress of the investigation.  (*Id.* ¶ 26.)  During the course of the investigation, Weil also received information and input from Grant Thornton.  (*Id*. ¶ 27.)  In particular, Grant Thornton discussed with Weil search terms to be applied in the collection and review of documents, witnesses to be interviewed, and the scope of the investigation.  (*Id*.)  During the course of the investigation, Weil also shared and discussed certain information and documents with Grant Thornton so that Grant Thornton could evaluate the impact of the investigation on ARCP's financial statements and so that Grant Thornton could provide additional input to Weil and E&Y regarding their investigation.  (*Id.* ¶ 28.)

### G.    Documents Over Which ARCP Has Claimed Privilege

#### 1.    ARCP Documents

To date, the ARCP Defendants have produced over 3 million pages of documents, and are withholding a total of 15,882 documents from production on privilege grounds.[6]  Of these documents, 5,107 have been withheld on the ground that they are related to the internal investigation.

#### 2.    Weil and E&Y Documents

Among the documents that ARCP has withheld are privileged communications with Weil and E&Y, as well as documents prepared by Weil and E&Y relating to the investigation.  In addition, in response to the third-party subpoena served on Weil and E&Y by Plaintiffs, ARCP has instructed Weil and E&Y to withhold privileged documents in their possession relating to the investigation.  These documents include, *inter alia*, Weil's internal memoranda and analyses,

---

[6] ARCP has also made redactions in 8,757 documents on the basis of privilege.

identification of documents reviewed or witnesses interviewed, E&Y's work papers, and communications relating to the investigation.

### 3.    Teneo Documents

ARCP has also withheld privileged communications with Teneo and documents prepared by Teneo relating to the investigation.  In addition, in response to a third-party subpoena served on it by Plaintiffs in April 2017, Teneo recently made responsive documents available to ARCP for a privilege review.  ARCP is currently reviewing these documents for privilege, and intends to produce a privilege log when its review is complete.

### 4.    Grant Thornton Documents

ARCP has also withheld certain documents prepared by Grant Thornton relating to the investigation, and certain communications related thereto.  ARCP also instructed Grant Thornton to withhold 671 documents from its productions on the basis of privilege (out of more than 110,000 documents produced by Grant Thornton), and has provided Plaintiffs with a privilege log for these documents.

## <u>ARGUMENT</u>

## I.    APPLICABLE LEGAL PRINCIPLES

### A.    The Court Has Broad Discretion to Issue a Protective Order.

Federal Rule of Civil Procedure 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]"  "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).[7]  The protection of documents covered by the attorney-client privilege or

---

[7] Unless otherwise noted, alterations, internal citations and quotation marks are omitted from case citations.

the work product doctrine constitutes "good cause" for the issuance of a protective order.  *See, e.g.*, *Banneker Ventures, LLC v. Graham*, 2017 WL 2124388, at *2 (D.D.C. May 16, 2017) ("A valid claim of privilege is considered good cause to justify a protective order."); *Roseman v. Bloomberg L.P.*, 2016 WL 3866375, at *5 (S.D.N.Y. June 17, 2016) (good cause exists when discovery seeks to "elicit privileged communications and protected information"); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 2008 WL 199537, at *5 (S.D.N.Y. Jan. 22, 2008) ("[A] valid assertion of privilege constitutes good cause. . . .").

### B.  Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance.'"  *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 526 (S.D.N.Y. 2015) (quoting *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. DOJ*, 697 F.3d 184, 207 (2d Cir. 2012)).

In its seminal decision in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Supreme Court held that internal investigations led by counsel—and the confidential communications exchanged with employees during that investigation—are protected by the attorney-client privilege.  *Id.* at 394-95.  There, the Government sought to compel the production of interview notes and memoranda prepared by a company's in-house counsel during an internal investigation of illegal payments by employees.  *Id.* at 386-88.  In holding that the documents were privileged, the Court explained that "the privilege exists to protect not only the giving of professional advice to those who can act on it *but also the giving of information to the lawyer to enable him to give sound and informed advice*."  *Id.* at 390 (emphasis added).  That is because the "first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant."  *Id.* at 390–91.  Moreover, failure to afford protection to such

communications would "threaten[] to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law." *Id.* at 392.

