H8OAARC1ps-corrected          corrected

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------x

3   IN RE:                                  15-mc-40 (AKH)

4   AMERICAN CAPITAL PROPERTIES, INC.
    LITIGATION
5
    ---------------------------------x
6
                                        New York, N.Y.
7                                       August 24, 2017
                                        10:40 a.m.
8

9   Before:

10                  HON. ALVIN K. HELLERSTEIN

11                                        District Judge

12                      APPEARANCES

13
    ROBBINS GELLER RUDMAN & DOWD LLP
14       Attorneys for Plaintiffs TIAA-CREF
         and the class
15  BY:  DEBRA J. WYMAN, ESQ.
         DANIEL S. DROSMAN, ESQ.
16
    STULL STULL & BRODY
17       Attorneys for Plaintiff IRA FBO John Esposito
    BY:  MARK LEVINE, ESQ.
18
    ROBBINS GELLER RUDMAN & DOWD LLP
19       Attorneys for Plaintiffs TIAA-CREF
         and the class
20  BY:  ROBERT M. ROTHMAN, ESQ.

21  WEISS & LURIE
         Attorneys for Plaintiff Simon Abadi
22  BY:  DAVID C. KATZ, ESQ.

23  MILBANK, TWEED, HADLEY & McCLOY LLP
         Attorneys for Defendants
24  BY:  SCOTT A. EDELMAN, ESQ.
         ANTONIA M. APPS, ESQ.
25       DAVID MARCOU, ESQ.
         JED M. SCHWARTZ, ESQ.

H8OAARC1ps-corrected         corrected

1  WEIL, GOTSHAL & MANGES LLP
        Attorneys for Defendants Frank, Michelson,
2          Andruskevich, Rendell, and Stanley
   BY:  RICHARD W. SLACK, ESQ.
3          EVERT J. CHRISTENSEN, ESQ.

4  SHEARMAN & STERLING LLP
        Attorneys for the Underwriter Defendants
5  BY:  DANIEL C. LEWIS, ESQ.

6  MORRIS MANNING & MARTIN
        Attorneys for Defendant Sealy
7  BY:  JOHN P. MacNAUGHTON, ESQ.

8  SIDLEY AUSTIN LLP
        Attorneys for Defendant Grant Thornton LLP
9  BY:  GARY F. BENDINGER, ESQ.
          MELANIE E. WALKER, ESQ.
10

11  KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
        Attorneys for Defendants Arc Capital LLC,
          William Kahane, Peter Budko, Edward Weil,
12          Brian Jones, and Scott Bowman
   BY:  REID M. FIGEL, ESQ.
13          CODY HERCHE, ESQ.

14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Defendant Nicholas Schorsch
15  BY:  AUDRA J. SOLOWAY, ESQ.

16

17

18                (In open court)

19                THE COURT:  As I had stated, we will walk through with

20  the experts first on the motions for certification, the overall

21  issue being if, after my rigorous analysis, I find evidence to

22  show that the alleged misrepresentations alleged in the third

23  amended complaint affected ARCP's stock prices between May 9,

24  2012 and October 29, 2014.

25                How shall we begin?  I guess there's a rebuttable

1    presumption, so that the defendant has the burden to rebut the

2    presumption alleged in the complaint.  Am I right, Mr. Edelman?

3            MS. WYMAN:  Good morning, your Honor.  I believe that

4    what we need to do is --

5            THE COURT:  So I don't embarrass myself and others,

6    the first time you speak, please identify yourself.

7            MS. WYMAN:  Sure.  Debra Wyman, your Honor.

8            I think that it makes most sense for plaintiff to lay

9    out the evidence that shows that the fraud-on-the-market

10   presumption is applicable in this matter.

11           THE COURT:  So you want to go first.

12           MS. WYMAN:  Yes, please.

13           THE COURT:  Any objection?

14           MR. EDELMAN:  No, your Honor.  We would agree, it's

15   their burden of proof to come forward with evidence on market

16   efficiency.

17           THE COURT:  OK.  I'm wrong and incorrect.

18           OK.  Go ahead.

19           MS. WYMAN:  Plaintiffs called Dr. Steven Feinstein to

20   the stand.

21           THE COURT:  You want to make some opening, give me

22   some kind of direction?

23           MS. WYMAN:  If your Honor would believe that's

24   helpful, I'm happy to.

25           THE COURT:  Yes, I believe it would be helpful.

1            MS. WYMAN:  OK.  I'll go to the lectern so you can

2   hear me.

3            As your Honor just mentioned, the fraud-on-the-market

4   presumption is a rebuttable presumption.

5            THE COURT:  It would be more helpful if you speak

6   loudly.

7            MS. WYMAN:  OK.  Is that better?

8            THE COURT:  It's better if you speak loudly.  Don't

9   worry about the microphone.

10           MS. WYMAN:  OK.  As your Honor just mentioned, the

11  fraud-on-the-market presumption is a rebuttable presumption.

12  It allows the plaintiff to presume reliance and not have to

13  show that individually for each class member, permitting us to

14  get the class certified in a securities fraud class action

15  case.

16           The presumption is shown through the analysis of

17  various factors called *Cammer* factors and *Krogman* factors.  And

18  through those factors an economist can look at the market and

19  its different attributes to determine whether or not the market

20  is receiving information, processing that information, and

21  reflecting that information in the price that the public sees

22  and pays and trades on the stock or the other securities for.

23           It's a pretty straightforward showing.  It's something

24  that is testable by various statistical tests, if you're

25  looking for direct evidence of market efficiency.  But the

1    Second Circuit in *Petrobras* about six weeks ago counseled that

2    the *Krogman* and *Cammer* factors need to be viewed holistically.

3    So there are eight factors in total, seven of which are deemed

4    to be indirect evidence.

5            THE COURT:  *"Cammer* factors" is C-a-m-m-e-r factors.

6            MS. WYMAN:  Yes, your Honor.

7            THE COURT:  And the other one is?

8            MS. WYMAN:  *Krogman*, K-r-o-g-m-a-n, which is, I

9    believe it's a district court case from the District of Texas.

10           THE COURT:  So not all of these are contested, not all

11   of these factors are contested.  Am I right?

12           MS. WYMAN:  I don't believe that it is necessarily

13   contested, but Dr. James didn't test any of those factors apart

14   from the empirical factor, which is *Cammer* factor five.

15           THE COURT:  Do I need testimony on all factors?

16           MS. WYMAN:  You need testimony on all factors, your

17   Honor, because the Second Circuit has said that the district

18   courts must use each of the factors in a totality-of-the-

19   evidence standard.  So you have to hear everything in order to

20   do a rigorous analysis and come to a decision that the

21   presumption has been met.

22           THE COURT:  I don't have to hear what I can read and

23   what is not contested.  And I read it.  So there's a lot

24   that's -- it's not at all contested.

25           Why don't you proceed the way you want to proceed and

1    we'll deal with it.

2            MS. WYMAN:  I promise, it won't be painful trying to

3    proceed.

4            THE COURT:  Mr. Edelman, do I need to hear everything,

5    your witness, or can I rely on what I read and just focus on

6    what's disputed?

7            MR. EDELMAN:  Your Honor, I think the way to proceed

8    would be, you can rely on what you've read.  I think the

9    opportunity of this hearing should be for us to focus on the

10   issues that are in dispute.

11           The experts both agree that while a number of the

12   factors, like float and capitalization, are indicative of

13   market efficiency, that economists agree that a market study is

14   what evidences market efficiency.

15           This is an unusual situation in this case, because

16   ARCP changed dramatically over the class period.

17           THE COURT:  Right.

18           MR. EDELMAN:  By the end of the class period, we're

19   talking about a $24 billion asset company, and yet at the

20   beginning of the class period, we're talking about something

21   that had about $75 million of market cap.  It will be our

22   contention at this hearing that for the first two thirds of the

23   class period, plaintiffs have failed to meet their burden.

24   We're not challenging with respect to the common shares that

25   plaintiffs have met their burden of showing market efficiency

1    for the period after the Cole merger when the market cap went

2    way up, but our focus will be on those first two periods.  And

3    what you're going to see, your Honor, is that when they did

4    their market efficiency tests, they had to do backflips and

5    change all sorts of things to make them work, and then they

6    still don't work if done properly.

7            In addition, we will be focusing on the preferred

8    shares and the notes for which we do not believe that

9    plaintiffs have made the requisite showing.  For those

10   instruments, they didn't do the collective event study because

11   they knew it would fail, and they did another supposed

12   controlled experiment, which wasn't an experiment at all.

13   Basically they just looked at the reaction of the market on

14   October 29, when it was being blasted across CNBC and *Wall*

15   *Street Journal* that there was an issue, and they said, did the

16   stock price react to that.  And based on that, they're

17   inferring that the market was efficient over the entire prior

18   class period.

19           So those are the issues that we want to highlight for

20   your Honor.  Certainly your Honor can also rely on what you

21   read and what has been submitted, but we think this hearing is

22   an opportunity for your Honor to test the experts and some of

23   the key issues that are contested.

24           THE COURT:  All right.  Ms. Wyman, proceed.

25           MS. WYMAN:  Your Honor, plaintiff calls Dr. Steve

1   Feinstein.

2           THE COURT:  Dr. Feinstein, please step up.

3   STEVEN P. FEINSTEIN,

4       called as a witness by the plaintiffs,

5       having been duly sworn, testified as follows:

6           THE COURT:  You may inquire, Ms. Wyman.

7   DIRECT EXAMINATION

8   BY MS. WYMAN:

9   Q.  Dr. Feinstein, can you please introduce yourself to the

10  Court.

11  A.  I'm Steven Feinstein.  I'm an associate professor of

12  finance at Babson College and a chartered financial analyst.

13  Q.  And do you hold a Ph.D. from Yale University?

14  A.  I do.

15  Q.  And what concentration?

16  A.  The degree is in economics, with a concentration in

17  finance.

18  Q.  And what year did you get that degree?

19  A.  1989.

20  Q.  You mentioned that you're a CFA.  What is that?

21  A.  It's a chartered financial analyst.  The "chartered

22  financial analyst" designation is the premier credential for

23  practicing financial analysts worldwide.

24  Q.  Did you have to pass an exam to gain that designation?

25  A.  It's a series of three exams over a course of three years.

H8OAARC1ps                          Feinstein - direct

1   It covers the body of knowledge that the Chartered Financial

2   Analyst Institute considers the important generally accepted

3   wisdom in the field of financial analysis, quantitative methods

4   and so forth.

5   Q.  Were you asked by plaintiffs to study the various ARCP

6   securities?

7   A.  I was.

8   Q.  What was your assignment?

9   A.  To examine the markets and the securities and assess, using

10  whatever tests I thought were appropriate, whether or not those

11  securities traded in efficient markets, in efficient markets or

12  not, maybe inefficient markets, over the course of the class

13  period or during those portions of the class period in which

14  they traded.

15  Q.  Which of ARCP's securities did you examine?

16  A.  I looked at the common stock, the preferred stock, and the

17  bonds that were issued during the class period.

18  Q.  Dr. Feinstein, have you ever acted as an expert witness in

19  this capacity prior to today?

20  A.  Yes.

21  Q.  On how many occasions?

22  A.  80 or more.

23  Q.  Did all of those assignments include an analysis of whether

24  a securities market was efficient?

25  A.  Most did.

H8OAARC1ps                    Feinstein - direct

1  Q.  Have you ever worked on and done litigation where you

2  studied common stock, preferred stock, and bonds for the same

3  company?

4  A.  Yes.

5  Q.  In what case was that?

6  A.  In a few cases, but most recently *Petrobras* in this

7  district.

8  Q.  That case is pending before Judge Rakoff?

9  A.  Correct.

10  Q.  In that case did you provide opinions to Judge Rakoff

11  concerning the efficiency of *Petrobras*'s common stock,

12  preferred stock, and bonds?

13  A.  Yes.

14  Q.  What was your conclusion there?

15  A.  That those --

16          THE COURT:  I'm not interested in *Petrobras*.  I'm

17  interested in this case.

18          MS. WYMAN:  This is the last question, I promise.

19          THE COURT:  This is not the question you're going to

20  ask, because it's objected to I'm sustaining the objection.

21  Q.  Dr. Feinstein, have you ever been subjected to a successful

22  *Daubert* challenge?

23  A.  No.

24          THE COURT:  What's the relevance of that?

25          MS. WYMAN:  I just wanted your Honor to understand

1  that his --

2          THE COURT:  It has no relevance.  Stick to what's

3  relevant here.

4          MS. WYMAN:  Yes, I will.

5  Q.  Did you perform the work necessary to make the

6  determinations that you made in this case?

7  A.  Yes.

8  Q.  And were you able to form any opinions concerning the

9  efficiency of the ARCP securities that you studied?

10 A.  Yes.  I conducted the analysis and found that those

11 securities traded in efficient markets over the course of the

12 class period or during those portions of the class period in

13 which they traded.

14 Q.  And did you prepare a report that described the --

15         THE COURT:  What's meant by "an efficient market"?

16         THE WITNESS:  Well, an efficient market is a market in

17 which investors and analysts don't ignore relevant, important

18 news, but, rather, they receive the news, they have the ability

19 to receive the news, process the news, trade on the news such

20 that the information is then reflected in the trading prices.

21 An inefficient market is a market in which the information is

22 ignored, for whatever reason, or there is not a

23 developed-enough trading platform for people to trade on it, so

24 important news is ignored and therefore not represented in the

25 price.  An efficient market is the opposite, where news is

1  quickly incorporated into the price that you observe and that

2  people trade on.

3         THE COURT:  Is it a matter of degree or are these

4  absolutes?

5         THE WITNESS:  It's a matter of degree.  The literature

6  talks about a taxonomy of types of efficiency.  A market can be

7  efficient with respect to some information but not other

8  information.  A market could be perfectly efficient.

9         THE COURT:  For example.

10         THE WITNESS:  Pardon me?

11         THE COURT:  For example.

12         THE WITNESS:  Oh, for example, if -- well, for

13  example, the issue in this case, there's a severe announcement

14  made on October 29, 2014 that the company advises investors not

15  to rely on its financials.  In an efficient market, that will

16  have an immediate and dramatic impact on the security prices,

17  and you can observe the security prices going down.  If the

18  market were inefficient, maybe people wouldn't have heard about

19  the information, the news wouldn't cover it, analysts couldn't

20  be there to help people know about it.  That's one reason a

21  market can be inefficient, because there's an impediment to

22  information flow.  Or maybe people hear about it and know about

23  it and they're concerned about; they go to trade the security

24  and they can't, because they can't find it, it's not on an

25  exchange, there aren't market makers.  So people have the

1    information; they can't trade.  That's another example of an

2    inefficient market, where the price won't reflect the new

3    information because people simply can't trade on it.  Or

4    another type of -- anyway, so an efficient market would be one

5    where the information does get incorporated because the market

6    is developed enough for the information to flow and people to

7    trade on it, and an inefficient market would be one where that

8    can't happen, as far as degrees, which I understand was your

9    question.

10          It's possible that the market is -- that the company

11   is obscure, to the extent -- obscure or smaller or there's a

12   flow-of-information impediment, such that people shrug off some

13   information but not all information.

14          THE COURT:  OK.

15   Q.  And, Dr. Feinstein, did you prepare a report that described

16   the work you did and the opinions that you reached from that

17   work?

18   A.  Yes.

19          MS. WYMAN:  Your Honor, if I might approach, I have a

20   notebooks of the exhibits that we're going to use today.

21          THE COURT:  Yes.

22          MS. WYMAN:  And here's a copy for the Court.

23   Q.  I just handed you, Dr. Feinstein --

24          THE COURT:  This is the same that was given to me in

25   the submissions, right?

1          MS. WYMAN:  That report was in our moving brief, yes.

2     Q.  In the notebook that I just gave you, Dr. Feinstein, under

3     tab 1 is marked Plaintiff's Exhibit 1, which is a document

4     that's called "Reports on Market Efficiencies, Professor Steven

5     P. Feinstein, Ph.D., CFA," dated March 15, 2017.  Do you

6     recognize that document, Dr. Feinstein?

7     A.  Yes.

8     Q.  Can you identify it for me?

9     A.  This is the report that I submitted in this matter.

10    Q.  Is it a true and accurate copy of the report you tendered?

11    A.  It is.

12    Q.  And if you could look on page 76 of Plaintiff's Exhibit 1,

13    is that your signature?

14    A.  Yes.

15    Q.  And there are several appendices and exhibits attached to

16    your report.  Is there a complete set of each of those in the

17    binder that I've handed to you?

18    A.  Yes.

19    Q.  After you tendered your report, did you have to make any

20    corrections to it?

21    A.  I did.

22    Q.  What did you have to correct?

23    A.  There was an error in the construction of Exhibit 8A.  The

24    data weren't lined up correctly.

25    Q.  If you turn to tab 2 in the binder that I gave you, there

1    is a document that's entitled "Exhibit 8A, ARCP Common Stock

2    Regression Results."

3    A.  Yes.

4    Q.  Do you recognize that document?

5    A.  I do.

6    Q.  What is it?

7    A.  It's the corrected exhibit, with the data lined up

8    correctly.

9    Q.  Is it the true and correct copy of the corrections that you

10   made to Exhibit 8A?

11   A.  Yes.

12   Q.  Can you explain in more detail why it would be necessary to

13   correct Exhibit 8A?

14   A.  Well, the prior exhibit didn't have the data presented

15   correctly.  The third column wasn't lined up with the dates

16   that were corresponding in the first column.  In the corrected

17   exhibit they line up.

18   Q.  Did any of the corrections that you made to Exhibit 8A

19   impact any of your opinions that you gave in this case?

20   A.  No, not at all.  The error in the construction of Exhibit

21   8A was just a presentation error.  It was nothing to do with

22   the computations in the analysis.

23          MS. WYMAN:  Your Honor, plaintiff moves to Exhibits 1

24   and 2 into evidence.

25          MR. EDELMAN:  No objection.

1            THE COURT:  What exhibits?

2            MS. WYMAN:  Exhibits 1 and 2.

3            THE COURT:  Received.

4            (Plaintiff's Exhibits 1 and 2 received in evidence)

5  Q.  Dr. Feinstein, in doing the work that you did in this

6  matter, did you follow methodologies that are generally

7  accepted in the area of finance and statics?

8  A.  Yes.

9  Q.  Did you also rely on published literature that that's

10 generally accepted in your field?

11 A.  Yes.

12           THE COURT:  Which is Exhibit 2?

13           MS. WYMAN:  Exhibit 2 is under tab 2 in your binder,

14 your Honor.  It's a correction to Exhibit 8A of Dr. Feinstein's

15 report.

16           THE COURT:  OK.  Thanks.

17 Q.  Dr. Feinstein, what opinions did you reach concerning ARCP

18 common stock?

19 A.  That it traded in an efficient market over the entire

20 course of the class period, from May 9, 2012 to October 29,

21 2014.

22 Q.  And what opinions did you reach concerning ARCP's preferred

23 stock?

24 A.  Essentially the same opinion.  It too traded in an

25 efficient market over the portion of the class period after

1    which it was issued.

2    Q.  And when was the ARCP preferred stock issued, if you can

3    recall?

4    A.  February of 2014.

5    Q.  What about ARCP bonds?  Did you reach any opinions

6    concerning them?

7    A.  The same opinion, that they traded efficiently over the

8    portion during which they traded.

9    Q.  And how did you arrive at the opinions that you reached?

10   A.  I ran a full and complete *Cammer* and *Krogman* analysis on

11   each of the securities.

12   Q.  So you looked at each of the *Cammer* and *Krogman* factors,

13   and there are eight total?

14   A.  That's right.

15   Q.  Why is it important for you to look at those factors to

16   make a determination of market efficiency?

17   A.  That's an important question.  I just want to point out

18   that, although there doesn't seem to be any disagreement

19   between the experts on the evaluation of the *Cammer* and *Krogman*

20   factors save for the empirical factor, there is quite a bit of

21   disagreement about the importance of those factors in arriving

22   at a decision as to whether or not the market is efficient or

23   inefficient.

24          I believe they are very important factors, the

25   indicator factors, all of the factors, whereas my understanding

1   is, Dr. James believes it's only the empirical factor, but

2   he'll talk about that.

3          So the reason why that's the appropriate --

4          THE COURT:  What's the empirical factor?

5          THE WITNESS:  A demonstration of a cause-and-effect

6   relationship between information and movement in the stock

7   price.

8          So most of the factors, seven of the eight factors,

9   are evaluations of characteristics of the market, for example,

10  is there high volume or is there low volume, are there analysts

11  covering the firm, are there no analysts covering the firm, is

12  it traded on an exchange, is it not traded on an exchange, are

13  there market makers facilitating trading or it's difficult to

14  find a market maker to facilitate trading.  Those are the sort

15  of factors that are indicator factors that tell you about the

16  structure of the market.

17         The empirical factor, the way I see it is the icing on

18  the cake.  After we've made an evaluation of the other factors,

19  it's a demonstration of the security prices behaving

20  efficiently.

21  Q.  And Dr. Feinstein, do your opinions rely on a holistic view

22  of all the factors that you looked at?

23  A.  Yes.

24         Also, I just want to add that I believe that it's

25  important to note that the reason why, in virtually every

1    securities case, analysts look at all the *Krogman* factors and

2    *Cammer* factors, it's not just because courts have accepted this

3    as reliable evidence and it's not just because there's

4    empirical published research that says these are valid

5    indicators that separate efficient from inefficient companies

6    and events.  It's because the factors directly address the

7    potential defects that might be in the market that could be

8    causes for inefficiency.

9         So because one cause of inefficiency, for example, is

10   that you can't find the stock to trade it, the *Cammer* factor

11   that there are market makers or that the stock is traded on an

12   exchange addresses that.  In this case, there were definitely

13   market makers that facilitated the trading of all of these

14   securities.  So that potential reason for inefficiency isn't

15   there.

16        Another potential reason, as I mentioned before, is

17   that the company might be obscure and therefore unknown and

18   therefore new information comes out but nobody cares about that

19   information.  That would cause the market to be inefficient.

20   Well, the volume factor addresses that.  The volume factor, you

21   can look at it and see, is there active trading in the stock or

22   is there active trading in the bonds, is there active trading

23   in the preferred stock.  If there is, you know that the company

24   is not so obscure that people are ignoring it.  And in this

25   case those securities definitely satisfied, to a very high

1   degree, that volume factor.

2            If I may just -- analyst coverage is another factor.

3   It addresses, does information get out?  Is there logistics for

4   the information being disseminated and for the information to

5   be processed and for investors to get help understanding the

6   meaning of the information?  Without analysts, someone might

7   say no, and that could be a potential cause of inefficiency.

8   But with analysts, you know that that's not going to happen.

9   That defect is not present.  And in this market, over the

10  course of the class period, there were always at least two --

11  there were always at least two analysts covering the stock and

12  the company, and there were by my count as many as 45 over the

13  course of the class period.

14  Q.  Is that enough to satisfy that *Cammer* factor that deals

15  with analyst coverage?

16  A.  Yes.

17  Q.  And I think you mentioned trading volume.  Did you study

18  ARCP trading volume for each of the securities you looked at?

19  A.  I did.

20  Q.  What did you find?

21  A.  It was very high.  For the stock, if you look at the

22  average over the course of the class period, it's close to 9

23  percent weekly turnover.  In other cases, in fact in the

24  seminal, landmark *Cammer* case, commentators offered that 1 to 2

25  percent weekly turnover would be considered active trading.

H8OAARC1ps                      Feinstein - direct

This is 9 percent, which is far above the threshold.  The

preferred stock was at 5 percent, which is well over the

threshold.  The bonds, it's very interesting in this case that

bonds typically trade infrequently.  That's what the literature

says and it's the nature of bonds that they typically trade

infrequently but in large blocks.  In this particular case,

even the bonds satisfy what is a threshold level of active

trading, when that threshold is determined based on other

stocks.  So the bonds all had more than 1 to 2 and sometimes

had far greater than 2 percent weekly turnover.

        Again, I just want to add one more thing, that even

looking at the earliest portion of the class period, which is,

defense counsel pointed out, was going to be the emphasis of

their challenge, there was active trading in the stock.  So

even in the earliest period, when the company was at its

smallest, there was very active trading in the stock, that

indicated that, even then, this was not an obscure company

escaping the notice of investors.

Q.  And I think that you mentioned too that you looked at the

market makers that were making markets in the ARCP securities

you looked at.  Did I remember that right?

A.  That's right.

Q.  And did you find that there were sufficient market makers

for each of the securities to satisfy you that that *Cammer*

factor had been met?

H8OAARC1ps                    Feinstein - direct

1    A.  I did.

2              The preferred stock and the common stock were listed

3    on NASDAQ.  The bonds are traded over the counter.  They had 11

4    underwriters.  Underwriters typically make a market

5    subsequently in the bonds.  And as well, the very frequent and

6    active trading of the bonds indicates that there is no

7    impediment, there was no impediment, to the trading of the

8    bonds.

9              THE COURT:  Did the bonds have convertible features?

10             THE WITNESS:  Two of them did.  The TAA and TAB bonds

11   were convertible senior notes.

12             THE COURT:  Into what?

13             MS. WYMAN:  Into the stock.

14             THE COURT:  Into stock.

15             And the preferred?

16             THE WITNESS:  The preferred had a fixed dividend.  I

17   don't believe it was convertible into the common.

18   Q.  So you've looked at, we've gone through *Cammer* factor one,

19   which is the trading volume; *Cammer* factor two, which is

20   analysts; *Cammer* factor three, which is market makers.  What's

21   the fourth *Cammer* factor that you looked at?

22   A.  S-3 registration eligibility.

23   Q.  Why is that important?

24   A.  It's really one of the more unusual factors, but the SEC

25   allows for companies that are well known, established, that

1    meet certain criteria, to issue secondary offerings, issue

2    stock and securities, in an expedited manner.  And the question

3    is, it's been offered as evidence of market efficiency because

4    if a company is well known enough, large enough, and has a

5    history of financial filings such that it's eligible for SEC

6    S-3 and S-4 registrations, then there is an inference that it

7    would also -- those same characteristics would promote and

8    engender market efficiency.

9    Q.  Did you find that that *Cammer* factor was satisfied for the

10   securities you studied?

11   A.  Not over the entire class period, for two reasons.

12   Q.  Which security are you speaking of?

13   A.  Just the common.  So for the preferred and the bonds, the

14   S-3 eligibility factor was satisfied everywhere, throughout

15   the -- everywhere since from the time they were issued to the

16   end of the class period.

17           For the common, at the earliest stage, right after,

18   right after the IPO and then right after the beginning of the

19   class period, there wasn't yet a year's worth of filings to

20   allow S-3 eligibility.  And right around the beginning of the

21   class period, I believe one month after the start of the class

22   period, for the first month of the class period, they didn't

23   have the $75 million float criterion satisfied.  But I

24   investigated to determine whether that was a concern or not.

25   Q.  And what did you find out?

H8OAARC1ps                     Feinstein - direct

A.  Well, one thing is that as soon as they were eligible, on

August 1, 2012, they not only were eligible, but they did

immediately file S-3.  So there's an August 1, 2012

eligibility.

        But if the factors are about the availability, I mean,

the factors underlying S-3 eligibility, are about availability

of financial data to the marketplace and whether the company is

big enough to be not obscure, in their IPO they submitted years

of prior financials and pro forma financials, and from the IPO

through August 2012, they supplemented that with additional

filings.  So the financial data was available.

        And as far as the size, I looked at -- I was

concerned.  I mean, was this company obscure or was it not

obscure in that early part of the class period.  I determined

it was not obscure.  There were over 200 news articles about

ARCP over that period, when they were not eligible for S-3

filing.

        THE COURT:  What was the period?

        THE WITNESS:  Of the 200 articles?  From the IPO

period to June of 2012, which is the -- after June of 2012,

they were over $75 million a quote.

        THE COURT:  So the only uncertainty you have is one

month.

        THE WITNESS:  That's right.

        THE COURT:  The first month, May.

1          THE WITNESS:  Right.

2     Q.  Did you satisfy yourself that there was enough information

3     available to you to analyze whether or not the market or that

4     *Cammer* factor was neutral to your analysis or satisfied based

5     on other information that was available to you?

