UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                        :

In re AMERICAN REALTY CAPITAL       :
PROPERTIES, INC. LITIGATION         :     Civil Action No. 15-mc-00040-AKH
                                        :
                                        :
                                        :

This Document Relates To:               :
                                        :
      ALL ACTIONS                  :
------------------------------------------------------------ x

## ARCP OUTSIDE, NON-MANAGEMENT DIRECTORS'
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Richard W. Slack
Christopher L. Garcia
Evert J. Christensen, Jr.
Adam J. Bookman
Aaron J. Curtis
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendants Thomas A.*
*Andruskevich, Leslie D. Michelson, Edward*
*G. Rendell, and William G. Stanley*

Dated:  February 8, 2019

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS .........................................................................................................5

A.      ARCP AND ITS OUTSIDE, NON-MANAGEMENT DIRECTORS ...............................5

B.      THE OUTSIDE, NON-MANAGEMENT DIRECTORS' REASONABLE
RELIANCE ON GRANT THORNTON'S OPINIONS REGARDING ARCP'S
"EXPERTISED" FINANCIAL STATEMENTS ................................................................6

C.      THE OUTSIDE, NON-MANAGEMENT DIRECTORS' DUE DILIGENCE
INTO "NON-EXPERTISED" PORTIONS OF THE REGISTRATION
STATEMENTS.................................................................................................................8

      1.      The Outside, Non-Management Directors Reviewed and Met to Discuss
Each Registration Statement .................................................................................8

            a.      Form S-4 and Proxy Statement/Prospectus Filed in Connection
with ARCP's Acquisition of American Realty Capital Trust, IV,
Inc. .......................................................................................................11

            b.      Prospectus Supplements and Free Writing Prospectus Filed in
Connection with the July 2013 Offering of 3.0% Senior Notes ...............11

            c.      Form S-4 and Joint Proxy Statement/Prospectus Filed in
Connection with ARCP's Acquisition of Cole Real Estate
Investments, Inc. ...................................................................................12

            d.      Prospectus Supplements and Free Writing Prospectuses Filed in
Connection with the December 2013 Offerings of 3.0% Senior
Notes and 3.75% Senior Notes ..............................................................13

            e.      Prospectus Supplements Filed in Connection with the May 2014
Offering of ARCP Stock........................................................................13

      2.      The Outside, Non-Management Directors' Due Diligence into the Annual
and Quarterly Reports.........................................................................................14

      3.      Other Due Diligence by the Outside, Non-Management Directors.......................19

            a.      The Outside, Non-Management Directors Familiarized Themselves
with ARCP ...........................................................................................19

            b.      The Outside, Non-Management Directors Oversaw and
Strengthened ARCP's Internal Controls..................................................20

D.      THE OUTSIDE, NON-MANAGEMENT DIRECTORS' RESPONSE TO THE
WHISTLEBLOWER COMPLAINT................................................................................21

# TABLE OF CONTENTS
### (continued)

Page

LEGAL STANDARD ............................................................................................... 22

ARGUMENT ........................................................................................................... 22

I.  THE OUTSIDE, NON-MANAGEMENT DIRECTORS REASONABLY
RELIED ON GRANT THORNTON WITH RESPECT TO "EXPERTISED"
PORTIONS OF ARCP'S REGISTRATION STATEMENTS ............................ 22

II. THE OUTSIDE, NON-MANAGEMENT DIRECTORS CONDUCTED A
REASONABLE INVESTIGATION WITH RESPECT TO THE "NON-
EXPERTISED" PORTIONS OF ARCP'S REGISTRATION STATEMENTS ............... 24

    A.  The Outside, Non-Management Directors Conducted a Reasonable
Investigation of ARCP's Financial Statements and Registration Statements ........ 27

    B.  Case Law Confirms that the Outside, Non-Management Directors'
Investigation Was Reasonable ............................................................. 30

CONCLUSION ......................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Cases**                                                                                      **Page(s)**

*In re Avant-Garde Computing, Inc. Securities Litigation*,
    1989 WL 103625 (D.N.J. Sept. 5, 1989) ...............................................................31

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    236 F.R.D. 313 (S.D. Tex. 2006), *rev'd and remanded on other grounds sub*
    *nom. Regents of Univ. of Ca. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d
    372 (5th Cir. 2007)....................................................................................................26

*Escott v. BarChris Constr. Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968).......................................................23, 25, 32, 33

*Fabrikant v. French*,
    691 F.3d 193 (2d. Cir. 2012)....................................................................................22

*In re Int'l Rectifier Sec. Litig.*,
    1997 WL 529600 (C.D. Cal. Mar. 31, 1997)..............................................22, 25, 29

*Laven v. Flanagan*,
    695 F. Supp. 800 (D.N.J. 1988) .................................................................23, 25, 26, 27

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    229 F.R.D. 441 (S.D.N.Y. 2004) ..............................................................................34

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)......................................................................................22

*Fed. Hous. Fin. Agency ex rel. Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
    873 F.3d 85, 131 (2d Cir. 2017), *cert. denied sub nom. Nomura Sec. Int'l, Inc. v.*
    *Fed. Hous. Fin. Agency*, 138 S. Ct. 2679 (2018), and *cert. denied sub*
    *nom. Findlay v. Fed. Hous. Fin. Agency*, 138 S. Ct. 2697 (2018)..........................25

*Phillips v. Kidder, Peabody & Co.*,
    933 F. Supp. 303 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1370 (2d Cir. 1997)................29

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*,
    1998 WL 513091 (W.D. Mich. June 15, 1998), *as amended* (June 25, 1998) ........28

*Serafin v. Schorsch*,
    2015 WL 3901646 (S.D.N.Y. June 24, 2015) (Hellerstein, J.)...................................4

*In re Software Toolworks Inc.*,
    50 F.3d 615 (9th Cir. 1994) ......................................................................................23

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Weinberger v. Jackson*,
  1990 WL 260676 (N.D. Cal. Oct. 11, 1990)......................................................23, 25, 27, 30, 31

*In re WorldCom, Inc. Sec. Litig.* (*WorldCom I*),
  346 F. Supp. 2d 628 (S.D.N.Y. 2004)...............................................................................22, 23

*In re WorldCom, Inc. Sec. Litig.* (*WorldCom II*),
  2005 WL 638268 (S.D.N.Y. Mar. 21, 2005).....................................................23, 25, 33, 35

**Statutes**

15 U.S.C. § 77k..........................................................................................................................23, 24

15 U.S.C. § 7262.............................................................................................................................34

**Other Authorities**

Bernard S. Black et al., *Outside Director Liability: A Policy Analysis*, 162 J.
  Institutional & Theoretical Econ. 5, 17–19 (2006)...........................................................26, 31

Fed. R. Civ. P. 56............................................................................................................................22

SEC Release No. 33-6335, 1981 WL 31062 (Aug. 6, 1981)..........................................................26

Stephen Wagner & Lee Dittmar, *The Unexpected Benefits of Sarbanes-Oxley*,
  Harv. Bus. Rev., Apr. 2006, at 135...............................................................................................34

## PRELIMINARY STATEMENT

This Court has already dismissed all claims against defendants Thomas A. Andruskevich, Leslie D. Michelson, Edward G. Rendell, and William G. Stanley (the "Outside, Non-Management Directors") but those arising out of purported violations of Section 11 of the Securities Act of 1933 relating to certain registration statements (the "Registration Statements") filed by American Realty Capital Properties, Inc. ("ARCP" or the "Company"). These claims should now be dismissed, and the Outside, Non-Management Directors out of this case.

*First*, the alleged statements that form the basis of the Section 11 claims against the Outside, Non-Management Directors were neither false nor misleading. Indeed, Plaintiffs do not allege that the Registration Statements themselves were false and misleading; instead, Plaintiffs contend that certain of ARCP's previously filed annual and quarterly reports incorporated by reference into the Registration Statements were false and misleading. As a threshold matter, and as discussed in other defendants' briefs, Plaintiffs' Section 11 claims against the Outside, Non-Management Directors must be dismissed because the statements that form the basis of the Section 11 claims were accurate in all material respects.[1]

*Second*, even if the reports were false and misleading—and they were not—the Outside, Non-Management Directors more than satisfied the standard of diligence required in their review of the Registration Statements.

---

[1] To avoid duplicative briefing, the Outside, Non-Management Directors expressly adopt and incorporate the arguments in ARCP's memorandum of law in support of its motion for summary judgment regarding the absence of any material misstatements or omissions in the Registration Statements to the extent those arguments relate to the Section 11 claims. In addition, the Outside, Non-Management Directors adopt and incorporate the arguments in Grant Thornton LLP's memorandum of law in support of its motion for summary judgment regarding the immateriality of the alleged misstatements and Plaintiffs' inability to trace their shares to the Registration Statements.

