JA3AAMEHps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE:                                15-mc-40 (AKH)

4    AMERICAN CAPITAL PROPERTIES, INC.
     LITIGATION
5
     ------------------------------x
6
                                           New York, N.Y.
7                                          October 3, 2019
                                           2:55 p.m.
8

9    Before:

10                  HON. ALVIN K. HELLERSTEIN

11                                         District Judge

12
                          APPEARANCES
13
     ROBBINS GELLER RUDMAN & DOWD LLP
14        Attorneys for Plaintiffs TIAA-CREF
          and The Class
15   BY:  DEBRA J. WYMAN, ESQ.
          ROBERT M. ROTHMAN, ESQ.
16        ELLEN GUSIKOFF STEWART, ESQ.

17   GLANCY PRONGAY & MURRAY LLP
          Attorneys for Plaintiff Joanne Witchko
18   BY:  MATTHEW M. HOUSTON, ESQ.
          BENJAMIN I. SACHS-MICHAELS, ESQ.
19

20   MILBANK, TWEED, HADLEY & McCLOY LLP
          Attorneys for Defendants American Realty Capital
21        Properties, Inc. and ARC Properties Operating
          Partnerships
22   BY:  SCOTT A. EDELMAN, ESQ.
          ANTONIA M. APPS, ESQ.
23        JED M. SCHWARTZ, ESQ.
          JONATHAN OHRING, ESQ.
24
     SIDLEY AUSTIN LLP
25        Attorneys for Defendant Grant Thornton LLP
     BY:  BRUCE R. BRAUN, ESQ.

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

JA3AAMEHps

1                          APPEARANCES (Cont'd)

2    SHEARMAN & STERLING LLP
          Attorneys for the Underwriter Defendants
3    BY:  ADAM HAKKI, ESQ.
          GRACE LEE, ESQ.

4
     KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
5         Attorneys for Defendants Arc Capital LLC,
          William Kahane, Peter Budko, Edward Weil,
6         Brian Jones, and Scott Bowman
     BY:  REID M. FIGEL, ESQ.
7         ANDREW E. GOLDSMITH, ESQ.

8    PETRILLO KLEIN & BOXER LLP
          Attorneys for Defendant Lisa Beeson
9    BY:  GUY PETRILLO, ESQ.
          DANIEL Z. GOLDMAN, ESQ.

10
     STEPTOE & JOHNSON, LLP
11        Attorneys for Defendant Brian Block
     BY:  MICHAEL C. MILLER, ESQ.
12        MICHAEL G. SCAVELLI, ESQ.

13   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Nicholas S. Schorsch
14   BY:  AUDRA J. SOLOWAY, ESQ.
          LORIN L. REISNER, ESQ.
15        DANIEL J. KRAMER, ESQ.

16   MORRIS MANNING & MARTIN
          Attorneys for Defendant Scott P. Sealy, Sr.
17   BY:  JOHN P. MacNAUGHTON, ESQ.

18   WEIL, GOTSHAL & MANGES LLP
          Attorneys for Defendants Thomas Andruskevich,
19        William Stanley, and Leslie Michelson
     BY:  CHRISTOPHER L. GARCIA, ESQ.
20        EVERT J. CHRISTENSEN, ESQ.
          RAQUEL KELLERT, ESQ.

21
     WINGET SPADAFORA & SCHWARTZBERG, LLP
22        Attorneys for Defendant Realty Capital Securities, LLC
     BY:  MATTHEW TRACY, ESQ.

23
     KIRKLAND & ELLIS LLP
24        Attorneys for Defendant David Kay
     BY:  BETH MUELLER, ESQ.

25

JA3AAMEHps

```
 1              THE COURT:  Rather than go through an introduction of

 2     counsel, all of whom have already been introduced in this court

 3     numerous times, just, before anyone speaks, identify yourself.

 4              The purpose of today's session is to consider whether

 5     or not I should give preliminary approval to a very large

 6     settlement, after a very hard-fought, I would say tenaciously

 7     fought and protractedly fought litigation.

 8              So, Ms. Wyman, are you going to present this?

 9              MS. WYMAN:  Yes, your Honor.

10              THE COURT:  OK.  Would you please take the podium and

11     do so.

12              MS. WYMAN:  I'm pleased to be here to present the

13     settlement, your Honor.

14              THE COURT:  Speak loudly, please.

15              MS. WYMAN:  Yes.  I'm pleased to be here to present

16     this settlement to your Honor after all these years.

17              As outlined in our brief, the settlement amount is for

18     $1,025,000,000 in cash.  That settlement fund is to be

19     deposited into an escrow account within ten days of your

20     Honor's preliminary approval order.

21              Additionally, within ten days of your preliminary

22     approval order, defendants are to provide lead counsel with a

23     couple of pieces of information that will help the

24     administration of the settlement fund, that being the

25     identities of the parties that have settled or provided
```

JA3AAMEHps

 1   releases to them.

 2           THE COURT:  Ms. Wyman, you're talking too low.

 3           MS. WYMAN:  I'm sorry.  Within ten days of your

 4   preliminary approval order, in addition to the deposit of the

 5   settlement funds --

 6           THE COURT:  The microphone is misleading.  It really

 7   doesn't work.  So speak loudly.

 8           THE CLERK:  Ms. Wyman, you can use the other one.

 9           MS. WYMAN:  I can speak much louder.  So can you hear

10   me better now?

