UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ———————————————— x | | |
| In re AMERICAN REALTY CAPITAL PROPERTIES, INC. LITIGATION | : : : | Civil Action No. 1:15-mc-00040-AKH |
| ———————————————— | : | CLASS ACTION |
| This Document Relates To: | : : | |
| CLASS ACTION. | : : | |
| ———————————————— x | | |


DECLARATION OF DEBRA J. WYMAN IN SUPPORT OF: (1) LEAD PLAINTIFF'S
MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION,
AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS'
FEES AND EXPENSES

**TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

I.  PRELIMINARY STATEMENT ...................................................................................1

II.  FACTUAL SUMMARY OF LEAD PLAINTIFF'S CLAIMS ...................................5

III.  RELEVANT PROCEDURAL HISTORY ...................................................................6

    A.  Commencement of the Litigation ...................................................................6

    B.  Lead Plaintiff and Lead Counsel's Investigation and the Class Action
        Complaint ........................................................................................................7

    C.  Defendants' First Round of 15 Motions to Dismiss .....................................10

        1.  Defendants' Motions to Dismiss.........................................................10

        2.  Lead Plaintiff's Omnibus Opposition to Motions to Dismiss...................15

        3.  Defendants' Replies in Further Support of Their Motions to
            Dismiss................................................................................................17

        4.  Resolution of the First Round of Motions to Dismiss ...............................17

    D.  The Second Amended Complaint ...................................................................18

    E.  Defendants' Second Round of Motions to Dismiss and Subsequent
        Related Events ...............................................................................................19

        1.  Defendants' Motions to Dismiss.........................................................19

        2.  Lead Plaintiff's Opposition to Defendants' Motions to Dismiss...............21

        3.  Defendants' Replies in Further Support of Their Motions to
            Dismiss................................................................................................22

        4.  RCS Capital Corporation and RCS Securities Bankruptcy
            Proceedings .........................................................................................22

        5.  Resolution of Defendants' Second Round of Motions to Dismiss ...........24

    F.  Third Amended Complaint .............................................................................26

    G.  RCS's Rule 12(c) Motion to Dismiss ............................................................27

    H.  Class Certification and Related Issues ...........................................................29

<div align="center">

- i -

</div>

**Page**

|  |  |  |  |
|---|---|---|---|
| 1. | Class Certification Briefing | ...................................................... | 29 |
| 2. | Grant Thornton's Motion for Summary Judgment on Standing | | 35 |
| 3. | Resolution of Class Certification and Grant Thornton's Motion for Summary Judgment on Standing | | 35 |
| 4. | Defendants' Petitions Pursuant to Rule 23(f) | ............................ | 37 |

I.  Fact Discovery ........................................................................................... 39

1. Written Discovery ...................................................................... 40

2. Depositions ................................................................................. 40

3. Third-Party Discovery ................................................................ 43

4. Defendants' Discovery to Named Plaintiffs ............................... 46

5. Discovery Disputes with Defendants .......................................... 47

     a. Disputes over Provisions in the Protective Order ........................... 47

     b. Disputes over the Scope of the Parties' Document Productions ...................................................................... 48

     c. Disputes Regarding Defendants' Privilege Logs ........................... 49

     d. Disputes Regarding ARCP's Internal Investigation Materials ...................................................................... 54

     e. Disputes over Discovery of the Affirmative Defense of Reliance on Counsel ................................................... 56

     f. Disputes over Deposition Conduct ................................. 57

     g. Disputes over Additional Grant Thornton Witness Depositions ................................................................ 58

     h. Disputes over Block's Requested Adjournment of His Deposition ................................................................ 59

     i. Dispute over the Deposition of Casson A. Wilson IV ................................................................ 59

J.  Summary Judgment ............................................................... 61

**Page**

1.      Defendants' Motions for Summary Judgment and Motion to De-
        Certify the Class ..................................................................................61

2.      Lead Plaintiff's Oppositions to Defendants' Motions for Summary
        Judgment ................................................................................................70

3.      Lead Plaintiff's Motion to Preclude ....................................................77

4.      Defendants' Replies in Support of their Motions for Summary
        Judgment and Motion to De-Certify the Class ............................79

5.      Lead Plaintiff's Motion for Partial Summary Judgment...........................82

6.      Summary Judgment Hearing, Decision, and Subsequent Related
        Events ....................................................................................................84

K.      Expert Discovery ..............................................................................................87

1.      Lead Plaintiff's Experts ......................................................................87

        a.      In-House Forensic Accounting Experts ........................................87

        b.      Steven P. Feinstein, Ph.D., CFA ....................................................91

        c.      John E. Barron, CPA, CFE ..............................................................93

        d.      William H. Purcell ...........................................................................94

        e.      Harvey L. Pitt ...................................................................................96

2.      Expert Depositions ..............................................................................97

L.      Pre-Trial Preparation .......................................................................................99

1.      Class Notice ..........................................................................................99

2.      Modification of the Trial Date ...........................................................101

3.      Witness and Exhibit Lists ..................................................................101

4.      Motions *in Limine* ...............................................................................102

        a.      Lead Plaintiff's Motions *in Limine* ..............................................103

        b.      Defendants' Motions *in Limine* and Summary Judgment............114

**Page**

|     |     | 5. | *Daubert* Motions | 143 |
|     |     |     | a. Lead Plaintiff's *Daubert* Motions | 143 |
|     |     |     | b. Defendants' *Daubert* Motions | 153 |
|     |     | 6. | Defendants' Motion for Summary Judgment on Tracing | 161 |

IV.  THE SETTLEMENT ............................................................................162

A.  Settlement Negotiations ...........................................................162

B.  Preliminary Approval Order .....................................................164

C.  Notice to the Class Meets the Requirements of Due Process and Rule 23 ..........165

D.  The Plan of Allocation .............................................................167

E.  The Range of Reasonableness of the Proposed Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation ...........................168

F.  Questions of Law and Fact Added Risks and Uncertainty .................................171

G.  Lead Counsel's Request for Attorneys' Fees and Expenses Is Reasonable ........179

V.  CONCLUSION.................................................................................181

4835-9551-9916.v18

I, DEBRA J. WYMAN, declare as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of California, and I have been admitted *pro hac vice* in this action.  I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), and counsel for Teachers Insurance and Annuity Association of America, College Retirement Equities Fund, TIAA-CREF Equity Index Fund, TIAA-CREF Real Estate Securities Fund, TIAA-CREF Large Cap Value Index Fund, TIAA-CREF Small Cap Blend Index Fund, TIAA-CREF Life Real Estate Securities Fund, TIAA-CREF Life Equity Index Fund, and TIAA-CREF Bond Index Fund (collectively, "TIAA" or "Lead Plaintiff").[1]  I have been actively involved in the prosecution and settlement of this action and am familiar with its proceedings (the "Litigation").  I have personal knowledge of the majority of the matters set forth herein based upon my active supervision of and participation in all material aspects of this Litigation.  As to the remaining matters, I have reviewed our litigation files and consulted with other attorneys who worked on this case and our support staff.  I could and would testify completely to the matters set forth herein if called upon to do so.

2.      I submit this declaration in support of Lead Plaintiff's motion for approval of: (a) the $1,025,000,000 settlement in cash on behalf of the Class (the "Settlement"); (b) the proposed Plan of Allocation; and (c) Lead Counsel's application for an award of attorneys' fees and expenses.

## I.      PRELIMINARY STATEMENT

3.      The $1,025,000,000 proposed Settlement in this action – among the top 15 largest recovery ever under the Private Securities Litigation Reform Act of 1995 ("PSLRA") – is the culmination of almost five years of tireless, hard-fought litigation.  Lead Plaintiff zealously

---

[1]   Unless otherwise noted, all capitalized terms have the same definitions as set forth in the Stipulation of Settlement dated September 30, 2019 (ECF No. 1272).

prosecuted its claims at every stage of the Litigation, and successfully defended the majority of its

claims against Defendants' repeated dismissal attempts.  The proposed Settlement was achieved only

after Lead Plaintiff, *inter alia*:

> (i) opposed and largely defeated Defendants' two rounds of motions to dismiss the complaint, responding to 25 separate briefs submitted by Defendants;

> (ii) obtained class certification after a full-day evidentiary hearing and withstood Defendants' Federal Rule of Civil Procedure 23(f) petitions;

> (iii) conducted extensive discovery, which included a review and analysis of over 12 million pages of documents produced by Defendants and third parties;

> (iv) defended or participated in 12 depositions of TIAA and other class representatives relating to class certification, as well as the parties' expert witnesses on market efficiency issues;

> (v) took 40 depositions of fact witnesses – many of which spanned multiple days;

> (vi) responded to discovery propounded by Defendants, including document requests and deposition notices;

> (vii) filed several complex discovery-related motions relating to claims of attorney-client privilege;

> (viii) opposed and largely defeated Defendants' 12 separate motions for summary judgment and motion to de-certify the class, and obtained partial summary judgment against certain Defendants;

> (ix) completed expert discovery, which included working with Lead Plaintiff's four experts as they drafted and finalized their reports, along with the taking or defending the depositions of the parties' 21 experts;

> (x) drafted 12 motions *in limine* and opposed Defendants' 32 motions *in limine* and motion for severance;

> (xi) drafted eight *Daubert* motions to exclude certain of defendants' experts and opposed Defendants' eight *Daubert* motions against Lead Plaintiff's experts; and

> (xii) meticulously prepared for trial, including the selection of over 600 exhibits, identifying Lead Plaintiff's final witness list, designating deposition testimony, and building trial witness files.

4.      Notably, Lead Plaintiff achieved these results against a dozen of the most well-

respected firms in the defense bar, including: Milbank LLP; Kellogg, Hansen, Todd, Figel &

Frederick, PLLC; Sidley Austin LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Steptoe & Johnson LLP; Zuckerman Spaeder LLP; Kirkland & Ellis LLP; Petrillo Klein & Boxer LLP; Weil, Gotshal & Manges LLP; Morris, Manning & Martin, LLP; Shearman & Sterling; and Winget Spadafora & Schwartzberg, LLP.

5.     As discussed in further detail below in §IV.E., Lead Plaintiff faced substantial risks in continuing the Litigation.  In opting to settle, Lead Plaintiff and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

6.     The proposed Settlement is the product of the litigation efforts summarized in ¶3 above, together with extensive arm's-length negotiations conducted over several years, including multiple mediation sessions facilitated by the Honorable Layn R. Phillips (Ret.), one of the nation's foremost mediators.  These negotiations were conducted by experienced counsel with a firm and full understanding of the respective case.  The substantial discovery, motion practice, and trial preparation outlined herein informed Lead Plaintiff not only of the case's many strengths, but also of potential weaknesses that had to be considered in determining the best course of action for the Class. The $1,025,000,000 proposed Settlement is extraordinary, particularly given that it represents approximately 50% of the Class's estimated maximum recoverable damages.  The proposed Settlement is also extraordinary because $237.5 million of the Settlement Fund is being paid by American Realty Capital Properties, Inc. ("ARCP" or the "Company") former Chief Executive Officer ("CEO"), Nicholas Schorsch (and the partnership he controls), and ARCP's former Chief Financial Officer ("CFO"), Brian Block.  These contributions are the largest payments made by a former officer or director defendant in any securities class action settlement that Lead Counsel is aware of.  Additionally, the proposed Settlement also includes a $49 million contribution by ARCP's former outside auditor Grant Thornton LLP.

7.      Lead Counsel prosecuted the Litigation on a wholly contingent basis and has advanced or incurred substantial litigation expense.  By doing so, Lead Counsel shouldered the substantial risk of an unfavorable result.  Lead Counsel has not yet received any compensation for its effort.  In consideration of the extensive efforts on behalf of the Class, Lead Counsel is applying for a fee award equal to 12.4% of the recovery pursuant to an *ex ante*, graduated fee structure negotiated by the Lead Plaintiff at the outset of the case.  The fee application of 12.4% is fair to the Class and warrants the Court's approval.  The fee negotiated here is within the range of fees awarded in large PSLRA securities class action settlements, and is fully justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal service preformed.

8.      Lead Counsel also seeks payment of $5,164,539.91 in expenses, costs, and charges reasonably and necessarily committed to the prosecution of the Litigation over the last five years.  These expenses include: (i) the substantial fees and expenses of experts and consultants whose services were required for the successful prosecution and resolution of this case; (ii) the costs associated with conducting or defending fact and expert witness depositions, which included court reporter and videographer fees and travel expenses; (iii) photocopying, imaging, shipping, and managing a database of more than 13 million pages of documents; (iv) online factual and legal research; and (v) mediation expenses.  As will be seen from the discussion of the efforts undertaken by Lead Counsel to achieve this proposed Settlement, these expenses were reasonable and necessary to obtain the successful result.

9.      The following is a summary of the principal events which occurred during the course of the Litigation and the legal services provided by Lead Counsel.

## II.      FACTUAL SUMMARY OF LEAD PLAINTIFF'S CLAIMS

10.      On October 29, 2014, ARCP announced that the Company had falsified its financial statements for Q1 2014 and Q2 2014, and that its previously reported fiscal year ("FY") 2013 financial results, and its financial results for Q1 2014 and Q2 2014 "should no longer be relied upon."  ARCP disclosed errors in the calculation of the metric used to measure the Company's operating performance, Adjusted Funds From Operations ("AFFO"), and that these errors were intentionally made and not corrected for the three and six months periods ended June 30, 2014. ARCP also revealed that it was "reevaluating its internal control over financial reporting and its disclosure controls and procedures."  Additionally, ARCP announced the resignation of its CFO, Block, and Chief Accounting Officer ("CAO"), Lisa McAlister.

11.      In response to this news, the price of ARCP's securities fell precipitously.  Indeed, on October 29, 2014, investors saw ARCP's common stock decline by $2.00 per share to close at $10 per share.

12.      Lead Plaintiff brought claims pursuant to §§11 and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging, among other things, that ARCP's 2012, 2013, and 2014 year-end financial statements were materially misstated.  Specifically, Lead Plaintiff alleged that ARCP reported inflated Funds From Operations ("FFO") and AFFO by misrepresenting the way it calculated its AFFO.  Lead Plaintiff also alleged that ARCP violated Generally Accepted Accounting Principles ("GAAP") in various ways in an effort to inappropriately increase certain line items that were used to calculate FFO and AFFO in order to increase the FFO and AFFO reported to investors.  Lead Plaintiff further alleged the pervasive material weaknesses in ARCP's internal financial controls permitted the GAAP violations to occur, and the inflated FFO and AFFO to be reported.  Lead

- 5 -

Plaintiff also alleged that the false and misleading financial statements, and AFFO reported to the market, allowed ARCP to complete two mergers, and several offerings of debt and equity securities.

13.     Lead Plaintiff asserted that Defendants' allegedly false and misleading statements caused ARCP's securities prices to be artificially inflated during the Class Period, and when the truth was disclosed to the market, the price of ARCP's securities collapsed, causing ARCP investors to suffer damages.

## III.     RELEVANT PROCEDURAL HISTORY

### A.     Commencement of the Litigation

14.     Beginning on October 30, 2014, a number of class action complaints were filed against ARCP, David Kay, Schorsch, Block, and McAlister in the United States District Court for the Southern District of New York:

| Case Name | Case No. | Date Filed |
|---|---|---|
| *Perry Ciraulu v. v. American Realty Capital Properties, Inc., et al.* | 14-cv-8659 | 10/30/14 |
| *Bernard Priever v. American Realty Capital Properties, Inc., et al.* | 14-cv-8668 | 10/30/14 |
| *Stuart Rubinstein v. American Realty Capital Properties, Inc., et al.* | 14-cv-8669 | 10/30/14 |
| *Kevin Patton v. American Realty Capital Properties, Inc., et al.,* | 14-cv-8671 | 10/30/14 |
| *James Edwards Jr. v. American Realty Capital Properties, Inc., et al.* | 14-cv-8721 | 10/31/14 |
| *Berney Harris v. American Realty Capital Properties, Inc., et al.* | 14-cv-8740 | 11/3/14 |
| *Simon Abadi v. American Realty Capital Properties, Inc., et al.* | 14-cv-9006 | 11/12/14 |
| *The City of Tampa General Employees Retirement Fund v. American Realty Capital Properties, Inc., et al.* | 14-cv-10134 | 12/29/14 |
| *Gary Wunsch v. American Realty Capital Properties, Inc., et al.* | 15-cv-02934 | Filed 11/25/14 in Maryland Circuit Court, Baltimore County; transferred to S.D.N.Y. on 4/14/15 |

- 6 -

15.     On December 29, 2014, 15 parties, including TIAA, sought appointment as lead plaintiff.  On January 5, 2015, the Court ordered that the movants attempt to form a working group with Robbins Geller named as Lead Counsel.  The Court further ordered any lead plaintiff movant to file a complaint by January 20, 2015, if they wished to continue vying for appointment as lead plaintiff.  Case No. 14-cv-8659, ECF Nos. 68, 78.

**B.     Lead Plaintiff and Lead Counsel's Investigation and the Class Action Complaint**

16.     Following the Court's January 5, 2015 directive, Lead Counsel took the lead and coordinated with nine of the other lead plaintiff movants to form a working group.  TIAA and Lead Counsel performed a thorough factual investigation in drafting a consolidated complaint.  This investigation included, among other things: researching the real estate investment trust industry and the use of AFFO as a measure of operating performance; researching ARCP's corporate structure and related companies under the control of Schorsch; researching Defendants' public statements about ARCP, including statements made in conference calls, investor presentations, published interviews, news articles, and other media reports, documents filed with the U.S. Securities and Exchange Commission ("SEC"), and press releases; reviewing reports from securities analysts and investor advisory services;  reviewing the sworn allegations in *McAlister v. American Realty Capital Properties, Inc., et al*., Index No. 162499/2014 (N.Y. Sup. Ct., N.Y. Cty.); interviewing former ARCP employees; reviewing and analyzing the price of ARCP's securities, the securities of ARCP's peers, and changes in Nasdaq and other exchanges; and preparing a preliminary estimate of damages.

17.     Fifteen days after the Court ordered the parties to file a complaint, on January 20, 2015, TIAA together with other named plaintiffs, filed a 131-page Class Action Complaint for Violations of the Federal Securities Laws.  Case No. 15-cv-0421, ECF No. 1 (the "Class Action

- 7 -

Complaint"). The Class Action Complaint included claims for violations of §§11, 12(a)(2), and 15 of the Securities Act and §§10(b), 14(a), 20(a) of the Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder.

18.    The Class Action Complaint named dozens of defendants: (i) the entity defendants: ARCP, ARC Properties Operating Partnership L.P. ("ARC Properties"), American Realty Capital Trust IV, Inc., AR Capital LLC, RCS Capital Corporation, RCS Capital, LLC, and Cole Real Estate Investments, Inc.; (ii) the ARCP management defendants: Schorsch, Kay, Block, Edward M. Weil, Peter M. Budko, Brian D. Jones, McAlister, and Lisa Beeson; (iii) the ARCP director defendants: William Kahane, Leslie D. Michelson, William G. Stanley, Edward G. Rendell, Scott J. Bowman, Thomas A. Andruskevich, Scott P. Sealy, Sr., and Bruce D. Frank; (iv) the AR Capital defendant: Nicholas Radesca; (v) the ARCT IV defendants: Abby M. Wenzel and Elizabeth K. Tuppeny; (vi) the Cole defendants: Christopher H. Cole, Marc T. Nemer, Jeffrey C. Holland, Stephan Keller, D. Kirk McAllaster, Jr., and Leonard W. Wood; (vii) ARCP's external auditor Grant Thornton; and (viii) the Underwriter Defendants.[2]

19.    The Class Action Complaint asserted claims on behalf of those who purchased or otherwise acquired ARCP securities, including ARCP common stock, preferred stock, and debt securities, as well as those who traded option contracts on ARCP stock between May 6, 2013 and October 29, 2014.

---

[2]    J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Barclays Capital Inc., BMO Capital Markets Corp., KeyBanc Capital Markets Inc., JMP Securities LLC, Ladenburg Thalmann & Co. Inc., Realty Capital Securities, LLC, Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, Wells Fargo Securities, LLC, Capital One Securities, Inc., Merrill, Lynch, Pierce, Fenner & Smith, Inc., Deutsche Bank Securities Inc., Wells Fargo, Robert W. Baird & Co., Janney Montgomery Scott, LLC, Mizuho Securities USA Inc., PNC Capital Markets LLC, Piper Jaffray & Co., and RBS Securities Inc.

20.     On January 20, 2015, the State Teachers Retirement System of Ohio filed a separate 94-page complaint.  Case No. 14-cv-8659, ECF No. 85 (the "STRS Ohio Complaint").  The STRS Ohio Complaint asserted claims against 12 defendants[3] for violations of §§10(b) and 20 under the Exchange Act.  In connection with the Cole Merger, the STRS Ohio Complaint also asserted violations of §§14 and 20(a) of the Exchange Act and §§11, 12(a)(2), and 15 of the Securities Act.

21.     On February 3, 2015, the New York City Funds withdrew their motion seeking appointment as lead plaintiff and became a part of Lead Counsel's working group, leaving the State Teachers Retirement System of Ohio as the only competing lead plaintiff movant.  Case No. 15-cv-00422, ECF No. 10.  On February 5, 2015, the State Teachers Retirement System of Ohio submitted a letter to the Court, confirming that it was still seeking a position on the plaintiffs' committee as the "only independent voice seeking to represent the shareholders of Cole Real Estate Investments Inc." in connection with the Cole Merger.  Case No. 14-cv-8659, ECF No. 98.

22.     On April 17, 2015, Lead Plaintiff filed the 177-page Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 30) (the "Amended Complaint").  The Amended Complaint added American Realty Capital Trust III, Inc. and ARC Properties Advisors LLC ("ARC Advisors") as entity defendants and David M. Gong as a director defendant.  The Amended Complaint incorporated information learned from ARCP's March 2, 2015 amended filings with the SEC setting forth the restatement of ARCP's 2012 and 2013 financial statements and its Q1 2014-Q2 2014 financial statements, as well as restatement of the AFFO reported in each of those periods.  Lead Counsel spent hundreds of hours reviewing and analyzing the new information that ARCP filed with the SEC.

---

[3]     These defendants included ARCP, Schorsch, Block, Kay, McAlister, Budko, Beeson, Kahane, Weil, Michelson, Rendell, and Bowman.

23.     Specifically, ARCP's March 2, 2015 filings confirmed ARCP's numerous and varied GAAP violations and financial reporting improprieties necessitating the restatement of ARCP's financial statements, and AFFO (the "Restatement").  The Restatement confirmed that defendants used a variety of accounting practices during the Class Period to falsify ARCP's financial results, including: (i) the understatement of expenses; (ii) payment of equity awards for executives on terms more favorable than authorized by ARCP's Board of Directors (the "Board"); (iii) misclassification of expenses; and (iv) improper accounting for loss on disposal and goodwill, all of which ARCP's deficient internal controls failed to prevent or detect.

**C.     Defendants' First Round of 15 Motions to Dismiss**

**1.     Defendants' Motions to Dismiss**

24.     On May 29, 2015, Defendants filed 14 separate motions to dismiss and a joinder. ECF Nos. 69, 71, 73, 76, 81, 84, 87, 90, 92, 95, 98, 100, 102, 113, 114.  In a 35-page memorandum in support of their motion to dismiss (ECF No. 99), ARCP, ARC Properties, American Realty Capital Trust III, Inc., American Realty Capital Trust IV, Inc., and Cole Real Estate Investments conceded that Lead Plaintiff's claims could proceed as to misstatements relating to ARCP's Q1 and Q2 2014 AFFO and Q2 2014 net loss misstatement but argued that Lead Plaintiff had failed to

   (i) adequately allege loss causation as to alleged misstatements revealed from the Restatement, as ARCP's stock price increased in response;

   (ii) adequately plead scienter as to any misstatements other than the AFFO misstatements for Q1 and Q2 2014;

   (iii) adequately allege that defendants spoke with "actual knowledge" of the falsity of forward-looking statements made in 2011, 2012, or 2013, each of which were also accompanied by meaningful cautionary language, thereby warranting protection under the PSLRA Safe Harbor; and

   (iv) adequately allege "control person" claims under §§15 and 20(a) that pre-date ARCP's Q1 2014 Form 10-Q filing because Lead Plaintiff failed to plead a primary violation and further failed to allege facts of culpable participation.

- 10 -

25.     AR Capital, ARC Advisors, Weil, Budko, Jones, Kahane, Bowman, Gong, and Radesca addressed Lead Plaintiff's §§11, 12(a)(2), 15, 14(a) and 20(a) claims in their 28-page memorandum in support of their motion to dismiss.  Weil, Budko, Jones, Kahane, and Bowman argued that the §11 claims should be dismissed for Lead Plaintiff's failure to plead falsity with particularity.  ECF No. 88 at 26-27.  In response to Lead Plaintiff's §12(a)(2) claims, defendants argued that the September 2014 Offering was not a public offering because it was part of an "Exxon Capital Exchange" and did not give rise to a §12(a)(2) claim; that Lead Plaintiff had failed to adequately allege any specific purchases in four additional offerings and thus had no standing to pursue §11 claims for those transactions; and that Lead Plaintiff failed to adequately allege that Weil, Budko, Jones, Kahane, and Bowman were statutory sellers in any of the offerings.  *Id.* at 4-12. Defendants also argued that Lead Plaintiff's §15 control person claim should be dismissed due to a failure to allege either culpable participation or control of ARCP by any of those defendants.  *Id.* at 12-16.  In connection with the §14(a) claims, Radesca contended that he did not solicit a proxy or permit the use of his name to solicit a proxy, as required under the statute; AR Capital, Weil, Kahane, Budko, Bowman, Gong, and Radesca argued that Lead Plaintiff failed to adequately allege the requisite fraudulent intent; and Kahane, Budko, Bowman, Gong, and Radesca asserted that Lead Plaintiff failed to allege that any of them acted with negligence.  *Id.* at 16-21.  AR Capital, ARC Advisors, Weil, Budko, Kahane, Bowman, and Gong also argued that the §20(a) claims should be dismissed against them in their entirety for two reasons: first, because there was no primary violation of §10(b) prior to the Q1 2014 Form 10-Q filing, and second, subsequent to that filing there was no evidence of control of ARCP, nor evidence of culpable participation in any alleged wrongful conduct upon which the primary violation was premised.  *Id.* at 21-26.

26.     Grant Thornton moved to dismiss the §11 claims against it in a 26-page memorandum, arguing that Lead Plaintiff had failed to adequately allege that Grant Thornton's 2012 and 2013 audit opinions were subjectively false, or omitted material facts about the basis for its opinions, under the standard set forth in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).  Grant Thornton also argued that its "certification" of ARCP's financial statements was not sufficient to establish liability under §11.  Finally, Grant Thornton offered a negative causation defense, contending that the October 29, 2014 disclosure did not reveal any falsity in connection with the 2012 and 2013 financial statements that Grant Thornton audited and could not have caused the drop in ARCP's securities as Lead Plaintiff claimed.  ECF No. 96.

27.     Schorsch submitted a two-page memorandum in support of his motion to dismiss, joining in ARCP's arguments regarding loss causation, scienter, and forward-looking statements; AR Capital, *et al.*'s argument regarding §12(a)(2) "statutory seller" allegations; and RCS, *et al.*'s argument regarding the failure of Lead Plaintiff to plead with particularity its §§11, 12(a)(2), and 14(a) claims.  ECF No. 115.

28.     Similarly, Block moved to dismiss and joined in the arguments set forth by ARCP regarding §10(b) and control person liability claims for pre-Q1 2014 conduct or errors not disclosed on October 29, 2014; and §14(a) claims due to Lead Plaintiff's failure to allege scienter, culpable participation, and/or loss causation.  Block further argued that claims based on forward-looking statements made prior to 2014 should be dismissed and also echoed his co-defendants' arguments for dismissal of Lead Plaintiff's §12(a)(2) claims based on lack of standing.  ECF No. 101.

29.     Kay moved to dismiss the claims against him in a ten-page memorandum, contending that Lead Plaintiff had failed to adequately plead his scienter, arguing that most of the allegations

- 12 -

were derived from McAlister's withdrawn defamation complaint.  He also argued that Lead Plaintiff failed to establish his culpable participation under §20(a).  ECF No. 72.

30.      Beeson moved to dismiss the claims against her in a nine-page memorandum, arguing that Lead Plaintiff had not adequately alleged her scienter and joined in certain of the arguments set forth by ARCP, AR Capital, Cole Real Estate Investments, Kay, and RCS.  ECF No. 77.

31.      McAlister joined in certain of the arguments set forth by ARCP, *et al.* and AR Capital, *et al.* in their motions to dismiss.  ECF No. 82.

32.      Andruskevich, Frank, Michelson, Rendell, and Stanley (the "Non-Management Directors") moved to dismiss in a 14-page memorandum, arguing: Lead Plaintiff's §§11 and 12(a)(2) claims had failed to satisfy the heightened pleading standard for claims sounding in fraud; Lead Plaintiff failed to adequately allege that the Non-Management Directors were "statutory sellers" under §12(a)(2); Lead Plaintiff failed to adequately allege that the Non-Management Directors had acted negligently; and that Lead Plaintiff's §§15 and 20(a) claims failed because there were no adequate allegations of control or culpable participation.  ECF No. 91.

33.      Sealy and Wood submitted a separate 11-page memorandum in support of their motion to dismiss, arguing that a settlement in *Polage, et al. v. Cole*, Consol. C.A. No. 24-C-13-0066, Circuit Court for Baltimore City of Maryland ("*Polage*") had released any claims against them for violations of §14(a) and that any remaining claims against Sealy failed due to the conclusory nature of the allegations.  ECF No. 70.  Cole, Nemer, Holland, Keller, and McAllaster moved to dismiss, submitting a 23-page memorandum arguing that: the *Polage* stipulation released the §14(a) claims against them; Holland, Keller, and McAllaster did not solicit any proxies as required by §14(a); Lead Plaintiff failed to adequately allege that Cole, Nemer, Holland, Keller, and McAllaster

- 13 -

acted negligently; and the §10(b) claim against Nemer failed because Lead Plaintiff failed to adequately allege scienter or allege that Nemer's puffery statements were false.  ECF No. 93.

34.     Tuppeny moved to dismiss the §14(a) claim brought against her, arguing in a 17-page memorandum that Lead Plaintiff lacked standing to bring this claim;  Lead Plaintiff failed to plausibly allege that Tuppeny believed any statements of opinion or belief in the ARCT IV merger proxy were false; Lead Plaintiff failed to plead Tuppeny's scienter or negligence in connection with any alleged misstatement of fact; and any forward-looking statements made by her were protected by the PSLRA's Safe Harbor provision.  ECF No. 85.  Wenzel set forth similar arguments in moving to dismiss, submitting a 16-page memorandum.  ECF No. 75.

35.     RCS Capital Corporation, RCAP Holdings, LLC, and Realty Capital Securities, LLC ("RCS Securities") moved to dismiss, arguing in their 24-page memorandum that the control person claims pursuant to §§15 and 20(a) should be dismissed for failure to adequately allege control and culpable participation.  RCS Securities further argued that Lead Plaintiff's §§11 and 12(a) claims sounded in fraud and must therefore satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirements, which Lead Plaintiff failed to do.  RCS Securities additionally argued that Lead Plaintiff lacked standing to bring a §12(a)(2) claim.  ECF No. 104.  The Underwriter Defendants submitted a separate seven-page joinder, joining in certain of the arguments raised by the other defendants.  Specifically, the Underwriter Defendants argued that because Lead Plaintiff's Securities Act claims sounded in fraud, its allegations failed to satisfy the particularity requirement of Rule 9(b); Lead Plaintiff lacked standing to bring §12(a)(2) claims; forward-looking statements were protected under the PSLRA Safe Harbor; and any alleged misrepresentations that constituted opinions were not actionable under the *Omnicare* standard.  ECF No. 113.

### 2.   Lead Plaintiff's Omnibus Opposition to Motions to Dismiss

36.     On July 17, 2015, Lead Plaintiff filed a 144-page omnibus opposition to Defendants' 15 motions to dismiss, citing over 200 cases in support of its position.  ECF No. 133.  Lead Counsel expended substantial time reviewing and analyzing Defendants' 223 pages of memoranda filed in support of their motions to dismiss, including researching, analyzing, and distinguishing many of the 241 cases cited by Defendants.  In opposing Defendants' motions to dismiss, Lead Counsel thoroughly addressed all of the arguments presented by Defendants, providing ample case law rejecting Defendants' arguments.

37.     In opposing Defendants' motion to dismiss arguments concerning scienter under §10(b), Lead Plaintiff argued that its reliance on McAlister's defamation complaint was appropriate given that she had verified her complaint.  Lead Plaintiff also contended that it had adequately alleged Defendants' motive and opportunity to commit fraud based upon allegations that: (i) Schorsch and Block funneled $917 million in "fees and commissions" to related parties they controlled and financially benefitted from those payments; (ii) Schorsch and Block manipulated their compensation pool and arbitrarily increased it by $100 million; and (iii) McAlister was given a bonus, raise, and promotion after not correcting ARCP's false financial reports.  Lead Plaintiff argued it also sufficiently alleged Defendants' recklessness and/or conscious misconduct based on the allegations in McAlister's complaint, ARCP's Restatement (which admitted financial manipulations of the Company's most important metric, AFFO, and a lack of internal financial controls), and the resignations of Schorsch, Block, McAlister, and Kay.  Lead Plaintiff also argued against ARCP, ARC Properties, Beeson, and Kay's additional scienter arguments.  *Id*. at 15-41.

38.     Lead Plaintiff addressed Defendants' loss causation arguments, identifying multiple broad-ranging disclosures indicating that the October 29, 2014 disclosures were not limited to

ARCP's AFFO, contrary to Defendants' assertions. *Id*. at 46-47. Indeed, Lead Plaintiff argued that the October 29, 2014 disclosure was not as narrowly focused as Defendants contended but rather had revealed that the Company's previously reported FY 2013, Q1 2014 and Q2 2014 financial statements, earnings releases, and other financial communications from those periods – including FY 2012 financial results and AFFO – "'should no longer be relied upon.'" *Id*. at 42-43.

39.     In connection with its §§11, 12(a)(2), and 15 claims, Lead Plaintiff argued that because its Securities Act claims did not sound in fraud, the pleading requirements of Federal Rule of Civil Procedure 8(a)(2) applied, not those of Rule 9(b). However, Lead Plaintiff also argued that irrespective of which standard applied, it had been met. *Id*. at 52-72. Specifically, Lead Plaintiff argued that in the Second Circuit under *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), Rule 9(b) is satisfied where Lead Plaintiff specified the alleged fraudulent statements, identified the speaker, stated where and when the fraudulent statements were made, and explained why each statement was fraudulent. Accordingly, Lead Plaintiff detailed in its opposition how it satisfied each of these requirements. ECF No. 133 at 69-72.

40.     With respect to the §14(a) claims alleged to have arisen in connection with the ARCT IV proxy, Lead Plaintiff addressed Defendants' arguments related to forward-looking statements, arguing that the PSLRA's Safe Harbor protection did not apply because the alleged false and misleading statements were of present or historical facts, not predictions of future events. Lead Plaintiff also argued that the PSLRA Safe Harbor did not provide protection to Defendants because the "cautionary language" required by the Safe Harbor (and cited by Defendants) was not "meaningful" as required by the Safe Harbor and, therefore, was insufficient to insulate Defendants from liability. Lead Plaintiff further argued that the Safe Harbor did not protect Defendants because the forward-looking statements were made with actual knowledge they were false. *Id*. at 98-120.

- 16 -

41.     Finally, Lead Plaintiff argued that it had adequately alleged control person liability claims under §§15 and 20(a), identifying how each defendant named in these claims controlled ARCP and ARC Properties and how each defendant specifically culpably participated in the alleged wrongdoing.  *Id*. at 120-39.

### 3.     Defendants' Replies in Further Support of Their Motions to Dismiss

42.     On August 12, 2015, certain defendants filed 11 separate replies and a joinder in further support of their motions to dismiss, totaling over 150 pages, largely reiterating the arguments made in their opening briefs.  ECF Nos. 137, 138, 140, 142, 143, 144, 145, 147, 149, 150, 151.

### 4.     Resolution of the First Round of Motions to Dismiss

43.     On October 27, 2015, the Court held a day-long hearing to address the parties' arguments relating to Defendants' 15 motions to dismiss.  On November 6, 2015, the Court issued a summary order denying in part and granting in part Defendants' motions to dismiss.  Specifically, the Court instructed Lead Plaintiff to restructure its complaint and delineate the Securities Act and Exchange Act claims so as to distinguish between the non-fraud and fraud claims.  The Court dismissed Lead Plaintiff's §12(a)(2) claims against all of the directors, holding that Lead Plaintiff lacked standing to bring §12(a)(2) claims, and dismissed the §14(a) claims.  The Court granted Defendants' motions to dismiss relating to Grant Thornton's §11 liability and §10(b) claims against Beeson, but gave Lead Plaintiff leave to amend.  The Court also noted that Lead Plaintiff previously agreed to reconsider its control person claim, but denied RCAP and RCS Capital's motion to dismiss the control person claims against them for failure to show control, and further directed Lead Plaintiff to clarify its basis for control person allegations in an amended complaint.  The Court also denied Defendants' motion to dismiss arguments based on forward-looking statements, loss causation in connection with §11 liability, and the §12(a)(2) claim against RCS Securities in connection with the

- 17 -

July 2013 Offering.  The Court reserved judgment on Lead Plaintiff's §12(a)(2) claim in connection

with the September 2014 Senior Notes. ECF No. 167.

### D.      The Second Amended Complaint

44.      On December 11, 2015, Lead Plaintiff filed the 133-page Second Amended Class

Action Complaint for Violations of the Federal Securities Laws (ECF No. 170) (the "SAC").

Following the Court's instructions, Lead Plaintiff organized its complaint into two distinct sections,

separating the Securities Act claims from the Exchange Act claims.

45.      In connection with its Securities Act claims, Lead Plaintiff brought the following

claims:

| Count | Offering | Claim | Defendants |
|---|---|---|---|
| I | July 2013 Offering of 3% Senior Notes | §11 | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Grant Thornton, JP Morgan, Citigroup, Barclays, BMO Capital, KeyBanc, JMP Securities, Ladenburg, and RCS Securities |
| II | December 2013 Offering of 3% Senior Notes | §11 | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman Grant Thornton, Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, and JMP Securities |
| III | December 2013 Offering of 3.75% Senior Notes | §11 | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Grant Thornton, Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, and JMP Securities |
| IV | ARCT IV Merger | §11 | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, and Grant Thornton |
| V | Cole Merger | §11 | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, and Grant Thornton |
| VI | May 2014 Offering of Common Stock | §11 | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Stanley, Andruskevich, Sealy, Grant Thornton, Merrill Lynch, Citigroup, Barclays, J.P. Morgan, Capital One, Credit Suisse, Deutsche Bank, Wells Fargo, Robert W. Baird, Ladenburg, BMO Capital, JMP Securities, Janney, Mizuho, PNC Capital, Piper Jaffray, and RBS |
| VII | September 2014 Registration of $2.55 Billion of Senior Notes | §11 | ARCP, ARC Properties, Schorsch, Stanley, Frank, Andruskevich, Michelson, Rendell, Bowman, Block, McAlister, and Grant Thornton |

- 18 -

| Count | Offering | Claim | Defendants |
|-------|----------|-------|------------|
| VIII | February 2014 Sale of $2.55 Billion of Senior Notes | §12(a)(2) | ARCP, ARC Properties,  Schorsch, Stanley, Block, and McAlister |
| IX | Control Person Liability | §15 | Schorsch, Kahane, Weil, Budko, Block, ARC Advisors, and AR Capital for their control of defendant ARCP in connection with ARCP's violations of §11 |

46.     In connection with its Exchange Act claims, Lead Plaintiff asserted violations of §10(b) against ARCP, ARC Properties, Schorsch, Block, Beeson, Kay, and McAlister.  Lead Plaintiff further asserted §20(a) claims against Schorsch, Kahane, Weil, Budko, Block, ARC Advisors, AR Capital, RCS Capital, and RCAP.

**E.     Defendants' Second Round of Motions to Dismiss and Subsequent Related Events**

**1.     Defendants' Motions to Dismiss**

47.     On February 12, 2016, Defendants filed ten motions to dismiss the SAC, submitting 115 pages of memoranda in support thereof.  ECF Nos. 189, 192, 194, 197, 198, 200, 203, 205, 207, 210.  ARCP and ARC Properties argued that Lead Plaintiff's §12(a)(2) claim should be dismissed based on their assertion that the February 2014 Offering was not a public offering but undertaken pursuant to Rule 144A, thereby precluding liability.  ECF No. 199.  Grant Thornton moved to dismiss in a 23-page memorandum, repeating similar arguments made in its first motion to dismiss regarding Grant Thornton's certification of ARCP's financial statements and Lead Plaintiff's failure to satisfy the *Omnicare* standard concerning statements of opinion or belief, and loss causation.  ECF No. 195.

48.     Weil, Jones, Kahane, and Bowman moved to dismiss the §11 claims against them in connection with the July and December 2013 Offerings, arguing that Lead Plaintiff failed to plausibly allege a material misstatement in the 2013 Shelf Registration Statement, which they

contended was the only part that became "effective" as to them and upon which liability for false or misleading statements in the July and December 2013 Offerings could be based. Jones moved to dismiss the §11 claims against him in connection with the December 2013 Offerings and the May 2014 Offering and Bowman moved to dismiss §11 claim against him based on the September 2014 Registration of the $2.55 billion Senior Notes, both arguing that they had left the Company by the time those offerings were declared effective, negating any liability on their part for false or misleading statements in the offering documents. AR Capital, ARC Advisors, Weil, Budko, Kahane, and RCAP Holdings moved to dismiss the §§15 and 20(a) claims against them arguing that Lead Plaintiff failed to allege culpable participation and failed to allege control over ARCP by AR Capital, ARC Advisors, and RCAP Holdings. ECF No. 201. Michelson and Rendell joined in AR Capital, *et al.*'s briefing with respect to the §11 claims related to the July Offering and the December 2013 Offerings. ECF No. 204.

49. Schorsch moved to dismiss again, largely joining in the arguments relating to §§11 and 12(a)(2) made by ARCP, AR Capital, and the Underwriter Defendants. Schorsch separately argued that he was not a "statutory seller" under §12(a)(2). He also moved to dismiss the §15 claim against him to the extent the §§11 and 12 claims against him were dismissed. ECF No. 208. Block also offered similar arguments in support of his motion to dismiss Lead Plaintiff's §§11, 12, and 15 claims against him. ECF No. 206. Likewise, McAlister joined in her co-defendants arguments with respect to the §12(a)(2) claims. ECF No. 211. Kay's only ground for dismissal was an assertion that he was not liable for any §10(b) claims that pre-dated his employment at ARCP. ECF No. 190. Beeson moved to dismiss again as well, arguing that Lead Plaintiff had failed again to adequately allege she acted with scienter. ECF No. 193.

- 20 -

50.     The Underwriter Defendants moved to dismiss the §11 claims against them, repeating their previous *Omnicare* arguments that Lead Plaintiff failed to adequately allege they were liable for statements of opinion or belief concerning ARCP's financial statements and internal controls. ECF No. 197. [4]

## 2.     Lead Plaintiff's Opposition to Defendants' Motions to Dismiss

51.     On March 15, 2016, after researching and evaluating all of Defendants' arguments, Lead Plaintiff filed a 72-page omnibus opposition to Defendants' motions to dismiss the SAC, addressing the arguments raised in Defendants' motions.  ECF No. 217.

52.     Lead Plaintiff argued, *inter alia*, that in connection with Lead Plaintiff's Securities Act claims, the SAC sufficiently pled a §11 claim against Grant Thornton based not only on its certification of ARCP's false financial statements, but also based on the auditor's own misleading audit opinions, and that the Court previously rejected Grant Thornton's negative causation arguments.  Lead Plaintiff also argued that the SAC sufficiently alleged §11 claims against the Underwriter Defendants, as any due diligence arguments were premature at this stage of the Litigation.  In response to Weil, Jones, Kahane, and Bowman's arguments, Lead Plaintiff argued that they were liable under §11 for the material misrepresentations and omissions in the 2013 Shelf Registration Statement in connection with the July and December 2013 Offerings because the prospectus supplements effected a "fundamental change" to the 2013 Shelf Registration Statement; that Jones and Bowman were liable for offerings that occurred after they resigned from ARCP because they never disavowed responsibility for the 2013 Shelf Registration Statement; and that the

---

[4]     Defendants Stanley, Andruskevich, Sealy, and Frank did not move to dismiss any of the SAC claims against them.

§12(a)(2) claims were sufficiently pled based on plaintiffs' purchases from ARCP or ARC Properties in the February 2014 Offering.

53.     In connection with Lead Plaintiff's §10(b) claims, Lead Plaintiff argued that Beeson knowingly or recklessly made false statements about ARCP's financial results, AFFO, and internal controls.  Notably, Beeson did not move to dismiss Lead Plaintiff's §11 claims against her.  Lead Plaintiff also argued that it had sufficiently pleaded control person claims under §§15 and 20(a), as defendants controlled ARCP and Realty Capital Securities, and had adequately pled culpable participation to the extent this element applied.

### 3.     Defendants' Replies in Further Support of Their Motions to Dismiss

54.     On April 5, 2016, ARCP, ARC Properties., AR Capital, ARC Advisors, RCAP Holdings, Grant Thornton, Weil, Budko, Jones, Kahane, Bowman, Schorsch, Block, McAlister, Kay, Beeson, Michelson, Rendell, and the Underwriter Defendants filed ten separate reply briefs in further support of their motions to dismiss, spanning over 75 pages, and reiterating the arguments described above.  ECF Nos. 218, 220, 221, 222, 223, 224, 225, 226, 228, 229.

### 4.     RCS Capital Corporation and RCS Securities Bankruptcy Proceedings

55.     On January 31, 2016, RCS Capital Corporation ("RCAP") and RCS Securities (collectively, the "Debtor Defendants") filed a voluntary petition for Chapter 11 bankruptcy, and filed a Suggestion of Bankruptcy and Notice of Operation of Automatic Stay in the Litigation the next day.  The Debtor Defendants advised Lead Counsel and the Court that as a result of the bankruptcy filing, the automatic stay provisions of Bankruptcy Code §362(a) applied.  ECF No. 182.

56.     On February 9, 2016, the Court issued an order directing Lead Plaintiff to move the Bankruptcy Court for leave to vacate the stay and to adjudicate its claims against the Debtor

Defendants in the U.S. District Court.  ECF No. 187.  Lead Counsel engaged bankruptcy counsel, Cole Schotz P.C., to represent Lead Plaintiff and the Class in the bankruptcy proceedings.

57.     On March 10, 2016, Lead Plaintiff filed a 16-page motion with the United States Bankruptcy Court for the District Court of Delaware to lift the automatic stay.  Case No. 16-10223-MFW, ECF No. 284.  The Debtor Defendants filed a 21-page objection to Lead Plaintiff's request for relief, with the Official Committee of Unsecured Creditors filing a joinder to the Debtor Defendants' objection.  Case No. 16-10223-MFW, ECF Nos. 468, 472.  Lead Plaintiff successfully persuaded the Bankruptcy Court to lift the automatic stay following an April 11, 2016 hearing before Bankruptcy Judge Mary F. Walrath.  The Bankruptcy Court issued an order on April 14, 2016, permitting Lead Plaintiff to "prosecute and/or settle the claims asserted in the ARCP Securities Litigation against the Debtor Defendants (the 'Claims'), including through final judgment, in the District Court and any appellate courts of appropriate jurisdiction."  Case No. 16-10223-MFW, ECF No. 546 at 2.  As a result, the Court issued a memo endorsement on April 18, 2016, advising all parties that the automatic stay had been lifted against the Debtor Defendants and the Litigation "shall proceed as to all defendants."  ECF No. 232.

58.     On May 3, 2016, following the lifting of the automatic stay, RCAP and RCS Securities moved to dismiss Lead Plaintiff's §§11, 15 and 20(a) claims against them in a 21-page memorandum.  Specifically, RCAP argued that Lead Plaintiff failed to adequately allege that RCAP controlled ARCP, or that it culpably participated in the alleged primary violations in connection with Lead Plaintiff's §§15 and 20(a) claims.  RCS Securities argued that Lead Plaintiff failed to plead with particularity its §11 claim against it.  ECF No. 240.

59.     On May 6, 2016, Lead Plaintiff filed a 20-page opposition to RCAP and RCS Securities' motion to dismiss, and argued that Rule 8(a) applied to Lead Plaintiff's §11 claim against

- 23 -

RCS Securities, but regardless, Lead Plaintiff's §11 claims satisfied both Rules 8(a) and 9(b). Lead Plaintiff also argued that it had adequately alleged its control person claims against RCAP, detailing its allegations against RCAP that demonstrated how it controlled ARCP and culpably participated in ARCP's primary violations. ECF No. 243.

60.     RCAP and RCS Securities filed their reply memorandum in support of their motion to dismiss on May 10, 2016. ECF No. 245.

### 5.     Resolution of Defendants' Second Round of Motions to Dismiss

61.     On June 1, 2016, the Court held oral argument on Defendants' motions to dismiss and largely upheld Lead Plaintiff's claims and directed Defendants to file answers by July 29, 2016.

62.     On July 29, 2016, Defendants filed answers to the SAC. ECF Nos. 267, 268, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 282, 283, 284, 286, 287.

63.     On August 5, 2016, the Court issued a summary order granting in part and denying in part Defendants' motions to dismiss the SAC. ECF No. 290. Specifically, the Court denied Weil, Jones, Kahane, and Bowman's motion to dismiss, finding that Lead Plaintiff had sufficiently demonstrated that the prospectus supplements for the three offerings at issue contained information representing a "fundamental change" – the 2013 financial statements and related information – to warrant liability under §11. The Court also denied Jones and Bowman's motion challenging certain of Lead Plaintiff's §11 claims for offerings that occurred after each left ARCP, holding that because Jones and Bowman did not explicitly disavow their responsibility for the registration statement they signed upon their resignations, they remained liable for its contents. The Court rejected Grant Thornton's argument that Lead Plaintiff had not adequately satisfied the *Omnicare* standard regarding Grant Thornton's audit opinions, and additionally denied Grant Thornton's motion to

dismiss based on loss causation, but informed defendant that both arguments could be renewed as affirmative defenses.

64.     The Court granted Defendants' motion to dismiss Lead Plaintiff's §12(a)(2) claims in connection with the February 6, 2014 sale of the $2.55 billion of Senior Notes, finding that there were insufficient facts alleged to conclude that the February 2014 Offering was a public offering within the meaning of §12(a)(2).  The Court additionally determined that it had not been adequately alleged that any of the Defendants were "statutory sellers," thereby warranting dismissal of Lead Plaintiff's §12(a)(2) claim.

65.     The Court upheld Lead Plaintiff's §10(b) claim against Beeson, finding Lead Plaintiff adequately alleged her participation in the false and misleading statements, as well as her scienter. In connection with Lead Plaintiff's "control person" claims under §§15 and 20, the Court noted that "[i]n contrast to §15, culpable participation is a clear requirement of §20."  Accordingly, the Court granted Schorsch, Kahane, Budko, Weil, Block, RCAP Holdings, RCAP, and RCS Capital Corporation's motions to dismiss the control person claims alleged against them.  However, the Court found that Lead Plaintiff had adequately alleged culpable participation with respect to ARC Advisors and AR Capital and denied their motions to dismiss Lead Plaintiff's §§15 and 20(a) claims against them.  *Id.*

66.     On September 8, 2016, the Court directed Lead Plaintiff to file a third amended complaint to conform with its rulings on Defendants' motions to dismiss the SAC and confirmed that the answers Defendants filed in response to the SAC would apply to Lead Plaintiff's third amended complaint.  ECF No. 299.

F.      **Third Amended Complaint**

67.     On September 30, 2016, Lead Plaintiff filed the 129-page Third Amended Class

Action Complaint for Violations of the Federal Securities Laws (ECF No. 312) ("TAC") to conform

with the Court's September 8, 2016 Order.

68.     Lead Plaintiff and Lead Counsel continued to litigate this case against 41 defendants

represented by 12 experienced and reputable law firms:

| Defendant | Counsel |
|---|---|
| ARCP and ARC Properties Operating Partnership, L.P. | Milbank LLP |
| AR Capital LLC, ARC Properties Advisors LLC, Edward M. Weil, Jr., Peter M. Budko, William M. Kahane, Brian D. Jones, and Scott J. Bowman (collectively, "ARC Defendants") | Kellogg, Hansen, Todd, Figel & Frederick, PLLC |
| Grant Thornton LLP | Sidley Austin LLP |
| Nicholas S. Schorsch | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Brian Block | Steptoe & Johnson LLP |
| Lisa P. McAlister | Zuckerman Spaeder LLP |
| David Kay | Kirkland & Ellis LLP |
| Lisa Beeson | Petrillo Klein & Boxer LLP |
| Thomas A. Andruskevich, Bruce Frank, Leslie D. Michelson, Edward G. Rendell, and William G. Stanley | Weil, Gotshal & Manges LLP |
| Scott P. Sealy, Sr. | Morris, Manning & Martin, LLP |
| Barclays Capital Inc.; BMO Capital Markets Corp.; Capital One Securities, Inc.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; Janney Montgomery Scott LLC; JMP Securities LLC; J.P. Morgan Securities LLC; KeyBanc Capital Markets Inc.; Ladenburg Thalmann & Co. Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Mizuho Securities USA Inc.; Morgan Stanley & Co. LLC; Piper Jaffray & Co.; PNC Capital Markets LLC; RBS Securities Inc.; Robert W. Baird & Co. Incorporated; and Wells Fargo Securities, LLC | Shearman & Sterling |
| Realty Capital Securities, LLC | Winget, Spadafora & Schwartzberg, LLP |

4835-9551-9916.v18

69.     Lead Plaintiff pursued the following claims against the following Defendants as set forth below:

| Count | Claim | Defendants |
|---|---|---|
| I | §11 related to July 2013 Offering of 3% Senior Notes | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Grant Thornton, JP Morgan, Citigroup, Barclays, BMO Capital, KeyBanc, JMP Securities, Ladenburg, and RCS Securities |
| II | §11 related to December 2013 Reopening of Offering of 3% Senior Notes | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Grant Thornton, Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, and JMP Securities |
| III | §11 related to December 2013 Offering of 3.75% Senior Notes | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Grant Thornton, Citigroup, Barclays, Credit Suisse, Morgan Stanley, Wells Fargo, Capital One, and JMP Securities |
| IV | §11 related to ARCT IV Merger | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, and Grant Thornton |
| V | §11 related to Cole Merger | ARCP, Schorsch, Weil, Kahane, Michelson, Rendell, Bowman, Budko, Block, Beeson, and Grant Thornton |
| VI | §11 related to May 2014 Offering of ARCP Common Stock | ARCP, Schorsch, Weil, Block, Jones, Kahane, Michelson, Rendell, Bowman, Stanley, Andruskevich, Sealy, Grant Thornton, Merrill Lynch, Citigroup, Barclays, J.P. Morgan, Capital One, Credit Suisse, Deutsche Bank, Wells Fargo, Robert W. Baird, Ladenburg, BMO Capital, JMP Securities, Janney, Mizuho, PNC Capital, Piper Jaffray, and RBS |
| VII | §11 related to September 2014 Registration of $2.55 Billion of Senior Notes | ARCP, ARC Properties, Schorsch, Stanley, Frank, Andruskevich, Michelson, Rendell, Bowman, Block, McAlister, and Grant Thornton |
| VIII | §15 | ARC Advisors and AR Capital |
| IX | §10(b) | ARCP, ARC Properties, Schorsch, Block, Beeson, Kay, and McAlister |
| X | §20(a) | ARC Advisors and AR Capital |

## G.     RCS's Rule 12(c) Motion to Dismiss

70.     On December 2, 2016, RCS moved to dismiss the claims against it for the third time, arguing that its bankruptcy discharge warranted dismissal pursuant to Federal Rule of Civil

- 27 -

Procedure 12(c).   According to RCS, the Bankruptcy Court had discharged RCS from the Bankruptcy, with the exception that Lead Plaintiff could proceed against RCS to the extent of any available insurance.  RCS argued that there was no insurance policy available but a $2 million self-insured retention ("SIR"), and that Lead Plaintiff's claims should be dismissed because courts frequently dismiss claims where only a SIR exists with no other available insurance.  ECF No. 328.

71.     On December 16, 2016, Lead Plaintiff submitted a comprehensive brief in opposition to RCS's motion to dismiss, and argued that RCS's motion was improperly premised on disputed factual materials outside of the pleadings; that an affidavit submitted by RCS in support of its motion was replete with disputable facts; the Bankruptcy Court's order specifically preserved Lead Plaintiff's claims against RCS; the SIR did not preclude RCS's insurance from covering Lead Plaintiff's claims; and ARCP's indemnity obligations and potential joint and several liability precluded dismissal.  ECF No. 332.

72.     RCS filed its reply on December 23, 2016.  ECF No. 334.  ARCP also submitted a response to Lead Plaintiff's opposition to RCS's motion to dismiss on January 3, 2017.  ECF No. 336.  ARCP requested the Court defer any rulings as to ARCP's indemnification obligations to RCS and/or whether ARCP may be held jointly and severally liable for RCS's conduct until after discovery.  *Id.*

73.     On January 5, 2017, the Court denied RCS's motion to dismiss and agreed with Lead Plaintiff's argument that RCS impermissibly relied on materials outside of the pleadings.  ECF No. 340.

H.      **Class Certification and Related Issues**

1.      **Class Certification Briefing**

74.      On March 15, 2017, Lead Plaintiff moved pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) for class certification, filing a 40-page memorandum in support thereof. ECF No. 368.  Lead Plaintiff proposed to certify a class of "those who purchased or otherwise acquired American Realty Capital Properties, Inc. . . . securities (including ARCP common stock, preferred stock and debt securities, as well as those who traded in option contracts on ARCP stock) between May 9, 2012 and October 29, 2014 (the 'Class Period')."  *Id*. at 1.

75.      Lead Plaintiff, joined by named plaintiffs Corsair,[5] NYC Funds,[6] Sheet Metal Workers' National Pension Fund, Union Asset Management Holding AG, City of Tampa General Employees Retirement Fund, IRA FBO John Esposito, Simon Abadi, Paul Matten, Noah Bender, Mitchell Ellis, and Bonnie Ellis sought to be appointed as class representatives and to have  Robbins Geller appointed as Class Counsel.

76.      Lead Plaintiff argued that the proposed class satisfied the requirements for class certification under Rule 23(a), including numerosity, commonality, typicality, and adequacy.  Lead Plaintiff also argued that the proposed class satisfied the requirements for class certification under Rule 23(b), as common questions of law or fact predominated over individual questions and a class action provided a superior method for the fair and efficient resolution of the Litigation.  Specifically,

---

[5]   "Corsair" refers collectively to Corsair Select 100 L.P., Corsair Select Master Fund, Ltd., Corsair Capital Partners L.P., Corsair Select L.P., Corsair Capital Partners 100 L.P., and Corsair Capital Investors, Ltd.

[6]   "NYC Funds" refers collectively to the New York City Employees' Retirement System, the New York City Police Pension Fund, the New York City Police Officers' Variable Supplements Fund, the Board of Education Retirement System of the City of New York, the Teachers' Retirement System of the City of New York and the Teachers' Retirement System of the City of New York Variable A, the New York City Fire Department Pension Fund, the New York City Fire Officers' Variable Supplements Fund, and the New York City Fire Fighters' Variable Supplements Fund.

- 29 -

Lead Plaintiff argued that the proposed class's claims depended on the same set of factual circumstances surrounding each alleged false statement – circumstances that inflated the price of ARCP securities, and when the truth of ARCP's financial condition was disclosed to the market, the price of ARCP's securities fell in response to the news.  Lead Plaintiff argued that the proposed class's claims also involved proof of common legal issues, including having to prove falsity under both its Securities Act and Exchange Act claims.

77.     Lead Plaintiff further argued that ARCP's securities traded in efficient markets during the Class Period, thereby entitling the proposed class to the fraud-on-the-market presumption of reliance.  In support of this assertion, Lead Plaintiff submitted the declaration of economist Dr. Steven P. Feinstein, who analyzed the markets in which ARCP securities traded and who conducted statistical analyses of the reaction of ARCP's securities to market news.  Lead Plaintiff presented Dr. Feinstein's findings in support of its motion for class certification, including that: (i) each type of ARCP security that traded during the Class Period satisfied all of the *Cammer/Krogman* factors, establishing that the markets for ARCP's securities were efficient; (ii) event studies showed that Defendants' false and misleading statements added inflation to the prices of ARCP's securities and also maintained inflation already present in the price of those securities; (iii) event studies also showed the price of ARCP's securities plummeted when the truth of Defendants' false and misleading statements were revealed to the market; and (iv) the proposed class's damages could be calculated on a class-wide basis using a common methodology.  ECF No. 369-13.

78.     On May 5, 2017 Grant Thornton opposed Lead Plaintiff's motion for class certification in a 34-page memorandum.  ECF No. 486.  Grant Thornton argued that the proposed class could not be certified because: (i) no plaintiff could satisfy §11's tracing requirement in

connection with the ARCT IV Merger, the Cole Merger, or the May 2014 Offering; (ii) none of the named plaintiffs purchased registered notes in the September 2014 Offering; and (iii) none of the named plaintiffs suffered a loss in connection with the ARCT IV Merger. *Id.* Sealy joined in Grant Thornton's opposition with respect to Lead Plaintiff's May 2014 Offering claim. ECF No. 377. In support of its opposition, Grant Thornton submitted the expert report of Professor Mark E. Zmijewski, who opined on Lead Plaintiff's §11 claims and Dr. Feinstein's related opinions. Specifically, Professor Zmijewski opined that: (i) the modern American stock custody and clearing system made it difficult for plaintiffs to establish tracing; (ii) certain named plaintiffs had gains in connection with their §11 claims related to the ARCT IV Merger and May 2014 Offering; and (iii) the unregistered notes investors purchased in the February 2014 Offering were based on the same basic economic terms of the registered notes they replaced in September 2014, with the difference being that the new registered notes were freely transferable. ECF No. 381-1.

79.     On May 5, 2017, ARCP, ARC Properties, ARC Capital, ARC Advisors, Schorsch, Block, McAlister, Kay, and Beeson filed a 38-page opposition to Lead Plaintiff's motion for class certification. ECF No. 497. These defendants offered several challenges to class certification, including asserting that: (i) the markets for ARCP's securities were not efficient during the Class Period, and that Dr. Feinstein's report was fatally flawed; (ii) defendants rebutted Lead Plaintiff's fraud-on-the-market reliance presumption, arguing that the allegedly false statements had no "price impact" on ARCP's securities; (iii) Lead Plaintiff had not provided an adequate damages model to account for damages solely attributable to its theory of liability, or a calculation of damages for each type of security at issue in the proposed class; and (iv) named plaintiffs failed to satisfy Rule 23(a) – as many of the named plaintiffs purportedly purchased ARCP common stock after the corrective disclosure, exposing those plaintiffs to unique defenses. *Id.* In support of its opposition, ARCP

submitted the expert report of Christopher M. James, Ph.D., who opined that: (i) Dr. Feinstein's analysis was flawed, incomplete, and unreliable and had not demonstrated that ARCP securities had traded in efficient markets throughout the Class Period; and (ii) Dr. Feinstein had not proposed an appropriate damages methodology that reliably measured damages based on Lead Plaintiff's allegations.  ECF No. 385-1.

80.     At the May 16, 2017 hearing, the Court observed that Lead Plaintiff had made a *prima facie* showing in support of its motion for class certification, but wished to hear live testimony from both parties' experts on the issue of the market efficiency for ARCP securities.  The Court also granted permission for each party to depose the other's expert in advance of the full-day evidentiary hearing the Court set for July 12, 2017, and set an additional hearing for August 22, 2017 to address all other outstanding issues related to class certification.  The Court ordered the parties to submit supplemental memoranda in support of their respective positions after further class discovery was completed.  ECF No. 391.  On June 22, 2017, upon the parties' request, the Court set August 22, 2017 to hear all issues related to class certification, including testimony from Dr. Feinstein and Dr. James.  ECF No. 396.

81.     On June 15, 2017, Dr. Feinstein was deposed by Defendants in New York, giving approximately seven hours of testimony.  Lead Counsel spent a significant amount of time meeting with Dr. Feinstein in preparation for his deposition.  On August 1, 2017, Lead Counsel deposed Dr. Christopher James in New York for over five hours on the record, questioning him at length about his 41-page report.

82.     On August 4, 2017, Lead Plaintiff filed a 27-page supplemental memorandum of law in support of its motion for class certification.  ECF No. 485.  Lead Plaintiff noted that Defendants did not contest that the proposed class satisfied the requirements for numerosity, commonality,

- 32 -

typicality, and superiority.  Instead, Defendants disputed the adequacy of certain proposed class representatives, the standing of certain class representatives as it related to one of the claims, and Lead Plaintiff's proposed damages model.  In response to these arguments, Lead Plaintiff argued that none of the named plaintiffs had antagonistic interests with the absent class members, as they all purchased ARCP securities at inflated prices during the Class Period, all of their claims are based on the same set of misstatements and omissions, and when the truth was revealed, they all were damaged just like the absent class members.  Lead Plaintiff also argued that none of the named plaintiffs were subject to unique defenses, supporting its argument with substantial case law that post-disclosure purchases are a common investment strategy and not subject to any unique defenses.

83.     Lead Plaintiff also argued that each named plaintiff satisfied the Second Circuit's requirements for standing, as each was damaged as a result of the same wrongful course of conduct by Defendants that implicated the same set of concerns for all members of the proposed class.  Lead Plaintiff further argued that proof of tracing was premature at class certification, and regardless, named plaintiffs had provided evidence that they could trace their shares to the ARCT IV Merger, the Cole Merger, and the May 2014 Offering.

84.     Finally, Lead Plaintiff defended Dr. Feinstein's proposed damages model and argued that it was consistent with Lead Plaintiffs' theory of liability that Defendants' false and misleading statements artificially inflated the price of ARCP's securities during the Class Period and that the price of ARCP's securities declined when the truth was revealed to the market, damaging the proposed class.  Lead Plaintiff also refuted each of Grant Thornton's remaining arguments that certain named plaintiffs had not suffered damages.

85.     On August 4, 2017, ARCP, ARC Properties, ARC Capital, ARC Advisors, Schorsch, McAlister, Kay, and Beeson filed 27-page supplemental brief in further opposition to Lead

Plaintiff's motion for class certification.  ECF No. 500.  Defendants again argued that Dr. Feinstein's damages model, which covered the entire proposed Class Period, was flawed, arguing that the October 29, 2014 corrective disclosure – the only corrective disclosure identified by Dr. Feinstein – concerned only certain Q1 2014 and Q2 2014 financial information.  Because the only corrective disclosure was far more narrow than Dr. Feinstein opined, his damages model was not capable of measuring damages prior to Q1 2014.  Defendants also argued that certain named plaintiffs were inadequate class representatives and should not be certified to represent the proposed class.  Block filed a joinder to certain arguments set forth in these defendants' supplemental brief.  ECF No. 446.

86.     On August 4, 2017, Grant Thornton filed a 12-page supplemental memorandum of law in support of its opposition to Lead Plaintiff's motion for class certification.  ECF No. 491.  Grant Thornton argued that discovery confirmed that no plaintiff could satisfy §11's tracing requirement, precluding class certification on the claims based on common stock acquired in the ARCT IV Merger, the Cole Merger, and the May 2014 Offering; none of the named plaintiffs purchased registered notes in the September 2014 Offering and thus had no standing to pursue the asserted §11 claim; and the named plaintiffs lacked recoverable damages from the ARCT IV Merger based on Grant Thornton's expert's calculation of §11 damages.

87.     On August 11, 2017, Lead Plaintiff submitted a 39-page response to Defendants' supplemental briefs in further support of its motion for class certification.  ECF No. 507.  ARCP, ARC Properties, ARC Capital, ARC Advisors, Schorsch, McAlister, Kay, and Beeson filed a 12-page response to Lead Plaintiff's motion for class certification.  ECF No. 502.  Block filed a joinder to certain arguments set forth in these defendants' response.  ECF No. 462.  Grant Thornton filed a 23-page response to Lead Plaintiff's supplemental brief in support of its motion for class certification of §11 claims.  ECF No. 493.

### 2. Grant Thornton's Motion for Summary Judgment on Standing

88.    On August 4, 2017, Grant Thornton moved for summary judgment of Lead Plaintiff's Count VII in the TAC, which related to the September 2014 registration of the $2.55 billion of Senior Notes. ECF No. 431. Specifically, Grant Thornton argued that the two named plaintiffs who had allegedly purchased notes in connection with the §11 claim in Count VII were Qualified Institutional Buyers who had participated in an Exxon Capital Exchange, which Grant Thornton argued could not serve as the basis for a §11 claim. ECF No. 494. In support of its motion Grant Thornton relied on eight exhibits and also submitted a Rule 56.1 Statement of Undisputed Facts, identifying ten purported statements. ECF Nos. 489, 490.

89.    In response, Lead Plaintiff filed a 13-page opposition on August 18, 2017. ECF No. 477. Lead Plaintiff argued that the Second Circuit's holding in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), enunciated a broad standard for class standing, wherein a purchaser in a debt offering could raise the same "set of concerns" raised by the purchaser of a different offering, as the debt was backed by the same company and was based on the same false or misleading statements. In support of its opposition, Lead Plaintiff relied on 25 exhibits and submitted a five-page response to Grant Thornton's 56.1 Statement. ECF Nos. 471, 479.

90.    In its 10-page reply filed on August 23, 2017, Grant Thornton argued, *inter alia*, that *NECA* did not apply to this Litigation, as Lead Plaintiff's different claims were based on different alleged misstatements, thereby requiring different evidence for each claim. ECF No. 480.

### 3. Resolution of Class Certification and Grant Thornton's Motion for Summary Judgment on Standing

91.    On August 24, 2017, the Court held an extensive day-long evidentiary hearing, with live expert testimony from both Dr. Feinstein and Dr. James. Lead Counsel elicited testimony from Dr. Feinstein and cross-examined Dr. James, with the Court questioning both experts at great length.

The Court also heard argument from the parties concerning whether Lead Plaintiff was required to provide a full, detailed damage calculation, or show that damages could be calculated on a class-wide basis.  During the hearing, the Court made several rulings indicating that Lead Plaintiff's motion for class certification would be granted.

92.     On August 31, 2017, the Court issued a summary order certifying the Class. Specifically, the Court certified the Class with respect to ARCP's common stock finding that the *Cammer* and *Krogman* factors had been met.  The Court also certified the Class with respect to ARCP's preferred stock and debt securities.  The Court rejected Defendants' argument that the Class Period should be delineated into three periods for certification – the Pre-ARCT III period, Post-ARCT III Period, and the Post-Cole Period.  Finally, the Court held that all proposed class representatives met the adequacy requirement of Rule 23(a) to serve as class representatives.  ECF No. 505.

93.     That same day, the Court issued an Order, finding that Lead Plaintiff's proposed damages model was adequate to prove the Class's damages, noting that "[a]lthough damages were incurred in connection with each purchase of shares throughout the Class Period, the evidence of that damage may be based, according to plaintiffs' expert, on the consequences of the company's October 29, 2014 disclosures, and the inflation thereby revealed."  The Court granted Grant Thornton's summary judgment with respect to Count VII, finding that NYC Funds and Sheet Metal Workers' National Pension Fund's purchases of the September 2014 Senior Notes traced back to a private offering made on February 6, 2014 and was part of an Exxon Capital Exchange upon which Lead Plaintiff could not base a §11 claim.  ECF No. 504.

**4.      Defendants' Petitions Pursuant to Rule 23(f)**

94.     On September 14, 2017, following the Court's certification of the Class, Defendants

filed two separate petitions with the United States Court of Appeals for the Second Circuit pursuant

to Federal Rule of Civil Procedure 23(f), seeking permission to appeal the Court's order granting

class certification.

95.     In one petition, ARCP, ARC Properties, the ARC Defendants, Schorsch, Kay,

Beeson, and McAlister argued that the Court committed a number of errors that warranted the

Second Circuit's review, including: (i) finding an efficient market for ARCP's notes and preferred

stock despite Lead Plaintiff presenting no direct evidence of market efficiency with respect to those

securities; (ii) certifying the Class for all securities despite not determining that ARCP's securities

traded in efficient markets for the first 20 months; (iii) certifying the Class despite Defendants'

evidence that none of the alleged misstatements during the first two-thirds of the Class Period had

any price impact, thereby rebutting the "fraud-on-the-market" presumption; (iv) certifying the Class

despite Lead Plaintiff's deficient damages model and failing to satisfy *Comcast*'s requirements on

measuring damages.  Case No. 17-2872, ECF No. 1.  In a separate Rule 23(f) petition, Grant

Thornton argued that aftermarket purchasers could not rely on generalized proof to trace their shares

to a secondary offering, and the proof required of plaintiffs to meet these tracing requirements

defeated predominance under Rule 23(b)(2).  Grant Thornton did concede, however, that courts in

the Second Circuit have certified classes that have included aftermarket purchasers.  Grant Thornton

also argued that the Court failed to conduct a rigorous analysis prior to certifying the Class's §11

claims.  Case No. 17-2858, ECF No. 1.  The Underwriter Defendants and Non-Management

Directors moved to join Grant Thornton's petition, or in the alternative, to intervene to join Grant

Thornton's petition on September 20, 2017.  Case No. 17-2858, ECF No. 23.

96.     On September 25, 2017, Lead Plaintiff filed answers in response to both petitions.  In its response to the petition led by ARCP, Lead Plaintiff argued, *inter alia*, that the Court properly determined market efficiency for ARCP's preferred stock and debt after being presented with both direct and indirect evidence; the Court properly exercised its discretion in finding market efficiency for the first portion of the Class Period after considering all parties' expert reports and testimony; petitioners could not defeat market efficiency by arguing loss causation after having failed to present evidence of the lack of price impact; the Court was persuaded by Dr. Feinstein's testimony that Lead Plaintiff's proposed damages model was adequate under *Comcast*; and petitioners' contentions would, at most, modify the Class rather than serve as the "death knell" of the litigation.  Case No. 17-2872, ECF No. 37.

97.     In response to Grant Thornton's petition, Lead Plaintiff argued that the auditor failed to satisfy the requirements necessitating Rule 23(f) review, as neither a "death knell" situation was at risk here, nor did any compelling legal question exist in this Litigation that would otherwise require immediate review under *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001).  Lead Plaintiff also argued that the Court conducted a rigorous analysis in certifying the Class and directly addressed Grant Thornton's arguments at the evidentiary hearing that aftermarket shares could not be traced.  Case No. 17-2858, ECF No. 34.

98.     On October 2, 2017, Defendants filed two motions for leave to file replies in support of their petitions.  Case No. 17-2858, ECF No. 39; Case No. 17-2872, ECF No. 51.  Subsequently, the parties submitted letters to the United States Court of Appeals for the Second Circuit concerning recent developments in Second Circuit jurisprudence concerning price impact.  Lead Plaintiff argued that the Second Circuit in *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), expressly held that direct evidence of price impact was not required to invoke the fraud-on-the-market presumption

- 38 -

4835-9551-9916.v18

of reliance.  Case No. 17-2872, ECF No. 57.  ARCP filed a response on November 15, 2017 and argued that *Barclays* did not resolve the questions it had presented in its Rule 23(f) petition.  Case No. 17-2872, ECF No. 61.  On January 16, 2018, Defendants argued that the Second Circuit's decision in *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018), confirmed the need to reverse the Court's order certifying the Class.  The petitioners argued that in *Goldman*, the Second Circuit determined clear error had occurred because the district court there had declined to review the defendants' evidence regarding lack of price impact at the time the alleged false statements were made, which Defendants argued also occurred in this Litigation.  Case No. 17-2872, ECF No. 74.  Lead Plaintiff filed a response on January 17, 2018, and argued that not only had Defendants misconstrued *Goldman*, but also refuted Defendants' assertion that they had presented "unrebutted evidence" of no price impact.  Case No. 17-2872, ECF No. 78.

99.     On January 24, 2018, the United States Court of Appeals for the Second Circuit issued an order denying both ARCP, *et al*.'s and Grant Thornton's petitions, holding that an immediate appeal of the Court's granting of Lead Plaintiff's motion for class certification was unwarranted under *Sumitomo*.  Case No. 17-2872, ECF No. 88; Case No. 17-2858, ECF No. 62.

### I.     Fact Discovery

100.     After Lead Plaintiff successfully opposed Defendants' multiple rounds of motions to dismiss, the parties commenced fact discovery, which involved the production of more than 900,000 documents comprising over 13 million pages, the completion of 52 depositions, and the litigation of several discovery disputes which involved all parties.  After the parties met and conferred extensively over the course of three telephonic conferences, the parties' Federal Rule of Civil Procedure 26(f) Conference was held on September 8, 2016.

### 1.     Written Discovery

101.     On September 16, 2016, Lead Plaintiff served its First Omnibus Request for Production of Documents on ARCP, ARC Properties, AR Capital, ARC Advisors, Schorsch, Block, Beeson, Budko, Kay, McAlister, Weil, Stanley, Sealy, Rendell, Michelson, Kahane, Jones, Frank, Bowman, Andruskevich, Grant Thornton, and the Underwriter Defendants.  On May 12, 2017, Lead Plaintiff served its Second Request for Production of Documents on ARCP, ARC Properties, Grant Thornton, Schorsch Block, Beeson, Budko, Kay, McAlister, Weil, Stanley, Sealy, Rendell, Michelson, Kahane, Jones, Frank, Bowman, and Andruskevich.  Lead Plaintiff served additional document requests on Rendell, McAlister, and Beeson on December 15, 2017 and on Block and Jones on February 23, 2018.  On June 4, 2018, Lead Plaintiff served additional document requests on Andruskevich, Bowman, Budko, Kahane, Kay, Michelson, Schorsch, Sealy, Stanley, and Weil.

102.     As a result of Lead Plaintiff's requests for production of documents, numerous discovery disputes arose, as further detailed below in §III.I.5.

### 2.     Depositions

103.     Lead Counsel deposed 40 current and former ARCP, AR Capital, and Grant Thornton employees, directors, underwriters and Federal Rule of Civil Procedure 30(b)(6) witnesses in various locations through the United States, as set forth below:

| Deponent | Date | Location | Affiliation |
|---|---|---|---|
| Andruskevich, Thomas | November 28, 2018 | New York, NY | Former Director of ARCP. |
| Armiger, Adam | March 14, 2018 March 15, 2018 March 16, 2018 | New York, NY | Former ARCP Assistant Vice-President in Real Estate and Corporate Acquisitions department. |
| Beeson, Lisa | October 10, 2018 October 11, 2018 | New York, NY | Former President and Chief Operating Officer ("COO") of ARCP. |
| Block, Brian | November 6, 2018 November 7, 2018 | New York, NY | Former Chief Financial Officer ("CFO") and Executive Vice |

| Deponent | Date | Location | Affiliation |
|---|---|---|---|
| | | | President ("EVP") of ARCP; beneficial owner of AR Capital. |
| Bowman, Scott | September 17, 2018 | New York, NY | Former Director of ARCP. |
| Budko, Peter | October 2, 2018 | New York, NY | Former EVP and Chief Investment Officer of ARCP and director of numerous ARCP-related entities; beneficial owner of AR Capital. |
| Cairns, Michael | October 10, 2018<br>October 11, 2018 | Chicago, IL | Grant Thornton auditor and lead partner on ARCP engagement. |
| Djoganopolous, Chris | December 17, 2018 | New York, NY | Bank of America Merrill Lynch, Pierce, Fenner & Smith Inc. 30(b)(6) witness. |
| Estrada, Jessica | April 4, 2018<br>April 5, 2018<br>April 6, 2018 | Chicago, IL | Grant Thornton auditor. |
| Frank, Bruce | May 21, 2018<br>May 22, 2018 | New York,  NY | Former Director of ARCP. |
| Gribbin, William | May 7, 2018<br>May 8, 2018<br>May 9, 2018 | New York, NY | Former ARCP Controller and SEC Whistleblower. |
| Grier, Thomas | November 14, 2018 | New York, NY | J.P. Morgan 30(b)(6) witness. |
| Ingrassia, Paul | May 30, 2018 | New York, NY | Citigroup 30(b)(6) Witness. |
| Jones, Brian | November 26, 2018 | Menlo Park, CA | Former COO of ARCP and held positons at other ARCP-related entities. |
| Jung, Jens | September 24, 2018 | New York, NY | Citigroup 30(b)(6) witness. |
| Kahane, William | December 12, 2018<br>December 13, 2018 | New York, NY | Former Director of ARCP and held positions at numerous other ARCP-related entities; beneficial owner of AR Capital. |
| Kay, David | December 18, 2018<br>December 19, 2018 | New York, NY | Former President, CEO, and Director of ARCP. |
| LaFleur, Rich | September 26, 2018<br>September 27, 2018<br>September 28, 2018 | Chicago, IL | Grant Thornton auditor and lead partner on ARCP engagement. |
| Lucarini, Richard | June 5, 2018<br>June 6, 2018 | Philadelphia, PA | Former ARCP Portfolio Controller. |
| Manning, Susan | March 6, 2018<br>March 7, 2018 | Philadelphia, PA | Former ARCP Corporate Controller. |
| McAlister, Lisa | June 5, 2018<br>June 6, 2018 | New York, NY | Former Senior Vice President and CAO of ARCP. |
| Mehta, Nishit | November 7, 2018<br>November 8, 2018 | New York, NY | Grant Thornton senior manager on ARCP engagement. |

- 41 -

| Deponent | Date | Location | Affiliation |
|---|---|---|---|
| Michelson, Leslie | October 3, 2018<br>October 4, 2018 | New York, NY | Former Director of ARCP and held positions at numerous other ARCP-related entities. |
| Morton, Chris | November 28, 2018<br>November 29, 2018 | Chicago, IL | Grant Thornton auditor and manager on ARCP engagement. |
| Peel, Matthew | July 9, 2018 | Phoenix, AZ | Former Vice President Controller of ARCP; former Vice President of Financial Reporting and Accounting at Cole Real Estate Investments. |
| Pramberger, Michael | January 24, 2018<br>January 25, 2018<br>January 26, 2018 | New York, NY | Grant Thornton auditor and senior manager on ARCP engagement. |
| Reiter, Michael | April 24, 2018<br>April 25, 2018 | New York, NY | Former ARCP employee who supervised Capital Markets and Strategic Analysis department and responsible for maintaining ARCP's guidance model. |
| Rendell, Edward | April 12, 2018<br>April 13, 2018 | New York, NY | Former Director of ARCP and held positions at numerous other ARCP-related entities. |
| Rudd, Brandon | January 22, 2018<br>January 23, 2018 | New York, NY | ARCP employee in financial reporting group who maintained ARCP's files that generated financial statements. |
| Schechner, Schecky | December 13, 2018 | New York, NY | Barclays 30(b)(6) witness. |
| Schorsch, Nicholas | December 10, 2018<br>December 11, 2018 | New York, NY | Former CEO and Chairman of the Board of ARCP; beneficial owner of AR Capital and held positions at numerous other ARCP-related entities. |
| Sealy, Scott | October 17, 2018 | Atlanta, GA | Former member of ARCP's Board. |
| Semonsky, Sathana | June 13, 2018 | New York, NY | Former Assistant Controller of ARCP. |
| Siko, Kevin | December 18, 2018 | New York, NY | Former Senior Manager of ARCP's Internal Audit. |
| Silfen, Richard | June 25, 20018 | New York, NY | Former EVP and General Counsel of ARCP. |
| Smith, Zachary | August 29, 2018<br>August 30, 2018 | Chicago, IL | Former Grant Thornton senior associate on the ARCP engagement. |

- 42 -

| Deponent | Date | Location | Affiliation |
|---|---|---|---|
| Stanley, William | December 5, 2018 | New York, NY | Former Director of ARCP and held positions at other ARCP-related entities; former interim Chairman and CEO at ARCP. |
| Steel, Ryan | May 22, 2018<br>May 23, 2018<br>May 24, 2018 | New York, NY | Former ARCP Director of Financial Reporting. |
| Weil, Edward | November 12, 2018<br>November 13, 2018 | New York, NY | Former President, Treasurer, and Director of ARCP; beneficial owner of AR Capital; held positions at other ARCP-related entities. |
| Wilson, Casey | December 5, 2018<br>December 6, 2018 | New York, NY | Former ARCP employee in the Capital Markets & Strategic Analysis department; worked on ARCP's forward-looking guidance. |

104.    In total, Lead Counsel took and/or participated in 71 days of deposition testimony in 11 months.  In preparation for these depositions, Lead Counsel reviewed approximately 12 million pages of documents produced during the litigation from various parties and non-parties.

### 3.    Third-Party Discovery

105.    Lead Counsel also conducted extensive third-party discovery, serving subpoenas on the following parties:

| Person/Entity | Affiliation | Date Subpoena Served |
|---|---|---|
| Abernathy MacGregor Group, Inc. | Outside consultant/advisor to ARCP. | 04/07/2017 |
| Ameriprise Financial Services, Inc. | Conducted due diligence review of ARCT IV. | 04/14/2017 |
| Armiger, Adam | Former ARCP Assistant Vice-President in Real Estate and Corporate Acquisitions department. | 04/17/2017;<br>12/15/2017;<br>01/26/2018 |
| Cairns, Michael | Grant Thornton auditor and lead partner on ARCP engagement. | 02/23/2018 |
| Cole, Christopher H. | Cole Inc.'s Executive Chairman of Board of Directors | 05/09/2017;<br>12/15/2017 |
| DDCWorks, Inc. | Outside consultant/advisor to ARCP. | 04/11/2017 |
| Deloitte LLP | Replaced Grant Thornton as ARCP's | 12/20/2016 |

- 43 -

| Person/Entity | Affiliation | Date Subpoena Served |
|---|---|---|
| | outside auditor. | |
| Donlan, Daniel | Securities analyst employed by Ladenburg. | 05/17/2019 |
| Ernst & Young LLP | Audit Committee's outside investigator retained to assist in the investigation. | 12/02/2016 |
| Estrada, Jessica | Grant Thornton auditor. | 12/15/2017 |
| Financial Industry Regulatory Authority Inc. | Self-regulatory organization with information relating to transaction and trade data of reporting entities. | 11/14/2016 |
| Frank, Bruce | Former Director of ARCP. | 02/26/2018 |
| FTI Consulting, Inc. | Consulting firm that provided proposal regarding ARCP's executives' compensation and bonuses. | 04/07/2017 |
| Goldman Sachs & Co. | Provided professional services to Cole Board of Directors in connection with Cole Merger. | 04/14/2017 |
| Gong, David | Former Director of ARCT III. | 04/07/2017 |
| Gribbin, William | Former ARCP Controller and SEC whistleblower. | 03/23/2017; 12/18/2017 |
| Holland, Jeffrey C. | Cole Inc.'s President and COO. | 05/09/2017 |
| Joele Frank Wilkinson Briber Katcher | Outside consultant/advisor to ARCP. | 04/07/2017 |
| Keller, Stephan | Cole Inc.'s EVP, CFO, and Treasurer. | 05/09/2017 |
| LaFleur, Richard | Grant Thornton auditor and lead partner on ARCP engagement. | 02/23/2018 |
| Lazard Freres & Co. LLC | Provided professional services to Cole Board of Directors in connection with Cole Merger. | 04/17/2017 |
| Lucarini, Richard | Former ARCP Portfolio Controller. | 02/23/2018 |
| Manning, Susan | Former ARCP Corporate Controller. | 04/07/2017; 12/15/2017 |
| McAllaster, Jr., D. Kirk | Cole Inc.'s EVP. | 05/09/2017 |
| Mehta, Nishit | Grant Thornton Senior Manager on ARCP engagement. | 07/18/2018 |
| Moelis & Company | Provided professional services to ARCP in connection with Cole transaction. | 04/13/2017 |
| Morton, Christopher | Grant Thornton auditor and manager of ARCP engagement. | 07/18/2018 |
| Nemer, Marc T. | Cole Inc.'s CEO. | 05/09/2017 |

| Person/Entity | Affiliation | Date Subpoena Served |
|---|---|---|
| Peel, Matthew | Former Vice President Controller of ARCP; former Vice President of Financial Reporting and Accounting at Cole Real Estate Investments. | 04/07/2017; 02/26/2018 |
| Pong, Jonathan | Securities analyst employed by Robert W. Baird. | 06/04/2019 |
| Pramberger, Michael | Grant Thornton auditor and senior manager on ARCP engagement. | 11/11/2017; 12/21/2017 |
| Radesca, Nicholas | EVP and CFO of AR Capital. | 04/07/2017 |
| RCS Capital Corporation | Managed by RCS Capital Management, LLC, an entity controlled by Schorsch and Kahane. | 04/20/2017 |
| RCS Capital LLC | Parent entity of Schorsch empire. | 04/20/2017 |
| Reiter, Michael | Former ARCP employee who supervised Capital Markets and Strategic Analysis department and responsible for maintaining ARCP's guidance model. | 04/07/2017; 11/08/2017 |
| Rudd, Brandon | ARCP employee in financial reporting group who maintained ARCP's files that generated financial statements. | 12/14/2017 |
| Sanabria, Juan | Securities analyst employed by Merrill Lynch. | 05/17/2019 |
| Semonsky, Sathana | Former Assistant Controller of ARCP. | 04/07/2017; 11/09/2017 |
| Siko, Kevin | Former Senior Manager of ARCP's Internal Audit. | 02/26/2018 |
| Silfen, Richard | Former EVP and General Counsel of ARCP. | 04/12/2017; 03/21/2018 |
| Smith, Zachary | Former Grant Thornton Senior Associate on the ARCP engagement. | 04/23/2018 |
| Sodo, Michael | Former Director of Financial Reporting and Treasury of ARCP; also served as CFO and Treasurer of ARCP. | 04/06/2017 |
| Steel, Ryan | Former ARCP Director of Financial Reporting. | 04/05/2017; 12/15/2017 |
| Tuppeny, Elizabeth | Former Director of ARCT IV. | 04/06/2017 |
| Teneo Strategy LLC | Public relations firm hired by ARCP's Audit Committee. | 04/07/2017 |
| Weil Gotshal & Manges LLP | Counsel for ARCP's Audit Committee investigation. | 04/05/2017 |

| Person/Entity | Affiliation | Date Subpoena Served |
|---|---|---|
| Wenzel, Abby | Former Director of ARCT IV. | 04/05/2017 |
| Wilson, Casey | Former ARCP employee in the Capital Markets & Strategic Analysis Department; worked on ARCP's forward-looking guidance. | 09/06/2018 |
| Woods, Leonard | Director of Cole Inc. | 05/09/2017 |

106.     In total, these third parties produced over 500,000 pages of documents – all of which Lead Counsel diligently reviewed and analyzed.  These third party documents were instrumental in establishing evidence of Defendants' wrongful conduct.

**4.     Defendants' Discovery to Named Plaintiffs**

107.     On September 16, 2016, Defendants served their First Joint Request for Production of Documents on named plaintiffs and a Second Joint Request for Production of Documents on named plaintiffs on April 14, 2017.  Almost 70 separate categories of document requests were encompassed by Defendants' two joint requests.

108.     On October 19, 2016, Lead Plaintiff diligently and timely responded to Defendants' First Joint Request for Production of Documents on behalf of all named plaintiffs and likewise on May 15, 2017 to Defendants' Second Joint Request for Production of Documents.  Lead Counsel met and conferred with Defendants multiple times to negotiate search terms to use in connection with the collection and review of named plaintiffs' documents.  Lead Counsel spent hundreds of hours responding to Defendants' document requests, negotiating search terms, collecting and reviewing tens of thousands of its own responsive documents, and producing a total of over one million pages of responsive documents.

109.     Lead Counsel also defended and/or participated in the depositions of Lead Plaintiff and the named plaintiffs.  These depositions included:

- 46 -

| Deponent | Date | Location |
|---|---|---|
| Abadi, Simon | August 3, 2017 | New York, NY |
| Corsair Capital Management – Elie Mishaan | July 19, 2017 | New York, NY |
| Esposito, John | July 28, 2017 | New York, NY |
| NYC Funds – Brian Horan | July 7, 2017 | New York, NY |
| NYC Funds – David Jeter | July 7, 2017 | New York, NY |
| Sheet Metal Workers' National Pension Fund – Timothy Myers | July 13, 2017 | Washington, D.C. |
| Tampa General Employees Retirement Fund – Ernest Carrera | June 29, 2017 | Tampa, FL |
| TIAA – Thomas Franks | July 27, 2017 | New York, NY |
| Union Asset Management Holding AG – Carsten Karl Guenter Fischer | July 25, 2017 | New York, NY |
| Union Asset Management Holding AG – Jochen Riechwald | July 25, 2017 | New York, NY |

110.    On November 28, 2018, Grant Thornton served its First Set of Interrogatories, which Lead Plaintiff duly responded to on behalf of all named plaintiffs on December 28, 2018.

### 5.    Discovery Disputes with Defendants

111.    Numerous discovery disputes arose throughout the Litigation, requiring hours of negotiating between the parties in an attempt to narrow the disputes.  As part of this process, Lead Counsel spent thousands of hours reviewing and analyzing tens of thousands of documents, including the deficient privilege logs produced by Defendants – which contained thousands of separate entries.  The parties submitted over 20 joint letters, pursuant to Rule 2.E. of the Court's Individual Rules of Practice, outlining their disputes and requesting resolution by the Court, which request was made only after substantial protracted meet-and-confer efforts.  Set forth below is an example of significant disputes that arose during discovery, each one requiring Lead Counsel to vigorously litigate on behalf of Lead Plaintiff and the Class:

### a.    Disputes over Provisions in the Protective Order

112.    On September 22, 2016, after two meet and confer teleconferences where all parties engaged in good faith discussions about the language and scope of a proposed protective order, the

parties submitted a joint letter to the Court concerning the parties' remaining differences over the proposed protective order.  ECF No. 308.  The parties remained in disagreement over Defendants' mandating: (i) "Highly Confidential" designation; and (ii) that fact witnesses would be required to sign an undertaking agreeing to be bound by the protective order and consenting to jurisdiction of the Court for purposes of enforcement.  ARCP and AR Capital submitted a third dispute – only between them – over the disclosure of discovery materials to insurers.  Lead Counsel argued that a two-tiered confidentiality designation was unnecessary for this Litigation and potentially prejudicial to Lead Plaintiff's prosecution of its claims.  On October 26, 2016, the Court issued an Order, determining, *inter alia*: (i) Defendants failed to demonstrate the necessity of a "Highly Confidential" designation in the protective order; (ii) Defendants failed to show a need for an undertaking by witness as a condition for being shown discovery materials designated as "confidential"; and (iii) Defendants failed to establish a justifiable need to include its insurer as an entity entitled to review, view, or be informed of the contents of "confidential" documents.  ECF No. 313.  The protective order as modified by the Court's rulings was entered on November 15, 2016.  ECF No. 324.

### b.  Disputes over the Scope of the Parties' Document Productions

113.    On January 21, 2017, the parties submitted a joint letter to the Court asking for resolution of continuing disputes related to document productions.  The request came after multiple teleconferences in October, November, and December 2016 and January 2017 failed to resolve the disputes.  The remaining disputes included: (i) the scope of the relevant time period applicable to ARCP's document production; (ii) the production of documents by Defendants that were previously produced to government and regulatory agencies; (iii) the necessity of the search term "AFFO"; (iv) whether documents and communications with Deloitte LLP were attorney-client privileged or

- 48 -

protected attorney work product and thus not discoverable; and (v) whether named plaintiffs' investment and trading histories for securities of non-ARCP REITs were relevant.

114.    On January 24, 2017, the Court held a hearing to address the parties' numerous discovery disputes.  During the hearing on January 24, 2017, Lead Counsel successfully argued that, as a first step, ARCP should produce responsive documents through March 31, 2015, instead of – as ARCP argued – cutting off the production period at December 31, 2014.  This permitted Lead Plaintiff some insight into the Company's internal discussions leading up to the Restatement.  It also meant that ARCP, at a minimum, was required to list the documents related to the internal investigation and Restatement it withheld on a privilege log.

115.    The Court issued an order the next day that a search of all of Defendants' documents through March 31, 2015 was warranted on the basis that an enlarged search would capture documents related to the Audit Committee investigation and the Restatement, that the documents previously produced to government and regulatory authorities by AR Capital and Grant Thornton regarding ARCP-related entities were relevant to this Litigation and necessitated production, and that Grant Thornton's communications with Deloitte from October 29, 2014 through June 30, 2015 were relevant as Deloitte transitioned into the role of ARCP's outside auditor.  The Court determined that Lead Counsel's request to use only "AFFO" as a search term of AR Capital's documents was too broad, and accordingly Lead Counsel agreed to qualify this search term.  Finally, the Court granted Defendants' request that named plaintiffs produce their trading records related to investments in non-ARCP REITs.  ECF No. 352.

### c.    Disputes Regarding Defendants' Privilege Logs

116.    Following negotiation among the parties, Lead Counsel informed the Court at the January 24, 2017 hearing that the parties had agreed to exchange privilege logs by April 7, 2017.  To

that end, named plaintiffs diligently reviewed their productions for privilege and created logs detailing the privilege claimed and description of the documents withheld from the productions of Lead Plaintiff, Corsair, the NYC Funds, Union Asset Management Holding AG, Sheet Metal Workers' National Pension Fund, Mitchell and Bonnie Ellis, Dr. John Esposito, Noah Bender, and Paul Matten.  In the course of conducting that additional review, Lead Counsel uncovered further non-privileged document responsive to Defendants' requests, which were served upon Defendants on April 6, 2017.  On April 7, 2017, Lead Plaintiff timely served named plaintiffs' logs, totaling 75 documents withheld for privilege.

117.   Defendants likewise served their privilege logs on April 7, 2017:

| Defendant | Log Contents |
|---|---|
| AR Capital | Redaction Log: 1,414 pages; 15,731 entries<br>Privilege Log: 2,018 pages; 13,816 entries |
| ARCP | Categorical Redaction Log: 12 pages<br>Categorical Log of Privileged Materials Withheld from Production: 17 pages<br>Categorical Log of Privilege Materials Withheld from ARCP's Regulatory Productions: 11 pages<br>(Due to the use of categorical logs, the total number of documents redacted and withheld documents was unknown upon the logs' production, but was later disclosed to be approximately 27,000 documents) |
| Beeson | 19 entries |
| Block | Categorical descriptions<br>(Because of the use of a categorical description, the total number of documents redacted and withheld was unknown) |
| Grant Thornton | 160 entries |
| Kay | 354 entries |
| McAlister | Categorical Privilege Log: 4 pages, 1,242 documents withheld<br>Document-by-Document Privilege Log: 36 entries |
| Non-Management Directors | Categorical Privilege Log: 34 pages<br>(Because of the use of a categorical log, the total number of documents redacted and withheld documents was unknown) |
| Sealy | 46 entries |
| Underwriter Defendants | 3,576 entries[7] |

---

[7]   The Underwriter Defendants served their privilege logs on January 18, 2017.

118.     The use of categorical logs by certain defendants and the voluminous size of other defendants' logs set in motion months of painstaking reviews of Defendants' logs by Lead Counsel, database searches to compare documents produced by one party while withheld by another, legal research and analyses concerning privilege and work product assertions, contentious meet-and-confer discussions with Defendants, letter briefing to the Court on these issues, and several hearings before the Court.  Lead Counsel's arduous efforts succeeded in obtaining orders requiring Defendants to reveal in greater detail what was withheld for privilege and to produce documents where the privilege assertion was overbroad or baseless.

119.     Specifically, on May 16, 2017, Lead Counsel informed the Court of the breadth of Defendants' privilege assertions.  In response, on May 18, 2017, the Court ordered Defendants to "review their privilege logs to eliminate all documents not properly covered by privilege" and to claim privilege by document, as opposed to categories.  ECF No. 391 at 1.

120.     In an attempt to limit the disputes over privilege, following the May 16, 2017 hearing, Lead Counsel negotiated with Defendants a stipulation under Federal Rule of Evidence 502(d) and (e) under which Defendants would produce "privileged or protected documents that Defendants believe are likely to be irrelevant or of limited significance to the disputed issues in the litigation."  ECF No. 397 at 1.  ARCP and AR Capital together produced 18,862 documents pursuant to this stipulation, which was entered by the Court on June 12, 2017.  ECF No. 397.  Once Defendants produced these documents, Lead Counsel reviewed them to ascertain whether they were relevant and whether the privilege protecting their use should be challenged.

121.     After Defendants produced revised logs on June 6, 2017 pursuant to the May 18, 2017 Order, Lead Counsel meticulously reviewed the new logs to determine whether non-privileged information remained on the logs, conducted numerous searches in the document database for

- 51 -

examples of redacted documents that appeared to exemplify non-privileged information, conferred and corresponded with Defendants to seek clarification on the information in their logs, and created lists of log entries specifying the reasons for Lead Plaintiff's challenges to Defendants' privilege assertions.  Based upon its review, and as provided in the Court's order, on June 22, 2017, Lead Counsel submitted to ARCP and AR Capital separate letters detailing the reasons and specifying each entry that Lead Plaintiff challenged on their logs.  Together, Lead Counsel's letters totaled 1,028 pages.

122.    Lead Counsel continued to conduct extensive negotiations with ARCP and AR Capital regarding the challenges described in the letters.  However, irresolvable disputes remained over thousands of purportedly privileged documents.  To outline these issues for the Court, Lead Counsel researched and drafted a letter to the Court, dated July 14, 2017, which briefed the reasons for Lead Plaintiff's challenges.  Lead Counsel argued that ARCP and AR Capital had improperly claimed privilege for any attachments to email communications they claimed to also be privileged without regard to whether the attachment was privileged; asserted privilege over documents sent among non-attorneys; asserted privilege over documents that provided business rather than legal advice; and claimed privilege over documents disclosed to third parties.  ECF No. 420.

123.    In a hearing on July 18, 2017, Lead Counsel successfully argued the privilege disputes.  Noting that Defendants had, on the eve of the hearing, again revised their logs and produced documents over which they had previously claimed privilege, the Court ruled that the parties would reconvene after Lead Counsel had identified a sample of privileged documents for the Court to review.  From Lead Counsel's sample, the Court would assess whether the privilege was properly claimed.

124.     Thereafter, Lead Counsel reviewed Defendants' revised privilege logs and the documents released from Defendants' privilege claims.  Lead Counsel continued to meet-and-confer with Defendants on the outstanding privilege issues.  In advance of the next hearing, Lead Counsel spent hours examining and creating a sample of disputed privilege entries from Defendants' logs.

125.     Having assiduously prepared for the hearing on September 11, 2017, Lead Counsel presented the samples of contested privilege entries to the Court.  Of the handful of documents the Court considered, the Court largely found they were not privileged, and ordered Defendants, based on those rulings, to further refine their privilege claims.  As the parties had agreed during the hearing, ARCP produced revised privilege logs on September 25, 2017, which Lead Counsel carefully reviewed to identify by October 10, 2017 the remaining objections to the privilege claims.

126.     AR Capital failed to revise their privilege log by the agreed-upon deadline and, as a result of that delay, the Court adjourned the next hearing that was set to resolve the privilege disputes.  Lead Counsel, however, persisted in bringing the issues before the Court and therefore, researched and drafted another submission to the Court seeking to compel the revised log on October 16, 2017.  ECF No. 533.

127.     Over the course of many months of letter writing, conference calls with Defendants, and oral argument before the Court, Lead Counsel succeeded in significantly narrowing Defendants' privilege assertions, but an impasse regarding AR Capital's privilege logs and continued disputes over privilege assertions on ARCP's logs remained.  Lead Counsel thus diligently prepared for oral argument on the issues and again created a sample of privilege entries for the Court's consideration at a hearing held on November 1, 2017.  The Court made rulings on a few selected documents. Following this hearing, Defendants continued to produce documents from their logs throughout the remainder of the Litigation, including, notably, during the course of summary judgment briefing.

- 53 -

Through this process, Lead Counsel succeeded in obtaining tens of thousands of relevant and responsive documents on which Defendants had originally claimed privilege and had improperly withheld.

<div align="center">

**d.      Disputes Regarding ARCP's Internal Investigation Materials**

</div>

128.     Through the extended meet-and-confer process described above, Lead Counsel determined that ARCP was withholding thousands of documents related to the internal investigation ARCP's Audit Committee initiated after whistleblowers reported potential accounting malfeasance. Lead Counsel attempted throughout the course of the Litigation to obtain this extremely relevant and probative evidence.   Lead Counsel first raised the issue of Defendants' liberal application of attorney-client privilege and attorney work product protections to internal investigation materials at the May 16, 2017 hearing.  The Court directed ARCP to submit a motion for a protective order, and the parties subsequently negotiated a briefing schedule.

129.     On June 27, 2017, ARCP moved for a protective order with respect to the internal investigation materials, contending that the materials were attorney-client privileged and protected attorney work-product, and that protection from disclosure extended to materials provided to and created by Ernst and Young LLP ("E&Y") (the forensic auditor selected by the Audit Committee to assist in the investigation), and Teneo Strategy LLC ("Teneo") (the public relations consultant the Audit Committee hired).  ARCP further argued that no waiver of privilege had occurred for internal investigation materials that the Audit Committee had provided to Grant Thornton.  ECF No. 400.

130.     On July 10, 2017, Lead Plaintiff filed its opposition to ARCP's motion for a protective order.  ECF No. 415.  In it, Lead Plaintiff argued that ARCP had not met its heavy burden to shield the investigation-related materials.  Specifically, Lead Plaintiff argued that ARCP had failed to demonstrate that the investigation materials would not have been created in an essentially

<div align="center">- 54 -</div>

similar form regardless of litigation since these same materials were used for the business purpose of restating the Company's financial statements, AFFO, and internal control disclosures.  Moreover, Lead Plaintiff argued that even if the investigative materials were privileged or otherwise protected work product, ARCP waived any such privilege or protection by providing the information to Grant Thornton.  Finally, Lead Plaintiff argued that materials provided to Teneo – a public relations firm – were not part of the rendering of legal advice but were instead for strategic messaging ARCP was formulating to address its October 29, 2014 disclosures.

131.    At a hearing on July 18, 2017, Lead Counsel argued against the protective order, explaining at length that because the investigative materials were created for the dual purpose of ARCP's internal investigation and its Restatement audit.  As a result, ARCP had the burden to show that the materials would have been created differently if they were solely for the Restatement audit – which was primarily a business, not litigation function – a showing ARCP failed in making. Additionally, Lead Counsel argued that because the materials were provided to Grant Thornton for purposes of its audit work on the Restatement, no work product protection could be afforded to those materials, and they should be produced.

132.    On August 14, 2017, the Court issued its order, largely granting ARCP's motion, but requiring the disclosure of documents prepared by Teneo.  ECF No. 467.  Based on that ruling, Lead Counsel reviewed and adjusted Lead Plaintiff's challenges to ARCP's privilege logs, while seeking the disclosure of the Teneo documents.  Lead Counsel carefully reviewed Teneo's documents upon their production.

133.    However, when depositions began, Defendants' counsel invoked the August 14, 2017 Order to prevent witnesses from testifying regarding non-privileged facts if the witness testified they learned those facts in connection with the Company's Restatement or internal investigation.  To

- 55 -

contest what Lead Counsel believed to be Defendants' improper extension of the August 14, 2017

Order, Lead Counsel researched and drafted another Rule 2.E. letter, filed on July 10, 2018. ECF

No. 583. This letter sought to move the Court for an order (1) to cease Defendants' use of privilege

to obstruct Lead Counsel's deposition questions, (2) to reopen certain depositions, and (3) to find

that Defendants' waived privilege for those subject-matters on which privilege was used as both a

sword and a shield. The Court denied Lead Counsel's request on July 18, 2018. ECF No. 593.

### e. Disputes over Discovery of the Affirmative Defense of Reliance on Counsel

134.    Because Defendants asserted the affirmative defense that they relied on professional

advisors, Lead Counsel duly undertook to procure discovery on this matter. On September 26, 2017,

Lead Counsel emailed Defendants requesting the identity of all the professionals upon whom

Defendants relied and intended to use to support their affirmative defense. Defendants, however,

refused to provide the information unless in interrogatory form. Lead Counsel objected to the delay

because it was in the process of strategizing depositions and determining how many fact depositions

would be necessary. Thus, Lead Counsel needed to know whether to include these professional

advisors in their consideration of which depositions to notice.

135.    To resolve this issue, Lead Counsel argued at the hearing on November 1, 2017 that

to streamline the process, the identities of professional advisors on whom Defendants relied should

be provided immediately. The Court agreed, stating that the identity of lawyers was not a waiver

and they should be provided in a letter to Lead Counsel.

136.    On November 29, 2017, Defendants sent a nine-page, single-spaced letter listing all

of the professional advisors on whom they relied. At a hearing the following week, on December 4,

2017, Lead Counsel argued that because of Defendants' reliance on these individuals and entities as

an affirmative defense, Lead Plaintiff was entitled to the documents, including communications

between an attorney and a client, concerning the subject matter of that advice.  The Court agreed and Defendants requested time to re-evaluate whether or not they would rely on the advice of counsel defense.  To preserve Lead Plaintiff's ability to test Defendants' defenses, the Court also ruled that if Defendants identified a witness on their trial witness list that Lead Plaintiff did not depose, Lead Plaintiff would have the opportunity to depose them before trial.  On January 5, 2018, Defendants (with the exception of McAlister) informed Lead Plaintiff in writing that at that time that they did not intend to assert the affirmative defense of reliance on advice of counsel.

### f.     Disputes over Deposition Conduct

137.     Once depositions began, Lead Counsel sought to impose a deposition protocol to not only streamline the discovery process, given the number of parties involved, but to also stifle improper deposition conduct that had manifested itself in the initial depositions.  Defendants, however, would not agree to any protocol and the parties submitted a joint letter to the Court on February 8, 2018, requesting assistance in resolving the dispute.  ECF No. 556.  Specifically, Lead Counsel requested that the parties coordinate their lines of questioning to avoid duplication and unnecessarily prolonging depositions, as the first two depositions each lasted multiple days.  Second, Lead Counsel requested that the parties abide by Federal Rule of Civil Procedure 30(c)(2) and preclude the use of speaking objections.  In opposition, Defendants argued that a protocol was not needed because they had been coordinating their examinations, and that the objections made were appropriate.

138.     At an extensive hearing regarding discovery conduct on February 13, 2018, the Court agreed with Lead Counsel and ruled that objections should be limited to an "objection to form."  The Court also noted that no conversations with witnesses should occur unless it concerned a good-faith inquiry into privilege.  Subsequently, the parties submitted a joint dispute letter on March 4, 2018,

- 57 -

wherein Defendants requested a clarification of the Court's Order asking whether counsel were permitted to confer with their witnesses. Lead Counsel argued that the Court's direction was clear and did not need clarifying, and that Defendants' "clarification" request was a thinly-veiled attempt to get permission to coach witnesses during depositions. ECF No. 559. On March 8, 2018, the Court issued a memo endorsement limiting deposition breaks and conversations with witnesses. ECF No. 560.

139.    Following the deposition of Adam Armiger, the parties filed another joint dispute letter with the Court on March 29, 2018 about deposition conduct. Lead Counsel objected to conduct at the Armiger deposition, citing to several examples of improper witness coaching – which occurred both on and off the record – that impeded the deposition. The Court issued a memo endorsement on April 4, 2018, agreeing with Lead Counsel that "[o]bjections whether to substance or to form are not to be supported" and noted that "[a]ny breach of this rule will be sanctioned." ECF No. 564 at 1.

### g.    Disputes over Additional Grant Thornton Witness Depositions

140.    On April 12, 2018, without meeting and conferring with Lead Counsel, ARCP, ARC Properties, the ARC Defendants, Schorsch, and Block submitted to the Court a joint dispute letter with Grant Thornton, over the latter's refusal to schedule the depositions of Grant Thornton witnesses Christopher Morton and Nishit Mehta. ECF No. 573. Lead Counsel promptly filed a letter in response arguing that ARCP and the other movants were trying to disrupt the strategic order of Lead Plaintiff's schedule of depositions – which had required months of negotiation with Grant Thornton to achieve. ECF No. 569. Lead Counsel asserted that it had strategically determined to depose more ARCP and AR Capital witnesses before deposing the remaining Grant Thornton witnesses and concurred with Grant Thornton that the depositions of Morton and Mehta should only

- 58 -

proceed after those depositions were completed if they were taken at all. ARCP and the other movants filed a letter with the Court on April 16, 2018, objecting to Lead Plaintiff's submission. ECF No. 570. The Court agreed with Lead Plaintiff and Grant Thornton's position, holding that that "[t]here is no need to upset the sequence of plaintiffs' depositions at this time" given that some witnesses on Lead Plaintiff's list likely would testify as to the same matters as Morton and Mehta and that their depositions may only be taken after Lead Plaintiff had completed its deposition of Grant Thornton's witnesses. ECF No. 571 at 2.

### h. Disputes over Block's Requested Adjournment of His Deposition

141. On October 29, 2018, Block requested an adjournment of his forthcoming deposition on the basis of a recently filed Federal Rule of Criminal Procedure 33 motion seeking a new trial, and Block's request for an evidentiary hearing concerning an alleged *Brady/Giglio* violation in connection with his criminal proceedings. Lead Plaintiff argued against the adjournment on the basis that Block made the decision to invoke his Fifth Amendment rights more than two years prior, and continued to do so through the entirety of discovery. Accordingly, Block's request was not just an adjournment request, but could result in a revocation of his Fifth Amendment invocations after the completion of discovery and on the eve of summary judgment – an improper strategic move that would greatly prejudice Lead Plaintiff and the Class. ECF No. 611. The Court agreed with Lead Plaintiff and issued a memo endorsement on October 30, 2018, denying Block's request for adjournment. ECF No. 612.

### i. Dispute over the Deposition of Casson A. Wilson IV

142. On July 18, 2018, Lead Plaintiff moved for authorization pursuant to 28 U.S.C. §1783 (the "Walsh Act") for the issuance of a deposition subpoena to Casson A. Wilson IV, a former employee of ARCP, who was living in Hong Kong. ECF No. 590. The Walsh Act authorizes the

issuance of a subpoena of U.S. nationals who are located abroad and Lead Counsel carefully researched the requirements for this motion and did a thorough investigation into Wilson's whereabouts prior to bringing it. Prior to filing its 13-page motion, Lead Counsel met and conferred with Wilson's counsel multiple times over the span of four months to facilitate Wilson's voluntary deposition in Hong Kong. After negotiations with Wilson's counsel stalled and the witness refused to be deposed, Lead Plaintiff sought relief from the Court.

143.    In support of its motion, Lead Plaintiff argued, that as ARCP's "point" person for the Company's corporate guidance model, Wilson's testimony was highly probative to core issues in the Litigation, that only he could provide such testimony, and that his testimony likely would provide direct proof to two key elements of Lead Plaintiff's claims – falsity and scienter. Lead Plaintiff also argued that Wilson was one of two ARCP employees who had independently discovered that ARCP was overstating its reported AFFO per share and had participated in a meeting with ARCP's executives following the Q1 2014 Form 10-Q filing to discuss the material AFFO per share overstatement, thereby underscoring the probative nature of his testimony.

144.    Wilson filed a 17-page response on July 20, 2018, characterizing Wilson as a junior employee at ARCP and downplaying his knowledge of the events at issue, while arguing that Lead Plaintiff had already obtained relevant testimony from other witnesses regarding the same subject matter that Lead Plaintiff sought to depose Wilson about. ECF No. 595. Lead Plaintiff submitted a nine-page reply on July 27, 2018, arguing, *inter alia*, that Wilson was a critical eyewitness to ARCP's fraud, and whose testimony would be more reliable than more senior, corporate insiders who are also defendants in the Litigation. Moreover, after filing its opening motion, Lead Plaintiff discovered evidence that Wilson would be returning to the United States in late 2018, thereby

- 60 -

refuting an earlier representation that he had no plans to return in the foreseeable future.  ECF No. 601.

145.    On August 2, 2018, the Court issued an Order authorizing the issuance of a subpoena pursuant to the Walsh Act for Wilson's deposition, finding that Lead Plaintiff had successfully demonstrated all of the requisite elements.  ECF No. 603.  Subsequently, Lead Plaintiff was able to elicit crucial deposition testimony from Wilson, as underscored by Lead Plaintiff's designation of him as one of its "will call" witnesses (via deposition testimony) for trial.

**J.    Summary Judgment**

**1.    Defendants' Motions for Summary Judgment and Motion to De-Certify the Class**

146.    On February 8, 2019, Defendants filed 12 separate motions for summary judgment and a motion to de-certify the Class.  ECF Nos. 624, 631, 639, 643, 644, 651, 655, 662, 663, 671, 673, 678.

147.    In support of its motion for summary judgment, ARCP submitted an 85-page brief, arguing that there were no genuine issues of material fact concerning falsity, scienter, loss causation, tracing, and forward-looking statements to be resolved by the trier of fact. [8]  Specifically, ARCP argued there could be no objectively materially false or misleading statement or omission prior to Q2 2014 because there were no accounting rules or requirements governing how to calculate AFFO, and that any omission concerning the Company's AFFO methodology was immaterial.  ECF No. 754 at 42-49.  ARCP also argued that Lead Plaintiff could not show that ARCP's AFFO methodology disclosed in its FY 2012 Form 10-K through Q1 2014 Form 10-Q was subjectively false because ARCP's calculation of AFFO was a statement of opinion and Lead Plaintiff had no evidence of

---

[8]    ARCP's motion for summary judgment was submitted collectively by ARCP and ARC Properties.

disputed material facts supporting its allegation the methodology was subjectively false under the standard set forth in *Omnicare*. *Id*. at 53-57. ARCP also argued that there were no disputed material facts about ARCP's scienter relating to alleged misstatements or omissions prior to the Q2 2014 Form 10-Q. *Id*. at 57-65.

148. With respect to loss causation, ARCP argued that the alleged misstatements and omissions could not have caused losses to any class member because the claims asserted by Lead Plaintiff were based on misstatements and omissions first disclosed by the Company in March 2015, not on October 29, 2014, which is the date of the sole corrective disclosure alleged by Lead Plaintiff. *Id*. at 65-70. ARCP also asserted that ARCP's methodology for calculating AFFO was disclosed and known to the market and accordingly, there could be no artificial inflation in the price of ARCP's securities. *Id.* at 70-71.

149. ARCP further argued that because the alleged misstatements concerning the design and effectiveness of ARCP's internal controls prior to Q2 2014 were statements of opinion, Lead Plaintiff had to produce disputed material facts showing those statements were subjectively false, which it argued Lead Plaintiff could not do. *Id*. at 71-77. ARCP further proffered an additional argument that Lead Plaintiff's §11 claims arising from the Cole Merger, the ARCT IV Merger, and the May 2014 Offering must be dismissed because the named plaintiffs could not trace their shares to the registration statements for those offerings. *Id*. at 77. Finally, ARCP argued that Lead Plaintiff's §10(b) claims based on forward-looking statements concerning ARCP's projected AFFO must be dismissed based on the Court's previous rulings dismissing these statements and alternatively, there was no evidence that ARCP's management believed the projected AFFO to be false. *Id*. at 77-80.

150.     In the alternative, ARCP moved to de-certify the Class arguing that individualized questions regarding each class member's knowledge of ARCP's AFFO methodology predominated over class-wide issues.  *Id*. 80-84.  ARCP's premise for its motion to de-certify the Class was its contention that the Company's methodology for calculating AFFO was fully disclosed to the market.  *Id*. at 82-84.  In support of this argument, ARCP provided declarations from three sell-side equity analysts.  ECF Nos. 756-44, 756-46, 756-47.  ARCP asserted that individualized trials would be necessary for every member of the Class to determine each class member's knowledge of the Company's methodology for calculating AFFO, and whether they were misled by ARCP's disclosures.  ECF No. 754 at 81.  Alternatively, ARCP requested that the Court shorten the Class Period so that it began on July 29, 2014, which is the date Defendants contended the Company stopped reporting AFFO using its prior methodology.  *Id*. at 84.

151.     In support of its motion for summary judgment or in the alternative, motion to de-certify the Class, ARCP relied on 139 exhibits and asserted that there were 203 statements of undisputed facts.  ECF Nos. 755, 756.

152.     The ARC Defendants submitted their own motion for summary judgment, setting forth five separate grounds for dismissal.  ECF No. 758.[9]  First, the ARC Defendants argued that because Lead Plaintiff's allegations concerning GAAP misstatements relied on the Company's restatements, which the ARC Defendants contended were inadmissible, there was no evidence to support any claim based on alleged GAAP misstatements.  *Id*. at 7-32.  Second, the ARC Defendants argued that ARCP's alleged GAAP errors were quantitatively and qualitatively immaterial.  *Id*. at 33-37.  Third, the ARC Defendants argued that AR Capital and ARC Advisors did not culpably

---

[9]     The ARC Defendants also joined in the motions for summary judgment filed by ARCP and Grant Thornton.

participate in the alleged misstatements that were the basis of the primary violations of §§10(b) and 11, thereby warranting summary judgment on the control person claims alleged against these two defendants. *Id*. at 37-44. Fourth, the ARC Defendants asserted that Bowman, Budko, Jones, Kahane, and Weil established an affirmative due diligence defense on the GAAP and internal control statements in the registration statements, and that Bowman established an affirmative due diligence defense on the non-GAAP portions of the registration statements. *Id*. at 44-53. Fifth, the ARC Defendants argued that Bowman, Jones, Kahane, and Weil were not liable for §11 violations because there were no disputed material facts evidencing any misstatement in ARCP's Shelf Registration Statement when it became effective in March 2013, which was the only offering document each signed. *Id*. at 53-58. In support of their motion for summary judgment, the ARC Defendants relied on 99 exhibits and asserted that there were 261 statements of undisputed facts. ECF Nos. 759, 760.

153.   Beeson relied on two separate grounds in moving for summary judgment.[10] Beeson first argued that she could not be liable for alleged misstatements that she did not make and over which she did not have "'ultimate authority,'" citing the Supreme Court's opinion in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). ECF No. 678-1 at 6-11. Beeson also asserted that there was no evidence that she acted with scienter in connection with ARCP's FY 2013 or Q1 2014 financial results, arguing that she was a non-accountant and was not aware of the Company's change in AFFO methodology; she relied on others in connection with the statements at issue, including Schorsch, Block, Grant Thornton, and Weiser Mazars LLP; and she had ample factual basis for the statement she made on the FY 2013 earnings call. *Id*. at 11-28. In support of

---

[10]   Beeson also incorporated the arguments set forth in the motions for summary judgment by Kay, Schorsch, and the ARC Defendants.

her motion for summary judgment, Beeson relied on 41 exhibits and asserted that there were 99 statements of undisputed facts.  ECF Nos. 678-2, 678-3.

154.    In Block's motion, he argued that he was entitled to summary judgment on all of Lead Plaintiff's claims, except for those pertaining to the reporting of AFFO in Q2 2014.  ECF No. 674 at 4-5.  Incorporating the arguments set forth in his co-defendants' motions for summary judgment, Block emphasized that his invocation of the Fifth Amendment could not be used to show a genuine issue of material fact.  *Id*. at 5.  Block also argued that the evidence showed that the decision to change AFFO methodology was fully researched and that the Company's management team believed the methodology to be appropriate.  *Id*.  In support of his motion for summary judgment, Block relied on both ARCP's and the ARC Defendants' statements of undisputed facts. ECF No. 675.

155.    Grant Thornton argued five distinct grounds for its motion for summary judgment. First, Grant Thornton argued that there was no evidence that its audit opinions omitted known material facts that would render them misleading under the standard set forth in *Omnicare*.  ECF No. 771 at 16-24.  Specifically, Grant Thornton argued that McAlister's representations about what she told the Grant Thornton auditor in July 2014 were not enough to support liability because she had recanted her allegations and McAlister's allegations were only relevant to a claim that had previously been dismissed by this Court.  Grant Thornton also asserted that the evidence demonstrated that its auditors were not aware of any alleged misstatement or of any weaknesses in ARCP's internal controls over financial reporting at the time.

156.    Second, Grant Thornton argued that it had established the affirmative defense of negative loss causation – that undisputed facts proved that something other than Defendants' alleged misrepresentations caused the Class's §11 losses.  *Id*. at 25-35.  In support of its negative loss

- 65 -

causation argument, Grant Thornton, like ARCP, contended that the October 29, 2014 disclosure was far narrower than Lead Plaintiff claimed and did not reveal that any alleged statement by Grant Thornton was false or misleading.   Instead, Grant Thornton argued it was the March 2015 Restatement that disclosed Grant Thornton's prior audit opinions were false.   Accordingly, Grant Thornton asserted that it was not liable for any losses, as the price of ARCP securities increased in response to the March 2015 disclosures in the Restatement.  *Id*. at 26-31.   Grant Thornton also argued that by the time of the October 29, 2014 disclosure, the 2012 Form 10-K was irrelevant to investors due to the extraordinary change ARCP had undergone as a Company, with assets growing from $256 million at year-end 2012 to $21.3 billion by the end of Q2 2014.  *Id*. at 31-35.

157.    Third, Grant Thornton asserted that the alleged misstatements in ARCP's 2012 financial statements were not material at the time of the offerings because the Restatement identified only a single group error adjustment of $284,000, which was inconsequential to a company that had reported assets of almost two billion dollars prior to the first offering at issue in this Litigation.  *Id*. at 35-38.

158.    Fourth, Grant Thornton contended that it was entitled to summary judgment related to certain of Lead Plaintiff's §11 claims because there was no evidence that any plaintiff could trace their ARCP common stock to the relevant registration statements.  *Id*. at 39-50.   Specifically, Grant Thornton argued that because the common stock is held in the Depository Trust Company's ("DTC") street name and in a fungible mass, there was no way that any particular share of common stock could be traced to a particular registration statement when there had been multiple offerings of ARCP common stock, which used the same CUSIP identifier.  *Id*. at 43-49.   Grant Thornton also argued that the Court should, at least, grant summary judgment of certain of Lead Plaintiff's §11

claims with respect to aftermarket purchasers because these purchasers did not buy their common stock in directly in an offering, but instead in the open market. *Id*. at 49-50.

159.    Finally, Grant Thornton argued that any claims against it based on alleged misstatements in the Management Discussion and Analysis ("MD&A") section of ARCP's Forms 10-K should be dismissed because this portion of each filing was not audited by Grant Thornton, and as a result, Grant Thornton was not responsible for any allegedly false or misleading statements in the MD&A. *Id*. at 50-55.  In support of its motion for summary judgment, Grant Thornton relied on 69 exhibits and asserted that there were 135 statements of undisputed fact.  ECF Nos. 772, 773.

160.    Kay's motion for summary judgment focused on the following arguments: (i) Lead Plaintiff had no evidence that Kay acted with scienter in connection with ARCP's historical accounting metrics, guidance, and internal controls, nor did Lead Plaintiff have any evidence demonstrating Kay's motive to commit fraud; (ii) Kay's alleged misstatements were neither material nor false, nor did Kay "make" any misrepresentation or omissions under the standard set forth in *Janus*; and (iii) Lead Plaintiff could not prove loss causation for periods earlier than Q1 2014 and on subject matters other than AFFO because these issues were not disclosed on October 29, 2014 (as also argued by ARCP in its motion for summary judgment).  ECF No. 688.  In support of his motion for summary judgment, Kay relied on 184 exhibits and asserted that there were 470 statements of undisputed fact.  ECF Nos. 687, 765.

161.    McAlister's motion for summary judgment joined certain of the arguments set forth by ARCP, and emphasized that her invocation of the Fifth Amendment privilege was not enough to create a genuine issue of material fact.  ECF No. 672.

162.    The Non-Management Directors offered two chief grounds in support of their motion for summary judgment.  ECF No. 653.  First, the Non-Management Directors argued that they were

- 67 -

exempt from liability because they reasonably relied on Grant Thornton for the portions of ARCP's registration statements that were "expertised." *Id*. at 22-24. The Non-Management Directors asserted that Grant Thornton had issued unqualified audit reports on the Company's 2012 and 2013 financial statements and the adequacy of ARCP's internal controls, which the Non-Management Directors relied upon and had no reason to doubt were accurate. Second, the Non-Management Directors further argued that they conducted a reasonable investigation on the "non-expertised" portions of ARCP's registration statements. *Id*. at 24-35. The Non-Management Directors identified various diligence actions that they took for each registration statement, including reviewing past filings, speaking with management and directors, reviewing drafts of both the registration statements and the annual and quarterly reports that were incorporated into the registration statements by reference, relying on the advice of auditors and other experts, and regularly attending Board meetings. *Id*. In support of their motion for summary judgment, the Non-Management Directors relied on 104 exhibits and asserted that there were 106 statements of undisputed fact. ECF Nos. 670, 654, 761.

163.     In RCS's motion for summary judgment, the underwriter asserted that because of its previous bankruptcy filing, it was precluded from using its assets to settle or defend Lead Plaintiff's claims. ECF No. 625 at 6-7. RCS joined in other defendants' negative causation arguments and argued it had conducted the requisite due diligence to defeat any §11 claim. *Id*. at 7-8. In support of its motion for summary judgment, RCS relied on two exhibits and asserted that there were 15 statements of undisputed fact. ECF Nos. 626, 628.

164.     Schorsch offered up five grounds for summary judgment in his favor. ECF No. 762. First, Schorsch joined in ARCP's argument concerning the pre-July 29, 2014 AFFO claims. In particular, Schorsch argued that: (i) ARCP's AFFO reporting was transparent and consistent with

applicable rules and regulations; (ii) the AFFO presentation was an expression of opinion and therefore not actionable unless believed to be false at the time (which Schorsch claimed he did not believe was false at the time); and (iii) there was no evidence of loss causation for statements made prior to Q2 2014. *Id*. at 15. Second, Schorsch argued that he was not the maker of any statements at issue in connection with the July 29, 2014 Form 10-Q filing under the standard set forth in *Janus*, including an assertion for the first time in this Litigation, that he did not authorize the AFFO presentation that appeared in the filed version of Q2 2014 Form 10-Q. *Id*. at 15-17. Third, Schorsch argued that Lead Plaintiff had no admissible evidence establishing his scienter in connection with ARCP's AFFO. *Id*. at 17-27. Fourth, with respect to alleged non-AFFO misstatements, Schorsch joined in the arguments set forth by the ARC Defendants, ARCP, and Grant Thornton. *Id*. at 27-28. Finally, Schorsch also joined in other defendants' arguments concerning Lead Plaintiff's §11 claims, including arguments regarding tracing, loss causation, due diligence, and lack of material falsity in the registration statements. *Id*. at 28-29. In support of his motion for summary judgment, Schorsch relied on 87 exhibits and asserted that there were 58 statements of undisputed fact. ECF Nos. 763, 764.

165.    Sealy filed his own motion for summary judgment, arguing that he had established an affirmative defense of due diligence. ECF No. 646. Sealy asserted that he reasonably relied on both Grant Thornton and ARCP's underwriters and other experts, and had no reason to believe that the expertised financial statements were inaccurate. *Id*. at 11-15. Sealy also contended that he conducted a reasonable investigation on the non-expertised portions of the registration statements, identifying various actions he had undertaken, including reviewing all of the materials presented to him and the Board, and regularly attending Board meetings. *Id*. at 15-22. In support of his motion

- 69 -

for summary judgment, Sealy relied on 19 exhibits and asserted that there were 58 statements of undisputed fact.  ECF Nos. 648, 649.

166.    The Underwriter Defendants' motion for summary judgment relied on three separate grounds: (i) they reasonably relied on Grant Thornton's audit of ARCP's financial statements; (ii) they accumulated a deep reservoir of knowledge through their due diligence, undertook additional due diligence in connection with each offering, and had no reason to believe that the AFFO statements were misleading due to the lack of red flags; and (iii) the non-lead Underwriter Defendants reasonably relied on the lead Underwriter Defendants.  ECF No. 664 at 26-33.   In support of their motion for summary judgment, the Underwriters Defendants relied on 158 exhibits and asserted that there were 146 statements of undisputed fact.  ECF Nos. 665, 689.

167.    In total, Defendants' motions for summary judgment and motion to de-certify the Class were comprised of 12 separate briefs, spanning over 400 pages and citing to over 250 different legal authorities.  Defendants also asserted that over 1,500 purported statements of undisputed fact existed and relied on hundreds of exhibits in support of their motions.  These exhibits included the Company's SEC filings, deposition transcripts, plaintiffs' documents, documents produced by various defendants and third parties, industry papers, and declarations submitted by analysts, experts, and individual defendants.

### 2.    Lead Plaintiff's Oppositions to Defendants' Motions for Summary Judgment

168.    After spending hundreds of hours reviewing and analyzing Defendants' arguments, evidence, and legal authorities, on March 15, 2019, Lead Plaintiff submitted over 300 pages of argument, in four separate briefs, in response to Defendants' motions for summary judgment and motion to de-certify the Class including: (i) an Omnibus Opposition to Defendants' Motions for Summary Judgement with Respect to Class Plaintiffs' Section 10(b) Issues; (ii) an Omnibus

- 70 -

Opposition to Defendants' Motions for Summary Judgment with Respect to Class Plaintiffs' §11 Claims; (iii) an Opposition to Defendant Grant Thornton LLP's Motions for Summary Judgment; and (iv) an Opposition to the Underwriter Defendants' and RCS's Motions for Summary Judgment. ECF Nos. 776, 782, 784, 785.  In support of its oppositions, Lead Plaintiff relied on over 340 exhibits and cited over 250 cases.  Lead Plaintiff also filed over 700 pages in responses and objections to Defendants' Rule 56.1 Statements of Undisputed Fact.  ECF Nos. 777, 778, 779, 780, 781, 783, 786, 787, 788.  Lead Plaintiff additionally submitted objections to over 500 exhibits presented in support of Defendants' motions for summary judgment.  ECF No. 727.

169.    In its 150-page opposition to Defendants' motions for summary judgment in connection with §10(b) issues, Lead Plaintiff addressed all of Defendants' contentions and argued that Defendants had failed to meet their heavy burden of demonstrating that there was no genuine issue of material fact with respect to falsity, scienter, the applicability of *Janus*, truth-on-the-market defense, loss causation, and control person liability.  ECF No. 776.  Specifically, in connection with falsity, Lead Plaintiff argued, *inter alia*, that genuine issues of material fact existed as to whether ARCP expressly admitted to material falsity in both the Company's October 29, 2014 disclosure and the Restatement.  The Restatement corrected false financial information in ARCP's Forms 10-K for FY 2012 and FY 2013 and Forms 10-Q for Q1 2014 and Q2 2014, and admitted that ARCP's AFFO was overstated for year end 2012 and 2013, and each of the six quarters starting with Q1 2013. Accordingly, because ARCP's offering materials incorporated false GAAP and non-GAAP financial information, Lead Plaintiff argued that the offering materials were materially false when issued. Lead Plaintiff also argued that the AFFO misstatements were material to investors, and in support, cited to testimony from numerous witnesses to the importance of the AFFO metric to analysts and investors, as well as support from Lead Plaintiff's experts.  *Id.* at 18-19.

- 71 -

170.     With respect to scienter, Lead Plaintiff presented evidence that the §10(b) defendants had both motive and opportunity to commit fraud, and cited to numerous documents and deposition testimony in support of its argument that through the ARCT III and ARCT IV Mergers, ARCP was able to funnel millions of dollars to Schorsch, Block, and the other AR Capital partners – all of which personally benefitted Schorsch and Block.  *Id.* at 29-38.  Lead Plaintiff also argued that the §10(b) defendants acted with conscious misbehavior or recklessness, based on evidence of: (i) Schorsch and Block's decision to change ARCP's AFFO calculation methodology to meet the Company's guidance, all without disclosing this change to investors; (ii) an unsupported plug in ARCP's Q3 2013 AFFO; (iii) ARCP's management's awareness of the AFFO misstatement in the Q1 2014 Form 10-Q; (iv) the intentional manipulation of the Company's Q2 2014 financial results and AFFO; (v) Schorsch and Block's scienter in connection with ARCP's GAAP financial results; (vi) Schorsch and Block knowingly making false statements regarding internal controls they violated during the Class Period; (vii) Kay and Beeson's involvement in the fraud; and (viii) the unreliability of the Company's AFFO guidance model, which was known by management.  *Id.* at 39-93.  Lead Plaintiff further argued that: (i) Block and McAlister's invocation of the Fifth Amendment throughout the Litigation warranted adverse inferences; (ii) the Company's scienter was established through the knowledge and actions of Schorsch, Block, Kay, Beeson, and McAlister; and (iii) certain defendants' reliance on other professionals did not negate evidence of their scienter.  *Id.* at 93-109.

171.     In response to Defendants' loss causation arguments, Lead Plaintiff submitted a 54-page declaration, with accompanying exhibits, from Dr. Feinstein, which contained his loss causation analysis and conclusions.  He opined that Defendants' alleged misrepresentations, omissions, and deceptive conduct artificially inflated the prices of ARCP securities from February 28, 2013 through November 3, 2014, and caused investors losses once the corrective disclosures

- 72 -

dissipated the artificial inflation from the prices of ARCP's securities. Dr. Feinstein opined that the corrective disclosures and their inextricable ramifications accounted for the residual price declines in ARCP securities on October 29-31, 2014 and November 3, 2014. In reaching his conclusions, Dr. Feinstein not only relied upon fundamental principles of finance and statistical evaluation, but he also conducted a thorough analysis of ARCP's statements, news articles, analyst reports, and analyst valuation models. Furthermore, Dr. Feinstein empirically proved his conclusions through an event study analysis. *Id.* at 124-138; ECF No. 791-119.

172.     With respect to Defendants' truth-on-the-market defense, Lead Plaintiff argued that ARCP's improper AFFO methodology and the resulting inflation of the Company's financials was not known to market analysts or investors, and challenged the veracity of the three analysts' declarations relied upon by certain of the Defendants. ECF No. 776 at 112-24. Lead Plaintiff also asserted that AR Capital and ARC Advisors were liable as control persons based on their control over ARCP and their culpable participation in ARCP's fraud, which was accomplished through Schorsch and Block. *Id.* at 138-44. Finally, Lead Plaintiff argued that Defendants' motion to de-certify was baseless given that ARCP's improper AFFO methodology was not known to market participants. *Id.* at 144-49.

173.     In Lead Plaintiff's 83-page opposition to Defendants' motions for summary judgment on §11 claims, Lead Plaintiff argued that there were genuine issues of material fact because: (i) no defendant had established a due diligence defense; (ii) no defendant had established a reliance defense; (iii) Lead Plaintiff had established evidence of AR Capital and ARC Advisors' "control" liability; (iv) the Restatement was admissible; (v) Bowman, Jones, Kahane, and Weil were liable for the July and December 2013 Offerings; and (vi) Lead Plaintiff had established evidence of tracing plaintiffs' shares to the false registration statements. ECF No. 784.

174.     In particular, in connection with the due diligence defense, which applied to non-expertised statements (including the unaudited financial information in ARCP's Forms 10-Q and Forms 10-K), Lead Plaintiff argued that no defendant had proved that he, she, or it had conducted a reasonable investigation into statements concerning both AFFO and internal controls over financial reporting.  *Id.* at 20-45.  In support, Lead Plaintiff cited to the substantial amount of evidence it had amassed from the numerous §11 defendants' deposition testimony.  With respect to Defendants' reliance defense as to the expertised portions of the registration statements at issue, Lead Plaintiff argued that multiple uninvestigated and unresolved red flags precluded Defendants from escaping liability. *Id.* at 45-59.  Lead Plaintiff argued that examples of these red flags included the multiple unsupported asset purchase agreements between ARCP and AR Capital, as well as the approval of ARCP's 2014 executive incentive compensation plan, which included an unauthorized increase of the award cap by Schorsch and Block from $120 million to over $222 million.

175.     As to control person liability, Lead Plaintiff contested Defendants' argument that §15 included the element of culpable participation, as its §11 claims were based on strict liability and not fraud, thereby overcoming any notion that such element was required.  *Id.* at 60-61.  Lead Plaintiff also argued that the Restatement was admissible against the ARC Defendants due to several hearsay exceptions, under the Federal Rules of Evidence, and also argued that any questions of the Restatement's reliability goes to the weight given to it rather that its admissibility.  *Id.* at 62-67.  In connection with Bowman, Jones, Kahane, and Weil's §11 liability for the July and December 2013 Offerings, Lead Plaintiff argued that these new offerings presented "fundamental changes" to the 2013 Shelf Registration Statement each had signed, rendering these individual defendants liable for these new offerings.  *Id.* at 68-73.  Finally, Lead Plaintiff addressed Grant Thornton's tracing argument, and argued that: (i) class members who received common stock acquired through the Cole

and ARCT IV mergers could trace their shares to the relevant proxy statements/prospectus for each merger; (ii) Lead Plaintiff had established the traceability of common stock purchased in the May 2014 Offering; and (iii) aftermarket purchases had standing under §11. *Id*. at 73-82.

176.    In Lead Plaintiff's 62-page opposition to Grant Thornton's motion for summary judgment, Lead Plaintiff argued that numerous genuine issues of material fact existed concerning Grant Thornton's statements that ARCP's financial statements complied with GAAP, that ARCP maintained effective internal controls over financial reporting, and that Grant Thornton conducted its audits in accordance with the Public Company Accounting Oversight Board ("PCAOB") standards. ECF No. 782.  Specifically, Lead Plaintiff argued that Grant Thornton's opinions in its 2012 audit report that it complied with PCAOB standards was false and misleading under *Omnicare* because Grant Thornton was aware that ARCP had revised its AFFO methodology just prior to the filing of the Company's 2012 Form 10-K and did not object to, or raise any questions regarding, the new methodology.  As a result of the revised methodology, a Grant Thornton auditor identified several material misstatements and inconsistencies in the AFFO table while reviewing the draft 2012 Form 10-K, but did no further investigation into these misstatements or inconsistencies; and Grant Thornton's failure to take action and to exercise professional skepticism in its audit violated PCAOB standards.  *Id.* at 9-22.  Lead Plaintiff also argued that: (i) Grant Thornton's opinions in its 2013 audit report were false and misleading under *Omnicare* because Grant Thornton knew that ARCP's related-party transactions – which involved unsubstantiated asset purchase agreements – did not comply with GAAP and failed to audit these transactions in compliance with PCAOB standards; (ii) Grant Thornton knew that Kay's and Beeson's sign-on bonuses were misclassified under GAAP and failed to audit these expenses in compliance with PCAOB standards; (iii) Grant Thornton was aware of ARCP's unsupported last minute adjustment to the AFFO table in Q3 2013, which

- 75 -

increased the Company's reported AFFO by one cent per share; and (iv) because Grant Thornton knew of ARCP's sham related-party transactions, its opinion that the Company maintained effective controls over financial reporting was false and misleading. *Id.* at 22-49.

177.     In its 42-page opposition to the Underwriter Defendants' and RCS's motions for summary judgment, Lead Plaintiff argued that there were genuine issues of material fact concerning the Underwriter Defendants' and RCS's liability under §11. ECF No. 785. First, Lead Plaintiff argued that the Underwriter Defendants had failed to establish that they had conducted a reasonable investigation of the non-expertised portions of the offering materials because they: (i) improperly applied the reliance defense standard (which only applies to expertised statements); (ii) failed to independently investigate and verify ARCP's unaudited financial information, which included AFFO; (iii) provided very little evidence of their due diligence investigation; and (iv) failed to establish that they had conducted due diligence by claiming they had a "reservoir of knowledge." *Id.* at 5-26. Second, in connection with the expertised portions of the offering materials, Lead Plaintiff argued that numerous red flags should have caused the Underwriter Defendants to question the accuracy of ARCP's audited statements, but their failure to follow-up or investigate those red flags precluded their ability to shield themselves with the reliance defense. *Id.* at 27-31. In connection with the affirmative due diligence defense, Lead Plaintiff argued that the non-lead underwriters had failed to demonstrate that their due diligence amounted to a reasonable investigation, as the evidence revealed that they were not substantially involved in the offerings at issue. *Id.* at 31-33.

178.     Finally, Lead Plaintiff addressed RCS's arguments pertaining to bankruptcy, indemnity, loss causation, and due diligence. Lead Plaintiff argued that its §11 claim against RCS was expressly preserved by the Bankruptcy Court and therefore could not serve as a basis for RCS's dismissal. *Id.* at 33-39. Additionally, Lead Plaintiff argued that ARCP's indemnification of the

underwriters meant that RCS's liability did not turn on the availability of its insurance coverage. *Id.* at 39-40. Lead Plaintiff further argued that RCS had failed to cite to any evidence in support of its negative causation defense and had also failed to substantiate its argument that it had conducted sufficient due diligence in connection with the July 2013 Offering. *Id.* at 40-41.

179.    In support of its oppositions to Defendants' motions for summary judgment, Lead Plaintiff submitted the 149-page Declaration of Auditing and Accounting Expert John Barron. In his declaration, Mr. Barron opined that: (i) ARCP's financial statements and AFFO beginning with the year ended December 31, 2012 through Q2 2014 were materially misstated; (ii) ARCP's disclosures accompanying its FFO and AFFO calculations using the hybrid method contained a material misstatement of fact; (iii) Grant Thornton failed to comply with PCAOB standards; and (iv) material weaknesses in ARCP's internal controls contributed significantly to the material errors in ARCP's financial statements and related financial information for the years ended December 31, 2012 and 2013, the interim periods in 2013, and Q1 and Q2 2014. ECF No. 791-118.

### 3.    Lead Plaintiff's Motion to Preclude

180.    On March 15, 2019, in addition to its oppositions to Defendants' motions for summary judgment, Lead Plaintiff filed a Motion to Preclude the ARCP Defendants from Asserting Defenses Premised on the Improper Use of the Attorney-Client Privilege. ECF No. 708. Lead Plaintiff sought to preclude ARCP from asserting any defenses at summary judgment or trial that the Restatement purportedly reflected changes in new management's policy or judgment and reflected changes for other non-fraudulent reasons. Lead Plaintiff argued that throughout discovery Defendants shielded themselves behind the attorney-client privilege by repeatedly refusing to produce documents and permit witnesses to answer questions during depositions on the factual bases for the Restatement. Accordingly, Lead Plaintiff asserted that Defendants could not now use the

attorney-client privilege as a sword to proclaim that the Restatement was the result of new management's judgment, or were merely adjustments for other non-fraudulent reasons, rather than an admission of material accounting errors.  ECF No. 774 at 1-4.  In the alternative, Lead Plaintiff requested that the Court find that ARCP had waived the attorney-client privilege, and permit Lead Plaintiff access to the withheld information.  *Id*. at 4.

181.    On March 29, 2019, both ARCP and Grant Thornton filed an opposition to Lead Plaintiff's motion to preclude.  ECF Nos. 766, 768.  ARCP contended that Lead Plaintiff was merely recycling its arguments on the attorney-client privilege it had previously presented to the Court and that there was no reason for the Court to revisit its previous rulings.  ECF No. 768 at 2-9.  Grant Thornton argued that it had permitted Lead Plaintiff access to discovery about the reasons for the Restatement, by producing relevant documents and allowing Grant Thornton witnesses to respond to questions on this issue.  ECF No. 766 at 3-6.

182.    On April 5, 2019, Lead Plaintiff filed its reply in support of its Motion to Preclude.  ECF No. 813.  Lead Plaintiff argued that ARCP – for the first time in this Litigation – was affirmatively using conclusions drawn from information the Company and other defendants had repeatedly shielded from discovery throughout this Litigation in a defensive manner.  Accordingly, an order from the Court precluding use of such information was now warranted.  *Id*. at 2-6.  Alternatively, Lead Plaintiff requested the Court re-open limited discovery to permit Lead Plaintiff to obtain testimony about the reasons underlying the Restatement without any objection from Defendants.  *Id*. at 6.

183.    On April 12, 2019, ARCP filed a Sur-Reply in Further Support of Opposition to Plaintiffs' Motion to Preclude, arguing again that Lead Plaintiff was using the same arguments concerning this subject-matter that were previously rejected by the Court.  ECF No. 837.

- 78 -

####     4.     Defendants' Replies in Support of their Motions for Summary Judgment and Motion to De-Certify the Class

184.     On April 5, 2019, Defendants filed 12 replies, consisting of over 350 pages of briefing, in support of their motions for summary judgment.  ECF Nos. 792, 794, 795, 799, 802, 805, 807, 808, 809, 824, 827, 828.  ARCP also filed a reply in support of its motion to de-certify the Class.  ECF No. 825.  Defendants also filed eight separate responses to Lead Plaintiff's objections to exhibits submitted in support of Defendants' motions for summary judgment.  ECF Nos. 793, 796, 797, 803, 816, 819, 826, 829.

185.     In its 83-page reply, ARCP argued that: (i) Lead Plaintiff had not raised a genuine issue of material fact on either objective or subjective falsity of ARCP's AFFO methodology prior to Q2 2014; (ii) ARCP had established the truth-on-the market defense by demonstrating that ARCP's AFFO methodology was known to and replicated by both analysts and investors; (iii) Lead Plaintiff had not established any facts demonstrating scienter, loss causation, or the falsity of ARCP's statements regarding internal controls prior to Q2 2014; (iv) Lead Plaintiff had not established evidence of tracing for the §11 claims; and (v) there was no basis for Lead Plaintiff's claims concerning forward-looking statements.  ECF No. 828.

186.     In ARCP's reply in support of its motion to de-certify the Class, ARCP highlighted various statements made by analysts, opt-out plaintiffs, and Lead Plaintiff's expert Mr. Barron to substantiate its arguments that the Company's calculation methodology for AFFO was known to the market, thereby requiring individualized inquiries into each class member's knowledge.  ECF No. 825 at 3-5.

187.     The ARC Defendants submitted a 40-page reply, arguing again that: (i) they were not liable as control persons under §§15 and 20 due to their lack of control over ARCP, and that there was no evidence of their culpable participation in ARCP's wrongful actions; (ii) the undisputed facts

demonstrated that they were not liable for the falsity of alleged GAAP misstatements, which they again asserted were immaterial; (iii) the Restatement was not admissible against the ARC Defendants; (iv) Bowman, Budko, Jones, Kahane, and Weil established their affirmative defense of due diligence; and (v) the July and December 2013 offering documents were not a "fundamental change" to the 2013 Shelf Registration signed by Bowman, Jones, Kahane, and Weil, thereby absolving them of liability.  ECF No. 808.

188.    In Schorsch's 31-page reply, he argued that testimony from Block's criminal trial was inadmissible against him; he repeated his assertion that he had not authorized the Q2 2014 AFFO presentation despite the fact that his electronic signature was affixed to the filings; argued that Lead Plaintiff still had not established falsity, material misrepresentations, or loss causation for pre-July 29, 2014 §10(b) claims;  and further attacked Lead Plaintiff's claims on non-AFFO misstatements, internal controls certifications, and forward-looking statements.  ECF No. 805.  Schorsch also joined in certain of the arguments asserted by ARCP, Grant Thornton, and the ARC Defendants relating to §11 claims.  *Id*. at 29-30.  Finally, Schorsch challenged the objections submitted by Lead Plaintiff on the exhibits cited by him that had accompanied his motion for summary judgment.  *Id*. at 30.

189.    Block provided a 21-page reply, largely reiterating the arguments made by the other Defendants in their reply briefs.  ECF No. 824.  More specific to Block, he again argued that his Fifth Amendment invocations should not serve as the basis of summary judgment, contending that Lead Plaintiff had not been able to corroborate any admissible evidence supporting the adverse inferences it claimed flowed from Block's Fifth Amendment assertions.  *Id*. at 16-20. McAlister joined in the arguments set forth by ARCP.  ECF No. 827.

190.    Kay submitted a 52-page reply, arguing again that Lead Plaintiff had not established Kay's scienter, that he made no misstatements, and joined in the other Defendants' arguments that Lead Plaintiff had not established loss causation.  ECF No. 809 at 4-43.

191.    Grant Thornton's 54-page reply argued that: (i) Lead Plaintiff failed to establish any disputed material fact with respect to the 2012 and 2013 audit reports; (ii) Lead Plaintiff had not established the ability to trace any named plaintiffs' ARCP common stock to the relevant registration statements; and (iii) Grant Thornton was not liable for the MD&A portion of ARCP's Forms 10-K. ECF No. 802.

192.    In Beeson's 21-page reply, she again disputed that Lead Plaintiff had established her scienter, or loss causation, and clarified that she had not abandoned her due diligence defense and may still present her defenses at trial even though she had not moved for summary judgment on the issue.  ECF No. 799.

193.    The Non-Management Directors' 18-page reply stressed that they reasonably relied on Grant Thornton for the "expertised" portions of ARCP's registration statements and performed a reasonable investigation for the non-expertised portions.  ECF No. 795.  In Sealy's 10-page reply, he argued that Lead Plaintiff had incorrectly lumped him in with the other §11 defendants in asserting that he had not established a reliance on professionals defense and further argued that he had conducted a reasonable investigation by pointing to examples in his declaration that he had previously submitted in connection with summary judgment.  ECF No. 792.

194.    The Underwriter Defendants argued in their 18-page reply that their due-diligence investigation was reasonable, citing to various actions they claim to have taken in connection with each of the offerings.  ECF No. 807 at 3-12. The Underwriter Defendants also argued that the "red flags" that Lead Plaintiff identified in their opposition to summary judgment did not create a

disputed material fact.  *Id*. at 12-15.  The non-lead Underwriter Defendants further argued that their sworn declarations were admissible to establish that they had conducted a reasonable due diligence investigation.  *Id*. at 16-17.  RCS joined in certain of the arguments of the Underwriter Defendants' reply, but separately reiterated that the Bankruptcy Court's order precluded Lead Plaintiff's claims against it and that neither its insurer, nor ARCP's possible indemnity obligations, precluded dismissal.  ECF No. 794.

### 5.        Lead Plaintiff's Motion for Partial Summary Judgment

195.    On February 8, 2019, Lead Plaintiff moved for partial summary judgment against Block and McAlister, arguing that because Block's criminal trial resulted in a conviction for violations of federal securities laws, and because McAlister pled guilty to violations of the federal securities laws, each was collaterally estopped from re-litigating their §10(b) liability in connection with ARCP's Q2 2014 Form 10-Q.  ECF No. 630.  Lead Plaintiff argued that the Second Circuit's four-prong inquiry set forth in *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38 (2d Cir. 1986), determining the application of collateral estoppel in connection with a prior criminal conviction, was satisfied here.

196.    First, Lead Plaintiff argued that because the elements underlying Block and McAlister's criminal convictions – falsity, in-connection-with, materiality, and scienter – were the same elements Lead Plaintiff needed to prove Block and McAlister's liability for §10(b) violations in this Litigation, the first prong of the *Gelb* test was satisfied.  *Id*. at 8-10.  Second, there was no question that the issues in Block and McAlister's criminal proceedings were "'actually litigated'" and "'actually decided,'" as Block was convicted following the conclusion of a comprehensive two-week trial and McAlister pled guilty, which was accepted by the Court, and judgment entered against her.  *Id*. at 10-11.  Third, both Block and McAlister had a full and fair opportunity to litigate the

- 82 -

criminal proceedings, as both defendants hired experienced and competent attorneys from well-known law firms. *Id*. at 11-12. Finally, under the fourth prong of the *Gelb* inquiry, the issues litigated in Block's and McAlister's criminal proceedings – falsity, in-connection-with, materiality, and scienter – were necessary to obtain the criminal conviction against Block and were required elements of the Government's §10(b) claim against McAlister. *Id*. at 12-13.

197. On March 15, 2019 Block and McAlister opposed Lead Plaintiff's motion for partial summary judgment. ECF Nos. 721, 730. In Block's 22-page opposition, he argued that the materiality of the Q2 2014 AFFO figure was not necessarily decided by the jury's guilty verdict, claiming that the Government had focused on the year to date AFFO figure, and not on the quarterly Q2 2014 AFFO figure. ECF No. 730 at 13-14. Block also argued that because he was appealing his criminal conviction in the Second Circuit, and also had a pending Rule 33 motion, the finality of the judgment was in doubt. *Id*. at 14-16. Block further argued that collateral estoppel in this Litigation would not be efficient because Lead Plaintiff still would have to prove the remaining elements of §10(b) against Block, as well as proving each element of §10(b) against the other defendants, requiring overlapping proof. *Id*. at 17-20. Finally, Block contended that application of collateral estoppel would not be fair, as his criminal conviction was unprecedented, based solely on non-GAAP financial metrics, and that such an outlier decision should not bind him. *Id*. at 20-21.

198. In McAlister's opposition to Lead Plaintiff's motion for partial summary judgment, she argued that Lead Plaintiff sought collateral estoppel on issues that were broader than the issues that were the subject of her guilty plea. ECF No. 721 at 4-5. McAlister asserted that only those statements that were the issue of her guilty plea related to AFFO and AFFO per share, whereas Lead Plaintiff sought partial summary judgment against her as to all of the alleged false statements in the Q2 2014 fillings. *Id.*

199.    On April 5, 2019, Lead Plaintiff filed a reply in support of its motion for partial summary judgment against Block and McAlister.  ECF No. 817.  Lead Plaintiff first highlighted to the Court that McAlister conceded that collateral estoppel did in fact apply to her on the elements of falsity, materiality, in-connection-with, and scienter for the false statements that she had pled guilty to, which was "'the reported figures for AFFO and AFFO per share for the second quarter of 2014 and the first six months of 2014.'"  *Id*. at 2.  Lead Plaintiff also noted that Block largely conceded the application of collateral estoppel against him, and instead argued that the jury did not "necessarily" decide the materiality of the Q2 2014 AFFO figure.  *Id*. at 3-6.  In response to Block's argument, Lead Plaintiff contended that the jury did in fact determine that the Q2 2014 AFFO figure was false, citing numerous examples from the record where the evidence to the jury presented focused on the Q2 2014 AFFO figure.  *Id.*  Lead Plaintiff also argued that the weight of authority in the Second Circuit established that Block's pending appeal did not preclude the application of collateral estoppel.  Finally, Lead Plaintiff notified the Court that Block's Rule 33 motion for retrial was denied on March 19, 2019 and that neither his appeal of the denial of that motion, nor of his criminal conviction, was a basis for not applying collateral estoppel in the Litigation.  *Id.* at 8-13.

### 6.    Summary Judgment Hearing, Decision, and Subsequent Related Events

200.    On April 17, 2019, the Court held a full-day hearing on all of the motions described above.  Lead Plaintiff cogently argued against Defendants' many motions for summary judgment and in support of its partial motion for summary judgment, fielding questions from the Court on a wide range of issues.  On May 10, 2019, the Court issued an order reflecting the rulings made at the hearing denying in part and granting in part Defendants' motions for summary judgment, denying Defendants' motion to de-certify the Class, and granting partial summary judgment in favor of Lead Plaintiff and the Class.  ECF No. 851.  Specifically, the Court found that genuine issues of material

- 84 -

fact existed in connection with the falsity of statements concerning ARCP's AFFO, holding that "whether ARCP's public disclosures were sufficient to put the market on notice of the net-gross AFFO calculation methodology is an issue of fact for the jury," and "whether the net-gross methodology was *in fact* known to market participants." *Id*. at 3 (emphasis in original). The Court also rejected Defendants' loss causation arguments, holding that "ARCP's corrective disclosure reasonably alerted investors that ARCP's earlier financial disclosures were also potentially materially misstated, and that stock prices thus were inflated." *Id*. at 4. The Court rebuffed Defendants' arguments concerning scienter, holding that there were "[s]everal issues relating to defendants' scienter requir[ing] a fact-intensive inquiry, including: defendants' rationale for inflating ARCP's AFFO amounts, the significance of the disclosures made by ARCP to GT, defendants' understanding of the content of the relevant public disclosures, and other facts known by or available to defendants at the time they engaged in the relevant conduct." *Id*. With respect to Grant Thornton, the Court found that because Lead Plaintiff had provided evidence that Grant Thornton had become aware of material inconsistences and misstatements related to ARCP's AFFO in the Company's Form 10-K, as a result, summary judgment of the §11 claims against it was not warranted because Grant Thornton had failed to prove that there were no disputed material facts indicating that Grant Thornton complied with applicable PCAOB standards. *Id*. at 5-6.

201.    The Court determined that the Underwriter Defendants' due diligence defense was not a basis for summary judgment of the Class's claims because Lead Plaintiff had identified several red flags that the Underwriter Defendants were aware of, or should have known about, which triggered an obligation to investigate. *Id*. at 6. Similarly, with respect to the director defendants – Weil, Budko, Kahane, Jones, Bowman, Andruskevich, Michelson, Rendell, and Stanley – the Court held that Lead Plaintiff had identified sufficient red flags concerning executive compensation and/or

related-party transactions, thereby warranting denial of summary judgments as to any reliance and due diligence defenses. *Id*. at 7. The Court also noted that while there was no evidence of red flags presented as to Sealy, a genuine issue of fact still existed about his exercise of due diligence over the non-expertised portions of the offering materials. *Id*.

202.    In connection with Lead Plaintiff's control person liability claims under §§15 and 20(a), the Court concluded that Lead Plaintiff had presented evidence of disputed material facts to present at trial to establish liability as to AR Capital and ARC Advisors from February 28, 2013 until January 8, 2014. *Id*. at 7-8.

203.    The Court rejected Defendants' tracing argument concerning the Cole Merger, the ARCT IV Merger, and the May 2014 Offering, but granted Defendants' summary judgment argument concerning aftermarket purchasers as to these same counts. *Id*. at 8.

204.    The Court also found RCS's motion for summary judgment to be premature, stating that RCS's argument concerning the bankruptcy order should be raised in connection with any judgment proceedings. *Id*. at 9-10.

205.    The Court denied ARCP's motion to de-certify the Class, informing the parties that any issues regarding an individual class member's knowledge concerning ARCP's AFFO methodology calculation would be resolved by the Court as they arose. *Id*. at 10.

206.    The Court granted Lead Plaintiff's motion for partial summary judgment against ARCP, McAlister, and Block on the elements of falsity, scienter, and in-connection-with elements of the §10(b) claims for the AFFO figures for Q2 2014 and year to date 2014 as reported in the Company's July 29, 2014 Form 10-Q. *Id*. at 10. In so doing, the Court agreed with Lead Plaintiff that Block's appeal of his criminal conviction to the Second Circuit did not preclude application of collateral estoppel to this litigation. *Id*. The Court denied Lead Plaintiff's summary judgment

motion as to false statements made in the Q1 2014 Form 10-Q filing and any filings that predate it. *Id*.

207.    On May 16, 2019, Court issued an order defining the beginning of the Class Period as February 28, 2013, after the parties submitted a proposed order confirming that at trial Lead Plaintiff would pursue claims only as to alleged actionable statements or omissions made on or after February 28, 2013. ECF No. 859.

208.    On May 17, 2019, ARCP moved for reconsideration of the Court's Order grating summary judgment against ARCP based on collateral estoppel grounds. ECF No. 866. On May 20, 2019, the Court granted ARCP's motion for reconsideration of the Court's order granting partial summary judgment against it based on the application of collateral estoppel arising from Block and McAlister's criminal proceedings, finding that ARCP did not have a full and fair opportunity to litigate the issues that arose from the criminal proceedings. ECF No. 868.

### K.    Expert Discovery

209.    Following the completion of the parties' motions for summary judgment, the Litigation entered into its next phase: expert discovery. Throughout the Litigation, Lead Plaintiff used the services of in-house forensic accounting experts, and retained the services of four testifying experts to assist it in the prosecution of its claims.

### 1.    Lead Plaintiff's Experts

### a.    In-House Forensic Accounting Experts

210.    In order to conduct effective discovery and prepare for trial, Lead Counsel employed highly specialized in-house forensic accounting professionals to provide investigative accounting, auditing, and financial expertise to Lead Counsel throughout the pendency of the Litigation. Andrew Rudolph, CPA, CFE and Heather Jennette, CPA, CFE (collectively, the "Forensic

Accountants"), provided the majority of forensic accounting services in this case.  They worked side-by-side with Robbins Geller attorneys in many facets of the case, including, but not limited to, case investigation and evaluation, developing and drafting complaint allegations, responding to motions, and assisting with document discovery, depositions, summary judgment, hearing preparation, preliminary trial preparation, and case mediation.

211.    Mr. Rudolph is the National Director of Lead Counsel's forensic accounting department.  He is a Certified Public Accountant (CPA) licensed to practice in California and has been designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics (CFF).  He is also a Certified Fraud Examiner (CFE).  Mr. Rudolph has approximately 35 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations of national and foreign companies, and began his career as an auditor for the public accounting firm of PriceWaterhouse LLP.  Mr. Rudolph is an active member of the AICPA, the California Society of Certified Public Accountants ("CalCPA"), and the Association of Certified Fraud Examiners ("ACFE").

212.    Ms. Jennette is a forensic accountant in Lead Counsel's forensic accounting department.  She is a Certified Public Accountant (CPA) licensed to practice in the states of California and New Jersey.  She has been designated by the AICPA as Certified in Financial Forensics (CFF).  She is also a Certified Fraud Examiner (CFE).  Ms. Jennette has 25 years of public accounting and consulting experience, including 21 years of forensic accounting experience directly related to the investigation of securities fraud.  Prior to joining the firm, she was an auditor for the public accounting firm of Deloitte & Touche LLP where she primarily audited large international public companies.  She is an active member of the AICPA, the CalCPA, and the ACFE.

4835-9551-9916.v18

213.    The Forensic Accountants were an integral part of Lead Counsel's litigation team. They provided valuable and expedient accounting and auditing expertise throughout the entire five-year lifespan of this Litigation.  More specifically, they assisted in the initial filing of the complaint, the discovery process (including preparing attorneys in taking depositions), the filing of Lead Plaintiff's oppositions to Defendants' numerous summary judgment motions, and finally with trial preparation.  ARCP's accounting was unique and presented a steep learning curve for Lead Counsel.  The significant reliance on in-house forensic accountants kept costs down and allowed Lead Counsel to avoid paying the substantially greater fees charged by outside accounting and auditing experts for this same assistance.  As a result of using in-house forensic accountants, accounting and auditing expert costs were limited to expenses related to a testifying expert – everything else was done in-house.

214.    The Forensic Accountants were instrumental throughout the discovery phase of this case.  They assisted in developing and drafting document discovery requests germane to REIT accounting and auditing.  They also were involved in discovery negotiations and motion practice, including determining the sufficiency of Defendants' accounting and audit-related document production.  Moreover, they became proficient in navigating and utilizing Grant Thornton's unique electronic workpaper database which allowed Lead Counsel to focus on the relevant and more pronounced evidence of accounting malfeasance.  The Forensic Accountants were critical in unraveling ARCP's three-year Restatement which involved hundreds of journal entries that impacted a multitude of ARCP's financial accounts.  Since neither the Company nor its auditors provided the underlying explanation for many of the Restatement adjustments, the Forensic Accountants spent thousands of hours analyzing and reconstructing the Company's original accounting and subsequent Restatement in order to identify the accounting and auditing fraud issues for Lead Counsel.

215.     The Forensic Accountants reviewed and analyzed the voluminous productions of accounting and finance-related documents obtained from ARCP, AR Capital, Grant Thornton, the individual defendants, and third parties.  The results of this analysis and review were critical to developing evidence for the accounting and audit issues in the case.  After a detailed analysis of the workpapers and documents produced by the auditor, and the related documents produced by the Company, the Forensic Accountants were instrumental in building the factual record evidencing that both ARCP and Grant Thornton defrauded investors.  For example, the Forensic Accountants identified inconsistencies within ARCP's earnings releases that were contrary to ARCP's defenses, and that Grant Thornton possessed information evidencing material inconsistencies between the MD&A and the financial statements, yet failed to react in violation of PCAOB standards.  This information was used in the depositions of Grant Thornton auditors to attack Grant Thornton's defense that it was unaware of material inconsistencies, and was instrumental in securing a sizable settlement with the auditors despite the fact that the allegations largely focused on unaudited figures.  This information was also used by Lead Plaintiff's accounting/audit expert and would have been used at trial to demonstrate that ARCP's AFFO disclosures were false and misleading, and that Grant Thornton failed to adhere to PCAOB standards despite falsely telling investors that it had done so.

216.     Lead Counsel also deposed numerous accounting, auditing, and finance professionals employed by ARCP, AR Capital, and Grant Thornton.  The Forensic Accountants played a critical role in this deposition process.  They assisted in identifying key deponents, clarifying deposition objectives, explaining complex audit and accounting principles, selecting deposition exhibits, developing deposition outlines, and attending many depositions in order to evaluate testimony and

confer with Lead Counsel in real-time. As a result, Lead Counsel was more effective during depositions, eliciting significant testimony helpful to Lead Plaintiff's case.

217.   The Forensic Accountants spent a significant amount of time assisting and preparing Lead Counsel and Lead Plaintiff's testifying experts on key accounting and auditing issues for expert reports and depositions. Specifically, the Forensic Accountants worked extensively with Lead Plaintiff's accounting/auditing expert, John E. Barron, CPA, CFE, in order to assist with the preparation of his reports and his deposition. Defendants submitted no less than seven accounting/auditing expert reports in this case. The Forensic Accountants spent hundreds of hours reviewing, analyzing, and ultimately assisting Lead Counsel in deposing those seven experts, including reviewing prior case testimony and publications, selecting deposition exhibits, attending the depositions, and assisted in preparing the motions *in limine* and *Daubert* motions. As a result, Lead Counsel believed Lead Plaintiff had a solid basis to significantly narrow the opinions that Defendants' accounting and compliance experts could have credibly advanced at trial, mitigating potentially damaging testimony.

218.   In addition, the Forensic Accountants assisted with summary judgment and the trial preparation. They provided valuable assistance with the selection of potential trial exhibits and deposition testimony excerpts for both summary judgment and trial purposes.

219.   The Forensic Accountants' substantial efforts in this case were instrumental in achieving the outstanding settlement of the Litigation.

### b.   Steven P. Feinstein, Ph.D., CFA

220.   Dr. Feinstein was retained by Lead Plaintiff to opine on the issues of market efficiency of ARCP's securities, causation, and damages. Dr. Feinstein is a Professor of Finance at Babson College and the founder and president of Crowninshield Financial Research, Inc., which is a

financial consulting firm. Dr. Feinstein has extensive experience in the financial industry, having been selected to review papers for finance journals, published in the field of finance, and conferences, and having conducted analyses and presented opinions related to markets, valuation, and damages in over 70 cases.

221. Dr. Feinstein prepared and submitted four declarations/reports in this litigation. Lead Counsel worked closely with Dr. Feinstein every step of the way to ensure that his opinions were reliable, well-founded, and accurate. Lead Counsel spent hundreds of hours discussing the loss causation and damages with Dr. Feinstein and his staff and analyzing, reviewing, and vetting his opinions and reports. As discussed above in ¶77, Dr. Feinstein first submitted a declaration on March 15, 2017, in support of Lead Plaintiff's motion for class certification. Dr. Feinstein's second declaration in this case was submitted in connection with Lead Plaintiff's opposition to Defendants' motions for summary judgment, as discussed above in ¶171.

222. In preparation for trial, on May 3, 2019, Dr. Feinstein submitted a 60-page expert report, plus appendices and exhibits, on causation and damages (the "Feinstein Report"). Dr. Feinstein quantified damages per security for: (i) ARCP common stock; (ii) ARCP preferred stock; (iii) ARCP Notes; and (iv) call and put options written for ARCP common stock. In quantifying the amount of damages, Dr. Feinstein conducted statistical analysis that isolated and removed market and industry sector effects from ARCP's securities returns on event dates. The Feinstein Report also contained his opinions concerning loss causation.

223. On June 3, 2019, Defendants submitted almost 400 pages of expert reports, plus accompanying appendices and exhibits, from seven different experts in rebuttal to the Feinstein Report: Allan W. Kleidon, Ph.D. and Brent W. Ambrose, retained by ARCP; Daniel R. Fischel, retained by the ARC Defendants; Mark E. Zmijewski, retained by Grant Thornton; Sanjay Unni,

Ph.D. and Bhala Dharan retained by Block; and Walter N. Torous, Ph.D., retained by ARCP, Schorsch, and the ARC Defendants.

224.    On June 24, 2019, Dr. Feinstein submitted a 52-page report in response to the arguments and conclusions related to Securities Act damages raised by Kleidon, Fischel, Unni, and Zmijewski.

### c.    John E. Barron, CPA, CFE

225.    Mr. Barron, a Certified Public Accountant with over 40 years of experience, was retained by Lead Plaintiff to opine on accounting issues related to this case.  On May 3, 2019, Mr. Barron submitted a 122-page expert report, opining on whether: (i) ARCP's reported AFFO from FY 2012 through Q2 2014 were materially misstated; (ii) ARCP's financial statements, beginning with FY 2012 through Q2 2014 were materially misstated; (iii) information concerning AFFO in ARCP's SEC filings issued between FY 2012 and Q2 2014 contained material misstatements of fact; (iv) the procedures performed by Grant Thornton with respect to ARCP's financial statements and other information complied with PCAOB standards; and (v) material control weaknesses reported in connection with the Restatement contributed to accounting errors and misstatements of AFFO.

226.    Mr. Barron's opinions were based on his knowledge, training, and extensive accounting experience, which previously included work as an auditor, as a consulting expert, as CFO of a private REIT, and serving as Deloitte LLP's National Director of Real Estate Investment Trusts Accounting and Auditing Services.  To formulate his opinions, Mr. Barron spent a significant amount of time reviewing documents produced in this case by the various Defendants; reviewing ARCP's SEC filings; reviewing 15 deposition transcripts and exhibits of ARCP and AR Capital's former employees, ARCP Board members, and multiple witnesses from Grant Thornton; reviewing

- 93 -

the testimony of five witnesses from Block's criminal trial and the exhibits associated with their testimony; and extensive consultation with Lead Counsel.

227.     In his report, Mr. Barron concluded that ARCP's previously issued AFFO was materially misstated; that certain of ARCP's previously issued financial statements were materially misstated; ARCP's disclosures accompanying its FFO and AFFO calculations contained material misstatements of fact; Grant Thornton failed to comply with PCAOB standards in conducting its audit of ARCP's financial information; and material weaknesses in ARCP's internal controls contributed to material departures from GAAP and materially misleading FFO and AFFO information in ARCP's SEC filings.  As set forth above, Mr. Barron worked closely and extensively with Robbins Geller's Forensic Accountants and attorneys in performing his engagement in this case.  It bears mentioning that defense counsel also attempted to hire Mr. Barron, demonstrating both his expertise as a REIT accountant and that Lead Counsel retained the best expert available.

228.     On June 3, 2019, in rebuttal to Mr. Barron's report, Defendants submitted six expert reports, totaling over 300 pages, plus appendices and exhibits, from the following experts: William W. Holder and Brent W. Ambrose, retained by ARCP; Jason S. Flemmons and Paul Habibi, retained by the ARC Defendants and Schorsch; J. Duross O'Bryan, retained by Grant Thornton; and John I. Salmon, retained by Block.

### d.     William H. Purcell

229.     William H. Purcell, an expert with over 50 years of wide-ranging investment banking experience, was retained by Lead Plaintiff to opine on investment banking standards, and on mergers and acquisitions.

230.     On December 4, 2018, in response to a request by the Non-Management Directors to permit testimony from due diligence experts at trial, the Court issued an order that the opinions of

- 94 -

such experts were limited to "what constitutes 'due diligence'. . . in the context of what should be reviewed about the business records and financial reporting of an issuer of a security." ECF No. 615. Accordingly, on June 3, 2019, Mr. Purcell submitted an 85-page report, containing his opinions about what constitutes a due diligence investigation to be undertaken by underwriters and the directors of an issuing company's board. As part of his report, Mr. Purcell rebutted the opinions previously submitted on May 3, 2019 by the Underwriters Defendants' expert Professor Gary M. Lawrence, the Non-Management Directors' expert Professor Michel Klausner, and Bowman, Kahane, and Weil's expert Jonathan F. Foster.

231.    Mr. Purcell's opinions were based on his decades of extensive experience in the investment banking industry, which included working as an investment banker, board member, and a CEO. Mr. Purcell is currently a Senior Director of Seale & Associates, an investment banking firm in the Washington, D.C. area, and has been retained as an expert witness in litigation matters in over 190 cases since 1976. His opinions were also based on his thorough review of key documents and evidence in this Litigation, including a review of the TAC, the parties' summary judgment briefing, a review of the depositions of 25 witnesses in this action and the accompany exhibits, ARCP's SEC filings, published industry materials, analyst reports, and documents produced by Defendants.

232.    With respect to what constitutes underwriter's due diligence, Mr. Purcell opined that: (i) underwriters must act as "gatekeepers" by ensuring that full disclosure of all material information is provided; (ii) underwriters must have independent analysis and judgment in conducting due diligence; (iii) underwriters should act as a "devil's advocate" by digging into an issuer's answers and applying professional skepticism; (iv) underwriters should meet with the issuer's independent auditor privately; (v) underwriters must "demonstrate affirmatively" that they conducted a "reasonable investigation" and "had reasonable ground to believe" that information contained in the

- 95 -

unaudited portion of a registration statements were true; (vi) underwriters must investigate any red flags that arise in connection with audited financial statements; and (vii) underwriters should carefully document their due diligence.

233.     With respect to what constitutes director due diligence, Mr. Purcell opined that the following typically feature: (i) timely receipt of offering documents and information incorporated by reference; (ii) familiarity with the company's important performance metrics and computation; (iii) probing questions of the issuer's management, auditors, and underwriters regarding material disclosures; (iv) ensuring that issuer's management, auditors, and underwriters are stratified with the due diligence they performed; and (v) documenting in detail their due diligence process.  Robbins Geller attorneys met and spoke extensively with Mr. Purcell to assist him with his engagement and report.

### e.       Harvey L. Pitt

234.     Lead Plaintiff retained Harvey L. Pitt, the former chairman of the SEC, to opine on the offering and distribution of securities.  Specifically, in his 28-page report submitted on May 3, 2019, Mr. Pitt opined on: (i) the practices and procedures utilized in the registration, offering, and sale of securities; (ii) the common understandings and expectations of market professionals, issuers, market participants, investors, shareholders, and regulators with respect to the disclosures made in connection with securities issued by the SEC; and (iii) the distribution of securities and the delivery of securities to their purchasers.  With respect to tracing, Mr. Pitt opined on how shares maintained at DTC have nothing to do with whether a particular share was offered and purchased pursuant to an effective registration statement filed with the SEC, or whether a purchaser can avail themselves of the protections afforded by the Securities Act.  Mr. Pitt concluded that in this Litigation, Lead Plaintiff and the named plaintiffs could trace their shares to the false registration statements.

235.    Mr. Pitt's opinions were based on his distinguished career, which first began at the SEC and continued for over a decade, where he served as the SEC General Counsel for three years before leaving and then returning to serve as the 26th Chairman of the SEC from 2001-2003. Mr. Pitt was also a senior partner and Co-Chairman of Fried, Frank LLP for almost 25 years, and has also served as a fiduciary director to numerous public and non-public companies, for-profit and non-profit organizations, and private sector and governmental advisory boards.  Mr. Pitt also has extensive teaching experience at a number of law schools.  In connection with his report, Mr. Pitt spent a significant amount of time reviewing numerous SEC filings related to the offerings at issue, as well as the trading records of TIAA and the named plaintiffs, and consulted with Lead Counsel throughout the process.

236.    On June 3, 2019, in rebuttal to Pitt's report, Defendants submitted the expert report of Jack R. Wiener.  Mr. Wiener's report totaled 31 pages, plus appendices and exhibits.

### 2.    Expert Depositions

237.    On May 28, 2019, Lead Plaintiff began serving deposition subpoenas on Defendants' 17 experts.[11]  Lead Plaintiff also sought the information and materials relied upon by each expert.  In preparation for each deposition, Lead Counsel spent hours poring over each expert's report, analyzing any statistical analysis, legal authorities, published materials, and other materials relied upon or cited by each expert.  During June and July of 2019, Lead Counsel deposed Defendants' experts, as set forth below:

---

[11]    The ARC Defendants and Schorsch also proffered a report from Barbara A. Halper concerning the appropriateness of the related-party transactions and payments made during the Class Period. Ms. Halper's report was 22 pages long, including exhibits and appendices.  Her report was not submitted in response to any opinion expressed by Lead Plaintiff's experts, but was offered in response to Lead Plaintiff's allegations that the related-party transactions and payments were manipulated to financially benefit Schorsch and his AR Capital partners.

| Expert | Date | Location |
|---|---|---|
| Ambrose, Brent | June 18, 2019 | New York, NY |
| Dharan, Bhala | July 16, 2019 | New York, NY |
| Fischel, Daniel | July 25, 2019 | New York, NY |
| Flemmons, Jason | June 27, 2019 | New York, NY |
| Foster, Jonathan | June 24, 2019 | New York, NY |
| Habibi, Paul | July 25, 2019 | New York, NY |
| Halper, Barbara | July 2, 2019 | New York, NY |
| Holder, William | July 10, 2019 | New York, NY |
| Klausner, Michael | July 24, 2019 | New York, NY |
| Kleidon, Allan | July 24, 2019 | New York, NY |
| Lawrence, Gary | July 19, 2019 | New York, NY |
| O'Bryan, J. Duross | July 23, 2019 | Chicago, IL |
| Salomon, John | July 29, 2019 | New York, NY |
| Torous, Walter | July 12, 2019 | New York, NY |
| Unni, Sanjay | July 15, 2019 | New York, NY |
| Wiener, Jack | June 28, 2019 | New York, NY |
| Zmijewski, Mark | July 26, 2019 | New York, NY |

238.     Lead Plaintiff also defended the depositions of its four experts, each of which lasted multiple days, wherein each expert was questioned by multiple attorneys representing the various defendants.  In preparation for each deposition, Lead Counsel met with each of its experts, spending hours reviewing each expert's report, Defendants' expert reports submitted in response, and all relevant materials.  These depositions were as follows:

| Expert | Date | Location |
|---|---|---|
| Barron, John | June 11, 2019<br>June 12, 2019 | San Diego, CA |
| Feinstein, Steven | July 17, 2019<br>July 18, 2019<br>July 25, 2019 | New York, NY |
| Pitt, Harvey | June 21, 2019<br>July 19, 2019 | Washington, D.C. |
| Purcell, William | July 15, 2019<br>July 16, 2019 | New York, NY |

- 98 -

L.      **Pre-Trial Preparation**

1.      **Class Notice**

239.     At the April 17, 2019 hearing, the Court advised Lead Counsel that once summary judgment was resolved, notice to the Class should be sent.  Following the hearing, Lead Counsel spent a significant amount of time meeting and conferring with Defendants over the proposed notice program and form of notice.  An initial dispute arose over the Class definition, and after reaching an impasse, the parties submitted a joint letter to the Court for resolution on May 14, 2019.  ECF No. 853.  Lead Plaintiff argued that the Court's August 24, 2017 order certifying the Class included holders of options on ARCP's common stock.  Defendants opposed and argued that the Class included only ARCP's common stock, preferred stock, and debt securities.  On May 16, 2019, the Court issued a memo endorsement, declining to include the purchasers of options in the Class, as "[d]ifferent considerations come into play with this type of security, and the case is too advanced to allow expansion."  ECF No. 860.

240.     The parties resumed their negotiations over the notice program and came to agreement over many aspects of it, including using Gilardi & Co. LLC ("Gilardi") as the notice and claims administrator, the use of postcard notice, engaging in a paid online advertising campaign to reach additional class members, the issuance of a press release over *Business Wire* informing interested parties of this action, and establishing a dedicated case website.  However, the parties remained in disagreement over language Defendants sought to include in the Postcard Notice and full-length Notice of Pendency to solicit individual settlements with class members.  Lead Plaintiff submitted a letter to the Court on May 31, 2019, arguing that Defendants' proposed language violated the neutral notice requirements of Federal Rule of Civil Procedure 23(c)(2).  Alternatively, Lead Plaintiff requested the inclusion of counterbalancing language if Defendants' proposed

- 99 -

language was approved.  ECF No. 871.  Defendants submitted their position on June 3, 2019.  ECF No. 872.  Hours later, Lead Plaintiff filed a reply emphasizing to the Court that Defendants were improperly transforming the neutral Class notice into a solicitation to abandon the Class and that its proposed counterbalancing language would allow class members to hear from all sides.  ECF No. 874.

241.    On June 12, 2019, the Court held a status conference on various issues, and heard oral argument on issues related to Class Notice.  The Court issued an order that day, approving Lead Plaintiff's proposed Class Notice with the inclusion of the following language:

> Certain defendants have indicated a willingness to settle before trial.  If any member of the class wishes to explore settlement, that member should communicate, by counsel, with Michael J. Dowd of Robbins Geller Rudman & Dowd, who will then immediately let counsel for the appropriate defendants(s) know.

242.    On July 23, 2019, the Court issued a memo endorsement of the parties' stipulation to the definition of the Class for purposes of giving notice, which consisted of:

> All persons who purchased or otherwise acquired American Realty Capital Properties, Inc. ("ARCP") common stock, preferred stock, or debt securities ("ARCP Securities") during the period between February 28, 2013 and October 29, 2014. Excluded from the Class are all defendants, members of the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

ECF Nos. 859, 905.

243.    Starting August 6, 2019, more than 183,102 notices of pendency were mailed to class members.  On August 6, 2019, the contents of the notice were published in *The Wall Street Journal* and in a press release over *Business Wire*.  Requests to be excluded from the Class were due by October 28, 2019.

- 100 -

## 2.     Modification of the Trial Date

244.     On May 24, 2019, the parties submitted a proposed pre-trial schedule for the Court's consideration.  After the parties had spent weeks negotiating the schedule, Schorsch, AR Capital, and Block requested the Court postpone the September 9, 2019 trial date to permit the parties additional time for pre-trial motions and evidentiary tasks.  Lead Counsel vigorously disagreed that the trial should be delayed.

245.     The Court heard oral argument on the requested trial date modification at the June 12, 2019 status conference.  After much debate, the Court ruled that due to the complexities of the Litigation and expected length of trial, along with upcoming conflicts, the trial should be reset to begin on January 21, 2020.  The Court also set September 9, 2019 to hear all pre-trial matters, which the Court anticipated to last approximately two weeks.  ECF No. 879.

## 3.     Witness and Exhibit Lists

246.     With expert discovery still ongoing, Lead Counsel concurrently prepared for trial.  On June 10, 2019, the parties exchanged initial witness lists.  After months of extensive review of the deposition testimony and wide-ranging evidence gathered throughout the Litigation, Lead Counsel identified 29 witnesses Lead Plaintiff "will call" and 23 witnesses Lead Plaintiff "may call" to testify live at trial.  Lead Counsel further identified three witnesses that Lead Plaintiff "will call" and two witnesses Lead Plaintiff "may call" via deposition testimony.  In total, amongst all the parties, 89 witnesses were identified by the initial witness lists.  On July 26, 2019, the parties exchanged final trial witness lists.  After a careful review, again, of all the relevant testimony and evidence, Lead Counsel identified 29 witnesses Lead Plaintiff "will call" and 23 witnesses Lead Plaintiff "may call" to testify live at trial, with three "will call" witnesses and two "may call" witnesses to testify via

- 101 -

deposition testimony at trial. Ninety-two witnesses total were identified by the parties' final trial witness lists.

247. Lead Counsel also undertook a meticulous review of the evidence to assemble Lead Plaintiff's trial exhibit list. For weeks, Lead Counsel reviewed, analyzed, and discussed the contents of thousands of documents, which also required reviewing, analyzing, and discussing any relevant deposition testimony about those documents. Lead Counsel's review was not limited to marked deposition exhibits – Lead Counsel cast its net widely and scoured all documents produced by Defendants in the event that a fresh look would provide new insight into these documents. The culmination of Lead Counsel's painstaking efforts, deliberate thought and analysis, was a trial exhibit list comprised of over 600 documents.

248. On July 19, 2019, the parties exchanged preliminary exhibit lists. In total, Defendants produced six separate exhibit lists, with over 10,000 entries identified. Lead Counsel began the Herculean task of reviewing the mountain of exhibits Defendants identified and began logging evidentiary objections, making substantial progress before the Litigation settled.

### 4. Motions *in Limine*

249. In advance of the Court's two-week hearing on pre-trial matters, scheduled to begin on September 9, 2019, the parties engaged in pre-trial motion practice. This included filing motions *in limine* to address numerous evidentiary issues that both parties expected to arise at trial. On July 31, 2019, the parties filed their motions *in limine*. Oppositions were filed by the parties on August 16, 2019. The Litigation settled before the parties filed their replies. The parties' motions are described below.

### a.   Lead Plaintiff's Motions *in Limine*

250.    After careful consideration of the evidence gathered throughout the Litigation, and arguments and statements previously made on the record by Defendants, Lead Plaintiff filed 12 motions *in limine*, comprised of over 100 pages and citations to over 120 cases.  In response, Defendants filed 21 oppositions and one joinder, accompanied by 75 exhibits, to Lead Plaintiff's motions *in limine*.

> **(1)   Motion *in Limine* No. 1 to Preclude Block and McAlister or Any of Their Defense Experts from Presenting Evidence or Argument that the Q2 2014 AFFO Figures Were Not Materially False or Made with Scienter**

251.    Lead Plaintiff sought to preclude Block, McAlister, and any expert testifying on either's behalf, from presenting evidence or argument at trial that the AFFO figures reported in ARCP's Q2 2014 Form 10-Q reported were not materially false, or made with scienter, based on the Court's Order granting partial summary judgment against Block and McAlister on these same issues. ECF No. 1129.

252.    In response, Block argued that the Court had previously granted summary judgment on the elements of scienter, falsity, and "in connection with," but not with materiality.  Accordingly, Block argued that Lead Plaintiff could not seek reconsideration of the Court's summary judgment ruling through a motion *in limine*.  ECF No. 1224.  McAlister submitted a separate opposition to Lead Plaintiff's Motion *in limine* No. 1, and likewise argued that the Court did not previously grant summary judgment with respect to materiality.  ECF No. 1225.

(2)     **Motion** *in Limine* **No. 2 to Preclude Evidence or
Argument Concerning the Purported Absence of
an SEC Enforcement Action Against ARCP, or
the SEC's Purported Implicit Approval of, or
Failure to Object to, ARCP's AFFO
Methodology**

253.    Lead Plaintiff's Motion *in Limine* No. 2 moved to preclude Defendants from

introducing any evidence, argument, or referring to: (i) the absence of a SEC enforcement action

against ARCP; or (ii) the SEC's purported tacit approval of, or failure to object to, ARCP's

methodology for calculating and publicly presenting AFFO.  Lead Plaintiff argued that the SEC's

investigation of ARCP was still ongoing and the Exchange Act specifically provides that any

declination or failure to act by the SEC should not be construed as approval of a company's financial

statements by the SEC.  *See* 15 U.S.C. §78z; ECF No. 912.

254.    Defendants submitted three separate briefs in opposition to Lead Plaintiff's Motion *in

Limine* No. 2.  ARCP, the ARC Defendants, Schorsch, Block, Beeson, the Underwriter Defendants

and RCS argued that evidence that the SEC reviewed and did not object to ARCP's methodology for

calculating and presenting AFFO was both relevant and admissible at trial.  Defendants argued that:

(i) the SEC's contemporaneous review of ARCP's AFFO and the SEC's lack of objection to the

Company's revised methodology was probative of scienter; (ii) 15 U.S.C. §78z did not preclude the

presentation of evidence at trial of the SEC's review of a company's public filings; and (iii) Lead

Plaintiff's argument of juror confusion and unfair prejudice was without merit.  ECF No. 1182.

Grant Thornton separately argued that it had no responsibility for ARCP's FFO/AFFO, and any

questions or issues with the Company's metric were raised with, and addressed by, outside counsel.

Grant Thornton also argued that precluding evidence of ARCP's actions would severely prejudice

Grant Thornton because it would prevent Grant Thornton from establishing its full defense at trial

and would also give the jury the false impression that it was responsible for the MD&A section of

- 104 -

ARCP's Forms 10-K.  ECF No. 1197.  Beeson separately argued that her review of ARCP's correspondence with the SEC – which occurred prior to her employment with ARCP – was relevant to her due diligence defense, as it demonstrated that she knew that ARCP was consulting with outside attorneys and subject matter specialists on ARCP's FFO/AFFO.  ECF No. 1177.

<div align="center">

**(3)     Motion *in Limine* No. 3 Regarding Miscellaneous Trial Procedures**

</div>

255.    Lead Plaintiff's Motion *in Limine* No. 3 sought rulings on miscellaneous trial procedures, including: (i) an order granting Lead Plaintiff the same number of peremptory challenges as Defendants combined; (ii) permission to examine witnesses identified with Defendants by leading questions; (iii) an order precluding Defendants from introducing live testimony from persons that are unavailable to Lead Plaintiff, and introducing deposition testimony of persons in Defendants' control; (iv) an order excluding percipient witnesses from the courtroom; (v) an order precluding counsel from communication with a witness until the witness's testimony is concluded; and (vi) an order permitting certain preliminary jury instructions.  ECF No. 919.

256.    In opposition to Lead Plaintiff's Motion *in Limine* No. 3, Defendants submitted a 17-page memorandum.  In response, Defendants argued that: (i) Lead Plaintiff's request to equalize the number of peremptory challenges should be denied, as this was a complex multi-party litigation with dozens of defendants represented by 12 different law firms; (ii) Lead Plaintiff's request to examine witnesses identified with Defendants by leading questions was premature; (iii) Lead Plaintiff's request regarding live testimony from Jessica Estrada should be denied because Ms. Estrada was outside of the Court's subpoena power and did not have personal knowledge of the claims at issue, but agreed to provide Brian Jones live as long as Mr. Jones is permitted to testify during Defendants' case; (iv) they did not object to exclude percipient witnesses from the courtroom, but requested that the exclusion end after the witness testified; (v) witnesses should not be limited in their

communications with counsel; and (vi) Lead Plaintiff's request for the issuance of preliminary jury instructions was premature.  ECF No. 1214.

<div align="center">

**(4)     Motion *in Limine* No. 4 to Admit Deposition Testimony of Block and McAlister, for Adverse-Inference Instructions, and to Preclude ARCP from Disputing It Was Block's Co-Conspirator**

</div>

257.     Lead Plaintiff's Motion *in Limine* No. 4 related to Block's and McAlister's repeated invocation of the Fifth Amendment throughout discovery and sought: (i) permission to play videotaped deposition testimony of Block and McAlister for the jury; (ii) an adverse jury instruction against Block and McAlister based on their assertions of the Fifth Amendment during their depositions; (iii) to submit into evidence a list of questions that Block and McAlister asserted their Fifth Amendment to and from which the jury may draw an adverse inference; (iv) an adverse inference jury instruction against ARCP; (v) to preclude Defendants from eliciting substantive testimony from Block and McAlister; and (vi) to preclude ARCP from disputing that it was a coconspirator of Block in connection with securities fraud.  ECF No. 922.

258.     Defendants submitted three oppositions to Lead Plaintiff's Motion *in Limine* No. 4. ARCP argued in its 29-page opposition that: (i) Block's and McAlister's invocations under the Fifth Amendment should be excluded under Federal Rule of Evidence 403; (ii) adverse inferences from Block's and McAlister's Fifth Amendment invocations could not be used to draw an adverse inference against ARCP under the *LiButti* test; and (iii) Judge Oetken's restitution order naming ARCP as a co-conspirator did not preclude ARCP from arguing at trial that it was not Block's co-conspirator, as collateral estoppel did not apply here.  ECF No. 1215.  In his 13-page opposition, Block stated that it was "likely" that he would invoke his Fifth Amendment rights at trial, but argued that it was premature for the Court to preclude him from testifying at trial, and requested less restrictive measures – which included a suggestion that Block and others have until November 7,

2019 (the date of the final pre-trial conference) to decide whether they would assert their Fifth Amendments rights at trial.  Block also argued that: (i) Lead Plaintiff was not entitled to a blanket adverse inference because it would violate his due process rights; (ii) video clips and lists of questions from his deposition should be excluded under Rule 403; and (iii) Lead Plaintiff's request for jury instructions on adverse inferences was premature and should also be amended to counter the likelihood of speculation and the drawing of erroneous conclusions.  ECF No. 1222.  McAlister separately argued that because of the Court's summary judgment rulings against her, her Fifth Amendment invocations were no longer relevant and should be excluded from trial.  ECF No. 1212.

### (5)  Motion *in Limine* No. 5 to Preclude Evidence that ARCP's Admissions in the Restatements Are Incorrect

259.    Lead Plaintiff's Motion *in Limine* No. 5 sought to preclude evidence that ARCP's admissions in the Restatements were incorrect.  Specifically, Defendants' experts had opined that certain material adjustments in the Restatement were not in fact errors, but instead changes in ARCP's new management's accounting policies or judgments.  Lead Plaintiff argued, *inter alia*, that the presentation of such evidence would contradict ARCP's own previous disclosures about the Restatement.  ECF No. 1130 at 3.  Lead Plaintiff also argued that Defendants' expert's opinion on the Restatement contradicted ASC 250, the accounting rule governing restatements.  *Id.* at 5-6.  Lead Plaintiff further contended that the presentation of any such evidence by Defendants would be fundamentally unfair as Defendants have blocked Lead Plaintiff from obtaining discovery regarding the bases and support for the Restatement throughout the entirety of the Litigation by claiming either attorney-client privilege, or protected attorney work product.  *Id.* at 9-11.

260.    Defendants submitted three oppositions and one joinder to Lead Plaintiff's Motion *in Limine* No. 5.  ARCP argued in its 20-page opposition that Lead Plaintiff was improperly re-

litigating issues that were previously decided by the Court at summary judgment. If the Court decided to allow Lead Plaintiff to introduce evidence regarding the Restatement, ARCP argued that it too should also be permitted to present evidence regarding the Restatement to support its defenses. ECF No. 1211. The ARC Defendants, Schorsch, Kay, and Beeson argued that the Restatement should either be excluded at trial or a severance of claims should be permitted to avoid prejudice and jury confusion. These same defendants also argued that Lead Plaintiff's request to preclude their falsity defense because of the Restatement was both factually and legally unsupported and that fairness required preclusion of the Restatement given the depth of access to discovery that Lead Plaintiff had. Finally, these defendants argued that they should not be punished based on the privilege invocations of others because it was ARCP, not them, who asserted privilege over the investigation and the Restatement. ECF No. 1159. Block submitted a joinder to these defendants' opposition to Lead Plaintiff's Motion *in Limine* No. 5. ECF No. 1221. Grant Thornton also joined in arguments made by certain of its co-defendants' that the Restatement was inadmissible at trial, and separately argued that the Restatement was irrelevant as to Grant Thornton and therefore inadmissible at trial; but alternatively argued that if evidence of the Restatement was admitted at trial, Grant Thornton too should be allowed to introduce evidence of its understanding of the Restatement at trial, as well as evidence of notes taken by Grant Thornton auditors. ECF No. 1207.

### (6) Motion *in Limine* No. 6 to Exclude Defendants' Cumulative Expert Testimony

261. Lead Plaintiff's Motion *in Limine* No. 6 sought to exclude Defendants' cumulative expert testimony, based on Defendants' designation of 17 expert witnesses for trial, many of which provided overlapping opinions and testimony. Defendants designated six accounting experts, five experts on loss causation and damages, and one on both accounting and loss causation. Lead Plaintiff highlighted for the Court how eight of these 12 experts opined on ARCP's truth on the

market defense.  Defendants also designated three experts on due diligence.  In support of its motion, Lead Plaintiff carefully reviewed, compared, and analyzed the various expert opinions and provided specific examples to the Court of the substantial overlapping testimony.  ECF No. 1131.

262.    Three briefs were submitted in opposition to Lead Plaintiff's Motion *in Limine* No. 6. In a 23-page opposition, the ARC Defendants, Schorsch, Block, Kay, Beeson, the Non-Management Directors, Sealy, and the Underwriter Defendants argued that limiting their experts prior to trial was premature, unfairly prejudicial, and impracticable and further contended that their experts presented non-duplicative opinions in defense of Lead Plaintiff's claims.  ECF No. 1160.  Grant Thornton submitted a separate nine-page opposition and argued that is auditing expert, Mr. O'Bryan, was critical to their due diligence defense and was non-cumulative, as Mr. O'Bryan was the only expert to opine on Grant Thornton's audits in connection with PCAOB standards.  Similarly, Grant Thornton argued that its loss causation and damages expert, Professor Zmijewski, was critical to its affirmative defense of negative loss causation and was non-cumulative as he was the only defense expert to opine on Grant Thornton's 2012 and 2013 audit reports.  ECF No. 1195.  ARCP argued that there was no basis to exclude any of their four experts given that these experts were critical to ARCP's defenses and directly rebutted Lead Plaintiff's experts on the same subject matters.  To the extent that ARCP's experts overlapped with other Defendants' experts, ARCP asserted that Defendants would coordinate experts at trial to avoid duplication, and thus Lead Plaintiff's motion to exclude cumulative experts was premature.  ECF No. 1218.

### (7)    Motion *in Limine* No. 7 to Preclude Evidence and Argument Regarding Truth on the Market

263.    Lead Plaintiff's Motion *in Limine* No. 7 sought to preclude Defendants from presenting evidence and argument regarding the truth-on-the-market defense.  Lead Plaintiff asserted that the weakness of Defendants' truth-on-the-market defense was exposed when Dr. Ambrose,

whose opinion was solely focused on the truth-on-the-market defense, was pulled as a defense trial witness after Lead Counsel deposed him and uncovered the flaws in his opinions.  ECF No. 953.

264.    In opposition, ARCP, the ARC Defendants, Schorsch, Kay, Block, the Underwriter Defendants, and RCS argued that the Court previously held at summary judgment that the issue of "truth on the market" was a factual issue for the jury, thereby warranting denial of Lead Plaintiff's Motion *in Limine* No. 7.  They also argued that ARCP's methodology for calculating AFFO using gross addbacks was disclosed on the face of its public filings, and relied on expert discovery conducted after summary judgment in support.  ECF No. 1208.

### (8)    Motion *in Limine* No. 8 to Preclude Certain Testimony or Evidence Regarding Named Plaintiffs

265.    Lead Plaintiff sought to preclude certain testimony or evidence concerning named plaintiffs.  At least ten named plaintiffs were identified as either a "may call" or "will call" witness on one or more of Defendants' witness lists.  Accordingly, Lead Plaintiff sought an order precluding: (i) evidence of named plaintiffs' non-ARCP investments, investment practices, or strategies, purported sophistication, or post-October 29, 2014 ARCP-related trading; (ii) evidence of named plaintiffs serving as plaintiffs in other unrelated actions; and (iii) evidence concerning named plaintiffs' relationships with counsel.  Lead Plaintiff argued that these issues were irrelevant to class-wide issues and unfairly prejudicial in nature.  ECF No. 965.

266.    Defendants argued that under Rule 401, evidence of the named plaintiffs' investment practices and strategies, sophistication, and post-Class Period ARCP investments were relevant to class-wide issues, including rebutting the "fraud-on-the-market" presumption of reliance, and relevant to Lead Plaintiff's damages and loss causation theory.  Defendants further asserted that Lead Plaintiff's request to exclude evidence of named plaintiffs serving as plaintiffs in other actions

- 110 -

and their relationships with counsel was premature and more appropriate for a determination at trial depending on the testimony and evidence presented.  ECF No. 1202.

<div align="center">

**(9)     Motion *in Limine* No. 9 to Preclude Evidence of
or Reference to Aggregate Damages to the Class**

</div>

267.     Lead Plaintiff's Motion *in Limine* No. 9 sought to preclude evidence of, or argument relating to, the aggregate damages suffered by the Class.  Lead Plaintiff argued that at trial damages would be calculated on a per share/unit basis by determining the amount of artificial inflation that was removed from the price of ARCP's securities when Defendants' misconduct was revealed to the market between October 29, 2014-November 3, 2014.  Lead Plaintiff noted that no party's expert had opined on aggregate damages, and the introduction of such evidence would serve no purpose other than an attempt at inducing sympathy for Defendants due to the impact a large verdict could have on them.  ECF No. 1132.

268.     Defendants argued that presentation of aggregate damages might be appropriate at trial depending on how Lead Plaintiff presented evidence of damages, and was therefore premature to exclude at this stage.  ECF No. 1164.

<div align="center">

**(10)     Motion *in Limine* No. 10 to Preclude Defendants
from Arguing or Introducing at Trial Evidence
or Testimony that They Received, Considered, or
Relied on the Advice of Counsel, or Emphasizing
at Trial the Involvement or Presence of Counsel
with Respect to Defendants' Processes and
Publics Disclosures**

</div>

269.     Lead Plaintiff's Motion *in Limine* No. 10 sought to preclude Defendants from: (i) arguing or introducing at trial evidence or testimony that they received, considered, or relied on the advice of counsel; and (ii) emphasizing at trial the involvement or presence of lawyers in connection with Defendants' due diligence procedures and ARCP's public disclosures.  Lead Plaintiff argued that because Defendants expressly disclaimed the advice of counsel defense prior to

<div align="center">- 111 -</div>

the start of depositions and repeatedly invoked the attorney-client privilege or attorney work product doctrine throughout discovery over documents, information, and testimony, Defendants should be precluded from asserting at trial any advice of counsel or "good faith" reliance on counsel defense. Lead Plaintiff also argued that Defendants may try to back-door in an advice of counsel defense through the presentation of evidence or testimony that lawyers were involved with due diligence procedures and/or ARCP's public disclosures or practices, which would improperly give the impression that the legality of ARCP's disclosures was blessed by professionals.  ECF No. 984.

270.    In a 20-page opposition, the ARC Defendants, Schorsch, Kay, Block, Beeson, the Non-Management Directors, Sealy, and the Underwriter Defendants argued that evidence of the involvement of counsel and other advisors in the drafting and approval of ARCP's SEC filings was relevant to their due diligence defense under §11.  They further argued that such evidence negated scienter and demonstrated their good faith, as it showed that they were not hiding ARCP's disclosures from outsiders.  Finally, these defendants argued that evidence relating to their due diligence defense and evidence negating scienter was not unfairly prejudicial to Lead Plaintiff, as the relevance of this evidence related only to counsel's involvement in the due diligence and governance processes and not on the content of the communications provided by counsel.  ECF No. 1161. Separately, Grant Thornton argued that evidence that ARCP and the other defendants addressed any issues with respect to FFO/AFFO with outside counsel, and not with Grant Thornton, demonstrated that they were not responsible for ARCP's methodology for calculating FFO/AFFO.  ECF No. 1197.

- 112 -

(11) **Motion *in Limine* No. 11 to Preclude Defendants from Arguing that Direct Participants in the ARCT IV or the Cole Mergers and the May 2014 Offering Cannot "Trace" the Shares They Acquired to Those Registration Statements**

271.    Lead Plaintiff's Motion *in Limine* No. 11 sought to preclude argument or evidence that named plaintiffs who acquired ARCP common stock directly in the ARCT IV Merger, the Cole Merger, or the May 2014 Offering could not "trace" the shares they received to the relevant registration statement for purposes of §11 claims.  Defendants had repeatedly advocated a "fungible mass" tracing theory throughout the Litigation, and Lead Plaintiff argued that the introduction of any such argument or evidence was simply not relevant to those named plaintiffs who demonstrated participation in the mergers or offerings at issue in this Litigation.  ECF No. 990.

272.    ARCP, the ARC Defendants, Grant Thornton, Schorsch, Block, Beeson, the Non-Management Directors, Sealy, and the Underwriter Defendants argued in a 17-page opposition that Lead Plaintiff's Motion *in Limine* No. 11 was procedurally improper and should be denied, as it was in actuality a motion for partial summary judgment on tracing.  These defendants further argued that "direct participation" was insufficient to establish tracing under pertinent case law and additionally argued that Lead Plaintiff's factual arguments were irrelevant, and echoed arguments made in Defendants' renewed motion for summary judgment.  ECF No. 1204.

(12) **Motion *in Limine* No. 12 to Preclude Schorsch from Presenting Evidence or Argument that He Did Not Receive or Approve the Final July 29, 2014 Press Release or Form 10-Q**

273.    Lead Plaintiff's Motion *in Limine* No. 12 sought to preclude evidence or argument that Schorsch did not receive or approve ARCP's final July 29, 2014 press release or Q2 2014 Form 10-Q.  For the first time in this Litigation, at summary judgment, Schorsch argued and failed to convince the Court that he did not approve the final AFFO presentation in the Company's filings on

- 113 -

July 29, 2014, despite the fact that his electronic signature was affixed to the documents at issue. However, Lead Plaintiff argued that dozens of communications with Schorsch concerning the July 29, 2014 press release and Q2 2014 Form 10-Q had been withheld on the basis of attorney-client privilege, thereby preventing Lead Plaintiff from testing his assertion.  Moreover, Lead Plaintiff contended that the record established that Schorsch had the ultimate authority over all of ARCP's affairs and was involved with everything, which included reviewing the final press releases and prepared remarks prior to earnings calls, contradicting Schorsch's assertions that he did provide final approval of the July 29, 2014 AFFO presentation.  ECF No. 999.

274.   Schorsch argued that the evidence Lead Plaintiff sought to preclude was highly probative and critical to Schorsch's defense that he never saw or approved the Q2 2014 AFFO presentation.  He also argued that the evidence was not unfairly prejudicial, because: (i) he had not asserted any privilege over the documents, as it was ARCP who held the privilege; (ii) he had no intention of relying on any of the withheld documents identified in connection with Lead Plaintiff's Motion *in Limine* No. 12; and (iii) counsel for AR Capital previously provided a sworn declaration that no documents withheld on the basis of privilege related to the AFFO presentation.  Schorsch also argued that the Court could conduct an *in camera* review of the remaining redactions from documents from the evening of July 28, 2014 to confirm Schorsch's assertion that he never saw or approved the Q2 2014 AFFO presentation.  ECF No. 1162.

### b.   Defendants' Motions *in Limine* and Summary Judgment

275.   Defendants filed 33 motions *in limine*, consisting of over 330 pages of arguments. Defendants also again moved for summary judgment, for the third time, on tracing.  Their motions, and Lead Plaintiff's opposition arguments are set forth below.

### (1)     Motions *in Limine* to Exclude Evidence
### Regarding a $747,000 Adjustment in Q3 2013

276.    All defendants, except for Grant Thornton, joined in a motion to preclude evidence of

a $747,000 accounting adjustment to ARCP's Q3 2013 Form 10-Q that was made prior to its filing

on November 7, 2013.  Defendants argued that the $747,000 adjustment, referred to as "plug" by

Lead Plaintiff but deemed immaterial by Defendants, was reversed in the next quarter and therefore

did not cause any injury to any plaintiff as it did not lead to a decrease in the price of ARCP's

securities.  ECF No. 916.

277.    Grant Thornton moved separately to preclude evidence or argument concerning the

$747,000 adjustment, arguing that it was part of an interim review and because only audit opinions

are incorporated into registration statements, Grant Thornton's quarterly interim reviews cannot

serve as the basis for a §11 claim.  Grant Thornton argued that admitting evidence of the $747,000

adjustment would unfairly prejudice Grant Thornton, as the jury may be led to believe that the

auditor could be liable under §11 for is quarterly interim work.  ECF No. 1119.

278.    In a 15-page opposition, Lead Plaintiff argued that evidence concerning the $747,000

adjustment or "plug" was admissible under Federal Rules of Evidence 401 and 402 because it was

highly relevant to two essential elements of Lead Plaintiff's claims – falsity and scienter.  Lead

Plaintiff also argued that the $747,000 plug was admissible under Federal Rule of Evidence 404(b),

because in connection with the Q2 2014 $13 million plug, the evidence demonstrated Defendants'

pattern of making last-minute, unsupported, and unapproved adjustments to add-backs in its AFFO

table to inflate ARCP's reported AFFO.  Finally, Lead Plaintiff argued that the probative value of

the $747,000 plug outweighed any purported risk of prejudice or confusion, given that this evidence

was highly relevant to the elements of falsity and scienter against several of the Defendants and there

- 115 -

was no reason to believe that the jury would be confused or mislead by evidence of the plug.  ECF

No. 1171.

<div style="text-align: center; font-weight: bold;">

(2)     Motions *in Limine* to Exclude Block's and
McAlister's Fifth Amendment Invocations and
Criminal Convictions, the Testimony from
Block's Criminal Trial and McAlister's Plea
Allocution, and the Complaints Filed by
McAlister

</div>

279.    ARCP and ARC Properties sought to preclude Lead Plaintiff from introducing

evidence at trial of: (i) Block's and McAlister's Fifth Amendment invocations and criminal

convictions; (ii) testimony from Block's criminal trial and McAlister's plea allocution; and

(iii) McAlister's defamation and retaliation complaints against ARCP.  Defendants argued that

Block's and McAlister's Fifth Amendment invocations should be excluded from trial under *LiButti*

*v. United States*, 107 F.3d 110 (2d Cir. 1997), because neither Block nor McAlister have any loyalty

towards ARCP, ARCP does not control either of them, their interests are not aligned with ARCP's,

and admitting the invocations against ARCP would not result in trustworthy evidence, as both

individuals invoked the Fifth Amendment to every question at their depositions.  Defendants further

argued that testimony from Block's and McAlister's criminal proceedings were inadmissible

hearsay, that their testimony and invocations were not relevant to the Litigation, and McAlister's

complaints were inadmissible hearsay and highly prejudicial to Defendants.  ECF No. 936.

280.    Block also sought to preclude evidence relating to his and McAlister's criminal

proceedings, as well as evidence related to the Audit Committee investigation and Restatement, and

his resignation from ARCP.  Specifically, Block moved to exclude evidence of his criminal

conviction and settlements with the SEC, arguing, *inter alia*, that the scope of his criminal trial was

narrower than the issues at play in this Litigation and that his SEC settlement was based on the

narrow set of issues in his criminal conviction, which could not expose him to broader liability in

<div style="text-align: center;">- 116 -</div>

this Litigation, and should not be used to show that he had a propensity to commit fraud. Block also sought to preclude evidence of McAlister's guilty plea, plea allocution, and trial testimony, arguing, in part, that her plea allocution was untrustworthy given that she had reason to curry favor with the Government to receive a more lenient plea deal, and Block did not have an opportunity to cross-examine her in connection with her plea allocution. Block asserted that McAlister's trial testimony was inadmissible for a similar reason, in that her testimony was much broader than the crimes he was charged with committing. ECF No. 1029.

281.    In response to these defendants' motions *in limine* to exclude evidence of: (i) the conviction, plea allocution, and criminal trial testimony of McAlister; (ii) Block's convictions for violations of the federal securities laws; (iii) witnesses' testimony from Block's criminal trial; (iv) McAlister's defamation and OSHA complaints; and (v) Block's and McAlister's assertions of the Fifth Amendment during depositions in the Litigation, Lead Plaintiff submitted a 30-page omnibus opposition. First, in connection with McAlister's conviction, plea allocution, and criminal trial testimony, Lead Plaintiff argued that this evidence was admissible as an admission of a party opponent under Federal Rule of Evidence 801(d)(2), statements against interest under Federal Rule of Evidence 804(b)(3), and under the hearsay residual exception of Federal Rule of Evidence 807. McAlister's testimony from the Block criminal trial was also admissible under the former testimony exception under Rule 804(b)(1). Second, evidence of Block's and McAlister's prior convictions for violations of the federal securities laws was admissible under Rule 404(b)(2) as evidence of prior acts and under Federal Rule of Evidence 803(22) as judgment of a previous conviction. Third, Lead Plaintiff argued that McAlister's plea allocution and testimony, and Block's and McAlister's convictions were admissible as relevant under Rule 401 and not unduly prejudicial under Rule 403. Fourth, Lead Plaintiff argued that evidence of, and adverse inferences drawn from, Block's and

- 117 -

McAlister's assertions of the Fifth Amendment during depositions in the Litigation were admissible, and cited its argument made in Lead Plaintiff's Motion *in Limine* No. 4.  Finally, Lead Plaintiff argued that McAlister's defamation and OSHA complaints were admissible as non-hearsay party admissions under Rule 801(d)(2), her statements against penal interest were admissible against other Defendants for the truth under Rule 804(b)(3), and her complaints were admissible against all Defendants for non-hearsay purposes.  ECF No. 1183.

<div align="center">

**(3)  Motion *in Limine* to Preclude Plaintiffs from Using the Restatement, SEC Letter, and Grant Thornton Notes at Trial**

</div>

282.    ARCP and ARC Properties sought to preclude: (i) the Restatement; (ii) a letter ARCP sent to the SEC on January 26, 2015 that contained the preliminary findings of ARCP's Audit Committee investigation into various GAAP and non-GAAP accounting issues; and (iii) documents containing notes taken by Grant Thornton (the "Grant Thornton Notes") employees during meetings where the Audit Committee's outside counsel provided information about the internal investigation, asserting that this information was protected by the work product privilege.  Specifically, with respect to the Restatement, ARCP once again argued that it: (i) primarily reflected new management's change in policy, and not a correction of material errors; (ii) contained quantitatively immaterial adjustments; (iii) contained combined ARCP and ARCT IV financial results which inflated the difference in numbers; and (iv) did not  impact ARCP's previously reported AFFO. Defendants also argued that the Restatement, SEC Letter, and Grant Thornton Notes had no probative value to the proof of loss causation and damages, and were therefore irrelevant to the Litigation.  ECF No. 1146.

283.    In a 19-page opposition, Lead Plaintiff argued that the Restatement and SEC Letter were admissible both as non-hearsay admissions by ARCP under Rule 801(d)(2) and were business

<div align="center">- 118 -</div>

records of ARCP.  Lead Plaintiff also argued that the Restatement and SEC Letter were not

unreliable, nor "subsequent remedial measures" under Federal Rule of Evidence 407, because ARCP

was required to restate and prepare these documents due to the GAAP errors in its financial

statements.  Lead Plaintiff further asserted that the Grant Thornton Notes were admissible under both

Rule 803(6) as business records of Grant Thornton and Rule 803(1) as a present sense impression.

Additionally, Lead Plaintiff argued that the Restatement, SEC Letter, and Grant Thornton Notes

were admissible under the residual exception set forth in Rule 807.  Finally, Lead Plaintiff contended

Rule 403 did not warrant exclusion of the Restatement, SEC Letter, or Grant Thornton Notes, as trial

would not be prolonged as a result of this evidence, mini-trials would not arise from ARCP's internal

investigation, nor would the jury be confused by this evidence.  ECF No. 1166.

### (4)    Motion *in Limine* to Exclude References to Regulation G

284.    All Defendants, except for Grant Thornton, moved to preclude references to

Regulation G, which is an SEC disclosure rule requiring companies that report non-GAAP financial

measures – like AFFO – to include a presentation comparing their non-GAAP financial measure to a

comparable GAAP financial measure.  Defendants argued that Lead Plaintiff did not reference

Regulation G in the TAC, but elicited testimony about this topic throughout discovery, and the

presentation of such evidence of, or references to it at trial, should be precluded because Regulation

G did not serve as the basis of any of Lead Plaintiff's claims.  ECF No. 1144.

285.    In a nine-page opposition, Lead Plaintiff argued that Regulation G was indisputably

relevant to Lead Plaintiff's claims, as this regulation requires non-GAAP metrics, like AFFO and

AFFO per share, to be disclosed accurately – contrary to defendants' assertion that there was no

official rule, regulation, or guidance that applied to ARCP's methodology for calculating AFFO.

Lead Plaintiff also asserted that it was not offering legal opinions concerning Regulation G.  Lead

Plaintiff's accounting expert, Mr. Barron, opined on the applicability of Regulation G to ARCP's disclosures concerning AFFO and AFFO per share – but these opinions were accounting opinions, not legal opinions. Finally, Lead Plaintiff argued that defendants provided no basis for their contention that Federal Rule of Evidence 403 barred evidence relating to Regulation G. ECF No. 1169.

<div style="text-align:center">

**(5)** **Motions *in Limine* to Exclude Evidence Related to Forward-Looking Statements and to Preclude Lead Plaintiff from Using the Term "Plug," Variations of the Term, or Other Similarly Pejorative Language During Trial**

</div>

286.    All Defendants, except for Grant Thornton, sought to exclude evidence regarding forward-looking statements at trial.  Defendants argued that forward-looking statements were irrelevant to the remaining claims in the case, as the Court previously dismissed the claims based on these forward-looking statements.  Defendant also argued that the forward-looking statements did not cause Lead Plaintiff and the Class any losses because the October 29, 2014 disclosure did not make references or revisions to AFFO guidance, and further argued that forward-looking statements were protected under the PSLRA Safe Harbor and the bespeaks caution doctrine.  ECF No. 1010.

287.    Block separately moved to preclude evidence or argument of adjustments in ARCP's guidance model, arguing that Lead Plaintiff first presented argument that these adjustments were "unsupported" at summary judgment.  Block joined in the arguments set forth in ARCP's motion *in limine* regarding the $747,000 adjustment, but also separately argued that evidence of these adjustments were improper to establish that Block had a propensity for plugging numbers, which he expected would result if Lead Plaintiff were to introduce such evidence at trial.  ECF No. 1019.

288.    In its 19-page opposition, Lead Plaintiff argued that the law-of-the-case doctrine precluded defendants' requested relief concerning forward-looking statements, as the Court

<div style="text-align:center">- 120 -</div>

sustained Lead Plaintiff's allegations related to forward-looking statements during the first round of motion to dismiss and again upheld these same statements at summary judgment.  In any event, Lead Plaintiff argued that defendants' loss causation argument was legally wrong, as the misstatements and corrective disclosure need not be mirror images, and factually wrong, as the October 29, 2014 disclosures were more expansive than defendants contend.  Lead Plaintiff also argued that Defendants' forward-looking statements were not protected under the PSLRA Safe Harbor or bespeaks caution doctrine, as Defendants' cautionary language was generic and boilerplate and not meaningful, which was underscored by the fact that ARCP's most senior executives knew that ARCP's AFFO guidance model was manipulated so that the Company could report a higher AFFO guidance.  Lead Plaintiff also argued that evidence related to forward-looking statements made after February 27, 2014 was relevant and admissible, as it provided necessary background evidence explaining why Defendants falsified AFFO throughout the Class Period. Finally, Lead Plaintiff argued that defendants failed to demonstrate that the forward-looking statements violated Rule 403, and in particular, contested defendants' objection to the use of the term "plug," noting that at trial Lead Plaintiff would present evidence that Defendants made up and manually inserted numbers into the AFFO guidance model to meet guidance.  ECF No. 1191.

### (6)   Joint Motion *in Limine* to Exclude Evidence or Argument Regarding GAAP Errors

289.    The ARC Defendants, Block, and the Underwriter Defendants moved to preclude evidence or argument regarding alleged GAAP accounting errors other than the six GAAP errors identified in Lead Plaintiff's TAC.  These defendants argued that Lead Plaintiff would allege at trial new and different GAAP errors that were never pled based on Lead Plaintiff's argument at summary judgment.  Defendants also argued that Lead Plaintiff failed to identify any evidence to support the

unpled GAAP violations, noting that the only evidence identified by Lead Plaintiff was the Restatement, which Defendants contended was inadmissible. ECF No. 1112.

290.    Lead Plaintiff argued that the TAC expressly included all of the GAAP violations related to ARCP's Restatement, and identified examples of specific paragraphs from the TAC that related to the numerous GAAP violations these defendants contented were "new and different." ECF No. 1168.

<div align="center">

**(7)     Joint Motion *in Limine* to Exclude Evidence or Argument Regarding Certain Defendants' Fiduciary Duties as Directors and Officers**

</div>

291.    The ARC Defendants, Schorsch, the Non-Management Directors, and Sealy moved to preclude evidence or argument concerning whether Bowman, Kahane, Weil, Andruskevich, Michelson, Rendell, Stanley, Sealy, and Schorsch properly discharged their fiduciary duties with respect to ARCP. Defendants argued that neither §§10(b) or 11 address standards applicable to fiduciary duty claims, rendering such standards irrelevant to this litigation. ECF No. 1017.

292.    Lead Plaintiff argued that defendants' §11 argument was moot, as Lead Plaintiff did not intend to use the term "fiduciary" in connection with its §11 claims. However, Lead Plaintiff also argued that evidence of fiduciary duties was related to scienter under §10(b) and thus relevant to the proof of its claims against Schorsch. ECF No. 1165.

<div align="center">

**(8)     Joint Motion *in Limine* to Preclude Dr. Feinstein from Repeating Plaintiffs' Allegations as Fact**

</div>

293.    The ARC Defendants, Schorsch, Block, and the Underwriter Defendants sought to preclude Dr. Feinstein from testifying as to the truth of Lead Plaintiff's allegations, which they contended he had asserted as fact during his deposition. Specifically, these defendants identified five issues that they argued Feinstein asserted as a fact during his deposition: (i) ARCP had "'concealed'" facts from the market; (ii) the concealed information "'was finally learned'"; (iii) what

<div align="center">- 122 -</div>

ARCP had presented was not the "'true condition'" of the Company; (iv) "'there was accounting fraud'" at ARCP; and (v) "'[a]ll'" of the Defendants conspired to commit that fraud. ECF No. 1113 at 3. Defendants argued that because Dr. Feinstein was not a percipient witness as to the events at ARCP, he should not be permitted to opine or testify as to the truthfulness of Lead Plaintiff's factual allegations. *Id*. at 4.

294.    In opposition, Lead Plaintiff argued that it would offer Dr. Feinstein's testimony only on the elements of loss causation and damages, which was based on the assumption that Lead Plaintiff's evidence satisfied the elements of falsity and scienter. Specifically, Lead Plaintiff argued that Dr. Feinstein would opine at trial that the disclosures on October 29, 2014, and in the days that followed, were corrective of ARCP's misstatements that had caused the prices of each of the relevant ARCP securities to fall. In connection with this testimony, Dr. Feinstein would discuss how: (i) the market interpreted and valued the disclosures, which would necessarily include testimony on how ARCP had committed fraud in Q1 2014-Q2 2014; (ii) ARCP had disavowed reliance on its 2013 financials; (iii) ARCP's CAO and CFO were forced to resign; and (iv) ARCP had to reevaluate and remediate its internal controls. Additionally, Lead Plaintiff noted that Dr. Feinstein would confirm testimony given by ARCP's expert that the Company's disclosures from October 29, 2014 were "extraordinary." Finally, Lead Plaintiff asserted that if ARCP's expert opened the door by arguing that the October 29, 2014 disclosures were not extraordinary, Lead Plaintiff argued it should be allowed to introduce evidence comparing ARCP's fraud to other significant frauds. ECF No. 1178.

### (9)    Joint Motion *in Limine* to Preclude Certain Testimony of William Gribbin

295.    The ARC Defendants, Schorsch, Block, Kay, Beeson, and the Underwriter Defendants moved to preclude William Gribbin from testifying at trial about: (i) the ARCP-ARCT

III Merger; (ii) accounting judgments or conclusions Mr. Gribbin reached about ARCP's Restatement; (iii) hearsay conversations he had with Ryan Steel and others; and (iv) his unfounded opinions regarding Beeson, Kay, Schorsch, or Block.  Specifically, these defendants argued that Mr. Gribbin was not a percipient witness to the ARCP-ARCT III Merger that occurred in February 2013, as Mr. Gribbin did not join ARCP until November 2013, and therefore asserted it would be improper for him to testify about these events.  These defendants also argued that Mr. Gribbin should not be permitted to testify about expense classifications, related-party transactions, and ARCP's AFFO calculation, as he did not have responsibility over, nor was involved in, those accounting decisions, and contended that his opinions on these issues were based solely from his work on the Restatement. Defendants additionally argued that Gribbin should not be permitted to testify about a conversation with Mr. Steel about the events that happened in Block's office on July 28, 2014, as it was inadmissible hearsay.  Similarly, these defendants argued that any opinions Mr. Gribbin had about Beeson, Kay, and Schorsch were based on hearsay and should therefore be excluded.  ECF No. 1115.

296.    In opposition, Lead Plaintiff argued that Gribbin's testimony regarding the ARCP-ARCT III Merger was admissible under Federal Rules of Evidence 602 and 701, as he had personal knowledge over this issue given his role as ARCP's Controller and Vice President of Accounting, because he was directly involved in matters related to accounting for this merger.  In connection with ARCP's historical accounting, Lead Plaintiff argued that Mr. Gribbin's testimony was admissible under Rule 701, as he had personal knowledge of ARCP's historical accounting issues and his testimony would be helpful at trial to understanding testimony or determining a fact at issue.  Additionally, Lead Plaintiff argued under the relevant case law, Mr. Gribbin, as a lay witness, is permitted to testify as to specialized or technical subject matters because of his position as ARCP's

- 124 -

Controller and Vice President of Accounting.  Lead Plaintiff further asserted that Mr. Gribbin's

conversation with Mr. Steel was admissible as non-hearsay under Rule 801(d)(2)(D).  With respect

to certain testimony regarding Kay, Beeson, and Schorsch, Lead Plaintiff addressed each challenged

testimony and argued why it was in fact admissible under the Federal Rules of Evidence.  ECF No.

1181.

> **(10)   Motion *in Limine* to Bar Lead Plaintiff from Offering (a) Evidence that Beeson Met with the Government and (b) Evidence Relating to the Findings of the Investigation by ARCP's Audit Committee, as Well as Evidence that in December 2014, the Board Presented Beeson with the Choice to Resign Voluntarily or Be Terminated**

297.    Beeson sought to preclude Lead Plaintiff from introducing evidence: (i) of the

Government's meeting with Beeson as part of its investigation into the events that occurred at

ARCP; (ii) of the findings of ARCP's Audit Committee investigation; and (iii) that Beeson was

presented with a choice by the Board to resign voluntarily, or be terminated, in December 2014.

Beeson argued that the meeting with the Government was irrelevant because she was never charged

with any violation of the law.  She also argued that evidence of the Audit Committee's findings and

that Beeson's resignation/termination should not be introduced because ARCP used the attorney-

client privilege to shield the Audit Committee investigation from discovery, thereby depriving a full

development of the record that could have potentially exculpated her.  ECF No. 980.

298.    In response, Lead Plaintiff maintained that it did not intend to offer evidence of

Beeson's meeting with the Government, so long as Beeson did not open the door to admission of

such evidence.  With respect to the Audit Committee's findings, Lead Plaintiff argued that Beeson

failed to identify specifically what evidence should be excluded, thereby dooming her motion.  ECF

No. 1186.

(11)   **Grant Thornton's Motion** *in Limine* **No. 1: To Bar Evidence or Argument Concerning Historical Accounting Scandals**

299.   Grant Thornton's Motion *in Limine* No. 1 sought to preclude evidence or testimony of the improper conduct of accounting firms in historical accounting scandals, like those involving the auditors for Enron Corp. or WorldCom, Inc.  Grant Thornton argued such evidence was irrelevant to the claims at issue and would instead invite improper speculation by the jury that Grant Thornton also acted inappropriately in connection with its audit work of ARCP, thereby warranting exclusion. ECF No. 926.

300.   In response, Lead Plaintiff noted that it had no intention of equating Grant Thornton's conduct with that of the outside auditors involved in historical accounting scandals, like *Enron, WorldCom, Tyco*, etc., but references to these scandals may arise at trial without directly implicating Grant Thornton.  For example, Lead Plaintiff highlighted testimony of one of defense's experts, who discussed how the Sarbanes-Oxley Act of 2002 was enacted in the wake of the *Enron* and *WorldCom* financial scandals. Lead Plaintiff also argued that these accounting scandals were all already well-known and Grant Thornton would not suffer any prejudice.  ECF No. 1188.

(12)   **Grant Thornton's Motion** *in Limine* **No. 2: To Bar Evidence or Argument Concerning ARCP's June 2015 Change of Auditor**

301.   Grant Thornton's Motion *in Limine* No. 2 moved to preclude evidence of its dismissal as ARCP's outside auditor in June 2015, arguing that ARCP never disclosed why it decided to dismiss Grant Thornton.  Accordingly, the introduction of evidence of Grant Thornton's dismissal would serve no purpose except to invite the jury to speculate that it was dismissed due to its failure to perform its audits in compliance with the applicable accounting standards. Grant Thornton also argued that it was prevented from taking discovery on the reasons behind its dismissal, arguing that

ARCP and other defendants shielded the Audit Committee's investigation findings from discovery behind the attorney-client privilege, and thus it would be unfair for Lead Plaintiff to introduce evidence on this subject without full discovery.  ECF No. 935.

302.    In response, Lead Plaintiff argued that because it intended to present evidence that Grant Thornton turned a blind eye to the misconduct at ARCP, the resulting dismissal of Grant Thornton after the conclusion of the Audit Committee investigation was directly relevant to Grant Thornton's conduct during the Class Period.  Lead Plaintiff also argued that Grant Thornton's argument that it was prevented from obtaining discovery of its dismissal due to ARCP's and others' assertions of privilege did not hold water because nothing prevented Grant Thornton itself from producing exculpating documents or other evidence.  In support, Lead Plaintiff also noted that Grant Thornton previously had no problem producing exculpating evidence in connection with other issues in the Litigation.  ECF No. 1189.

> **(13)    Grant Thornton's Motion *in Limine* No. 3: To Bar Evidence or Argument Concerning Other Enforcement Proceedings Against Grant Thornton**

303.    Grant Thornton's Motion *in Limine* No. 3 sought to preclude evidence or argument of other enforcement proceedings or litigation brought against them, arguing that such information was not probative of the issues in this case.  Specifically, Grant Thornton argued that this Litigation was only about ARCP, and no other client of Grant Thornton's, and any references to any extraneous actions or litigations would be unfairly prejudicial by inviting the jury to question the propriety of Grant Thornton's conduct here as a consequence of its conduct with its other clients.  ECF No. 948.

304.    In response, Lead Plaintiff asserted that it had no intention of introducing evidence at trial of other enforcement proceedings against Grant Thornton, but if Grant Thornton opened the

door to such evidence, Lead Plaintiff would respond appropriately with relevant evidence.  ECF No. 1188.

> **(14)    Grant Thornton's Motion *in Limine* No. 4: To Bar Ryan Steel & William Gribbin from Offering Opinions Regarding Auditing Standards**

305.     Grant Thornton' Motion *in Limine* No. 4 moved to preclude Messrs. Steel and Gribbin from opining on professional standards applicable to independent auditors, as they did at their depositions.   Grant Thornton argued that neither Mr. Steel nor Mr. Gribbin have been designated as experts, and may therefore not testify as such at trial, especially since Grant Thornton did not have a chance to test their opinions or evaluate their expertise to testify as to those subject matters.  Grant Thornton further argued that neither Mr. Steel nor Mr. Gribbin should be permitted to offer lay testimony as to whether Grant Thornton acted in accordance with professional standards, as they were not percipient witnesses to Grant Thornton's work.  ECF No. 957.

306.     Lead Plaintiff first noted that although Grant Thornton sought to preclude Messrs. Steel and Gribbin from testifying about auditing standards, Grant Thornton concurrently asserted that their auditors – lay witnesses like Messrs. Steel and Gribbin – should be permitted to testify about PCAOB standards.  In any event, Lead Plaintiff argued that it had no intention of soliciting expert opinions from either Mr. Steel or Mr. Gribbin at trial, nor did Lead Plaintiff intend to elicit testimony from either witness about relevant auditing standards and the application of these standards to this Litigation.  Instead, Lead Plaintiff argued that Messrs. Steel and Gribbin had personal knowledge of Grant Thornton's audits and quarterly reviews of ARCP as a result of their positions at ARCP, and accordingly, both witnesses should be permitted to offer lay testimony under Rule 701 based on that personal knowledge.  ECF No. 1184.

**(15)   Grant Thornton's Motion *in Limine* No. 5: To Bar Evidence or Argument Concerning Grant Thornton's Conduct Between May 21, 2014 and September 6, 2014**

307.    Grant Thornton's Motion *in Limine* No. 5 moved to preclude evidence or argument regarding its knowledge, statements, or conduct between May 21, 2014 and September 6, 2014 on the basis that the last actionable statement against Grant Thornton was on May 21, 2014 in connection with the secondary offering of ARCP common stock that occurred that day. Accordingly, Grant Thornton argued that its interim review of the Q2 2014 Form 10-Q was not related in any way to the §11 claims alleged against it and evidence of its conduct that occurred after the May 2014 Offering would substantially prejudice Grant Thornton. In particular, Grant Thornton argued that certain evidence may cause the jury may speculate whether it was alerted on either July 28 or 29, 2014 to the wrongdoing at ARCP; that the jury may infer that it should decide whether Grant Thornton should have taken additional action in connection with the Q2 2014 Form 10-Q filing as a result of internal emails between Grant Thornton employees discussing the filing; or that the July 29, 2014 texts between McAlister and Richard LaFleur would lead the jury to believe Grant Thornton's review work in connection with the Q2 2014 Form 10-Q was a part of this Litigation. ECF No. 967.

308.    In an 11-page opposition, Lead Plaintiff argued that the evidence Grant Thornton sought to preclude was highly relevant and admissible under Rules 401 and 402. Specifically, Lead Plaintiff argued that this same evidence was deemed both admissible and relevant in Block's criminal trial, which concerned identical issues. Additionally, Lead Plaintiff contended that other defendants intended to offer at trial the same evidence that Grant Thornton sought to exclude based on ARCP's cross examination during the depositions of Grant Thornton auditors throughout discovery. Finally, Lead Plaintiff argued that any purported "prejudicial effects" of this evidence did

- 129 -

not substantially outweigh its probative value. In particular, Lead Plaintiff argued that McAlister's call to Ms. Estrada the night of the Q2 2014 filing should be admitted, as it goes directly to ARCP's due diligence defense under §11 and the element of scienter under Rule 10b-5. Similarly, evidence of the text messages exchanged between Mr. LaFleur and McAlister the morning of the Q2 2014 filing should be admitted, as this evidence is critical to issues in this case and is highly relevant as to the scienter of not only McAlister, but also the Company. ECF No. 1174.

<p style="text-align:center">(16)   <strong>Grant Thornton's Motion <em>in Limine</em> No. 6: To Bar Evidence or Argument Concerning Grant Thornton's Reviews of ARCP's Quarterly Financial Statements</strong></p>

309.   Grant Thornton's Motion *in Limine* No. 6 moved to preclude evidence or argument that Grant Thornton's interim review of ARCP's quarterly financial statements failed to comply with PCAOB standards. Specifically, Grant Thornton argued that it did not audit ARCP's quarterly financial statements, no audit opinion was produced, and no statements concerning these interim quarterly reviews were a part of any registration statement at issue in this case, which was the only basis for Grant Thornton's alleged §11 liability. Grant Thornton further asserted that allowing such evidence at trial may lead the jury to believe that it was in fact liable under §11 for these interim reviews, which would unfairly prejudice it. ECF No. 1117.

310.   Lead Plaintiff argued that evidence concerning Grant Thornton's quarterly interim reviews was probative of Grant Thornton's §11 liability. Specifically, Lead Plaintiff argued that if it establishes at trial that Grant Thornton was aware of material facts that rendered its 2012 and 2013 audit opinions misleading, including if Grant Thornton learned of those facts from its quarterly interim review processes, Grant Thornton would be liable under §11. Additionally, Lead Plaintiff argued that evidence of Grant Thornton's interim reviews was relevant to falsity and scienter with respect to other Defendants, as well as Defendants' due diligence claims. ECF No. 1175.

<p style="text-align:center">- 130 -</p>

### (17)    Motion *in Limine* to Exclude Specific Categories of Evidence

311.    Kay moved to preclude evidence or argument concerning: (i) statements Kay did not "make" or statements that were outside the scope of Lead Plaintiff's allegations against him; (ii) Kay's effort to ensure ARCP meet AFFO guidance; and (iii) Kay's conversations in July 2014 with analysts concerning adjustments to their AFFO estimates.  Kay argued that Lead Plaintiff's theory about Kay's conversations with analysts was not pled in the TAC and was not relevant to the Litigation, and further argued that there was no evidence that any plaintiff was harmed by any analyst revising its AFFO estimate.  ECF No. 952.

312.    In response, Lead Plaintiff submitted a 16-page opposition addressing all of Kay's contentions.  First, Lead Plaintiff argued that evidence that Kay signed ARCP's 2013 Form 10-K was relevant because Kay was the "maker" of statements in this SEC filing under the standard set forth in *Janus* and with respect to scienter.  The Court previously rejected Kay's same challenges at summary judgment.   Next, Lead Plaintiff argued that evidence of Defendants' fraudulent manipulations of ARCP's financial results to meet guidance was relevant and admissible because it provided valuable contextual evidence and supported Lead Plaintiff's theory of the case.  More specifically, Lead Plaintiff argued that: (i) Defendants' efforts to meet guidance directly resulted in the manipulation of ARCP's methodology for calculating AFFO; (ii) evidence of Kay's involvement with ARCP's financial projections was relevant to Kay's liability for statements he made about the Company's financial performance; (iii) Kay met with analysts to convince them to lower their estimates ahead of the Company's release of its Q2 2014 results; and (iv) evidence of Kay's deceitful efforts to meet guidance is directly relevant to scienter, which was imputed to ARCP.  Finally, Lead Plaintiff argued that evidence of Kay's conduct was not unfairly prejudicial,

particularly in light of the fact that Kay was given the choice of either resigning or facing termination for cause.  ECF No. 1192.

<div align="center">

**(18)   Motion *in Limine* to Exclude Evidence
Regarding Insurance Coverage, Indemnification,
and Joint Defense Communications**

</div>

313.    All Defendants, except for Grant Thornton, McAlister, and RCS sought to exclude evidence of, or references to: (i) ARCP's and AR Capital's insurance coverage; (ii) indemnification of the Defendants and payment of legal fees for certain nonparty witnesses; and (iii) joint defense communications by counsel for the Defendants.  Defendants argued that ARCP's D&O policy was irrelevant to any issues in the Litigation and highly prejudicial, given that the policy had long been exhausted, with ARCP footing the bill for hundreds of millions of dollars already.  Similarly, these defendants argued that ARCP's indemnification and payment of legal fees for certain nonparty witnesses was irrelevant to any issues to be tried and invited a risk that the jury may award damages based on Defendants' ability to pay and/or may believe the indemnification to be evidence of wrongdoing.  Defendants further asserted that evidence of joint defense communications should be excluded because there was nothing improper about their arrangement – an agreement commonly seen in litigations with multiple parties – but may lead a jury to draw negative inferences from such arrangements.  ECF No. 988.

314.    In response, Lead Plaintiff argued that evidence of Defendants' liability insurance, ARCP's indemnification, payment of legal fees for multiple witnesses, and joint defense activities was admissible under Rules 401, 402, and 403 due to its relevance in demonstrating prejudice or bias as to certain Defendants.  For example, Lead Plaintiff argued that Michael Reiter, a former employee of ARCP who was fired by the Company, hired Jenner & Block to represent him in this Litigation, but also met with ARCP's counsel for over 13 hours in preparation for his deposition.  Evidence of

<div align="center">- 132 -</div>

this meeting – where Mr. Reiter discussed the case, his testimony, and documents presented by ARCP's counsel – was relevant to bias.  Lead Plaintiff also asserted that any minimal prejudice faced by Defendants could be limited through an appropriate jury instruction.  ECF No. 1176.

### (19) Motion *in Limine* to Exclude Evidence Concerning Relationships with Schorsch and Schorsch-Affiliated Entities

315.    The Non-Management Directors moved to preclude evidence concerning their personal and professional relationships with Schorsch and Schorsch-affiliated entities.  The Non-Management Directors argued that Lead Plaintiff was conflating their status as an "outside" vs. "inside" director by connecting it to their independence, or lack thereof, from Schorsch.  The Non-Management Directors acknowledged the significance of "outside" vs. "inside" director status, confirming that inside directors are held to a higher due diligence standard under §11 liability in reviewing registration statements.  However, they argued that they were not insiders simply by virtue of their personal and professional relationships with Schorsch and his related entities and to determine insider status under SEC regulations, only their relationship with ARCP was relevant – not to Schorsch and/or his other entities.  The Non-Management Directors further argued that introduction of such evidence would result in undue delay because additional evidence would be necessary to rebut any assertions by Lead Plaintiff as to their purported insider status, thereby prolonging trial.  Additionally, the Non-Management Directors argued that evidence of their relationship to Schorsch and Schorsch-related entities, would be unfairly prejudicial to them as it would invite guilty-by-association speculation from the jury.  ECF No. 1140.

316.    In a 21-page opposition, Lead Plaintiff argued that the Non-Management Directors' service on 12 Schorsch-controlled boards and related companies, along with the related compensation, was relevant evidence because: (i) it demonstrated their conflicts and bias and

- 133 -

therefore was directly relevant to their due diligence defense under §11; (ii) of the resulting expertise in REIT financial reporting that arose from the Non-Management Directors' service on 12 REITs, which was directly relevant as to whether they had reason to believe in the accuracy of ARCP's AFFO during the Class Period; and (iii) it resulted in an impediment to the Non-Management Directors' ability to conduct a thorough and searching inquiry in their due diligence. Additionally, Lead Plaintiff argued that evidence of their lack of independence – regardless of insider vs. outsider status – was relevant and admissible. Lead Plaintiff further argued that Michelson, Rendell, and Stanley were not "outside" directors based on all of their relationships with ARCP. Finally, Lead Plaintiff argued that the probative value of Michelson, Rendell, and Stanley's relationships with Schorsch and his related entities outweighed any danger of delay, as much of Defendants' counter evidence may not even be needed at trial. Lead Plaintiff also pointed out that the Non-Management Directors' relationships with Schorsch preceded the October 2014 disclosures and they never sought to dissociate themselves previously. Even after the disclosures, Michelson and Rendell refused to initially step down from ARCP's Board. ECF No. 1193.

### (20) Motion *in Limine* to Exclude Certain Evidence or, in the Alternative, for Severance of Claims or Bifurcation of Trial

317.    The ARC Defendants, Schorsch, Kay, and Beeson sought to preclude all evidence of Block's and McAlister's criminal proceedings, including: (i) Block's guilty conviction and McAlister's guilty plea; and (ii) Block's trial testimony and McAlister' plea allocution. Defendants also asked the Court to limit the adverse inferences to be drawn from Block's and McAlister's invocation of the Fifth Amendment in this Litigation. Defendants further sought to preclude the Audit Committee's investigation findings, including the Restatement, SEC Letter, and Grant Thornton Notes. Finally, these defendants moved to preclude McAlister's complaint. In the

alternative, defendants requested that the Court sever the claims against them or bifurcate trial.  With respect to defendants' alternative relief, they argued that admission of any evidence related to Block's and McAlister's criminal proceedings would irreparably prejudice them.  For example, Schorsch and Kay argued that testimony from Block's trial was the only evidence Lead Plaintiff had of their scienter.  Defendants further argued that without a severance, the jury may become confused over the multitude of evidence, which may be admissible as to one defendant, but not another.  Defendants also asserted that a consolidated trial would protract matters, and numerous side issues would likely arise requiring Defendants to present additional evidence to the jury explaining why, for example, McAlister's guilty pleas were not relevant to them.  ECF No. 1152.

318.    As discussed above in ¶281, Lead Plaintiff addressed all of defendants' arguments regarding evidence from Block's and McAlister's criminal proceedings, and in ¶283, Lead Plaintiff addressed all of defendants' arguments regarding the Restatement, SEC Letter, and Grant Thornton Notes in an omnibus opposition.  ECF No. 1166.  In a separate eight-page opposition, Lead Plaintiff argued that federal courts generally disfavored the severance of claims and bifurcation of trials and meticulously analyzed the Second Circuit's Five-Factor Test to establish that no exception to the general rule existed in the Litigation.  Additionally, Lead Plaintiff argued that because of the interrelated nature of Lead Plaintiff's claims, severance and/or bifurcation would only create substantial judicial inefficiency, given the significant overlap between witnesses and evidence that would be used to prove Lead Plaintiff's claims, resulting in unnecessarily prolonging trial with duplicative evidentiary presentations.  Finally, Lead Plaintiff argued that the Court could simply include a limiting instruction to the jury to manage any prejudicial value of the challenged evidence.  ECF No. 1172.

**(21)     Motions *in Limine* to Exclude Evidence or
            Argument Regarding the Compensation Paid to
            and the Wealth of Certain Defendants**

319.     Schorsch, Weil, Budko, Kahane, Jones, and Bowman moved to preclude evidence or argument relating to their personal or familial wealth, arguing that it was irrelevant to any issue to be presented at trial.  These defendants argued that the only reason Lead Plaintiff wanted to introduce evidence of their wealth was to evoke class- and wealth-based prejudice in the jury, thereby warranting exclusion.  ECF No. 942.

320.     Block also sought an order to preclude evidence of his compensation, wealth, and related-party fees, and incorporated the arguments set forth in certain of the other Defendants' motions *in limine* which sought similar evidentiary rulings.  ECF No. 1035.

321.     Kay separately moved to preclude evidence or argument that: (i) the amount and structure of Kay's incentive compensation was a motive to commit fraud; and (ii) that ARCP paid certain sign-on bonuses or provided a bicycle to Kay.  Specifically, Kay wanted to prevent Lead Plaintiff from introducing testimony of ARCP's annual incentive compensation program, arguing that such generalized allegations concerning his compensation have low probative value to prove allegations of fraud.  Kay also argued that evidence of the bicycle given to Kay would unfairly prejudice him and would require him to spend time explaining the circumstances surrounding the bicycle.  ECF No. 943.

322.     Lead Plaintiff submitted an omnibus opposition to Kay, Bowman, Budko, Jones, Kahane, Schorsch, Weil, and Block's motions to exclude evidence of either their compensation, wealth, or both.  Lead Plaintiff argued that this evidence was probative of their motive to commit fraud.  For example: (i) most of these defendants held large quantities of ARCP stock and OP Units, incentivizing them to commit fraud; (ii) the partners of AR Capital were also officers and/or

directors of ARCP and controlled the mergers, acquisitions, and deals of numerous AR Capital-affiliated REITs that they participated in, which allowed them to pocket enormous sums of money from the fees and commissions charged in connection with the services provided to ARCP for each transaction; (iii) Defendants used ARCP's stock as currency for each of ARCP's many acquisitions, thereby motivating them to maintain a higher share price; and (iv) Schorsch, Block, and Kay's performance bonuses were tied directly to achieving AFFO targets.  Furthermore, Lead Plaintiff argued that Defendants' financial interest in ARCP demonstrated their bias and also noted that their large financial stake in ARCP – which was tens of millions of dollars for some Defendants – was so large that it was relevant to challenging Defendants' assertions that they did not understand AFFO. ECF No. 1187.

### (22)    Motion *in Limine* to Exclude Evidence Related to the SEC Settlement

323.    Schorsch and the ARC Defendants moved to exclude evidence of their recent settlements with the SEC.  These defendants argued that these settlements were inadmissible under Federal Rule of Evidence 408(a).  Defendants also contended that their SEC settlements were irrelevant because their settlements did not concern ARCP's AFFO.  Instead, the ARC Defendants argued that the SEC settlements were about the calculation of the subordinated distribution in connection with ARCP's merger with ARCT III and ARCT IV, and the asset purchase and sale agreements entered into in connection with those mergers.  Accordingly, the ARC Defendants maintained that their SEC settlements had no relevance to Lead Plaintiff's claims in this Litigation. Schorsch separately argued that the SEC charges levied against him only required proof of negligence and not scienter, and thus introduction of any evidence of the settlement would confuse the jury and prejudice Schorsch.  ECF No. 951.

324.     Lead Plaintiff argued that defendants' request was far too broad, as evidence related to the SEC settlements related to the same scheme at issue in the Litigation.   Additionally, Lead Plaintiff argued that it should not be restricted in its ability to cross-examine prior sworn statements made by Defendants to the SEC.   Finally, Lead Plaintiff stated that they would not refer to or introduce the SEC settlements unless Defendants first opened the door, thereby leaving defendants' motion moot.   ECF No. 1167.

### (23)   Motions *in Limine* to Exclude Evidence or Argument Regarding the Resignations of Schorsch, Kay, and Block

325.     Schorsch and Kay moved to exclude testimony, evidence, or argument of their December 2014 resignations from ARCP, and Schorsch's resignation from other AR Capital related entities.   Since Lead Plaintiff asserted at summary judgment that these resignations – which occurred six weeks after ARCP's October 29, 2014 disclosure – were evidence of their scienter, Schorsch and Kay argued that the jury would improperly speculate about what the privileged Audit Committee investigation may have uncovered.   Kay argued that his resignation was part of the Board's efforts to start over and rebuild ARCP's credibility, while Schorsch separately argued that ARCP acknowledged that his departure would not be "For Cause" and members of the Board in fact thanked him for his efforts at ARCP over the years.   ECF No. 958.

326.     Block also moved to exclude evidence of his resignation, arguing that his resignation was the result of a preliminary conclusion of the Audit Committee investigation, the underlying basis of which was protected from discovery under the attorney-client privilege or attorney work product doctrine.   ECF No. 1029.

327.     Lead Plaintiff argued that evidence of Schorsch, Kay, and Block's forced resignations was relevant and admissible.   In particular, Lead Plaintiff argued that Schorsch, Kay, and Block were

- 138 -

given the option to either resign or be fired, and if not permitted to include this evidence at trial,

Lead Plaintiff would be prejudiced.  Instead, Lead Plaintiff argued that evidence of the forced

resignations would demonstrate that these "resignations" were not normal resignations and were in

fact connected to the wrongdoing at ARCP.  Accordingly, because evidence of their resignations was

relevant and the danger of unfair prejudice did not outweigh its probative value, Lead Plaintiff

argued that evidence of Schorsch, Kay, and Block's forced resignations was admissible.  ECF No.

1187.

### (24)   Motions *in Limine* to Exclude Evidence or Argument Regarding AR Capital's Name Changes, AR Capital-Related Businesses, and Related Party Fees

328.    The ARC Defendants and Block sought to preclude evidence or argument related to:

(i) AR Capital's name changes prior to and after the Class Period; and (ii) entities affiliated with AR

Capital which had no direct relationship with ARCP.  These defendants argued that any name

changes were irrelevant, as businesses frequently change their names for any number of legitimate

reasons, and Lead Plaintiff had no evidence of any improper reason for the name changes here.

Defendants additionally argued that references to other AR Capital-related entities, with no direct

relationship to ARCP and the issues in this case should be excluded, as it would confuse the jury and

unfairly prejudice the Defendants by highlighting the successes of all the businesses managed by AR

Capital.  ECF No. 1114.

329.    Schorsch and the ARC Defendants also sought to preclude evidence or argument

pertaining to the $900 million-plus in fees and expenses paid by ARCP, ARCT III, and ARCT IV to

AR Capital and its affiliates.  These defendants argued that these related-party payments were not

related to ARCP's reported AFFO, but were instead normal service fees typically incurred with any

transaction.  Schorsch and the ARC Defendants further asserted that the two categories of fees at

issue were not identified until the Restatement. Consequently, defendants argued that because this evidence was a part of the Restatement, it was inadmissible hearsay against them. Defendants also again challenged Lead Plaintiff's loss causation argument contending that the disclosure of these fees in March 2015 caused no losses to Lead Plaintiff and the Class. Defendants also noted that the introduction of evidence of the $900 million-plus related-party fees would undoubtedly result in a series of mini-trials over the propriety of the fees. ECF No. 961.

330.    In response, Lead Plaintiff submitted a 25-page opposition and first argued that evidence of AR Capital's ownership structure was admissible, as this evidence was relevant to multiple issues in dispute, including motive, falsity, and control. Second, evidence of ARCP's related-party fees was highly probative of the wrongdoing alleged, as it was relevant to falsity, scienter, and control, and was not outweighed by any purported prejudice. Third, Lead Plaintiff argued that evidence regarding AR Capital-related businesses was highly relevant to the due diligence defense of several defendants, as the evidence demonstrated the lack of independence by ARCP's Board members and the lucrative business opportunities the Underwriter Defendants did not want to lose. ECF No. 1190.

### (25)    Motion *in Limine* to Exclude References to Privileged Materials

331.    Schorsch moved to exclude evidence or argument regarding certain privileged materials withheld by ARCP and AR Capital. Specifically, Schorsch sought to exclude evidence of AR Capital's and ARCP's privilege logs, arguing that ARCP previously executed a limited waiver over certain materials that resulted in a production to Lead Plaintiff of all responsive documents that related to ARCP's AFFO presentation in Q2 2014, including documents that would have previously been withheld as privileged. As such, Schorsch contended that Lead Plaintiff had the evidence of his final approval of the Q2 2014 AFFO presentation if it in fact existed. Schorsch also asserted that it

was ARCP's – not his – privilege that had been asserted over the documents, and he could not waive another's privilege claim.  ECF No. 963.

332.    Lead Plaintiff argued that Schorsch's contention that he did not approve the Q2 2014 AFFO presentation meant that the fact that dozens of documents had been withheld on privilege grounds was undoubtedly relevant.   Specifically, Lead Plaintiff argued that Schorsch's argument that ARCP waived privilege over all communications related to Q2 2014 AFFO was illogical given that 52 documents were still withheld from July 29, 2014.  Additionally, Lead Plaintiff argued that ARCP's privilege waiver was limited, and under the contours of the waiver, evidence of Schorsch's involvement with the Q2 2014 AFFO presentation could still have been withheld.  ECF No. 1170.

> **(26)    Motion *in Limine* of Non-Lead Underwriters to Establish for Trial that They Can Rely on the Due Diligence Conducted by the Lead Underwriters**

333.    The Underwriter Defendants moved for an order that would allow the non-lead underwriters to rely on the lead underwriters' investigation in establishing their due diligence defense at trial.  In support, the Underwriter Defendants argued that it was customary practice in the industry for non-lead underwriters to rely on the due diligence work of lead underwriters, and accordingly, any evidence concerning the work of the non-lead, was irrelevant. The Underwriter Defendants also argued that the introduction of any evidence concerning the non-lead underwriters would unnecessarily lengthen trial and result in cumulative testimony.  Accordingly, the Underwriter Defendants requested a jury instruction affirming that the participating underwriters could rely on the lead underwriters' due diligence work in establishing their due diligence defense.  ECF No. 1125.

334.    Lead Plaintiff argued that there was no issue that three of the lead underwriters – Barclays, J.P. Morgan, and Merrill Lynch – would have to rely on their own due diligence

investigations in support of their defense against the §11 claims asserted against them.  However, Lead Plaintiff argued that Citi was not in the same position as the other non-lead underwriters, and should also be required to rely only on its own due diligence defense at trial.  In support, Lead Plaintiff argued that from the beginning of discovery, the parties understood that Citi would be treated like the three lead underwriters, with Citi not only designated as a document custodian, but one of the four underwriters to produce a 30(b)(6) witness (with Citi in fact producing two 30(b)(6) witnesses).  Lead Plaintiff further argued that if Citi was permitted to rely on the lead underwriters' due diligence investigation at trial, then Citi must still be required to prove that its reliance was reasonable and Lead Plaintiff should accordingly be permitted to present evidence challenging that assertion. ECF No. 1180.

### (27)    Motion for Severance of Claims Against Jones and Bowman

335.    Jones and Bowman moved for severance of the claims against them, arguing that the only claims against them are §11 claims – claims that do not require evidence of scienter – based on SEC filings that were not the subject of any criminal convictions or charges.  Jones and Bowman argued that the claims against them stand in stark contrast to the Exchange Act claims based on the Q2 2014 filings that ARCP admitted were intentionally misstated, resulting in the criminal conviction of Block and guilty plea of McAlister.  Jones and Bowman asserted that Lead Plaintiff would likely spend much time at trial on the events related to the Q2 2014 filing, which they had no involvement or responsibility over.  Accordingly, Jones and Bowman requested a severance to cure the prejudice that would likely result from a joint trial.  ECF No. 1025.

336.    Lead Plaintiff argued that the severance of claims and separate trials are generally disfavored by federal courts, and Bowman and Jones failed to demonstrate that severance was warranted here.  Specifically, Lead Plaintiff argued that: (i) its §11 claims against Bowman and

Jones arose out of the same transactions and occurrences and presented common questions as the claims against the other defendants; (ii) severance of the claims would create substantial judicial inefficiency, given the significant overlap of witnesses and evidence; (iii) evidence of the intentional misrepresentations of the Q2 2014 results would not prejudice Bowman and Jones, because they would have the opportunity to testify as to their own involvement at trial; and (iv) a limiting instruction by the Court could address Bowman and Jones' concerns over the impact of the Q2 2014 events.  ECF No. 1173.

### 5.    *Daubert* Motions

337.    After spending hundreds of hours meticulously reviewing the reports and testimony of Defendants' experts, on August 5, 2019, Lead Plaintiff moved to exclude the opinions and/or testimony that did not meet the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 403.  Likewise, Defendants also moved to exclude Lead Plaintiff's four experts.  The parties filed oppositions to *Daubert* motions on August 21, 2019.  The Litigation settled prior to the filing of reply briefing.  The parties' arguments are descried below.

### a.    Lead Plaintiff's *Daubert* Motions

338.    Lead Plaintiff moved to exclude the testimony of Bala G. Dharan, Ph.D., CPA, Allan W. Kleidon, Ph.D., Sanjay Unni, Ph.D., Jack R. Wiener, Jonathan F. Foster, Michael Klausner, Walter N. Torous, Ph.D., John I. Salomon, Barbara Halper, and certain of Gary M. Lawrence's opinions.  ECF Nos. 1055, 1061, 1064, 1133, 1134, 1136, 1137, 1138.  Lead Plaintiff filed nearly 100 pages of briefing and cited to over 85 cases in support of its motions.  In response, Defendants filed 12 oppositions, which consisted of over 100 pages and cited to over 100 cases in support.

### (1)   Motion to Exclude the Testimony of Bala G.
Dharan, Ph.D., CPA

339.    Lead Plaintiff moved to exclude the testimony of Block's expert, Dr. Dharan, who

opined on whether a CFO similarly situated to Block could have reasonably believed that ARCP's

registration statements from February 28, 2013 through May 21, 2014 did not contain material

misstatements or omissions.  Lead Plaintiff argued that Dr. Dharan's opinions were not based on a

reliable methodology, as he did not identify or explain anywhere in his report the methodology he

utilized.  Nor could Dr. Dharan identify any evidence he considered or objective criteria he applied

to determine if a CFO was "similarly situated" to Block.  Dr. Dharan also ignored evidence that

contradicted his assumptions that formed the basis of his opinion.  In sum, Lead Plaintiff asserted

that Dr. Dharan's methodology fell far short of meeting Rule 702's requirements on reliability.  Lead

Plaintiff further argued that Dr. Dharan's opinion improperly usurped the province of the jury to

make factual determinations.  Finally, Lead Plaintiff argued that Dr. Dharan's testimony should be

excluded under Rule 403, as his report was nothing more than a legal brief masquerading as an

expert report – as evidenced by Dr. Dharan's testimony that his report employed Block's counsel's

interpretation of §11 standards and only used evidence provided by Block's counsel.  ECF No. 1137.

340.    In response, Block argued that Dr. Dharan's opinions were helpful and reliable and

therefore should be admitted.  Specifically, Block argued that: (i) Dr. Dharan's methodology was

explained in his report; (ii) Dr. Dharan's opinion was limited to what a reasonable CFO would

believe, not what Block actually believed; (iii) Dr. Dharan's expert report contained a rigorous

analysis of how a CFO, in Block's position, would approach a company's financial reporting; and

(iv) Dr. Dharan's methodology was based on the contemporaneous evidence available at the time.

Block also argued that Dr. Dharan's opinions did not "invade the province of the jury," as he did not

opine on Block's actual knowledge or subjective beliefs, nor did he draw any ultimate conclusions. ECF No. 1255.

<div align="center">

**(2)     Motion to Exclude Expert Testimony of Allan
Kleidon, Ph.D. and Sanjay Unni, Ph.D. as to
Defendants' Truth-on-the-Market Defense**

</div>

341.    Lead Plaintiff moved to exclude ARCP's expert Dr. Kleidon and Block's expert Dr. Unni regarding their opinions that ARCP's "hybrid method" used to calculate AFFO was identifiable to the market and not new information, otherwise known as Defendants' truth-on-the-market defense.  In its 13-page memorandum, Lead Plaintiff argued that neither Dr. Kleidon nor Dr. Unni conducted a scientific or technical analysis in support of their opinions, neither explained why a reasonable investor should ignore ARCP's own statements that AFFO numbers were reported "'net of non-controlling interest effect, where applicable,'" and neither had specialized expertise as to accounting, real estate financials, or REITs.  Lead Plaintiff also contended that because the numbers in the income statement, the starting point for determining AFFO, were materially misstated, there was no way there could be any truth on the market.  ECF No. 1136.

342.    In opposition, ARCP, joined by the Underwriter Defendants, argued that Dr. Kleidon's opinion was appropriately based on his examination of ARCP's public filings and other materials, as well as his specialized training and experience as a financial economist.  Accordingly, ARCP argued that Dr. Kleidon would assist the jury by explaining how no inflation was caused by the alleged misstatement concerning ARCP's "net-gross" AFFO methodology.  ARCP argued that Dr. Kleidon directly addressed Lead Plaintiff's allegation that the market did not know that ARCP's AFFO was calculated with a net basis utilizing gross add-backs.  Finally, ARCP argued that Dr. Kleidon's testimony was relevant to demonstrate that there were no damages as a result of ARCP's methodology for AFFO.  ECF Nos. 1234, 1239.

<div align="center">

- 145 -

</div>

343.   Block argued that: (i) Lead Plaintiff's motion to exclude Dr. Unni's testimony was in reality a motion for reconsideration of the Court's summary judgment decision on the truth-on-the-market defense; (ii) based on his experience, Dr. Unni was qualified to opine on whether ARCP's treatment of its non-controlling interests was new information to the market as of October 29, 2014; and (iii) Dr. Unni's analysis in support of his conclusions was both technical and specialized under Rule 702 and Supreme Court precedent.  ECF No. 1257.

### (3)   Motion to Preclude Dr. Kleidon's and Dr. Unni's Respective Opinions Regarding Loss Causation and Damages

344.   In addition to moving to exclude Dr. Kleidon's and Dr. Unni's opinions on the truth-on-the-market defense, Lead Plaintiff additionally moved to exclude Dr. Kleidon's and Dr. Unni's opinions on loss causation and damages in a 14-page memorandum.  Lead Plaintiff argued that Dr. Kleidon's opinion on loss causation was inadmissible because it was based on an incorrect legal standard previously rejected by the Second Circuit – that Lead Plaintiff must point to a "mirror image" disclosure tantamount to an admission of fraud to establish loss causation.  Lead Plaintiff additionally argued that Dr. Unni's loss causation and damages opinions were arbitrarily limited. Pursuant to Block's counsel's instructions, Dr. Unni ignored the start of the Class Period and limited his analysis to the misstatements made in Q1 2014-Q2 2014 (May 8, 2014 – July 29, 2014), which he characterized as the "Relevant Alleged Misstatements."  Lead Plaintiff contended that this limited analysis would only serve to confuse the jury and should be excluded under Rule 403.  ECF No. 1138.

345.   ARCP, joined by the Underwriter Defendants, argued that Dr. Kleidon's analysis of the October 29, 2014 drop in share price was relevant because his analysis demonstrated that the decline was not a result of the revelation of the alleged misrepresentations in ARCP's FY 2013 (or

earlier) public filings – an opinion based on Dr. Kleidon's expertise on financial economics and market behavior. ARCP disputed Lead Plaintiff's contention that Dr. Kleidon's analysis was based on the "mirror image" legal standard, and maintained that Dr. Kleidon's report was not expressly based on any legal standard. Finally, ARCP argued that Lead Plaintiff's request for Dr. Kleidon to disclose his compensation was procedurally improper, as it should have been raised during expert discovery. ECF Nos. 1239, 1249.

346. Block argued that the Court's orders at summary judgment and class certification did not preclude him from arguing the same issues at trial. Further, Block argued that: (i) Dr. Unni's opinions were limited and focused only on the Q1 2014 and Q2 2014 overstatement of AFFO and the impact of its disclosure; (ii) Dr. Unni's report defined "Relevant Alleged Misstatements," thereby allaying any concerns over juror confusion; and (iii) Dr. Unni's rebuttal opinion of Dr. Feinstein was permissible given that his opinion was based on both his experience and review of economics literature. ECF No. 1256.

### (4) Motion to Preclude Certain Expert Opinions Regarding Due Diligence

347. Defendants identified three experts – Mr. Foster, Professor Klausner, and Professor Lawrence – to opine on due diligence, and Lead Plaintiff moved to exclude the entirety of Mr. Foster's and Professor Klausner's opinions and certain of Professor Lawrence's opinions in a nine-page memorandum. On December 4, 2018, the Court issued an order stating that any experts opining on due diligence would be "limited to what constitutes 'due diligence.'" ECF No. 615. Accordingly, Lead Plaintiff argued that Mr. Foster's opinion that Schorsch, Weil, Kahane, and Bowman "'acted consistent with custom and practice'" in their oversight of ARCP's financial reporting, went beyond the permissible scope set forth by the Court's Order and improperly invaded the province of the jury. Lead Plaintiff moved to exclude Professor Klausner's opinion, arguing that

- 147 -

he did not opine on "what constitutes 'due diligence'" at all, instead opining on the role of an outside director, which would only serve to confuse the jury, necessitating exclusion under Rule 403. Finally, Lead Plaintiff argued that the 80 pages of appendices that Professor Lawrence included with his report should be excluded because in them he assessed the evidence, applied the evidence to the steps he thought were necessary to perform due diligence, and determined that each step was satisfied – an exercise that unequivocally invaded the province of the jury – and exceeded the scope of permissible due diligence opinions set forth by the Court.  ECF No. 1134.

348.    The Non-Management Directors argued that their expert, Professor Klausner, adhered to the Court's Order and limited his opinion as to what constituted due diligence, and did so only in the context of the role of outside directors.  ECF No. 1232.  The Underwriter Defendants argued that Professor Lawrence's opinion was limited to the 11 aspects of a customary due diligence investigation in connection with the offerings at issue in the Litigation, which was within the confines of the Court's Order on due diligence.  With respect to Professor Lawrence's appendices, the Underwriter Defendants argued that he did not opine or provide any ultimate conclusions on whether or not the Underwriter Defendants in fact satisfied their due diligence obligations in this Litigation.  ECF No. 1236.  Schorsch, Weil, Kahane, Budko, Jones, and Bowman argued that legal precedent demonstrated it was entirely appropriate for experts to opine on whether a party acted in accordance with industry customs and practice.  Defendants argued that Mr. Foster should be allowed, at a minimum, to opine on industry customs and practices and his opinion should not be excluded in its entirety.  Additionally, these defendants argued that if Mr. Foster was precluded from opining on the contemporaneous conduct of individuals in the Litigation, then cross-examination on this same topic should also be foreclosed. ECF No. 1230.

- 148 -

### (5)   Motion to Exclude the Opinion and Testimony of Barbara Halper

349.   Lead Plaintiff submitted a 21-page memorandum in support of its motion to exclude the opinion and testimony of Schorsch and the ARC Defendants' expert Ms. Halper, who was retained "'[t]o review the reasonableness of the fees and costs'" paid to ARCP-related parties.  Lead Plaintiff argued that her testimony usurped the province of the jury, as she inappropriately opined that certain of fees and costs paid by and to ARCP, ARCT III, and ARCT IV were reasonable.  Lead Plaintiff further asserted that Ms. Halper did not utilize sufficient facts or data in reaching her opinion, she did not base her opinion on reliable principles and methods, and she did not apply her principles and methods to the actual facts of the case, thereby warranting exclusion of her opinion and testimony.  ECF No. 1055.

350.   In a 22-page opposition, Schorsch and the ARC Defendants first asserted that if the purported related-party fees were precluded from trial, then they would not introduce the opinions of Ms. Halper at trial.  In opposition to Lead Plaintiff's motion to exclude Ms. Halper, Schorsch and the ARC Defendants argued that Ms. Halper's analysis was appropriately based on a selection of comparable REITs, which were picked based on her decades of experience in the REIT industry. Schorsch and the ARC Defendants further argued that her opinion was based on her professional experience and relevant case law refuting Lead Plaintiff's assertion that her opinion should have been more in line with mathematical or scientific opinions.  Defendants also argued that Ms. Halper's opinion was limited only by Lead Plaintiff's allegations, explaining why she did not account for certain information that Lead Plaintiff contended was missing from her report. Defendants additionally argued that: (i) Ms. Halper's opinion on the "reasonableness" of the related-party fees was appropriate; (ii) Lead Plaintiff's argument that Ms. Halper's opinion required no expertise because she reviewed SEC filings in support was without merit; and (iii) Lead Plaintiff's

- 149 -

cherry-picked quotes did not support its argument to exclude Ms. Halper's testimony. ECF No. 1229.

### (6)    Motion to Exclude the Testimony and Opinions of Jack R. Wiener

351.    In a 17-page memorandum, Lead Plaintiff moved to exclude the testimony and opinion of Mr. Wiener, who was retained by Grant Thornton, ARCP, ARC Properties, Schorsch, and the ARC Defendants to opine that named plaintiffs could not "trace" their ARCP common stock acquired in the Cole Merger, the ARCT IV Merger, and the May 2014 Offering.  In addition, Mr. Wiener offered a "fungible mass tracing" opinion, wherein he asserted that no plaintiff who acquired ARCP common stock in exchange for Cole and ARCT IV stock in each merger would be able to prove that their shares were newly issued if the shares passed through DTC's fungible mass. According to Mr. Wiener, because DTC's fungible mass consisted of multiple ARCP offerings, no plaintiff could trace their share directly to a specific offering.  Similarly, Mr. Wiener opined that any plaintiff who purchased shares in the May 2014 Offering would not be able to trace their shares – even if purchased directly from an underwriter as named plaintiffs did here – as the shares would also be held by the DTC in fungible mass.  Lead Plaintiff argued that Mr. Wiener's tracing opinion was in direct contradiction to the weight of relevant legal authority, and the Court's previous observations on this subject, rendering his opinion irrelevant.  Lead Plaintiff also argued that Mr. Wiener's opinion lacked sufficient facts and data, he unreliably applied his methodology to specific direct participant plaintiffs like TIAA, and Mr. Wiener was not qualified to opine on DTC's processes and tracing from 2014, as he lacked contemporaneous knowledge of the processes and records available at the time of the Cole Merger, the ARCT IV Merger, and the May 2014 Offering. ECF No. 1133.

352.     In a 21-page opposition, ARCP, Grant Thornton, the ARC Defendants, Schorsch, Block, the Non-Management Directors, Sealy, and the Underwriter Defendants argued that Mr. Wiener's opinions were relevant because of his ability to explain the DTC's intermediated system of holding securities and the resulting implications for the Litigation.  These defendants also argued that Mr. Wiener would provide critical background and explanatory information concerning the modern system of handling securities and information concerning ARCP and how its securities were held at the DTC.  Based on his analysis of the record in the Litigation, Mr. Wiener opined that none of the named plaintiffs could trace their shares of ARCP common stock to the ARCT IV Merger, the Cole Merger, or the May 2014 Offering, which defendants argued was relevant to the jury's determination of traceability.  Defendants further contended that Mr. Wiener was not offering legal opinions, but instead offering opinions, based on his specialized knowledge, on the tracing of securities in the modern era.  With respect to reliability, defendants argued that Mr. Wiener's opinions were reliable because they were based on records produced by DTC, which showed that ARCP common stock was held in fungible bulk and that named plaintiffs received a *pro rata* share of that fungible mess. Finally, defendants argued that Mr. Wiener was qualified to opine on the tracing of securities given his extensive, first-hand knowledge of DTC's processes, arising from almost 17 years spent at the DTC.  ECF No. 1244.

### (7)      Motion to Preclude Expert Witness John I. Salomon

353.     Lead Plaintiff moved to exclude Block's expert Mr. Salomon, in a 11-page brief. Lead Plaintiff argued that Mr. Salomon did little more than parrot Block's criminal defense concerning "'loan defeasement/excess-interest.'"  Lead Plaintiff argued that Mr. Salomon's opinion was not supported by experience, nor was it tethered to the underlying facts in the Litigation, as admitted by Mr. Salomon himself, thereby warranting preclusion.  ECF No. 1061.

354.     Block argued that Lead Plaintiff's motion to exclude Mr. Salomon was in reality an improper and untimely motion for reconsideration of the Court's Order denying Lead Plaintiff's partial motion for summary judgment as to materiality in connection with ARCP's Q2 2014 SEC filings.  Block attempted to refute Lead Plaintiff's argument that Mr. Salomon's opinion was unreliable because he did not rely on any materials that supported the "Excess-Interest Lookback Addback" used in his report, arguing that AFFO had no standard definition and was calculated using a variety of methods in the industry.  Instead, Block argued that Mr. Salomon used scientific methods and surveyed other market participants in support of his analysis and found that others used similar addbacks as ARCP and also conducted a careful review of ARCP's AFFO disclosures. Block further contended that Mr. Salomon's analysis was based on sound assumptions and the facts of the case.  ECF No. 1258.

### (8)     Motion to Preclude Expert Witness Walter N. Torous, Ph.D.

355.     Lead Plaintiff moved to exclude ARCP, ARC Properties, Schorsch, and the ARC Defendants' expert Dr. Torous, who submitted a rebuttal to Dr. Feinstein's opinion on market efficiency.  Lead Plaintiff argued that Dr. Torous went further than simply attempting to rebut Dr. Feinstein – he opined that the seven indirect *Cammer/Krogman* factors as a whole were not reliable indicators of market efficiency.  Lead Plaintiff argued that because Dr. Torous's condemnation of the seven indirect *Cammer/Krogman* factors was in complete contradiction to Second Circuit authority, his opinions should be excluded.  ECF No. 1064.

356.     In opposition, all Defendants, except for Grant Thornton, argued that there is no one binding test for proving market efficiency in the Second Circuit, and the jury is not required to consider the indirect *Cammer/Krogman* factors.  Dr. Torous asserted that if the fifth *Cammer* factor (the most important factor) was not satisfied, an efficient market did not exist and defendants

contended that this opinion was consistent with other financial economists. Dr. Torous also opined on the purported fallacies of Dr. Feinstein's analysis of the fifth *Cammer* factor, thereby rendering Dr. Torous's opinions relevant to the Litigation. ECF No. 1247.

### b.     Defendants' *Daubert* Motions

357.    On August 5, 2019, Defendants filed nine motions to exclude the opinions offered by Lead Plaintiff's four experts, along with three joinders. ECF Nos. 1071, 1073, 1088, 1104, 1105, 1116, 1121, 1123, 1128, 1142, 1148, 1150. Defendants' memoranda in support of their motions consisted of over 200 pages and cited to over 150 cases. Defendants filed four motions and a joinder against Dr. Feinstein, two against Mr. Barron, two motions and a joinder against Mr. Purcell, and one against Mr. Pitt. In response, Lead Plaintiff filed six oppositions on August 21, 2019, comprised of over 125 pages and cited to over 150 cases. The parties' arguments are described below.

### (1)     Motions to Exclude Steven P. Feinstein

358.    ARCP, ARC Properties, Schorsch, the ARC Defendants, Kay, Sealy, Beeson, and the Non-Management Directors moved to exclude the opinions offered by Dr. Feinstein in a 54-page memorandum. First, these defendants argued that Dr. Feinstein's damages and loss causation opinions did not "fit the facts" of this case, were unreliable, and would confuse and mislead the jury. Specifically, defendants argued that Dr. Feinstein's opinion that ARCP's common stock price was "artificially inflated" by a constant $4.61 on every day of the Class Period was at odds with the changing nature and magnitude of each misstatement and omission. Defendants further contended that Dr. Feinstein's opinion that ARCP's October 29, 2014 disclosure caused losses for the period prior to May 8, 2014 should be excluded because they asserted that the disclosure was narrow and did not correct any alleged misrepresentation made prior to May 8, 2014. Defendants also took issue with Dr. Feinstein's opinion that the Class could recover from the market declines that occurred on

- 153 -

October 30-31, 2014 and November 3, 2014 on the basis that the declines on those dates were the result of "'inextricable ramifications'" of the initial disclosure, arguing that there was only one corrective disclosure at issue in this case – that of October 29, 2014.  With respect to market efficiency, defendants argued that Dr. Feinstein's opinions were fundamentally flawed, as evidenced by the exclusion of his opinion in a case in the Northern District of Ohio where he provided "indistinguishable evidence" from the evidence he provided in this case.  Defendants also attacked Dr. Feinstein's single-day event study of ARCP's common stock, asserting that it was factually and methodologically unsound and unreliable.  ECF No. 1148.

359.    Both Block and McAlister incorporated by reference certain of the arguments made by the defendants referenced above in ¶358 in support of their motions to exclude Dr. Feinstein's opinions.  ECF Nos. 1105, 1106.

360.    The ARC Defendants and the Underwriter Defendants submitted an 18-page memorandum in support of their separate motion to exclude Dr. Feinstein's loss causation and damages opinions, challenging his use of a constant inflation ribbon.  These defendants repeated many of the same arguments that ARCP, *et al.* made in their memorandum.  Defendants also argued that Dr. Feinstein did not use a sound methodology in determining the resulting inflation and that Dr. Feinstein's methodology did not match Lead Plaintiff's theory of the case that Defendants' fraud increased over time.  ECF No. 1116.

361.    Grant Thornton, the ARC Defendants, Schorsch, Block, Beeson, and the Underwriter Defendants moved to exclude Dr. Feinstein's opinion as it related to §11 damages in a separate 17-page memorandum.  These defendants offered four grounds for his exclusion: (i) Dr. Feinstein used the incorrect date to calculate §11 damages, using the date of November 12, 2014 for all Defendants, asserting that Dr. Feinstein should have calculated damages from January 20, 2015,

- 154 -

which was the date Grant Thornton was first sued for violations of §11; (ii) Dr. Feinstein improperly "unbundles" the merger consideration for the ARCT IV Merger in calculating damages by calculating damages on a per share basis instead of in the aggregate; (iii) Dr. Feinstein's opinions on "amount paid" and the offering price for the ARCT IV and Cole Merger exchanges was contradictory to the law; and (iv) Dr. Feinstein incorrectly opined that class members may recover for declines in ARCP securities prior to the corrective disclosure. ECF No. 1121.

362.    Lead Plaintiff submitted two separate oppositions to Defendants' motions to exclude Dr. Feinstein. In one 47-page opposition, Lead Plaintiff addressed all of the Defendants' arguments against Dr. Feinstein, except for arguments made by Grant Thornton. Lead Plaintiff argued that Dr. Feinstein reliably demonstrated loss causation. In denying Defendants' motions for summary judgment, the Court held that "ARCP's corrective disclosure reasonably alerted investors that ARCP's earlier financial disclosures were also potentially materially misstated, and that stock prices thus were inflated." ECF No. 851 at 4. Based on the Court's previous holding, Lead Plaintiff argued that the Court should again reject defendants' argument that Dr. Feinstein failed to show loss causation for any misstatement prior to May 8, 2014. Second, Lead Plaintiff argued that Dr. Feinstein had reliably estimated damages by utilizing the "out-of-pocket" damages rule, as well as a constant inflation ribbon – both of which have been accepted by courts and experts. Third, Lead Plaintiff argued that defendants' attacks on Dr. Feinstein's opinions relating to the price declines from the October 30-31, 2014 and November 3, 2014 corrective disclosures failed because Dr. Feinstein demonstrated that the stock price declines were caused by the market's continued reaction to new information that was revealed on those dates. Lead Plaintiff addressed the remainder of defendants' contentions and argued: (i) the Northern District of Ohio applied a legal standard against Dr. Feinstein that directly contradicted binding Second Circuit precedent; (ii) defendants'

- 155 -

motion violated the law-of-the-case doctrine since the Court previously held that Dr. Feinstein's event studies demonstrated a cause-and-effect relationship in satisfaction of *Cammer* 5; (iii) Dr. Feinstein's demonstrated cause-and-effect relationship at the end of the Class Period was probative of the cause-and-effect relationship that existed during the entire Class Period; and (iv) Dr. Feinstein's methodology was reliable.  ECF No. 1246.

363.    In response to Grant Thornton's motion to exclude Dr. Feinstein, Lead Plaintiff submitted a 13-page opposition.  Lead Plaintiff argued that: (i) November 12, 2014 was the relevant date in calculating §11 damages under Second Circuit precedent; (ii) Dr. Feinstein did not have to bundle up the ARCP securities used to purchase ARCT IV in calculating damages, as the securities at issue needed to be analyzed separately in the first place and considering the securities as a bundle was not accurate; (iii) the acquirer's share price was the correct starting point in calculating §11 damages based on the statutory language and relevant case law; and (iv) under §11, any damages are presumed to be caused by the misrepresentations in the registration statement from the date of the issuance until the date of the suit.  ECF No. 1241.

### (2)    Motions to Exclude John E. Barron

364.    ARCP, ARC Properties, the ARC Defendants, Schorsch, Block, McAlister, Kay, Beeson, the Non-Management Directors, Sealy, and the Underwriter Defendants submitted a 36-page memorandum in support of their motion to exclude Mr. Barron's report, testimony, and opinions.  Defendants first argued that Mr. Barron's opinions on ARCP's AFFO were inadmissible because they usurped the role of the Court and the jury, particularly because he opined on Regulation G liability.  Defendants further attacked Mr. Barron's AFFO opinion as unreliable and conclusory, and improperly offering "factual narratives" and conclusions.  Defendants also argued that both

Mr. Barron's GAAP and internal controls opinions were inadmissible because he relied on the Restatement instead of performing an expert analysis.  ECF No. 1150.

365.    Grant Thornton submitted a separate 29-page memorandum in support of its motion to exclude certain opinions of Mr. Barron.  Specifically, Grant Thornton argued that six of Mr. Barron's opinions should be excluded to avoid prejudice and jury confusion: (i) Grant Thornton had actual knowledge that ARCP changed its methodology for calculating AFFO; (ii) Grant Thornton's interim review procedures – for which it did not provide an audit opinion – failed to meet PCAOB standards; (iii) Mr. Steel exhibited auditor professional skepticism under PCAOB standards; (iv) Grant Thornton's consents failed to comply with PCAOB standards in connection with its 2012 and 2013 audit opinions; and (v) Grant Thornton failed to obtain sufficient audit evidence to support the recording and classification of the $8.5 million in assets and costs related to the ARCT III Merger.  Grant Thornton further moved to exclude any undisclosed opinions that were not previously identified in Mr. Barron's report.  ECF No. 1071.

366.    Lead Plaintiff submitted two separate oppositions to Defendants' motions to exclude Mr. Barron.  In one 24-page opposition, Lead Plaintiff addressed all of Defendants' arguments, except for those offered by Grant Thornton.  Lead Plaintiff argued that Mr. Barron's AFFO, GAAP, and internal controls opinions were all admissible.  First, with respect to Mr. Barron's AFFO opinions, Lead Plaintiff argued that Mr. Barron's Regulation G opinions were not legal opinions, but were instead accounting opinions based on his experience as a REIT expert.  Lead Plaintiff also contended that Mr. Barron appropriately based his accounting and disclosure opinions to the facts of the Litigation, as required under the Federal Rule of Evidence and that nowhere does Mr. Barron ultimately opine on what ARCP's management knew or intended on any matter at issue in the Litigation.  Finally, Lead Plaintiff argued that Mr. Barron's AFFO opinions were reliable, as they

were based on his extensive experience as a REIT accountant and auditor.  In connection with Mr. Barron's GAAP opinions, Lead Plaintiff argued that: (i) Mr. Barron relied on admissible evidence (including the Restatement, SEC Letter, Grant Thornton Notes, and evidence relating to the criminal trials) in support of his opinions; (ii) Mr. Barron conducted a thorough analysis of ARCP's GAAP errors, as expressly demonstrated in his report; (iii) Mr. Barron's materiality analysis of ARCP's GAAP violations was both appropriate and reliable based on a thorough review of the record; and (iv) Mr. Barron analyzed all of the GAAP restatement items as part of his materiality analysis, and not just some of the GAAP restatement items as defendants contended.  Finally, with respect to Mr. Barron's internal control opinions, Lead Plaintiff argued that Mr. Barron conducted an independent analysis to determine that ARCP had materially weak financial reporting and disclosure controls and his thorough report would assist the jury in understanding internal controls.  ECF No. 1238.

367.    In response to Grant Thornton's motion, Lead Plaintiff submitted a 14-page opposition arguing that Mr. Barron's opinions regarding ARCP's change in methodology for calculating AFFO were admissible because they were relevant and reliable, as his opinions were based on the analysis and review of the documents that were either prepared by or produced to Grant Thornton from ARCP during the Class Period revealing the methodology change.  Lead Plaintiff also argued that Mr. Barron's opinions regarding Mr. Steel were admissible because he did not opine on Mr. Steel's compliance with PCAOB standards on professional skepticism, but instead opined that Grant Thornton failed to comply with PCAOB standards.  Lead Plaintiff further argued that: (i) Mr. Barron's opinions regarding Grant Thornton's consents were relevant and admissible because they provided the foundation for factual arguments concerning the impropriety of the consents; (ii) Mr. Barron's opinions regarding the ARCT III transaction were admissible, as these opinions

were supported by relevant evidence; and (iii) Mr. Barron's opinions that were offered during his deposition were also admissible, as Defendants initiated questions asking for opinions they knew were outside the scope of his report.  ECF No. 1240.

### (3)    Motion to Preclude Testimony of William Purcell

368.    The ARC Defendants, Schorsch, the Non-Management Directors, and Sealy moved to preclude testimony of Mr. Purcell in a 20-page memorandum.  Defendants attacked Mr. Purcell's education and experience, arguing that he lacked both to properly opine on §11 director due diligence.  They also argued: (i) that Mr. Purcell's testimony should be excluded because his deposition testimony was unclear, conflicting, and confusing; (ii) that he usurped the role of the Court by using legal standards from case law as the basis of his opinions; and (iii) went beyond what the Court mandated and case law permits by opining on whether certain defendants satisfied their director due diligence obligations.  ECF No. 1142. The Underwriter Defendants incorporated many of the arguments raised by the other defendants in their motion to exclude Mr. Purcell, and further contended that it was not clear to them what Mr. Purcell intended to opine on with respect to their due diligence as underwriters.  ECF No. 1127.  RCS joined in the arguments raised by the other defendants in their motions to exclude Purcell.  ECF No. 1108.

369.    Lead Plaintiff submitted a 23-page opposition in response, and argued that Mr. Purcell was eminently qualified to opine on due diligence based on his 50-plus years of investment banking experience and defendants' attacks on Mr. Purcell's testimony amounted to little more than quibbles over semantics, which only went to the weight of Mr. Purcell's testimony. Additionally, Lead Plaintiff argued that Mr. Purcell's opinions were reliable and appropriately based on his extensive experience in the investment banking industry, which included actual underwriting experience.  In response to defendants' arguments regarding Mr. Purcell's reliance on legal

- 159 -

authorities in his report, Lead Plaintiff argued that it was common for underwriters to stay informed of substantial legal opinions that affected their industry. Lead Plaintiff also argued that Mr. Purcell's report and testimony were limited to the contours of the Court's Order on due diligence experts' opinions and he had no intention of opining on whether any individual defendant reasonably conducted due diligence in the Litigation. Lead Plaintiff argued that Mr. Purcell's report discussed evidence from the Litigation only to directly rebut Defendants' experts – who also discussed at length the evidentiary record. ECF No. 1252.

### (4)   Motion to Preclude Harvey Pitt

370.   Defendants, except for McAlister and RCS, moved to exclude Mr. Pitt in a 30-page memorandum. Defendants argued that Mr. Pitt improperly offered legal opinions, including those related to liability under Regulation G, underwriter and director due diligence liability, and tracing requirements. Defendants also argued that: (i) Mr. Pitt's opinions on securities practices should be excluded because they were comprised of inaccurate statements of law; and (ii) his tracing opinions should be excluded because they were little more than legal arguments and he also failed to conduct an independent analysis to support his tracing opinions. ECF No. 1088.

371.   In opposition, Lead Plaintiff argued that Mr. Pitt's opinions were limited to a discussion of the reporting requirements of public companies and the general context of offerings, subjects upon which he is sufficiently qualified to offer opinions (based on experience as the General Counsel and Chairman of the SEC and almost 50 years of experience with public companies). Lead Plaintiff asserted that these opinions would be helpful to the jury given the complexity of the Litigation and the securities industry as a whole. In connection with tracing, Lead Plaintiff argued that if Mr. Wiener was permitted to testify on tracing, then Mr. Pitt should also be allowed to testify on tracing. Specifically, Mr. Pitt's review and analysis would be helpful to the jury to demonstrate

that the named plaintiffs either directly purchased in an offering or exchanged shares in a merger in the Litigation.  At bottom, Lead Plaintiff argued that Mr. Pitt's testimony would be about customs and practices in connection with the securities industry.  ECF No. 1242.

### 6.    Defendants' Motion for Summary Judgment on Tracing

372.    On August 5, 2019, Defendants, except for Kay, McAlister, and RCS, renewed their motion for partial summary judgment on tracing.  Defendants argued that Lead Plaintiff's §11 claims relating to the Cole Merger, the ARCT IV Merger, and the May 2014 Offering should be dismissed because: (i) courts strictly enforce §11's tracing requirement even in light of the modernization of securities trading practices; (ii) courts have recognized that DTC's method of holding shares in DTC's street name as part of a fungible mass means that there is no way to identify the specific shares owned by any DTC participant and have accordingly granted summary judgment on tracing grounds; and (iii) named plaintiffs *pro rata*  interest in DTC's fungible bulk here means that they cannot trace their shares to any particular registration statement at issue in this case.  ECF No. 1101. Defendants also submitted a Rule 56.1 Statement in support of their renewed motion for partial summary judgment, identifying 29 statements of purported undisputed fact. ECF No. 1102.

373.    On August 19, 2019, Lead Plaintiff opposed defendants' renewed motion for partial summary judgment on tracing.  Lead Plaintiff once again argued that it had presented indisputable evidence that named plaintiffs directly acquired ARCP common stock in both the ARCT IV and Cole Mergers, and directly in the May 2014 Offering, thereby satisfying the §11 tracing requirement. ECF No. 1226.  Lead Plaintiff also responded and objected to defendants' Rule 56.1 Statement in a 16-page reply, addressing defendants' 29 purported statements of undisputed facts.  ECF No. 1227.

## IV.  THE SETTLEMENT

### A.  Settlement Negotiations

374.    Settlement discussions in the Litigation first commenced in 2015.  They continued off and on until September 2019.  The settlement efforts in this case, like the Litigation itself, was hard fought.  The parties met with the Honorable Layn R. Phillips (Ret.) in four in-person mediation sessions.  Additionally, Judge Phillips facilitated the mediation of this matter through numerous telephone calls, emails, and written submissions by both sides over the last three years.

375.    On March 16-17, 2017, the parties participated in a two-day mediation session before Judge Phillips in New York.  Prior to that mediation session, Lead Counsel provided Judge Phillips with extensive opening and reply briefing on the then-current procedural history and factual status of the Litigation.  Lead Counsel also prepared, at Judge Phillips' request, a power point presentation describing Lead Plaintiff's case, and Defendants' liability, which was given during the joint opening session of the mediation.  The initial mediation session was not successful.

376.    On September 27, 2017, a second in-person mediation session with Judge Phillips was held in New York with Lead Counsel, counsel for ARCP, and representatives from the Company in attendance.  During that second mediation session, the parties discussed the merits of the case and their views on settlement in both joint sessions as well as separate caucuses.  While progress was made during that second in-person mediation, the parties remained far apart.

377.    On June 27, 2019, after completion of fact discovery, and the resolution of the parties' summary judgment motions, ARCP and Lead Counsel met for a third, half-day, mediation session with Judge Phillips in California.  The parties had substantive and productive discussions concerning the merits and settlement value of the Litigation.  While no resolution was reached,

progress was made.  After this session, Lead Counsel continued to have regular dialogue with Judge Phillips about Lead Plaintiff's settlement position.

378.     On August 15, 2019, the parties participated in a full-day mediation session before Judge Phillips in New York.  Prior to that mediation session, Lead Counsel provided Judge Phillips with Lead Plaintiff's summary judgment submissions in an effort to update him on the factual status of the Litigation, particularly with respect to developments in discovery as it pertained to proving liability and damages, and defenses to Lead Plaintiff's claims.   Significant progress toward settlement was made during this session, but no resolution was reached on that day.

379.     On August 16, 2019, Judge Phillips issued a Mediator's Recommendation (the "Recommendation") to the parties to settle the action for a cash payment to the Class of $1,025,000,000.  The Recommendation indicated that the proposed settlement would be funded by the following payments:

1)      $738.5 million paid by ARCP;

2)      $225 million paid by Schorsch and AR Capital;

3)      $12.5 million paid by Block; and

4)      $49 million paid by Grant Thornton.

380.     Judge Phillips informed the parties on August 21, 2019 that his Recommendation had been accepted by all parties.

381.     Lead Counsel and counsel for Defendants engaged in an intense, around the clock negotiation of the detailed settlement terms over the course of the following two and half weeks.  On September 8, 2019, the parties executed a Memorandum of Understanding outlining the material terms of their agreement to resolve this Litigation.  On September 30, 2019, the parties executed the Stipulation of Settlement formalizing their agreement to resolve the Litigation for $1,025,000,000.

- 163 -

**B.      Preliminary Approval Order**

382.      On September 30, 2019, Lead Plaintiff submitted its Unopposed Motion for Preliminary Approval of Proposed Settlement, Memorandum of Law, and the Stipulation of Settlement.  ECF Nos. 1269, 1270, 1272.  Lead Plaintiff asked the Court, pursuant to Federal Rule of Civil Procedure 23 to preliminarily approve: (i) the proposed Settlement as embodied in the Stipulation of Settlement; and (ii) the form and method for providing notice of settlement to class members.

383.      The Court heard argument on the matter on October 3, 2019, during which Lead Counsel described the terms of the proposed Settlement and the reasons the Settlement was an excellent result for the Class.  The parties also sought approval of the notice program and proposed a time table for final consideration of the proposed Settlement, Plan of Allocation, and request for attorneys' fees and expenses, including deadlines for submitting claims and objections to the proposed Settlement, Plan of Allocation, or request for attorneys' fees and expenses.

384.      On October 4, 2019, the Court issued its Order which, *inter alia*:

(a)      preliminarily approved the Stipulation of Settlement and the proposed Settlement as being fair, reasonable, and adequate to class members, subject to further consideration at the Settlement Hearing;

(b)      scheduled the final Settlement Hearing pursuant to Rule 23(d) for January 21, 2020, to determine, whether: (i) the proposed Settlement is fair, reasonable, and adequate to class members and should be approved by the Court; (ii) the Judgment as provided under the Stipulation of Settlement should be entered and whether the release by the Class of the Released Claims should be provided to the Released Defendant Parties; (iii) whether the proposed Plan of Allocation of the

proceeds of the settlement is fair and reasonable and should be approved by the Court; and (iv) counsel's application for an award of attorneys' fees and expenses should be approved;

(c)     approved the form, substance, and requirements of the Notice of proposed Settlement of Class Action, the Proof of Claim and Release form, and the Summary Notice.  The Court also found that the procedure for mailing and distributing the Notice, and for publishing the Summary Notice was adequate under applicable law;

(d)     approved the appointment of Gilardi as the Claims Administrator;

(e)     ordered the Claims Administrator to cause the Notice and the Proof of Claim and Release form ("Claim Form") to be mailed by First-Class Mail to all potential class members by no later than October 25, 2019 ("Notice Date"); and

(f)     ordered the Claims Administrator to publish the Summary Notice once in *The Wall Street Journal* and once over a national newswire service by November 1, 2019.  ECF No. 1274.

385.    Upon final approval of the Stipulation of Settlement and proposed Settlement by the Court and entry of a judgment that becomes a final judgment, the Net Settlement Fund will be distributed according to the Plan of Allocation (described below) to class members who submit valid, timely Claim Forms.  Further terms of the proposed Settlement are set forth in the Stipulation of Settlement.  A summary of the proposed Settlement was set forth in the Notice.

### C.     Notice to the Class Meets the Requirements of Due Process and Rule 23

386.    As required by the Court's Preliminary Approval Order, beginning October 25, 2019, the Claims Administrator, Gilardi, mailed copies of the Notice to potential class members.

387.    The Notice provides class members with information on: (a) the essential terms of the Settlement; (b) their right, and the procedure, to object, to any aspect of the Settlement, the Plan of

- 165 -

Allocation, or Lead Counsel's fee and expense application; (c) the date, time, and place of the Settlement Hearing; and (d) the procedure by which a Claim Form should be submitted to the Claims Administrator and the deadline for doing so.  The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed plan of allocating the Net Settlement Fund among Authorized Claimants.

388.    Filed herewith is the Declaration of Carole K. Sylvester Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Sylvester Decl.").  Ms. Sylvester is an employee of Gilardi who oversaw the notice services provided by Gilardi for this case.

389.    In the aggregate, as of the date of this Declaration, I am informed that Gilardi has disseminated over 243,000 copies of the Notice to potential Class Members and their nominees. Sylvester Decl., ¶12.

390.    In addition, in compliance with the Court's Preliminary Approval Order, a Summary Notice was published in *The Wall Street Journal* and over *Business Wire* on October 30, 2019.  *Id.*, ¶13.  Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator specifically for this Litigation, www.ARCPSecuritiesLitigation.com.  *Id.*, ¶15.  This method of giving notice, previously approved by the Court, is appropriate, because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]."  Fed. R. Civ. P. 23(e)(1)(B).

391.    As explained in the accompanying Memorandum, the Notice apprises class members of their rights with respect to the proposed Settlement and therefore is the best notice practicable under the circumstance and complies with the Court's Preliminary Approval Order, Rule 23, the PSLRA, and due process.

- 166 -

**D.    The Plan of Allocation**

392.    As set forth fully in the Notice, the Plan of Allocation provides for the distribution of the Net Settlement Fund to class members who timely submit valid Claim Forms that are accepted for payment by the Court.  The goal of the Plan of Allocation is to equitably distribute the Net Settlement proceeds to class members who suffered economic loss as a proximate result of the alleged wrongdoing.

393.    To this end, Lead Plaintiff engaged its damages expert, Dr. Feinstein, to develop the Plan of Allocation.  Based on his analysis of causation and damages as outlined in his reports described in ¶¶220-224, Dr. Feinstein developed the Plan of Allocation which contains separate formulas to calculate damages for each of the ARCP securities at issue.

394.    To have a Recognized Loss Amount under the Plan of Allocation, shares or units of ARCP securities must have been purchased or acquired during the Class Period and held until October 29, 2014.  As set forth in greater detail in the Notice, the calculation of the Recognized Loss Amount is based upon various formula that take into account: (a) when the shares or units were sold; (b) whether the shares or units were held at the close of trading on October 28, 2014; (c) the amount of the alleged artificial inflation per share or unit; (d) the purchase/acquisition price; and (e) the purchase/acquisition price minus the average closing price between January 30, 2015 and the date of sale.

395.    In sum, the Plan of Allocation represents a method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocation of the Net Settlement Fund.

4835-9551-9916.v18

E.      **The Range of Reasonableness of the Proposed Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

396.    The $1.025 billion proposed Settlement is particularly remarkable in light of the best possible recovery and the attendant risks of litigation.  Indeed, in the history of PSLRA jurisprudence, I am not aware of another PSLRA class action case that has settled for more than a $1 billion prior to trial and recovered a higher percentage of the maximum recoverable damages.[12]

397.    At the outset of the Litigation, legal commentators and securities' analysts issued reports that attempted to predict the extent of the Company's financial exposure as a result of the conduct alleged in the Litigation.  Those reports indicated that a settlement of the action could cost ARCP up to $39-$117 million.  Elliott Z. Stein & John Giordano, *BI Litigation Watch: American Realty Shareholder Suit*, Bloomberg (2017).

398.    Institutional investors who elected to forgo the class action and proceed individually failed to recover anywhere close to what Lead Plaintiff recovered for the Class.

399.    For example, in June 2018, ARCP paid $90 million to settle a case brought by several Vanguard funds that made substantially similar allegations to those made here.  Those mutual funds reportedly held approximately 13% of ARCP's outstanding shares of common stock (approximately 117 million shares) at the end of the period covered by the various pending shareholder actions. https://www.prnewswire.com/news-releases/vereit-enters-into-settlement-agreement-and-release-with-vanguard-300663769.html.

400.    Later in 2018, Blackrock, PIMCO, and other institutional investors settled their claims with ARCP in exchange for $85 million.  According to ARCP, including the previously

---

[12]    The only PSLRA case that settled for more than $1 billion and recovered a greater percentage of damages was *Lawrence E. Jaffe Pension Plan v. Household International, Inc., et al.*, No. 02-C-5893 (N.D. Ill.), which settled after 14 years of litigation, including a trial and post-trial appeals.

announced settlement with the Vanguard, the Company had then settled claims brought by approximately 24% of ARCP's outstanding shares of common stock and swaps referencing common stock held at the end of the period covered by the various pending shareholder actions for a total of $175 million. https://www.prnewswire.com/news-releases/vereit-enters-into-settlement-agreements-and-releases-with-eight-opt-out-plaintiffs-300722344.html.

401.    After those settlements were announced, the Company began soliciting other large holders of ARCP securities in an attempt to encourage them to settle individually rather than proceed as part of the Class. The Company was successful in its efforts. For example, in October 2018, ARCP agreed to pay $42.5 million to settle claims with four additional opt-out plaintiffs. Including the October 2018 settlement, potential class members reportedly holding 31% of the Company's outstanding shares and swaps referencing common stock had been eliminated from the Class in exchange for $217.5 million. https://www.prnewswire.com/news-releases/vereit-enters-into-settlement-agreements-and-releases-with-four-opt-out-plaintiffs-300738824.html.

402.    If the Class had settled on the same *pro rata* basis as Vanguard, BlackRock, PIMCO and the other institutional investors who elected not to proceed as part of the Class, the Class would have received approximately $450 million in exchange for resolution of its claims – less than half of the $1.025 billion it ultimately received.

403.    Lead Plaintiff is not attempting to denigrate the recoveries received by the opt-out plaintiffs. Rather, those recoveries are probative of how highly sophisticated investors, who hired and paid for their own lawyers, viewed their potential recoveries in light of the attendant risk of this Litigation, as more fully detailed in ¶¶412-430, *infra*. The fact the proposed Settlement provides recoveries more than twice the *pro rata* amount these institutional investors accepted supports the conclusion that the proposed Settlement is more than fair, reasonable, and adequate.

404.    According to Lead Plaintiff's expert on damages and causation, the most the Class could have recovered at trial was $2.02 billion in damages.  Thus, the proposed Settlement represents more than 50% of the maximum recoverable damages in the case.  Lead Counsel is unaware of any major securities fraud case that comes close to recovering a percentage of damages of this magnitude prior to trial.

405.    The proposed Settlement is even more noteworthy when viewed against the market loss suffered by ARCP common stock on the day ARCP disclosed its previous accounting improprieties.

406.    Prior to the market opening on October 29, 2014, ARCP revealed that its previously reported AFFO for Q1 2014 was incorrect and that error was subsequently identified but intentionally not corrected in Q2 2014, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.

407.    In response to this announcement, the price of ARCP common stock declined by $2.38/share.  According to Lead Plaintiff's damage consultant, $0.06/share of this decline was caused by market and sector factors unrelated to the fraud, resulting in $2.32/share of damages on that day.[13]

408.    Under the Plan of Allocation, the average distribution to purchasers of ARCP common stock is roughly $1.72/share.  Class members who held other ARCP securities will also receive highly significant amounts.  Specifically, the average distributions will be approximately $1.35 per preferred share, $6.91 per $100 face value of the TAA Notes, $9.04 per $100 face value of

---

[13]    To be clear, Lead Plaintiff's damage estimate of $2.02 billion includes damages associated with other ARCP securities and common stock price declines on several subsequent trading days, for which Defendants and their experts argued there was no loss causation.

the TAB Notes, $2.24 per $100 face value of the QAA/QAB Notes, $2.78 per $100 face value of the QAC/QAD Notes, and $5.27 per $100 face value of the QAE/QAF Notes.

409.    All of these amounts assume that every member of the Class will submit a claim. Because 100% of class members do not submit claims, the payouts to those Class members who make claims will increase on a pro rata basis.

410.    Lead Plaintiff recognizes that a portion of the risk in this Litigation was reduced by the fact that ARCP's former CFO was convicted of securities fraud.  However, the facts upon which that conviction was based only resulted in a small percentage of the damages suffered by the Class. Specifically, following the institution of this action, the United States Department of Justice brought criminal charges against Block, who was ultimately convicted of securities fraud for conduct that occurred on July 28 and 29, 2014, and statements included in ARCP's Q2 2014 earnings announcement.  The Government did not pursue claims for any of the other statements or conduct alleged by Lead Plaintiff.

411.    If Lead Plaintiff had limited the Litigation to the allegations pursued by the Government, the maximum recoverable damages would be less than $290 million.  By actively pursuing additional claims and areas for relief, Lead Plaintiff was able to obtain a recovery equal to 350% of the maximum amount of damages the Class could have received after trial had Lead Plaintiff utilized the Government's theory of the case.

F.    Questions of Law and Fact Added Risks and Uncertainty

412.    While Lead Plaintiff is confident it would have ultimately prevailed at trial based on the robust documentary and testimonial evidentiary record developed during the Litigation, it also recognized that a number of factors made the outcome of trial uncertain.  Compounding matters, the parties' 44 motions *in limine*, a motion for severance, and 17 *Daubert* motions were all outstanding

- 171 -

at the time of the Settlement.  Resolution of any of these evidentiary motions against Lead Plaintiff could have severely impeded its ability to prove its claims at trial.  Additionally, Defendants' motion for summary judgment on tracing was also outstanding and if successful, would have resulted in the dismissal of Lead Plaintiff's §11 claims in connection with the ARCT IV Merger, the Cole Merger, and the May 2014 Offering.

413.    Lead Plaintiff needed to consider the risks associated with Defendants' anticipated defenses, including: (i) Lead Plaintiff failed to show any materially false or misleading statements or omissions regarding ARCP's methodology for calculating AFFO; (ii) any misstatement or omission regarding ARCP's methodology for calculating AFFO was immaterial as a matter of law under the "truth on the market" doctrine because the actual methodology used to calculate AFFO was simultaneously disclosed in, and apparent on the face of, ARCP's public filings; (iii) ARCP had discretion in how to calculate AFFO, a non-GAAP metric, and because the calculation of AFFO is a statement of financial opinion, Lead Plaintiff would be required, but unable, to show that statements regarding ARCP's methodology for calculating AFFO were both objectively and subjectively false at the time they were made; (iv) there is no evidence that Defendants acted intentionally or recklessly in connection with the alleged misstatements; (v) Lead Plaintiff failed to prove that certain Defendants had actual control over any alleged misstatement by ARCP; (vi) Lead Plaintiff failed to demonstrate an adequate causal relationship between the alleged misstatements or omissions and any losses it suffered; (vii) statements regarding ARCP's internal controls were statements of opinion, and Lead Plaintiff could not show that management did not objectively or subjectively believe those statements of opinion at the time they were made; (viii) the alleged misstatements in Grant Thornton's audit reports were statements of opinion, and Lead Plaintiff could not show that those opinion statements omitted known material facts that would render them misleading; (ix) Grant

Thornton cannot be held liable for any alleged misstatements outside of the audited financial statements; (x) certain defendants are shielded from any §11 liability by their exercise of due diligence; (xi) Lead Plaintiff's §11 claim based on certain equity offerings fail because Lead Plaintiff could not trace its shares to the allegedly false or misleading registration statements; (xii) Lead Plaintiff's claims based on forward-looking statements concerning ARCP's AFFO projections are legally inactionable and did not cause any losses; and (xiii) in the event of liability, damages would be significantly lower than the damages calculated by Lead Plaintiff's expert.

414.    If the jury credited some or all of these defenses, the Class could have recovered much less than the amount received through the Settlement, or nothing at all.  For example:

**1.    Risk of Being Unable to Establish Falsity and Materiality**

415.    Lead Plaintiff faced the risk of not being able to establish that Defendants made any materially false or misleading statements or omissions regarding ARCP's methodology for calculating AFFO, particularly in the period prior to July 29, 2014.  Specifically, as they had argued throughout the Litigation, Defendants would attempt to convince the jury that ARCP's methodology for calculating AFFO was not false because (i) there was no accounting rule or other requirement that AFFO be calculated pursuant to a specific methodology and (ii) the Company's public filings disclosed the methodology it used to calculate AFFO.

416.    Defendants claimed that they had significant discretion when deciding how to calculate the Company's AFFO.  In support of their argument, Defendants relied on the fact that AFFO was a non-GAAP measure, without a corresponding accounting rule, governmental regulation, or industry guidance concerning its calculation.  Defendants' bolstered their argument by relying on industry white papers indicating that preparers and users of REIT financial statements had not reached a consensus on a definition of AFFO.  As a result, there was a wide variation in how

- 173 -

REITs calculated AFFO and AFFO per share.  According to Defendants, far from being false, ARCP's AFFO was computed in one of the many acceptable ways that a REIT could calculate AFFO.

417.    Thus, Lead Plaintiff alleged that Defendants issued materially false and misleading statements throughout the Class Period concerning both non-GAAP and GAAP financial information, as well as disclosures regarding the effectiveness of ARCP's internal financial controls. In contrast, throughout the Litigation, Defendants consistently contended that Lead Plaintiff could not demonstrate a materially false or misleading statement or omission regarding ARCP's methodology for calculating AFFO prior to Q2 2014.  Specifically, Defendants asserted that ARCP's method for calculating AFFO was not subject to any specific accounting rule or regulation and moreover, their methodology for calculating AFFO was disclosed and known to the market, thereby establishing a truth-on-the-market defense.  Defendants also argued that the GAAP violations disclosed by the Restatement were not errors related to fraud, but instead were the result of changes in new management's policy or judgment, and thus the Restatement was not an admission that ARCP's prior financial statements were false and misleading when originally issued.  Furthermore, Defendants argued that Lead Plaintiff had no evidence of the falsity of ARCP's statements regarding internal controls prior to Q2 2014, asserting that Schorsch and Block believed their statements concerning the effectiveness of ARCP's internal financial controls at the time they were made, and that the statements had a reasonable basis in fact based on the testimony of internal AR Capital and ARCP employees.  Although Lead Plaintiff believes the record unequivocally establishes that Defendants disseminated materially false or misleading statements or omissions throughout the Class Period, a jury could agree with Defendants' arguments and the Class would recover nothing.

### 2.      Risk of Being Unable to Defeat the Truth-on-the-Market Defense

418.    Plaintiffs faced an additional risk of being unable to overcome Defendants' truth-on-the-market defense, further precluding liability.  In support of this defense, Defendants argued that the methodology they utilized to calculate AFFO was openly disclosed in ARCP's public filings. Specifically, Defendants contended that ARCP's use of a net starting point and gross add-backs were readily apparent on the face of each filing and further known to many market participants.  Because Lead Plaintiff was proceeding under an efficient market theory, the price of ARCP's securities were presumed to have incorporated this information.  Thus, according to Defendants, any omission specifically highlighting the precise methodology utilized to calculate AFFO would be immaterial as a matter of law.  If the jury agreed with Defendants' argument, the recovery would have been reduced dramatically.

### 3.      Risk of Being Unable to Establish Subjective Falsity

419.    Lead Plaintiff also faced the risk that the jury would determine that Defendants' statements regarding AFFO were opinions that were not subjectively false.  According to Defendants, because AFFO is a non-GAAP metric with no objective standard and requiring considerable judgment, and is an indication of performance over time, it is actually a statement of opinion.  If the jury agreed with that assessment, Lead Plaintiff would need to show in addition to being objectively false, it was also subjectively false.  This, according to Defendants, was something that Lead Plaintiff would be unable to do.

420.    Defendants attempted to further support their argument that AFFO was a statement of opinion by highlighting that they repeatedly emphasized the subjectivity of their AFFO calculation by using words typically associated with the expression of an opinion, such as "we believe" and "we

consider," which according to Defendants signaled to investors that AFFO conveyed a lack of certainty.

421.    If Defendants were able to convince the jury that AFFO methodology reflected management's subjective judgments as to its calculation, Lead Plaintiff would need to overcome the additional hurdle of establishing that AFFO was subjectively false.  In order to do so, Lead Plaintiff would need to satisfy the additional burdens of establishing that Defendants did not subjectively believe their method for calculating AFFO was appropriate.  This presented a real risk for Lead Plaintiff, as each and every individual involved in determining ARCP's AFFO methodology steadfastly maintained that they believed it was appropriate under the circumstances.

422.    If Lead Plaintiff was unable to overcome this defense, the recovery would be zero.

### 4.    Risk of Being Unable to Establish Scienter

423.    Lead Plaintiff faced the risk that it would be unable to establish that Defendants acted with the requisite scienter prior to July 29, 2014.  Defendants argued that there was no evidence that they even contemplated that the AFFO methodology was false or inaccurate.  Instead of making intentional or reckless misstatements, according to Defendants, they adopted ARCP's methodology for calculating AFFO in good faith, after researching how other REITs calculated their AFFO.

424.    In sum, Defendants argued that Lead Plaintiff could not establish the element of scienter with respect to ARCP's methodology for calculating AFFO prior to Q2 2014.  In particular, Defendants argued that the change in AFFO methodology was decided upon only after research was conducted about how other REITs calculated AFFO and thus, the resulting implementation of the Company's new AFFO methodology was done in good faith.  Defendants also asserted that the disclosure of its revised AFFO methodology to Grant Thornton and its disclosure to investors demonstrated their lack of scienter.  In connection with ARCP's GAAP financial results, Defendants

- 176 -

contended that the Restatement did not identify any intentional misconduct associated with those disclosures, thereby foreclosing any evidence of scienter.  If the jury was persuaded by any of Defendants' scienter arguments, the Class would not be able to recover on its Exchange Act claims.

### 5. Risk of Being Unable to Establish Loss Causation/Damages

425.   Even if Lead Plaintiff were to successfully establish Defendants' liability at trial, proving damages was not without risk.  Defendants have steadfastly argued that Lead Plaintiff could not prove loss causation, contending that the October 29, 2014 corrective disclosure was limited to information concerning its Q1 2014 AFFO and Q2 2014 AFFO and net loss; the resignations of Block and McAlister; and the Company's re-evaluation of its internal controls as a result of the disclosed misconduct.  Accordingly, Defendants insisted that the balance of Lead Plaintiff's allegations – which they asserted were the majority of the alleged false and misleading statements – were related to disclosures in the March 2015 Restatement.  Therefore, Defendants contended that the increase in ARCP's stock price upon disclosure of the March 2015 Restatement demonstrated that the Class suffered no loss.

426.   Similarly, in connection with Lead Plaintiff's §11 claims, Grant Thornton argued that it had established a negative loss causation affirmative defense, arguing that Lead Plaintiff's false and misleading statements were not disclosed until the March 2015 Restatement, when the price of ARCP's securities increased.  Grant Thornton also asserted that the 2012 Form 10-K, which served as the basis of Lead Plaintiff's claims in connection with several of its §11 claims, was irrelevant to investors at the time of the October 29, 2014 disclosures because of the transformative changes to ARCP, which grew from $256 million in assets at year end 2012, to $21.3 billion in assets by Q2 2014.

427.    Lead Plaintiff enlisted the support of Dr. Feinstein, who conducted various statistical analyses that established that members of the Class suffered economic loss on October 29, October 30-31 and November 3, 2014.  However, Defendants challenged Dr. Feinstein's analysis, presenting no less than six experts who disputed the veracity of his analysis and opinions.  Notwithstanding the parties' pending *Daubert* motions, resolution of loss causation and damage issues would have likely come down to a "battle of the experts" at trial, which can be highly unpredictable.

### 6.    Risk of Being Unable to Defeat Additional Affirmative Defenses

428.    A number of Defendants mounted affirmative defense campaigns throughout the Litigation (separate from the negative loss causation argument discussed above), and successfully establishing these defenses at trial would have absolved them of liability.  For example, Grant Thornton argued that it was prepared to establish at trial that it complied with PCAOB rules and regulations, in satisfaction of auditor due diligence standards.  The Non-Management Directors argued that at trial they would establish they had reasonably relied on Grant Thornton in connection with ARCP's "expertised" financial statements, and in connection with the "non-expertised" portions of the registration statements, that they conducted substantial due diligence on each of the offerings at issue.  Likewise, the Underwriter Defendants consistently argued that they had unequivocally established a due diligence defense.  It is entirely possible that the jury could have accepted these affirmative defense arguments, and if the jury did so, Lead Plaintiff would have lost many of its claims.

### 7.    Risk of Not Being Able to Maintain the Class

429.    The Class was certified on August 31, 2017, and Defendants moved to de-certify the Class on February 8, 2019, on the basis that individualized questions regarding each class member's knowledge of ARCP's methodology for calculating AFFO predominated over classwide issues.

- 178 -

Although the Court denied Defendants' motion to de-certify the Class, the Court stated that it would deal with any issues concerning an individual class member's knowledge of ARCP's methodology for calculating AFFO as it arose during trial.  Accordingly, there was no guarantee that Defendants would not have been successful in de-certifying the Class during or after trial.

430.   In the end, there was no guarantee that a jury would agree with Lead Plaintiff's allegations.  The Settlement eliminates all of these risks.

### G.   Lead Counsel's Request for Attorneys' Fees and Expenses Is Reasonable

431.   The successful prosecution of this Litigation required Lead Counsel and its para-professionals to perform 100,691.99 hours of work valued at $65,680,342.10 and incur $4,526,987.70 in expenses, as detailed in the accompanying Declaration of Debra J. Wyman Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Declaration").

432.   Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis and has requested a fee in the amount of 12.4% of the Settlement Fund.  In light of the nature and extent of the Litigation, the diligent prosecution of the Litigation, the complexity of the factual and legal issues presented, and the other factors described above and in the accompanying motion for approval of the fee  and expenses requested, Lead Plaintiff and Lead Counsel believe that the requested fee of 12.4% of the Settlement Fund is fair and reasonable, and the expenses incurred by counsel of $5,164,539.91 reasonably incurred and necessary to permit the aggressive litigation efforts undertaken by Lead Counsel.

433.   A 12.4% fee award is justified by the specific facts and circumstances in this case and the substantial risks that Lead Plaintiff overcame at the pleading, class certification, fact discovery,

and expert discovery phases of the Litigation, ultimately largely prevailing at summary judgment, as set forth herein. The $1.025 billion cash Settlement was achieved as a result of extensive and vigorous prosecution of this Litigation, contentious and complicated motion practice, hard-fought discovery efforts, analysis of voluminous evidence, defeating Defendants' arguments at summary judgment, and preparing for trial.

434.    The Settlement Amount, $1.025 billion, represents approximately 50% of maximum damages that Lead Plaintiff could reasonably expect to be recovered at trial; in contrast, Defendants and their experts contended that the market was not mislead by Defendants' AFFO statements and, as a result, no damages were recoverable in this matter. If the jury were to reject any or all of Lead Plaintiff's arguments related to statute of limitations, materiality, or causation, described above, the amount of damages recovered would have been significantly less, if not zero.

435.    This Litigation was prosecuted by Lead Counsel on an "at-risk" contingent-fee basis. Lead Counsel fully assumed the risk of an unsuccessful result and has received no compensation for services rendered or the significant expenses incurred in litigating this action for the benefit of the Class. Any fees or expenses awarded to Lead Counsel have always been at risk and completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort.

436.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can only occur if private plaintiffs can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out,

courts should award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

437.    Lead Counsel is among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of its partners are described in Exhibit G to the Robbins Geller Declaration.  Similarly, since the passage of the PSLRA, Robbins Geller has been approved by courts to serve as lead counsel in scores of class actions throughout the United States and in several of the most significant federal securities class actions in history.  These high profile matters handled by Robbins Geller include: *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (representing The Regents of the University of California and recovering in excess of $7.2 billion for investors); *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al.*, No. 02-C-05893 (N.D. Ill.) (largest securities class action settlement following a trial: $1.575 billion); *In re UnitedHealth Group, Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) (recovering over $925 million and representing the California Public Employees' Retirement System); *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio) (representing Amalgamated Bank and others and recovering $600 million for investors); *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S (N.D. Ala.) (representing Central States SE and SW Areas Pension Fund and others and obtaining a combined recovery of $671 million); and *In re Dynegy, Inc. Sec. Litig.*, No. H-02-1571 (S.D. Tex.) (representing the Regents of the University of California and recovering $474 million).  *See* Robbins Geller Declaration, Ex. G.

## V.    CONCLUSION

438.    In light of the $1,025,000,000 extraordinary Settlement obtained – among the top 15 largest since the enactment of the PSLRA, representing approximately 50% of the Class's estimated

recoverable damages – and the risks faced, the quality of work performed, the contingent nature of

the fee, and the complexity of the case, as described above and in the accompanying memoranda in

support of their motions, Lead Plaintiff and its Counsel respectfully submit that the Court should

approve the Settlement and Plan of Allocation as fair, reasonable, and adequate, and award a fee in

the amount of 12.4% of the Settlement amount plus $5,164,539.91 in expenses.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed this 17th day of December, 2019, at San Diego, California.


<div align="right">

s/ Debra J. Wyman
_____
DEBRA J. WYMAN

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 17, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Debra J. Wyman
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: debraw@rgrdlaw.com

## Mailing Information for a Case 1:15-mc-00040-AKH In re American Realty Capital Properties, Inc. Litigation

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Simon Abraham**
  jabraham@aftlaw.com

- **Robin L. Alperstein**
  ralperstein@beckerglynn.com,esteckhan@beckerglynn.com,hhill@beckerglynn.com

- **Antonia Marie Apps**
  aapps@milbank.com,ggreen@milbank.com,AutoDocketECF@milbank.com

- **Adam M. Apton**
  aapton@zlk.com

- **Karim Basaria**
  kbasaria@sidley.com

- **Khristoph Becker**
  kbecker@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Stanley D Bernstein**
  bernstein@bernlieb.com,birkeland@bernlieb.com,ecf@bernlieb.com

- **Rebecca A. Beynon**
  rbeynon@kellogghansen.com

- **Brian Roger Blais**
  brian.blais@usdoj.gov,usanys.ecf@usdoj.gov,CaseView.ECF@usdoj.gov

- **Jeffrey Craig Block**
  jeff@blockesq.com,jason@blockesq.com,pacer-blockleviton-9062@ecf.pacerpro.com

- **Kristen Leigh Bokhan**
  kristen.bokhan@kirkland.com

- **Adam Jerrod Bookman**
  adam.bookman@weil.com,adam-bookman-4279@ecf.pacerpro.com

- **Bruce Roger Braun**
  bbraun@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com,catherine.stewart@sidley.com,kbasaria@sidley.com,ntygesso@sidley.com,nconrad@sidley.com,braun-9612@ecf.pacerpro.com

- **Kristina Anne Bunting**
  kbunting@paulweiss.com,mao_fednational@paulweiss.com

- **Jennifer Nunez Caringal**
  jcaringal@rgrdlaw.com,SCaesar@rgrdlaw.com,kmccormack@rgrdlaw.com,JCaringal@ecf.courtdrive.com

- **Alexandra Rebecca Clark**
  aclark@pkbllp.com

- **Neil Harris Conrad**
  nconrad@sidley.com,efilingnotice@sidley.com,neil-conrad-4222@ecf.pacerpro.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com,smiller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jason Robert D'Agnenica**
  jasondag@ssbny.com

- **Glen DeValerio**
  gdevalerio@bermandevalerio.com,bdentremont@bermandevalerio.com,ecf@bermandevalerio.com,bmccarthy@bermandevalerio.com

- **Bruce Whitney Dona**
  bruce.dona@ksfcounsel.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,E_File_SD@rgrdlaw.com,tholindrake@rgrdlaw.com,DanD@ecf.courtdrive.com

- **H. Miriam Farber**
  mfarber@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,miriam-farber-7421@ecf.pacerpro.com,manattyoffice@shearman.com

- **Meagan Alicia Farmer**
  mfarmer@gardylaw.com

- **Reid Mason Figel**
  rfigel@kellogghansen.com,fli@kellogghansen.com,cparra@kellogghansen.com

- **Christopher Lee Filburn**
  cfilburn@paulweiss.com,mao_fednational@paulweiss.com

- **Robert Craig Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com,mgianfagna@wolfpopper.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com,JForge@ecf.courtdrive.com

- **Adam Fotiades**
  afotiades@zuckerman.com

- **Molly Bruder Fox**
  mbfox@steptoe.com

- **Christopher Louis Garcia**
  christopher.garcia@weil.com,mco.ecf@weil.com,evert.christensen@weil.com,christopher-garcia-1339@ecf.pacerpro.com,nymao@ecf.pacerpro.com

- **James Philip Gillespie**
  jgillespie@kirkland.com,kevin.mccarthy@kirkland.com,kenymanagingclerk@kirkland.com

- **Daniel Zachary Goldman**
  dgoldman@pkbllp.com

- **Andrew Edward Goldsmith**
  agoldsmith@kellogghansen.com,ecfnotices@kellogghansen.com,ggoldfeder@kellogghansen.com,ecf-2ff5a29c9f5d@ecf.pacerpro.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Douglas W. Greene**
  dgreene@bakerlaw.com,agougisha@bakerlaw.com,bhlitdocket@bakerlaw.com

- **Theresa Hsin-Yi Gue**
  tgue@pkbllp.com

- **John Gueli**
  jgueli@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,manattyoffice@shearman.com,john-gueli-5051@ecf.pacerpro.com

- **Adam Selim Hakki**
  ahakki@shearman.com,managing-attorney-5081@ecf.pacerpro.com,Courtalert@shearman.com,manattyoffice@shearman.com,adam-hakki-1816@ecf.pacerpro.com

- **John Louis Hardiman**
  hardimanj@sullcrom.com,john-hardiman-9552@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **David Charles Harrison**
  dharrison@lowey.com

- **Barbara J. Hart**
  bhart@lowey.com

- **Steven P. Harte**
  steven@blockesq.com,pacer-blockleviton-9062@ecf.pacerpro.com

- **James Ormerod Heyworth , V**
  jheyworth@sidley.com,nyefiling@sidley.com,james-heyworth-0340@ecf.pacerpro.com

- **William Scott Holleman**
  holleman@bespc.com,ecf@bespc.com

- **Geoffrey Coyle Jarvis**
  gjarvis@ktmc.com,9343632420@filings.docketbird.com,mswift@ktmc.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Rebecca M Katz**
  rkatz@katzlawnewyork.com,disaacson@motleyrice.com,dabel@motleyrice.com,lkorenblit@motleyrice.com,kweil@motleyrice.com

- **Christopher J. Keller**
  ckeller@labaton.com,5497918420@filings.docketbird.com,lpina@labaton.com,ElectronicCaseFiling@labaton.com

- **Michael Anthony Keough**
  mkeough@steptoe.com,ehartman@steptoe.com,docketadministrators@steptoe.com,rgillis@steptoe.com,ocorn@steptoe.com,cdecamp@steptoe.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Robert Klipper**
  rklipper@kellogghansen.com,jmarine@kellogghansen.com

- **Lawrence Paul Kolker**
  kolker@whafh.com

- **Alexia Dorothea Korberg**
  akorberg@paulweiss.com,mao_fednational@paulweiss.com

- **Daniel Jonathan Kramer**
  dkramer@paulweiss.com,mao_fednational@paulweiss.com

- **Larry Howard Krantz**
  lkrantz@krantzberman.com

- **Eric Albin Larson**
  elarson@mmmlaw.com,eeckard@mmmlaw.com

- **Angel P. Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,alau@ecf.courtdrive.com

- **Grace Jheeyoung Lee**
  grace.lee@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,grace-lee-
  3889@ecf.pacerpro.com,manattyoffice@shearman.com,stephen.ross@shearman.com,mariusz.jedrzejewski@shearman.com

- **Justin David Lerer**
  jlerer@paulweiss.com,mao_fednational@paulweiss.com

- **Michelle Lynn Levin**
  mlevin@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Daniel Craig Lewis**
  daniel.lewis@shearman.com,managing-attorney-5081@ecf.pacerpro.com,daniel-lewis-
  6070@ecf.pacerpro.com,CourtAlert@Shearman.com,manattyoffice@shearman.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Neil Robert Lieberman**
  nlieberman@hsgllp.com,crodriguez@hsgllp.com,Managingclerk@hsgllp.com

- **Howard Theodore Longman**
  tsvi@aol.com,hlongman@ssbny.com

- **Morgan Paige Lucas**
  mlucas@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **John Phillip MacNaughton**
  jpm@mmmlaw.com,wew@mmmlaw.com,elarson@mmmlaw.com

- **Michael David Margulies**
  mmargulies@carltonfields.com

- **Jerry Lee Marks**
  jmarks@milbank.com

- **Rita Kathleen Maxwell**
  rita.maxwell@bracewelllaw.com,mco@bracewelllaw.com

- **Francis Paul McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Glen Garrett McGorty**
  gmcgorty@crowell.com

- **Donald Alan Migliori**
  dmigliori@motleyrice.com,kdotson@motleyrice.com

- **Michael Campion Miller**
  mmiller@steptoe.com,spu@steptoe.com,ocorn@Steptoe.com,ehartman@steptoe.com

- **Mark Tamerlane Millkey**
  mmillkey@rgrdlaw.com,e_file_ny@rgrdlaw.com,MMillkey@ecf.courtdrive.com

- **Erin Jennifer Morgan**
  ejmorgan@paulweiss.com,mao_fednational@paulweiss.com

- **Christopher F. Moriarty**
  cmoriarty@motleyrice.com,sturman@sturman.ch

- **Daniel P. Moylan**
  dmoylan@zuckerman.com,jlinton@zuckerman.com,cvandergriff@zuckerman.com

- **Beth Mueller**
  beth.mueller@kirkland.com,lroberts@kirkland.com,kenymanagingclerk@kirkland.com

- **Mark Francis Murphy**
  mmurphy@steptoe.com

- **Sean Michael Nadel**
  snadel@kellogghansen.com

- **William H. Narwold**
  bnarwold@motleyrice.com,glevin@motleyrice.com,lmclaughlin@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Shawn Patrick Naunton**
  snaunton@zuckerman.com,lgehlbach@zuckerman.com

- **Gregory Mark Nespole**
  gnespole@zlk.com,jtash@zlk.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jonathan Ohring**
  johring@milbank.com,DMarcou@milbank.com,mprostko@milbank.com,TQuinn@milbank.com,JKammerman@milbank.com,milbank@ecf.courtdrive.com,jon-ohring-4945@ecf.pacerpro.com,dhooks1@milbank.com,klandis@milbank.com,AutoDocketECF@milbank.com,ggreen@milbank.com,MGrier@milbank.com,molsson@milb

- **Bradley E Oppenheimer**
  boppenheimer@kellogghansen.com,ecf-780f0d54d6a1@ecf.pacerpro.com,ggoldfeder@kellogghansen.com

- **Guy Petrillo**
  gpetrillo@pkbllp.com

- **Ashley M. Price**
  APrice@rgrdlaw.com,aprice@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **Kingdar Prussien**
  kprussien@milbank.com,autodocketecf@milbank.com

- **Arlen Pyenson**
  apyenson@crowell.com

- **Fei-Lu Qian**
  fqian@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Leah Margaret Quadrino**
  lquadrino@steptoe.com,pparker@steptoe.com

- **Daniel Brett Rehns**
  drehns@hrsclaw.com,efilings@hrsclaw.com

- **Kenneth Mark Rehns**
  krehns@saxenawhite.com,krehns@cohenmilstein.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Julie Goldsmith Reiser**
  jreiser@cohenmilstein.com

- **Lorin L. Reisner**
  LReisner@paulweiss.com,mao_fednational@paulweiss.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Ann Kimmel Ritter**
  aritter@motleyrice.com,glevin@motleyrice.com,kweil@motleyrice.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com,jcaringal@rgrdlaw.com

- **Lara Elizabeth Romansic**
  lromansic@steptoe.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,RRothman@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Peter George Safirstein**
  psafirstein@safirsteinmetcalf.com,sfeerick@safirsteinmetcalf.com

- **Michael Gerard Scavelli**
mscavelli@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Jed Mastren Schwartz**
jschwartz@milbank.com,jed-schwartz-8050@ecf.pacerpro.com,milbank@ecf.courtdrive.com,ggreen@milbank.com,AutoDocketECF@milbank.com

- **Kevin S. Sciarani**
ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph R. Seidman**
seidman@bernlieb.com

- **Jonathan Lucas Shapiro**
jshapiro@kasowitz.com,courtnotices@kasowitz.com,autodocket@kasowitz.com

- **Jessica T. Shinnefield**
jshinnefield@rgrdlaw.com,JShinnefield@ecf.courtdrive.com,landracchio@rgrdlaw.com

- **Thomas Michael Skelton**
tskelton@lowey.com

- **Richard William Slack**
richard.slack@weil.com,mco.ecf@weil.com,richard-slack-
7880@ecf.pacerpro.com,adam.bookman@weil.com,Patrick.Branson@weil.com,nymao@ecf.pacerpro.com,evert.christensen@weil.com,Raquel.Kellert@weil.com

- **Patrick Kevin Slyne**
pkslyne@ssbny.com

- **Patrick C Smith**
psmith@dehay.com

- **Audra Jan Soloway**
asoloway@paulweiss.com,mao_fednational@paulweiss.com

- **Luigi Spadafora**
spadafora.l@wssllp.com

- **Kendra L Stead**
kstead@sidley.com,efilingnotice@sidley.com,jdent@sidley.com,kendra-stead-0480@ecf.pacerpro.com

- **Michael Howard Steinberg**
steinbergm@sullcrom.com,michael-h-steinberg-5026@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **Christopher D. Stewart**
cstewart@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Elizabeth Johnson Stewart**
elizabeth.stewart@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,elizabeth-stewart-
0821@ecf.pacerpro.com,manattyoffice@shearman.com

- **Ellen Anne Gusikoff Stewart**
elleng@rgrdlaw.com

- **Daniel Ben Tehrani**
Daniel.Tehrani@usdoj.gov,CaseView.ECF@usdoj.gov

- **Steven Jeffrey Toll**
stoll@cohenmilstein.com,efilings@cohenmilstein.com

- **Matthew Tracy**
tracy.m@wssllp.com

- **Nicholas Tygesson**
ntygesso@sidley.com

- **Anil Karim Vassanji**
avassanji@fklaw.com

- **Melanie Elizabeth Walker**
mewalker@sidley.com,melanie-walker-7174@ecf.pacerpro.com,efilingnotice@sidley.com

- **Reid Weingarten**
rweingarten@steptoe.com

- **Joseph Harry Weiss**
jweiss@weisslawllp.com,infony@weisslawllp.com,joshua-rubin-1257@ecf.pacerpro.com,exec@weisslawllp.com

- **Theodore Von Wells , Jr**
twells@paulweiss.com,mao_fednational@paulweiss.com

- **Collin White**
cwhite@kellogghansen.com

- **Regis C. Worley , Jr**
  rworley@rgrdlaw.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,DebraW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **Genevieve Graeme York-Erwin**
  gyorkerwin@bakerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Ar Capital LLC

,

Dwight            Phillip Bostwick
Zuckerman Spaeder, LLP
1800  M  Street,  N.W.,   Ste. 1000
Washington, DC 20036-5802

Scott           Alexander Edelman
Milbank LLP
55 Hudson Yards
New York City, NY 10001-2163

Kevin Patton

,

William           Taylor
Zuckerman Spaeder LLP
1800 M Street, N.W
Washington, DC 20036

David           C. Walton
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101

Abby M. Wenzel

,
```