Courts in this Circuit have consistently applied *Upjohn* to protect from disclosure the work of law firms in an internal investigation and accounting firms hired to assist them in the investigation. For example, in *In re Woolworth Corp. Securities Class Action Litigation*, 1996 WL 306576 (S.D.N.Y. June 7, 1996), after the company's treasurer made allegations of accounting irregularities, a special committee of independent directors retained outside counsel, which in turn retained a forensic accounting firm, to investigate the allegations. *Id.* at *1. After the company issued a press release stating that it intended to restate its financial results for the previous year due to the accounting irregularities, shareholders filed a class action lawsuit. *Id.* The plaintiffs sought to compel the law firm and accounting firm to produce their internal notes and memoranda that were created during the investigation, arguing that their involvement was in furtherance of a "business" purpose, rather than providing legal advice. *Id.* Relying on *Upjohn*, the court rejected that argument, observing that the law firm had engaged in discussions with the SEC on behalf of the committee after being retained and that it had advised the company to issue a press release stating that it intended to restate its financial statements, and that it was therefore indisputable that the investigation was connected to the provision of legal advice to the special committee. *Id.*

Similarly, in *In re General Motors LLC Ignition Switch Litigation*, 80 F. Supp. 3d 521 (S.D.N.Y. 2015), plaintiffs sought to compel the production of documents relating to an investigation into vehicle defects conducted by outside counsel, including attorney notes, summaries, and memoranda of witness interviews. *Id.* at 525. Judge Furman held that *Upjohn* "applie[d] squarely to the materials at issue" because, as in *Upjohn*, the internal investigation and accompanying interviews were conducted "as part of [the company's] request for legal advice" in

light of possible misconduct and accompanying governmental investigations and civil litigation.
*Id.* at 527.  Moreover, as in *Upjohn*, the employees interviewed were informed that the purpose of
the interviews was to collect information to assist in providing legal advice to the company, and
that the matters discussed were therefore confidential, and the materials were kept confidential.
*Id.* at 527-28.

The attorney-client privilege applies to communications relating to an internal
investigation where "the predominant purpose of the communication is to render or solicit legal
advice." *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 529 (citing *In re County
of Erie*, 473 F.3d 413, 420 (2d Cir. 2007)).  "The primary purpose test, however, does not require
a showing that obtaining or providing legal advice was the ***sole*** purpose of an internal investigation
or that the communications at issue would not have been made but for the fact that legal advice
was sought." *Id.* at 530 (emphasis in original) (citing *In re Kellogg Brown & Root, Inc.,* 756 F.3d
754, 759 (D.C. Cir. 2014)).  Instead, "the primary purpose test, sensibly and properly applied,
cannot and does not draw a rigid distinction between a legal purpose on the one hand and a business
purpose on the other.  So long as obtaining or providing legal advice was one of the ***significant
purposes*** of the internal investigation, the attorney-client privilege applies, even if there were also
other purposes for the investigation." *Id.* (emphasis added) (rejecting argument that investigation
documents were not privileged because the investigation served business purposes of correcting
problems and reassuring investors); *see also In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599
F.2d 504, 510 (2d Cir. 1979) (where outside counsel was retained to investigate whether public
disclosure of allegedly improper payments was required, the investigation involved the rendering
of legal advice and triggered the attorney-client privilege); *In re Kellogg Brown & Root*, 756 F.3d

at 758-59 (rejecting argument that investigation materials were not privileged because investigation served business purpose of complying with regulatory requirements).

Finally, the mere fact that a third party or non-lawyer is included in the communication does not waive the attorney-client privilege "if the communication [was] made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961). In *Kovel*, the Second Circuit extended the attorney-client privilege to communications with an outside accountant where the purpose of the communications was to assist counsel in providing legal advice to the client. *Id.* at 921. The court recognized that "[a]ccounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases." *Id.* at 922. Because "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer," "the presence of an accountant, whether hired by the lawyer or by the client . . . ought not destroy the privilege." *Id.*; *see also United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) ("The [attorney-client] privilege also is held to cover communications made to certain agents of an attorney, including accountants hired to assist in the rendition of legal services."); *Florentia Contracting Corp. v. Resolution Tr. Corp.*, 1993 WL 127187, at *6 (S.D.N.Y. Apr. 22, 1993) ("[W]orkpapers and reports of an accountant in most cases will be protected by the attorney-client privilege if the accountant has been retained by the attorney or by the client at the attorney's direction.").

## C.   Work Product Protection

The work product doctrine, as codified in Rule 26 of the Federal Rules of Civil Procedure, protects from disclosure "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). The doctrine, which is both "distinct from and broader than the attorney-client privilege," *United States*

*v. Nobles*, 422 U.S. 225, 238 n. 11 (1975), "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).  To qualify for work product protection, the document need not be prepared by, or even at the direction of, an attorney to qualify for work product protection, as long as it is prepared "in anticipation of litigation."  *See, e.g.*, *In re Grand Jury Subpoenas Dated June 5, 2008*, 329 F. App'x 302, 303 (2d Cir. 2009) (document prepared while defendant was "between lawyers" was protected work product because, even though not created "at the behest of counsel," it was "produced in anticipation of litigation"); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 221 (S.D.N.Y. 2001) ("[D]ocuments prepared in anticipation of litigation need not be created at the request of an attorney.").