6     A.  That's, that's what I'm saying, yes.

7     Q.  And so is your conclusion, then, that given all the

8     information that you looked at with regard to the common stock

9     in that early period, that you feel that the *Cammer* factor four

10    is satisfied with regard to the stock in that short time

11    period?

12    A.  That's right.

13          There's just one more thing I wanted to say about

14    that, which is that the reason why there were so many news

15    articles about this company and why it was not obscure, even in

16    its early phase, is because management, Mr. Schorsch, was well

17    known in this field and had very large nontraded REITs

18    available and had a team of staff of many, many brokers and

19    dealers essentially marketing and publicizing the other

20    investments.  He's a very well-known person in this space.

21    Therefore, when he started a publicly traded option, it gained

22    a lot of notoriety, a lot of coverage.  It was not obscure at

23    all.

24    Q.  And then the other factors that you've looked at were what?

25    Can you identify them?

1    A.  So those first four factors that we talked about are the

2    first four *Cammer* factors.  The fifth one we'll get to next.  I

3    mean, it's the area where there's the most contention here, is

4    the empirical factor, demonstration of a cause-and-effect

5    relationship.  But some courts have gone beyond the *Cammer*

6    factors and looked at three additional factors, which are

7    called the *Krogman* or *Unger* factors.

8                THE COURT:  Stay away from "courts."  The word we're

9    talking about is "economics."

10               THE WITNESS:  OK.  So the other factors are bid–ask

11   spread.

12               THE COURT:  That's my job.  "Courts" are my job.

13   "Economics," your job.

14   Q.  What are the other factors?

15   A.  First one, bid-ask spread.

16   Q.  What's a bid-ask spread?

17   A.  A bid-ask spread is essentially the fee that market makers

18   charge.  It's the spread between what they will pay for a

19   security and what they will charge you for a security.  So if

20   you buy and sell from a market maker, you basically pay them a

21   full bid-ask spread.

22   Q.  Why is that important to know when you're assessing the

23   efficiency of a market?

24   A.  If it's very wide, it means it's expensive to trade the

25   security.  And if it's expensive to trade the security, then

1   people might choose not to trade even when they have important

2   information.  So that is another reason why a market could be

3   inefficient.

4   Q.  Were you able to determine the bid-ask spread for each of

5   the securities you studied?

6   A.  The -- definitely for the common stock I had the bid-ask

7   spread.

8   Q.  And was it sufficiently narrow that you were satisfied that

9   that factor was confirmed?

10  A.  Yes.  And --

11  Q.  What about the preferred stock?

12  A.  Same thing.  It was not only -- it was far narrower than

13  the average for all other publicly traded stocks on American

14  exchanges.  That holds for both the common and the preferred.

15  Q.  And what about ARCP bonds?

16          THE COURT:  Can you give some specific examples.

17          THE WITNESS:  Yes.

18          THE COURT:  Ms. Wyman.

19          MS. WYMAN:  Yes.  I can inquire.

20  Q.  Dr. Feinstein, could you tell us what the bid-ask spread

21  was for ARCP's common stock that you calculated.

22  A.  This would be, the section is on page 28 of my report.  The

23  data are provided in paragraph 106.

24          THE COURT:  What did you look at, the pink sheets?

25          THE WITNESS:  No.  No, no, it's a NASDAQ traded stock.

1  So it's CRSP, the Center for Research in Security Prices at the

2  University of Chicago, has that data.  And I got that data and

3  examined that data.

4        THE COURT:  What does it do, list the bid and the ask?

5        THE WITNESS:  Each day.

6        THE COURT:  Once each day.

7        THE WITNESS:  Well, I believe there's -- I used

8  end-of-day data, but I believe it gives the bids and asks

9  throughout the course of each day.

10        There's TAQ data that we got.  It's called trade end

11  quote data.  And that data lists bids and asks, but it also has

12  bids and asks at the end of the day.  And I averaged end-of-day

13  bids and asks.

14        THE COURT:  Are these bids and asks that are posted by

15  market makers, or are they the actual bids and asks in trading

16  that day?

17        THE WITNESS:  Well, both.  It's both.  That's how the

18  NASDAQ market works.  They, market makers posts their bids and

19  asks, and then there are electronic media that consolidate all

20  the market makers' bids and asks so that you can see the inside

21  bid and ask, which is the best bid and the best ask, and that's

22  what's reported in the data.

23        THE COURT:  What's the inside bid and ask?

24        THE WITNESS:  That would be the highest bid and the

25  lowest ask.  So if you were selling your stock, you would want

1    the highest bid.  That would be most relevant bid for you.  If

2    you were buying the stock, you would want the lowest ask.  So

3    that data is available from CRSP.

4              THE COURT:  Is there a conventional average on the

5    market for bids and asks, in terms of spread?

6              THE WITNESS:  Yes.  I have that in paragraph 106.

7              So I did the analysis over the entire class period for

8    all other stocks in the CRSP database.  "CRSP" stands for the

9    Center for Research in Security Prices.  They're the provider

10   of this database.  It was 0.7 percent for all stocks traded on

11   American exchanges.  So 0.7 percent over that period.

12             For the common stock of ARCP, over the same period, it

13   was 0.18 percent.  So less than a third as wide.  So that tells

14   you it's an actively traded stock that could be traded very

15   economically.

16             The preferred stock --

17             THE COURT:  And there's competition among buyers and

18   sellers.

19             THE WITNESS:  Exactly right.

20             THE COURT:  Which tends to close the spread.

21             THE WITNESS:  That's exactly right.

22   Q.  And did you do the same analysis for the preferred stock,

23   Dr. Feinstein?

24   A.  Yes.

25             THE COURT:  So the preferred was issued -- when was

H8OAARC1ps                    Feinstein - direct

1    the preferred issued for the first time?

2              THE WITNESS:  That was in February of 2014.

3    Q.  Dr. Feinstein, I will direct you to paragraph 1485 of your

4    report on page 48.

5    A.  I'm sorry.  It's January.  I was off by a month.  It's

6    January 6, 2014, is when the preferred was issued.

7              Actually, it was issued on January 3, 2014, in

8    conjunction with one of the mergers that -- or acquisitions

9    that took place then.  But it began --

10             THE COURT:  Was the preferred issued in the ARCT

11   merger?

12             THE WITNESS:  Yes.

13             THE COURT:  In July of 2013?

14             THE WITNESS:  No.  January 6th of 2014 is the CapLease

15   and ARCT IV acquisition.  CapLease and ARCT IV is --

16             THE COURT:  "ARCT IV" is A-R-C-T.

17             THE WITNESS:  Yes, A-R-C-T IV.  So it's not the ARCT

18   III acquisition.  It's the ARCT IV acquisition.  And just

19   before that, to raise the money for that is when the preferred

20   was issued.

21             So it's January 6, 2014, is when it began trading.

22   And I looked at the bid-ask spread for the entire period from

23   January 6, 2014 through the end of the class period.

24   Q.  And what was your conclusion?

25   A.  It's on page 54 of my report.  The average bid-ask spread

1    was 0.15 percent, far below the average for the overall market

2    for other stocks that traded in the overall market.

3    Q.  And were you also able to compute the bid-ask spread for

4    ARCP's bonds?

5    A.  No.

6    Q.  Why not?

7    A.  That type of data is generally not available for the bonds.

8    Q.  Is that specific to ARCP or is that generally true for

9    corporate bonds?

10    A.  Generally true for corporate bonds.

11    Q.  Did you do anything else to satisfy this particular factor

12    concerning the bonds?

13    A.  I did.

14         So there wasn't -- I couldn't evaluate that particular

15    factor for the bonds.  But I was able to see the volume.  And

16    there's overlap between the importance and implications of each

17    of these factors.  These bonds traded extraordinarily actively

18    and extraordinarily frequently, not only in comparison to

19    stocks, but in comparison -- or not only in comparison to other

20    bonds but even in comparison on the standards of stocks.

21         So seeing how frequently these bonds traded told me

22    that there was no impediment to investors keeping them from

23    being able to buy and sell these particular bonds.

24         I just want to mention that the analysis I did there

25    is based on work by a researcher named Mohanty, who looked at

H8OAARC1ps                    Feinstein - direct

1    how frequently bonds trade, not just what the --

2            THE COURT:  How do you find out the frequency of

3    trading of bonds?

4            THE WITNESS:  Well, these particular bonds were --

5    this data is available.  This data is available from FINRA.

6    FINRA collects data on trades, and that data then is made

7    available to researchers who request it.  I requested it from

8    counsel and counsel, I understand, got it from FINRA.

9            THE COURT:  And what's the methodology of collection?

10   How is it collected?  Information, etc.

11           THE WITNESS:  The FINRA rules are that FINRA members,

12   who are the market makers who make the market in those bonds,

13   have to report their trades, the prices and the volumes, to

14   FINRA, and then FINRA collects and maintains --

15           THE COURT:  Each day?

16           THE WITNESS:  Yes.  Each trade.  Each trade.

17           So what I was able to see is that whereas, according

18   to the Mohanty --

19           THE COURT:  You could actually trace all the trades of

20   the bonds, everything that was reported.

21           THE WITNESS:  Right.

22           THE COURT:  And it's an obligation to report.

23           THE WITNESS:  That's right.

24           THE COURT:  And from that you could determine -- how

25   do you determine the spreads?

1              THE WITNESS:  Well, I couldn't.  I couldn't.

2              THE COURT:  You could only see the trades.

3              THE WITNESS:  The trades and the prices.  The volumes

4    and the prices, but not the bids and the asks.

5              THE COURT:  So what did you do in analyzing the trades

6    to come to your opinion that there was efficiency with regard

7    to this factor?

8              THE WITNESS:  Well, specifically with regard to bid

9    and ask, I report that I could not.

10             THE COURT:  Well, bid and ask, there is no bid and ask

11   of bonds.  All you have is price and volume.

12             THE WITNESS:  Right.

13             THE COURT:  Right?

14             THE WITNESS:  So I conducted a Mohanty study.  A

15   Mohanty study looks at how much time is there between trades.

16   So typically the research, the literature on bonds is that

17   bonds trade infrequently but in very large blocks.  So one

18   institution might move $100 million of their holdings or $50

19   million of their holdings, but they're not going to do that

20   every day.  They'll do it from time to time.  So typically for

21   corporate bonds you see very large trades but very

22   infrequently.  Many days will pass between one trade and the

23   next.

24             That was not the case with the ARCP bonds.  They

25   traded many times a day on average.  There were some days when

H8OAARC1ps                        Feinstein - direct

1    there was no trading.  But I calculated the average time

2    between trades and it was less than a day.  So on average, they

3    traded every -- on average, I mean, using that metric, they

4    traded very frequently and more than once a day.

5            So I was able to do a lot of work with that data.  I

6    was able to then later do an event study with that data.

7    Whereas typically with bonds you can't do an event study.

8    Because these bonds traded so extraordinarily actively, I was

9    able to examine, do more empirical work with those bonds.

10   Q.  You mentioned that you did a Mohanty study.  Is that the

11   generally accepted way to figure out whether the bid-ask spread

12   component of a market efficiency analysis is met when you are

13   dealing with bonds?

14   A.  No.  That's -- it's -- no.  I could not do the bid-ask

15   spread evaluation for the bonds because I didn't have that

16   data, so instead I looked at the Mohanty work and did a Mohanty

17   study to see -- to answer the same question: was there an

18   impediment to the trading of the bonds.  And I found there was

19   no impediment to the trading of the bonds.

20           THE COURT:  The point is that the more frequent the

21   trade, the closer the range in stock prices, the more efficient

22   the market.

23           THE WITNESS:  Yes, I would say that.  I would say that

24   it is --

25           THE COURT:  There is a lot of opportunity to trade.

1           THE WITNESS:  Yes.

2           THE COURT:  A lot of people willing to buy and sell.

3           THE WITNESS:  Right.

4           THE COURT:  An open market, available market.

5           THE WITNESS:  Right.

6           THE COURT:  There is not a terrible amount of price

7    fluctuation between trades.

8           THE WITNESS:  OK.  I mean, there -- that's reasonable.

9           THE COURT:  Why is that the case?

10          THE WITNESS:  If there's active trading, then -- the

11   way the over-the-counter bond market works is that if an

12   institution wants to buy a bond, it's an over-the-counter

13   market, so they'll either use the telephone or they'll use

14   other platforms to survey three or so market makers and find

15   out what the bond is being offered for.  If the bond is

16   actively traded, that information becomes available through

17   this kind of surveying of market makers.  So the more active

18   trading there is, the better you can shop around for the bond

19   if you're trying to buy the bond and get a better price.

20          THE COURT:  And the less the volatility.  There's a

21   lesser fluctuation.

22          THE WITNESS:  I have to admit I didn't evaluate that

23   specifically, but it sounds -- you're -- the inference is

24   reasonable.

25          THE COURT:  So what did you look at?  You looked at

1    prices and volume.  The volume tells you that there were a fair

2    number of market makers.  There's a ready market to buy and

3    sell.

4            THE WITNESS:  Right.

5            THE COURT:  But you didn't do any analysis of what the

6    prices might mean, in terms of market efficiency.

7            THE WITNESS:  Well, I did.  I mean, for the -- I did

8    do an event study on the bonds to see how it responded to the

9    October 29 information.  That I was able to do.  And I did a

10   regression analysis to see what the relationship is between

11   movements --

12           THE COURT:  We haven't gotten to that.  Ms. Wyman can

13   elicit that information when she gets to it.

14   Q.  So with regard to the bonds, you were able to study the

15   frequency with which they traded instead of determining the

16   bid-ask spread.  Is that right?

17   A.  That's right.

18   Q.  And are you satisfied that the frequency that you

19   calculated is indicative of a market where the bond was

20   available to trade if someone wanted to?

21   A.  Yes.

22   Q.  And then the last factors are, what?

23   A.  Size, in terms of market capitalization, meaning, for

24   stock, it's the total number of shares outstanding times the

25   price of the stock, so the total value of the outstanding

H8OAARC1ps                    Feinstein - direct

1    issue.  Most people call that number the market capitalization

2    of the company.

3    Q.  And is that something you looked at with regard to the

4    stocks?

5    A.  Yes.

6    Q.  Did ARCP's business grow during the class period?

7    A.  It did.

8    Q.  How did you account for that during your analysis of the

9    market capitalization factor?

10   A.  Well, I looked at different periods.  I looked at an

11   average over the entire class period.  I looked at an average

12   over essentially the first half of the class period versus the

13   second half of the class period.  And then in response to

14   Dr. James' work, I looked at the earliest period as well to see

15   what the market cap was even in the earliest period -- portion

16   of the class period.

17   Q.  How do you decide to divide the class period?  On what

18   basis did you make that decision?

19   A.  Well, the reason I divided the class period is I

20   anticipated there might be some concern about the growth of the

21   company over time.  So I observed that analysts said that a

22   major break, a major change in the nature of this company came

23   in August of 2012, with the announcement of an event called

24   internalization.  Until -- in the earlier part of the class

25   period, the company had, I believe, no employees.  I mean, they

H8OAARC1ps                         Feinstein - direct

1    subcontracted externally for the management of the company.

2    And that was a concern that potential investors had regarding

3    just how the company was managed and regarding whether -- it

4    was a concern that some analysts pointed out could make it

5    difficult for the company to acquire other REITs and other,

6    other businesses.  But with internalization, that concern

7    disappeared.  And so that announcement of internalization was

8    in August of 2012 --

9              THE COURT:  "Internalization" means -- it's the

10   management?

11             THE WITNESS:  The management, that they took the

12   management from being subcontracted to an outside firm, an

13   outside Schorsch-controlled form, to inside ARCP.

14             And it just so happens that that was approximately

15   right at midpoint of the class period.

16   Q.  I think you said August 2012.  Are you sure that that's the

17   year that that happened?

18   A.  No.  It's August 2013.  I misspoke.

19   Q.  So the first part of the -- the first interval that you

20   looked at was from May 9, 2012 to August?

21   A.  2 thousand -- August 20 -- August 19, 2013.

22   Q.  So you looked at the market cap metric during that period

23   separately from the entire class period, right?

24   A.  Yes.

25   Q.  And what did you find when you looked at it in that period?

H8OAARC1ps                    Feinstein - direct

A.   On average over that period it was extraordinarily high.

Q.   And then did you subsequently --

          THE COURT:  What was extraordinarily high?

          THE WITNESS:  The market cap, the total outstanding --

the average of the total outstanding value of the stock and the

preferred --

          THE COURT:  Over what period?

          THE WITNESS:  May 9, 2012 to August 19, 2013.

          THE COURT:  And you say that was extraordinarily high?

          THE WITNESS:  Yes.

          THE COURT:  In relationship to what?

          THE WITNESS:  Other stocks, other publicly traded

companies.

          THE COURT:  It had a high capitalization.

          THE WITNESS:  Correct.  It was on average big.

          THE COURT:  And after August 19, 2013, capitalization

was even higher?

          THE WITNESS:  I'm sorry.  Pardon?

          THE COURT:  After it was even higher?

          THE WITNESS:  Even higher, that's right.

          THE COURT:  It was high on both sides.

          THE WITNESS:  That's right.

          THE COURT:  High before August 19, 2013 and high

afterwards.

          THE WITNESS:  On average.

1           THE COURT:  On average.

2    Q.  And did you satisfy yourself --

3           THE COURT:  "Average" meaning average versus the

4    average of all stocks, all publicly traded stocks?

5           THE WITNESS:  No, "average" meaning the average across

6    each day in the period.

7    Q.  So how did you calculate the average that you're talking

8    about?

9    A.  I measured the market capitalization each day, added them,

10   and divided by the number of days.

11   Q.  And did you satisfy yourself, in doing that exercise, that

12   that factor was met for the common stock during the full class

13   period plus the two intervals that you identified?

14   A.  Yes.

15   Q.  And did you do the same exercise for the preferred stock?

16   A.  Yes.

17   Q.  And did you have to divide the preferred stock analysis

18   into intervals as well?

19   A.  No, because of when it was issued.

20   Q.  And what was your conclusion concerning the preferred stock

21   market capitalization?

22   A.  It's on page 53 of my report.  It was high.  It was close

23   to a billion dollars.  It was, the average is, I'm reading from

24   paragraph 205, it's $988.6 million.  And what's interesting

25   about that number is, even if that were the only securities

H8OAARC1ps                    Feinstein - direct

1    that ARCP had ever issued, even if there were no bonds and if

2    there were no common stock, that $988.6 million would place the

3    company in the top fifth decile relative to all other companies

4    in the United States ranked by size, which means it would be --

5    more than 50 percent of other companies would be less than even

6    that number alone.

7    Q.  And in your opinion that was enough, their market

8    capitalization was enough to satisfy that factor?

9            THE COURT:  Why don't you just move into the cause and

10   effect or the empirical factor if that's the one at issue.

11           MS. WYMAN:  Sure.

12           THE COURT:  I actually want to hear what Dr. Feinstein

13   says on this, and then I want to turn the podium over to

14   Mr. Edelman.

15   Q.  In analyzing *Cammer* factor five, Dr. Feinstein, what did

16   you do concerning that factor with the common stock?

17           THE COURT:  He said, he took it on the period of the

18   end of the class period, October 29, 2014.  Right?

19           THE WITNESS:  Well, I did a -- that was one of the

20   tests I did.

21           THE COURT:  What other tests did you do?

22           THE WITNESS:  The other test is a collective-event

23   test.  A collective-event test identifies, using a screen, days

24   on which one would reasonably believe there was a higher flow

25   of information to the market about that stock.  And based on my

screen, I came up with 45 such days.  Then I ran tests to

compare those 45 days, where there was reasonably a greater

flow of information to the market, to all other days in the

class period and also other portions of the class period.  And

the experiments, the statistical tests, seek to determine

whether the price dynamics among the news events are different

from the price dynamics in the more typical days, because if

there is a greater significance -- a greater incidence of

significant days in the news events than typically among all

other days, that is a demonstration that the stock is reacting

to news.  So I analyzed 45 days.  If there was a greater

frequency of significant days among those 45 and the division

between the 45 and the other days is on the basis of

information flow, you now know that information flow matters.

You now know that information is reaching the marketplace and

the market is reacting to it.

          So that was one test.  That's called the Z test.  And

I did find that there was a statistically significantly higher

incidence rate of significant days among the news days than the

non-news days.

Q.  Did you study that over the course of the entire class

period?

A.  Yes.

          THE COURT:  Is there a table in your report that

depicts what you found?  Tab what?

H8OAARC1ps                          Feinstein - direct

1               THE WITNESS:  Page 206, tab 10.

2               THE COURT:  Tab 10?

3               THE WITNESS:  Tab 10.

4               So -- are you there?

5               THE COURT:  Yes.

6               THE WITNESS:  OK.  So in the far right column are the

7   results for the entire class period.  There were 623 days in

8   the entire class period.  Of those, 41 are statistically

9   significant.

10              THE COURT:  What does that mean?

11              THE WITNESS:  "Statistically significant" means the

12  stock price movement was severe, either up or down, that it was

13  a big movement, such that it would be rare for a movement like

14  that to happen on the basis of random volatility alone.  That's

15  what "statistical significance" means.

16              THE COURT:  And did you find some cause to that

17  movement?

18              THE WITNESS:  Yes.  That's actually, in fact, what the

19  study shows.  Because we could see that -- see the number 26.67

20  percent.  Of the 45 news days, 26.67 percent were statistically

21  significant, but of the non-news days, only 5.02 percent, which

22  is the typical rate for typical days, were statistically

23  significant, and that tells you that the incidence of

24  statistical significance is five times greater among the news

25  days, on days when there's a larger flow of news, than on days

H8OAARC1ps                    Feinstein - direct

1    when there's a lesser flow of news, which is a demonstration

2    that this market cares about news.

3              THE COURT:  OK.  I think you've covered it.  Right,

4    Ms. Wyman?

5              MS. WYMAN:  Well, he actually did several more tests

6    on -- statistical tests on the common stock, and he did tests

7    on the preferred and the bonds, which he can describe to you.

8              THE COURT:  Go ahead.

9    Q.  And so you did this collective-event study and you found

10   that on --

11             THE COURT:  Don't repeat.  This is the common stock.

12   What did you do for the preferred?  Is there another table

13   showing what happened with the preferred stock?

14             THE WITNESS:  For the preferred I ran only the event

15   study on October 29, 2014.

16             THE COURT:  And what happened to the preferred that

17   day?  Dramatic movement?

18             THE WITNESS:  Yes.  It fell significantly.

19             THE COURT:  How about, what other equities were

20   involved?

21             MS. WYMAN:  There were no other equities.  It was

22   bonds.

23             THE COURT:  Bonds.

24   A.  I was able to run the event study.  I had another data.

25   There was enough trading on the bonds.

1          THE COURT:  The bonds fell too?

2          THE WITNESS:  They fell significantly.

3    Q.  And Dr. Feinstein, why didn't you do the collective-event

4    study on the preferred and the bonds?

5    A.  The nature of a collective-event study is, you're not

6    screening the data on the basis of should -- is the news so

7    severe that it should cause a statistically significant drop.

8    It's a much more objective screen, that just tries to identify

9    on which days was there a greater news flow.  And for the most

10   part the greater news flow for this company was not so dramatic

11   over the course of the class period that it would affect, in a

12   significant way, bonds or preferred stock, because bonds and

13   preferred stock are both designed to be stable.  So when there

14   was -- it might be important news that was disclosed, but

15   generally the kind of news that would move a stock in a

16   statistically -- a common stock in a statistically significant

17   manner wouldn't move a bond or a preferred stock in a

18   statistically significant manner, unless it's some blockbuster

19   news like what came out on the disclosure.

20         THE COURT:  So what came out here?  Was there

21   movement?

22         THE WITNESS:  On the last day there was.

23         THE COURT:  Only on the last day.

24         THE WITNESS:  Well, that's the only test.

25         THE COURT:  What about the bonds?

1           THE WITNESS:  Same thing.  They fell significantly in

2   response to the October disclosures.

3           THE COURT:  So what about the other 44 news events

4   that affected the common stock, according to your analysis?

5           THE WITNESS:  I didn't subject the other securities to

6   that same test.

7           THE COURT:  Why not?

8           THE WITNESS:  Because the kind of information would

9   not, just based on valuation principles, would not --

10          THE COURT:  You expected it would not result in a

11  price movement, so why look.

12          THE WITNESS:  That's right.

13          THE COURT:  OK.  Cross-examination.

14          THE WITNESS:  Could I just make clear that it's based

15  on principles you wouldn't expect it to.  It shouldn't

16  necessarily cause a price movement, not that I didn't think it

17  would.

18          THE COURT:  You didn't think there wouldn't be any

19  movement, and you didn't look.

20          THE WITNESS:  Right.  Under an efficient market it's

21  not compelled that there should be a movement.

22          THE COURT:  You explained it.

23          THE WITNESS:  OK.

24          THE COURT:  Those kinds of securities don't move as

25  much.

1              THE WITNESS:  Right.

2              THE COURT:  Realistically they only move if the

3      dividend is in jeopardy --

4              THE WITNESS:  That's right.

5              THE COURT:  -- or if the maturity level of the bond

6      and the ability to pay, the maturity, to pay interest along the

7      way is in jeopardy.

8              THE WITNESS:  That's correct.

9              THE COURT:  That's a different analysis.

10             OK, Mr. Edelman.

11     CROSS-EXAMINATION

12     BY MR. EDELMAN:

13     Q.  Dr. Feinstein, Judge Hellerstein asked you about the

14     definition of market efficiency.  Do you recall that?

15     A.  Yes.

16     Q.  And he asked you whether it was relative.  Do you recall

17     that?

18     A.  Yes.

19     Q.  And you answered in terms of how much information gets

20     ignored or not ignored.  Right?

21     A.  Right, that there are degrees of efficiency and the degrees

22     would relate to exactly what you said.  Sure.

23     Q.  But, sir, you agree that the definition of market

24     efficiency is that an efficient market rapidly incorporates

25     into the price of a security all -- and I emphasize "all" --

1  publicly available information.  Correct?

2  A.  That's the ideal.  That's, that's --

3  Q.  Well, that's the way you defined it, sir.  Correct?

4  A.  That's the way I define the ideal, and I remember we went

5  over this in the deposition.  That would be called perfect

6  efficiency.

7  Q.  Sir, the way you defined market efficiency in your expert

8  report was that you used the word "all" public information.

9  Right?

10  A.  Correct.

11  Q.  And you agreed at your deposition that "all," in the

12  economic literature, means all, not some.  Right?

13  A.  Yes.

14  Q.  And if you turn to page 13 to 14 of your expert report, you

15  provided some definitions of an efficient market, and, for

16  instance, you cited Professor Fama at the bottom of page 13 and

17  you provided a definition there from Professor Fama, who you

18  sited to me as an expert in this area.  Correct?

19  A.  Yes.

20  Q.  And his definition was, "A market in which prices always

21  'fully reflect' available information is called 'efficient.'"

22  correct?

23  A.  Yes.

24  Q.  And that's your report and you used that definition, and it

25  includes the word "always."  Right?

H8OAARC1ps                    Feinstein - cross

A.   Yes.  But I want to point out that the very next sentence
of my report says, "Professor Fama elaborated and refined his
definition in the *Halliburton II* amicus curiae that he
coauthored."

            THE COURT:  I don't know where we'll go with this,
Mr. Edelman.  It's not an absolute.  I don't understand an
efficient market as an absolute concept.

            MR. EDELMAN:  Well, your Honor --

            THE COURT:  I know, I see that Fama says "always fully
reflect available information."

            MR. EDELMAN:  And, your Honor, I would point out that
Dr. Feinstein also included in paragraph of 50 a quotation from
the *Amgen* Supreme Court case that also makes clear that an
efficient market will reflect all publicly available
information about a company.  And that was included.
Q.   And that was included in your report from the *Amgen* case,
right?

            THE COURT:  I don't think legally I'm required to
reserve for the definition of "efficiency" to the markets that
are a hundred percent efficient.  There's no such thing as
perfection.  Not in economics.  Certainly not in judging.
Q.   But you agree that when economists study market efficiency,
they're not looking just for a market that sometimes gets
public information and sometimes doesn't.  They're looking for
something that always, or -- perfection is elusive -- almost

H8OAARC1ps                    Feinstein – cross

always incorporates public information.  Correct?  That's the

economic definition.  Correct?

A.  I would defer to what Professor Fama wrote that I quote in

paragraph 48: "Economists do not generally disagree about

whether market prices respond to new material information."