The federal securities laws provide that the diligence required of various persons participating in securities offerings is a sliding scale, with outside, non-management directors bearing the least responsibility (and having the lowest threshold for diligence) for the statements contained therein. This is with good reason: outside, non-management directors are far less "in the know" with respect to the corporate affairs of corporations than those who manage the corporations day-to-day. Accordingly, outside, non-management directors are merely required to conduct a reasonable investigation and are entitled to rely on the opinions and other work by auditors in connection with the financial statements. Because it is uncontroverted that the Outside, Non-Management Directors amply fulfilled these requirements with respect to each of the offerings at issue, the Section 11 claims against them must be dismissed.

Here, Grant Thornton, a leading and highly reputable national accounting firm, audited each of the annual reports incorporated by reference in the Registration Statements, concluding with respect to each that they "present[ed] fairly, in all material respects, the financial position of American Realty Capital Properties, Inc." As a matter of law, the Outside, Non-Management Directors were entitled to rely on these "expertised" portions of the Registration Statements and did. Nothing in the millions of pages of documents produced or the more than 40 depositions taken shows that the Outside, Non-Management Directors knew or should have known about the alleged accounting improprieties (indeed, as the Court is well aware, Plaintiffs do not even contend that the Outside, Non-Management Directors violated Section 10(b) of the Exchange Act). On the contrary, one of Plaintiffs' central claims in this action is that members of ARCP management engaged in a "complex" and "opaque" scheme, involving an "array" of companies and a "host of account schemes and manipulations" that successfully concealed their actions from outsiders. *See* Third Am. Compl. ¶¶ 135, 143, 175. The Outside, Non-Management

Directors were on the outside looking in. Accordingly, as a matter of law, they are entitled to have the Section 11 claims against them dismissed to the extent they turn on purported inaccuracies in ARCP's annual financial statements.

Moreover, the discovery record is clear that each of the Outside, Non-Management Directors conducted a reasonable inquiry with regard to other "non-expertised" portions of the Registration Statements. The Outside, Non-Management Directors carefully reviewed materials provided to them by ARCP management in connection with offerings and in the ordinary course of ARCP's business. They regularly attended Board meetings with ARCP's management and its financial advisors, lawyers, and underwriters that were devoted to discussing the Registration Statements. They learned in their conversations during these meetings that these same advisors, including the underwriters for the securities offerings, conducted extensive due diligence on the offerings and did not identify any material concerns. They also met regularly with Grant Thornton, which also did not flag any issues with regard to the annual and quarterly reports, despite being obligated under its engagement letters with the Company to inform ARCP management and the Audit Committee of any material misstatement of fact during its work. Grant Thornton also provided comfort letters with respect to the financial information contained in the Registration Statements after extensive analyses. Finally, the Outside, Non-Management Directors asked questions of ARCP's management, Grant Thornton, and ARCP's many advisors, in connection with the Registration Statements. Nothing in the record contradicts this record of diligence in connection with the Registration Statements.

On the contrary, discovery in this case has only confirmed that the Outside, Non-Management Directors exercised diligence throughout their tenures on the ARCP Board. For instance, when Grant Thornton advised the Audit Committee that there was a "significant

deficiency" in the Company's financial reporting (having nothing at all to do with the issues underlying the Section 11 claims), the Audit Committee and the Company promptly remedied it. And as this Court recognized in dismissing a related derivative lawsuit, "in response to a September 7, 2014 report by a whistleblower, the board's Audit Committee," which was comprised at the time of Messrs. Michelson and Stanley and Governor Rendell, "promptly initiated an investigation with the assistance of independent counsel and forensic experts." *Serafin v. Schorsch*, 2015 WL 3901646, at *4 (S.D.N.Y. June 24, 2015) (Hellerstein, J.).

Indeed, the Grant Thornton professionals responsible for the ARCP engagement had the obligation to assess the effectiveness of the Audit Committee's oversight of the Company's controls over financial accounting and reporting and repeatedly concluded that the Audit Committee engaged in an "appropriate level" of oversight of the Company's accounting and reporting and played "an active role in overseeing" risk management, accounting and financial matters. Nothing in the discovery record contradicts this conclusion by Grant Thornton or the clear record of the Outside, Non-Management Directors' diligence.

In sum, because there simply is no issue of material fact as to whether the Outside, Non-Management Directors exercised the level of diligence required by the federal securities laws with regard to their review and approval of the Registration Statements, they are entitled to summary judgment as a matter of law. Having at all times done the right thing—including by taking immediate action in response to the whistleblower complaint that ultimately resulted in this litigation—it is time for the Outside, Non-Management Directors to be able to put this matter behind them once and for all.

## STATEMENT OF FACTS[2]

### A.   ARCP AND ITS OUTSIDE, NON-MANAGEMENT DIRECTORS

ARCP (now known as VEREIT, Inc.) owns and operates commercial properties that it leases to high credit-quality tenants. ¶¶ 1–2. As of December 2014, the Company owned more than 4,000 commercial properties. ¶ 2. Nicholas Schorsch served as ARCP's chief executive officer and chairman until October 2014, at which point he stepped down as chief executive officer. ¶ 3. He maintained his position as chairman until December 2014. ¶ 3.

The Outside, Non-Management Directors are accomplished professionals with substantial business experience:[3]

- Thomas A. Andruskevich is the chairman and chief executive officer of TAA Consulting, LLC. ¶ 4. Mr. Andruskevich formerly served as an officer of public companies, including as the chief financial officer of Tiffany & Company and the president and chief executive officer of Birks & Mayors, Inc. ¶¶ 5–7. Mr. Andruskevich also has served on the boards of several private and public companies. ¶ 8. His background gave him experience evaluating financial statements, familiarity with generally accepted accounting principles ("GAAP"), an understanding of internal control over financial reporting, and knowledge regarding audit committee functions. ¶ 8. Mr. Andruskevich joined ARCP's Board of Directors immediately following ARCP's February 2014 acquisition of Cole Real Estate Investments, Inc., an entity for which he previously served as a director. ¶¶ 8–9.

- Leslie D. Michelson is the chairman and chief executive officer of Private Health Management. ¶ 10. Mr. Michelson has been chairman and/or chief executive officer of several companies, and has served on the boards of directors of a number of companies, including real estate companies. ¶¶ 11–12. His background, including his service as a chief executive officer and work on the boards of various real estate entities, gave him experience evaluating financial statements, familiarity with GAAP,

---

[2] As required by Local Rule 56.1, the undisputed facts underlying the Outside, Non-Management Directors' motion are set forth in the Outside, Non-Management Directors' Local Rule 56.1 Statement. Citations in the format of "¶ []" are to the Rule 56.1 Statement.

[3] Non-party Bruce D. Frank served on ARCP's Board from July 2014 until February 2017. ¶ 23. Mr. Frank is a former Senior Partner of Ernst & Young LLP, who worked in the firm's real estate practice. ¶ 22. Mr. Frank was only named as a defendant in Count VII of the Third Amended Complaint, *see* Third Am. Compl. ¶¶ 107–11, and the Court dismissed Count VII in its August 31, 2017 Order, ECF No. 504. Therefore, Mr. Frank is no longer a defendant in the case.

an understanding of internal control over financial reporting, and knowledge regarding audit committee functions. ¶ 11. From October 2012 until March 2015, Mr. Michelson served as an independent member of ARCP's Board and sat on its Audit Committee. ¶ 13.

- Edward G. Rendell is the former Governor of Pennsylvania, Mayor of Philadelphia, and District Attorney for Philadelphia. ¶ 15. As Mayor of Philadelphia and then Governor of Pennsylvania, he oversaw and administered multi-billion dollar budgets. ¶ 15. Since leaving public office, Governor Rendell has served on the boards of a number of companies, including real estate companies. ¶ 16. Governor Rendell served as a member of ARCP's Board and Audit Committee from July 2011 to October 2012 and again from February 2013 to April 2015. ¶ 17. He is currently a special counsel at the law firm of Ballard Spahr, LLP. ¶ 14.

- William G. Stanley is the founder and managing member of Stanley Laman Securities, LLC and the founder and president of the Stanley-Laman Group Ltd. ¶ 18. Mr. Stanley has served on the boards of a number of companies, including real estate companies. ¶ 19. His background, including his service as a director on boards of various real estate entities, gave him experience evaluating financial statements, familiarity with GAAP, an understanding of internal control over financial reporting, and knowledge regarding audit committee functions. ¶ 19. Mr. Stanley was appointed a director of ARCP in January 2014 in connection with ARCP's acquisition of American Realty Capital Trust, IV, Inc. ¶ 20. He remained a director until April 2015. ¶ 20. From December 2014 until April 2015, Mr. Stanley served as the interim chairman and chief executive officer of ARCP. ¶ 21.