11           THE COURT:  Yes.

12           MS. WYMAN:  OK.  So one of the things that the

13   defendants are also going to do, VEREIT is also going to

14   provide us with the names of the parties that have settled with

15   them previously and people that have given them releases, as

16   your Honor --

17           THE COURT:  Why is that relevant?

18           MS. WYMAN:  Because your Honor will remember that

19   there were a number of opt-out cases that have settled prior to

20   now.

21           THE COURT:  Yes.

22           MS. WYMAN:  And that information will help us

23   administer the settlement fund so that there is no

24   double-dipping of claims from those released parties.

25           THE COURT:  OK.

JA3AAMEHps

1          MS. WYMAN:  They are also to provide us with the scope

2     of those releases to the extent that it captures assigns or

3     successors, etc., of the opt-out plaintiffs that they have

4     settled with previously.

5          Another piece of information that they're going

6     provide to the claims administrator is, to the extent it's in

7     their possession, they're going to provide us anonymized

8     trading data for those settling parties as a double-check for

9     us to use against claims that are made into the settlement fund

10    so that we can try and identify anybody that is either claiming

11    mistakenly or by purpose into the settlement fund that's

12    already been paid and released, the claims that have been

13    adjudicated in this case.

14         So these are the things that are going to happen.  And

15    in response to all that, the plaintiffs are going to provide,

16    there will be mutual releases between the parties.  So that

17    that's essentially the big-picture terms of the settlement that

18    we've got going on.

19         I don't know if you want to go through each of the

20    factors under Rule 23(e)(2).

21         THE COURT:  I do.

22         MS. WYMAN:  OK.  There are a number of factors that

23    your Honor has to consider in preliminarily approving our

24    settlement.  One of those is, under 23(e)(2)(A), your Honor has

25    to make a preliminary determination that counsel have

JA3AAMEHps

1  adequately represented the class.

2           THE COURT:  I do so.  I see you have worked and I see

3  you have prepared your presentations.  You have done a very

4  good, very competent, and very professional job.  We needn't go

5  further on that.

6           MS. WYMAN:  Thank you, your Honor.

7           The next factor that needs to be considered in Rule

8  23(e)(2) is whether or not the settlement has been negotiated

9  at arm's length.  And as we've described in our moving

10  papers --

11          THE COURT:  I so find.  I know how hard fought this

12  case was.  The sums themselves suggest that they were very hard

13  fought, though I'd like to get more justification on that when

14  you come to it.  Lane Phillips is a well-known and highly

15  competent mediator, and it took him a number of sessions to

16  settle with you.  And I know you were seemingly very eager to

17  try the case, as I was also.  So I can easily find that there

18  was zealous representation, and do so.

19          MS. WYMAN:  Thank you, your Honor.

20          The next factor that you need to consider under Rule

21  23(e)(2)(c) is whether or not the release provided by the

22  settlement is adequate.  And there is a number of subfactors

23  for you to consider in making that determination, the first

24  being the costs, risks, and delay of a trial and appeal in this

25  case.  As your Honor well knows, the trial in this case was

JA3AAMEHps

1    estimated to last weeks, six to eight weeks to be exact.

2                    THE COURT:  That was your estimate.  It wasn't mine.

3                    MS. WYMAN:  The issues were very complex.  There were

4    over 40 defendants.  Dozens of lawyers would be involved.

5    Many, many expert witnesses, a lot of competing expert opinions

6    would have been offered to the jury.  And it would have been an

7    expensive undertaking, as you can well imagine.

8                    THE COURT:  I think it would have been a very

9    expensive undertaking.  I'm not so sure it would have been so

10   difficult for a jury to understand the issues that were

11   involved.  Basically the main issue had to do with funds from

12   operations.  And it's a concept that seems strange to a lot of

13   people but it can be explained pretty easily.  And what was

14   supposedly the misstatement also could be explained easily.

15   That's not to say that's the end of the case.  There were large

16   elements of causation that had to be proved.  There were other

17   statements in the offering documents that had to be compared.

18   It would have been a complex undertaking.  It would have been

19   very expensive and would have taken a considerable amount of

20   time, even though we had spent a lot of time before the

21   settlement and would not be spending relatively that much after

22   the settlement.  But I think it is sufficiently clear that this

23   would be a difficult trial.  The greatest difficulty would have

24   would be a number of parties that were involved.  And the more

25   parties you have, the more tendency there is to have a lengthy

JA3AAMEHps

1   trial.  And that's a big expense.

2          Defendants' counsel don't compete, and I think,

3   although you have been paid on a day-to-day basis, your search

4   for funds would have been greater also, because of the greater

5   time that you would have put into it.  So it clearly is a

6   cost-saving and time-saving, and it's clearly a saving to the

7   Court, in that I don't have to spend all the judicial time and

8   energy on this case.  So that factor is clear too.

9          MS. WYMAN:  And let us not forget, too, no matter what

10  the outcome of the trial, there likely would have been appeals

11  from it, so it could have been years before things were

12  resolved, or we may have been back before your Honor after a

13  trip to the Second Circuit.  It's unknown at this point.

14         THE COURT:  That is very much so.  Before there would

15  be finality, you could have to go through three or four years

16  of litigation.