In *Adlman*, the Second Circuit set forth the standard for when a document that is created with both a litigation and business purpose is prepared "in anticipation of litigation," holding that the document need only be prepared "'because of' existing or expected litigation."  *Adlman*, 134 F.3d at 1198.  In so holding, *Adlman* expressly rejected the test employed by the Fifth Circuit— that the document be prepared "primarily or exclusively to assist in litigation"—noting that such a test "would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision."  *Id*.  Thus, under *Adlman*, a document created "because of" the prospect of litigation "does not lose protection under this formulation merely because it is created in order to assist with a business decision."  *Id.* at 1202; *see also Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015) ("Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings.").  Conversely, "documents that are prepared in the ordinary course of business or that

would have been created in essentially similar form irrespective of the litigation" do not qualify for work product protection. *Adlman*, 134 F.3d at 1202.

Following *Adlman*, courts have consistently treated materials generated in the course of an internal investigation led by counsel as protected work product. *See, e.g.*, *Patel v. L-3 Commc'ns Holdings, Inc.*, 2016 WL 4030704, at *3 (S.D.N.Y. July 25, 2016) (documents created during the course of an investigation into accounting practices led by external counsel were protected work product); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 724555, at *1 (S.D.N.Y. Mar. 9, 2007) (same); *In re Woolworth Corp. Sec. Class Action Litig.*, 1996 WL 306576, at *3 (same).

Moreover, even where a company ***would have been required*** to restate past financials or conduct a similar investigation ***absent*** the prospect of litigation, the work product protection applies as long as the investigation was conducted, in part, because of the prospect of litigation. For example, in *Patel*, after internal allegations regarding potential issues with the company's accounting with respect to a contract with the U.S. Army (the so-called C-12 Contract), the company engaged outside counsel to conduct an investigation, and outside counsel retained a forensic accounting firm (Alix) to assist with the investigation. *Patel*, 2016 WL 4030704, at *1. After the investigation revealed evidence of intentional misconduct, the company self-reported the misconduct to the SEC and publicly disclosed that it had uncovered intentional misconduct resulting in errors in the company's financial statements. *Id*. The next day, a class action lawsuit was filed, and within a week, government regulators served document subpoenas on the company. *Id*. The class action plaintiffs moved to compel production of documents relating to the forensic accounting firm's work on the investigation, arguing that that the company would have conducted the forensic accounting review with or without anticipated litigation because the company "was legally obligated to conduct an investigation to determine whether its prior statements were

materially false and required revision." *Id.* at *3.  Judge Caproni rejected plaintiffs' argument and held that the documents were protected work product, explaining that "[w]hile [the company] would have, or at least should have, conducted a review upon learning of the fraud allegation, the scope and manner of conducting the investigation was clearly influenced by the expectation and reality of litigation." *Id.*  Thus, "[a]lthough [the company] may have had independent obligations or business reasons to seek to assure itself that the accounting problems discovered within [the company's Army Sustainment Division] were limited to the C-12 Contract and were not duplicated elsewhere in the company, that fact [did] not alter the reality that the review was conducted as it was in large part because of expected litigation." *Id.*

Similarly, in *In re Veeco*, Judge McMahon upheld a magistrate judge's order denying plaintiff's motion to compel the production of documents generated by the company's outside counsel and a forensic accounting firm during an internal investigation prompted by the discovery of potentially improper accounting entries relating to the company's inventory. *In re Veeco*, 2007 WL 724555, at *1.  Judge McMahon dismissed plaintiff's "overarching" contention that the investigation documents should be produced because they also served non-litigation purposes, explaining "the fact that some or even all of the documents at issue were created in part to ensure that [the company's] public disclosures were accurate does not remove them from the ambit of work product protection under *Adlman*." *Id.* at *8; *see also In re Woolworth Corp. Sec. Class Action Litig.*, 1996 WL 306576, at *3 (S.D.N.Y. June 6, 1996) (upholding work product claim where company retained outside counsel to investigate alleged accounting improprieties despite plaintiffs' assertion that counsel's investigation was furthering a "business purpose," and noting that "[a]pplying a distinction between 'anticipation of litigation' and 'business purposes' is in this case artificial, unrealistic, and the line between is here essentially blurred to oblivion").

## II.     DISCUSSION

### A.     The Weil and Audit Committee Materials Are Protected by the Attorney-Client Privilege and the Work Product Doctrine.