And so I think that's the level of perfection that is the

consensus in the profession.

          THE COURT:  As Daniel Kahneman points out in his book,

if a market were fully efficient, no one would buy and no one

would sell, because the market would always reflect the full

expectations of everyone.  So there always has to be a level of

inefficiency that's perceived in order to motivate a buyer to

sell a stock, in order to motivate a seller to buy a stock.

          (Continued on next page)

H8O5arc2                    Feinstein - cross

1   BY MR. EDELMAN:  (Continuing)

2   Q.  Now, you were also asked about the significance of the

3   fifth Cammer factor in the event study; correct?

4   A.  Yes.

5   Q.  And I heard you testify here that that factor, you view as,

6   you said, icing on the cake, correct?

7   A.  That's right.

8   Q.  But the fact is that in your expert report you

9   characterized it quite differently, correct?

10  A.  I don't believe so.  I pointed out that it was a unique

11  factor because it is a demonstration of market efficiency and

12  that it is special for that reason.  I wouldn't discount icing

13  on the cake.

14  Q.  You didn't use the phrase "icing on the cake" in your

15  expert report, right?

16  A.  Correct.

17  Q.  If you turn to paragraph 109 of your report you stated:  Of

18  the five Cammer factors, the empirical factor was cited by the

19  Cammer Court as one of the most convincing ways to demonstrate

20  efficiency, correct?

21  A.  Yes.  And they're right, because once you've looked at the

22  other factors, to see a demonstration of the market behaving

23  efficiently would be very convincing.

24  Q.  And in fact you wrote, affirmatively, when you put in your

25  expert report that, in paragraph 110, second line:  The

H8O5arc2                    Feinstein – cross

1    empirical factor focuses on the essence of market efficiency as

2    the other four factors are indicators that generally signal

3    market efficiency, correct?

4    A.   That's right.

5    Q.   And, in fact, you would agree that the event study is the

6    paramount tool for testing market efficiency, right?

7    A.   Yes.

8    Q.   And you would agree that it is the most important factor,

9    right?

10   A.   No.

11   Q.   Well, sir, you never put in an expert report, to your

12   recollection, for market efficiency on a security without doing

13   an event study unless there was no data available; correct?

14   A.   That's true.

15   Q.   And it is a fact that at your deposition you were asked:

16   "Q  And wouldn't you agree that the fifth empirical factor is

17   the most important one?"

18           And you testified:

19   "A  Generally speaking, yes."

20           Correct?

21   A.   Can you read that back, please?

22   Q.

23   "Q  And wouldn't you agree that the fifth empirical factor is

24   the most important one?

25   "A  Generally speaking, yes."

H8O5arc2                          Feinstein - cross

1    A.  I don't know what went before or after that but as I

2    described, it is a special --

3              THE COURT:  Overruled.

4    A.  It is a special factor.

5    Q.  Let me hand up your deposition, I'm going to give you a

6    binder.

7              May I approach, your Honor?

8              THE COURT:  You may.

9              What you are saying in the deposition is of all the

10   factors, that the empirical factor is the most important.

11   A.  It certainly, as I understand it, as I have always

12   testified, the factor should be examined holistically and

13   comprehensively.

14             THE COURT:  Meaning that you take all of the factors

15   into consideration.

16             THE WITNESS:  Right.

17             THE COURT:  But of all the factors there, Mr. Edelman

18   is asking you, if you said at your deposition that the

19   empirical factor --

20             MR. EDELMAN:  If you look at page 49.

21             THE COURT:  -- the empirical factor is the most

22   important.  In other words what happened is more important than

23   what should have.  What might be expected to happen.

24   BY MR. EDELMAN:

25   Q.  Why is it difficult for you to concede that, sir?

 1    A.  No, I'm going to concede it says:  Generally speaking, yes.

 2              THE COURT:  Generally speaking.

 3    Q.  And you generally conceded that because you knew that you

 4    testified to that effect in multiple other depositions,

 5    correct?

 6    A.  Generally speaking, yes.

 7    Q.  Because in the next question I ask you:

 8    "Q  And in fact that's something that you testified to,

 9    correct?"

10              And you said:

11    "A  Yes."

12    A.  No.  The question was, and you would agree --

13              THE COURT:  Don't take offense to the questions.  Do

14    you agree, do you not, that event studies, empirical factors,

15    are more important than indicators?

16              THE WITNESS:  But his question was --

17              THE COURT:  Look at me, Dr. Feinstein.

18              THE WITNESS:  Sure.

19              THE COURT:  We agree that what happens in the real

20    world is more important than this kind of a study, than what

21    you think is likely to happen by an indicator.

22              THE WITNESS:  Okay.

23              THE COURT:  All right.  You have it.

24    BY MR. EDELMAN:

25    Q.  And that's what you meant when you said "icing on the

1   cake?"

2              THE COURT:  Mr. Edelman, we got it.  Let's go.

3   Q.  Now, you testified that you divided the class period into

4   two parts to study them separately, correct?

5   A.  That's right.

6   Q.  Did you divide the class period based on when the market

7   capitalization of the securities changed?

8   A.  No.

9   Q.  Were there dates when the market capitalization of the

10  securities changed?

11  A.  Yes.

12  Q.  Can we bring up Exhibit 1 to Mr. James' report?  We will

13  come back to that.

14             THE COURT:  What are you looking for?

15             MR. EDELMAN:  I am looking for an exhibit to

16  Mr. James' report.  Actually, your Honor, we have a -- I am

17  going to hand up Dr. James' report.

18             THE COURT:  Do you want him to comment on something

19  that James did?

20             MR. EDELMAN:  I just want to show him a chart in there

21  that I think we will be talking about.

22             THE COURT:  Do you have a copy for me?

23             MR. EDELMAN:  I thought I just handed it up.

24  BY MR. EDELMAN:

25  Q.  If you could look at Exhibit 1 to that report?

H8O5arc2                          Feinstein - cross

1   A.  I see it.

2   Q.  So, that's a chart that was contained in Dr. James' report

3   that shows three periods of the class action, correct?

4   A.  Yes.

5   Q.  And, it notes that you know that there were two significant

6   transactions that dramatically changed the amount of shares

7   outstanding and the float in ARCP shares, correct?

8   A.  That's right.

9   Q.  And those two changes occurred between February 27th and

10  February 28th where this first dotted line is and, again,

11  between February 6 and February 7th where the second dotted

12  line is, right?

13          THE COURT:  Yes.

14          THE WITNESS:  Yes.

15          THE COURT:  2013 and 2014, respectively.

16  Q.  With that amendment, yes.

17  A.  Yes.

18  Q.  But the line that you chose to draw, in terms of studying

19  these, was somewhere in the middle of the second period, right?

20  A.  That's right.

21  Q.  And you chose that line because that was the date that the

22  company announced internalization of its management, correct?

23  A.  That's right.  The strategy of the company changed and

24  analysts commented that that opened the door for the mega

25  mergers -- the external mega mergers.

1    Q.  And that didn't change, on that day, the company's market

2    capitalization, right?

3    A.  That's right.

4    Q.  It didn't change the characteristics of the market in terms

5    of how many shares were out there, right?

6    A.  Correct.

7    Q.  And, in fact, that announcement was implemented for some

8    months later, right?

9    A.  Right.

10    Q.  The internalization that was announced in August, was it?

11    A.  Of 2013, yes.

12    Q.  It wasn't implemented until when, sir?

13    A.  I believe it happened right around the time of the Cole

14    mergers, that's in 2014.  No, I'm sorry, it happened around the

15    time of the CapLease merger.

16    Q.  But when you were adopting your scientific tests to

17    determine what sub periods to look at, you chose that August

18    2013 date to create two sub periods, right?

19    A.  Yes.

20    Q.  Now let's turn to your October 29, 2014 allegation-related

21    event study.  That's what you call it, right?

22    A.  Which page?

23    Q.  Do you have something in your report that you refer to as

24    an allegation-related event study, sir?

25    A.  Yes.

H8O5arc2                          Feinstein - cross

1  Q.  And, you testified that your allegation-related event study

2  was a controlled experiment, right?

3  A.  Right.

4  Q.  That was your word to describe this study, correct?

5  A.  Right, because what it allows a researcher to do is examine

6  the value of the securities in the marketplace when the

7  marketplace did not yet have the October disclosure information

8  and allows you immediately to also seek what is the value of

9  the securities in the marketplace when the marketplace does

10 have that information.  So, the only thing that's changing

11 across that break is the market doesn't have the information

12 and the market does have the information, so in a controlled

13 experimental manner you can see the impact of that information.

14 Q.  And you conducted an experiment.  That's what you said,

15 right?

16 A.  I said -- I explained this in the deposition.  The market

17 conducted the experiment, I interpreted it.

18 Q.  So when you called it a controlled experiment it wasn't a

19 controlled experiment the way economists use the term, it was

20 something that the market did that you are calling an

21 experiment?

22 A.  No.  It is a controlled experiment in that you can see the

23 value of the securities and you can see how the marketplace

24 behaved, one, without the information; and then two, with the

25 information.  So, in that manner, it is an experiment.

H8O5arc2                          Feinstein - cross

1    Q.  Let's talk about what you did.

2              Typically in allegation-related event studies one

3    looks at the announcements that are the subject of the

4    allegations of false statements, right?

5    A.  I'm not sure what you mean.  Do you mean they look at the

6    misrepresentations?

7    Q.  Yes.  Typically you look at the misrepresentations, right?

8    A.  No, that's not true, because in most cases

9    misrepresentations maintain the market's perception that

10   everything is smooth at the company, and so you would not

11   expect misrepresentations and especially omissions when they're

12   made to move the stock price a statistically significant

13   amount.  So, you look at the disclosure to see what happened to

14   the security prices when the information finally became

15   available.

16   Q.  Well, sir, you testified in response to Ms. Wyman that you

17   have done a lot of these reports in the course of your career,

18   right?

19   A.  Yes.

20   Q.  And most of them have dealt with market efficiency, right?

21   A.  Yes.

22   Q.  I think the number was 80, right?

23   A.  I haven't counted exactly, but that's a fair estimate.

24   Q.  And at your deposition you could not recall a single

25   allegation-related event study where you had used only a single

H8O5arc2                          Feinstein - cross

1    date, correct?

2    A.  I can now.

3    Q.  At your deposition you couldn't, but you can now.

4    A.  That's right.

5    Q.  And how many of the 80 were single-event dates?

6    A.  I don't know how many the of the 80 but there were three

7    recent cases; Prudential, Freddie Mac, the third one eludes me.

8            THE COURT:  I don't think it is going to be important.

9    BY MR. EDELMAN:

10   Q.  Now, you did not do an analysis --

11   A.  I'm sorry.  The BP Alaska.

12           THE COURT:  Let it go, please.

13   A.  Okay.  BP Alaska.

14   Q.  You did not do an analysis of earning announcement dates as

15   part of your event study, correct?

16   A.  I didn't focus only on the earnings announcement dates,

17   that's right.

18   Q.  You never did an analysis?

19           THE COURT:  Can I ask, what qualified as an event?

20           MR. EDELMAN:  Well, for purposes of the October 29th

21   study first.

22           THE COURT:  No.  You 45 event days day.

23           MR. EDELMAN:  Your Honor, this first test --

24           THE COURT:  Counsel, I'm the Judge.

25           MR. EDELMAN:  Okay.  Answer his questions.

H8O5arc2                           Feinstein - cross

1              THE COURT:  You testified there were 45 event days,

2    right?

3              THE WITNESS:  Right.

4              THE COURT:  How did you fix an event?  What made an

5    event?

6              THE WITNESS:  So, remember, these events or the

7    collective event study are not dates that one would expect, in

8    an efficient market, would necessarily cause a statistically

9    significant --

10             THE COURT:  Answer my question.

11             THE WITNESS:  If the company issued an 8-K, so, if the

12   company said this was an event, and then analysts addressed

13   what the company had issued in the 8-K so that analysts also

14   considered it to be important news.  So, I looked for -- those

15   are the two screens.  It had to be an 8-K --

16             THE COURT:  Supposing the 8-K said everything is as

17   good as it was and we consider that life will be as good after

18   as it was before.  That should not move the stock, should it?

19             THE WITNESS:  That's right; but to be objective I kept

20   it in.  If those two objective screens were met it was in 45.

21             THE COURT:  So that defines an event.

22             Go ahead, Mr. Edelman.  Sorry to interrupt.

23   BY MR. EDELMAN:

24   Q.  Wait.  You did two studies, the collective event study we

25   are going to get to, and the study I'm asking about now is the

H8O5arc2                         Feinstein - cross

1   allegation-related event study, right?

2   A.  Yes.

3   Q.  And for that one you chose only one event?

4   A.  That's right.

5   Q.  And the only event you chose was October 29 when the

6   announcement of all of the problems at ARCP came out, right?

7   A.  That's right.

8   Q.  And you know that was announced on CNBC, right?

9   A.  That's right.

10  Q.  It was in the Wall Street Journal that day, right?

11  A.  True.

12  Q.  That was a Big event with a capital B, right?

13  A.  Which is what you are looking -- what a researcher should

14  look for in choosing a market efficiency event study event.

15          THE COURT:  What are we trying to bring out,

16  Mr. Edelman?

17          MR. EDELMAN:  What's that?

18          THE COURT:  What are we trying to bring out?

19          MR. EDELMAN:  We are trying to bring out that all this

20  demonstrates is that on one day, where there was a blockbuster

21  announcement, there was a movement in the stock price.  And

22  that --

23          THE COURT:  Well, he said that for the preferred and

24  the debt he just looked at that one day, but for common he

25  looked at 45 days.

1          MR. EDELMAN:  No.  For the common he is offering two

2     different experiments which he claims both support his claim of

3     efficiency.  With respect to the preferred and the debt, he is

4     only offering this theory which makes no sense.

5          THE COURT:  I understand.

6          MR. EDELMAN:  And so --

7          THE COURT:  I will decide if it makes sense or doesn't

8     make sense, but the common he said there were 45 events.

9          MR. EDELMAN:  That's with respect to his collective

10     event study and I am going to get to that.

11          THE COURT:  Let's go there right now.  I understand

12     your argument.  You can't make a rule of one be a basis for a

13     projection for a period of three years.

14          MR. EDELMAN:  Before I go to the collective event

15     study can we cover the notes in the preferred and then I will

16     move to the collective event study?

17          THE COURT:  He already did, it is one day, October

18     29th.

19          MR. EDELMAN:  There is more you should know about the

20     notes in the preferred.

21     BY MR. EDELMAN:

22     Q.  First, you would agree that the notes and preferred stock

23     needed to be analyzed for efficiency separately from the common

24     shares, correct?

25          THE COURT:  He has already said that.

H8O5arc2                    Feinstein - cross

1   Q.  And you made the decision not to perform the collective

2   event study, the 45-day study, on the notes and preferred?

3          THE COURT:  He said that because he said he didn't

4   expect anything to happen.  Let's -- give me a break.  I'm

5   following it.  I really am.

6   BY MR. EDELMAN:

7   Q.  Sir, you agree that for the preferred shares you believe

8   that none of the 8-Ks issued by ARCP over the entire class

9   period were of sufficient importance that you would have

10  expected a statistically significant price change, correct?

11          THE COURT:  For the preferred and the debt.  He said

12  it.  Can we do on?

13          MR. EDELMAN:  Correct?

14          THE COURT:  Go to the 45 days, please.

15  BY MR. EDELMAN:

16  Q.  Now, the collective event analysis that you did --

17          THE COURT:  Collective events means 45 days.

18  BY MR. EDELMAN:

19  Q.  45 days.

20          The 45-day event analysis that you did, you did the

21  same -- you have done the same analysis in other cases,

22  correct?

23  A.  Yes.

24  Q.  And in this case, instead of analyzing every 8-K, you

25  placed an additional screen by only including the 8-Ks that

H8O5arc2                         Feinstein - cross

1  were mentioned in an analyst report subsequently, right?

2  A.  First of all, I think there is an implication --

3           THE COURT:  It is a yes or no answer for this.

4           THE WITNESS:  Pardon?

5           THE COURT:  A yes or no answer, if possible.

6           THE WITNESS:  I'm sorry.  Can I hear the question

7  again?

8           THE COURT:  Did you filter out the events to include

9  events only that were commented on by analysts?

10           THE WITNESS:  That's how I chose the event, yes.

11  BY MR. EDELMAN:

12  Q.  And other times when you have done this test you just used

13  all the 8-Ks, correct?

14  A.  Not every time, but yes, sometimes I have done that.

15  Q.  Like in the *Petrobras* case you used every 6-K --

16  A.  That's not accurate.

17  Q.  But other times you have used all 6-Ks and you are saying

18  in the *Petrobras* case you applied a filter.

19  A.  I did apply a filter in *Petrobras*.  I also did a study with

20  all 6Ks.  Their press releases were in Portuguese, so, and the

21  analyst reports were in Portuguese.  So, I did a 6-K event

22  analysis with screens and also without the screen.

23  Q.  But you would agree that in some expert reports you do it

24  will all 8-Ks or all 6-Ks, right?

25  A.  I remember in *Petrobras* I did it with screens and also

H8O5arc2                         Feinstein - cross

1    without the screen.

2    Q.  Here you didn't do it with all the 8-Ks.

3    A.  Right, and there was good reason for that.

4             THE COURT:  So, am I to assume from that, that with

5    regard to the ones you didn't do there was no movement?  That's

6    what you want me to take from that, right?

7             MR. EDELMAN:  No.  I want to ask the question -- can I

8    give a piece of context because I don't think -- when you

9    compared --

10            THE COURT:  Why don't you do it through your expert.

11   It will come out better and I will understand better.

12            MR. EDELMAN:  Okay.  Then I get to cross him after

13   that.

14            THE COURT:  Maybe.

15            MR. EDELMAN:  I need to cross him after that.

16            THE COURT:  If the answer is hard enough the answer

17   will be yes, but I don't think I will need it because I think I

18   will understand the issue.

19            Look.  I understand.  If there wasn't a price movement

20   he wasn't really interested.  He was interested in ones that

21   showed price movement and he is arguing -- or Ms. Wyman will

22   argue there were enough days showing price movement to make it

23   statistically significant.

24            MR. EDELMAN:  Right, but you know --

25            THE COURT:  And you would argue that it is not a valid

H8O5arc2                          Feinstein - cross

1    study unless you do a hundred percent.

2    BY MR. EDELMAN:

3    Q.  But you know, Dr. Feinstein, if you had met, if you had

4    used every 8-K it would not have passed this test that you have

5    come up with in your collective event study, right?

6            THE COURT:  I don't know what the test is.  What is

7    the standard?  There is no standard.

8            MR. EDELMAN:  It wasn't -- this is why it will come

9    out better after -- if I can explain.

10           THE COURT:  There is no standard.  There is no

11   standard here.

12           MR. EDELMAN:  Your Honor, there is a standard.

13           THE COURT:  He said that it was more movement than the

14   average security, right?  That's the standard.

15           THE WITNESS:  On typical days.

16           THE COURT:  It is a relative standard.  There is more

17   movement where there was event that sparked some price change

18   than there is with most other companies.  How he got that, I

19   don't know, but that's what he is saying.

20           MR. EDELMAN:  Your Honor, if I may?

21   BY MR. EDELMAN:

22   Q.  Is the essence of this test that you conducted that you

23   compared the likelihood of a move on a news day to the

24   likelihood of a move in the stock price that was statistically

25   significant on a non-news day, and you determined whether there

H8O5arc2                          Feinstein - cross

1   was a statistically significant difference between news day

2   movement and non-news day movement?

3            THE COURT:  He didn't do that.  That's not it.

4            MR. EDELMAN:  Is that what you did, sir?

5            THE COURT:  He didn't make a comparison between

6   non-news days and news days.  He didn't make a comparison

7   between those news days that resulted in a price change and

8   those that didn't.  He said that where there is change in

9   stocks, generally, there was less of a change than there was in

10  the change of news days with ARCP.

11           Look.  That is no standard.  I know that.

12  BY MR. EDELMAN:

13  Q.  Sir, when you did your test you based it on an --

14           THE COURT:  Unless there is an objectively standard

15  sampler you can't compare one to the other.  I understand that.

16  So, why are we belaboring it?

17           MR. EDELMAN:  Let me move on.  If I need to, I will

18  cover it later.

19  BY MR. EDELMAN:

20  Q.  You based your test on something, a paper by Ferillo and

21  some co-authors, correct?

22  A.  Yes.

23  Q.  And you have seen that the Ferillo paper refers to

24  measuring the test results using unequal variances, correct?

25  A.  I understand that, yes.  No.  That --

1    Q.  And --

2    A.  Well, yes.

3    Q.  When you conducted your test, did you use unequal

4    variances?

5    A.  No.  I used the appropriate Z-test statistic.

6              THE COURT:  The answer is.

7              THE WITNESS:  I used the equal variances.

8              THE COURT:  The answer is yes.  The variance that you

9    considered equivalent but there is no objective way of

10   measuring this using equal variance, right?

11             THE WITNESS:  No, there is.

12             THE COURT:  There is.  What is the standard way?

13             THE WITNESS:  Well, it is a little bit technical here.

14             The construction of the Z-statistic, but the

15   Z-statistic has to be constructed before the experiment is run

16   consistent with the null hypothesis that is being tested.  And

17   the question in this experiment is is there more stock movement

18   on news days versus non-news days.  So, therefore, the null

19   hypothesis in this test is exactly the opposite:  Do news days

20   have equal or less movement than typical non-news days.

21             So, the Z-statistic has to be constructed under the

22   assumption of that null hypothesis that the news days have

23   equal or less movement.

24             THE COURT:  But you didn't do that here.

25             THE WITNESS:  No, I did.  I did.  Dr. James is arguing

H8O5arc2                         Feinstein - cross

1    that it should have been done a different way.  I did exactly

2    that.

3                THE COURT:  You testified that you compared it against

4    stocks generally, but you took 45 new days of a much larger

5    sample and said that I guess that -- I don't think you made a

6    comparison between non-news days and news days.  If you did,

7    show me the table.

8                THE WITNESS:  The table is here.

9                MS. WYMAN:  Your Honor, I think you are

10   misunderstanding his test and if you give him an opportunity to

11   show you and explain what he did.

12               THE COURT:  Very well.  I apologize for being hasty.

13               Continue, Mr. Feinstein.

14               THE WITNESS:  My Z-statistic was constructed correctly

15   and I believe Dr. James' Z-statistic was constructed

16   incorrectly, because under the null hypothesis that news days

17   have equal or less movement, the general population variance is

18   going to be greater than the variance from among news days, and

19   therefore the equal variance Z-statistic will be appropriate or

20   even conservative.  To use an unequal variance you are using

21   output from the experiment that shows there is greater movement

22   on news days to essentially increase the variance in the

23   Z-statistics which moves the goal post away from, you know,

24   once there is a finding of significance it moves the goal post

25   so that you have the appearance of no significance.

H8O5arc2                         Feinstein - cross

1   BY MR. EDELMAN:

2   Q.  I am asking a much simpler question.

3          At your deposition you testified that you based this

4   methodology on the Ferillo paper, correct?

5   A.  Yes.

6   Q.  And the Ferillo paper talks about unequal variances, right?

7   A.  It mentions it, but --

8   Q.  And you, instead of using a test using unequal variances,

9   you used a test using equal variances, correct?

10  A.  And I have reasons for doing that.

11         MR. EDELMAN:  Your Honor, I have some other

12  examination that relates to the manner in which the 8-K

13  selection screen was used which I think will make more sense

14  after our expert has testified so I propose I sit down.

15         THE COURT:  Okay.

16         MR. EDELMAN:  Okay.

17         THE COURT:  All right.  I set out time slots that

18  apparently do not make too much sense and as you have noted,

19  except for a little bit of impatience during examination and

20  cross-examination, I have let you go on to whatever extent is

21  significant and meaningful to you and we will continue that

22  way.

23         Yes, Ms. Wyman?

24         MS. WYMAN:  Your Honor, I think if you allow me to do

25  some redirect examination on Dr. Feinstein now --

H8O5arc2                    Feinstein – redirect

1    THE COURT:  Would you like to do redirect?

2    MS. WYMAN:  Yes; it will clear up your confusion about

3  his collective event study.

4    THE COURT:  Go ahead.

5  REDIRECT EXAMINATION

6  BY MS. WYMAN:

7  Q.  Dr. Feinstein, you recall Mr. Edelman asking you questions

8  about your collective event study, correct?

9  A.  Yes.

10 Q.  And in constructing your collective event study, did you

11 just make up the methodology?

12 A.  No.

13 Q.  What was it based on?

14 A.  It was based on an article, and it is based on how the test

15 has been applied in other cases by their expert.

16 Q.  And is this a methodology that's been used and generally

17 accepted in your field?

18 A.  Yes.

19 Q.  Okay.  Now, when you selected the 8-K days you mentioned

20 that you applied a screen?

21 A.  Right.

22 Q.  Can you describe to me specifically what kind of screen you

23 applied?

24 A.  So, in order to identify if the day had higher than typical

25 news flow, the first screen was was there a company 8-K about

1    it.  But, most company 8-Ks were about immaterial things that

2    would not -- it might be important for investors in general but

3    immaterial for the valuation of the stock -- changing board

4    seats, the completion of a previously announced building

5    purchase.  And, in fact, in this case earnings announcements

6    constituted a large amount of those and the allegation in this

7    case is the company manipulated earnings announcements so that

8    they would be uneventful.

9            So, I knew that the test, as it is generally applied,

10   would already be weak because there were so many of these 8-Ks

11   that were not valuation relevant.  So, I could have gone

12   through the 8-Ks myself and subjectively picked out which ones

13   are valuation-relevant and which ones are not but I know that

14   would have been subject to criticism, so I deferred to the

15   analysts.  If the analysts commented on the 8-K and said we are

16   going to consider this in how we evaluate this company, that's

17   the second screen.  So, the screen was two-fold:  An 8-K from

18   the company saying it is a material event, and then an analyst

19   commenting and addressing it indicating that it is meaningful

20   to analysts.

21   Q.  And what was the purpose of running this test?  What were

22   you trying to understand?

23   A.  Because there were so few or just one ideal, single event

24   study candidates for this company because of the nature of the

25   company and because of the nature of the allegations, I was

1    looking to do another test that could demonstrate whether or

2    not the stock and the other securities -- or the stock was

3    moving efficiently.  So, with the way the test works is it

4    looks for days on which there is a higher than typical news

5    flow, that's what we are after.  The collection event is not

6    based on whether I think it is going to cause a statistically

7    significant movement or not, just as it passes a screen that it

8    indicates that there is a higher than typical news flow that

9    day.  Then, it compares the price dynamics on news days to the

10    price dynamics on non-news days and if there is evidence that

11    the news generally impacts the stock price it is indicated by

12    the test.

13            And that's a demonstration that the security reacts to

14    news.

15    Q.  And you mentioned before that the question you were trying

16    to answer was is there a greater frequency of statistically

17    significant price changes on news days versus non-news days.

18    That was a question you are asking yourself, right?

19    A.  Right.

20    Q.  And then to construct your experiment you mentioned that

21    you had to test the opposite.  Why is that?

22    A.  Well, the way classical hypothesis testing works is you

23    pose a question, you construct a test using the opposite of

24    that preposition and see whether the data allows you to reject

25    the opposite.  If the data allows you to reject the opposite

H8O5arc2                          Feinstein - redirect

1    then you reject the opposite in favor of the original

2    proposition.

3              So, in this case the proposition is that there is more

4    stock movement on news days.  The opposite is that there is

5    equal or less stock movement on news days.  So, the test is

6    constructed under the hypothesis that there is equal or less

7    stock movement on news days.  The data then show that that's

8    not the case.

9    Q.  And is because the hypothesis that you are testing is that

10   there are equal or less likely to be events on news days versus

11   non-news days that you had to use the equal variances that

12   Mr. Edelman was asking you about?

13             THE COURT:  I don't understand the question.

14             MS. WYMAN:  Let me rephrase it because it really

15   wasn't a very good question.  I will just do it more directly.

16   Q.  Why is it that you used equal variances versus unequal

17   variances in the test that you ran?