## B.  THE OUTSIDE, NON-MANAGEMENT DIRECTORS' REASONABLE RELIANCE ON GRANT THORNTON'S OPINIONS REGARDING ARCP'S "EXPERTISED" FINANCIAL STATEMENTS

The Registration Statements incorporated by reference the consolidated financial statements from ARCP's Forms 10-K for 2012 and 2013 (the "Annual Reports"), which included the Company's consolidated balance sheets and the related consolidated statements of operations and comprehensive loss, changes in equity, and cash flows. ¶¶ 48, 53, 69, 73, 77, 85.[4] These

---

[4] The Third Amended Complaint references the 2011 Form 10-K but does not allege that it is among the "financial statements" "[a]t issue in this case" or that it was incorporated by reference into the Registration Statements. Third Am. Compl. ¶¶ 51, 77, 82, 87, 93, 99, 104. Thus, while the complaint describes an alleged misstatement in adjusted funds from operations ("AFFO") for fiscal year 2011, id. ¶ 61, the only relevant misstatements for purposes of the claims against the Outside, Non-Management Directors are those that were contained in ARCP's public filings for fiscal years 2012, 2013, and 2014.

consolidated financial statements were audited by Grant Thornton in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB") and thus were "expertised" for purposes of Section 11. ¶¶ 86–88. Specifically, Grant Thornton examined evidence supporting the amounts and disclosures in the financial statements, assessed the accounting principles used and the significant judgments and estimates made by management, and evaluated the overall financial statement presentations. In addition, Grant Thornton obtained an understanding of internal control over financial reporting, assessed the risk that material weaknesses existed, tested and evaluated the design and operating effectiveness of internal controls based on the assessed risk, and performed other procedures it deemed necessary. *See* Slack Decl. Ex. KKKK at GT-ARCP DOC_01399172–86 (engagement letter describing GT's audit of ARCP's 2013 financial statements and internal controls); Slack Decl. Ex. LLLL at GT-ARCP DOC_00596316–34 (engagement letter describing GT's audit of ARCP's 2014 financial statements and internal controls).[5]

Grant Thornton issued unqualified—or "clean"—audit reports each year, which stated that ARCP's financial statements for 2012 and 2013 "present[ed] fairly, in all material respects, the financial position of American Realty Capital Properties, Inc. and subsidiaries . . . and the results of their operations and their cash flows . . . in conformity with accounting principles generally accepted in the United States of America." ¶ 89. Grant Thornton also opined that ARCP "maintained, in all material respects, effective internal control over financial reporting." ¶ 89. The Outside, Non-Management Directors did not believe—and did not have any grounds to believe—that these audited financial statements were inaccurate or omitted material facts or that

---

[5] All citations in the format "Slack Decl." are to the Declaration of Richard W. Slack in Support of the ARCP Outside, Non-Management Directors' Motion for Summary Judgment.

Grant Thornton's conclusions about the effectiveness of the Company's internal controls were not accurate. ¶ 29.

## C.   THE OUTSIDE, NON-MANAGEMENT DIRECTORS' DUE DILIGENCE INTO "NON-EXPERTISED" PORTIONS OF THE REGISTRATION STATEMENTS

The Outside, Non-Management Directors conducted transaction-specific due diligence with respect to each of the Registration Statements at issue in this case, which incorporated by reference the Annual Reports and the Forms 10-Q for 2013 and the first quarter of 2014 (the "Quarterly Reports") containing the alleged misstatements. As discussed in further detail below, the Outside, Non-Management Directors' diligence into the Registration Statements included (i) reviewing the draft filings, (ii) meeting with ARCP management concerning the proposed transactions and offerings, (iii) retaining reputable financial advisors and securities brokerage firms to examine and analyze the proposed transactions and offerings, (iv) retaining reputable outside counsel to conduct due diligence concerning the proposed transactions and offerings, (v) obtaining advice and assurances from ARCP management, auditors, underwriters, outside counsel, and financial advisors, and (vi) discussing the transactions and related Registration Statements at Board meetings before approving them.

### 1.   The Outside, Non-Management Directors Reviewed and Met to Discuss Each Registration Statement

Before Board or Audit Committee meetings, the Outside, Non-Management Directors received copies of the materials to be discussed at the meeting, including the financial statements and Registration Statements at issue here. ¶ 26. The Outside, Non-Management Directors reviewed the draft filings, including the financial disclosures. Andruskevich Decl. ¶ 26 ("Before signing any public filing, I received a draft of the document and its exhibits, which I reviewed carefully."); Michelson Decl. ¶ 19 ("I reviewed and performed a thorough investigation into the accuracy of the . . . ARCP registration statements and prospectuses at issue in this action . . . .");

Rendell Decl. ¶ 22 ("In addition to my review of the Registration Statements themselves, I also reviewed and performed a diligent investigation into the Company's Forms 10-K . . . and Forms 10-Q . . . ."); Stanley Decl. ¶ 16 ("I undertook my own review of the Registration Statements concerning the accuracy of these filings.").[6]

After receipt of information, ARCP's Board of Directors met to discuss, review, and evaluate the Company's business, financial statements, and any proposed transactions or securities offerings. ¶ 30. These meetings included presentations by the Company's management, as well as by external advisors, such as Grant Thornton, outside counsel, financial advisors for particular transactions, and underwriters for securities offerings. ¶¶ 45–46, 50, 65–67, 78–83, 97–99. Board members asked questions of management, the auditors, and other experts. ¶¶ 31, 99. Based on their experience as chief executive officers, board members, investment advisors, and government officials, the Outside, Non-Management Directors knew when they needed to ask questions about the filings and obtain additional information from management, the auditors, and other advisors. The uncontroverted record establishes that they did.

Governor Rendell explained that he asked questions when he "didn't understand something because [he] wanted to be in a position to exercise independent judgment." Slack Decl. Ex. J, Rendell Tr. 166:11–15. Mr. Andruskevich also testified that he "posed questions to management, other board members, the auditors if necessary, lawyers if necessary . . . so that I got myself comfortable with making sure that I was exercising my duty of care and loyalty to the

---

[6] *See also* Slack Decl. Ex. E, Andruskevich Tr. 61:19–62:7 ("I would typically review a document like this in its entirety, any public filing that had my signature on it, before I signed it."); Slack Decl. Ex. J, Rendell Tr. 98:10–17, 144:15–19; 187:21–25 (stating that he "would read [a filing] thoroughly" and "would learn what [he] didn't know before [he] voted"); Slack Decl. Ex. G, Michelson Tr. 254:8–255:10 ("[M]y general practice with respect to [reviewing SEC filings] is certainly to review the document front to back, to take notes, to raise questions."); Slack Decl. Ex. L, Stanley Tr. 68:18–69:20 ("It would have been my practice to review a draft of anything that was forwarded to me in advance of any meeting.").

company and to its shareholders before affixing my signature to such a document." Slack Decl. Ex. E, Andruskevich Tr. 59:25–60:17. Mr. Stanley similarly noted, "If I saw things that I didn't understand or if they didn't add up for some reason, I would ask [Grant Thornton] if I was looking at it the correct way." Slack Decl. Ex. L, Stanley Tr. 80:10–16. Mr. Michelson stated that he would "ask a lot of questions" and would not allow management to file documents with the SEC until the Board members were "satisfied that their questions had been asked and answered in the ways that [were] satisfactory to them." Slack Decl. Ex. G, Michelson Tr. 254:8–255:10.

The members of the Board and Audit Committee were also aware that auditors at Grant Thornton—experts on accounting and financial matters—reviewed the Registration Statements and provided comfort letters to the Company that gave the Board further assurance that the Registration Statements did not contain material misstatements.  ¶¶ 90–96. In preparing these comfort letters, Grant Thornton reviewed interim financial information, inquired of ARCP management responsible for financial and accounting matters, compared financial figures in various documents to ensure that they were consistent, and proved the arithmetic accuracy of certain figures. ¶ 94. Grant Thornton also recomputed AFFO and compared the AFFO amounts reported in ARCP's public filings with those in the Company's internal records to identify any discrepancies. *E.g.*, Slack Decl. Ex. OOOO at BARC-ARCP_00100083–97 (noting that Grant Thornton "[r]ecomputed funds from operations (FFO) [and] adjusted FFO (AFFO)" and compared FFO and AFFO balances as reported in the filing document with those reported in the Company's records).

The specific Registration Statements at issue are as follows:

### a. Form S-4 and Proxy Statement/Prospectus Filed in Connection with ARCP's Acquisition of American Realty Capital Trust, IV, Inc.

In connection with its acquisition of American Realty Capital Trust IV, Inc. ("ARCT IV"), the Company filed a registration statement on Form S-4 and a proxy statement/prospectus. ¶ 48. Prior to approving these filings, Mr. Michelson and Governor Rendell[7] received and reviewed drafts of the Form S-4 and proxy statement/prospectus. ¶ 26. In June 2013, Mr. Michelson and Governor Rendell participated in a combination of nine Board meetings and executive sessions of ARCP's independent directors to discuss a proposal to acquire ARCT IV. ¶¶ 35–43. Grant Thornton also performed review procedures in connection with the transaction. ¶ 90.  On July 1, 2013, the Board met again to discuss the proposed ARCT IV acquisition. ¶ 44. During that meeting, ARCP's financial advisor, Citigroup Global Markets, Inc. ("Citi"), made a presentation regarding its financial analysis of the proposed acquisition. ¶ 46. After discussion, the Board approved the ARCT IV acquisition and the registration statement on Form S-4 that would be filed with the SEC in connection with the transaction. ¶ 47.