17         MS. WYMAN:  That's right.

18         And while TIAA was very confident in its claims and

19  the evidence that had been generated in support of those claims

20  during discovery, the defendants were very formidable

21  opponents.  And they have defenses that they would have very

22  aggressively presented to the jury.  So there was no guarantee

23  that we were going to walk away with a victory at the end of

24  the day.  So that's one of the things that has to be taken into

25  consideration, the risk of the jury accepting the defenses that

JA3AAMEHps

1   they would offer versus an immediate and certain payment now of

2   approximately 50 percent of the recoverable damages.

3        THE COURT:  That's a point that I would like you to

4   develop.  There's a lot of money involved here.  The settlement

5   is for $1.025 billion.  But it's said that the estimate of

6   recoverable damages was over $2 billion.  So if the sums were

7   smaller, a 50 percent recovery would not be so great.  Why

8   should it be different because the sums are larger?

9        MS. WYMAN:  Well, I think that a 50 percent recovery

10  is, in most actions, is fairly extraordinary.  The averages are

11  far, far lower than this.  50 percent of your damages now, or

12  zero percent of your damages after losing a trial, is a pretty

13  easy choice to make, I think.

14       THE COURT:  Well, I'm not sure I agree.  That doesn't

15  seem to be the case with many of the lawsuits I have.

16       The item of damages itself is complicated.  When you

17  buy a certain price and sell at a lower price, you suffer a

18  loss.  But that entire loss is not a recoverable loss.  It

19  could be losses in the way stocks operate.  And there could be

20  consecutive changes in a market sector that come into play as

21  well.  So the regulations, the SEC regulations, provide that

22  you have to take a -- or you could tell me better, but it's an

23  average or a mean 30 days after disclosure to find the price

24  that it settles at.  How is that resolved?

25       MS. WYMAN:  What has happened -- and Mr. Rothman can

JA3AAMEHps

```
1    probably explain this better than I can -- but what has
2    happened is, we have hired an economist, Dr. Feinstein.  He was
3    here during the class certification hearing.  He has done a
4    statistical analysis that removes the market factors, removes
5    the sector factors, and focuses only on the loss in the price
6    of the security that's attributable to the fraud that's
7    alleged.
8              THE COURT:  And that comes out to $2 billion?
9              MS. WYMAN:  It does, your Honor.
10             THE COURT:  OK.  The amounts are large.  And in the
11   circumstances, I think it would be fair to have a 50 percent
12   recovery because of the considerations that you point out in
13   terms of the difficulty of proof, the numbers of experts, the
14   length of time that a jury would have to sit, which also comes
15   into play, and therefore I give preliminary approval on that
16   basis as well.
17             Now, I'm told that, of that 1-plus billion dollars
18   that would be the settlement amount, that the parties
19   identified with ARCP, or, as it's now called, VEREIT --
20             MS. WYMAN:  VEREIT.
21             THE COURT:  -- VEREIT, put up $738,530,000 --
22   $738,500.  And others are putting up the difference of $225
23   million.  Tell me more about that.
24             MS. WYMAN:  Certainly.  There are some contributors to
25   the settlement fund apart from the company.  $225 million is
```

JA3AAMEHps

being contributed from the AR Capital parties, including

Mr. Schorsch and his partners.  $12.5 million is being

contributed by Mr. Block.  And $49 million is being distributed

by Grant Thornton.  The rest of it, $738.5 million, is being

paid into the settlement fund by VEREIT.

            THE COURT:  And there's something about this payment

by the non-VEREIT defendants as being a credit of the VEREIT

defendants.  Tell me about that.

            MS. WYMAN:  Well, I can tell you what I know about it.

There are several side agreements that were made as part of the

derivative settlement that bear on the contribution and

indemnity claims that VEREIT and the other AR Capital, Block,

and Grant Thornton have amongst themselves.  Those agreements

don't impact the settlement fund in my case.  The settlement

fund would remain whole no matter what happens after final

approval is had, in this case and in the derivative case.  But

what you need to understand is, there is a contingency between

final approval in our case and final approval in the derivative

case.

            THE COURT:  I can understand that it's required that I

approve both.  If I don't approve both, neither works.

            MS. WYMAN:  That's right.  And the contingency on the

class approval --

            THE COURT:  But why is the contribution of some

defendants cause for a lesser contribution by other defendants?

JA3AAMEHps

1          MS. WYMAN:  I'm sorry?  I don't understand your

2     question.

3          THE COURT:  The way it's worded is that the

4     contribution of these non-VEREIT parties causes there to be a

5     deduction in how much will be paid by the VEREIT parties.

6          MS. WYMAN:  Well, there is.  I mean, VEREIT has agreed

7     to pay $738.5 million towards the class settlement fund.  And

8     the balance that remains between that and $1.025 billion is

9     being paid by the other three entities and persons that I just

10    mentioned.

11         THE COURT:  OK.  Go on.

12         MS. WYMAN:  You look frustrated.  Did I not answer

13    your question?

14         THE COURT:  I'm not sure I understand.  But I

15    understand the rough proposition that you can make a settlement

16    for one aggregate amount and then chop it up into different

17    pieces that contribute.  Now, if one of the pieces doesn't come

18    through, sometimes other people have to pay more and sometimes

19    the aggregate is reduced.  Both settlements can work.  This is

20    as reasonable as the other.

21         MS. WYMAN:  Well, my understanding is that the class

22    settlement won't be reduced, even if one of the aggregate

23    pieces does not pay their portion.