#### 1.     The Materials Are Protected by the Attorney-Client Privilege.

Weil's and the Audit Committee's communications and the documents they prepared in connection with the investigation are squarely protected by the attorney-client privilege under *Upjohn*.  As in *Upjohn*, Weil's investigation was conducted in connection with the Audit Committee's request for legal advice in light of possible accounting errors and the anticipation of governmental investigations and civil litigation.  (Garcia Decl. ¶¶ 5-6.)  Here, like in *Upjohn*, the witnesses interviewed were explicitly told that the purpose of the interviews was to collect information to assist in providing legal advice to the corporate client (in this case, the Audit Committee), and that the matters discussed were therefore privileged and confidential.  (*Id.* ¶ 22.)  Finally, as in *Upjohn*, the Investigation Materials have been kept confidential.  (*Id.* ¶ 24.)

The fact that Weil's investigation on behalf of the Audit Committee furthered some business purposes, such as identifying certain deficiencies in the Company's internal controls, does not obviate the fact that Weil unquestionably conducted its investigation for the purpose of providing legal advice to the Company.  "Rare is the case that a troubled corporation will initiate an internal investigation solely for legal, rather than business, purposes; indeed, the very prospect of legal action against a company necessarily implicates larger concerns about the company's internal procedures and controls, not to mention its bottom line."  *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 530.  As *Upjohn* itself recognizes, "an attorney-client privilege that fails to account for the multiple and often-overlapping purposes of internal investigations would 'threaten[] to limit the valuable efforts of corporate counsel to ensure their client's compliance

with the law.'" *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 530 (quoting

*Upjohn*, 449 U.S. at 392).[8]

## 2.    The Materials Are Protected by the Work Product Doctrine.

Documents prepared by Weil or the Audit Committee in connection with the investigation

are also protected work product under *Adlman* because they were prepared in anticipation of

ligation.  The September 6, 2014 whistleblower email that was brought to the Audit Committee's

attention by Grant Thornton raised numerous questions regarding ARCP's accounting decisions,

including those relating to bonus accrual, calculation of AFFO, passed adjustments, certain

revenue recognition practices, and related-party transactions, and the ARCP employee who sent

the email had familiarity with ARCP's accounting and access to ARCP accounting information.

(Garcia Decl. ¶ 4; Garcia Decl., Ex. A.)  As a result, the Audit Committee promptly retained Weil

to assist it in conducting an internal investigation of the alleged misconduct.  (Garcia Decl. ¶ 5.)

Based on the nature and source of the allegations in the email, Weil anticipated civil litigations

and regulatory investigations arising from the allegations, and conducted its investigation in a

manner to take account of the prospect of such litigations and regulatory investigations.  (*Id.* ¶ 6.)

Indeed, "[i]t did not take a fortune teller with a well-tuned crystal ball to know that the disclosure

of [ARCP's] accounting misstatements would generate at least one private securities class action

lawsuit and government investigations."  *Patel*, 2016 WL 4030704, at *3.  The expectation of

litigation was, of course, not a mere specter—the first (of many) putative class action lawsuits

---

[8] *See also In re Grand Jury Subpoena Dated December 19, 1978*, 599 F.2d at 510 (where outside counsel was retained to investigate whether public disclosure of allegedly improper payments was required, the investigation involved the rendering of legal advice and triggered the attorney-client privilege); *In re Kellogg Brown & Root*, 756 F.3d at 759 (rejecting argument that investigation materials were not privileged because investigation served business purpose of complying with regulatory requirements); *In re Woolworth Corp. Sec. Class Action Litig.*, 1996 WL 306576, at *1 (rejecting argument that investigation materials were not privileged because investigation served business purpose of filing restated financial statements).

against ARCP was filed ***one day after*** the October 2014 Disclosure, and on that same day, the United States Attorney's Office for the Southern District of New York contacted Weil regarding the matters discussed in the October 2014 Disclosure.  (Garcia Decl. ¶ 16.)  That was followed shortly thereafter by the commencement of regulatory investigations by the SEC and the Secretary of the Commonwealth of Massachusetts, and several individual and shareholder derivative actions. (*Id.* ¶¶ 17-19.)