18   A.  Because it's -- two reasons.

19             Under the null hypothesis that news days have the same

20   or less movement, using the general population variance it is

21   going to be higher and therefore a more conservative

22   Z-statistic for evaluating the results.  If you would -- the

23   other way that Dr. James proposed is incorrect, it eviscerates

24   the power of the test, it biases the test in a manner so that

25   you are not likely to find a significant result, you are not

1   likely to see the significant effect of information on prices

2   even when there is a significant effect of information on

3   prices.

4   Q.  You keep talking about a Z-statistic.  What is that?

5   A.  A Z-statistic is a mathematical formula that the output

6   from the test allows you to evaluate which then could be

7   compared to standard tables to see whether the data are

8   consistent or inconsistent with the proposition being tested.

9   Q.  And how do you know whether or not the Z-statistic that

10  your test generates indicates efficiency or not?

11  A.  Well, under the null hypothesis there is a range of

12  reasonable Z values.

13          Remember, the null hypothesis here is that information

14  is not affecting the stock price and under that hypothesis

15  there is a certain reasonably expected range of Z-scores.  If

16  the data and test produce a Z-score that is way outside that

17  range of reasonableness you should, you are compelled to reject

18  that null hypothesis in favor of the alternative which is that

19  information does affect the security price.

20  Q.  And why is it that you couldn't do this collective event

21  study using each of the 8-Ks that ARCP issued?

22  A.  You could, but it just wouldn't be informative.

23          Given what we know about this company, that it is a

24  REIT, given that it is designed to be stable, given what we

25  know about the earnings announcements or at least what is

H8O5arc2                    Feinstein – redirect

1  alleged about the earnings announcements, that it is alleged

2  that they were manipulated to be unsurprising and uneventful,

3  and given that we know that from reading the news that most of

4  the 8-Ks were about mundane, routine things that happened in

5  the regular course of business, you would be contaminating the

6  new sample with so many observations that were not really news

7  that the test itself would be weak.  You wouldn't really be

8  comparing news days to non-news days, you would be comparing a

9  contaminated sample of news days with a lot of non-news thrown

10  in with non-news days.

11           THE COURT:  I think have you done it.

12           MS. WYMAN:  Do you understand?

13           THE COURT:  Yes.

14           MS. WYMAN:  Okay.  Thank you.

15           THE COURT:  You can step down, Dr. Feinstein.  Thank

16  you very much.

17           Take a five-minute break.

18           (Recess)

19           THE COURT:  Yes, Ms. Wyman?

20           MS. WYMAN:  If you will indulge me, your Honor, before

21  we get started, I wanted to be sure that all of your confusion

22  was cleared up.

23           You had mentioned during Mr. Edelman's --

24           THE COURT:  Why don't we say there is more than just

25  confusion.  There is controversy.  That's part of it.

1          MS. WYMAN:  I want to make sure you understand that

2     the collective event study is tethered to a standard and you

3     had mentioned.

4          THE COURT:  I understand that and I think I was in

5     error in that comment.  There is controversy about the efficacy

6     of the standard but I understand.

7          MS. WYMAN:  Thank you.

8          THE COURT:  Okay, Mr. Edelman.

9          MR. EDELMAN:  Dr. James, would you take the witness

10     stand?

11          Your Honor, we have a PowerPoint presentation that I

12     am going to use with Dr. James to walk him through his

13     examination.  We provided it to counsel yesterday evening.

14          THE COURT:  Okay.

15     CHRISTOPHER MARTIN JAMES,

16          called as a witness by the Defendant,

17          having been duly sworn, testified as follows:

18          THE WITNESS:  Can I clean up here a little bit?

19          THE COURT:  Would you please, Ms. Wyman?

20          MS. WYMAN:  Yes.

21          MR. EDELMAN:  Some of those were mine.

22          THE WITNESS:  I have yours.

23          THE DEPUTY CLERK:  Please state your full name and

24     spell your last name, slowly, for the record.

25          THE WITNESS:  Christopher Martin James.  J-A-M-E-S.

H8O5arc2                      James - direct

1    DIRECT EXAMINATION

2    BY MR. EDELMAN:

3    Q.  Dr. James, how are you employed?

4    A.  I am with the William H. Dial Eminent Scholar in Finance at

5    the University of Florida.

6    Q.  Where did you get your Ph.D?

7    A.  I got my Ph.D at the University of Michigan.

8    Q.  Can you just sketch, really quickly, your professional

9    career since University of Florida?

10   A.  Sure.

11          I have taught at a number of universities including

12   Cambridge University in the UK, University of Michigan.  I have

13   got an academic career that spans now almost 40 years.  I have

14   been an editor or associate editor of all the major journals in

15   finance and I have served as an expert witness in a number of

16   cases including a number of securities cases.

17   Q.  And you have been an expert in many, many cases, correct?

18   A.  Over the span of my career; that is correct.

19   Q.  Can you give the Court an overview of what your testimony

20   will be this morning?

21   A.  Sure, and we prepared, I think, a PowerPoint --

22   Q.  Yes.

23   A.  -- that addresses that.

24          I think in my experience in securities cases, this one

25   is unusual and it is unusual for a couple of reasons.  The

1    first is this is a company that dramatically changes over the

2    class period.

3            THE COURT:  I think you would be more comfortable

4    facing --

5            THE WITNESS:  Him?

6            THE COURT:  Yes, because I'm a short guy and there is

7    a big barrier between us and you have to strain your neck.

8            THE WITNESS:  Okay.

9            So, this is unusual in part because this is a company

10   that undergoes, really, transformative events during the class

11   period starting out as a microcap stock and ending up with, you

12   know, $20 billion in assets and $10 billion in market caps.  So

13   big changes during the class period.

14           THE COURT:  What was the first one?  Micro?

15           THE WITNESS:  Microcap stock, so its public float was

16   under $100 million.  And that's important when thinking about

17   issues regarding market efficiency and damage methodologies in

18   a securities case.

19           The second thing I'm going to point out is the tests,

20   the direct tests that Dr. Feinstein proposes are relatively

21   easy tests to pass and when properly conducted, they don't pass

22   for most of the class period for the common stock at issue

23   here.

24           The only empirical test that you construct for

25   purposes of the preferred and the bonds are a test that looks

H8O5arc2                          James - direct

 1    at one day, the last day in the class period.  He hasn't

 2    provided any evidence that the securities were efficient during

 3    the proposed class period.  In fact, he can't construct the

 4    collective event test for the bonds and notes, in part, because

 5    as he concedes, there aren't events that are likely to be

 6    moving those, the prices of those securities.

 7            And then the final point I want to make is that here

 8    we have, at the end of a class period, a corrective disclosure,

 9    an alleged corrective disclosure, which pertains to the first

10    two quarters of 2014 which means that any sort of price

11    reaction you are observing at the end of the class period isn't

12    a price reaction that you can use to compute damages or

13    inflation earlier in the class period than May 8th, 2014.

14            THE COURT:  There are at least two arguments for

15    projecting backwards.  One is statements made in that very 8-K

16    about the unreliability or the probable unreliability of

17    earlier statements; and the second is the common sense notion

18    that fraud that begins at one point in time is likely to have

19    begun earlier.

20            THE WITNESS:  Well, I think there is two responses.

21    First, the company is making a statement regarding AFFO that is

22    mistaken.  It is not saying and it is not revealing any

23    mistakes on earlier financials.

24            THE COURT:  True.  True.

25            THE WITNESS:  And second, the nature of AFFO itself

1   when are you thinking about a company that has $20 billion in

2   assets and is announcing a mistake in calculation of AFFO, when

3   it has 3,700 properties versus is that going to be informative

4   of any inflation at an earlier point in time when the company

5   has 90 properties and seven tenants. Just economically it is

6   not something that is a useful methodology to employ in a

7   company that is changing so dramatically, putting aside the

8   fact of the disclosure being only with respect to the first two

9   quarters in 2014.

10  BY MR. EDELMAN:

11  Q.  We are going to skip over the slide that defines market

12  efficiency --

13  A.  Thank you.

14  Q.  -- and we are going to move to the Cammer and Krogman

15  factors.

16          What I would like you to comment on is not as a lawyer

17  or judge but as an economist. How do economists relatively

18  weigh the various Cammer and Krogman factors?

19  A.  Well, if we put aside the direct test of what we call

20  market efficiency, a cause and effect relationship between new

21  publicly available information in the share price, the other --

22  Cammer factors -- are really indirect measures. They're things

23  we look at to say is the market conducive to market efficiency

24  but they're not demonstrations of market efficiency. And there

25  is no bright lines in those measures from a financial economics

H8O5arc2                         James - direct

1    point of view.  So, when you are asking the question what about

2    analyst coverage, is one or two enough?  What about trading

3    volume?  One of the things that economists do look at is are

4    market participants discussing and raising concerns about

5    impediments to information getting embedded into securities

6    prices.  And you see that here.

7              THE COURT:  Impediments to information become embedded

8    prices?

9              THE WITNESS:  Yes.

10             THE COURT:  Is that right?

11             THE WITNESS:  So, if you have for example, as you do

12   in this case during the class period, during most of the class

13   period there was only two analysts covering the stock and both

14   analysts are saying a bar to institutional ownership of the

15   stock is its illiquidity.  They are saying that with some of

16   these transformative mergers, the investor base of ARCP may

17   change such that you are going to get more institutional

18   involvement in the marketplace and that's what you see, that

19   you see very little institutional involvement in this stock

20   early on in the class period and it changes dramatically as

21   these transformative events occur.

22   BY MR. EDELMAN:

23   Q.  Let's turn to the chart on page 8 of the PowerPoint.

24             THE COURT:  Are you -- has this been submitted in

25   advance?

H8O5arc2                          James - direct

1           MR. EDELMAN:  Yes.

2           THE COURT:  You did last night.

3           MR. EDELMAN:  I provided it to counsel last night.

4           THE COURT:  You need to mark it for the record.

5           MR. EDELMAN:  Yes.  I would ask that we --

6           THE COURT:  Exhibit A?

7           MR. EDELMAN:  We will call it Exhibit A.

8           THE COURT:  Give Ms. Jones a copy to mark.

9           MR. EDELMAN:  It will actually be Exhibit B because I

10   think the expert report is Defendant's Exhibit A.

11          THE COURT:  Dr. James' report will be Exhibit A

12   received in evidence, and Exhibit B will be the PowerPoint.

13          In evidence or illustrative?  Put it in evidence.

14          Are you say are okay with that, Ms. Wyman, in

15   evidence?

16          MR. DROSMAN:  Your Honor, this is Dan Drosman.  I

17   think it is demonstrative so I don't think it should be in

18   evidence.

19          THE COURT:  Well, so is the report.  I don't usually

20   take a report as an exhibit either but in this kind of

21   proceeding I think it is what the expert is relying on.  So, we

22   will mark both and receive both in evidence.

23          (Defendant's Exhibits A and B received in evidence)

24   BY MR. EDELMAN:

25   Q.  So, taking a look at that chart, can you describe what that

H8O5arc2                          James - direct

1  chart illustrates to you as relevant to this case?

2  A.  Sure.  So, I have graphed two things.  On the left --

3  Q.  Can you pull the microphone closer?

4          THE COURT:  Speak louder.  It is even better.

5  A.  All right, I will speak louder.

6          So, market capitalization is on the left legend and

7  the assets of the company are on the right legend.  And what

8  you can see here is that the company undergoes what I think are

9  two transformative events.  An analyst, by the way, discussed

10  these as transformative events.  The first is the ARC III

11  merger in which the company's assets increase by over 700

12  percent and the company really goes from a microcap stock to

13  having a market capitalization of about $1.8 billion.

14          The second transformative events is the Cole merger

15  which occurs in February of 2014, and there again you see a

16  increase in the company's market cap as well as an increase,

17  substantial increase in the assets that the company has.  And

18  this is indicative of a company changing fairly dramatically

19  during the period that's covered by the class here.

20  Q.  Now, you heard Dr. Feinstein testify about the average

21  market capitalization over the whole period, correct?

22  A.  Right.

23  Q.  But if you look at just the first period, the pre-ARC III

24  period, how is the market capitalization for that period

25  compared with market capitalization of, let's say, the post

H8O5arc2                        James - direct

1    Cole period?

2    A.   There is really no comparison in the sense that they're not

3    comparable in the sense that the market capitalization in the

4    pre-ARC period, it is a microcap stock.  In the post-Cole

5    period it is one of the larger market cap stocks in the

6    marketplace.  Now, if you average the two you are going to say

7    it is on average a large cap stock.  But, during the early part

8    of the class period it is clearly a very small company with a

9    small asset base.

10   Q.   Now, Dr. Feinstein testified that he divided this larger

11   period into two parts dividing it sometime in August based upon

12   an announcement of internalization.  As an economist, is that a

13   methodology that makes sense to you?

14   A.   It doesn't make sense to me.  It's not associated with any

15   change in the structure of the market for this company, it is

16   not associated with a change in its asset base.  It is not

17   associated with any sort of capital structure change that the

18   company is undergoing.  I think that -- I think, more

19   appropriately, let's look at when the company changes and to

20   take a look at within the class period when the company is a

21   microcap stock, between the ARC III merger and the Cole

22   acquisition and then after the Cole acquisition in which the

23   company grows substantially and rises to a company with a $10

24   billion market cap.

25   Q.   Now, you mentioned earlier that there were two analysts

H8O5arc2                       James - direct

that were covering the company and that they, at points, made

statements about the liquidity or liquidity of the market.  If

you could turn to the next slide there is a slide about JMP

securities on March 1, 2013.  Why did you want to highlight

that to the Court?

A.   This is one example of -- so, there are two analysts during

the beginning part of the class period that are covering the

stock; JMP is one and Ladenburg is the other and both are

saying -- in this case I pulled out from JMP a statement

concerning investment risks and what they're saying is:  Trade

illiquidity.  Just 11,000 shares trade daily, on average,

representing about 120 K of market value.  We believe the

limited share volumes will preclude institutional investors

that seek active trading level from making meaningful

investments in the company.

Q.   That statement was made on March 1, 2013 at the beginning

of your second sub period?

A.   That's correct.

Q.   So it was made at the conclusion of the entirety of the

first sub period that you described as being under

$100 million?

         MR. DROSMAN:  Objection, your Honor.  Leading.  He has

been leading the entire time.

         THE COURT:  Overruled.

Q.   Can you turn to the next slide?  Why did you want to

H8O5arc2                       James - direct

1    highlight that for the Court?

2    A.   Again, it is around the same period of time and it is

3    actually connected to an event in which market participants are

4    concerned about information not getting embedded into the share

5    prices.  And here an analyst is saying that ARCP should receive

6    plenty of support from large institutions that were unable or

7    unwilling to own ARCP because of its microcap size and thin

8    liquidity.  And that was made by the other analyst following

9    the stock during this period of time on March 4th, 2013.

10   Q.   Take a look at slide no. 11.  How, aside from the market

11   cap, how did the company change over the course of a class

12   period?

13   A.   Well, it's transformation is fundamental.  If you start the

14   class period you have got seven tenants and 90 properties and

15   less than $100 million in assets.  The company grows, and grows

16   dramatically.  Post-Cole merger you have 3,710 properties, $20

17   billion in assets, and over 1,100 tenants.  So, it is a

18   fundamentally different company in terms of the assets that are

19   generating its earnings than it was at the beginning of the

20   class period when it had 90 properties and seven tenants.

21             THE COURT:  May I have a copy of what you are working

22   with?

23             MR. EDELMAN:  Sure.  I thought we had handed one up.

24   Q.   We are going to move to page 14, your Honor.

25             Now, I would like to direct your attention to the

H8O5arc2                        James - direct

1    first of the two tests that Dr. Feinstein testified about, the

2    October 29, 2014 test and I would ask you, do you believe that

3    that is a scientifically reliable test that economists like you

4    and Dr. Feinstein would rely upon in your work?

5    A.  No.

6    Q.  Can you explain why not?

7    A.  For several fundamental reasons.

8    Q.  Keep your voice up for me.

9    A.  Okay.

10           First, a price reaction on October the 29th, 2014

11   can't demonstrate market efficiency throughout the class

12   period.  When you think about what market efficiency is, a

13   market is in which available information is rapidly

14   incorporated into the price of the security such that trading

15   prices reflect all available information.  That's a quote from

16   Dr. Feinstein's report.  Okay?  So, one day in the class period

17   doesn't tell you anything about all the other days in the class

18   period in terms of whether the market is rapidly incorporating

19   value-relevant information into the price of the security.

20           We are hesitant, as scientists, to extrapolate from a

21   sample of one, to a population in the common stock of over 600

22   days.  The second problem --

23   Q.  Is hesitant an understatement when you say you are

24   hesitant?

25   A.  I don't think it is the stuff of good science.

H8O5arc2                        James – direct

1    Q.   Another understatement.  Go on.

2    A.   A properly conducted study of market efficiency should show

3    a consistent relationship between new material information and

4    the price reactions, and the problem with focusing on one day

5    is you are not showing a consistent relationship, you are

6    focusing on one day and it is a day that if you, in reading the

7    complaint, you would know there was a significant price

8    reaction.  So, it's confirming something that's in the

9    complaint, it is not an independent experiment of new

10   information coming into the marketplace.

11   Q.   In your experience, is it common in analyses of market

12   efficiency for experts to look at earnings announcements or

13   earnings-like announcements like AFFO?

14   A.   Yes.

15        So, the academic studies, you know, I have reviewed

16   and am familiar with, of market efficiency, look at events such

17   as earnings announcements and say are earnings surprises

18   associated with significant price movements.  In securities

19   cases that I have been involved in, that is also a frequently

20   employed technique.

21        So, what you do is you say let's look at what analysts

22   think the company's earnings are going to be and there is a

23   consensus which represents the median of analyst forecasts and

24   ask, well, when the company announces its results, if they're

25   substantially above what analysts' consensus estimate is,

H8O5arc2                          James - direct

1    that's referred to as a positive earning surprise.  And that

2    should be associated, typically, with a positive stock price

3    reaction.  Similarly, if the earnings come in below the analyst

4    forecast, then that would be considered a negative earning

5    surprise.

6    Q.  Now, did you do any analysis of the market reaction to AFFO

7    announcements in this case?

8    A.  I did.  During the class period --

9    Q.  Is that reflected at page 16?

10   A.  Yes.

11   Q.  And that's a copy of information that's an exhibit to your

12   report, correct?

13   A.  That's correct.

14   Q.  And can you explain what that shows?

15   A.  Sure.

16           So, there were 10 earnings announcements during the

17   class period beginning with the first quarter 2012 and ending

18   with the first quarter of 2014.  And what I have done is gotten

19   from a source called S & P Capital IQ, what the consensus

20   estimate from analysts was and compared it to the actual

21   results as reported by Capital IQ.  And I note when there is an

22   earnings surprise that is positive -- so for the first quarter

23   of 2012 you see one and a half cents -- it is in black, that's

24   a positive surprise of one and a half cents which is 7 percent

25   above the consensus estimate.

H8O5arc2                          James - direct

1          Similarly, there were other events during this event

2     in which there were negative surprises.  So, for example, on,

3     for the third quarter of 2012 on 10/31/2012 there was a miss by

4     3.2 cents which was a miss of 12 percent relative to analyst

5     consensus forecasts.  So then what I did --

6          THE COURT:  What does abnormal mean, the abnormal

7     return column?

8          THE WITNESS:  So, that means what is the return of the

9     common stock of ARCP controlling for market and industry

10    factors.  So, what is the unusual movement in the common stock.

11    So, it is just taking the common stock return and correcting

12    for market and industry movements to see what is

13    company-specific stock return.  And then I test whether it is

14    statistically significant, substantially different from the

15    normal variability that you observe in the stock, and then the

16    last column says whether it is statistically significant or

17    not.  And as you can see, there is two earnings announcements

18    that are associated with a statistically significant stock

19    price movement.  The first is on February 28, 2013; and the

20    second, and they're highlighted in yellow, is the earnings

21    announcement on February 27, 2014.  And you can see that on

22    February 28, 2013 there was a positive earning surprise, in

23    other words the company delivered earnings that were above what

24    analysts had expected but the stock price is down, it is down

25    almost 5 percent and is statistically significant.

1          THE COURT:  Which period is this?

2          THE WITNESS:  So it is the highlighted in yellow, the

3   first one.

4          THE COURT:  2012, fourth quarter?

5          THE WITNESS:  Yes.  See the 3 cent difference?

6          THE COURT:  Yes.

7          THE WITNESS:  13 percent earnings surprise positive;

8   negative stock return around 5 percent -- 4.87.  The T

9   statistic is minus 4.05 which means that it is statistically

10  significant and different from zero and it is in the wrong

11  direction of the earnings surprise for reasons that I will

12  explain in just a minute.

13         The other place where I found the significant price

14  reaction -- so, I only found two out of 10 in which there are

15  earnings surprises.  The other is on February 27th, 2014 where

16  the company misses analyst expectations by 4 percent and the

17  company stock price is up 2.73 percent which is statistically

18  significant.

19         So, you have, for most of the earnings surprises, not

20  a statistically significant price movement, and where you do

21  see a statistically significant price movement it is in the

22  opposite direction.

23  BY MR. EDELMAN:

24  Q.  Let's take a look --

25         THE COURT:  Do you need to know what other stocks in

H8O5arc2                          James - direct

1    the same category are doing in order to complete this analysis?

2                THE WITNESS:  And that's what I have controlled for.

3                So, this abnormal return is controlling for -- it is

4    using the same regression model that Dr. Feinstein proposes

5    which controls for the industry which is other REITs, and it

6    controls for other market-wide factors as well.  So, it is

7    saying here is company-specific information that is coming to

8    the market and what's unusual about the company stock price

9    controlling for industry and market factors.

10               THE COURT:  Just so I understand this, looking at 2013

11   fourth quarter, there was a disappointing earnings earning of a

12   dollar or a penny?

13               THE WITNESS:  A penny.

14               THE COURT:  A penny.

15               THE WITNESS:  Per share.

16               THE COURT:  Per share; 4 percent lower than

17   expectations?

18               THE WITNESS:  Correct.

19               THE COURT:  However the stock price is increased by

20   2.73 percent against an expectation that it should increase

21   because of other REITs 2.27 percent.

22               THE WITNESS:  What it is saying --

23               THE COURT:  Is that how to read that?

24               THE WITNESS:  What it is saying is controlling what

25   other REITs are doing, this company is up in a statistically

H8O5arc2                         James – direct

significant way, by 2.73 percent controlling for what other

REITs are doing.

THE COURT:  What does 2.27 mean?

THE WITNESS:  2.27 is a T statistic, and the threshold

for statistical significance is roughly 1.95.  So, it is

statistically significant at the 5 percent level which is the

standard that is used in my profession to evaluate whether

something is unusual in a statistical sense.

The other one is the February 28, 2013 where you see

an earnings surprise of 13 percent and the abnormal return,

meaning controlling for industry and market factors, this

company's stock price was down minus 4.87 percent with a

T-statistic of over 4 which means it is highly unlikely that

it's due to chance and would be viewed by the profession, the

standards of my profession as being statistically significant

and an indication of a unusual movement in the stock price.

THE COURT:  And from unusual movements you would infer

market inefficiency?

THE WITNESS:  Not necessarily.

What you would infer is market inefficiency is if you

observe what is positive information -- an earnings surprise --

associated with a negative price reaction, and you look out and

see what market participants are saying about what's moving the

stock price.  Why isn't positive information getting embedded

into the stock price?  And what analysts say, for example, on

1    February 28, 2013 is there is an impediment to getting

2    market -- this positive information into the marketplace.  It

3    is the thinness in which the company's stock is trading.  There

4    is converting shares that are impacting the order flow of the

5    company on this day so there is not enough activity by

6    arbitragers, by professional hedge funds and the like to smooth

7    out what would be positive information.  It is not getting

8    embedded into the price.

9    BY MR. EDELMAN:

10   Q.  You just made reference to what analysts are saying.  You

11   are referring to the February 28th, 2013 announcement and that

12   was a reference to the analyst commentary on March 1st, 2013

13   and March 4, 2013 that we just reviewed earlier?

14   A.  Yes.

15             THE COURT:  Even though the company was getting, was

16   earning 3 cents a share, 13 percent better than expectations,

17   the stock price was dropping almost 5 percent?

18             THE WITNESS:  Yes.

19             THE COURT:  And you are saying that is because there

20   is the impediment of thinness in the market?

21             THE WITNESS:  Yes.  Analyst reports during the period

22   of time, some of which we just looked at are saying, look, it

23   indicates a lack of liquidity in the marketplace, the thinness

24   in the marketplace that they believe that sales of newly issued

25   shares that had already been announced are having a depressing

H8O5arc2                        James - direct

1    effect on the company stock.

2            THE COURT:  But in the fourth quarter of 2013 when the

3    company's capitalization was much more substantial, you have a

4    disappointment of 4 percent in earnings --

5            THE WITNESS:  Yes.

6            THE COURT:  -- you had a price increase of 2.75

7    percent.  Why should that be if the market then is much more

8    efficient?

9            THE WITNESS:  I think that that's, again, evidence of

10   what I will refer to as anomalous in the sense it is not what

11   you would expect in an efficient market.

12   BY MR. EDELMAN:

13   Q.  Just to clarify, Dr. James, with respect to February 27,

14   2014, you are not saying that there wasn't other unrelated

15   information that might have had an increase on -- might have

16   caused an increase on the stock that day, correct?

17   A.  I looked.  I didn't see any confounding information.

18           I think the important thing, the take away from this

19   is Dr. Feinstein didn't do an earnings announcement analysis as

20   he has done in other cases and the take away from this earnings

21   analysis is the stock isn't moving in a manner consistent with

22   the earnings surprises that you are observing.  Okay?

23           THE COURT:  Why don't we take a break for lunch.

24           MR. EDELMAN:  Sure.

25           THE COURT:  Come back afterwards.

H8O5arc2                        James – direct

1              Off the record.

2              (Discussion off record)

3              THE COURT:  So let's get back at 2:15, approximately.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H8OAARC3ps                    James - direct

1              A F T E R N O O N   S E S S I O N

2                         2:25 p.m.

3   CHRISTOPHER JAMES, Resumed.

4              THE COURT:  Dr. James, you remain under oath.

5   Mr. Edelman, please continue your direct examination.

6   DIRECT EXAMINATION (Cont'd)

7   BY MR. EDELMAN:

8   Q.  Dr. James, I would like to turn your attention to the

9   collective event, the 45-day event study.

10  A.  OK.

11  Q.  Did you identify any flaws -- well, before I get to that,

12  are you familiar with the article on which that study was

13  based?

14  A.  I am.

15  Q.  What is that article?

16  A.  It's an article by Ferrillo, et al., which appeared, I

17  think, in the *St. John's Law Review*.  It's an article that

18  Dr. Feinstein cites to in support of his use of comparing

19  through a collective-event study news and non-news based.

20  Q.  In reviewing the 45-day event study, did you identify any

21  aspects of that analysis that you believed were flawed?

22  A.  I did.  I identified what I think are two key flaws.  There

23  are other flaws, but I think the two flaws that are most

24  problematic is that he conducts a comparison using an

25  inappropriate test.  The article that he cites to compares

H8OAARC3ps                    James - direct

 1    price movements on news and non-news days.  And when comparing

 2    the frequency of significant price movements on the news days

 3    versus the non-news days, they assume correctly an unequal

 4    variance, meaning that the variance in the news days and the

 5    non-news days is different.  And that's what a statistics text

 6    would tell you to do if you're conducting what's called a

 7    one-tailed test.

 8              THE COURT:  A what test?

 9              THE WITNESS:  A one-tailed test.  So you're saying,

10    are there more significant price actions on news days compared

11    to the null, which is, as Dr. Feinstein said, no difference or

12    fewer.  OK.  And that difference, meaning that one-tailed test,

13    calls for the appropriate test statistic to be an unequal

14    variance.

15              THE COURT:  Who was the fellow that he relied on?

16              THE WITNESS:  It's Ferrillo, Tabak, and I forgot the

17    last guy's name.

18              THE COURT:  Do they have any reputation?

19              THE WITNESS:  They do.  And I've spoken to Dr. Tabak

20    concerning this, and he confirmed with me that, in a one-tailed

21    test it's appropriate to --

22              THE COURT:  Well, I don't need that.  That would be

23    hearsay.  But they have a reputation as economists?