### b. Prospectus Supplements and Free Writing Prospectus Filed in Connection with the July 2013 Offering of 3.0% Senior Notes

The Company filed prospectus supplements and a free writing prospectus in connection with its July 2013 offering of 3.0% Convertible Senior Notes due August 1, 2018 (the "2018 Notes"). ¶¶ 49, 53. Prior to approving these filings, Mr. Michelson and Governor Rendell received and reviewed drafts of the prospectus supplements and free writing prospectus. ¶ 26. Grant Thornton also performed review procedures in connection with the issuance of comfort

---

[7] Messrs. Stanley and Andruskevich did not serve on the Board until after the first five transactions and offerings at issue in this case (Counts I–V of the Third Amended Complaint). Thus, they are only defendants as to the Section 11 claim arising out of the May 2014 offering (Count VI). *See* Appendix A.

letters for the transaction. ¶¶ 93–94.  On July 18, 2013, ARCP's Board of Directors met to discuss the proposed notes offering. ¶ 49. Brian Jones, the Company's chief operating officer, presented to the Board concerning the proposed terms of the offering. ¶ 50. J.P. Morgan Securities LLC ("J.P. Morgan"), one of the underwriters for the offering, also discussed the market outlook for convertible securities, described its diligence regarding the proposed offering, and outlined a proposed execution timeline. ¶ 50. After discussion with management, the Board voted to approve the offering. ¶ 51. On July 22, 2013, the Board reviewed and executed a unanimous written consent formalizing its approvals of the offering and the prospectus supplements that would be filed in connection with the offering. ¶ 52.

### c. Form S-4 and Joint Proxy Statement/Prospectus Filed in Connection with ARCP's Acquisition of Cole Real Estate Investments, Inc.

The Company's merger with Cole Real Estate Investments, Inc. ("Cole") was conducted pursuant to a registration statement on Form S-4 and a joint proxy statement/prospectus. ¶ 69. Prior to approving these filings, Mr. Michelson and Governor Rendell received and reviewed drafts of the Form S-4 and joint proxy statement/prospectus. ¶ 26. Grant Thornton also performed review procedures in connection with the transaction. ¶ 90. In September and October 2013, over the course of eleven meetings, the Board and independent directors discussed the proposed merger with Cole. ¶¶ 54–64. At the final meeting on October 22, 2013, representatives of Barclays Capital Inc. ("Barclays") gave a presentation regarding their financial analysis of the proposed acquisition. ¶ 65. ARCP's outside counsel, Proskauer Rose LLP, discussed the results of its diligence review. ¶ 67. Following discussion, the Board approved the proposed Cole acquisition and the Form S-4 that would be filed with the SEC in connection with the transaction. ¶ 68.

### d. Prospectus Supplements and Free Writing Prospectuses Filed in Connection with the December 2013 Offerings of 3.0% Senior Notes and 3.75% Senior Notes

The Company filed prospectus supplements and free writing prospectuses in connection with its December 2013 reopening of the 2018 Notes and its additional offering of 3.75% convertible senior notes due December 15, 2020. ¶¶ 70, 73. Prior to approving these filings, Mr. Michelson and Governor Rendell received and reviewed drafts of the prospectus supplements and free writing prospectuses. ¶ 26. Grant Thornton also performed review procedures in connection with the issuance of comfort letters for the offerings. ¶¶ 93–94.   On November 25, 2013, the Board of Directors met to discuss the proposed reopening of the 2018 Notes and the proposed offering of 3.75% convertible senior notes. ¶ 70. Because these particular offerings were carried out pursuant to an earlier shelf offering (which allows an issuer to register a new issuance of securities without selling the entire issuance at once), the Board was able to rely in part on diligence it conducted in connection with the original offering. ¶ 70. In addition, the offerings were underwritten by Barclays and Citi, which reviewed the draft prospectus supplements and participated in due diligence calls in connection with the offerings without raising any issues with the Board. ¶ 71. After discussing the proposal with management, the Board approved the offerings and accompanying prospectus supplements. ¶ 72.

### e. Prospectus Supplements Filed in Connection with the May 2014 Offering of ARCP Stock

ARCP filed a preliminary prospectus supplement and a final prospectus supplement for its May 2014 offering of common stock. ¶ 77. Prior to approving these filings, each of the Outside, Non-Management Directors received and reviewed drafts of the preliminary prospectus supplement and final prospectus supplement. ¶ 26. Grant Thornton also performed review procedures in connection with the issuance of comfort letters for the transaction. ¶¶ 93–94.   On

April 23, 2014, the Board of Directors met to consider the proposed stock offering. ¶ 74. Like the December 2013 notes offerings, this offering of stock was carried out pursuant to an earlier shelf registration statement. ¶ 74. Thus, the Board was able to rely in part on diligence it had conducted in connection with the original offering. This offering was underwritten by Barclays, Citi, J.P. Morgan, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, which reviewed the draft prospectus supplements and participated in due diligence calls in connection with the offering. ¶ 75. After discussion with management, the Board approved the offering and the related prospectus supplements. ¶ 76.

### 2. The Outside, Non-Management Directors' Due Diligence into the Annual and Quarterly Reports

In addition to their specific diligence with respect to the Registrations Statements themselves, the Outside, Non-Management Directors also reviewed the Annual and Quarterly Reports that were incorporated into the Registration Statements by reference, and they retained and relied upon auditors to assist the Board in reviewing the Annual and Quarterly Reports. ¶¶ 28, 78–83, 86–92. The Outside, Non-Management Directors received copies of the Annual and Quarterly Reports in advance of Board and Audit Committee meetings. ¶¶ 78–83. While they sometimes received the reports close in time to the meetings, the record is clear that in all instances the Outside, Non-Management Directors had sufficient time to review the documents before they were filed. Slack Decl. Ex. E, Andruskevich Tr. 56:15–57:10 ("[I]f I signed that document, then I can tell you very definitively that I would have carried out my diligence as a board member. I would have reviewed it very carefully, read it, asked questions of management, the auditors or the lawyers, if I had any, before signing such document."); Slack Decl. Ex. G, Michelson Tr. 298:25–299:2 (testifying that it was his practice to review filings before signing them); Slack Decl. Ex. J, Rendell Tr. 143:23–146:11 (testifying that he received drafts in

advance of meetings and reviewed them thoroughly); Slack Decl. Ex. L, Stanley Tr. 68:18–69:1, 144:6–10 (testifying that it was his practice to review drafts in advance of meetings and before signing them).

For their part, in addition to conducting formal audits of the consolidated financial statements in ARCP's Annual Reports, Grant Thornton also reviewed non-GAAP measures such as AFFO and other non-expertised statements in the Annual and Quarterly Reports. ¶ 90. Grant Thornton performed analytical procedures, made inquiries of individuals at the Company who were responsible for financial and accounting matters, and obtained sufficient knowledge of ARCP's business and internal controls to assist the Company "in identifying the types of potential material misstatements that may occur" in the non-GAAP financial information. ¶ 91. Pursuant to its engagement letters with the Company, Grant Thornton also agreed to inform ARCP's management of any "material misstatement of fact" that Grant Thornton identified in the Annual and Quarterly Reports and to inform the Audit Committee of any such misstatement that was not corrected. ¶ 91. The Outside, Non-Management Directors knew that Grant Thornton was performing these reviews and that they would be informed if Grant Thornton identified any material misstatements. ¶ 92. Grant Thornton consistently informed the Board members that there were "no concerns" with and no "material errors" in ARCP's financials, which indicated that the auditors' reviews had not uncovered any material misstatements. ¶¶ 78–79, 81–83.

Form 10-K for 2012. Prior to the February 22, 2013 meeting of the Board of Directors, the Board members received an e-mail containing a draft of the Form 10-K for 2012, which they reviewed. ¶ 78. The Board met on February 22, 2013, to discuss the proposed filing. ¶ 78. During the meeting, ARCP management and Grant Thornton discussed the Form 10-K with the Board. ¶ 78. Michael Cairns, on behalf of Grant Thornton, expressly informed the Board that "no

concerns, past adjustments, significant deficiencies or material errors ha[d] been identified in [ARCP's] financials." ¶ 78. Indeed, this was consistent with the audit work performed by Grant Thornton and its internal notes that confirmed that Grant Thornton had found no issues with the Form 10-K. ¶ 32. Cairns confirmed in his testimony that the Board members were active and asked questions during meetings. Slack Decl. Ex. X, Cairns Tr. 526:8–13, 579:21–25. The Board then approved the Form 10-K. ¶ 78.

Form 10-Q for the First Quarter of 2013. Prior to the May 1, 2013 meeting of the Board of Directors, the Board members received a draft of the Form 10-Q for the first quarter of 2013, which they reviewed. ¶ 79. The Board met on May 1, 2013, to discuss the proposed filing. ¶ 79. During the meeting, ARCP management and Grant Thornton discussed the Form 10-Q with the Board, after which Grant Thornton stated that "no concerns, past adjustments, significant deficiencies or material errors ha[d] been identified in [ARCP's] financials." ¶ 79.