24         THE COURT:  Yes.  It's clearly stated that way.  And

25    you did.

JA3AAMEHps

1          MS. WYMAN:  The next factor that we need to look at is

2     the effectiveness of the distribution of the settlement

3     proceeds to the class.  That's under Rule 23(e)(2)(c).  And our

4     brief has outlined the notice program that is reasonable and

5     the best possible notice that can be given under the

6     circumstances.  It involves sending a direct mailing of a

7     notice of settlement that contains all the pieces of

8     information that are required by the PSLRA.

9          THE COURT:  I've read it.  It's a very extensive

10    notice.

11         MS. WYMAN:  Yes.

12         THE COURT:  I have some questions with regard to the

13    notice.  First is the opt-out exclusion that's in the

14    supplementary agreement.

15         MS. WYMAN:  Yes.

16         THE COURT:  I think I need to review and approve that.

17    I understand why you do not want to make a public statement of

18    the opt-out figure, but can't everything else be made public?

19         MS. WYMAN:  Yes.  We would ask that the Court, if the

20    Court is going to review the supplementary agreement concerning

21    the opt-out level, that it be kept in camera and under seal.

22         THE COURT:  Let me see the agreement.

23         Paragraph 1, page 1, makes reference to one party.

24    Are there supplemental agreements with other parties?

25         MS. WYMAN:  No, your Honor.  This is the only

JA3AAMEHps

 1     supplementary agreement that there is.

 2             THE COURT:  So only this particular party can exercise

 3     the opt-out condition?

 4             MS. WYMAN:  That's correct.

 5             THE COURT:  Why can't we have this agreement filed,

 6     having just the amount redacted?

 7             MS. WYMAN:  May I speak with Mr. Edelman?

 8             THE COURT:  Yes.

 9             Mr. Edelman, speak.

10             MR. EDELMAN:  Your Honor, I think we would be OK with

11     it being filed as long as the amount is redacted.

12             THE COURT:  So do that, please.

13             MS. WYMAN:  Yes.

14             THE COURT:  File a complete copy under seal, and the

15     copy showing the redaction on ECF.

16             MS. WYMAN:  We will do so.

17             THE COURT:  Let me retain this copy.

18             MS. WYMAN:  OK.

19             THE COURT:  Do you have a copy of the notice?

20             MS. WYMAN:  I do.

21             THE COURT:  Page 3, it appears from the reading that

22     there is a disagreement among the settling parties.  I think

23     you need to say "the settling parties and the defendants."  Oh,

24     "the settling parties," both.  That's my error.  That's not a

25     problem.  I'm sorry.  I withdraw that.  The settling parties

JA3AAMEHps

 1   are both plaintiffs and defendants.

 2             MS. WYMAN:  Yes, that's correct, your Honor.

 3             THE COURT:  I would like to see in this document some

 4   more detail as to what the issues in dispute were, a lengthy

 5   paragraph, contributed to by both plaintiffs and defendants, so

 6   that the reader of this document would be able to get a better

 7   understanding of what the issues are and why they're so

 8   difficult.

 9             MS. WYMAN:  Yes, your Honor.

10             THE COURT:  Now, this is a very difficult document to

11   understand if you're not a professional.  So the likelihood of

12   questions is high.  Is there danger to having discussions

13   between your firm alone, your, plaintiffs', firm alone and a

14   questioner, or shouldn't there be some other procedure?

15             MS. WYMAN:  There should be no problem with that.

16   These actually technically are our clients, so we should be

17   able to adequately --

18             THE COURT:  They're not your clients.  They're a

19   class.  The clients are the representatives whose names appear

20   in the caption.  And the whole point of the notice is that

21   people should rely on that.  I can't remember if that's a stock

22   clause in other settlement agreements or not.  Is it?

23             MS. WYMAN:  It is, yes.

24             THE COURT:  Does anybody have any problem with it,

25   Mr. Edelman or other defendants?

JA3AAMEHps

1          The issue is whether it's appropriate for some member

2     of the potential class who has questions to call up the

3     plaintiff's lawyers.

4          MR. EDELMAN:  We have no objection to that, your

5     Honor.

6          THE COURT:  All right.

7          Tell me how the summary notice works.

8          MS. WYMAN:  The summary notice is a short-form notice

9     much like the one that we did for the notice of pendency that

10    gets published in the *Wall Street Journal*.  That's what the

11    summary notice that we submitted to the Court --

12         THE COURT:  And the point is, give a barebones

13    information, if a person wants more, to get it through the

14    website.

15         MS. WYMAN:  They can get it through the website.  I

16    believe that the summary notice also gives them our telephone

17    number.

18         THE COURT:  You're going to create a website, is that

19    it?

20         MS. WYMAN:  There is already a website created.  It

21    was created when the notice of pendency was sent out at the

22    beginning of August.  And it will be updated and maintained

23    with the settlement information as well.

24         THE COURT:  Is it possible to have this part of --

25    wise to have it part of the VEREIT website?

JA3AAMEHps

1              MR. EDELMAN:  Your Honor, I think we prefer, it's

2     standard in these case, to do it this way, and we prefer not to

3     have it on our website.

4              THE COURT:  How about a reference over from your

5     website?  If people have questions and don't remember about the

6     special website, they will know to go to VEREIT.