Moreover, "the fact that some or even all of the documents at issue were created in part to ensure that [the company's] public disclosures were accurate does not remove them from the ambit of work product protection under *Adlman*."  *In re Veeco*, 2007 WL 724555, at *8; *Patel*, 2016 WL 4030704, at *3 ("Although [the company] may have had independent obligations or business reasons to seek to assure itself that the accounting problems discovered within [the company's Army Sustainment Division] were limited to the C-12 Contract and were not duplicated elsewhere in the company, that fact does not alter the reality that the review was conducted as it was in large part because of expected litigation.").  Indeed, as Mr. Garcia's declaration establishes, the investigation was conducted in the manner that it was, and the Investigation Materials were prepared in the form that they were, because of the prospect of litigation.  (Garcia Decl. ¶ 6.)  That is not surprising, as the "scope and manner of conducting the investigation [are] clearly influenced by the expectation and reality of litigation."  *Patel*, 2016 WL 4030704, at *3.  The Investigation Materials are therefore protected under the work product doctrine.  *See id.*; *In re Veeco*, 2007 WL 724555, at *8; *In re Woolworth Corp. Secs. Class Action Litig.*, 1996 WL 306576, at *3 (upholding work product claim where company retained outside counsel to investigate alleged accounting improprieties despite plaintiffs' assertion that counsel's investigation was furthering a "business purpose").

To the extent that courts have declined to find that work product protection applies, it has been in cases where the company did not retain a law firm to lead the investigation or the investigation was clearly conducted for business purposes.  In *Allied Irish Banks v. Bank of America*, 240 F.R.D. 96 (S.D.N.Y. 2007), for example, the company hired a non-lawyer consultant, the principal of a consulting firm, to conduct an investigation.  *Id.* at 100.  The terms of the consultant's engagement were limited to business-related matters and said nothing about legal advice.  *Id.* at 100-01.  And while the consultant had engaged a law firm to "assist" in his investigation, neither the company nor the law firm "provided any evidence regarding the manner in which [the law firm's] purported legal advice was provided to [the company]."  *Id.* at 101.  In fact, "[t]he only document attributable in any form to [the law firm] that was also presented to [the company]" was the final report itself, "which indisputably did not provide legal advice."  *Id.* at 104.  *Allied* has been distinguished in numerous cases where, as here, the law firm was hired for the express purpose of providing legal advice to the company or a committee of the company's board of directors in connection with matters where litigation was likely.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d at 531 (distinguishing *Allied Irish Banks* on this basis); *In re Weatherford Int'l Sec. Litig.*, 2013 WL 12185082, at *4 (S.D.N.Y. Nov. 5, 2013) (same).

### B.     The E&Y Documents Are Protected By the Attorney-Client Privilege and Work Product Doctrine.

Documents prepared by, and communications with, E&Y, the forensic accounting firm retained by Weil to assist it in providing legal advice to the Audit Committee in its investigation, are subject to the attorney client-privilege and work product protection to the same extent as documents prepared by either Weil or the Audit Committee itself.

E&Y was retained directly by Weil, and the Statement of Work attached to the engagement letter provided that E&Y would provide the services "in connection with [Weil's] provision of

legal advice to the Audit Committee of ARCP with respect to a matter that involves an internal investigation as a result of whistleblower allegations" and acknowledged that the services would be performed "under [Weil's] direction."  (E&Y Engagement Ltr., SOW at 1.)  The Statement of Work expressly recognized the possibility of litigation or regulatory investigations relating to the internal investigation, requiring Weil to notify E&Y of "any suit in connection with" the subject matter of the investigation and allowing the parties to extend the agreement "[i]f a regulatory inquiry or civil litigation is initiated relating to the [m]atter during this period," while allowing Weil to "incorporate into any communications with government or regulatory authorities [E&Y's] recommendations, conclusions, and findings[.]"  (*Id.* at 1-2.)  The Statement of Work "acknowledge[d] [Weil's] belief that the Services and Reports, or portions thereof, are or may be protected from disclosure by the attorney-client privilege, work product protection, or both," and stated that "[a]ccordingly, [E&Y] shall treat our communications, work product and documentation (including the Reports) arising out of or relating to the Services in a manner consistent with the maintenance of any such privilege or protection[.]"  (*Id.* at 1.)  Pursuant to the agreement, documents and communications generated by E&Y or shared with E&Y during the investigation were kept confidential.  (Garcia Decl. ¶ 8.)

Simply put, E&Y was merely an extension of Weil for purposes of the investigation.  As the concerns raised by the whistleblower entirely related to accounting irregularities at ARCP, E&Y's advice was not only "highly useful," but was "necessary" for effective legal counsel. *Kovel*, 296 F.2d at 922.  Accordingly, any communications with E&Y during the investigation are protected by the attorney-client privilege under *Kovel*.  *See Deangelis v. Corzine*, 2015 WL 585628, at *3 (S.D.N.Y. Feb. 9, 2015) (holding that documents prepared by E&Y in connection with forensic accounting services it performed under direction of counsel for liquidation trustee