24              THE WITNESS:  Yes.

25    BY MR. EDELMAN:

H8OAARC3ps                    James – direct

1    Q.  So let's direct your attention to slide 20.

2                 THE COURT:  Before we leave that, an unequal variance

3    means what?

4                 THE WITNESS:  So when you're comparing essentially the

5    average of two samples, OK, so you have a sample of news days

6    and a sample of non-news days, do you assume that within those

7    samples the variability is the same or is it different, in

8    terms of the underlying variability of the data?  The data

9    indicate that the variability is different.  And the way the

10   hypothesis is structured, being a one-tailed test, your prior

11   would be that they're different, which is why the Tabak et al.

12   article uses a test that accounts for the differences in

13   variance.

14                THE COURT:  When you say "unequal variance," you mean

15   the variation in price movement on non-news days is used as

16   comparison to the variation in price movement on news days.  Is

17   that what you mean?

18                THE WITNESS:  It's basically the variation between

19   when you have significant news days and nonsignificant news

20   days relative to the variation in significant non-news days

21   versus insignificant non-news days.

22                THE COURT:  So you would expect that a news day would

23   produce a greater variation in price than a non-news day.

24                THE WITNESS:  The variation within the news day sample

25   is different than the variations in the non-news day sample.

H8OAARC3ps                    James - direct

1          THE COURT:  And what does that indicate?

2          THE WITNESS:  It indicates that the appropriate test

3    to compare the difference in the proportion of the days that

4    are significant between the two samples should employ an

5    unequal variance.

6          THE COURT:  You would expect, if there were any

7    stimulus that would provoke a response, that the responses

8    might vary according to the intensity of the stimulus.

9          THE WITNESS:  So --

10         THE COURT:  You would expect that the variation in

11   price movement in news days would exceed the variation in

12   prices on non-news days.

13         THE WITNESS:  Well, what we're really asking is where

14   the -- so we're not looking at the magnitude of the statistical

15   significance.  We're just counting the number of days that are

16   statistically significant in the news sample and in the

17   non-news sample.  And it's the variation within that count

18   which is what is being incorporated into the test stat

19   statistic?

20         THE COURT:  Variation in what?  Price movement?

21         THE WITNESS:  No, the variation is 1 if it's a

22   significant price reaction and 0 if it's not.  And the

23   proportion is basically -- so, for example, if you turn to the

24   next slide, if you would, 22, slide 22.

25         So if you look at this, take the pre-ARCT period,

H8OAARC3ps                    James - direct

1    post-ARCT period, and post-Cole period.  Notice that the

2    proportion of significant news days in the pre-ARCT period is

3    16 percent.  In the post-ARCT period it's 16 percent.

4            THE COURT:  Where are these percentages?

5            THE WITNESS:  So if you go down, it's the fourth line.

6    You see where it says "news days"?

7            THE COURT:  It says 20 percent and 32 percent -- oh, I

8    see.  16.67 percent.

9            THE WITNESS:  What that's saying is, he's identified a

10   set of news days where there's analyst commentary, where he

11   expects there to be price movement.  In 16 percent of time you

12   see it in the pre-period, 50 percent in the post-Cole period,

13   so there's an increase during the Cole period.  What we're

14   really asking in the question is, is that 16.67 meaningfully

15   different from the proportion of significant news days in the

16   non-news day sample, which is 4.52.  And the Z-score tells you,

17   because it's below 1.67, that it's not statistically

18   significant.  So we don't have a scientific basis for

19   concluding that the frequency of significant price movements on

20   news days is any different than non-news days.

21           THE COURT:  Just so I understand this, on news days,

22   16 percent of the time there's a significant price movement.

23           THE WITNESS:  Right.

24           THE COURT:  On non-news days, 4 1/2 percent of the

25   time there's a significant price movement.

H8OAARC3ps                        James - direct

1            THE WITNESS:  Right.

2            THE COURT:  Why should that -- that seems to be

3    normal.

4            THE WITNESS:  Well --

5            THE COURT:  I'm not saying the 16 percent versus any

6    other percent.  But the variation in movement and intensity of

7    movement should be greater when there's a stimulus than when

8    there's not a stimulus.

9            THE WITNESS:  That's correct, and the objective

10   measure of that is whether they're statistically different from

11   one another in a meaningful way.  That's what the Z-score test

12   is trying to do.

13           THE COURT:  On the surface, it looked like there's a

14   big difference between 16.67 percent and 4.52 percent.

15           THE WITNESS:  Yes.  But the fact that there are so

16   many more non-news days than news days and because of the

17   variation within those samples, you can't say with a reasonable

18   degree of certainty that the data -- there is a difference.

19   You can only say that with a reasonable degree of certainty for

20   the post-Cole period, if you're using the pre-ARCT, post-ARCT,

21   and post-Cole period, or if you're using his intervals, which I

22   don't agree with, you would have to reject it for the

23   interval 1, and you could say that there is a meaningful

24   difference, in a statistical sense, between news days and

25   non-news days in interval 2.

H8OAARC3ps                    James - direct

1          THE COURT:  That may statistically be true or not

2     true.  I can't tell.  But just as I look at this table, it

3     doesn't seem to me to support your point.  I would think, as I

4     said before, different stimuli produce different consequences,

5     much more so than non-stimuli or a stimulus of minor impact.

6          THE WITNESS:  Well, a couple of points.  First is,

7     from a statistical standpoint, we can't reject the hypothesis

8     that they are the same.  Second, that these are news events

9     that have been selected in a way that's more likely to have

10    significant price reactions, because they're not just 8-K

11    dates.  There are 8-K dates in which there is an analyst

12    mentioned.  Now, it's not all of the 8-K dates in which there's

13    an analyst mentioned, just some of them.  If you were to go and

14    look at all of the 8-K dates in which the company makes a news

15    announcement, if you go to -- if you could flip to no. 25,

16    here's where you see that, if you do all 8-Ks like he did in

17    *Petrobras*, all 6Ks, you don't see -- it's not statistically

18    significant for pre-ARCT, post-ARCT, and the percentage of news

19    days that are significant is only 2 percent versus non-news

20    days at 5.88 percent.  Similarly, for news days, there's only a

21    slight difference in the post-ARCT III time period.  And again

22    in his interval 1, you have 5 percent news days significant and

23    non-news days 7.24.

24          I want to stress that this is generally a pretty easy

25    test to pass, OK.  And when properly specified, it doesn't pass

H8OAARC3ps                    James - direct

1    for the events that he's chosen, and it doesn't pass for the

2    events that are just 8-Ks, and it doesn't pass when you include

3    news announcements with analyst coverage that he's omitted.

4            So for most of the class period, whether you use 8-K

5    dates, whether you use 8-K dates with analyst coverage, that

6    he's omitted, or whether you use 8-K dates with analyst

7    mentioned that he's included and the proper test statistic, it

8    flunks most of the time.

9            This is an easy test.  This is unusual to see the kind

10    of failure rate for what is an easily passed test in most

11    instances.

12   Q.  Turning back to slide 22, his Honor focused on the 16.67

13   and the 16 percent --

14   A.  Yes.

15   Q.  -- and that number goes up to 50 percent in the post-Cole

16   period.

17   A.  Right.

18   Q.  Why would there be a dramatic increase in the number of

19   movements on news days in the post-Cole period as opposed to

20   the earlier period?

21   A.  Well, the conclusion I would say is that the market is more

22   responsive to news during the post-Cole period than it is

23   during the pre-Cole period.

24   Q.  And to the extent that you are using the test of these

25   scores and statistical significance, who put that test forth as

H8OAARC3ps                  James – direct

1    the proper test to be used in this case?

2    A.  It's the article that -- it's outlined in the article that

3    Dr. Feinstein references.  It's in, on page 20 of the slide

4    presentation.

5    Q.  And taking a look at page 20, what is it in the article

6    that leads you to say that the test as enunciated by Ferrillo

7    et al. was to be done with unequal areas?

8    A.  Well, it says in the footnote that's describing the test,

9    "The test examines whether the means of two samples with

10   potentially different variances are the same."  So when they're

11   explaining potentially different variances, that's allowing for

12   the variances between the news days and non-news days to be

13   different.  And when you conduct the test in the way that's

14   described in the Ferrillo article, which I believe, as a

15   financial economist, is the appropriate way to do it, from two

16   of the three periods during the class period, the ARCP common

17   stock fails the test.

18   Q.  And in preparing for your testimony, did you consult with

19   any of the authors of the Ferrillo study?

20   A.  I did.

21          MR. DROSMAN:  Objection.  Calls for hearsay, your

22   Honor.

23          THE COURT:  Not yet.  Maybe the next question.

24          MR. DROSMAN:  All right.

25          MR. EDELMAN:  I want to ask the next question?

H8OAARC3ps                    James – direct

1    Q.  Whom did you consult?

2              THE COURT:  OK.

3    A.  Dr. Tabak.

4    Q.  Did you consult for the purpose of providing expert opinion

5    here?

6              MR. DROSMAN:  Objection, your Honor.  This is going

7    down the hearsay track.  No reason for this.

8              THE COURT:  Tracks are OK.

9    Q.  What if anything --

10             THE COURT:  You didn't answer the question.  Is it

11   yes?

12   A.  Yes.

13   Q.  What if anything did you learn from that conversation?

14             MR. DROSMAN:  Objection, hearsay.

15             THE COURT:  Sustained.

16   Q.  Now, you mentioned one flaw being equal variance versus

17   unequal variance.  What is the second flaw that you identified?

18   A.  Dr. Feinstein classifies news days based on what I will

19   refer to as a subjective and inconsistent judgment regarding

20   what constitutes a mention by analyst that is the focus of the

21   analyst report.  He doesn't classify news days based on

22   objective criteria.

23             So one important aspect of scientific inquiry that is

24   required is that a study be replicateable, that, as described,

25   you can replicate it.  And when I tried to replicate his study,

H8OAARC3ps                    James – direct

1    by looking at 8-Ks for which there was also analyst commentary

2    concerning those 8-Ks, I found that he had not included 12 8-K

3    events in which there was also analyst commentary.

4    Q.  Let's take a look at 24.  What's reflected on that chart?

5    A.  So what 24 is doing is saying, what happens when you

6    include the omitted 8-K event.  So you followed his methodology

7    and include all 8-K events for which there is an analyst

8    mention or commentary of the 8-K.  And what you see is, again,

9    that, for interval 1, for his intervals, or for pre-ARCT III,

10   post-ARCT III time period, it fails the test, meaning the

11   proportion of news days that are statistically significant is

12   not reliably larger than the number of non-news days.

13   Q.  Now, you testified that there were some days classified by

14   Dr. Feinstein as non-news days that under his criteria should

15   have been news days.  Can you give us an example of that.

16   A.  Oh, sure.  One example is, the company announced that it

17   was going to repurchase $250 million of its common stock.

18   There is commentary in the analyst reports concerning the

19   repurchase of $250 million of common stock.  And at the time

20   the announcement was made, that's a big share purpose.  That's

21   about an 8th of the outstanding shares.  He doesn't include

22   that as a news date, even though there's an 8-K that tells you

23   that there is a $250 million stock repurchase being approved

24   and analysts commenting on a $250 million stock repurchase.

25   Q.  And so the effect of that was that that went from being a

H8OAARC3ps                    James – direct

 1    news day to a non-news day?

 2    A.   That's correct.

 3    Q.   How many instances of that did you find?

 4    A.   12.

 5    Q.   And this chart reflects correction for those issues.

 6    A.   That's correct.

 7    Q.   Let's take a look at chart 25.  Tell us what you are

 8    showing in chart 25.

 9    A.   Well, if you look at all 8-Ks, instead of looking at 8-Ks

10    in which there is analyst mention, one concern I have about

11    looking at 8-Ks in which there is analyst mention is,

12    oftentimes, analysts will write up something based on observing

13    a price movement.  So the price moves, the analyst makes a

14    commentary.  If you're really wanting to ask, is news getting

15    incorporated into the stock in a consistent and reliable way,

16    as he did in other cases, you look at all 8-Ks.  And when you

17    look at all 8-Ks, again, you find that ARCP's common stock

18    fails this test for two thirds of the class period in the

19    alternative subperiods or in his interval 1.

20            And as you can see, in some instances you find more

21    significant non-news days than news days.

22    Q.   An example of that would be the pre-ARCT III period?

23    A.   Yes.

24    Q.   Can you point that out to the Court.

25    A.   Yes.  So there's 2.08 percent news days are significant

1    versus 5.88 non-news days being significant.  Or in his

2    interval 1, 5 percent of the news days were significant versus

3    7.24 of the non-news days.

4    Q.  And you mentioned earlier this was an easy test to pass.

5    A.  Right.

6    Q.  To the extent that these markets were truly efficient,

7    would you expect them to have any problems passing if all 8-K

8    days were considered?

9    A.  No.  I wouldn't expect there to be any problem testing.  I

10   think it's a very easy test to pass because it's not asking the

11   question, for example, is the stock price moving in the

12   direction that's appropriate given the news.  It's simply

13   asking if there's news are there price reactions more

14   frequently than when there's non-news.

15   Q.  Under this test, to the extent that a stock price moves

16   opposite the expected price reaction for an AFFO result, would

17   that count as a yes or a no with respect to that news day?

18   A.  It counts as a yes.  So if, as you remember, February 2013,

19   where the price reaction is in the opposite direction of what

20   the earning surprise is, that still gets counted in this test

21   as a significant price movement.

22   Q.  Let's move to the question of the preferred stock and the

23   notes.  What are your views about Dr. Feinstein's analysis of

24   the preferred stock and notes?

25   A.  Well, in terms of his empirical analysis of cause and

H8OAARC3ps                    James - direct

effect, he's looking at a single day, the October 29, 2014,

which, as I mentioned earlier, cannot be a test of market

efficiency throughout the class period or the period under

which the notes and the preferred stock are trading.  He does

not conduct the collective-event study analysis.  So he doesn't

offer any evidence whatsoever as to a cause-and-effect

relationship on any day in the class period other than October

29, 2014.

Q.  And what's your view as to whether the October 29, 2014

analysis he did is useful in establishing market efficiency

during the class period?

A.  I don't think it's informative of market efficiency during

the class period, both because it's just looking at one day at

the end of the class period where prior there's a negative

price reaction.  And, second, he's basically saying, look,

information that might impact the common stock is not likely to

be value-relevant for these other securities and so I can't

really look at a cause-and-effect relationship for these other

securities during the class period, other than October 29,

2014.

Q.  Let's turn to slide 29.  Were there any structural

impediments to efficiency in the market for ARCP notes that you

identified?

A.  Yes, there were.  And I think they talked about these this

morning.  The trading in the notes is different than the

H8OAARC3ps                        James - direct

1    trading in the stock.  The trading in the notes are on an

2    over-the-counter market, and as a result, as a market

3    participant, you don't have the kind of transparency that you

4    need.  And transparency means, pre-trade, can I observe who's

5    willing to buy, what the bids and the asks are in the

6    marketplace.  And the answer is, for the notes trading over the

7    counter, the answer is no.

8            THE COURT:  Why is that?

9            THE WITNESS:  It's just the nature of the market that

10   the notes trade in.  It doesn't have that transparency.  You

11   can't see quotes being -- on the various books of the brokers.

12           THE COURT:  Do they get quoted once a day?

13           THE WITNESS:  So, for some of the notes they do.  So

14   that's a figure I have that's called the TRACE database, and

15   TRACE records prices.  That gives you what's called post-trade

16   transparency.  So I know what people traded at, OK.  But if I'm

17   going to submit a bid for a particular bond, say I want to buy

18   a bond, I don't know what the current bids or asks for the

19   bonds are.

20           THE COURT:  You just see the last prices.

21           THE WITNESS:  I just see the last prices.

22           THE COURT:  But if you know the last prices, it's

23   always an indication of what the next price might be.

24           THE WITNESS:  Well, there might be price movement.

25           THE COURT:  So you can test it.

H8OAARC3ps                    James - direct

1              THE WITNESS:  Yes.  The other thing --

2              THE COURT:  You also know who's buying and selling.

3              THE WITNESS:  No, you don't know that.

4              THE COURT:  You don't know that.

5              THE WITNESS:  Yeah.

6              THE COURT:  But if you're on the market, you tend to

7    know who's buying the stock.

8              THE WITNESS:  You -- the -- there isn't that type of

9    transparency.  What you don't see is who's willing to buy or

10   willing to sell.

11             THE COURT:  You have a statement of history and it's

12   not so clear.

13             THE WITNESS:  Exactly.

14             THE COURT:  But if you're around the market, you tend

15   to know who have been the buyers and who have been the sellers.

16             THE WITNESS:  Exactly, except for one thing.  For most

17   of the bonds here, for most of the class period, they're 144As,

18   so you don't --

19             THE COURT:  It's a private deal.

20             THE WITNESS:  They're private placement.  So for

21   144As, you don't have post-trade transparency until June 30,

22   2014.  And that transparency is with a 15-minute delay.

23             So you don't have the kind of transparency in the 144A

24   notes.  And FINRA basically says, when it began posting with a

25   delay the TRACE data for 144A, they describe it as, the

H8OAARC3ps                    James - cross

1    addition of post-trade transparency, as bringing transparency

2    to a market that's previously operated in the dark.  Markets

3    that operate in the dark are not typically conducive to market

4    efficiency.

5    Q.  Dr. James, I'd like to just spend a few moments addressing

6    Dr. Feinstein's proposed damages methodology.  He we can turn

7    to slide 32?

8            THE COURT:  That hasn't been touched on yet.  There's

9    been no direct on that.

10           MR. EDELMAN:  You want us to do that separately?

11           THE COURT:  Yes.

12           MR. EDELMAN:  Then I will pass the witness.

13   CROSS-EXAMINATION

14   BY MR. DROSMAN:

15   Q.  Dr. James, let's talk about your conclusions, or your lack

16   of conclusions as it might be, in this case.  You never

17   conclude that the market for ARCP common stock during the class

18   period is not, underline not, efficient, correct?

19   A.  No.  My testimony is -- and as I understand it the

20   plaintiffs have the burden to show efficiency and that for the

21   common stock, using the test that Dr. Feinstein has proposed,

22   it fails through most of the class period.

23   Q.  Let me ask you the question again.  I don't think I

24   received an answer.  You never concluded --

25           THE COURT:  I think he did answer.  He said that that

H8OAARC3ps                    James - cross

1    wasn't his focus.  His focus was showing deficiencies in

2    Dr. Feinstein's report.

3    Q.  You never conclude that the market for ARCP preferred stock

4    during the class period was not efficient --

5              THE COURT:  Same point, Mr. Drosman.  Don't make

6    rhetorical points.  I have it.  His focus is to impeach what

7    Feinstein said.  He's not giving positive testimony.

8              MR. DROSMAN:  Fine, your Honor.

9    Q.  Let's discuss the *Cammer* factors.  It's fair to say that

10   your criticism of Dr. Feinstein focuses almost exclusively on

11   *Cammer* factor number five, correct?

12   A.  I think that that is correct, that the four other *Cammer*

13   factors that we've talked about, from a financial economist's

14   perspective, are indirect evidence, and I think Dr. Feinstein

15   concludes this as well, that is conducive to market efficiency

16   but is not in and of itself evidence of market efficiency.

17   Q.  And it's fair to say that you don't contest Dr. Feinstein's

18   conclusion that the first four *Cammer* factors, the, as you call

19   them, indirect evidence of market efficiency, was satisfied,

20   correct.

21   A.  Well, I do, in the sense that, while there's -- the *Cammer*

22   factors lay out some legal standards for, for example, daily --

23   weekly trading --

24             THE COURT:  Let me cut through this because we're

25   wasting time.  He divided the period of the class into three.

H8OAARC3ps                    James - cross

1    In the first period, he testified that there was a very thin

2    capitalization, a micro cap, he said.  The second, there was a

3    more widespread capitalization, third period even more so.  So

4    to that extent, his testimony affects all five of the *Cammer*

5    factors.

6         MR. DROSMAN:  That's not true, your Honor.  That's

7    *Krogman* factor two.  The *Cammer* factors deal with different

8    things: average weekly trading volume, eligibility to file an

9    S-3.  We've got, the second *Cammer* factor is analyst coverage.

10        THE COURT:  Do you have any opinion on the average

11   weekly trading volume of the stock in the three periods that

12   you identified?

13        THE WITNESS:  Yes.  The average trading volume in the

14   stock goes up during -- from period 1, 2, and 3.  If you use

15   what I think is an artificial standard like 1 or 2 percent of

16   the overall volume outstanding, it will pass that standard.

17        THE COURT:  For all three?

18        THE WITNESS:  For all three.  But --

19        THE COURT:  What about the number of securities

20   analysts following and reporting on the stock?

21        THE WITNESS:  There's no clear dividing line there.

22   There are two analysts for most of the class period that are

23   following the stock.  Only --for most of the earnings --

24        THE COURT:  And probably a number of others following

25   the two.

1          THE WITNESS:  No.  Just -- so you start the class

2    period, OK, with two analysts, OK.  On most earnings dates,

3    only one analyst is providing a forecast.  You end the class

4    period with, I think, ten or 12 analysts following the stock.

5    So that's changing during the class period.

6          THE COURT:  So if you have two analysts following the

7    stock throughout, is that a satisfaction or not a satisfaction

8    of the *Cammer* factor?

9          THE WITNESS:  I think that it's -- again, there's no

10   bright line.  So you look at things like, is there -- what are

11   the analysts --

12         THE COURT:  You look at how much reputation the

13   analysts have and how frequently they report.

14         THE WITNESS:  Right.  And what they're reporting.  And

15   if the analysts are reporting, as these two do, that, hey, this

16   is an illiquid stock, without institutional involvement, that

17   tells you that those and analysts, while they're following the

18   stock, are pointing out impediments to information getting

19   embedded into the share price.

20         THE COURT:  The third is the extent --

21         MR. DROSMAN:  Your Honor, it's important that we go

22   back to the second factor.  He told me at his deposition that

23   he never evaluated the second factor, right.

24         (Mr. Edelman rose)

25         THE COURT:  Ask him.

H8OAARC3ps                    James - cross

1    Q.  Did you ever evaluate the second factor?

2              THE COURT:  What's the matter, Mr. Edelman?

3              MR. EDELMAN:  I just, I'd like to get a question.

4              THE COURT:  He's just asking it.

5              MR. EDELMAN:  Well, I was wincing before I got the

6    question.

7              THE COURT:  OK.  Sit down and relax, and Mr. Drosman

8    will now ask the question.

9    BY MR. DROSMAN:

10   Q.  You never evaluated *Cammer* factor number two, did you, sir?

11   A.  I didn't make a conclusion as to whether it passed or

12   failed *Cammer* factor two.  As I indicated in my deposition,

13   there's no clear dividing line.  If you have one analyst

14   providing an analyst -- a forecast, even your expert says, when

15   there was one analyst following the stock, he wasn't

16   comfortable concluding the market was efficient.

17   Q.  I'm going to show you your deposition.  We're going to mark

18   it as Plaintiff's Exhibit 3.

19             THE COURT:  You don't have to mark it.

20             "At such and such a date, were you asked the following

21   question" --

22   Q.  On August 1, 2017, you were deposed, right, sir?

23   A.  Yes.

24   Q.  And at that deposition you swore to tell the truth.

25             MR. DROSMAN:  May I approach, your Honor?

H8OAARC3ps                    James - cross

1          THE COURT:  Relax.  Just ask a question.

2          Were you asked the following question and did you give

3    the following answer?

4          MR. DROSMAN:  Should I provide him with a --

5          THE COURT:  No, just go back to where you're

6    questioning him.

7          MR. DROSMAN:  OK.

8          THE COURT:  Don't be so intense.

9          MR. DROSMAN:  Well, it's difficult to sit here and

10   listen to what I know --

11         MR. EDELMAN:  Objection.

12         THE COURT:  You're experienced as a lawyer.  You know

13   how to listen.

14   BY MR. DROSMAN:

15   Q.  OK.  I'm looking at page 193 of your deposition on August

16   1, 2017, and on that day --

17         THE COURT:  Page --

18   Q.  Page 193, line 12 of your deposition.  And on that day, you

19   were asked:

20   "Q. My question is, did you conclude that *Cammer* factor number

21   two was not satisfied?"

22         Your response:  "I didn't.  I wasn't asked to evaluate

23   it."

24         Is that your testimony, sir?

25   A.  Yes.

H8OAARC3ps                        James - cross

1          MR. EDELMAN:  Well, wait.  That's just the beginning

2    of the answer.

3          THE COURT:  Gentlemen, I have it.

4    Q.  So you weren't asked to evaluate *Cammer* factor --

5          THE COURT:  He just said he wasn't.  All right.  Move

6    on.

7    Q.  With respect to *Cammer* factor number three, you didn't do

8    any analysis to quantify the number of market makers, correct?

9    A.  That's correct.

10   Q.  And you also never addressed Dr. Feinstein's conclusion

11   that there was extensive news coverage of ARCP during the class

12   period, did you?

13   A.  No.

14   Q.  With respect to *Cammer* factor number four, that's

15   eligibility to file a form S-3, right?

16   A.  That's correct.

17   Q.  You didn't do any analysis to determine whether ARCP was

18   eligible to file a form S-3 during the class period; is that

19   right?

20   A.  Correct.

21   Q.  And you don't disagree with Dr. Feinstein's conclusion that

22   ARCP was eligible to file a form S-3 from August 1, 2012 until

23   the end of the class period, correct?

24   A.  That's correct.

25   Q.  *Cammer* factor number five is empirical effect showing a

H8OAARC3ps                     James - cross

1    cause-and-effect relationship between unexpected news and an

2    immediate response to the stock price, right?

3    A.  Yes, a cause-and-effect relationship.

4    Q.  And you understand that Dr. Feinstein performed an event

5    study with respect to this factor, right?

6    A.  That's correct.

7    Q.  And he ran a regression analysis, right?

8    A.  That's correct.

9    Q.  And you understand that Dr. Feinstein concluded that *Cammer*

10   factor number five is satisfied, right?

11   A.  Yes.  I agree that he concluded that.  I don't agree with

12   his conclusion.

13   Q.  Right.  And you understand that he used equal variances in

14   his Z-score, right?

15   A.  Incorrectly, yes.

16   Q.  You believe it's incorrect, right?

17   A.  That is correct, as to the authors of the article that he

18   cites.

19             THE COURT:  Objection, your Honor.  I move to strike.

20             MR. DROSMAN:  Sustained.

21   Q.  Sir, just answer my question if you could.  You understand

22   that all the charts that you provided to this Court during your

23   direct examination, the Z-score was followed by the parens

24   "unequal variances," right?

25   A.  That's correct.

H8OAARC3ps                    James - cross

1    Q.  You didn't use equal variances, right?

2    A.  I have used equal variances.

3    Q.  You didn't use equal variances in this particular test that

4    you performed here, did you?

5    A.  That's correct.

6            THE COURT:  I don't understand what that means.

7    Q.  I think that the best person --

8            THE COURT:  Ask.

9    Q.  So equal variances --

10           THE COURT:  What do "equal variances" mean?

11           THE WITNESS:  That you assume that the variance

12   between the two samples, for news dates and non-news dates, are

13   equal, which would be a standard assumption if you were doing a

14   two-tailed test looking at proportion.  When you're using a

15   one-tailed test looking at proportions, the appropriate test

16   statistic is unequal variance because --

17           THE COURT:  "One tail" means one event?

18           THE WITNESS:  "One tail" means that you're saying, so

19   think about a test in which you were saying, I'm going to

20   compare the average heights of men and women.  OK.  One way to

21   hypothesize that is, there's no difference, versus, there is a

22   difference.  That would be a two-tailed test.  A one-tailed

23   test would say, I'm going to test whether men are taller than

24   women, OK, against the null that there's no difference or

25   they're smaller.

1             THE COURT:  What's the question here?

2    Q.  The question is --

3             THE COURT:  Not, not -- what's the question here?

4             THE WITNESS:  The question here as he's formulated it

5    is equivalent to, are men taller.

6             THE COURT:  Not equivalent.  What is the test here?

7    What's the question he's asking?

8             THE WITNESS:  He's asking, is the proportion of

9    significant news days greater than the proportion of

10   significant non-news days.  So the null hypothesis is no

11   difference or less than.

12            THE COURT:  In proportion to what?

13            THE WITNESS:  Proportion of all days in which there is

14   news, a significant price reaction.