Form 10-Q for the Second Quarter of 2013. Prior to the August 2, 2013 meeting of the Board of Directors, the Board members received a draft of the Form 10-Q for the second quarter of 2013, which they reviewed. ¶ 80. The Board met on August 2, 2013, to discuss the proposed filing. ¶ 80. During the meeting, ARCP management and Grant Thornton discussed the Form 10-Q with the Board. ¶ 80. Grant Thornton indicated that while it had found no material weaknesses, it had identified a "significant deficiency" in ARCP's internal controls relating to financial reporting (having nothing whatsoever to do with the Section 11 claims). ¶ 80.[8] This

---

[8] "A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting." Slack Decl. Ex. ZZZZ at ARC_CIV_SDNY_1645442. Because a "significant deficiency" does not rise to the level of a "material weakness," an auditor's finding of only a "significant deficiency" means that the auditor has concluded that there is not a "reasonable possibility" that the underlying issues will cause a company to fail to prevent or detect "a material misstatement of the company's annual or

"significant deficiency" had been reported to the Company and the Audit Committee on July 22, 2013, and the Company took immediate steps to remedy it by hiring additional accounting personnel. ¶ 80.

Form 10-Q for the Third Quarter of 2013. Prior to the November 1, 2013 meeting of the Board of Directors, the Board members received a draft of the Form 10-Q for the third quarter of 2013, which they reviewed. ¶ 81. The Board met on November 1, 2013 to discuss the proposed filing. ¶ 81. During the meeting, ARCP management and Grant Thornton discussed the Form 10-Q with the Board. ¶ 81. Grant Thornton noted that the Company had hired additional personnel to remediate the "significant deficiency" identified in the second quarter of 2013. ¶ 81. Grant Thornton also told the Audit Committee that "no concerns, past adjustments, significant deficiencies or material errors ha[d] been identified in [ARCP's] financials." ¶ 81. Given that Grant Thornton made this assessment for the third quarter, it is clear that the "significant deficiency" identified in the previous quarter had been swiftly and sufficiently remedied by the Company.

Form 10-K for 2013. Prior to the February 24, 2014 meeting of the Audit Committee, the Board members received a draft of the Form 10-K for 2013, which they reviewed. ¶ 82.[9] The Audit Committee met on February 24, 2014, to discuss the proposed filing. ¶ 82. During the

interim financial statements" on a timely basis. *Id.* Thus, notwithstanding the finding of a "significant deficiency" in the Company's internal controls, Grant Thornton concluded at the time that the Audit Committee provided effective oversight of the Company's reporting and internal controls. Slack Decl. Ex. X, Cairns Tr. 538:21–539:8.

[9] Mr. Andruskevich was not copied on the email transmitting the draft of the Form 10-K to the Audit Committee because he was not a member of that committee. Nonetheless, he expressly states in his declaration that he "reviewed and performed a diligent investigation into the accuracy of the Company's Form 10-K for the year ended December 31, 2013." Andruskevich Decl. ¶ 25; *see also* Slack Decl. Ex. E, Andruskevich Tr. 56:15–57:10 56:15–57:10 ("I would have reviewed it carefully, read it, asked questions of management, the auditors or the lawyers, if I had any, before signing such document.").

meeting, ARCP management and Grant Thornton presented information about the Form 10-K. ¶ 82. Grant Thornton then informed the Audit Committee that "no concerns, past adjustments, significant deficiencies or material errors ha[d] been identified in [ARCP's] financials." ¶ 82. Moreover, notwithstanding the "significant deficiency" found in the second quarter of 2013 (and promptly remedied by the Company), Grant Thornton provided the Company with a clean opinion on internal controls. ¶¶ 81, 89. The Board subsequently approved the Form 10-K. ¶ 82.

Form 10-Q for the First Quarter of 2014. Prior to the May 5, 2014 meeting of the Audit Committee, the Board members received a draft of the Form 10-Q for the first quarter of 2014, which they reviewed. ¶ 83. The Audit Committee met on May 5, 2014, to discuss the proposed filing. ¶ 83. During the meeting, ARCP management and Grant Thornton presented information about the Form 10-Q. ¶ 83. Representatives of Grant Thornton also discussed the significant accounting policies and practices that ARCP utilized, the scope of Grant Thornton's review of the Company's quarterly financial information and internal controls, and the results of its review. ¶ 83. Grant Thornton reported to the Audit Committee that "no concerns, past adjustments, significant deficiencies or material errors ha[d] been identified in [ARCP's] financials." ¶ 83.

During the foregoing meetings, the Outside, Non-Management Directors would ask "any questions that the report raised" and "have a real discussion with the independent auditor" before voting on whether to approve the Annual or Quarterly Report. Slack Decl. Ex. J, Rendell Tr. 136:24–137:8. Based on observations of Audit Committee meetings, the questions committee members asked, and the materials committee members reviewed, Michael Cairns and Richard LaFleur, the lead partners at Grant Thornton responsible for the ARCP engagement, concluded on multiple occasions that the Board and Audit Committee had engaged in an "appropriate level" of oversight of ARCP's accounting and reporting. Slack Decl. Ex. X, Cairns Tr. 460:16–461:17.

Grant Thornton noted that the Board and Audit Committee played "an active role in overseeing" risk management, accounting, and financial matters; met "regularly (at least quarterly) with management" to discuss the Company's financial reporting; received "quarterly and annual financial reports prior to the quarterly meetings, which serve[d] as the basis for discussions with management"; and asked specific questions of ARCP's management and external advisors. Slack Decl. Ex. Y at GT_VOYAGER_MC_32.1; Slack Decl. Ex. Z at GT_VOYAGER_ZS_25.2–.3.

### 3. Other Due Diligence by the Outside, Non-Management Directors

#### a. The Outside, Non-Management Directors Familiarized Themselves with ARCP

In addition to the diligence conducted on the specific Registration Statements and financial information incorporated into those statements, the Outside, Non-Management Directors also conducted general diligence by educating themselves about ARCP and its operations. ¶¶ 24–25. Specifically, they reviewed the Company's past financial statements and public filings; they spoke with senior members of management and their fellow Board members about the Company and its operations; and they asked questions about the Company and the real estate industry. *See* Slack Decl. Ex. E, Andruskevich Tr. 105:22–106:23 ("I had a meeting with Nick Schorsch, Josh Levit, James Tanaka, Bill Kahane prior to joining the board, and I was given a binder of information in that meeting."); Slack Decl. Ex. G, Michelson Tr. 268:17–269:20 (noting that he informed himself about ARCP by having discussions with management, internal audit, Grant Thornton, in-house counsel, outside counsel, and investment bankers); Slack Decl. Ex. J, Rendell Tr. 78:15–79:22 (noting that he spoke with Mr. Schorsch about ARCP before joining the Board and that he would research a business before joining a board); Rendell Decl. ¶ 14 ("Prior to joining the Board, I reviewed the Company's past financial statements and public filings, spoke with Nicholas Schorsch . . . about the Company and its operations, and

asked numerous questions about the Company and the real estate industry."); Stanley Decl. ¶ 10

("I carefully reviewed certain materials, such as the Company's past financial statements, prior

to joining the board. In addition, I spoke with Nicholas Schorsch . . . about the Company and its

operations.").

### b.  The Outside, Non-Management Directors Oversaw and Strengthened ARCP's Internal Controls

The Outside, Non-Management Directors also oversaw and sought to strengthen ARCP's

internal controls during their tenures on the ARCP Board. ¶ 33. As Mr. Michelson explained,

"the Audit Committee increased its communication with the auditors at Grant Thornton,

regularly consulting with them in advance of Audit Committee meetings. In 2014, the Board also

recruited Bruce Frank, a former partner from Ernst & Young, who has significant experience

auditing real estate entities." Michelson Decl. ¶ 41. Moreover, the Audit Committee made

changes to the Company's internal complaints policy in July 2014. ¶ 34. In contrast to the

previous version of the policy, which allowed individuals to file complaints only through ARCP,

the revised version provided that employees with concerns about ARCP's accounting, internal

controls, or auditing could file complaints through an independent third-party administrator.

¶ 34.

As noted above, the Audit Committee's effectiveness in overseeing the Company's

internal controls was confirmed by Grant Thornton. The Board expressly required Grant

Thornton to "assess whether the audit committee exercises oversight responsibility over the

Company's external financial reporting and internal control over financial reporting." Slack

Decl. Ex. KKKK at GT-ARCP DOC_01399172–86; Slack Decl. Ex. LLLL at GT-ARCP

DOC_00596316–34. And each year, Grant Thornton concluded that the Audit Committee

effectively oversaw the Company's internal controls. Slack Decl. Ex. X, Cairns Tr. 505:20–21

("Nothing came to our attention that would raise concerns over the audit committee."); Slack Decl. Ex. W, LaFleur Tr. 836:4–837:15, 839:9–841:2 (stating that the Audit Committee acted effectively in its oversight of ARCP's financial reporting). In addition, Grant Thornton provided clean opinions on the Company's internal controls. Slack Decl. Ex. EEEE, Am. Realty Capital Props., Inc., Annual Report F-2 (Form 10-K) (Feb. 28, 2013); Slack Decl. Ex. IIII, Am. Realty Capital Props., Inc., Annual Report 94 (Form 10-K) (Feb. 27, 2014). The Board was entitled to and did rely on Grant Thornton's opinions on internal controls as part of its due diligence.