7              (Defense counsel confer)

8              MR. EDELMAN:  Your Honor, as I understand it, the

9     derivative settlement will be posted on our website because

10    that is a settlement that pertains to our stockholders, whereas

11    many of the stockholders here are no longer stockholders of

12    VEREIT.  It is not standard to have a link on the website, to

13    my knowledge, and we would prefer not to have one.

14             THE COURT:  I think there should be a link.  These two

15    settlements are related.  They're working together.  And I

16    think people can't really make a decision as to one without

17    really considering the other.  So there should be a link.  And

18    I would order you to create a link so a person will find an

19    easy way to go to the place where this is all set out, all laid

20    out.

21             MR. EDELMAN:  I will confer with the client and we'll

22    see what we can do.

23             THE COURT:  Can you do it now?

24             MR. EDELMAN:  I think we're going to need to talk to

25    the website people, who aren't here.  But I understand the

1   Court's directive.

2           THE COURT:  I've given my preliminary approval, and

3   I'm hesitant to do so unless I know that there's a way that

4   people can find quite easily what they have to look for.

5           MR. EDELMAN:  I understand.

6           THE COURT:  OK.  So if it's a problem, let me know,

7   let's say by Tuesday next week?

8           MR. EDELMAN:  Yes, your Honor.

9           THE COURT:  Please, Ms. Wyman, go over the methods of

10  allocation and why different securities have different face

11  prices.  Do you want to have one of your colleagues do that?

12          MS. WYMAN:  Yes.  Actually, Mr. Rothman was going to

13  speak about those issues to you.

14          MR. ROTHMAN:  Your Honor, getting to your question as

15  to why different securities have different base prices, it's

16  all related to the amount of artificial inflation that was in

17  each of the securities as a result of the alleged

18  misstatements.  The expert we hired went through and tried to

19  determine the amount of inflation in each of those securities,

20  and then the plan allocation is designed to compensate people

21  for that inflation.  Most of it is based upon the price

22  declines following the revelation of the news on October 29th.

23  So when October 29th came and they disclosed that there were

24  accounting improprieties, the price of the stock dropped, and

25  the expert determined what portion of that price decline was

1    caused by the omissions and misrepresentations as opposed to

2    other market effects.

3          So, for example, with respect to the common stock, on

4    October 29th, the price dropped $2.38, and the expert

5    determined that about $2.32 of that was caused by the

6    revelation of the news of the accounting improprieties and the

7    other 6 cents were caused by market and sector factors

8    unrelated to the news.

9          And with respect to the other securities, he performed

10   a similar analysis, for the preferred stock as well as for the

11   notes.

12         THE COURT:  Wouldn't the price drop attributable to

13   the disclosure be the same?

14         MR. ROTHMAN:  No, because the different securities

15   reacted differently to that disclosure, and different

16   securities were inflated with respect to different amounts.

17   Securities aren't all equal.  Some of the notes trade

18   differently than the stock.

19         THE COURT:  So a bond would be affected less than a

20   common stock.

21         MR. ROTHMAN:  That's correct.  Or affected

22   differently, not always necessarily less.

23         THE COURT:  Yes.  OK.  Well said.

24         MR. ROTHMAN:  And the plan allocation follows both the

25   '33 Act and the '34 Act with respect to allocating and

1    determining a recognized loss for each of the securities.

2               THE COURT:  Is there a distinction made here between a

3    claim under the '33 Act and a claim under the '34 Act?

4               MR. ROTHMAN:  Yes.  There are distinctions made in the

5    plan.  However, if someone has both a '33 Act claim and a '34

6    Act claim arising from the same transaction and ARCP security,

7    they get the higher amount under the plan allocation.

8               THE COURT:  Why?

9               MR. ROTHMAN:  Because in most instances the person

10   with the '33 Act claim has a lower damage amount under the plan

11   allocation.  But that person also has a '34 Act claim.  If

12   there was a false statement made in a registration statement,

13   the purchaser has both a '33 Act claim resulting from that

14   false statement as well as a '34 Act claim resulting from that

15   statement.  They shouldn't be able to recover it twice, but

16   they should be able to pursue their '34 Act recovery, and not

17   their '33 Act recovery, which would give them less money.

18               THE COURT:  The '33 Act would give them less money?

19               MR. ROTHMAN:  In most instances it would give them

20   less money.

21               THE COURT:  Why?

22               MR. ROTHMAN:  Because the '33 Act caps damages at the

23   difference between the price paid up to the offering price

24   minus the price on the date suit was brought, which was October

25   30th.  The '34 Act, as your Honor mentioned earlier, the

JA3AAMEHps

1  damages are the price paid minus the price sold -- well, if

2  it's sold within 90 days of the corrective disclosure, it's the

3  average trading price in the period from the disclosure to the

4  date of sale.  If it's sold after or held after the 90 days,

5  you get the difference between the price paid and that 90-day

6  lookback price, which is the average price for that entire 90

7  days.  And that, in almost all, I think in almost every -- I

8  shouldn't say I think -- in every instance is greater than the

9  price on October 30th.  And when I say it's greater, the

10  difference between the price paid and the 90-day lookback price

11  is greater in every instance than the price paid in the October

12  30th price.  So people will recover more under their '34 Act

13  claim.

14          THE COURT:  OK.  All right.  Any other points under

15  Rule 23, Ms. Wyman?

16          MS. WYMAN:  There are a few other categories of

17  factors that you need to consider under the rule.