conducting investigation of failed company were protected by attorney-client privilege); *Perino v. Edible Arrangements Int'l, Inc.*, 2015 WL 1442737, at *8 (D. Conn. March 27, 2015) (holding that attorney-client privilege extended under *Kovel* to forensic audit report prepared by outside accounting firm at behest of in-house counsel to assess scope of plaintiff's "offline accounting activities" so that counsel could provide "legal advice to defendants about the consequences of [those] actions and whether any further legal action was necessary"); *Fitzpatrick v. Am. Int'l Grp., Inc.*, 2011 WL 335672, at *3 (S.D.N.Y. Jan. 28, 2011) (upholding privilege over communications between law firm investigating claims on behalf of company and accounting firm hired by law firm, as well as documents prepared by accounting firm); *Florentia Contracting Corp.*, 1993 WL 127187, at *6 (holding that letter prepared by accountants who had been retained by counsel "to perform various activities in connection with the rendering of legal advice" by counsel was privileged).

For similar reasons, documents prepared by E&Y in connection with Weil's investigation were prepared in anticipation of litigation, and are therefore protected under the work product doctrine. *See Patel*, 2016 WL 4030704, at *2-3 (upholding work product protection over documents created by forensic accounting firm retained by outside counsel that were intended to assist outside counsel in providing legal advice relating to an internal investigation); *In re Veeco*, 2007 WL 724555, at *6-8 (same); *In re Woolworth Corp. Sec. Class Action Litig.*, 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (same); *In re Cardinal Health, Inc., Sec. Litig.*, 2007 WL 495150, at *6-7 (S.D.N.Y. Jan. 26, 2007) (same); *Fitzpatrick v. Am. Int'l Grp., Inc.*, 2011 WL 335672, at *4 (S.D.N.Y. Jan. 28, 2011) (upholding work product protection and noting that "[t]he accounting firm was performing forensic accounting services, which are concededly a part of the function of an accountant, but that does not alter our finding that the functions performed were

serving a *bona fide* need of the attorneys to assist them to undertake their counseling and other lawyerly functions on behalf of defendants").

### C. Documents Prepared by, and Communications With, Teneo Are Also Protected By the Attorney-Client Privilege and Work Product Doctrine.

Likewise, documents prepared by, and communications with, Teneo, which was retained by Weil to assist Weil in providing legal advice to the Audit Committee regarding communications with the public and media in connection with the investigation, are protected by the attorney-client privilege and the work product doctrine to the same extent as those generated by Weil or the Audit Committee.

Teneo was retained by Weil "as [Weil's] agents in connection with [Weil's] provision of legal services to the Audit Committee."  (Garcia Decl., Ex. D at 1.)  Teneo was tasked with the responsibility of managing relations with the media and public, including the drafting of statements for public release and internal dissemination within ARCP, with the understanding that any statements by the Company might be used against the Company in future litigation, and it coordinated closely with Weil in this regard.  (Garcia Decl. ¶ 14.)  Teneo provided the services "subject to the supervision and direction of [Weil]" that were "adjunct to and supportive of [Weil's] services as attorneys."  (Garcia Decl., Ex. D at 1.)  As provided in the engagement letter, all communications between Teneo and Weil, the Audit Committee, or ARCP employees were "for the purpose of assisting [Weil] in rendering legal advice and representation to the Audit Committee and [would] be confidential and subject to attorney client privilege and/or attorney work product protection," as would "[a]ll written work of [Teneo], including any reports, memoranda or status summaries, prepared in connection with" its services.  (*Id.*)  Pursuant to the agreement, documents and communications generated by Teneo or shared with Teneo during the investigation were kept confidential.  (Garcia Decl. ¶ 15.)

Accordingly, documents prepared by and communications with Teneo were clearly generated to assist Weil in providing legal advice to the Audit Committee regarding ARCP's relations with the media and public in light of the applicable factual and legal framework, including the likely prospect of litigation.  Accordingly, these documents and communications are protected by the attorney-client privilege under *Kovel* and the work product doctrine under *Adlman*.  *See In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 218-21 (holding that confidential communications and documents relating to public relations firm's work for company in anticipation of litigation were protected by attorney-client privilege and work product doctrine); *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 324-34 (S.D.N.Y. 2003) (holding that communications between company's lawyers and the public relations firm were protected by the attorney-client privilege where the public relations firm was hired by counsel to assist in dealing with media and for purpose of giving legal advice, and that there was "no serious question" that documents prepared by public relations firm were protected work product because they "were prepared in anticipation of litigation"); *Haugh v. Schroder Inv. Mgmt. N. Am. Inc.*, 2003 WL 21998674, at *5 (S.D.N.Y. Aug. 25, 2003) (communications between public relations consultant and plaintiffs' former counsel were protected work product because "they were all prepared by a party, her agent, attorney or consultant in anticipation of litigation").[9]