15            THE COURT:  So it's the proportion of greater news

16   days to all days and the proportion of non-greater days to all

17   days.

18            THE WITNESS:  So the proportion of news days for which

19   there is a significant price reaction.

20            THE COURT:  You're saying they should be equal?

21            THE WITNESS:  He's saying that they should be equal or

22   less, is the null hypothesis, versus the alternative, that

23   they're greater.

24            And that requires --

25            THE COURT:  And for concluding, if you can, on the

H8OAARC3ps                    James - cross

1  issue of market efficiency, is it the greater, the more

2  efficient, or is it the more equal, the more efficient?

3            THE WITNESS:  Well, if you're testing the hypothesis,

4  you're testing, is it more likely on news days against the

5  alternative, that if the market were inefficient you might

6  observe more frequent significance during non-news days or no

7  difference between the two.

8            THE COURT:  I'm not following.

9            THE WITNESS:  OK.

10           THE COURT:  If there's more movement of stock price on

11  a news day proportionally to all, than on a non-news day,

12  that's an indication of greater efficiency, is it not?

13           THE WITNESS:  Not unless you can say, with a

14  reasonable degree of certainty, that that greater frequency is

15  not by chance, meaning that you can say --

16           THE COURT:  Other things being equal.

17           THE WITNESS:  You need to say with confidence that

18  there is a meaningful difference between the two.

19           THE COURT:  Got it.  OK.

20           THE WITNESS:  Just as if you're eval --

21           THE COURT:  I got it, I got it.  Continue.

22  BY MR. DROSMAN:

23  Q.  And you understand that Dr. Feinstein tested a null

24  hypothesis, right?

25  A.  Yes.

H8OAARC3ps                    James - cross

1   Q.  And you've already told us that the null hypothesis is that
2   the difference between the news days and the non-news days will
3   be the same or less, right?
4   A.  That's correct, as opposed to what typically is done, which
5   is saying there's no difference between the two.
6   Q.  Let's see.  The first four *Cammer* factors, if the first
7   four *Cammer* factors were met but the fifth --
8           THE COURT:  I think you've got all the points you
9   want.
10          MR. DROSMAN:  What's that?
11          THE COURT:  You've got all the points you want, that
12  he didn't do any study on points one through four and on five
13  you challenged them.  So what do you need?
14          MR. DROSMAN:  Well, here's what I'd like to ask:
15  Q.  If the first four *Cammer* factors were met but the fifth
16  *Cammer* factor was not satisfied, you would not opine that a
17  market is efficient, correct?
18  A.  I would say that that would be evidence that would be
19  inconsistent with market efficiency, certainly in the context
20  of finding additional evidence by market participants that
21  there are impediments to information flows that exist in this
22  case.
23  Q.  At your deposition, at page 185, lines 9 through 16, you
24  were asked:
25  "Q. What I'm asking you, sir, is that if the first four *Cammer*

H8OAARC3ps                    James - cross

1   factors were satisfied and the fifth factor is not, can a

2   market be efficient for a particular security, in your expert

3   opinion?"

4        Response: "I would not opine that the market is

5   efficient if the first four *Cammer* factors were met and the

6   evidence was that the security failed the fifth *Cammer* factor."

7        Is that correct, sir?

8   A.  Yes.

9   Q.  You also said that the comments do not rely on indirect

10  tests, like the first four *Cammer* factors, to determine market

11  efficiency, right?

12  A.  That's typically the case, yes.

13  Q.  The first four *Cammer* factors are considered indirect

14  evidence of market efficiency, right?

15  A.  That's correct.

16  Q.  And the three top *Krogman* factors are also considered

17  indirect evidence of market efficiency, right?

18  A.  I think they're -- and let me just correct my prior answer.

19  I think they're considered to be indirect evidence of

20  conditions that may be conducive to market efficiency, not

21  evidence of market efficiency itself, because market efficiency

22  is defined, as we've talked about, as a, does the price of the

23  security react to all value-relevant information rapidly and

24  accurately.

25  Q.  So I take it that you agree with the Second Circuit's

H8OAARC3ps                    James - cross

1    *Petrobras* decision that there should be no evidentiary

2    hierarchy between --

3                THE COURT:  That's not a good question.

4                MR. DROSMAN:  I think it's important, your Honor,

5    because I think --

6                THE COURT:  It may be important, but it's not a

7    competent question.

8    Q.  Let me ask you this.  Do you agree that there should be no

9    evidentiary hierarchy between direct evidence and indirect

10   evidence of market efficiency.

11               (Mr. Edelman rose)

12               THE COURT:  Objection sustained.

13               I think you're finished, Mr. Drosman.

14               MR. DROSMAN:  Well, let me talk about his regression

15   analysis, your Honor, very briefly, if I could.  It relates to

16   *Cammer* factor number five.

17   Q.  You heard Dr. Feinstein's testimony concerning your

18   application of his regression results to your three study

19   periods, right?  You read that deposition testimony?

20   A.  Yes.

21   Q.  And if you take a look at Exhibit 2 to your report, which

22   is in evidence, you see that your first subject here is called

23   the pre-ARCT III period, right?

24   A.  Yes.

25   Q.  And it's 201 days long.  Is that correct?

H8OAARC3ps                    James - cross

1    A.  Yes.

2    Q.  And you would agree with me there is a footnote on Exhibit

3    No. 2 to your report that says that you relied on

4    Dr. Feinstein's interval-1 event study regression results for

5    your pre-ARCT III sub period, correct?

6            THE COURT:  Slow down, Mr. Drosman.  You're speaking

7    faster than I can absorb, and even though Paula is an

8    extraordinary reporter and is probably faster --

9            MR. DROSMAN:  I'm sorry.  I'll ask the question more

10   slowly.

11   Q.  You would agree with me that footnote no. 2 to your report

12   says that you relied on Dr. Feinstein's interval-1 event study

13   regression results for your pre-ARCT III subperiod, correct?

14   A.  That's correct.  So what I'm doing is, I am identifying

15   days during the pre-ARCT III time period that Dr. Feinstein has

16   concluded have statistically significant price reaction.

17   Q.  So it's correct that you used Dr. Feinstein's regression

18   results for a period of 321 days and relied on those results

19   for your 201-day pre-ARCT III subperiod.  Correct?

20   A.  No.  I'm just identifying dates that your expert has

21   identified as statistically significant using his interval 1.

22   And as I indicated in my deposition, I'm doing that in part

23   because --

24           THE COURT:  We're not getting anywhere, Mr. Drosman.

25   I think you're finished.

H8OAARC3ps                    James - redirect

1          Anything on direct?

2              MR. DROSMAN:  Your Honor, I have more that I could --

3              THE COURT:  I understand, but you're wasting time.

4      You're making debatist points rather than providing useful

5      information.

6              MR. DROSMAN:  Well, I have a demonstrative exhibit

7      that I think would show your Honor why this is really

8      problematic.

9              THE COURT:  What is really problematic?

10             MR. DROSMAN:  What his use of Dr. Feinstein's

11     interval-1 regression analysis for a shorter period is

12     problematic.

13             THE COURT:  I don't really care.

14             MR. DROSMAN:  It impacts his entire results.

15             THE COURT:  Go ahead, Mr. Edelman.

16     REDIRECT EXAMINATION

17     BY MR. EDELMAN:

18     Q.  Dr. James, you were asked whether you had done the analysis

19     using both equal variance and unequal variance at any point in

20     your report.

21     A.  That's correct.

22     Q.  I just wanted to review, do you have your report in front

23     of you?

24     A.  I do.

25     Q.  Can you take a look at Exhibits 2, 4, and 5 of your report.

H8OAARC3ps                    James - redirect

1          MR. EDELMAN:  Does the Court have it, your Honor?

2          THE COURT:  I do, but I'm not going to be able to

3    follow so many exhibits at one time.

4          MR. EDELMAN:  OK.  Let's start with Exhibit 5.

5    A.  You say Exhibit 5?

6    Q.  Yes.

7    A.  OK.

8          MR. EDELMAN:  Do you want us to hand it up?

9          THE COURT:  I have it.  You just did Feinstein

10   Exhibit 10.

11         MR. EDELMAN:  Right.

12   Q.  That's the analysis you did if you used all the 8-Ks as

13   opposed to a selection.

14   A.  That's correct.

15   Q.  Did you do the analysis using both equal variance and

16   unequal variance?

17   A.  I did.

18   Q.  And can you show the Court where that is?

19   A.  So if you look in the bottom two boxes, so Z-score assuming

20   equal variance and Z-score assuming unequal variance, and then

21   there's statistical significance, if you used either test for

22   all of the 8-Ks, ARCP's common stock fails the test for

23   Feinstein's interval 1 and it fails the test for the pre-ARCT

24   III period and the post-ARCT III period.

25         THE COURT:  What are we proving here?  And understand

H8OAARC3ps                    James - redirect

1    it in my terms.  You say you would expect that there be an

2    equal variance as between the proportion of non-event days to

3    total 8-Ks and event days to total 8-Ks?

4              THE WITNESS:  No.  What I'm saying is that you can --

5    there is a -- the test statistic is constructed either

6    assuming -- what you do is pool all the data and say the

7    variance for all of the data is the same, versus, is there a

8    difference in the variance between the news days and the

9    non-news days.

10             THE COURT:  Feinstein said they were variable.

11             THE WITNESS:  He's saying, I'm going to assume that

12   they're all the same, for my test statistic.  I'm going to

13   assume equal variance to the two groups.  All right.  I'm

14   saying that isn't the way you've structured your test.  That's

15   not what the article says to do.  That's not what statistics

16   texts --

17             THE COURT:  I may be mistaken, but I don't think he

18   said that.

19             THE WITNESS:  Well, that's what it means to employ an

20   equal variance, that you're saying --

21             THE COURT:  Can I get Feinstein sitting up here and

22   ask.

23             MR. EDELMAN:  Time?  It's time?

24             THE COURT:  Yes.

25             MR. EDELMAN:  Do you want me to sit down?

H8OAARC3ps                          James and Feinstein

1           THE COURT:  You can stand up.

2           Dr. James, go in the jury box.

3           THE COURT:  You are under oath, Dr. Feinstein.

4           WITNESS FEINSTEIN:  I understand.

5     CHRISTOPHER JAMES and STEVEN P. FEINSTEIN, As witnesses

6     together.

7           THE COURT:  All right.  Will you comment.

8           WITNESS FEINSTEIN:  The null hypothesis of the test is

9     that -- actually as a preliminary matter, I want to ask this,

10    or state this.

11          THE COURT:  Actually, I would like the two of you to

12    talk.  Talk to each other.  This is an innovation that has been

13    worked through the Australian courts.

14          WITNESS JAMES:  I've participated in that.

15          THE COURT:  Have you?

16          WITNESS JAMES:  Yeah.  I've been in the hot tub.

17          THE COURT:  So a student who had interned here and

18    written a major paper there had interviewed me.  And I had used

19    a form of this before in the 9/11 cases, but not too much.  But

20    I've had another experience having to do with Mexican law,

21    where I have had experts from either side and I was

22    dissatisfied with the contentiousness that was brought by the

23    question by lawyers.  I had the experts talking to each other,

24    which I found to be very helpful.  And so I'd like to do that

25    here.

H8OAARC3ps                         James and Feinstein

1          WITNESS JAMES:  OK.

2          WITNESS FEINSTEIN:  Interesting.

3          If you're willing to concede or stipulate that the

4   variance for price movements for news days is greater than the

5   variance of price movements for non-news days, then there's no

6   need to even run the test that they were done.  That would

7   prove that there's an impact of information on the stock

8   prices.

9          THE COURT:  So that means that you're not positing

10  equal variation.  You're positing unequal variation.

11         WITNESS FEINSTEIN:  If that's the concern.

12         THE COURT:  What were you doing?  Were you positing

13  unequal variation?

14         WITNESS FEINSTEIN:  I constructed my Z-statistic using

15  the equal-variance formula, because that was the more

16  conservative.  I did testing, diagnostics, simulations to show

17  that that was the more conservative way to run the test, with

18  the equal variance, because, under the null hypothesis that the

19  news days have equal or less variance than the general

20  population, using the general population variance would be

21  bigger than the news day variance, and so using that general

22  population of all news-day variance would be the bigger number

23  and the Z-statistic construction would be more conservative.

24  So that was the appropriate way to run the test as I saw it.

25         THE COURT:  Dr. James.

H8OAARC3ps                    James and Feinstein

1          WITNESS JAMES:  He's talking about a conservative test

2     in which you make it easier to pass.

3          THE COURT:  Look at each other.

4          WITNESS JAMES:  Yes.

5          You're talking about a test in which it's easier to

6     pass.  My question to you is, you read the Ferrillo article.

7     You knew what -- you reference it.  And you know that they were

8     using unequal variance.  And you know from textbooks that

9     that's the way to do it.  But you didn't do it here.  And you

10    are not running a two-tailed test.  You're not saying, the news

11    days, non-news days, are different from one another versus

12    they're the same.  You're running a one-tailed test.  And you

13    know that when you run a one-tailed test, the significance

14    level that you need to get is 1.67, not 1.95.  And will you

15    agree that if you had done a two-tailed test in your analysis,

16    OK, against a null, that there's no difference, that it would

17    fail your test during your interval 1 and during my ARCT III,

18    pre-ARCT III period and the post-ARCT III period.  It would

19    fail under a two-tailed test.  Will you agree with that?

20         WITNESS FEINSTEIN:  Well, a one-tailed test is the

21    appropriate test.

22         WITNESS JAMES:  No.  Would it fail?

23         THE COURT:  Don't talk over each other.

24         WITNESS FEINSTEIN:  The one-tailed test is the

25    appropriate test to run, and I didn't see any criticism of that

H8OAARC3ps                         James and Feinstein

1    in your report.  If you do run it as a two-tailed test, meaning

2    you're testing the hypothesis that news days have less

3    significance --

4         WITNESS JAMES:  No, no.  That's not a two-tailed test.

5    You're basically saying --

6         WITNESS FEINSTEIN:  Then it's different, OK, under a

7    two-tailed test.

8         THE COURT:  I think we're dealing with a lot of

9    different concepts and there could be disagreement.  We're not

10   going to get very far unless you allow each person to finish.

11        WITNESS JAMES:  OK.

12        THE COURT:  And then you can try to fix up the

13   different parts.

14        WITNESS FEINSTEIN:  A one-tailed test is the

15   appropriate test to run, and the Z-statistic as I constructed

16   it is the appropriate Z-statistic.  If I had run the test

17   inappropriately -- and there's myriad ways of running the test

18   inappropriately -- it would fail, it would be uninformative.

19        But I looked at Dr. Tabak's reports that he submitted

20   to courts and I saw that he ran the test identical to the way I

21   did.  He used the Z-statistic constructed under the assumption

22   of equal variance, not unequal variance.  The article that you

23   pointed to and put the demonstrative up had a cryptic footnote

24   that you highlighted, but it never did say construct the

25   Z-statistic using an assumption of unequal variance.

H8OAARC3ps                    James and Feinstein

1           WITNESS JAMES:  How could you conduct a Z-statistic to

2   allow the variances to be different unless you were running a

3   Z-statistic with unequal variances?

4           WITNESS FEINSTEIN:  Exactly the way I did it.  I ran

5   simulations and did calculations to show that running it with

6   the equal-variance assumption was the more conservative way of

7   running the Z -- the more conservative way -- let's not talk

8   over each other.

9           WITNESS JAMES:  No.

10          WITNESS FEINSTEIN:  Is the more conservative way of

11  running the test.

12          The reason why it's really important not to run it

13  your way with the unequal-variance statistic -- and this is in

14  the textbooks that you cite -- is it eviscerates the power of

15  the test.  It makes the test likely to not find a significant

16  result when in fact the truth is a significant result.  It

17  creates what's called type 2 error, which is the error that the

18  testing too weak to find the actual effect.

19          And the reason why, the analytical reason why it

20  eviscerates the power of the test is, under -- when the results

21  come back and show that there's higher, greater movement among

22  the news days, that greater movement causes the Z-statistic as

23  you constructed it to be inflated, above what would be the

24  appropriate -- the variance, I'm sorry, the variance to be

25  inflated, so that the Z-statistic would be too low.

H8O5arc4                         JAMES and FEINSTEIN.

1           THE COURT:  What is the Z-statistic?

2           WITNESS FEINSTEIN:  The Z-statistic is the

3     mathematical formula that gives the scientific basis for the

4     test.  The data are fed into a formula.  The formula value is

5     then compared to tables that indicate how likely, what the

6     probability is of observing this kind of data and this kind of

7     Z-statistic under various hypotheses.

8           THE COURT:  Is it a threshold of statistical

9     significance?

10          WITNESS FEINSTEIN:  Yes.  It determines the threshold

11    for statistical significance.  And running it your way it

12    eviscerates the power of the test.  It makes it so that the

13    test will not find significance.

14          THE COURT:  The last word, Doctor.

15          WITNESS JAMES:  What he is basically saying is that if

16    you run the test using the unequal variants, which is what the

17    article that he cites uses, that it will fail most of the time.

18    We disagree on a fundamental point which is when you are using

19    a one-tailed test where the hypothesis --

20          THE COURT:  One tailed-test means?

21          WITNESS JAMES:  That you are only going to look at the

22    right part of the distribution so you are going to have a lower

23    critical value for the Z instead of --

24          THE COURT:  So the difference is that Feinstein uses a

25    sample of what he considers news days that result in price

H8O5arc4                          JAMES and FEINSTEIN.

1    movement and you argue that that's an inappropriate sample.

2              WITNESS JAMES:  That's one criticism.  The second

3    criticism --

4              THE COURT:  And he justifies that by saying that I'm

5    trying to measure movement and so I can't mix in where there is

6    no movement and where there is movement, or where there is

7    analyst comment or where there is no analyst comment.  And my

8    observation is that the statistics are intended to prove a

9    predictive result and therefore they're flawed because they're

10   flawed by looking for the prediction that you are trying to

11   prove.

12             WITNESS JAMES:  Exactly.

13             THE COURT:  However, they're indicative.

14             I think I would come out with this, folks, in terms of

15   a finding:

16             I don't have enough scientific basis to identify that

17   which is statistically appropriate and that which is not

18   statistically appropriate.  I am not able to say that one way

19   of looking at this for statistical or scientific measure is

20   better than another way, and I have to look at it in terms of a

21   whole, looking at it as a whole.  This fifth factor was tested

22   to show that an event, an 8-K which excited commentary from

23   analysts, resulted in a price movement that was statistically

24   significant, that is to say was measurable, that looked to be

25   greater than the absence of equal movement on a non-event day,

H8O5arc4                    JAMES and FEINSTEIN.

1    that is to say an event which, although started by an 8-K, did

2    not excite analyst commentary.  It is a proposition that is

3    either self-evident or will cause us to spend endless time in

4    trying to devise scientific formulas for measuring but

5    intuitively, if things excite analysts and analysts excite

6    price movement, there is a measure of efficiency in the market.

7    To what degree, I am unable to say.

8         Given this evaluation on my part and the indication

9    that comes out for both sides that the first four factors of

10   the Cammer case are satisfied, I come to the conclusion that

11   there is requisite degree of efficiency in the market for ARCP

12   common stock, namely that the alleged misrepresentations

13   affected ARCP's stock price partially or entirely throughout

14   the period.

15        I then come to two other questions that I have to

16   answer, one is whether this is the case for the entire period;

17   and second, whether this conclusion is applicable to debt and

18   preferred stock.

19        Now, the division of the class period into two based

20   on this internal management factor, I think, is artificial and

21   inappropriate and I think the analysis of Dr. James, showing a

22   tripartite division is more appropriate for our purposes.  And

23   then the question is partly practical and partly factual.  If

24   there is to be a class certification for at least the last

25   third and probably the last two thirds of this three-part

H8O5arc4                          JAMES and FEINSTEIN.

1    period, that is, for the period after the ARC III merger -- and

2    that would be a date, Ms. Wyman, that would be?

3            MS. WYMAN:  I think it is February 28, 2013.

4            THE COURT:  -- and thereafter, practically speaking

5    there is no reason now to divide the class into two and say

6    part is class and part is non-class.

7            This is a decision that I think should be deferred.

8    And part of my justification for deferring this decision and

9    moving along on the finding that the class period should cover

10   the entire period from May 9, 2012 to October 29, 2014, is the

11   proposition stated by Dr. Feinstein that there were numerous

12   analysts -- maybe numerous is bad, apparently there are only

13   two, but -- there were lots of news commentary and lots of

14   following of the stock, and although that alone is not

15   sufficient to make for an efficient market, it is a sufficient

16   indication that a certification of the class for part of this

17   period should extend for the entire period.

18           We don't have any statistical measurements for average

19   weekly trading volume in this early period.  I don't think

20   that's in the record, is it Ms. Wyman?

21           MR. DROSMAN:  Your Honor, I was going to elicit this

22   on cross-examination.  There is statistics for the first

23   period's average weekly trading volume, it is over 2 percent.

24           THE COURT:  So it is marginally accurate.

25           MR. DROSMAN:  Cammer says that is persuasive evidence

H8O5arc4                          JAMES and FEINSTEIN.

1    of sufficiency.

2            THE COURT:  The numbers of securities analysts

3    following and reporting on the stock, even though there are

4    two, these people followed it continuously and I think from the

5    beginning of the period; is that right?

6            MS. WYMAN:  From the beginning of our class period;

7    that's right, your Honor.

8            THE COURT:  So, again, that's indicative.

9            The extent to which market makers and arbitragers

10   trade in the stock, what is the basis of that?

11           MS. WYMAN:  The basis for that, I think Dr. Feinstein

12   testified, were -- the basis for the market makers were data

13   that he got from --

14           WITNESS FEINSTEIN:  Nasdaq.

15           MS. WYMAN:  Nasdaq.

16           THE COURT:  How far back?

17           WITNESS FEINSTEIN:  All the way.  All the way since

18   the IPO.

19           THE COURT:  Since May 9, 2012?

20           WITNESS FEINSTEIN:  May 9 was class period and it was

21   listed on Nasdaq as of that date.  It was listed on Nasdaq

22   prior to that date.

23           THE COURT:  So, that's another indicator.

24           There is eligibility, I think you testified, from

25   August 1, 2013.

H8O5arc4                        JAMES and FEINSTEIN.

1          WITNESS FEINSTEIN:  '12.

2          THE COURT:  Pardon?

3          WITNESS FEINSTEIN:  August 1st, 2012.

4          THE COURT:  Sorry.

5          And, the last factor we have already talked about.

6          As to the factors under the Krogman case, the company

7    capitalization, although much smaller, didn't have -- how much

8    capitalization?

9          MS. WYMAN:  I think at the very beginning of the class

10   period it was $75 million and within a few weeks it was up

11   above $100 million for the common stock.

12         THE COURT:  The relative size of the bid-ask spread

13   for the security?

14         WITNESS FEINSTEIN:  Narrow from the very beginning.

15         THE COURT:  And the company's float, and that changed

16   a substantial amount.

17         From all of this I feel that it's appropriate, with

18   regard to the common stock, to certify the class from the

19   entire period.  As to the preferred and the debt, there is

20   larger question.  Although there was significant price movement

21   following the 8-K of October 29, 2014, that is not proof

22   sufficient to go backward in time.  The Latin notion is *post

23   hoc ergo propter hoc* which is a proposition of logic that

24   doesn't follow.  That is to say, just because it happened now

25   doesn't mean it happened before.  However, the discovery is not

H8O5arc4                        JAMES and FEINSTEIN.

1   going to be affected in the slightest because there are

2   different securities involved.  We have convertible senior

3   notes, different classifications, we have common stock and

4   preferred stock coming through a merger and there are senior

5   notes that are coming, there will not be variation in discovery

6   because of this, and there will be time later in the case to

7   fine tune the class.

8           So, this is my holding on the point of certification.

9   Do I need to make further finding, Ms. Wyman, on this point?

10          MS. WYMAN:  No, your Honor.

11          I just wanted to be clear that your holdings on market

12  efficiency applied to the 10b case and don't have anything to

13  do with the Section 11 claims that we have got.

14          THE COURT:  What difference would it make?  First of

15  all, in Section 11, market efficiency is not critical because

16  it is a strict liability case based on misrepresentations and

17  the burden is on the defendants to disprove liability and

18  disprove causation.

19          MS. WYMAN:  Right; and there is no reliance element.

20  I wanted to make sure I understood clearly.

21          THE COURT:  I don't draw any distinction between the

22  theories of action at this point.

23          MS. WYMAN:  Thank you, your Honor.

24          THE COURT:  Anything further I need to find?

25          MS. WYMAN:  Nothing that jumps to mind right now.

H8O5arc4                          JAMES and FEINSTEIN.

1              THE COURT:  Mr. Edelman?

2              MR. EDELMAN:  Your Honor, we have two additional

3    issues that have been raised with respect to class

4    certification.

5              THE COURT:  Causation.

6              MR. EDELMAN:  The damages issues and the adequacy

7    issues.

8              THE COURT:  Yes.  So, the adequacy would be

9    propositions of law.  Causation would also require experts,

10   right?

11             MR. EDELMAN:  We can do a very short examination.

12             THE COURT:  Why don't we do that.

13             MR. EDELMAN:  Our focus will be -- our focus is lack

14   of a model to show damages for the period prior to May 8th

15   under the *Comcast* case.  I don't know if it makes sense to have

16   Dr. Feinstein start by explaining how he is going to do that.

17             MS. WYMAN:  I was just going to stand up and ask, your

18   Honor, if we could do it that way.

19             THE COURT:  Okay.  So, should I excuse Dr. James and

20   put Dr. Feinstein back on?

21             WITNESS JAMES:  Do we exchange seats?

22             THE COURT:  You can do that, too.

23             You can collect the books on the table, Ms. Wyman.

24             MS. WYMAN:  Yes.

25    STEVEN P. FEINSTEIN, recalled.

H8O5arc4                    Feinstein – redirect

1    REDIRECT EXAMINATION

2    BY MS. WYMAN:

3    Q.  Dr. Feinstein, as part of the opinions that you rendered in

4    this case, did you also offer damages methodologies for both

5    the Section 10b claims and the Section 11 claims that are

6    alleged in plaintiff's complaint?

7    A.  Yes.

8    Q.  Can you please describe the methodology that you proffered

9    for the 10b claims?

10   A.  The 10b damage methodology is an inflation-driven

11   methodology.

12          Using valuation tools, the damage expert can calculate

13   what the security prices would have been at each point in time

14   prior to the -- over the course of the class period, assuming

15   on the assumption of full information and full disclosure -- it

16   is called the but-for price -- and then compare the but-for

17   price to the actual price to calculate how much the security

18   price was inflated by the alleged misrepresentations and

19   omissions.  The damage formula for each investor therefore

20   would be the change in artificial inflation over his or her

21   holding period or the change in price, whichever is less,

22   subject to various statutory caps.

23   Q.  And, does the fact that ARCP's business changed and grew

24   during the class period impact at all the methodology that

25   would be employed to calculate damages for the Section 10b

H8O5arc4                        Feinstein – redirect

1   claimants?

2   A.   No.   Just as analysts and investors value the stock in

3   real-time across the entire class period, a forensic analyst

4   can value what the stock would have been worth over the course

5   of the class period under the but-for assumptions.

6   Q.   And, am I correct in understanding that the same

7   mathematical formula, once it is derived, would be applicable

8   to each class member?

9   A.   Yes.

10  Q.   And did you have a different methodology from the

11  Section 11 claim?

12  A.   Yes.

13  Q.   Can you please describe that?

14  A.   It is a statutory formula, it is in the Section 11 statute.

15  It is the entire declining, the entire investment loss that an

16  investor suffered over his or her holding period less any

17  amount of that loss attributable to what is called negative

18  causation; any amount of that loss that defendants can prove

19  was caused by something else.

20  Q.   And in the Section 11 claimants' analysis is the same

21  formula applied to each person or each claimant?

22  A.   Yes.

23  Q.   And are the methodologies that you ascribed consistent with

24  the theories of liability that are outlined in plaintiff's

25  complaint?

H8O5arc4                        Feinstein - redirect

1    A.  Yes.

2                THE COURT:  That's not going to help.

3                MS. WYMAN:  That's the legal standard in *Comcast*, your

4    Honor.  I have no more questions.

5                THE COURT:  You need to develop the first proposition

6    that had the misrepresentations not been made the price would

7    have been some degree less.