## D. THE OUTSIDE, NON-MANAGEMENT DIRECTORS' RESPONSE TO THE WHISTLEBLOWER COMPLAINT

On September 7, 2014, Mr. Michelson learned that Grant Thornton had received a whistleblower complaint from an ARCP employee asserting that there had been improprieties with respect to ARCP's financial statements. ¶ 100. Two days later, the Audit Committee met to discuss the whistleblower complaint. ¶ 102. The Audit Committee then retained Weil, Gotshal & Manges LLP ("Weil") as independent counsel to assist in investigating the allegations, and Weil in turn retained Ernst & Young to conduct forensic accounting. ¶ 103. As a result of the investigation, on October 29, 2014, ARCP issued a press release and Form 8-K announcing that the Audit Committee believed ARCP had incorrectly included certain amounts in AFFO for the first quarter of 2014. ¶ 104. On March 2, 2015, ARCP filed restated financial results for fiscal years 2012 and 2013 as well as the first and second quarters of 2014. ¶ 105. Reflecting on the Audit Committee's investigation, Mr. LaFleur of Grant Thornton concluded that the Audit Committee promptly and appropriately responded to the whistleblower complaint. Slack Decl. Ex. W, LaFleur Tr. 842:8–843:12. Grant Thornton likewise concluded that the Company's response to the whistleblower complaint was consistent with its obligations under Section 10A of the Exchange Act, which requires an auditor to assess, among other things, whether a company

and its board of directors have taken timely and appropriate action in response to accounting improprieties. *Id.*; *see* 15 U.S.C.§ 78j-1(b)(2).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Fabrikant v. French*, 691 F.3d 193, 205 (2d. Cir. 2012) (citation omitted).

## ARGUMENT

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). Under Section 11, certain defendants— including outside directors—may invoke a "due diligence defense," *In re WorldCom, Inc. Sec. Litig.* (*WorldCom I*), 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004). As set forth below, the due diligence defense consists of two separate, but related, affirmative defenses: (i) the reliance defense, which concerns the audited portions of a registration statement (*i.e.*, the "expertised" portions); and (ii) the due diligence defense, which concerns portions of a registration statement that were not formally audited (*i.e.*, the "non-expertised" portions). *Id.* "[T]he diligence conducted must be reasonable, not perfect." *In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600, at *7 (C.D. Cal. Mar. 31, 1997).

## I. THE OUTSIDE, NON-MANAGEMENT DIRECTORS REASONABLY RELIED ON GRANT THORNTON WITH RESPECT TO "EXPERTISED" PORTIONS OF ARCP'S REGISTRATION STATEMENTS

Outside, non-management directors are not liable under Section 11 for "any part of the registration statement purporting to be made on the authority of an expert" if they "had no

reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C); *see also Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 688–92 (S.D.N.Y. 1968) (dismissing claims against outside directors with respect to expertised statements where outside directors had "no reasonable ground to believe" that audited financials were inaccurate and believed audited financials to be correct because they "had confidence in" the auditor). Plaintiffs' Section 11 claims against the Outside, Non-Management Directors fail to the extent they are premised on misstatements in ARCP's audited financial statements. Third Am. Compl. ¶¶ 53–55, 57, 59–60.

"[I]t is settled that an accountant qualifies as an expert, and audited financial statements are considered expertised portions of a registration statement." *WorldCom I*, 346 F. Supp. 2d at 664 (collecting cases). Outside directors "can rely on an accountant's audit opinion incorporated into a registration statement." *WorldCom I*, 346 F. Supp. 2d at 666; *accord Weinberger v. Jackson*, 1990 WL 260676, at *4 (N.D. Cal. Oct. 11, 1990) (noting that outside director was "given comfort by the fact that the prospectus and the information in it were reviewed by . . . accountants"); *Laven v. Flanagan*, 695 F. Supp. 800, 811–12 (D.N.J. 1988) (holding that outside director could reasonably rely on independent audits). This means that outside directors "need not conduct due diligence into the 'expertised' parts of a prospectus, such as certified financial statements," *In re Software Toolworks Inc.*, 50 F.3d 615, 623 (9th Cir. 1994), absent facts that should have alerted "a prudent man in the management of his own property" that the audit itself was performed in error, 15 U.S.C. § 77k(b), (c); *see also In re WorldCom, Inc. Sec. Litig.* (*WorldCom II*), 2005 WL 638268, at *8 (S.D.N.Y. Mar. 21, 2005) (noting that directors may rely

on audit opinion unless "red flags" emerge "regarding the reliability of an audited financial statement").

There is no issue of material fact that (1) Grant Thornton issued unqualified audit reports attesting to the accuracy of ARCP's 2012 and 2013 financial statements and the adequacy of ARCP's internal controls during those reporting periods, and (2) the Outside, Non-Management Directors relied on Grant Thornton's opinion regarding ARCP's audited financial statements and believed that those statements contained no material falsities or omissions. *See* Statement of Facts § B. Moreover, there is no evidence in the record to show that the Outside, Non-Management Directors' reliance on the work performed by Grant Thornton was anything but reasonable. To the contrary, Grant Thornton is a reputable, national accounting firm; the Audit Committee met regularly with Grant Thornton; and Grant Thornton did not identify any material weaknesses in or concerns with ARCP's financial statements or its controls over financial reporting. *Id.* § C.

Accordingly, the Outside, Non-Management Directors are entitled to summary judgment with respect to any alleged misstatements or omissions in the expertised financial statements.

## II. THE OUTSIDE, NON-MANAGEMENT DIRECTORS CONDUCTED A REASONABLE INVESTIGATION WITH RESPECT TO THE "NON-EXPERTISED" PORTIONS OF ARCP'S REGISTRATION STATEMENTS

Outside directors are exempt from liability for alleged misstatements or omissions in the non-expertised portions of a registration statement if, after conducting a "reasonable investigation," they had "reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(A). Ultimately, "*[w]ithout the benefit of hindsight*, the Court must determine whether '[t]he overall investigation . . . was reasonable

under the circumstances at the time of the investigation.'" *Int'l Rectifier*, 1997 WL 529600, at *7 (second and third alterations in original) (emphasis added) (citation omitted).

"As Congress explained when it initially passed the Securities Act, '[t]he duty of care to discover varies in its demands upon participants in security distribution with the importance of their place in the scheme of distribution and with the degree of protection that the public has a right to expect.'" *Fed. Hous. Fin. Agency ex rel. Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 131 (2d Cir. 2017), *cert. denied sub nom. Nomura Sec. Int'l, Inc. v. Fed. Hous. Fin. Agency*, 138 S. Ct. 2679 (2018), and *cert. denied sub nom. Findlay v. Fed. Hous. Fin. Agency*, 138 S. Ct. 2697 (2018) (quoting H.R. Rep. No. 73–85, at 9 (1933)). This Court, in *BarChris*, recognized "'a sliding scale of liability' among directors, 'draw[ing] a distinction between insiders and outsiders.'" *WorldCom II*, 2005 WL 638268, at *9 (citation omitted). "'The law is that an inside director with intimate knowledge of corporate affairs and of particular transactions is expected to make a more complete investigation and to have more extensive knowledge of the facts supporting the statement than is an outside director.'" *Id.* at *10 (citation omitted); *see also Laven*, 695 F. Supp. at 812 ("As outside directors they were under a lesser obligation to conduct a painstaking investigation than an inside director with an intimate knowledge of the corporation.").

Indeed, an outside director is "not obliged to conduct an independent investigation into the accuracy of all the statements contained in the registration statement." *Weinberger*, 1990 WL 260676, at *4. Rather, an outside director can "rely upon the reasonable representations of management, if his own conduct and level of inquiry were reasonable under the circumstances." *Id*. Outside directors may also rely on the work of experts who are more familiar with a company's finances and accounting. *See Weinberger*, 1990 WL 260676, at *4 (noting that

outside director was "given comfort by the fact that the prospectus and the information in it were reviewed by underwriters, counsel and accountants"); *Laven*, 695 F. Supp. at 811–12 (holding that outside director could reasonably rely on independent audits and independent investigations conducted by experts). "Delegation to others of the performance of acts which it is unreasonable to require that the fiduciary shall personally perform is permissible. Especially is this true where the character of the acts involves professional skill or facilities not possessed by the fiduciary himself." SEC Release No. 33-6335, 1981 WL 31062, at *14 (Aug. 6, 1981) (quoting H.R. Rep. No. 152, at 26 (1933)). This is meant "to avoid placing excessive burdens on the issuer's directors." *Id.* at *15.