18          The next one is the terms of any proposed attorney's

19  fees and the timing of the payment of those fees.  And the

20  Court obviously has ultimate authority over the fees that are

21  paid in this case.  Before TIAA was appointed lead plaintiff,

22  they negotiated with my firm a fee schedule that is based on

23  tiers.  And that fee schedule was designed by them to optimize

24  the recovery that the class would get and align counsel's

25  interest in conjunction with the class.  And as we stated in

JA3AAMEHps

1    our brief, in the notice, we were going to ask to request a fee

2    not to exceed 13 percent of the settlement fund.

3              Also in the brief, also, we outlined the fact that we

4    were going to ask the Court to reimburse expenses not to exceed

5    $6 million, which is half of 1 percent of the settlement fund,

6    so we were very mindful in litigating this case to do a

7    diligent job but to keep the expenses in check, to the extent

8    that we could.

9              THE COURT:  You say somewhere in there that you will

10   be giving a detailed analysis to the Court of how much time you

11   put into the case and who put in the time, for what matters.

12             MS. WYMAN:  That's right.  When we file our motion

13   for --

14             THE COURT:  I know.  But it should clearly say that.

15             MS. WYMAN:  Yes, it does.  It says that the brief that

16   we will --

17             THE COURT:  You are asking for a lot of money, and I'm

18   mindful of how people react when a lot of money is awarded.  So

19   the proper criteria should be set out, in terms of measurement.

20   I have to look first at how much time you spent in the case.

21   And people should understand that you are getting compensated

22   for, what, five years of litigation?

23             MS. WYMAN:  Yes.

24             THE COURT:  And so many witnesses and so many experts

25   and so on, that the amount of expenses deals with having to pay

experts and other large tickets and the like.  Have in mind

that there's accountability and you want to look and want the

Court to look in a proper fashion with regard to the fee that's

awarded.

        I'm not making any promises.  I'm not saying anything.

But clearly the amount has to be a significant amount, and

people should understand why that's so.

        MS. WYMAN:  And when we do our final approval motion,

there will be a very --

        THE COURT:  This is the only notice that's going out

at this time.

        MS. WYMAN:  Yes.

        THE COURT:  OK.  Anything else under Rule 23?

        MS. WYMAN:  The last category under Rule 23(e) is

whether there are any side agreements.  We have talked about

the only one that there was.  It was a supplementary agreement

that your Honor has reviewed, and asked us to file under seal

and in redacted form on the ECF, which we will do just as soon

as possible.

        THE COURT:  And no others.

        MS. WYMAN:  And no others.

        THE COURT:  OK.  All right.  Before I give preliminary

approval, I have to understand the merits of the VEREIT

settlement as well.  So maybe I should do that now.

        MS. WYMAN:  Thank you, your Honor.

JA3AAMEHps

1          MR. HOUSTON:  Your Honor, Matt Houston of Glancy

2   Prongay & Murray on behalf of derivative plaintiffs.

3          Your Honor is also, as you have acknowledged, being

4   asked to approve the derivative settlement as part of the

5   global relief sought through these various settlements.

6          THE COURT:  I meant that.

7          MR. HOUSTON:  I'm sorry, your Honor?

8          THE COURT:  How many settlements are there here?

9          MR. HOUSTON:  There are two settlements.  There is the

10   class settlement, and the derivative settlement.

11          THE COURT:  You're going to explain the derivative

12   settlement.

13          MR. HOUSTON:  I am.  And the derivative settlement,

14   your Honor, is of course brought on behalf of the company,

15   VEREIT.  So the recovery that we achieved in our case is really

16   funds coming into VEREIT or for the benefit of VEREIT, which

17   makes it very different obviously than the class action, which

18   is for a group of shareholders of VEREIT for a particular

19   period of time.

20          With respect to the action that we have, our claims

21   are based on Maryland breach of fiduciary duty.  These are not

22   federal securities claims, but, rather, claims that VEREIT had

23   against individual defendants.  This is important because the

24   recovery that is being obtained, or for which our action is the

25   conduit, is bringing money from individual wrongdoers into

JA3AAMEHps

1    VEREIT.

2          The benefit here is, as your Honor has briefly

3    outlined, we would aggregate that number at $286,500,000.  That

4    is basically the total contribution of all of the non-VEREIT

5    settling defendants.  Our action was the one in which those

6    individuals said they would not agree to make any

7    individualized payments but for the release of the claims in

8    the derivative action, because of the fact they had liability

9    vis-a-vis the company.

10          The amount that's being brought into the company

11   through the derivative settlement is indeed part of the global

12   amount that is going to be used to satisfy the class action.

13   Your Honor had --

14          THE COURT:  Some of the $786 million that VEREIT is

15   coming in comes from people who are defendants in the

16   derivative suit.

17          MR. HOUSTON:  Not exactly, your Honor.  That 786 -- or

18   56 -- number is the amount that VEREIT is paying to satisfy the

19   class action.  Where the benefit of our action is with respect

20   to bringing in individual contributions is that it limited the

21   amount that VEREIT had to pay in the settlement.  Absent the

22   contribution by these individuals, VEREIT would have had to pay

23   more to satisfy the class action.  So one way to think about it

24   is, this is indeed a limiting factor on how much the company

25   has had to pay out, but does not necessarily pertain to the

JA3AAMEHps

756.