### D.   ARCP Did Not Waive Work Product Protection With Respect to Documents Shared with Grant Thornton.

ARCP did not waive work product protection with respect to Investigation Materials provided to Grant Thornton.  The ARCP Defendants recognize that in *Medinol, Ltd. v. Boston Scientific Corp.*, 214 F.R.D. 113 (S.D.N.Y. 2002), this Court found that, on the facts before it,

---

[9] While the *Haugh* court concluded that the communications at issue were not protected by the attorney-client privilege, it did so only after reviewing the communications *in camera* and determining that the communications were not in furtherance of counsel's provision of legal advice to the client.  *Haugh*, 2003 WL 21998674, at *3.

disclosure of board meeting minutes to an auditor effected a waiver of work product protection. As discussed in more detail below, however, in the 15 years since that decision, numerous courts – including the only Court of Appeals decision to address the issue – have declined to find a waiver of work product protection resulting from sharing documents or information with an outside auditor. Indeed, to hold otherwise would chill the full and open discussion between counsel conducting internal investigations into allegations of corporate misconduct and the company's outside auditor, when all parties share the common goal of uncovering the facts and reporting accurate information to the market. In light of these significant public policy considerations and the development in the law, *Medinol* should be confined to its facts, which are distinguishable from those presented here.

"In this circuit, disclosure to an outside auditor **does not generally waive work product protection**," *In re Weatherford Int'l Sec. Litig.*, 2013 WL 12185082, at *5 (emphasis added), and "most courts which have addressed the specific issue of whether the sharing of litigation related statements with outside auditors should result in a waiver" have rejected that position. *Vacco v. Harrah's Operating Co.*, 2008 WL 4793719, at *7 (N.D.N.Y. Oct. 29, 2008); *see also United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010) ("Among the district courts that have addressed this issue [of whether disclosing work product to an independent auditor constitutes waiver], most have found no waiver." (citing cases)).[10]  That is because "the courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445 (S.D.N.Y. 2004).  As explained by Judge Baer, such an adversarial

---

[10] *See also Int'l Design Concepts, Inc. v. Saks Inc.*, 2006 WL 1564684, at *3 (S.D.N.Y. June 6, 2006) (no waiver); *Vacco v. Harrah's Operating Co.*, 2008 WL 4793719, at *6 (N.D.N.Y. Oct. 29, 2008) (same); *In re JDS Uniphase Corp. Sec. Litig.*, 2006 WL 2850049, at *1–2 (N.D. Cal. Oct. 5, 2006); *Wells Fargo & Co. v. United States*, 2013 WL 2444639, at *39 (D. Minn. June 4, 2013) (same).

relationship generally is not present in the context of a company sharing information with its auditor:

> [A]ny tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine.  Nor should it be. ***A business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud.  Indeed, this is precisely the type of limited alliance that courts should encourage.***

*Merrill Lynch*, 229 F.R.D. at 448 (emphasis added); *accord Int'l Design Concepts, Inc.*, 2006 WL 1564684, at *3.

Moreover, "to construe a company's auditor as an adversary and find a blanket rule of waiver of the applicable work product privilege" would undermine public policy because it would "discourage corporations from conducting a critical self-analysis and sharing the fruits of such an inquiry with the appropriate actors."  *Merrill Lynch*, 229 F.R.D. at 449.  "Instead, the aim should be for corporations to ***share information with their auditors to facilitate a meaningful review and, ultimately, the availability of more accurate information for the investing public***."  *Id.* (emphasis added).  Moreover, it is "important to encourage complete disclosure between a company and its auditor, so that auditors are not inadvertently shielded from complete frankness by corporate management, so that they can later claim that they had no knowledge of alleged malfeasance."  *Id.*

These principles are illustrated in the D.C. Circuit's decision in *United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010), the only Court of Appeals decision to address whether disclosure to an auditor waives work product protection.  In *Deloitte*, the Government argued that Dow Chemical Company waived work product protection with respect to certain documents by disclosing them to its outside auditor, Deloitte, so that Deloitte could provide an unqualified audit opinion for Dow's financial statements.  *Id.* at 139-40.  The Government argued that the disclosure

effected a waiver because Deloitte was (i) a potential adversary of Dow and (ii) a conduit to other adversaries. *Id.* at 140.