8    BY MS. WYMAN:

9    Q.  Dr. Feinstein, how would you determine what the but-for

10   price was in your Section 10b model that you described?

11   A.  I would look at how analysts were valuing the stock at each

12   point in time and overlay that with an assumption that they

13   knew additional information which is the alleged

14   misrepresentations and omissions that are eventually disclosed.

15   So, for example, that they should disregard financials, that

16   there are internal control issues.  Whatever was --

17               THE COURT:  Let me see if I can do it the way I

18   understand it.

19               So, an analyst on a REIT would value the stock

20   according as one important measure the quantity of adjusted

21   funds from operations?

22               THE WITNESS:  Pardon?

23               THE COURT:  Adjusted funds from operations.

24               THE WITNESS:  That's right.

25               THE COURT:  Namely, the cash flow that a business

H8O5arc4                         Feinstein - redirect

1    throws off less expenses including expenses for normal and

2    containable repairs and maintenance.

3                THE WITNESS:  Correct.

4                THE COURT:  And this would be an important measure?

5                THE WITNESS:  Absolutely.

6                THE COURT:  And the damages expert could quantify how

7    much of a price would be inflated according to inflated

8    estimates of this adjusted fund from operations.

9                THE WITNESS:  That would be one important

10   consideration.  There are others.

11               THE COURT:  And some of the others are?

12               THE WITNESS:  That the financials were deemed to be

13   unreliable, and that essentially in the finance literature it

14   is called the opaque or dark financials that you cannot trust

15   the financial information coming out about the company.  There

16   is a literature on how that impacts valuation.

17               THE COURT:  Anything else?  Any other factors?

18               THE WITNESS:  Well, related to that is other

19   information that ultimately came out which relates to the same

20   thing, simply that there were internal control issues at the

21   company.

22               THE COURT:  So, to the extent that information is not

23   reliable there is a lower factor relating to price of the

24   stock.

25               THE WITNESS:  Correct.  There is a literature, there

1    are articles on reputation effect.

2              THE COURT:  Got it.

3              THE WITNESS:  If management has a poor reputation

4    there is a discount for that.

5              THE COURT:  I'm satisfied.

6              Cross, Mr. Edelman?

7    RECROSS EXAMINATION

8    BY MR. EDELMAN:

9    Q.  Dr. Feinstein, your Section 10b methodology in your report

10   is set forth at pages 73 to 75, correct?

11   A.  I don't know.  I don't have it in front of me right now.

12             MS. WYMAN:  May I, your Honor?

13             THE COURT:  Yes.

14             THE WITNESS:  Paragraph 74?

15   BY MR. EDELMAN:

16   Q.  Pages 73 to 75.

17   A.  Okay.

18   Q.  That's where you set forth your theory as to how damages

19   would be measured in this case, correct?

20   A.  The model.

21   Q.  The model, right?

22   A.  Right.

23   Q.  And under your model you state that the first thing you

24   would look at is the amount of the price decline when there is

25   corrective disclosure in that paragraph first, correct?

H8O5arc4                          Feinstein - recross

A.   No.  It says valuation tools, which would include the event

study analysis, so it is all valuation tools including the

event study analysis and potentially other empirical analyses,

if necessary, would be used to establish.

Q.   But you were asked to provide the methodology that you

would use, right?

         THE COURT:  Mr. Edelman is pointing out that you start

with the fall in the prices when proper information is

disclosed.

         THE WITNESS:  That certainly would be one

consideration.  That is a valuable source of information about

the impact of the omitted news, information.

BY MR. EDELMAN:

Q.   And the amount of decline on October 29th, do you know

approximately what it was?

A.   Approximately 20 percent.

Q.   And when that decline happened, you are aware that there

were corrections made for the prior two quarters' AFFOs,

correct?

A.   My understanding is that the -- yes.  Yes.

Q.   And let's say with respect to a class member who purchased

in late 2012 or early 2013, there was no definitive information

provided to the market about what the true state of facts were

or weren't in 2012 or 2013, right?

A.   That's not accurate that they learned nothing about 2013

H8O5arc4                    Feinstein - recross

and prior years.  That's not accurate.  They learned a lot

about 2013 in prior years.

Q.  And what did they learn?

A.  They learned that the company was disavowing the 2013

financials.

Q.  So they learned --

A.  And that the company was continuing an investigation into

that year and earlier years.

Q.  But you would agree that they were not made aware of

whether the financials would change or how much they would

change, correct?

A.  The quantification of an eventual restatement was not

offered at that time but the likelihood that there would be a

restatement and that there was a disavowing of the financials

was made public then.

Q.  Why didn't you take the step of offering a model as to how

you were going to measure damages for a stockholder who

purchased in late 2012 or early 2013 given that you have

offered no way of measuring the percentage of that 20 percent

decline that you would attribute to being in the stock price on

any prior day?

A.  This is a model.  I do describe a model.

Q.  Sir, it is really, with all respect, this is not a model,

it is a description that is very generic of what --

            THE COURT:  It is what it is, Mr. Edelman.

H8O5arc4                    Feinstein - recross

1            THE WITNESS:  It is not the actual damage methodology,

2    it is not the damage calculation.  The full record in this case

3    hasn't been developed so that the damage expert would know

4    precisely what are the actionable misrepresentations and

5    omissions ultimately.

6    BY MR. EDELMAN:

7    Q.  You have not come forward with any damage methodology that

8    would measure damages for the period prior to May 8th, 2014,

9    correct?

10           THE COURT:  Or even afterwards.

11   A.  No, but I have, moments ago.

12           THE COURT:  You showed that there would be an effect

13   but you haven't quantified the effect.

14           THE WITNESS:  I haven't done the damage calculation

15   but we could use discounted clash flow measures, we can use

16   valuation multiple measures, we can use the literature on

17   reputation effect, we can use the literature on opaque

18   accounting and use the Akerlof Nobel Prize-winning work on

19   pricing things to worse when the market doesn't know.

20   BY MR. EDELMAN:

21   Q.  So, what I am hearing is that all of the options of

22   economics are available to you within evaluation tools and

23   potentially other empirical analyses, if necessary?

24   A.  Yes.

25   Q.  But you haven't told us how you are going to go about doing

H8O5arc4                    Feinstein - recross

1    that in connection with class certification.

2    A.  I haven't done the calculation.  We don't yet have all the

3    facts for doing damage calculations.

4            THE COURT:  What is my burden at this time?

5            MR. EDELMAN:  Under *Comcast*, they are obligated to

6    come forward with a model that can demonstrate that they can

7    prove damages on a class-wide basis.

8            THE COURT:  I think he has given sufficient model.

9            MR. EDELMAN:  Your Honor, the way that he proposed

10   that he would measure damages through this back-casting is not

11   going to work for the period prior to May 8 because there is no

12   way that you can attribute some portion --

13           THE COURT:  May 8, 2014.

14           MR. EDELMAN:  May 8, 2014.  There is no way you can

15   attribute some portion of that stock price decline to, well,

16   that amount of inflation was in the stock price on a random day

17   in 2013 because the market didn't even know on October 29th,

18   2014 whether there would be a change in 2013, what the change

19   would be, how big it would be.

20           THE COURT:  So this is a legal argument, right?

21           MR. EDELMAN:  Well, I think under *Comcast* the burden

22   was on the plaintiffs to come forward with a model --

23           THE COURT:  This is a legal argument.  We have gone as

24   far as we can with Dr. Feinstein, haven't we, Ms. Wyman?

25           MS. WYMAN:  Yes.  And actually your charge, at this

H8O5arc4                    James - redirect

1    point --

2            THE COURT:  I am asking a simple question.

3            MS. WYMAN:  Yes.

4            THE COURT:  Are we now going to go into a legal

5    argument?

6            MS. WYMAN:  Yes.

7            THE COURT:  We don't need Dr. Feinstein any more?

8            MS. WYMAN:  I don't believe so.

9            THE COURT:  We don't need Dr. James any more?

10           MS. WYMAN:  Yes.

11           MR. EDELMAN:  It might be useful just to hear from

12   Dr. James why --

13           THE COURT:  Exchange places, gentlemen.

14    CHRISTOPHER MARTIN JAMES, recalled

15   REDIRECT EXAMINATION

16   BY MR. EDELMAN:

17   Q.  Dr. James, have you considered the analysis put forth by

18   Dr. Feinstein at pages 73 to 75 and specifically with respect

19   to how that would be applied for damages prior to May 8, 2014?

20   A.  I have.

21   Q.  And based on your experience as an expert on damages, what

22   is your view about use of a back-casting model to estimate

23   damages?

24   A.  Well, you can use a back-casting model only as far back as

25   the corrective disclosure pertains to.  The corrective

H8O5arc4                      James - redirect

disclosure, as it pertains to AFFO, the key performance

characteristics that plaintiffs allege was misrepresented, the

company announces that it's going to restate AFFO for the first

two quarters of 2014.  It doesn't indicate that there are

problems with the AFFO calculation on earlier dates.  And that

as a result, the corrective disclosure date tells me nothing

about what potential inflation might be in the stock or the

various securities prior to May 8, 2014.  It is just not a

methodology that can be applied throughout the class period.

It only applies to the first two quarters of 2014.

Q.  Now, what about with respect to the preferred stock and the

bonds.  You heard earlier Dr. Feinstein testify that because of

the equity cushion in the stock, preferred stock and the bonds,

he would not have expected AFFO results to have had any effect

on the preferred stock or the bonds.  How would that affect

damages for those securities?

A.  He is basically saying that the equity buffer is such that

those securities that are senior in the capital structure are

not expected to be affected by the AFFO miscalculations, at

least there is no direct evidence of that from, during the

class period.

         MR. EDELMAN:  Your Honor, they can cross-examine, if

they would like.

         MR. DROSMAN:  May I cross, your Honor?

         THE COURT:  Yes.

H8O5arc4                    James - recross

1    RECROSS EXAMINATION

2    BY MR. DROSMAN:

3    Q.  Dr. James, you don't opine in your report that a damage

4    analysis in this case is not feasible, correct?

5    A.  That's correct.

6    Q.  And you don't opine in your report that you could not

7    measure Section 10b damages in this case, do you?

8    A.  No.  As I understand it, I wasn't asked to and that's not

9    the -- my role is not to propose a damage methodology but,

10   rather, to evaluate the extent to which Dr. Feinstein has

11   articulated a damage methodology that's applicable through the

12   class period.

13   Q.  You don't take issue that statutory Section 11 damages

14   could be calculated under class-wide basis in this case, do

15   you?

16   A.  Well, I certainly don't disagree that there is a statutory

17   calculation that is applied during the class period, I agree.

18   Q.  And, you haven't made any effort to prove negative

19   causation for the Section 11 claims in this case, have you?

20   A.  I haven't been asked to, no.

21   Q.  I'm sorry, I didn't hear you.

22   A.  I haven't been asked to, no.

23           I would say that with respect to negative causation,

24   again going back before May 8, I don't see how you would use

25   the curative disclosure for that purpose.

H8O5arc4

1    Q.  And for clarity's sake, that opinion that you just

2    expressed, that is nowhere to be found in your report, is it?

3              THE COURT:  He hasn't been asked to do it.

4              THE WITNESS:  That's correct.

5              MR. DROSMAN:  Thank you, your Honor.

6              THE COURT:  Anything more?

7              MR. DROSMAN:  Nothing for plaintiffs.

8              THE COURT:  Let's go with the legal argument on

9    causation.

10             Are we going to be using the experts any more, folks?

11             MS. WYMAN:  I don't believe so.

12             THE COURT:  Mr. Edelman, can we discharge the experts?

13             MR. EDELMAN:  Yup.

14             THE COURT:  Gentlemen, thank you very much.

15             Before I release you -- off the record.

16             (Discussion off record)

17             (Witnesses excused)

18             THE COURT:  Bottom line, before we start arguing is,

19   my ability, after rigorous analysis, to find if the

20   misrepresentations can be proved to be the cause of the

21   inflation of a price of a point in the class period.  At this

22   point I don't have to find how much the damages are likely to

23   be or even provide a range of damage or even provide a

24   threshold of damage.  I believe that my task is to see if there

25   is a relationship between the representations and damages

H8O5arc4

1   resulting from the misrepresentations.

2           When you start arguing, Ms. Wyman or Mr. Drosman,

3   would you focus on that question first?  And, Mr. Edelman,

4   would you do the same?

5           MS. WYMAN:  Thank you, your Honor.

6           The question that you just posed actually is not

7   correct.  There is no requirement at class certification that

8   plaintiff prove loss causation or causation on any level.  All

9   that is required concerning the damages methodology, according

10  to the Second Circuit, is that plaintiffs must be able to show

11  that their damages stem from the defendant's actions that

12  created the legal liability.

13          THE COURT:  Is that what I said.

14          MS. WYMAN:  That is from Sykes v. Mel S. Harris &

15  Associates.

16          THE COURT:  Is that what I said?

17          MS. WYMAN:  No.  You were talking about levels of

18  causation.  At least that's how I understood your question.

19          THE COURT:  I don't think so.

20          MS. WYMAN:  If that's my misunderstanding, I

21  apologize.

22          THE COURT:  Okay.  Please proceed.

23          MS. WYMAN:  What we heard Dr. James describe as

24  necessary before a class can be certified in this case,

25  basically, is requiring that plaintiffs do a causation and

H8O5arc4

1    damages analysis and set forth the results of it in their

2    market efficiency offering and that simply isn't required.  All

3    that is required we show is that there is an ability to

4    calculate those damages consistent with the theory of liability

5    that is pled in the complaint and we have made that showing.

6            THE COURT:  *Comcast* rules as follows:  A model

7    purporting to serve as evidence of damages in a class action

8    must measure only those damages attributable to that theory.

9            So, I think Mr. Edelman is going to argue that we need

10   at least a model formula, not just rhetoric.

11           MS. WYMAN:  That's not what the District Courts have

12   required, that's not what the Second Circuit requires.

13           THE COURT:  That is what *Comcast* requires and that is

14   the United States Supreme Court.

15           MS. WYMAN:  The Second Circuit case that I just cited

16   to you came after *Comcast* in 2015 and specifically rejects

17   that.  It says that whether it --

18           THE COURT:  Sykes v. Mel S. Harris & associates, LLC.

19           MS. WYMAN:  Yes, sir.

20           THE COURT:  780 F.3d 70 at page 82 rules as follows:

21   All that is required at class certification is that the

22   plaintiffs must be able to show that their damages stemmed from

23   the defendant's actions that created the legal liability, that

24   they can prove, through common evidence, that all class members

25   were injured by the alleged conspiracy.  They do not have to

H8O5arc4

1    show at the certification stage by common evidence the precise

2    amount of damages incurred by each class member.

3              That's the rule I have to follow, right?

4              MS. WYMAN:  That's right, and we have satisfied that

5    standard, your Honor.  It doesn't require us to -- in order

6    to --

7              THE COURT:  What proof would you offer?

8              MS. WYMAN:  What proof would I offer?

9              THE COURT:  Yes.

10             MS. WYMAN:  For the damage methodology?

11             THE COURT:  Yes.

12             MS. WYMAN:  I would offer the description that

13   Dr. Feinstein gave you just a moment ago.

14             THE COURT:  Well, he starts with the inflation and

15   goes backward.

16             MS. WYMAN:  He starts with the inflation -- he starts

17   with the corrective disclosure and I will note that the

18   corrective disclosure is far broader than either defendants or

19   Dr. James are willing to admit.

20             THE COURT:  Yes, because it puts into question all of

21   the 2013 financials.

22             MS. WYMAN:  And we argue the 2013 -- that's right; and

23   importantly tells the market that ARCP is admitting that it

24   intentionally falsified at least two quarters' worth of its

25   financials and that the CFO that was responsible for all the

H8O5arc4

1    public financials is suddenly resigning.

2            THE COURT:  So, to the extent that the information is

3    no longer reliable and that information is what investors

4    relied on going back to the beginning of the class period,

5    there would be an effect on the price of the stock.

6            MS. WYMAN:  And that's exactly what Dr. Feinstein

7    described he would do.

8            THE COURT:  And so, whether he described it or not, an

9    analyst for the stock would make certain predictions on the

10   basis of the cash flow and the profitability, and with regard

11   to preferred and debt as to the security of the company and

12   reliability of the company in paying the dividend, and in

13   having enough funds to give the return of money and payment of

14   interest to the debt holders.

15           MS. WYMAN:  That's right.

16           THE COURT:  And that would all go into the financial

17   analysis, it would be based on the cash flow and on the

18   profitability of the company and on the asset structure of the

19   company.  These are all information that comes out of the

20   disclosures in the financials and to the extent that that

21   information is not reliable or misstated, that affects the

22   price.  That's all you need to show right now?

23           MS. WYMAN:  That's right.

24           THE COURT:  Got it.

25           Mr. Edelman?

H8O5arc4

1          MR. EDELMAN:  Let's start with *Comcast*.

2          So, in *Comcast*, what the Court had before it was, in

3     contrast to what we just saw here, Dr. McClave, who was the

4     expert there, he designed a regression model comparing actual

5     cable prices in the Philadelphia DMA with hypothetical prices,

6     he came up with a specific damage amount, and he acknowledged,

7     because the Court had the model in front of it to scrutinize,

8     that the model didn't isolate damages resulting from any one

9     theory of antitrust injury, there were multiple theories.  We

10    don't have a model in front of us so the threshold issue here

11    is plaintiffs are saying ignore *Comcast*.  The way around

12    *Comcast* is you won't be able to say we don't have a damages

13    model that works if we don't put a damages model in front of

14    you.  That's the nub of the legal issue here.

15          Now, they rely on the Sykes case.  Sykes is an

16    entirely different case.  Sykes was a debt collection act case

17    in which a class action was brought against some entities that

18    were allegedly improperly collecting debts and the damages were

19    inevitably going to be individualized damages.  The defendants

20    there were trying to knock out the class action by saying there

21    was some new requirement that you could never have a class

22    action if damages are to be individually determined.  That's

23    not what we have here.

24          What we have here is either the damages are going to

25    be determined on a class-wide basis or not and the plaintiffs

H8O5arc4

1    have made a judgment not to put forward a model.  And, with all

2    due respect, your Honor's effort to substitute a model for them

3    is not a substitute for what we are entitled to be able to test

4    in this proceeding.  We don't have a model.  And there are big

5    problems with your Honor's hypothetical model in that --

6              THE COURT:  I have been a trial lawyer long enough to

7    know that you can't get a model at the beginning of a case that

8    will stand up at the end of a case, and the effect of having a

9    model now is to trap the plaintiff into a certain way of

10   proving damages that may not be useful later on.

11             MR. EDELMAN:  But, your Honor --

12             THE COURT:  What that standard is is illusory.

13             MR. EDELMAN:  There is a difference between saying

14   somebody has to come forward with a definitive model and then

15   they need to come forward with a model that will work -- I have

16   one, your Honor, do you want it?

17             THE COURT:  Sure.  You red my lips.  Is it underlined?

18             MR. EDELMAN:  It is.

19             THE COURT:  Does it have handwriting?

20             MR. EDELMAN:  I may have handed up the wrong opinion.

21             THE COURT:  You handed up Sykes.

22             MR. EDELMAN:  Ah, here is *Comcast*.

23             (Pause)

24             THE COURT:  I have to read this case more carefully

25   than I have before, so why don't I defer this decision.

H8O5arc4

1              What is next, folks?

2              MR. EDELMAN:  So, the last issue we have is to address

3    the adequacy issue.

4              THE COURT:  Yes.

5              MR. EDELMAN:  Which Ms. Apps is going to argue for us.

6              MS. WYMAN:  Just before we exit the damages

7    methodology issue, there is briefing that the parties

8    submitted, the supplemental briefing that the Court asked for

9    at the beginning of August addresses specifically the damages.

10   So, if that's helpful to you.

11             THE COURT:  Thank you very much.

12             MR. ROTHMAN:  Your Honor, since it is our motion and

13   our burden to prove adequacy would you like us to go first?

14             THE COURT:  I don't care.

15             MR. ROTHMAN:  Good afternoon, your Honor.  Robert

16   Rothman from Robbins Geller on behalf of the plaintiffs.

17             with respect to the 23(a) requirements, the defendants

18   don't challenge the first three of the numerosity, commonality

19   or typicality.  So, unless your Honor has questions about

20   those, I will go right to adequacy.

21             THE COURT:  I don't.

22             MR. ROTHMAN:  With respect to adequacy, the defendants

23   are not challenging the adequacy of 9 of the 11 proposed class

24   representatives, they're only challenging the adequacy of

25   Dr. John Esposito and Union Asset Management and they make no

H8O5arc4

secret about why they want do that.  They say that if they
could knock out Union Asset Management, there won't be a class
representative for the December notes offerings; and if they
could knock out Dr. Esposito, there won't be any class
representative on behalf of people who receive common stock in
the ARCT IV merger.  The Second Circuit has warned District
Courts to be weary of finding inadequacy where the result may
be to relieve defendants of the reliability for certain claims.

        With respect to Union Asset Management, it is a more
than adequate class representative.  It has no interest
antagonistic to the class and it has hired competent counsel.
Defendants' dispute with Union concern the way that Union
participated in discovery in this case.  What they say is that
Union failed to produce witnesses capable of testifying in
connection with the 34 separate topics that defendants put in
their 30(b)6 notice.

        THE COURT:  Who represents Union.

        MR. ROTHMAN:  Well, we do as class counsel, and the
Motley Rice firm does as well.

        THE COURT:  Is Motley Rice here?

        MR. ROTHMAN:  I don't believe so, your Honor, but I
was at the Union deposition.  Union is based in Germany.  They
flew two witnesses from Germany to testify about the 34 topics.

        THE COURT:  I don't want to get into this.  I'm not
going to hold they're inadequate because they were slow to

H8O5arc4

1     respond to discovery obligations.  I just want to let you know,

2     very clearly, that if this pattern of slowness to respond or

3     partially responding continues, even though I may certify them

4     now, I will strike them later.

5                MR. ROTHMAN:  Understood, your Honor.

6                THE COURT:  I will not accept this conduct.

7                MR. ROTHMAN:  Understood, your Honor.

8                THE COURT:  I want you to let Mr. Rice and

9     Mr. Migliori know what I said.

10               MR. ROTHMAN:  We will do so.

11               The other witness or representative that they are

12    challenging the adequacy of is Dr. John Esposito who is a

13    retired oral surgeon, he practiced for 42 years on Long

14    Island --

15               THE COURT:  And he was slow to know what was going on

16    but said that he wanted to sue because he thought that the

17    conduct of defendants was very criticizable.

18               MR. ROTHMAN:  That's correct, your Honor.

19               THE COURT:  Mr. Edelman, I think these are sufficient.

20               MR. EDELMAN:  Ms. Apps, your Honor.

21               THE COURT:  Ms. Apps, why does he give you things that

22    you can't argue?  I know are you fantastic and I have found

23    from experience that you affect my judgment in very strong ways

24    but you can't win on this particular point.

25               MS. APPS:  Will you give me a chance to try?

H8O5arc4

1          THE COURT:  Sure.

2          MS. APPS:  Okay.  I will be brief.

3          So, starting with Dr. Esposito.  Look.  He said at his

4    deposition when asked what input he had provided to counsel he

5    said, "Little, at all.  I don't recall anything, really.  It

6    seemed to me that was in the hands of the lawyer."  He's

7    abdicating his responsibility as class representative so we

8    would say --

9          THE COURT:  70 percent of class representatives, if

10   they were honest, would say that.

11         MS. APPS:  Well, let me address Union Asset

12   Management.

13         THE COURT:  Yes.

14         MS. APPS:  And they're the class representative for

15   two Section 11 Counts, Counts Two and Three.  Yes, they've been

16   slow but it is a little bit more than just being slow, of

17   course.  Your Honor, they missed many deadlines.  We got a

18   representation --

19         THE COURT:  It is not going to happen anymore.

20         MS. APPS:  This was the --

21         THE COURT:  It is not going to happen anymore.

22         MS. APPS:  I just want to put on the record just one

23   thing, your Honor, which is even as of today, we don't have

24   e-mails, internal e-mails between and among the portfolio

25   managers who purportedly have no recollection of how they made

H8O5arc4

1    decisions.

2            THE COURT:  I think you have got to point out,

3    Mr. Rothman, that the European notion of what is discoverable

4    is not the same as the American notion of what is discoverable,

5    and if they want to be a plaintiff in this court they must

6    conform to the American model.  I will not be easy on them if

7    they don't.

8            MR. ROTHMAN:  Understood, your Honor.

9            THE COURT:  We are going to pass on that.

10           MS. APPS:  Thank you, your Honor.

11           THE COURT:  But if it is a problem, I want to hear it.

12           MS. APPS:  Thank you.

13           THE COURT:  The motion to strike as inadequate these

14    two plaintiffs is denied.

15           MR. EDELMAN:  I think we are completed with argument?

16           THE COURT:  Excellent.

17           MR. EDELMAN:  Oh, I'm the class, so we have the Grant

18    Thornton motion.

19           Your Honor, I want to clarify that the Court is not

20    issuing a ruling on class now, that you are going to read

21    *Comcast*.

22           THE COURT:  Yes.

23           MR. EDELMAN:  And that I just want to be clear, the

24    23F period to consider an appeal does not run until you

25    issue --

H8O5arc4

1          THE COURT:  No.  I have not issued decision until I

2    issue a written decision.

3          MR. EDELMAN:  And if you wanted to wait until after

4    Labor Day, that would be fine.

5          THE COURT:  I probably won't forget and will lose

6    Gabriel.

7          MR. EDELMAN:  Thank you.

8          THE COURT:  We will go ahead on this.

9          Before I do certify the class, though, I have been

10   troubled in the past by the issue of time in notice.  We need a

11   procedure to regulate notice and I also need to be advised on

12   an important policy of when to give notice.  I think it may

13   have been Robbins Geller firm or some other firm that waited a

14   very long period of time between the order for class

15   certification and the issuance of a notice.  I know that

16   notices are expensive but I am not sure that it is good policy

17   not to give a notice reasonably soon after an order for

18   certification has been granted rather than wait until you see

19   if the case can be settled and just give one notice that

20   accomplishes both the certification and the approval of the

21   settlement.

22         So, I don't want to just drift into that, I want to be

23   advised, I want to know what would be the proper thing to do

24   and I want both sides to contribute to that.

25         So, that means, I think, assuming I order a class

H8O5arc4

1    certification, we need another time to regulate that so I will

2    be able to regulate the notice and fix the time.  And you might

3    think what would be the best way to accomplish that?

4            MR. ROTHMAN:  Your Honor, I would suggest that we wait

5    until the appeal period runs before we have that next

6    conference so we can see whether or not there is a 23F appeal

7    and then we will be better able to come up with a date.  If

8    there is no 23F appeal, obviously we can send out notice

9    earlier.

10           THE COURT:  I agree with that.

11           Mr. Edelman?

12           MR. EDELMAN:  That's acceptable.  Yes.

13           THE COURT:  Okay.  Grant Thornton.

14           MR. BENDINGER:  Thank you, your Honor.

15           THE COURT:  Mr. Bendinger or is it Ms. Walker?

16           MR. BENDINGER:  No, it is Mr. Bendinger today.

17           So, Gary Bendinger for Grant Thornton, LLP, your

18   Honor.  We have a motion for summary judgment with respect to

19   Count Seven and it is a very straightforward issue.  Following

20   discovery I --

21           THE COURT:  It is a Section 11 claim, right?

22           MR. BENDINGER:  It is a Section 11 claim.

23           THE COURT:  That would have to be based on the

24   prospectus.

25           MR. BENDINGER:  Correct.

H8O5arc4

1              THE COURT:  And the prospectus issued --

2              MR. BENDINGER:  This particular claim, Count Seven,

3     Judge --

4              THE COURT:  -- issued September 12, 2014, gave the

5     right to sell privately issued senior notes issued February 14,

6     2014.

7              MR. BENDINGER:  Correct.

8              THE COURT:  So, how, you might ask, could Section 11

9     cover a private issuance of February 14, 2014 because there

10    couldn't have been a purchase by reason of a prospectus at that

11    time.

12             MR. BENDINGER:  And that's the argument.  There is no

13    purchaser -- there are two named plaintiffs.