If outside directors were expected to independently ensure the accuracy of all of the information a company discloses to the public, corporate governance would be impeded and companies would have far more difficulty recruiting qualified board members. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 236 F.R.D. 313, 318 n.6 (S.D. Tex. 2006), *rev'd and remanded on other grounds sub nom. Regents of Univ. of Ca. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007); Bernard S. Black et al., *Outside Director Liability: A Policy Analysis*, 162 J. Institutional & Theoretical Econ. 5, 17–19 (2006). "The extensive precautions [board members] would adopt in response could well stifle risky business initiatives capable of delivering positive risk-adjusted returns to investors" and "could delay decisions and encumber board decision-making to such a degree that valuable business opportunities are lost." Black et al., *supra*, at 17–18. Moreover, "the supply of good outside directors should decline in response to an increase in liability risk." *Id.* at 18. As a result, board fees would need to be increased considerably to compensate board members for the additional legal risk and time commitment they would take on. *Id.* at 18–19. Accordingly, courts have consistently held that outside

directors should be held to less exacting standards of diligence than other parties. *See Weinberger*, 1990 WL 260676, at *4; *Laven*, 695 F. Supp. at 811–12.

### A.   The Outside, Non-Management Directors Conducted a Reasonable Investigation of ARCP's Financial Statements and Registration Statements

There is no issue of material fact that the Outside, Non-Management Directors exercised appropriate diligence in reviewing and approving the Registration Statements.

*First*, the Outside, Non-Management Directors are accomplished professionals who had substantial relevant board experience in the industry that helped inform them in the discharge of their duties as ARCP directors. Statement of Facts § A. The Outside, Non-Management Directors familiarized themselves with ARCP and its operations by reviewing past filings, speaking with management and directors, and asking questions about the Company. *Id.* § C(3)(a).

*Second*, the record shows that the Outside, Non-Management Directors received and reviewed drafts of Registration Statements in advance of the Board meetings at which those documents were considered. *Id.* § C(1). To the extent the Outside, Non-Management Directors had questions about these Registration Statements, they asked questions of ARCP's management, their fellow directors, or the external advisors. *Id*.

*Third*, the Outside, Non-Management Directors conducted a reasonable investigation of the non-expertised portions of the financial statements incorporated by reference into the Registration Statements. The Board received and reviewed drafts of the Annual and Quarterly Reports that were incorporated into the Registration Statements by reference. *Id.* § C(2). The Board retained and relied upon Grant Thornton to assist the Board in its review. *Id.* § C. Each quarter, Grant Thornton conducted a review of the quarterly financial results and Form 10-Q and reported its findings to the Board. *Id.* Grant Thornton consistently reported that there were "no concerns" and no "material errors" in these financial statements. *Id.* § C(2). Grant Thornton

provided clean opinions and concluded that the Audit Committee conducted appropriate oversight of ARCP's accounting and reporting. *Id.* §§ B, C(2). The one time that Grant Thornton identified a "significant deficiency," demonstrating its diligence and confirming the appropriateness of the Outside, Non-Management Directors' reliance on its work, the Company promptly remediated the issue. *Id.* § C(2). To the extent the Outside, Non-Management Directors had questions about the Annual and Quarterly Reports, they asked questions of ARCP's management, their fellow directors, or Grant Thornton. *Id.*

*Fourth*, during Board meetings, the Company's management and external advisors made presentations regarding ARCP's business, its Annual and Quarterly Reports, ARCP's financial statements, the proposed transactions and offerings, the content of the related Registration Statements, the financial analyses that had been carried out, and internal controls and auditing procedures. *Id.* §§ C(1)–(2). Directors asked questions of ARCP's management, the auditors from Grant Thornton, and other experts to ensure that the directors fully understood the transactions and the related Registration Statements. *Id.* § C(1). Indeed, the Outside, Non-Management Directors made sure that all of their questions had been "asked and answered" before they allowed management to file any documents with the SEC. *Id.*

*Fifth*, the Outside, Non-Management Directors reasonably relied on advice from competent and well-respected auditors and other experts in connection with these Registration Statements. *Id.* § C. The Board members employed Grant Thornton to provide comfort letters to the Company in connection with the offerings at issue here, *id.*, which gave the Outside, Non-Management Directors further assurances that ARCP's interim financials and Registration Statements were accurate, *see Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 1998 WL 513091, at *15 (W.D. Mich. June 15, 1998) (considering comfort letters to be one of several

28

relevant factors in evaluating an underwriter's diligence), *as amended* (June 25, 1998); *Int'l Rectifier*, 1997 WL 529600, at *8 (same); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 323 (S.D.N.Y. 1996) (same), *aff'd*, 108 F.3d 1370 (2d Cir. 1997). As part of their review procedures in connection with issuing a comfort letter, Grant Thornton would review interim financial information, inquire of ARCP management responsible for financial and accounting matters, compare financial figures in various documents to ensure that they were consistent, and prove the arithmetic accuracy of certain figures. Statement of Facts § C. Grant Thornton would also recompute AFFO and compare the AFFO amounts reported in ARCP's public filings with those in the Company's internal records to identify any discrepancies. *Id.*

*Sixth*, nothing in the record shows that the Outside, Non-Management Directors were presented with information that was inconsistent with the information they had acquired from management, Grant Thornton, and other professionals retained by the Board concerning the accuracy of ARCP's financial statements with respect to the issues underlying the Section 11 claims. Nor is there any evidence that the Outside, Non-Management Directors received any information suggesting that professionals and advisors like Grant Thornton were exercising anything other than the appropriate level of care in connection with conducting their work.

*Seventh*, the Outside, Non-Management Directors attended regular Board meetings at which ARCP management discussed ARCP's business, and the Board met more frequently in connection with proposed transactions, such as the acquisitions of ARCT IV and Cole. *Id.* §§ C(1)–(2).

*Eighth*, the Outside, Non-Management Directors oversaw ARCP's internal controls and even sought to implement more robust systems for reviewing ARCP's financial reporting and discovering errors in the Company's public filings. *Id.* § C(3)(b). For example, the Outside, Non-

29

Management Directors added Mr. Frank, an experienced public company auditor, to the Board, and the Audit Committee revised ARCP's internal complaints policy to enable employees to file complaints regarding the Company's accounting and internal controls through an independent third-party administrator. *Id.* Each year, Grant Thornton expressly concluded that the Company and its Audit Committee "maintained, in all material respects, effective internal control over financial reporting." *Id.* § B.

*Finally*, the record is clear that when the Outside, Non-Management Directors did learn information raising concerns about ARCP's financial statements in September 2014, they did precisely what diligent directors would do in such a situation—they initiated a prompt and thorough independent investigation with the assistance of legal counsel and forensic accountants. *Id.* § D. Ultimately, the Outside, Non-Management Directors reported the results of the investigation to ARCP's shareholders and took appropriate remedial actions. *Id.*

In short, there is no issue of material fact as to whether the Outside, Non-Management Directors took reasonable steps in connection with the diligence of the non-expertised portions of the Registration Statements. Accordingly, they are entitled to summary judgment with respect to the alleged misstatements and omissions in the non-expertised portions of the Registration Statements.

**B.    Case Law Confirms that the Outside, Non-Management Directors' Investigation Was Reasonable**

The *Weinberger* decision is directly on point. There, as here, the outside director "was reasonably familiar with the company's business and operations." 1990 WL 260676, at *4. There, as here, the outside director "regularly attended board meetings at which the board discussed every aspect of the company's business." *Id.* There, as here, the outside director "reviewed the company's financial statements" and "was involved with various company

decisions." *Id.* There, as here, the outside director reviewed "drafts of the registration statement and saw nothing suspicious or inconsistent with the knowledge that he had acquired as a director" and "discussed certain aspects of the registration statement with management." *Id.* The court found that the outside director had no duty to ask management about specific representations in the prospectus "so as long as the prospectus statements were consistent with the knowledge of the company which he had reasonably acquired in his position as director." *Id.* Accordingly, the court held that the outside director had conducted a reasonable investigation and was entitled to summary judgment on his due diligence defense. *Id.* at \*4–5.

Indeed, this holding in *Weinberger* is practically necessary and fundamental to service by outside directors on boards. An outside director cannot be charged with verifying or asking questions about every fact, financial figure, or representation in an often thick prospectus. *See* Black et al., *supra*, at 17–19. If that kind of diligence was required, companies would have tremendous difficulty attracting qualified outside directors to serve on their boards. *Id.* That has never been the diligence standard for outside directors. Instead, Section 11 simply requires outside directors to attend regular board meetings, review the registration statements, look for any statements that are suspicious or inconsistent with the directors' knowledge, and discuss any questions with management or other advisors. *Weinberger*, 1990 WL 260676, at \*4–5.