            The amounts that are being paid here, as I mentioned,
are amounts that are being paid with release of claims.  What
makes this an extraordinary settlement, your Honor, is that
these amounts are being paid directly by individual defendants,
as opposed to insurance proceeds under D&O policies.  As your
Honor is well aware, this case has been pending a long time, a
lot of proceedings.  The D&O insurance coverage in this case
was long ago extinguished.

            THE COURT:  In payments.

            MR. HOUSTON:  In payments, indemnity payments, in
payments of opt-out cases, in payouts by the company, or for
the benefit of the company.

            So it was very important that we were the mechanism or
conduit to say, OK, there is no more insurance, how do we get
more money in.  And the way we do that is from who we have
alleged are the wrongdoers.

            So the fact that the individual contributions coming
in of $286,000, which I'll tell the Court is unprecedented, we
don't see a contribution by personal individuals, in class or
derivative litigation, ever that large.  But because that money
is coming in, it's money that is a benefit to VEREIT because
they do not have to satisfy any more of the judgment, or
settlement, rather, that's being used to pay the class action.

            THE COURT:  Some of these, all of the defendants being

JA3AAMEHps

1    sued by VEREIT in the derivative suit are defendants in the

2    class action as well.

3         MR. HOUSTON:  Yes, they are.

4         THE COURT:  So they are paying out a certain amount of

5    money, and dividing that payout into the class action and into

6    the derivative action.  So I don't know that there would have

7    been a difference.

8         MR. HOUSTON:  There would have been a difference

9    because of the fact that, without it being a global settlement

10   of all claims, there wouldn't have been any payment by the

11   individuals.  That's stated in the stipulation.

12   Representations have been given to us that they would not have

13   settled.

14        THE COURT:  If there had not been a derivative action,

15   the amount of money paid by the defendants would perhaps have

16   been exactly the same, the settlement class action.

17        MR. HOUSTON:  It's entirely possibly, your Honor, but

18   there was a derivative settlement.

19        THE COURT:  I understand.  There had to be.  Otherwise

20   there could not be a settlement.  But in my mind it's hard to

21   figure out what exactly was the added value from the derivative

22   suit.

23        MR. HOUSTON:  In addition to the payment of the 286

24   million, which, again, the parties identified as, but for the

25   settlement of the derivative suit, they would not have made,

1     quote, any payment.

2            But setting that aside for the moment, we also secured

3     the benefit of additional agreements, which are, we've called

4     the springing agreement and the agreements between the various

5     parties.

6            The springing agreement, your Honor, is designed to

7     assure that VEREIT will get the benefit of the payment of these

8     individual contributions even if this settlement, approved by

9     this Court hopefully, but overturned on appeal, that money

10    would not have to be returned back to the individuals.  In fact

11    it would be a credit on a payment, but the same amount of money

12    would remain with VEREIT.  So in essence we've guaranteed that,

13    regardless of what happens to the ultimate resolution of this

14    derivative suit, the payment made by these individuals is

15    secured by VEREIT, obviously of a benefit to the company

16    itself.

17           THE COURT:  If there's a sufficient number of opt-outs

18    to pass a threshold and VEREIT opts not to settle, what happens

19    to your settlement?

20           MR. HOUSTON:  Then we would not have a settlement,

21    because the way that it's structured is, it's a mutually

22    approved --

23           THE COURT:  If the money comes in to VEREIT, only in

24    the context of my not giving them final approval or my approval

25    being overturned by the Court of Appeals?

1          MR. HOUSTON:  A slight variation on that, your Honor.

2     If your Honor does not give approval to either the class

3     settlement or the derivative settlement, there is no settlement

4     of either case.  If your Honor approves the settlement of both

5     cases but we then face someone who appeals our settlement,

6     takes it up to the Second Circuit, at that point, if it's

7     reversed, we would still -- that's where the springing

8     agreement kicks in -- we would still make sure the money

9     remains with the company.

10          Lastly, part of the settlement here is an agreement

11     for all non-VEREIT settling defendants to stand down on

12     counterclaims.  The one of particular interest here is Grant

13     Thornton.  The Grant Thornton counterclaim was one that, while

14     not made formally, was one that was certainly present in

15     everyone's mind during the discovery and the depositions of the

16     Grant Thornton personnel.  It is something that we believe

17     we've helped the company by not only guaranteeing --

18          THE COURT:  What was the counterclaim?

19          MR. HOUSTON:  There was no counterclaim filed.  What

20     we anticipated the counterclaim to be would be that, as the

21     independent auditors of ARCP, Grant Thornton would have taken

22     the position that they were the subject of misrepresentations

23     from VEREIT itself and VEREIT personnel, such that they would

24     therefore have a counterclaim back against them to the extent

25     that they have any liability in the case.

JA3AAMEHps

1              THE COURT:  In other words, if Grant Thornton was

2     liable in a class action, you were concerned that Grant

3     Thornton would allege that they were misled, contrary to the

4     representations made to Grant Thornton when Grant Thornton was

5     engaged.

6              MR. HOUSTON:  Yes, your Honor.  And this was something

7     that was very much an issue during discovery.  We heard, on

8     repeated occasions -- and I'm here not to carry Grant

9     Thornton's brief exactly on this -- but we heard on many

10    occasions that Grant Thornton also alleged, made the argument,

11    that AFFO is not a GAAP measure and therefore was not something

12    that they were required to opine upon.  So that would have also

13    further complicated matters.