In a thorough and searching opinion, the D.C. Circuit held that the disclosure to Deloitte did not effect a waiver of work product protection. *Id.* Rejecting the Government's argument that Deloitte was a potential adversary of Dow, the court observed that "as an independent auditor, Deloitte ***cannot*** be Dow's adversary," because under accounting profession standards, "[e]ven the threat of litigation between an independent auditor and its client can compromise the auditor's independence and necessitate withdrawal." *Id.* (emphasis added). "Further, Deloitte's power to issue an adverse opinion, while significant, does not make it the sort of litigation adversary contemplated by the waiver standard." *Id.* Moreover, "the possibility of a ***future*** dispute between Deloitte and Dow [did] not render Deloitte a potential adversary for the present purpose." *Id.* (emphasis added). With respect to the Government's argument that Deloitte was a conduit to Dow's adversaries, the D.C. Circuit disagreed, concluding that Dow "had a reasonable expectation of confidentiality because Deloitte, as an independent auditor, ha[d] an obligation to refrain from disclosing confidential client information." *Id.* at 142. The court acknowledged Deloitte might be required to "disclose some information relevant to Dow's finances," but there was no requirement that it disclose ***protected work product***: "An independent auditor can fulfill its duties and render an opinion concerning a company's public financial statements without revealing every piece of information it reviews during the audit process." *Id.* at 142-43.

Finally, the *Deloitte* court noted that finding waiver would undermine public policy because "it might discourage companies from seeking legal advice and candidly disclosing that information to independent auditors." *Id.* at 143. Because auditors "have significant leverage over the companies whose finances they audit[,] [a]n auditor can essentially compel disclosure by

refusing to provide an unqualified opinion otherwise.  Finding waiver based on such disclosures could well encourage the sort of '[i]nefficiency, unfairness and sharp practices' that *Hickman* sought to avoid."  *Id*.

The rationale behind *Deloitte* and the multitude of other decisions finding no waiver is equally applicable here.  As in the cases discussed above, Grant Thornton was not an adversary of the type required to effect a waiver.  Quite the contrary.  Weil and Grant Thornton shared an interest in getting to the root of any errors in ARCP's financial statements, which had previously been reviewed or audited by Grant Thornton.  Accordingly, Weil and Grant Thornton coordinated on the work plan for the investigation, with Weil receiving information and input from Grant Thornton, including discussion of the search terms to be applied in the collection and review of documents, witnesses to be interviewed, and the scope of the investigation, while Weil also shared and discussed certain information and documents with Grant Thornton so that Grant Thornton could evaluate the impact of the investigation on ARCP's financial statements and so that Grant Thornton could provide additional input and information to Weil and E&Y.  (Garcia Decl. ¶¶ 27-28.)  Moreover, even if there were a possibility that any corrections to ARCP's financial statements would later require a restatement, Weil and the Audit Committee had a reasonable expectation that any ***work product*** shared with Grant Thornton would be kept confidential.

In any event, this Court's decision in *Medinol* is distinguishable.  As another court observed, "the determination in *Medinol* was based on a finding that the auditor's interests were not aligned with that of the corporation and that the disclosure of the documents at issue—the Special Litigation Committee's minutes—did not serve a pertinent litigation interest."  *Merrill Lynch*, 229 F.R.D. at 446 (citing *Medinol*, 214 F.R.D. at 116).  In *Medinol*, the Court held that the auditor had no "'common interests' in litigation" with respect to the documents at issue because

they were simply meeting minutes shared with the auditor so that it could evaluate the company's litigation reserves. *Medinol*, 214 F.R.D. at 116-17. Here, there is no doubt that ARCP's Audit Committee and Grant Thornton shared a common litigation interest. Both were undoubtedly aware of the likelihood of litigation arising from the accounting errors, and Grant Thornton in particular could reasonably anticipate that it might be the subject of litigation given that it had reviewed or audited the accuracy of the very financial statements that were under investigation. Accordingly, unlike in *Medinol*, the Audit Committee and Grant Thornton had a common interest in cooperating in a fulsome investigation, and they coordinated on the investigation in furtherance of that interest. In these circumstances, the Court should endorse the reasoning of nearly all courts to have decided the issue and hold that work product protection was not waived with respect to documents shared with Grant Thornton.

## CONCLUSION

For the foregoing reasons, the Court should enter a protective order preventing discovery of the Investigation Materials.

Dated:   June 27, 2017
         New York, New York

MILBANK, TWEED, HADLEY & McCLOY LLP


By: _/s/ Scott A. Edelman_____
Scott A. Edelman
Antonia M. Apps
Jed M. Schwartz
Jonathan Ohring
28 Liberty Street
New York, New York 10005
Telephone:  212-530-5000
Fax:  212-530-5219
Email: SEdelman@milbank.com
        AApps@milbank.com
        JSchwartz@milbank.com
        JOhring@milbank.com

*Attorneys for Defendants American Realty Capital
Properties, Inc. and ARC Properties Operating
Partnership, L.P.*