14             THE COURT:  Who is going to answer that question?

15             MR. ROTHMAN:  I will, your Honor.  We are not

16    asserting the Section 11 claim in connection with the February

17    offering.

18             THE COURT:  You are not.

19             MR. ROTHMAN:  We are offering it in connection with

20    the September registered notes.

21             THE COURT:  How can you have claim on registered notes

22    when we are dealing with noteholders who became such in

23    February?

24             MR. ROTHMAN:  We are only dealing with the noteholders

25    for the Section 11 claim who exchanged their unregistered notes

H8O5arc4

1    for the registered notes.

2             THE COURT:  And your argument is that you don't need

3    reliance for a Section 11 claim.

4             MR. ROTHMAN:  That is our argument, your Honor.

5             THE COURT:  Okay.

6             With that introduction, you start.

7             MR. BENDINGER:  Judge, on that you have identified the

8    issue and it is a straightforward issue.  What you have got,

9    and he just said, is an exchange, and the case law that we have

10   cited is very consistent that exchange participants are not

11   considered purchasers for purposes of Section 11 and they've

12   cited no case to the contrary.  So, fundamentally, they have no

13   claim.  We are entitled, with respect to these two named

14   plaintiffs, for an entry of judgment as a matter of law because

15   they were not purchasers and, in fact -- in fact -- their

16   almost entire response to this motion for summary judgment on

17   Count Seven was not directed at establishing these two named

18   plaintiffs for purchasers.  Their argument was an end around

19   argument, in effect an acknowledgment that they lacked

20   statutory standing to assert this claim but, instead, argue

21   that under class standing, they had the right to assert this

22   claim even though they did not purchase these bonds, registered

23   bonds pursuant to a defective registration statement.

24            THE COURT:  So, is an exchange the equivalent of a

25   purchase?

H8O5arc4

1              MR. BENDINGER:  Excuse me.

2              THE COURT:  Is an exchange the equivalent of a

3      purchase?

4              MR. BENDINGER:  No.

5              THE COURT:  That's exactly the issue I have do deal

6      with, isn't it?

7              MR. BENDINGER:  And all that you have got here, Judge,

8      is the exchange of unregistered bond for a registered bond, and

9      what we have cited to the Court is Judge Lynch's decision in

10     REFCO, you have got the Health South decision, you have Safety

11     Clean, you have got Levi Strauss.  There is no question in all

12     of that authority that these exchange participants are not

13     considered purchasers and they don't cite a single case to the

14     contrary, nor do they really take on that authority.

15             If you look at their memorandum in opposition it is

16     entirely focused on a class standing argument and the only

17     reason you make a class standing argument is because you do not

18     have statutory standing.  If they had statutory standing as a

19     purchaser they wouldn't be arguing they need class standing and

20     they don't have class standing because to have class standing

21     they basically a single case which is the NECA v. Goldman Sachs

22     case.

23             THE COURT:  The plaintiff is any person acquiring such

24     security unless it is proved that at the time of such

25     acquisition he knew such untruth and omission.  So,

H8O5arc4

1      Mr. Rothman's argument is going to be that even though he

2      already owned the note, by exchanging it for another note he

3      acquired the new note.  I have to refresh my memory about the

4      other cases but I don't think any of them dealt with this

5      proposition.

6              MR. BENDINGER:  I'm sorry, Judge?

7              THE COURT:  I don't think any precedent dealt with

8      this proposition of an exchange.

9              MR. BENDINGER:  Oh, no, they did.  REFCO did, Health

10     South did.

11             THE COURT:  They were focused more on whether or not

12     buying on a private placement memorandum was buying on a

13     prospectus and the issue in all of these cases, what is a

14     prospectus.  But here it is that we have a prospectus.

15             MR. BENDINGER:  No.  The issue in those cases, Judge,

16     wasn't so much about was there a prospectus.  The issue really

17     is at the time that you acquire these unregistered bonds there

18     is no registration statement, it is a private placement.  So,

19     you don't have a registration statement.  The investment

20     decision is made at that time.  There is an exchange that is

21     already contemplated and there is no reason why somebody

22     wouldn't go ahead and exchange when the exchange offer and

23     opportunity is there.

24             THE COURT:  What is the remedy if you can't go under

25     Section 11?

H8O5arc4

1          MR. BENDINGER:  They've got a Section 10b claim if

2     they can assert it.  Right?  And that's the point of all of

3     this.  And really they cite not a single case -- not a single

4     case -- for the proposition that in this exchange participants

5     are considered purchasers.  And they're not.  They just aren't.

6     And that's why they spend --

7          THE COURT:  I'm not sure they would have a 10b case

8     because they don't have a Section 12 case.  I'm not sure they

9     would have a 10b-5 case.  Their remedy may be under state law.

10          MR. BENDINGER:  In any case, it is not under the

11     contract.

12          THE COURT:  Let me hear what Mr. Rothman says and I

13     will come back to you.

14          MR. BENDINGER:  Thank you.

15          MR. ROTHMAN:  Your Honor, counsel is basing his

16     argument --

17          THE COURT:  Wait until you get to the lectern.

18          (Continued on next page)

19

20

21

22

23

24

25

H8OAARC5ps

1          MR. ROTHMAN:  Your Honor, the defendants' argument is

2     what he just said, that the decision to exchange the notes when

3     they bought them in February, the unregistered notes, the old

4     notes or the new notes, was already made in February.

5          THE COURT:  Does he physically get a new note?

6          MR. ROTHMAN:  Yes.  It's a different note, I believe,

7     with a different CUSIP number.

8          THE COURT:  When he took the note and the 144, was

9     there any legend on it that said you can't trade this?

10          MR. ROTHMAN:  No.  They were tradeable.  Only

11     qualified institutional buyers could buy them originally, but

12     they could sell those notes.  And there was no requirement in

13     this case --

14          THE COURT:  This is not a secondary.

15          MR. ROTHMAN:  No.

16          THE COURT:  The holders were not selling.  They were

17     simply exchanging.

18          MR. ROTHMAN:  The holders could have kept their old

19     notes after the new notes were registered.  They could have

20     sold their old notes.  And in fact, what American Realty said

21     to them in the registration statement -- and this is at Wyman

22     Declaration, Exhibit 9, at page SF18603, "Investing in the

23     exchange notes involves substantial risks.  You should

24     carefully consider all of the risks described in risk factors

25     beginning on page 15 of this prospectus in addition to other

H8OAARC5ps

1    information contained or contained by reference in this

2    prospectus before tendering any old notes."  American Realty

3    understood that people did not have to tender these notes and

4    instructed them to consider the registration statement before

5    tendering the notes.

6           In the *Refco* case, what Judge Lynch held was the

7    statements in the registration statement were immaterial, that

8    people would have gone through with the registration anyway.

9    What American Realty did here is said, you don't have to go

10   through with it.  You should consider all this information

11   because this information is material.  That's why this case is

12   not like *Refco*.

13          THE COURT:  This is Lynch as a district judge, right?

14          MR. ROTHMAN:  This is Lynch as a district judge.

15          And Grant Thornton says, we didn't cite any cases

16   going our way.  In fact, Judge Spatt held in the Eastern

17   District, in this same sort of situation, where the defendant

18   claimed that no one had standing -- and I quote -- "The Court

19   finds that there is at least a question of fact as to whether

20   the bond registration could have had any impact on their

21   decision to participate in the exchange."  That same issue of

22   fact is present here and precludes the granting of summary

23   judgment.

24          THE COURT:  Why would they not participate?

25          MR. ROTHMAN:  Well, for example, TIAA, which owned

H8OAARC5ps

these bonds, stated, once they learned of ARCP's misdeeds, they

basically knocked down everything that they would do with ARC's

statement.

          THE COURT:  They were no worse off by exchanging.

          MR. ROTHMAN:  Well, I don't know that, your Honor.

They could have sold the notes privately.  And there is at

least an issue of fact as to whether or not these plaintiffs

would have exchanged.

          THE COURT:  They couldn't sell.

          MR. ROTHMAN:  No, they could sell privately.  They

could sell the unregistered notes privately or they could have

held the unregistered notes.  The unregistered notes were still

being paid.  ARCP was still honoring the obligations under

those unregistered notes.

          And even if these plaintiffs did not have standing,

then there is class standing.  Counsel for Grant Thornton said,

all we do is cite one case, *NECA-IBEW v. Goldman Sachs*.  It's a

second circuit case, on class standing, that's been

consistently followed since it was issued, that says, even if

you don't have individual standing because you didn't purchase

in the offering, if it involves the same concern and you've

been damaged by the defendant's conduct, you don't need to

purchase at every offering.  So a representative who didn't

purchase in the note offering could still represent purchasers

who did.

H8OAARC5ps

1          And that goes for the exchangers as well as the

2    aftermarket purchasers who could trace their notes to the

3    exchange.  Because that's the other part of the class.  It's

4    not only people who exchanged, but these registered notes were

5    freely tradeable after they were registered.

6          THE COURT:  How would you prove that?

7          MR. ROTHMAN:  How would I prove what?

8          THE COURT:  That shares purchased from the holder of

9    private notes could be traceable to the offering.

10          MR. ROTHMAN:  Well, I'm not saying shares purchased

11    from the holders of private notes.  I'm saying that people who

12    bought in the market bought the registered notes.  They had a

13    separate CUSIP.

14          THE COURT:  You could you trace it back to the

15    offering?

16          MR. ROTHMAN:  You could trace it to the offering

17    because the registered notes were first issued in the offering.

18    That's the only place these registered notes came from.  So

19    anyone who bought those notes later can trace back to the

20    registration statement because there were no other notes with

21    these terms.

22          THE COURT:  And Section 11 liability extends to that.

23          MR. ROTHMAN:  Yes.

24          THE COURT:  For how long a period of time?  The

25    statute of limitations?

H8OAARC5ps

1          MR. ROTHMAN:  The statute of limitations of after one

2     year, your Honor, then someone may need to prove reliance under

3     the statute, or after one year of audited financial statement,

4     I believe it is, then you may need to prove reliance.  But for

5     at least that one-year period, there is no reliance element.

6          THE COURT:  The decision will be reserved.

7          You want to say anything more, Mr. Bendinger?

8          MR. BENDINGER:  Just on this point, your Honor.  When

9     you look at their memorandum in opposition to the motion for

10    summary judgment, they do not cite a case establishing or

11    standing for the proposition that an exchange participant is

12    considered to be a purchaser for purposes of Section 11.

13         THE COURT:  You need to be an acquirer.

14         MR. BENDINGER:  They need to be a purchaser or

15    acquirer.  But here --

16         THE COURT:  Any person acquiring the security.  And he

17    argues that he acquired the security in the exchange.

18         MR. BENDINGER:  Yes.  They exchanged unregistered

19    bonds for registered bonds, but for all the reasons cited by

20    Judge Lynch when he was a district court judge in *Refco* and the

21    other courts, that is not considered a purchase for purposes of

22    Section 11.  It's just not.

23         And that's why, when you look at their memorandum in

24    opposition, for the motion for summary judgment, their entire

25    focus --

H8OAARC5ps

1          THE COURT:  I have you.

2          MR. BENDINGER:  -- is on class standing.  And the

3     point about class standing, Judge, and why it doesn't apply --

4          THE COURT:  Class standing is really not the issue.

5     It's whether a person acquiring a registered security in

6     exchange for his private security qualifies under Section 11.

7     That's the issue.  If he does, there's class standing.  If he

8     doesn't, there's no class standing.

9          MR. BENDINGER:  Right.  We've cited *Refco*, etc.

10         THE COURT:  Right.  Decision reserved.

11         Go on to argue the class.

12         MR. BENDINGER:  OK.  So on the -- we have opposed

13    class certification with respect to all Section 11 claims

14    asserted against Grant Thornton.  But let me focus specifically

15    to begin with on Counts Four through Six.  So you've got the

16    ARCT IV merger.  You've got the Cole merger.  And you've got a

17    secondary offering in May of 2014.  And there are fundamental

18    problems in certifying a Section 11 claim with respect to each

19    of those counts.

20         That fundamental problem is, they cannot trace, and

21    discovery has shown that they have not traced, discovery has

22    established that they did not hold the shares in their name,

23    nor do they know, in some cases, exactly how the shares are

24    held.

25         THE COURT:  Do they have to trace it now?

H8OAARC5ps

1          MR. BENDINGER:  They haven't traced.

2          THE COURT:  For certification.

3          MR. BENDINGER:  And here's what we know.  Before ARCT

4     IV, there were over 200 million shares in the market.  Those

5     shares were commingled.  You have ARCT IV merger shares.  You

6     have Cole merger shares.  You have the secondary offering.  All

7     of those get commingled.  And when you've got commingled

8     shares, you cannot trace.

9          THE COURT:  Who commingled them?

10          MR. BENDINGER:  To the extent their held by the DTTC.

11     And that's the --

12          THE COURT:  The custodians.

13          MR. BENDINGER:  The custodians.

14          And that was the point of the argument, is tracing,

15     number one --

16          THE COURT:  Well, how do we know that?  Because there

17     are journal entries that are made each time a certificate is

18     taken in by the custodian.

19          MR. BENDINGER:  Well, that's the point.  You've got

20     record entries.  They're not held in their name.  They have the

21     burden, at the class certification stage, to come forward and

22     demonstrate that they can trace that the shares they actually

23     acquired in connection with each of those transactions were

24     directly acquired in connection with a defective registration

25     statement.  Because the shares acquired in those transactions

H8OAARC5ps

1    were commingled, they can't satisfy their burden, and on this

2    record they have not satisfied their burden.  And that's why,

3    when you look at the *Plu de Pol* decision of Judge Forrest,

4    that's why, among other things, she said, OK, in circumstances

5    like this, where you've got these shares that are commingled,

6    you can't separate them, and therefore you can't trace, and as

7    a result of that you have no claim.

8            And in any event, even if they could trace, which they

9    can't, tracing would be a very individualized issue that would

10   predominate over any alleged common issue.

11           So for our purpose, Judge, tracing --

12           THE COURT:  There is nothing in the Second Circuit on

13   this, is there?

14           MR. BENDINGER:  On tracing?

15           THE COURT:  Yes.  Tracing affected class

16   certification.

17           MR. ROTHMAN:  Your Honor, every case dealing with

18   tracing on class certification says it's premature at this

19   stage.

20           THE COURT:  District court decision.

21           MR. ROTHMAN:  That's correct, your Honor.  But -- I'm

22   sorry.  I'll let him finish.

23           MR. BENDINGER:  Just to that point, Judge, we could

24   spend almost a full day --

25           THE COURT:  I don't know now whether it can or can't

H8OAARC5ps

1    be traced.  It would be imprudent to require the plaintiffs to

2    front the considerable amount of money that would be required

3    to do this research, until there's certification.

4            MR. BENDINGER:  The point, respectfully, Judge, is

5    that at this stage, the rigorous analysis requires them to do

6    something other than just rely on a pleading.

7            THE COURT:  Inherently it's traceable.  Inherently if

8    the custodian knows whether something comes in and knows when

9    that particular certificate is moved for one reason or another.

10           MR. BENDINGER:  Respectfully, when those shares come

11   in, they are commingled and once they're commingled.

12           THE COURT:  The physical certificates may be

13   commingled but the journal entries regarding them may not be.

14   I cannot assume that.  I cannot assume that they are not

15   traceable.

16           MR. BENDINGER:  If you've got -- the plaintiffs say,

17   OK, ARCT IV, we're going to place an order with Merrill Lynch.

18   We want a thousand shares of ARCP in connection with this ARCT

19   IV transaction.

20           THE COURT:  And if the custodian transfers those

21   securities, then you're right, but if it doesn't, you may not

22   be right.  I can't assume it.

23           MR. BENDINGER:  I'm not asking you to assume anything.

24   It's their burden to come forward with evidence at this

25   juncture that they actually have traced.  They have not come

H8OAARC5ps

         forward and done that.  And it's an individualized inquiry.

                  THE COURT:  Their burden is to show they're traceable,

         they are traceable.  Whether they can in fact be traced is

         something that I don't know.  But I don't think they have to

         prove it now.  Just that they're traceable.

                  MR. BENDINGER:  So they argued that it was premature

         because it goes to the merits, but we just spent most of this

         day dealing with an issue that goes to the merits, which is

         market efficiency.  And here tracing, to the extent it goes to

         the merits, also goes to elements of Rule 23 and can be

         considered at this stage.

                  THE COURT:  This is true, and the trend of the case is

         to require district judges to do more and more on the

         certification stage, but it hasn't reached this point on this

         case.

                  I hold that these shares are traceable, though they

         may not in fact be traced.  And at this point in time,

         requiring them to prove that the shares can be traced is

         premature.  The motion is denied.

                  MR. BENDINGER:  Judge, respectfully, I think our

         position, subject to the ruling, but that any class ultimately

         certified with respect to ARCT IV, Cole, secondary offering

         should exclude aftermarket purchases.  Just like Judge --

                  THE COURT:  Mr. Rothman says they're traceable but not

         excludable.  They are traced.  They're not excludable.

H8OAARC5ps

1          MR. BENDINGER:  The point about the aftermarket

2     purchasers is, just like Judge Scheindlin considered in the IPO

3     decision, there you've got, plainly you're going to have

4     essentially a myriad of mini trials on this individualized

5     issue with respect to each and every one of these aftermarket

6     purchasers.

7          THE COURT:  I don't think it works that way.

8          All right.  So decision is reserved as to the motion

9     to dismiss Count Seven.  Class certification against Grant

10    Thornton is found with respect to Counts One to Six.

11         OK.  What's next?

12         I saw there are other pending motions, other people's

13    motions, embracing what we've done today.

14         MR. ROTHMAN:  I believe all the other motions were

15    just joinders in either Grant Thornton's motion or American

16    Realty's motion.

17         THE COURT:  I saw that Paul Weiss is moving to dismiss

18    the case against Schorsch?  Is that pending?

19         MS. SOLOWAY:  Yes, your Honor.  There's a motion to

20    dismiss pending in one of the opt-out cases, fairly newly

21    filed.

22         THE COURT:  I haven't reached that yet.

23         MS. SOLOWAY:  You actually don't have a fully briefed

24    motion yet, your Honor.  We filed motion papers and we're

25    negotiating a schedule with the plaintiff in that case, which

H8OAARC5ps

1    we will first submit to your Honor for approval.

2              THE COURT:  Thank you.  And you are?

3              MS. SOLOWAY:  Barbara Soloway from Paul Weiss.

4              THE COURT:  Thank you, Ms. Soloway.

5              Are there any other pending motions in any other ARCP

6    cases?

7              MR. FIGEL:  This isn't a pending motion, your Honor,

8    but --

9              THE COURT:  Your name, sir.

10              MR. FIGEL:  Reid Figel representing ARC Capital.

11              As you probably know, your Honor, we have a hearing or

12    conference to deal with some privilege issues, and this has

13    become --

14              THE COURT:  This is Monday.

15              MR. FIGEL:  Yes.  It's become the ever-shrinking

16    conference.  I haven't had a chance to speak to plaintiffs

17    about that.  I don't know if you want me to do this now or take

18    a short break.

19              THE COURT:  I don't want to cover it now.  It's a

20    quarter to 5.  We've done enough today.  We're supposed to do

21    this on Monday.

22              MR. FIGEL:  Yes, but we have a proposal that would

23    obviate the need for us to do anything on Monday.  So that's

24    what I would like to raise.

25              THE COURT:  I'm all for that.

H8OAARC5ps

1          MR. FIGEL:  I thought you might be.

2          MS. WYMAN:  I haven't heard this proposal yet, your

3     Honor.  They haven't discussed it with us.

4          THE COURT:  Yes.  So do that and let me know.

5          MR. FIGEL:  Can I just have a couple minutes with

6     Ms. Wyman?

7          MS. APPS:  The only this thing is just, so far, just

8     so we're clear, the plaintiffs have not raised any additional

9     privilege logs for you to consider on Monday.  I was fine

10     coming on Monday because we would actually just sit and watch

11     because the plaintiffs have now made no complaints about any

12     additional documents.  So I just want to put that on the

13     record, because if we are going to adjourn on Monday, I don't

14     want that to allow additional time for the plaintiffs to come

15     up with additional documents.  I think as long as we're done,

16     from the ARCP perspective, which is where we are today, I don't

17     mind what AR Capital and the plaintiffs negotiate between

18     themselves.

19          THE COURT:  I do.  I would like them to negotiate.

20          MS. WYMAN:  I need to address that because that's not

21     entirely accurate.  What the plaintiff has told ARCP is that in

22     light of your Honor's granting of their motion for a protective

23     order and your instruction for plaintiff to go back through the

24     logs to make sure that we flag any documents we find outside

25     the scope of your Honor's orders, that we wouldn't be asking

H8OAARC5ps

1  your Honor to look at any documents in camera on Monday the

2  28th.

3         THE COURT:  You would or would not?

4         MS. WYMAN:  We would not at this point in time be

5  doing that because we're not yet prepared to do that.  But

6  that's just for ARCP.  But that we're not --

7         THE COURT:  So would you submit a procedure or

8  timetable that will let me resolve that issue?

9         MS. WYMAN:  I have to talk to my partners that are

10 back in San Diego that are trying rigorously to finish the

11 report before we come see you on Monday so that I can give you

12 an idea of what the time frame will be, but right now I can't.

13        THE COURT:  What's your name, sir?

14        MR. FIGEL:  Reid Figel.

15        THE COURT:  Figel?

16        MR. FIGEL:  Figel, yes.

17        THE COURT:  I get the impression there may not be a

18 session on Monday.

19        MS. APPS:  Your Honor, just one thing, because this is

20 important.  Your Honor has given plaintiffs two months to come

21 up with documents to complain about on our privilege log.  When

22 we appeared on July 18, they had given us thousands of

23 documents.  We narrowed the field down to two remaining

24 documents that they would just be disputing in a letter.

25        THE COURT:  Just two?

H8OAARC5ps

1          MS. APPS:  Just two.

2          THE COURT:  So let's go ahead on Monday.  I'll deal

3     with those then.

4          MS. APPS:  Fine.  But we think we should be done on

5     Monday.  They should not get another bite at the apple

6     concerning another 2,000 documents.

7          MS. WYMAN:  No, your Honor.  That's not true, your

8     Honor.  We don't just have two left.  There were two that were

9     specifically raised in that letter as examples, but before that

10    we sent them exhibits that had many hundreds of documents that

11    we were challenging.  And the documents at the time we were

12    here on the 18th that were still in issue were the priv --

13         THE COURT:  So you knew for a long time that I was

14    going to regulate this on Monday.

15         MS. WYMAN:  I understand that.  But your Honor issued

16    your protective order motion two weeks, maybe a week and a half

17    ago, and ordered us to go back through the 15 or 16 thousand

18    entries that were that are on their log.

19         THE COURT:  So you have only had two weeks to do that?

20         MS. WYMAN:  Yes.  Plus the 30,000 that we have to deal

21    with for AR Capital.  We're trying to do that.  But what we've

22    told ARCP right now is that we are doing your Honor's

23    instructed review.

24         THE COURT:  When would I be able to resolve these

25    issues?

H8OAARC5ps

```
1              MS. WYMAN:  I will be able to tell you that on Monday,
2     your Honor.  I can't tell you that right now because I don't
3     know.  It's very soon.  We're like at the tail end of it.
4              MS. APPS:  I just want to register an objection,
5     because your order covered the documents honoring the
6     investigation.  There were other documents for other challenges
7     they had.  We spent so much of the summer negotiating this.
8     Since the last conference when you directed --
9              THE COURT:  You want to go forward on Monday?
10             MS. WYMAN:  Yes.
11             THE COURT:  Ms. Apps?
12             MS. APPS:  I think that should be the end of their
13     ability --
14             THE COURT:  You want to go over on Monday?
15             MS. APPS:  If that's the end to their privilege
16     objections, yes.
17             THE COURT:  I can't rule that now.
18             MS. WYMAN:  Your Honor, I know we have a couple
19     hundred documents that we had set aside in arrears that we were
20     going to bring up.
21             THE COURT:  They're in New York.
22             MS. WYMAN:  They can send them.
23             THE COURT:  They're in New York.  Why don't you
24     negotiate this.  And so we look forward to doing it Monday.
25             MS. APPS:  Your Honor, I'm sorry.  I have to get on a
```

H8OAARC5ps

1    plane to go to Miami tomorrow for a witness interview in Miami.

2    I'm not in New York.  They have had months to come to us --

3              THE COURT:  What do you want me to do, Ms. Apps?

4              MS. APPS:  To say that their time for objecting to

5    additional privileged document has expired.

6              THE COURT:  I'm not going to do that.

7              What's plan B?

8              MS. WYMAN:  I think plan B, your Honor, should be on

9    Monday, when we appear before you, I will tell you that we are

10   ready to provide ARCP with a list of the documents that we

11   still challenge, to give them an opportunity to either produce

12   them to us under the 502(d) order that your Honor has already

13   entered or to revoke the privilege that is on it so that we can

14   narrow it down to the documents that we need your Honor's help

15   with.

16             MS. APPS:  That's highly prejudicial.  You told them

17   on July 18 --

18             THE COURT:  What's your proposal?

19             MS. APPS:  OK.  Why don't we give them -- well --

20   if -- Ms. Wyman, you said that 200 documents you're identifying

21   for the first time tomorrow?

22             THE COURT:  Can we go off the record.

23             (Discussion held off the record)

24             THE COURT:  Let's go.

25             After extended discussion, all these discovery matters

H8OAARC5ps

1    will be adjourned, from August 28 to September 11 at 10:30.  I

2    expect at that time that the issue of the privilege log will be

3    regulated between Ms. Wyman and Ms. Apps and, if not, all

4    documents over which privilege is claimed will be brought to

5    court and we'll have a sampling method to test privilege.

6              With regard to Mr.Figel, the same thing.

7              MR. FIGEL:  Thank you, your Honor.

8              MS. WYMAN:  Thank you, your Honor.

9              MS. APPS:  Thank you, your Honor.

10             THE COURT:  You don't mean it.

11             OK.  So September 11.

12             Is your dispute also privilege?

13             MR. FIGEL:  Yes.

14             THE COURT:  So make sure that the documents over which

15   privilege is claimed are documents that reflect a request for

16   advice and the delivery of advice.  Just because a lawyer's

17   name is mentioned is not a basis for privilege.

18             And with regard to work product, make sure that it's a

19   document which was prepared for litigation or in contemplation

20   of litigation.

21             Mr. Bendinger.

22             MR. BENDINGER:  Your Honor, just before we adjourn, I

23   just want to clarify that our time, Grant Thornton's time for

24   any appeal doesn't begin to run --

25             THE COURT:  No.  We've talked about that.

H8OAARC5ps

1          MR. BENDINGER:  Thank you.

2          THE COURT:  I haven't made any final decision until

3    something comes out in writing.

4          MR. BENDINGER:  Thank you.

5          THE COURT:  It may come out in pieces, but I'll try to

6    get this out within a few weeks.

7          OK.

8          MS. WYMAN:  Thank you very much, your Honor.

9          THE COURT:  Lovely to see you.

10         MR. FIGEL:  Thank you, your Honor.

11         MS. APPS:  Thank you, your Honor.

12         (Adjourned to September 11, 2017)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

STEVEN P. FEINSTEIN

Direct By Ms. Wyman . . . . . . . . . . . . . . 8

Cross By Mr. Edelman . . . . . . . . . . . . . .47

Redirect By Ms. Wyman . . . . . . . . . . . .72

CHRISTOPHER MARTIN JAMES

Direct By Mr. Edelman . . . . . . . . . . . . .79

Direct By Mr. Edelman . . . . . . . . . . . . .99

Cross By Mr. Drosman . . . . . . . . . . . . 115

Redirect By Mr. Edelman . . . . . . . . . . 130

CHRISTOPHER JAMES and STEVEN P. FEINSTEIN        133

STEVEN P. FEINSTEIN

Redirect By Ms. Wyman . . . . . . . . . . . 146

Recross By Mr. Edelman . . . . . . . . . . . 150

CHRISTOPHER MARTIN JAMES

Redirect By Mr. Edelman . . . . . . . . . . 155

Recross By Mr. Drosman . . . . . . . . . . . 157

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1 and 2  . . . . . . . . . . . . . . . . . .16

DEFENDANT EXHIBITS

Exhibit No.                                 Received

 A and B  . . . . . . . . . . . . . . . . . .84