*In re Avant-Garde Computing, Inc. Securities Litigation* is similarly instructive. 1989 WL 103625, at \*7–9 (D.N.J. Sept. 5, 1989). There, as here, the outside director participated in "Board meetings prior to the offering and several independent conversations with other Board members" in which the proposed public offering was discussed. *Id.* at \*8. There, as here, the outside director was aware that the company's outside accountants "had examined [the company's] financial statements and that the accounting firm found they consistently were in conformity

with generally accepted accounting principles." *Id*. There, as here, the outside director "received and reviewed a draft preliminary prospectus." *Id.* There, as here, the outside director "interviewed company personnel, including members of senior management," and became familiar with the company's operations "to assure himself that, as an outside director, he understood [the company's] business." *Id.* The court found that plaintiffs had failed to show that the outside director's due diligence was inadequate, that he lacked "an honest belief in the truth of the financial statements in question, or that he behaved recklessly in his consideration thereof." *Id.* at *9. Accordingly, the court held that the outside director was entitled to summary judgment on his due diligence defense. *Id*.

The cases that have denied outside directors relief are easily distinguishable from the instant case. In *BarChris*, for example, one of the outside directors only "glanced at [the registration statement] briefly," "did not read it thoroughly," and "made no investigation of [its] accuracy." 283 F. Supp. at 688. Another outside director spent "about ten minutes" reading the first version of the registration statement and subsequently signed the signature sheet without reviewing the final version. *Id.* at 689. A third outside director was held to a higher standard than others because he drafted the registration statement. *Id.* at 689–90. "As the director most directly concerned with writing the registration statement and assuring its accuracy, more was required of him in the way of reasonable investigation than could fairly be expected of a director who had no connection with this work." *Id.* at 690. The court noted that "[t]o require an audit would obviously be unreasonable," but in drafting the statement, the director was required to check matters that were "easily verifiable." *Id.* Similarly, the fourth outside director served as both an underwriter and outside director to the company. *Id.* at 692. Because these individuals failed to

take investigatory actions commensurate with their close relationships with the company, the court held that they were not entitled to the due diligence defense. *Id.* at 692, 697.

In this case, the Outside, Non-Management Directors spent substantial time reviewing the Registration Statements and underlying financials. As the record shows, drafts of the Annual and Quarterly Reports and Registration Statements were sent to the Board and the Audit Committee in advance of their meetings, and the Outside, Non-Management Directors reviewed those drafts. Statement of Facts §§ C(1)–(2). The Board and Audit Committee then met to discuss the proposed filings. *Id.* Those meetings often included presentations from Grant Thornton on ARCP's internal controls and auditing procedures, and undisputed deposition testimony shows that the Outside, Non-Management Directors were active in questioning Grant Thornton and management about ARCP's accounting methods and financial statements. *Id.* Unlike in *BarChris*, none of the Outside, Non-Management Directors were involved in drafting the Registration Statements or underlying financial statements, and none of them served as underwriters to ARCP. ¶ 27.

*WorldCom II* is also inapposite. There, the court held that there was a disputed fact as to whether the chairman of the board of directors was an inside or outside director and therefore refused to grant summary judgment on his due diligence defense. 2005 WL 638268, at *12. In presenting his defense, the chairman "emphasized his 'intelligent and well-reasoned reliance' on his fellow directors, experts, and professionals who were in the position to evaluate WorldCom, and his review of the materials management gave to the Board." *Id.* The court stated that "reliance on management's presentations to the Board, after a careful examination of the materials provided to the Board, may suffice in some cases." *Id.* But the chairman "ha[d] not shown that he conducted *any* sort of investigation, much less a reasonable investigation in light

of all relevant circumstances." *Id.* Thus, there were "questions as to whether it was incumbent on [the chairman] to engage in a more active dialogue with management and perhaps even with the Company's auditors and underwriters." *Id.*

As an initial matter, the regulatory and corporate governance landscapes have dramatically transformed since the WorldCom and the Enron scandals of the early 2000s. The Sarbanes-Oxley Act of 2002 now requires management to maintain an adequate internal control structure and procedures for financial reporting. *See* 15 U.S.C. § 7262(a). The Act also requires companies to assess the effectiveness of their internal control structures and financial reporting procedures at the end of each fiscal year. *Id.* As a result, companies have developed far more robust control environments, and "internal controls play a more direct role in the work of auditors." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 448 n.10 (S.D.N.Y. 2004); *accord* Stephen Wagner & Lee Dittmar, *The Unexpected Benefits of Sarbanes-Oxley*, Harv. Bus. Rev., Apr. 2006, at 135 ("A focus on the control environment helps ensure that the controls themselves are the second and third lines of defense, not the first. Employees who have been made to understand that it's not all right to strike side deals with customers, to recognize revenue prematurely, to conceal possible conflicts of interest, or to look the other way when these types of activities are going on won't be busy circumventing the control system at every turn."). In this context, outside directors—like auditors—may rely more on internal controls to ensure that a company's financial statements and other reporting are accurate—and here, Grant Thornton repeatedly confirmed to the Outside Non-Management Directors that the company's internal controls were adequate and that the Audit Committee was doing its job in overseeing those controls.

Furthermore, in contrast to *WorldCom II*, where the chairman had not shown that he carried out *any* kind of investigation, here the Outside, Non-Management Directors were diligent in their oversight of the Company and conducted investigations into the accuracy of ARCP's Registration Statements. The Outside, Non-Management Directors regularly attended Board meetings in which the Board and management discussed all aspects of ARCP's business, and the Outside, Non-Management Directors were involved in various company decisions. Statement of Facts §§ C(1)–(2). Undisputed testimony shows that the Outside, Non-Management Directors reviewed drafts of ARCP's Annual and Quarterly Reports and its Registration Statements and saw nothing suspicious or inconsistent with the information they had acquired as directors. *Id.* § C. Moreover, the Outside, Non-Management Directors engaged in "active dialogue with management" *and* "with the Company's auditors and underwriters." *WorldCom II*, 2005 WL 638268, at *12; *see* Statement of Facts § C. These efforts fulfilled the Outside, Non-Management Directors' obligations to the Company and its investors.

## CONCLUSION

The undisputed record demonstrates that the Outside, Non-Management Directors reasonably relied on Grant Thornton's audits of the expertised portions of the Registration Statements and that the Outside, Non-Management Directors' investigation into the non-expertised portions was reasonable and diligent. As a matter of law, they cannot be liable for violating Section 11 of the Securities Act. Summary judgment should be entered in favor of the Outside, Non-Management Directors on Counts I–VI of the Third Amended Complaint.

Dated: February 8, 2019

Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By:     *Richard W. Slack*
  Richard W. Slack
  Christopher L. Garcia
  Evert J. Christensen, Jr.
  Adam J. Bookman
  Aaron J. Curtis

767 Fifth Avenue
New York, New York  10153
(212) 310-8000 (Telephone)
(212) 310-8007 (Fax)
richard.slack@weil.com
christopher.garcia@weil.com
evert.christensen@weil.com
adam.bookman@weil.com
aaron.curtis@weil.com

*Attorneys for Defendants Thomas A. Andruskevich,*
*Leslie D. Michelson, Edward G. Rendell, and*
*William G. Stanley*

## APPENDIX A

| Count | Offering | Registration Statements | Incorporated by Reference | Directors on Board |
|---|---|---|---|---|
| I | July 23, 2013 Offering of 3% Senior Notes | Form S-3ASR filed Mar. 13, 2013; Prospectus Supplements dated July 23 and 25, 2013; Free Writing Prospectus (term sheet filed July 24, 2013). | 2012 Form 10-K; Q1 2013 Form 10-Q. | Michelson; Rendell. |
| II | Dec. 4, 2013 Offering of 3% Senior Notes | Form S-3ASR filed Mar. 13, 2013; Prospectus Supplements dated Dec. 5 and 6, 2013; Free Writing Prospectus dated Dec. 5, 2013. | 2012 Form 10-K; Q1 2013 Form 10-Q; Q2 2013 Form 10-Q; Q3 2013 Form 10-Q. | Michelson; Rendell. |
| III | Dec. 4, 2013 Offering of 3.75% Senior Notes | Form S-3ASR filed Mar. 13, 2013; Prospectus Supplements dated Dec. 5 and 6; Free Writing Prospectus dated Dec. 5, 2013. | 2012 Form 10-K; Q1 2013 Form 10-Q; Q2 2013 Form 10-Q; Q3 2013 Form 10-Q. | Michelson; Rendell. |
| IV | ARCT IV Merger | Form S-4 dated Dec. 3, 2013; Proxy Statement/Prospectus dated Dec. 4, 2013. | 2012 Form 10-K; Q1 2013 Form 10-Q; Q2 2013 Form 10-Q; Q3 2013 Form 10-Q. | Michelson; Rendell. |
| V | Cole Merger | Form S-4 dated Dec. 23, 2013; Joint Proxy Statement/Prospectus dated Dec. 23, 2013. | 2012 Form 10-K; Q1 2013 Form 10-Q; Q2 2013 Form 10-Q; Q3 2013 Form 10-Q. | Michelson; Rendell. |
| VI | May 21, 2014 Offering of Common Stock | Form S-3ASR filed Mar. 13, 2013; Preliminary Prospectus filed May 21, 2013; Prospectus Supplement filed May 23, 2014. | 2012 Form 10-K; 2013 Form 10-K; Q1 2014 Form 10-Q. | Michelson; Rendell; Stanley; Andruskevich. |