14             As part of the derivative settlement, though, all of

15    the parties agreed to stand down on potential counterclaims,

16    which, again, is a benefit for VEREIT insofar as it provides

17    assurance about where and when the terms of the settlement will

18    be applicable.

19             The standards for requirement of preliminary approval

20    in a derivative action are not as specifically stated as it is

21    in 23(c).  23.1 does not say what standards the Court should

22    use to consider.  We nonetheless believe that the Court, at

23    this stage, for many of the reasons expressed by Ms. Wyman and

24    Mr. Rothman, we feel we meet the same standards.  We'll

25    obviously have to present those standards as well at final

JA3AAMEHps

1      approval.  But I'm happy to go through those factors as well.

2              THE COURT:  How did you get the number attributable to

3      the VEREIT settlement?

4              MR. HOUSTON:  The number that is attributable, the

5      286.5 million, is the 225 million made by AR defendants, the

6      12.5 million made by Mr. Block, and 49 million made by GT.  All

7      of those parties are what we've used in our papers and

8      settlement documents to refer to as the non-VEREIT settling

9      defendants.

10             THE COURT:  How did you come about the number?  How

11     did that get negotiated?

12             MR. HOUSTON:  That number was a subject of using our

13     derivative claims, going to defendants, saying, you need to

14     make them independent and individualized contributions to the

15     settlement.  We've made presentations as part of the mediation

16     and as part of direct settlement negotiations outlining

17     particular claims that the derivative plaintiffs had, and that

18     was the basis presumably for that final number.

19             THE COURT:  If I were to feel that the derivative

20     action did not contribute value to the overall settlement

21     because the amount that ultimately was recoverable by the

22     class, 1.025 billion would have been the same if there had been

23     a or had not been a derivative action, would I be off base?

24             MR. HOUSTON:  You would be off base because of what

25     the settlement documents say, which is that the parties, the

JA3AAMEHps

1   non-VEREIT settling defendants specifically acknowledge that,

2   but for the settlement of the derivative action, they would not

3   have made any contribution.  And that is plainly stated within

4   the settlement agreement.  Therefore I think you would be off

5   base, your Honor, because of the fact that the parties have

6   acknowledged it was part of the settlement.

7             THE COURT:  OK.  I hear.

8             MR. HOUSTON:  23.1 requires the Court to determine

9   that there's reasonable notice.  The notice plan that we have

10   proposed is one similar to most derivative actions currently

11   being approved these days, which is primarily publication on

12   the company website and a publication in *Investor's Business*

13   *Daily*.  The case here is a little different than the class case

14   insofar as there is no claim form and it's a notification of

15   current shareholders, or at least shareholders on the date of

16   the signed stipulation, September 27th, I believe, that it is

17   the necessary notice.  Obviously the party of greatest interest

18   here is VEREIT itself.  These derivative claims were brought on

19   behalf of VEREIT.  VEREIT plainly has notice of these claims.

20   Our notice program is designed to alert current shareholders of

21   VEREIT that this settlement has been preliminarily approved and

22   when the final hearing would be.

23             THE COURT:  Where will I find your notice?

24             MR. HOUSTON:  We have two notices.  We have a direct

25   long-form notice that is Exhibit A1.  So if you look at my

1   declaration, and behind that you'll see Exhibit 1, which is the

2   stipulation, and then Exhibit A1 to that stipulation is the

3   long-form notice, and then A2 is the summary publication

4   notice.

5          THE COURT:  OK.  Anything else?

6          I grant the preliminary approval to the derivative

7   settlement as well, on the basis of a properly broad case.  It

8   had to be resolved and it was resolved on terms that were

9   consistent with and perhaps additive to the benefit achieved in

10  the class action.  So through this overall settlement, VEREIT

11  is quit, assuming final approval, of a great burden of

12  litigation on the individual officers and former officers and

13  directors and present officers and directors of VEREIT and of

14  Grant Thornton and of others as well.  The settlement is fair

15  and reasonable, both settlements.  And I give preliminary

16  approval to both.

17         So I need to file a signed order, right, Ms. Wyman?

18         MS. WYMAN:  Yes, your Honor.  That's the case.  And a

19  number of deadlines get kicked off of that.

20         THE COURT:  All right.  So would you and my law clerk

21  get together on dates and fill those in, and I'll sign the

22  order of preliminary approval tomorrow.

23         MS. WYMAN:  All right.  Thank you, your Honor.

24         MR. HOUSTON:  Thank you.

25         THE COURT:  But I can't sign, actually, until I hear

JA3AAMEHps

 1    from Mr. Edelman.

 2              MR. EDELMAN:  Your Honor, you've heard from

 3    Mr. Edelman.  We will post the class notice.  We will find a

 4    way to link the class notice on our website.

 5              THE COURT:  Excellent.  OK.  So I'll sign tomorrow.

 6              MS. WYMAN:  Great.  Thank you very much, your Honor.

 7              THE COURT:  Thank you all.

 8              By the way, this is Henry Ross's next-to-last day.

 9              MR. EDELMAN:  Congratulations.  Thank you.

10              THE COURT:  He's a very valuable person.

11              Brittany Sykes will assume responsibility on Monday.

12              THE LAW CLERK:  Thank you, Judge.

13              (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25