UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
In re AMERICAN REALTY CAPITAL          :     Civil Action No. 1:15-mc-00040-AKH
PROPERTIES, INC. LITIGATION            :
——————————————————————       :     CLASS ACTION
                                       :
This Document Relates To:              :
                                       :
        ALL ACTIONS.                   :
—————————————————————— x

**REPORT OF PROFESSOR CHARLES SILVER IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

# CONTENTS

I.     Summary of Opinions ........................................................................................... 1

II.    Credentials ........................................................................................................... 1

III.   Prior Trial and Deposition Testimony .................................................................. 3

IV.    Documents Reviewed ........................................................................................... 4

V.     Facts ..................................................................................................................... 5

VI.    Background Analysis ............................................................................................ 5

   A.   Fee-Setting Is a Positive-Sum Game .............................................................. 6

   B.   Fee Negotiated by the Lead Plaintiff .............................................................. 8

   C.   Quality of Plaintiffs' Counsel ....................................................................... 12

VII.   Fees Prevailing in the Private Market for Legal Services ................................... 13

   A.   In Contingent Fee Litigation, Percentage-Based Compensation Predominates ............... 14

   B.   Clients Normally Pay Contingent Fees in the Range of 25 Percent to 40 Percent ........... 16

      1.   Personal Injury Cases ........................................................................... 17
      2.   Large Commercial Lawsuits .................................................................. 19

VIII.  Results Obtained .................................................................................................. 30

   A.   Ratio of Recovery to Investors' Losses ......................................................... 30

   B.   Class Members Will Recover a Higher Percentage of Their Losses than the Opt-Out Claimants    34

   C.   Contributions by Individual Defendants and Grant Thornton ......................... 34

IX.    Fee Awards in Comparable Cases ....................................................................... 37

X.     Lodestar Cross-Check .......................................................................................... 41

XI.    Compensation ...................................................................................................... 45

XII.   Conclusion ........................................................................................................... 45

I, Charles Silver, state as follows:

## I.   SUMMARY OF OPINIONS

1.     Throughout my career, I have encouraged judges to take guidance from the market for legal services when awarding fees in class actions.  Comparing the fee negotiated by Lead Plaintiff to the rates that clients pay lawyers to handle complex commercial cases makes it apparent that the fee requested by Class Counsel falls far below the usual and customary range.

2.     The reasonableness of the fee request is also supported by the fact that Lead Plaintiff, a sophisticated institutional investor with a large financial stake and an interest in maximizing the net recovery to the Class, negotiated the fee terms at the start of litigation.

3.     The result achieved by Class Counsel justifies a fee considerably higher than the amount requested because the ratio of dollars recovered to investors' estimated losses is unusually high and because class members' recoveries exceed those won by claimants who retained their own lawyers to bring individual actions rather than remain members of the Class.

4.     The request also falls within the range of percentages that judges have approved in securities class actions, including those that produced enormous recoveries.

## II.   CREDENTIALS

5.     I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then, I have been a Visiting Professor at University of Michigan School of Law (twice), the Vanderbilt University Law School, and the Harvard Law School.

6.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

7.      I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years.  I have published over 100 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Declaration.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996), the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, and the RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT.

8.      My first publication after joining the Texas Law faculty, an analysis of the restitutionary basis for fee awards in class actions, appeared in 1991.  Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991).  My most recent publication in the field, an empirical study of fee awards in securities fraud class actions, appeared in the Columbia Law Review nearly twenty-five years later.  Lynn A. Baker, Michael A. Perino, and Charles Silver*, Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUM. L. REV. 1371 (2015) (*Is the Price Right?*).  The CORPORATE PRACTICE COMMENTATOR chose this article as one of the ten best in the field of corporate and securities law in 2016.  The study of attorneys' fees has been a principal focus of my academic career.

9.      I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in a number of class actions, including *In re Enron*

2

*Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), and *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) , all of which settled for amounts exceeding $1 billion.

10.     Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.  In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

11.     I have attached a copy of my resume as Exhibit 1 to this declaration.

## III.     PRIOR TRIAL AND DEPOSITION TESTIMONY

12.     In the past four years, I have testified in the following matters:

| Case | Proceeding | Jurisdiction | Topic of Testimony | Year |
|------|-----------|-------------|-------------------|------|
| *William "Max" Duncan, Jr. and Duncan Litigation Investments, LLC v. Robert C. Hilliard and HMG, LLP* | Arbitration | N/A | Legal Ethics- Fee Splitting with Non- Lawyer | 2019 |
| *Sandra Kinney v. George Fleming* | Case No. 2008-65396 | District Court of Harris County, Tex., 215th Judicial District | Legal Ethics- Aggregate Settlements | 2016 |

## IV.    DOCUMENTS REVIEWED

13.    In preparing this report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I also reviewed other items including, without limitation, cases, studies, and published scholarly works.

- Third Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Sept. 30, 2016), ECF No. 312

- Class Plaintiffs' Omnibus Opposition to Defendants' Motions for Summary Judgment with Respect to Class Plaintiffs' Section 10(b) Issues, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Apr. 1, 2019), ECF No. 776

- Class Plaintiffs' Omnibus Opposition to Defendants' Motions for Summary Judgment with Respect to Class Plaintiffs' §11 Claims, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Apr. 1, 2019), ECF No. 784

- Class Plaintiffs' Opposition to Defendant Grant Thornton LLP's Motion for Summary Judgment, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Apr. 1, 2019), ECF No. 782

- Class Plaintiffs' Opposition to the Underwriter Defendants' and RCS's Motions for Summary Judgment, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Apr. 1, 2019), ECF No. 785

- Expert Report of John E. Barron, CPA, dated May 3, 2019, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Aug. 5, 2019), ECF No. 1074-17

- Expert Report on Damages, Professor Steven P. Feinstein, Ph.D., CFA, dated May 3, 2019, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Aug. 12, 2019), ECF No. 1135-5

- Expert Section 11 Rebuttal Report, Professor Steven P. Feinstein, Ph.D., CFA, dated June 24, 2019, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Aug. 21, 2019), ECF No. 1253-23

- Memorandum in Support of Unopposed Motion for Preliminary Approval of Proposed Settlement, *In re American Realty Capital Properties, Inc. Litigation*, No. 1:15-mc-00040-AKH (S.D.N.Y. Sept. 30, 2019), ECF No. 1270

- Decision and Order Approving Settlement, *Christine Asia Co., Ltd., et al. v. Yun Ma, et al.*, No. 1:15-cv-01405-CM (S.D.N.Y. Oct. 16, 2019), ECF No. 35

- VEREIT Press Releases, dated June 11, 2018-September 9, 2019

- September 9, 2019 VEREIT Business Update Call

- Letter dated December 23, 2014 from Robbins Geller Rudman & Dowd to the Senior Managing Director, General Counsel and Head of Corporate Governance, TIAA-CREF.

- Notice of Proposed Settlement of Class Action

- Proof of Claim and Release and General Instructions

- Stipulation of Settlement

- Order Granting Preliminary Approval Pursuant to Fed. R. Civ. P. 23(e)(1) and Permitting Notice to the Class

- Notice of Pendency of Class Action

- Postcard Notice

- Memo Endorsement on Stipulation and Proposed Order Regarding Class Notice Procedures

- Stipulation and Proposed Order Regarding Class Notice Procedures

## V.     FACTS

14.     The litigation-related facts that provide the basis for the conclusions expressed in this report are set out in the documents listed above.  I develop them in the discussions below as needed to support my conclusions and explain their importance.

## VI.     BACKGROUND ANALYSIS

15.     Class Counsel is requesting a fee award pursuant to a fee grid negotiated between Lead Plaintiff and Class Counsel at the outset of the litigation.  When applied to the $1.025 billion recovery in this case, the fee grid yields a requested fee equal to 12.4% of the Settlement amount. The reasonableness of this request can be assessed in many ways.  In this report, I will compare this request to fees prevailing in the relevant sector of the private market for legal services and to fees awarded in other cases with similar recoveries.  Before getting into these matters, however, I will offer some general observations on fee awards that provide essential background for the discussions that follow.

A.      **Fee-Setting Is a Positive-Sum Game**

16.      When regulating fees, judges act as claimants' guardians and take this role seriously.  The Court famously did so in *In re World Trade Ctr. Disaster Site Litigation*, where it refused to approve a settlement until the plaintiffs' attorneys reduced their contingent fees from one-third of their clients' recoveries to 25 percent.  Alvin K. Hellerstein, James A. Henderson Jr., and Aaron D. Twerski, *Managerial Judging:  The 9/11 Responders' Tort Litigation*, 90 CORNELL L. REV. 127, 171 (2012).

17.      When thinking how to regulate fees so as to serve claimants' best interests, it is important to keep in mind that fee-setting is a positive-sum game, not a zero-sum game in which more for the lawyers means less for the claimants.  To see this, one need only imagine how claimants would fare if judges set lawyers' contingent fees at 0 percent.  At the outset of litigation, a 0 percent fee looks terrible to a claimant because no lawyer will take a case for that amount.  When the fee is zero, the expected recovery is zero too.

18.      In other words, the object is to maximize claimants' expected recoveries net of fees, not to minimize fees without regard to how claimants' fare.  A claimant who takes home $1 million after paying $400,000 in fees is better off than one who nets $500,000 after paying $100,000.

19.      The Third Circuit stated it this way, "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee.*  The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report,* 208 F.R.D. 340, 373 (January 15, 2002) (emphasis added).  The Seventh Circuit made a similar point in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001).  It rejected the so-called "mega-fund rule," according to which fees must be capped at low

percentages when recoveries are very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Id*. at 718.

20.     Judges often perceive fee-setting as a zero-sum game – a competition in which each participant gains at the other's expense – because they award fees when class actions settle, at which time recoveries are fixed and the question is how much money will be left for class members after their lawyers are paid.

21.     In the market for legal services, by contrast, claimants see both the costs of hiring lawyers and the hoped-for gains because they set fees when representations begin, not when they end.   Upfront, they see the benefit of paying lawyers' fees that are reasonably calculated to maximize the claimants' expected recoveries net of fees.  This is why the Seventh Circuit observed that:

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees.  They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d 712, 724 (7th Cir. 2001).

22.     When awarding fees in class actions, the objective is to ascertain: What fee would class members collectively have agreed to pay when litigation began in hope of maximizing their net recoveries?  That is, how do we create the same bargain that class members would have struck in direct negotiations with their lawyers at the outset of litigation.  In other words, when awarding fees, judges should 'mimic the market.'

23.     The information I have gathered over years of study shows that claimants typically agree to pay contingent fees of 25 percent to 40 percent, even when sophisticated clients hire

lawyers to handle complex commercial lawsuits with the potential to generate enormous recoveries.

**B.      Fee Negotiated by the Lead Plaintiff**

24.      In this case, Class Counsel are submitting a fee request pursuant to a fee grid negotiated by the Lead Plaintiff at the commencement of the action – 12.4% – an amount far below the normal range for attorneys' fees in PSLRA class actions.  This fact is strong evidence that the fee is reasonable or even low.  This case is, however, a securities class action with a $1.025 billion settlement, and in cases like this one, lead plaintiffs that are institutional investors sometimes negotiate fees lower than those seen in other contexts.

25.      Here, the Lead Plaintiff is Teachers Insurance and Annuity Association of America, College Retirement Equities Fund, TIAA-CREF Equity Index Fund, TIAA-CREF Real Estate Securities Fund, TIAA-CREF Large Cap Value Index Fund, TIAA-CREF Small Cap Blend Index Fund, TIAA-CREF Life Real Estate Securities Fund, TIAA-CREF Life Equity Index Fund, and TIAA-CREF Bond Index Fund (collectively, "TIAA").  TIAA forms the principal retirement system for the nation's education and research communities and is one of the largest retirement systems in the world based on assets under management.  As of December 31, 2018, the combined net assets for entities within the TIAA organization totaled approximately $1 trillion.  In late 2014, when TIAA engaged Robbins Geller Rudman & Dowd LLP ("Robbins Geller") to serve as its counsel, TIAA negotiated an agreement pursuant to which Robbins Geller would advance "all fees and expenses necessary to prosecute the case" and would receive in return the right to compensation on a contingent fee basis according to a scale of rising percentages.  The agreement also provided that Robbins Geller would receive 17.5 percent of all sums recovered from individual defendants and further provided that in no event would the firm receive more than 13

percent of the aggregate gross recovery. *Letter from Robbins Geller Rudman & Dowd to General Counsel, TIAA-CREF*, dated Dec. 23, 2014.

26.     Now that a settlement has been reached, Robbins Geller is submitting a fee request pursuant to the terms of that agreement.  The table below summarizes the fee terms memorialized in the engagement agreement and applies them to the recovery.

*Remainder of page intentionally left blank*

9

| TABLE 1.  SETTLEMENT AND FEE CALCULATION | | |
|---|---|---|
| **PANEL A.  RECOVERY SOURCES AND AMOUNTS** | | |
| *DEFENDANT GROUP* | *AMOUNT* | |
| **Non-Individual Defendants** | | |
| ARCP | $738,500,000 | |
| Grant Thornton | $49,000,000 | |
| Contribution in Vereit's Custody | $31,972,934 | |
| **Sub-Total Non-Individual Contributions** | | **$819,472,934** |
| | | |
| **Individual Defendants** | | |
| AR Capital, ARC Advisors, Schorsch, Budko, Kahane and Weil | $193,027,066[1] | |
| Brian Block | $12,500,000 | |
| **Sub-Total Individual Contributions** | | **$205,527,066** |
| **TOTAL SETTLEMENT AMOUNT** | | **$1,025,000,000** |

| PANEL B.  FEE GRID APPLIED TO SETTLEMENT AMOUNT | | |
|---|---|---|
| *DEFENDANT GROUP* | *AMOUNT* | |
| **Non-Individual Defendants** | | |
| Incremental Recovery | Marginal Fee % | Marginal Fee $ |
| $25,000,000 | 0.0% | $0 |
| $25,000,000 | 8.0% | $2,000,000 |
| $50,000,000 | 9.0% | $4,500,000 |
| $150,000,000 | 10.0% | $15,000,000 |
| $500,000,000 | 12.0% | $60,000,000 |
| $69,472,934 | 14.0% | $9,726,211 |
| | | |
| **Individual Defendants** | | |
| $205,527,066 | 17.5% | $35,967,236 |
| | | |
| **TOTAL FEE** | **12.4%** | **$127,193,447** |

[1]   Although the contribution from this group was $225 million, $31,972,934 of that amount had been previously disgorged to Vereit.  Accordingly, in an effort to be conservative, the fee request only considers the remaining $193,027,066 of individual contributions.

Cases\4844-6260-7277.v2-12/13/19

27.     These facts lead me to conclude that Class Counsel's request is **below** the amount typically awarded in cases such as this one.  TIAA is an institutional investor that lost tens of millions of dollars by investing in ARCP securities.  As a result, it had a strong interest in maximizing its recovery by retaining outstanding lawyers at a below-market rate.  In similar circumstances, my research determined that courts see no reason to award less than the fee that a sophisticated client with an interest in maximizing the net recovery thought it reasonable to pay.

28.     To the contrary, I have repeatedly written in favor of both upfront fee-setting and scales with fee percentages that increase with the recovery.  *See, e.g.*, *Is The Price Right?*, *supra*, at 1432-1433 (setting out proposal according to which lead plaintiffs would negotiate fees when retaining lawyers to handle securities class actions and judges would review the agreements when appointing class counsel).  Setting fees at or near the start of litigation makes sense because that is when the risks of litigation are clear and because the practice creates reliable expectations that encourage lawyers to devote resources to lawsuits appropriately.  As the Seventh Circuit observed in *In re Synthroid Mktg. Litig.*, judges should

> estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed).  The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low).  This is what happens in actual markets. Individual clients and their lawyers *never* wait until after recovery is secured to contract for fees.  They strike their bargains before work begins.

264 F.3d 712, 718 (7th Cir. 2001) (original emphasis).

29.     Rising scales make sense because they reward lawyers for securing dollars that are harder to recover.  It is easy to settle a lawsuit with an expected value of $100 million at trial for $1 million.  It is considerably more difficulty to convince the defendant to pay $30 million, and

11

much harder still to extract $50 million.  To secure higher dollars, lawyers must bear greater risks.  Scales with percentages that rise at the margin encourage them to do so.

### C.    Quality of Plaintiffs' Counsel

30.    When considering how much lawyers should be paid, it is also important to remember that the quality of counsel matters greatly.  Lawyers' charges vary with experience, rank, and accomplishment.  For example, it is well known that a select group of attorneys with outstanding reputations command exceedingly high rates, often more than $1,500 per hour.

31.    The lawyers representing the class in this case have achieved considerable success.  Robbins Geller is one of the most accomplished law firms in the world that represents investors in securities fraud class actions.  In terms of both dollars recovered and number of settlements, it routinely ranks at or near the top in the ISS Securities Class Action Services annual survey.  In 2018, it ranked third in dollars recovered and second in number of settlements.  ISS Securities Class Action Services, *The Top 50 of 2018* 7 (2019).[2]  In prior years, it has ranked first in both categories.  Robbins Geller is tops in other areas of class action litigation too.  Among law firms that handle antitrust cases, it ranked 11th in total dollars recovered during the 2013-2018 period.  Joshua Davis and Rose Kohles, *2018 Antitrust Annual Report: Class Action Filings in Federal Court* 26-27 (2019).[3]  The firm also participated in two of the largest antitrust cases that settled in 2018:  ISDAfix, which settled for $504,500,000; and Bain Capital Partners, which recovered $590,000,000.  *Id.*, p. 18.

---

[2]   This report is available at https://www.issgovernance.com/file/publications/SCAS_Top_50_of_2018.pdf?elqTrackId=b5aa0bd7363c43d581e53ae49de36e74&elq=5405f50f36c1407fb763037f04d65857&elqaid=2023&elqat=1&elqCampaignId=&elqcst=272&elqcsid=262.

[3] This report is available at https://www.huntington.com/-/media/pdf/commercial/antitrust-annual-report-050819.

32.     Big cases are nothing new for Robbins Geller.  It obtained the largest securities class action recovery in history (*Enron*: $7.2 billion); the largest securities class action recovery following a trial (*Household*: $1.575 billion); the largest stock option backdating recovery (*United Health Group*: $925 million); and the largest opt-out securities action recovery (*WorldCom*: $657 million).

33.     By retaining outstanding counsel, negotiating a low fee structure designed to maximize the recovery to the Class, and monitoring the conduct of the litigation, TIAA did exactly what a lead plaintiff in a securities class action is supposed to do.  As the legislative history of the Private Securities Litigation Reform Act of 1995 ("PSLRA") makes clear,  "[i]ncreasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." H. Rept. 104-369 – Securities Litigation 104th Congress.   The consequence of TIAA's efforts in this case is a proposed settlement which, if approved, will be the 14th largest recovery since the enactment of the PSLRA. *Memorandum in Support of Unopposed Motion for Preliminary Approval of Proposed Settlement*, p.1.  An outstanding result is the best evidence one can have that a working arrangement was designed well.

## VII.    FEES PREVAILING IN THE PRIVATE MARKET FOR LEGAL SERVICES

34.     In both scholarly works and expert reports written over decades, I have urged judges to take guidance from the market for legal services when sizing fee awards.  The market provides an objective basis for awards.  It also prices lawyers' services efficiently because it is highly competitive.  Rates are especially likely to be efficient in cases like this one, where sophisticated clients can easily compare offers from lawyers of similar quality.

35.     More and more judges are embracing the 'mimic the market' approach.  For example, Judge John Gleeson, who sat on the Eastern District of New York, did so in the enormous

13

antitrust action relating to payment card fees, writing that "fee awards should, where possible, approximate market rates." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 443 (2014), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016). *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), supports this assertion. There, the Second Circuit wrote that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Id.*, p. 52 It is hard to do better than "ideal."

36.     Judges find the 'mimic the market' approach attractive for two reasons. They understand the importance of incentivizing lawyers properly and they desire an objective basis on which to decide how much lawyers will be paid. The two considerations – incentivization and objectivity – are linked. Judge Gleeson addressed the connection as follows.

> The law sets only minimal constraints on fee awards. . . . More precise guidance would be useful . . . for the lawyers who do this kind of work. Bearing the risk of failure on the merits comes with the territory, but it seems anomalous that counsel must also bear the additional financial risk that inheres in such broad discretion even when they succeed.

*Id.*

## A.     In Contingent Fee Litigation, Percentage-Based Compensation Predominates

37.     Having established that market rates are "ideal" proxies, it remains to consider how the market compensates plaintiffs' attorneys. In this section and the next, I explain what I know about this issue.

38.     I start by noting that when clients hire lawyers to handle lawsuits on straight contingency, the market sets lawyers' compensation as percentages of claimants' recoveries. Even sophisticated business clients with complex, high-dollar legal matters use the percentage approach.

> [T]he contingency fee model covers all sorts of plaintiffs' litigation, including cases where sophisticated individual clients have high-stakes, complex claims worth hundreds of millions of dollars. . . . [I]t is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained.

14

991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014). *See also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (Easterbrook, J.) (noting the predominance of the percentage method in plaintiff representations and observing that "[w]hen the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate'" (emphasis in the original)).

39.     Abundant evidence supports this contention.  When two coauthors and I studied hundreds of settled securities fraud class actions specifically looking for terms included in fee agreements between lawyers and investors seeking to serve as lead plaintiffs, all the agreements we found provided for contingent percentage fees.  *Is the Price Right*, *supra*.  No lead plaintiff agreed to pay its lawyers by the hour; nor did any retain counsel on a lodestar basis.

40.     The finding just described was expected.  Over the course of my academic career, I have studied or participated in hundreds of class actions, many of which were led by sophisticated business clients.  To the best of my recollection, I have encountered only one in which a lead plaintiff paid class counsel out of pocket, and that case is more than 100 years old.  Even wealthy clients that, in theory, might have paid lawyers by the hour used contingent, percentage-based compensation arrangements instead.  Because percentage-based compensation arrangements dominate the market, judges should also use them when awarding fees from common funds.

41.     The market also appears to favor fee percentages that are flat or that rise as recoveries increase.  Scales with percentages that decline at the margin are rarely employed.  Professor John C. Coffee, Jr., the country's leading authority on class actions, made this point in a report filed in the antitrust litigation relating to high fructose corn syrup.

> I am aware that "declining" percentage of the recovery fee formulas are used by
> some public pension funds, serving as lead plaintiffs in the securities class action
> context.  However, I have never seen such a fee contract used in the antitrust
> context; nor, in any context, have I seen a large corporation negotiate such a

contract (they have instead typically used straight percentage of the recovery formulas).

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), ¶ 22.

42.     My experience is similar to Professor Coffee's.  I know of no instance in which a large corporation used a scale of declining percentages when hiring a lawyer or firm to represent only itself.

43.     In view of the rarity with which declining scales are used, the 'mimic the market' approach suggests that flat percentages and scales with percentages that rise at the margin create better incentives.  This is so because flat percentages and rising scales better incentivize plaintiffs' attorneys to extract higher dollars that are harder to obtain.  Flat percentages or percentages that increase with the recovery encourage plaintiffs' attorneys to turn down inadequate settlements.

**B.     Clients Normally Pay Contingent Fees in the Range of 25 Percent to 40 Percent**

44.     Millions of plaintiffs have hired lawyers on contingency to handle cases of diverse types.  Consequently, the market for legal services is a rich source of information about lawyers' fees.  In this section, I survey this evidence.

45.     Before doing so, I wish to note that there is broad agreement that fees ranging from 25 percent to 40 percent prevail in most types of plaintiff representations.  For example, judges have often noted that fees in personal injury cases normally equal or exceed one-third of plaintiffs' recoveries.  *See, e.g.*, *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"); *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 201 (N.D. Ill. 2018) ("a typical contingency agreement in this circuit might range from 33% to 40% of recovery"); *Wolff v. Cash*

*4 Titles*, No. 03-22778-CIV, 2012 U.S. Dist. LEXIS 153786, 2012 WL 5290155, at *4 (S.D. Fla. Sept. 26, 2012) ("One-third of the recovery is considered standard in a contingency fee agreement."); *Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 997 (N.D. Ind. 2010) (observing that "a counsel fee of 33.3% of the common fund 'is comfortably within the range typically charged as a contingency fee by plaintiffs' lawyers' in an FLSA action").

46.     Many judges have also observed that attorneys regularly contract for contingent fees between 30 percent and 40 percent in non-class, commercial cases.  See, e.g., *Kapolka v. Anchor Drilling Fluids USA, LLC*, No. 2:18-CV-01007-NR, 2019 WL 5394751, at *10 (W.D. Pa. Oct. 22, 2019); *Lincoln Adventures LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. CV 08-00235 (CCC), 2019 WL 4877563, at *8 (D.N.J. Oct. 3, 2019); *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *2 (D. Colo. Apr. 28, 2017); and *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *32 (D.N.J. Oct. 1, 2013).

47.     The point of surveying the evidence, then, is not to establish something new.  It is to show that what everyone already knows is correct.  When representing plaintiffs on a straight contingency basis in high-dollar commercial cases, lawyers normally charge fees ranging from 25 percent to 40 percent.

       1.    <u>Personal Injury Cases</u>

48.     If judges chose to base fee awards in class actions on fees charged in personal injury cases, this Declaration could be quite short.  The evidence clearly shows that contingent fees normally range from 25 percent to 40 percent in these cases,[4] are often higher in mass tort

---

[4] On fees in personal injury cases, *see* Deborah R. Hensler *et al*., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29

contexts,[5] and are higher still in medical malpractice cases, which are exceptionally risky.[6] Lower

rates prevail in commercial airplane crash cases, where liability is usually conceded.[7]  Fees vary

across contexts because cases of different types require lawyers to bear different risks.

---

percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 N.Y.U. L. REV. 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[5] On fees in mass tort cases, *see* James S. Kakalik, *et al*., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation **expenses** equal to about 42 percent of their recoveries); James S. Kakalik *et al*., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries).  For anecdotal reports of fees in mass tort cases, *see In re A.H. Robins Co., Inc*., 182 B.R. 128, 131 (E.D. Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, NEW YORK TIMES, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill – and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent).

[6] On factors affecting the size of contingent fees charged in medical malpractice cases, *see* ABA/TIPS Task Force on Contingent Fees, Report on Contingent Fees In Medical Malpractice Litigation (September 20, 2004), available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf.

[7] *See id*., at 27.  *See also* ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily . . . [made] an early settlement offer and concede[d] all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

## 2.      Large Commercial Lawsuits

49.      We do not know as much about fees paid in large commercial lawsuits as we might.[8] No publicly available database collects information about this sector of the market, and businesses that sue as plaintiffs rarely reveal their fee agreements.  Consequently, most of what is known is drawn from anecdotal reports.[9]  That said, the evidence available on the use of contingent fees by sophisticated clients shows that marginal percentages tend to be high.

### a)      Patent Cases

50.      Consider patent infringement representations.  There are many anecdotal reports of high percentages in this area.  The most famous one related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

---

[8]I have studied the costs insurance companies incur when *defending* liability suits.  *See* Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AM. L, & ECON, REV. 185 (2008).  Unfortunately, this information sheds no light on the amounts that businesses pay when acting as plaintiffs.

[9] Businesses sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.  In a recent case against Bank of America, for example, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery.  Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORP. COUNS. (Online) April 9, 2010.  Hybrid arrangements hold few lessons for class actions, however, because lawyers representing plaintiff classes must work on straight contingency.

19

51.     Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement[10] after securing a $501 million jury award against Boston Scientific.  Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA J. (May 20, 2008).[11]  In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc.  Penalties and interest added $90 million to the total.  The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million, assuming the verdict held up.  Cheryl Hall, *Patents and Patience Pay Off for Dallas Law Firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

52.     These reports are typical, not aberrations, as Professor David L. Schwartz found when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.

> There are two main ways of setting the fees for the contingent fee lawyer [in patent cases]: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

---

[10] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate.  Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in class actions.

[11] The parties later settled the case for $50 million.  American Lawyer, Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b5487d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20Lawyer_Saffran.pdf.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALA. L.

REV. 335, 360 (2012).  In a case like this one that required the lawyers to bear significant litigation

expenses with no guarantee of reimbursement a high fixed percentage would apply.[12]

53.     Another example of the use of scaled contingent percentages in patent litigation

appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex.

Ct. App. 2003), which involved a sophisticated client with an enormous intellectual property claim.

The decision reports that the plaintiff agreed to pay its attorneys on the following terms.  "Under

the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale:

25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60

million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200

million."  *Id.* at 248-249.  The agreement also contained other provisions favorable to the lawyers,

including a promise of "$100 million if they obtained a permanent injunction."  "The total fees

Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from

royalties were capped at $300 million."  *Id.* at 249.  Like NTP in the *Blackberry* litigation, Tanox

agreed to pay both a high percentage and a potentially enormous amount.

54.     Clearly, in the segment of the market where sophisticated business clients hire

lawyers to litigate patent cases on contingency, successful lawyers earn enormous premiums over

---

[12] Professor Schwartz's findings are consistent with reports found in patent blogs, one of which
stated as follows.

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not
> pay any legal fees for the representation.  Instead, the law firm only gets paid from
> damages obtained in a verdict or settlement.  Typically, the law firm will receive
> between 33-50% of the recovered damages, depending on several factors – a strictly
> results-based system.

Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION,
http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

their normal hourly rates.  The reason is obvious.  When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.  Clients still prefer this arrangement to bearing the risks and costs of litigation themselves, so they willingly do.

b)      *Other Large Commercial Cases*

55.     Turning from patent lawsuits to business representations more generally, many examples show that compensation tends to be a significant percentage of the recovery.  A famous case from the 1980's involved the Texas law firm of Vinson & Elkins ("V&E").  ETSI Pipeline Project ("EPP") hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter for 5 years.  At the conclusion, we had settled with all defendants for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Ariz., Nov. 30, 1990).

56.     Several things about this example are noteworthy.  First, the contingency fraction was one-third of the recovery in a massive case.  Second, V&E bore no liability for out-of-pocket expenses, whereas, in this case, Class Counsel advanced – and risked losing – more than $4.9 million  in costs that were necessary to advance the litigation.  Third, the ETSI Pipeline case was enormous, ultimately generating a recovery greater than $600 million and a fee north of $200

million.  Fourth, the client was a sophisticated business with access to the best lawyers in the country.  No claim of pressure or undue influence by V&E could possibly be made.

57.    The National Credit Union Administration's ("NCUA") experience in litigation against securities underwriters provides a more recent example of contingent-fee terms that were used successfully in large, related litigations.   After placing 5 corporate credit unions into liquidation in 2010, the NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks.  To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-back securities, the NCUA retained two outside law firms, Korein Tillery LLP and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on a straight contingency basis.  The original contract entitled the firms to 25 percent of the recovery, net of expenses.  As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which the NCUA had paid $1,214,634,208 in fees.[13]  In an interesting coincidence, the Kellogg firm represents several of the Defendants named in this litigation.

58.    When it retained outside counsel on contingency, NCUA knew that billions of dollars were at stake.  The failed corporate credit unions had sustained $16 billion in losses, and the NCUA's object was to recover as much of that amount as possible.  It also knew that dozens of defendants would be sued and that multiple settlements were possible.  Even so, the NCUA agreed to pay a straight contingent percentage fee in the standard market range on all the

---

[13]The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations:   Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National Credit Union Administration, Legal Recoveries from the Corporate Crisis, https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration   to   the   Hon.   Darrell   E.   Issa,   Feb.   6,   2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

recoveries.  It neither reduced the fees that were payable in later settlements in light of fees earned in earlier ones, nor bargained for a percentage that declined as additional dollars flowed in, nor tied the lawyers' compensation to the number of hours they expended.

59.     In *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young.  He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery.  Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar.  The bankruptcy judge granted the request, writing: "[v]iewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range." *Id*. at 335.

60.     Examples of sizeable contingent fees can also be found in cases involving business clients that retained lawyers to participate on their behalf in class actions.  Judge Easterbrook mentioned several in his *Synthroid* opinion.  He reported that, *after a settlement was already on the table*,

> a group of more than 100 [third party payers] . . . contracted with two law firms to represent them. . . .  [T]he contracts provided for a 25% contingent fee at maximum. The "Porter Wright Group" (18 [third party payers] referred to collectively by their law firm's name) also negotiated with and hired counsel.  Their setup allowed each insurance company to pick one of two fee options.  Either the client paid Porter Wright's full costs and 70% of its normal hourly fees each month, with a 4% of recovery kicker at the end, or the client paid only costs each month but had to pony up 15% of the final settlement.  Insurers are sophisticated purchasers of legal services, and these contracts define the market.  Unfortunately, though, they identify a market mid-way through the case, after defendants already had agreed to pay substantial sums.

*In re Synthroid Marketing Litig.*, 264 F.3d at 727.  In *Synthroid*, the lawyers' job was merely to garner as large a portion of the settlement fund as possible for the third-party payers.  They bore

minimal risk of non-payment.  Even so, their sophisticated clients promised them large percentage fees.  An even larger fee is obviously warranted in this case, where the non-payment risk was enormous, as discussed below.

61.     *In re High Fructose Corn Syrup Antitrust Litigation* provides additional examples. There, the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30 percent and "more than 25%," respectively.  Gray & Co., an opt-out claimant, promised its lawyers 33 percent to 40 percent of the recovery in parallel litigation, depending on the time of settlement.  *Declaration of John C. Coffee, Jr*., submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2.

62.     Based on what lawyers who write about fee arrangements in business cases have said, contingent percentages of one-third or more remain common.  In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, which reported typical contingent fee rates of 33 percent to 40 percent.

> A pure contingency fee arrangement is the most traditional alternative fee arrangement.  In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff.  Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients.  Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation.  Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

*c)      Sophisticated Named Plaintiffs in Class Actions*

63.      Sophisticated business clients also agree to pay fees in the indicated range when serving as lead plaintiffs in class actions.  Here are a few examples.

- In *Payment Card,* a multi-billion-dollar litigation, twelve business clients signed retainer agreements which generally provided that class counsel would receive one-third of the class-wide recovery.[14]

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees,

---

[14] Typical language read as follows:

(a) Fees As Class Counsel

(1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b) Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

26

with expenses to be separately reimbursed.  (The 35 percent fee was bargained down after initially being set at over 40 percent.)

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio – Court of Common Pleas), which settled for $420 million, seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement as fees, with a bump to 35 percent in the event of an appeal.  Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

64.     A series of related pharmaceutical antitrust cases provides a particularly compelling example.  The plaintiffs in these cases were 20 or so drug wholesalers who appeared as a class. Many were large companies – several were of Fortune 500 size or bigger – and most or all had in-house or personal counsel monitoring the litigations.  The potential damages were enormous.  In one of the cases, *King Drug Company of Florence, Inc. v. Cephalon, Inc*., No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million.  In the series as a whole, they won more than $2 billion.  In all the cases that produced recoveries, the wholesalers actively supported fee awards in the normal range.  Many submitted declarations or letters urging judges to approve such amounts.  Seeing that these sophisticated clients believed that class counsel should receive market rates despite the number and size of the recoveries, the presiding judges gave their opinions great weight.

65.     The table below identifies the pharmaceutical antitrust cases just discussed that produced "mega-fund" recoveries of $100 million or larger.   As is apparent, the plaintiffs supported fees equal to one-third of the recovery in most of the cases.   Even in the largest settlement, they supported a 27.5 percent fee.

*Remainder of page intentionally left blank*

28

| **TABLE 2.     RECOVERIES   AND   FEE   AWARDS   IN   PAY-FOR-DELAY PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE** | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

*Remainder of page intentionally left blank*

66.     In sum, when seeking to recover money in risky commercial lawsuits involving large stakes, sophisticated business clients typically pay contingent fees ranging from 25 percent to 40 percent, with fees of 33 percent or more being promised in most cases.

## VIII.   RESULTS OBTAINED

67.     The results obtained in this lawsuit justify a fee award higher than 12.4 percent. One basis for this conclusion is that the settlement recovers approximately 50 cents per dollar of the class' estimated loss.   Memorandum in Support of Unopposed Motion for Preliminary Approval of Proposed Settlement, *In re American Realty Capital Properties, Inc., Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y. Sept. 30, 2019), ECF No. 1270, p. 21.   A second is that the class members will do considerably better than the investors who opted out of the class and retained their own lawyers to file lawsuits on their behalf.   A third is that the settlement includes substantial contributions by the individual defendants and by Grant Thornton, the issuer's auditor.   In this section, I discuss each reason in turn.

### A.     Ratio of Recovery to Investors' Losses

68.     The proposed settlement is estimated to recover about one-half of the losses investors incurred as a result of the fraud.   By securities class action standards, this is remarkable. In fact, market analysts had estimated in 2017 that the Class would recover $39 million to $117 million based on median settlements of similar shareholder lawsuits.   Elliott Z. Stein, *More Than $3 Billion in Market Cap Loss At Stake in VEREIT Suit*, Bloomberg Intelligence, Feb. 14, 2017 and July 6, 2017.   Over decades, commentators have noted that settlements tend to yield pennies on the dollar, and that the ratio of recoveries to losses declines as losses grow in size.

69.     A recent report by National Economic Research Associates ("NERA") explains the relationship between estimated losses[15] and recoveries.

> In general, settlement size grows as NERA-defined Investor Losses grow, but the relationship is not linear. Based on our analysis of data from 1996 to 2018, settlement size grows less than proportionately with Investor Losses. In particular, small cases typically settle for a higher fraction of Investor Losses (i.e., more cents on the dollar) than larger cases. For example, the ratio of settlement to Investor Loss for the median case was 19.4% for cases with Investor Losses of less than $20 million, while it was 0.7% for cases with Investor Losses over $10 billion (see Figure 27).

*Recent Trends 2018*, *supra*, at 34.  Considering only investors' estimated losses as calculated by NERA and assuming that those losses fall somewhere between $1 billion and $4.999 billion, the median recovery in cases like this one is 1.2 cents on the dollar.[16]  *Id.*, p. 35, Fig. 27.

70.     It is possible, in theory at least, that the class could have recovered more than 50 cents on the dollar at trial.  But in practice, even plaintiffs who win at trial often recover far less than their verdicts.  I documented this in 2013 by studying the outcomes of the few securities class actions that, at that time, had been tried to plaintiff verdicts.  The table below summarizes my findings.  As the column headed "Ultimate Resolution" makes clear, plaintiffs who won at trial often fared poorly.

---

[15] As calculated by NERA, estimated investor losses "is a rough proxy for the relative size of investors' potential claims" that has historically been "a powerful predictor of settlement size." Stefan Boettrich and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, NERA 11 (2019) ("*Recent Trends 2018*").

[16] A model containing a larger number of relevant variables might, and likely would, predict a settlement with a higher recovery ratio.  See *Id.*, at 37.  Unfortunately, the information in *Recent Trends 2018* does not enable me to calculate the expected recovery more precisely.

| TABLE 3: POST-PSLRA SECURITIES FRAUD CLASS ACTIONS WITH PRO-PLAINTIFF JURY VERDICTS, AS OF 2013 | | |
| --- | --- | --- |
| **Case** | **Verdict Amount** | **Ultimate Resolution** |
| *In Re Real Estate Associates Limited Partnerships* (C.D. Cal.)[17] | $185 million | • Verdict reduced by the trial court to $120 million;<br>• Settled for $83 million |
| *In re Clarent Corp.* (N.D. Cal.)[18] | Unknown; verdict appears to have been on liability only | • Settled for $6.9 million |
| *In re Apollo Group Inc. Sec. Litig.* (D. Ariz.)[19] | $280 million | • Verdict overturned by trial judge post-trial;<br>• Verdict reinstated by Ninth Circuit;<br>• Cert denied by US Supreme Court;<br>• Settled for $145 million |
| *In re Vivendi Universal S.A. Sec. Litig.* (S.D.N.Y.)[20] | Verdict did not determine total damages | • Post-trial motions greatly narrowed the class;<br>• Settled for $26.4 million |
| *BankAtlantic Bancorp* (S.D. Fla.)[21] | $2.41 per share | • Verdict set aside on post-trial motion and judgment entered for the defendants |
| *In re Homestore.com Inc. Sec. Litig.* (C.D. Cal.). | Per share damage award, with damages varying across fraud period;[22] described by named plaintiff as "multi-million" dollar award[23] | • No recovery;<br>• Judgment entered for the trial defendant dismissing all claims because verdict was offset by prior settlements |
| *Claghorn v. Edsaco Ltd.* (N.D. Cal.) | $170.7 million | • Settled for $10 million |

[17]   http://www.labaton.com/en/cases/Copy-of-In-re-Real-Estate-Associates-Limited-Partnership-Litigation.cfm

[18] http://securities.stanford.edu/1019/CLRN01/.

[19] http://securities.stanford.edu/1032/APOL04_01/.

[20] http://securities.stanford.edu/1024/V02-01/.

[21]
http://www.dandodiary.com/stats/pepper/orderedlist/downloads/download.php?file=http%3A//www.dandodiary.com/uploads/file/bankatlpost.pdf

[22]
http://www.dandodiary.com/stats/pepper/orderedlist/downloads/download.php?file=http%3A//www.dandodiary.com/uploads/file/homestorejuryverdictform.pdf.

Cases\4844-6260-7277.v2-12/13/19

71.     I have not updated Table 3 recently.  But I do know how one more tried securities class action, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al.*, No. 02 C-5893 (N.D. Ill.), turned out.   After the class won a verdict that would have resulted in a recovery of approximately $2.225 billion, the defendants appealed to the Seventh Circuit, which reversed and remanded for a new trial.  In 2016, 14 years after litigation started, the parties settled for $1.575 billion, about 70 percent of the verdict.  This astoundingly good result shows that, every so often, a class of investors can recover more than 50 cents on the dollar by winning at trial.  But in view of the risks and delays that must be borne if the incremental increase is to be obtained, there is much to be said in favor of recovering 50 percent of investors' estimated losses far sooner.

72.     It is common knowledge that, in settlement negotiations, plaintiffs who win at trial tend to discount jury verdicts steeply to avoid the risks and delays associated with appeals.  This is why in antitrust cases, where treble damages are available, recoveries of even single damages are uncommon.  See John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages*, 100 IOWA L. REV. 1997, 1998 (2015) (studying 71 antitrust cases and finding that "the median average settlement was 37% of single damages").

73.     My research group observed the same pattern of steep discounts on jury verdicts in medical malpractice cases.  In our dataset, 75 percent of plaintiffs who won at trial received payments less than their verdicts (adjusted for pre- and post-judgment interest).  Across all years and cases, the aggregate verdict reduction was 56 percent, meaning that plaintiffs recovered only 44 percent of their jury awards.  "Haircuts" increased in frequency and size with verdict amounts, meaning that the malpractice plaintiffs who won the largest verdicts discounted their verdicts the

---

[23]  http://www.businesswire.com/news/home/20110225006092/en/CalSTRS-Receives-Judgment-Homestore-Class-Action-Suit.

most when settling after trial.[24]   Rare is the plaintiff who, after winning at trial, recovers 100 percent of his or her actual loss.

**B.      Class Members Will Recover a Higher Percentage of Their Losses than the Opt-Out Claimants**

74.      A fee above 12.4 percent is also warranted because class members here won more on a percentage basis than opt-out claimants did.   Looking at the recoveries by the opt-out plaintiffs, who reportedly secured a combined total of $233.2 million, an analyst predicted that the claimants who stayed in the class would "walk away with something like $466.4 million."   Jenna Greene, *Daily Dicta: Robbins Geller Settles Vereit Class for $1B.  Are Opt-Out Plaintiffs Kicking Themselves?*" Law.com, Sept. 11, 2019, https://www.law.com/litigationdaily/2019/09/11/daily-dicta-robbins-geller-settles-vereit-class-for-1b-are-opt-out-plaintiffs-kicking-themselves/?slreturn=20191006194230.   In reality, the class members recovered more than more than twice that amount.   I have not heard of this happening before.

75.      Opt-out claimants, who hire lawyers directly, typically pay fees in the normal market range, that is, 25 percent or more of their recoveries.   Assuming they did so here, the class members are receiving far more and paying far less.

**C.      Contributions by Individual Defendants and Grant Thornton**

76.      A truly singular fact about the proposed settlement is that the individual defendants are contributing $237.5 million.[25]   This is unprecedented.   It is far and away the largest amount recovered from individual defendants in a securities class action of which I am aware.

---

[24] David A. Hyman, Bernard Black, Kathryn Zeiler, Charles Silver, and William M. Sage, Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988–2003, 4 JOURNAL OF EMPIRICAL LEGAL STUDIES 3 (2007).

[25] This includes $31.9 million, including the value of certain operating partnership units, that Defendants AR Capital, Nicholas Schorsch and Brian Block chose to surrender in connection with their July 2019 settlement with the Securities and Exchange Commission.

77.     Historically, securities class actions have settled without contributions from individuals.  Writing in 2011, an insurance executive and an insurance coverage lawyer observed that "in only a handful of cases have settlements [of securities class actions] required personal contributions from directors and officers," and that contributions by outside directors are "exceedingly rare."  Mark Roellig & Tim Burns, *Preparing for the Worst: D&O Protection and the Major Corporate Lawsuit*, ACC DOCKET, May 2011, at 32, 38.  Two years later, a group of researchers found that corporate officers contributed personal funds to 2 percent of the cases they studied.  Michael Klausner, Jason Hegland and Matthew Goforth., *How Protective Is D&O Insurance in Securities Class Actions? An Update*, PLUS J., May 2013, at 1, 3-4.[26]  As of 2016, nothing had changed.  That year, Professors Randall Thomas and Harwell Wells observed that securities class actions were often said to be failures because "'Directors and Officers' (D&O) insurance carriers pay all settlement amounts, so individual managers and directors do not contribute any personal funds for wrongdoing."  Randall S. Thomas & Harwell Wells, *James D. Cox: The Shareholders' Best Advocate*, 66 DUKE L.J. 467, 482–83 (2016).

78.     In securing enormous contributions from individual defendants, the proposed settlement is truly exceptional.

79.     The payment from Grant Thornton also bucks the trend.  According to a study of

all federal securities class-action lawsuits brought against auditors from 1996-June 2016, . . . the influence of Rule 10b-5 has significantly declined – dismissals have increased, and the number of claims has decreased.  Consistent with the waning influence of Rule 10b-5, auditors' settlement payouts have fallen (both in terms of dollar value and as a percentage of the total settlement value paid by all defendants).

---

[26] This article is available at http://securities.stanford.edu/academic-articles/20130501-how-protective-is-dno-insurance-in-securities-class-actions.pdf.

Colleen Honigsberg, Shivaram Rajgopal, and Suraj Srinivasan, *The Changing Landscape of Auditor Liability* (draft of March 1, 2018).[27]   More particularly, the fraction of cases in which auditors contributed to settlements fell from 70 percent in 1996-1998 to 15 percent in 2014-June 2016.  The total dollars paid by auditors fell from its peak of $1.432 billion in 2002-2004 to "a mere $22 million for cases filed in 2011-2013 , and just $1 million for 2014-June 2016, although many cases filed during the latter period remained open at the time of the study.  *Id.* at 22.  The authors attribute the decline in auditors' exposure to the Supreme Court's decisions in *Tellabs v. Makor Issues & Rights, Ltd.,* 549 U.S. 1105 (2007) and *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135 (2011).

80.     Here, Grant Thornton will pay the class $49 million.  In view of the statistics just reported, this is remarkable.  It is also especially noteworthy for two reasons.  First, Grant Thornton had credible defenses.  It contends that

> "[American Realty Capital Properties, Inc.]s ARCP's disclosures of AFFO [Adjusted Funds From Operations] and AFFO per share were not in violation of any SEC rule or regulation; that the GAAP violations outlined in the restatement of financial statements issued by ARCP were the result of the application of the judgment of ARCP's new management and do not reflect errors in the application of GAAP during the Class Period; that at all times ARCP's directors, GT, and underwriters conducted adequate due diligence, complying with their obligations under the law; and that no Defendant acted with scienter.

Memorandum in Support of Unopposed Motion for Preliminary Approval of Proposed Settlement, *In re American Realty Capital Properties, Inc., Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y. Sept. 30, 2019), ECF No. 1270, p. 18.  Second, according to Class Counsel, this is the largest amount that Grant Thornton has ever paid to resolve a securities fraud class action.

---

[27]  This article is available at https://www-cdn.law.stanford.edu/wp-content/uploads/2017/10/ Honigsberg_et_al_The-Changing-Landscape-of-Auditor-Liability_1-Mar-2018.pdf.

36

IX.     FEE AWARDS IN COMPARABLE CASES

81.     In the preceding sections, I explained that judges should base fee awards on prevailing market rates and showed that lawyers commonly receive fees ranging from 25 percent to 40 percent of recoveries when handling complex commercial cases for sophisticated clients on a straight contingency basis.

82.     I start this discussion of prevailing judicial practices by quoting Judge Colleen McMahon's observation two months ago in the Alibaba securities litigation (which generated a fee award of 25 percent on a recovery of $250 million) that "[d]istrict courts in the Second Circuit routinely award fees upwards of 25% in securities and other complex litigation settlements of comparable size." *Christine Asia Co., Ltd. V. Jack Yun Ma*, No. 1:15-md-02631 (S.D.N.Y. Oct. 16, 2019), at 36.  By comparison to the 25% fee awarded in the Alibaba case, the fee requested here is extremely modest.

83.     Judge McMahon also awarded a 25 percent fee in *Velez v. Novartis Pharm. Corp*., No. 04 Civ. 09194 (CM), 2010 WL 4877852, at *21, (S.D.N.Y. Nov. 30, 2010), which settled for $152.5 million.  In support of this decision, she referenced a 2009 empirical study of fee awards in class actions by Professors Theodore Eisenberg and Geoffrey P. Miller, which found mean and median awards of 27 percent and 25 percent, respectively, for cases of that type.  *Id*. at 21 (citing Theodore Eisenberg and Geoffrey P. Miller, *Attorneys Fees and Expenses in Class Action Settlements: 1993–2008,* NYU Center for Law, Economics and Organization, Working Paper No. 09-50 (November 2009), *available at* http://ssrn.com/abstract=1497224).

84.     Eisenberg and Miller published an updated study in 2016.  Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N. Y.U. L. REV. 937 (2017)  It reports mean and median fee percentages of 27 percent and 29 percent, respectively, for all cases in the authors' dataset.  The corresponding numbers for cases in the

37

Southern District of New York are 27 percent and 31 percent. The revised study also finds that fee percentages tend to decline as settlements increase in size, but still average 22.3 percent in the highest decile, which includes cases with recoveries exceeding $67.5 million.

85.    Professor Brian Fitzpatrick's study of federal class actions that resolved in 2006 and 2007 provides additional, if now somewhat dated, information on fees. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 820 (2010). He found that awards ranged from 3 percent to 47 percent, but clustered within the market range. The figure below displays his results. *Id*., at 834, Fig. 4.

*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.



86.    Fitzpatrick also found that awards tend to decline as settlement amounts increase. In the highest recovery category, which ran from $72.5 million to $6.6 billion, the mean and median fee awards were 18.4 percent and 19.0 percent, respectively.

87.     Professors Lynn Baker, Michael Perino, and I recently published an empirical study of fee awards in securities fraud class actions in the Columbia Law Review.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371 (2015).  Our dataset included "every securities class action filed in every federal district court in which the parties announced a settlement from January 1, 2007 through December 31, 2012," more than 400 in all.  *Id*., at 1387.

88.     For the dataset as a whole, we found a mean fee award of almost 24 percent and a median award of 25 percent.  *Id*., at 1389, Table 1.  Like other researchers, we found that fee percentages tend to decline as settlements grow in size, but we also discovered that this inverse relationship exists only in districts that handle large numbers of cases.  In the top quartile of securities cases we examined, fee awards averaged 17.46 percent in high-volume districts like the Southern District of New York.

89.     By comparison to the averages and medians reported in the preceding paragraphs, the 12.4 percent fee requested in this case is low.

90.     An examination of fee awards in mega-fund cases with recoveries of $100 million or more strengthens this conclusion.  There are many mega-fund cases with awards that greatly exceed 12.4 percent.  For example, in *Cook v. Rockwell Int'l Corp.*, No. 90-CV-00181-JLK, 2017 WL 5076498, at *1 (D. Colo. Apr. 28, 2017), the court awarded 40 percent of a $250 million recovery as fees.  In *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006), the court awarded a 31.3 percent fee on a recovery of $1.075 billion.  Similarly, in *Jaffe v. Household Int'l*, the court awarded a 24.68% fee on a $1.575 billion settlement.

91.     I mention these cases to show that judges try to award fees that are appropriate in the circumstances.  They neither reflexively reduce fee percentages as recoveries increase nor

adhere to other hard-and-fast rules.  This is why there are so many mega-fund cases – more than 100 – with fee awards of 15 percent or more.  The judges who handled those cases believed that the facts warranted large fee awards.

92.     A table of mega-fund cases with fees of at least 15 percent appears in Exhibit 2.  The table is exemplary, not exhaustive.  There are many more cases than it reports.  The entries in the table have not been adjusted for inflation either.  By increasing settlement values to current dollars, an inflation adjustment would both greatly increase the number of qualifying cases and make older cases that are in the table seem much larger.

93.     Judge Gleeson's opinion on fees in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, which at the time had a value of $5.7 billion, is an interesting example of the application of discretion in a mega-fund case.[28]  After deciding to 'mimic the market,' Judge Gleeson adopted a table of declining marginal fee percentages. 991 F. Supp. 2d at 445.  Personally, I believe that rising marginal percentages incentivize lawyers better than declining ones and that Judge Gleeson's percentages were too low.  Even so, as the table below shows, applying Judge Gleeson's scale to this case yields a fee equal to 18 percent of the recovery, almost 50% more than the 12.4 percent that Class Counsel requests.

---

[28] Because Judge Gleeson's opinion approving the settlement was reversed on appeal, his opinion on fees was of no effect.

| TABLE 4.   JUDGE GLEESON'S *PAYMENT CARD* SCALE APPLIED TO THIS SETTLEMENT | | |
|---|---|---|
| Recovery Level  (Millions) | Fee Percentage | Marginal Fee (Millions) |
| 0–$10 | 33% | $3.30 |
| $10-$50 | 30% | $12.00 |
| $50-$100 | 25% | $12.50 |
| $100-$500 | 20% | $80.00 |
| $500-$1,000 | 15% | $75.00 |
| $1,000-$2,000 | 10% | $2.50 |
| $2,000-$4,000 | 8% | NA |
| $4,000-$5,700 | 6% | NA |
| **TOTAL FEE** | | **$185.30** |
| **SETTLEMENT** | | **$1,025.00** |
| **FEE %** | | **18%** |

94.     By any measure, Class Counsel's request for a 12.4 percent fee is reasonable.

## X.     LODESTAR CROSS-CHECK

95.     In the Second Circuit, judges often perform lodestar cross-checks when awarding fees. *See Goldberger*, 209 F.3d at 50 ("Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage").

96.     When considering the reasonableness of a requested fee on a lodestar basis, matters can often be simplified by considering what a defendant's lawyers were paid, both in total and by the hour.  The comparison is helpful because investors deserve the same caliber of representation that defendants receive.  If the rules governing fee awards forced investors to pay less than issuers, investors would be outgunned in litigation and would predictably fare poorly.

97.     According to Glenn J. Rufrano, VEREIT'S CEO, the company incurred "about $225 million" in legal fees from 2015 forward, and would have spent "at least $100 million" more "if litigation continued and [VEREIT] went to trial." *Business Update Call Transcript*, Sept. 9,

41

2019, pp. 2 & 6.  Here, Class Counsel's requested fee of $127 million is about half of what ARCP paid, without considering any fees paid by other defendants.  Consequently, the starting point for a lodestar comparison should be the fear that Class Counsel's fee request is too low.

98.     I have already shown that Robbins Geller numbers among the finest class action law firms in the world.  Consequently, the hourly rates charged by its attorneys should be compared to those charged by lawyers who practice at other elite firms.  The following table summarizes the hourly rates requested by lawyers at Robbins Geller.

| HOURLY RATES FOR ATTORNEYS AND SERVICE PROVIDERS | |
|---|---|
| Partners | $725 - $1,250 |
| Of Counsel | $450 - $1,250 |
| Associates | $400 - $600 |
| Staff Attorneys | $360 - $425 |
| Paralegals | $265 - $350 |
| Forensic Accountants | $575 - $725 |
| Other Positions | $75 - $430 |
| *BLENDED HOURLY RATE* | *$652* |

99.     There are many sources of information about the hourly rates that lawyers at elite firms charge.  For example, one can study the fee applications that lawyers submit in bankruptcy proceedings.  Using this approach, one learns that many lawyers seek to be compensated at rates far higher than those requested here.  For example, in the Sears bankruptcy proceeding, the fee application submitted earlier this year by Weil, Gotshal & Manges LLP, the debtors' attorneys, includes dozens of lawyers whose hourly charges exceed $1,000, with nine lawyers charging $1,500 per hour or more.  Unlike Plaintiffs' Counsel, the lawyers listed were not working on contingency.  Even so, the bankruptcy judge approved the fee request in full.

100.    Even higher hourly rates were sought in the Toys R' Us bankruptcy, where Kirkland & Ellis LLP serves as debtors' counsel.  There, the highest hourly rate was $1,795, the blended rate for all partners, of which there were dozens, was $1,227, and the blended rate for all

timekeepers, including paralegals and support staff, was $901.  Similar hourly rates and blended

rates have been sought in other bankruptcy proceedings.  When compared to those charges, Class

Counsel's requested rates are low.

101.    Rates charged by opposing counsel, who normally are paid by the hour when

representing defendants, also shed light on the reasonableness of Plaintiff Counsel's requested

rates.  Although I do not know how much the defense lawyers in this case are charging their clients,

I do know, as mentioned above, that Kellogg, Hansen, Todd, Figel & Frederick, counsel for

VEREIT, represented the NCUA pursuant to a contingent fee contract that entitled the firm to

collect a straight 25 percent on more than $5 billion in recoveries.  By comparison, in this case

Class Counsel requests only 12.4 percent, half as much.

102.    I also know that the rates Robbins Geller are requesting here are comparable to

those that judges have awarded the firm in other cases.  For example, in *David N. Zimmerman v.*

*Diplomat Pharmacy, Inc., et al.*, Case No. 2:16-cv-14005-AC-SDD, ECF No. 70-2 at 2 (E.D.

Mich. July 16, 2019), the firm submitted hourly rates topping out at $1,250 for a named partner

and averaging $595 for all timekeepers combined.  The highest hourly rate requested here is the

same, and the blended hourly rate is comparable.

103.    One can also examine opinions containing lodestar cross-checks to learn what

hourly rates judges find reasonable.  *Pantelyat v. Bank of Am., N.A.*, No. 16-CV-8964 (AJN), 2019

WL 402854 (S.D.N.Y. Jan. 31, 2019), a recent decision by Judge Alison J. Nathan of the Southern

District of New York, provides an example.  Presiding over a $22 million class settlement, Judge

43

Nathan approved a 25 percent fee based on a blended hourly rate of $695 supplemented by a multiplier of 4.89. *Id*. at *10.[29]

104.     Finally, one can consult surveys of law firms' billing rates, such as those taken by the NATIONAL LAW JOURNAL (NLJ).  The number of firms participating in the NLJ surveys varies from year to year, but always exceeds 100.  The NLJ surveys are often cited to courts as evidence supporting hourly rates in fee applications.  *See, e.g.*, *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010) (admitting into evidence and relying upon expert report by Professor William Rubenstein which was based in part on NLJ surveys).

105.     The NLJ surveys report that senior partners at large law firms often charge $1000 per hour or more.  *See* Karen Sloan, *NLJ Billing Survey: $1,000 Per Hour Isn't Rare Anymore,* THE NATIONAL LAW JOURNAL (January 13, 2014).  Reading the text of the article, one learns that "[n]early 20 percent of the firms included in THE NATIONAL LAW JOURNAL's annual survey of large law firm billing rates [in 2014] had at least one partner charging more than $1,000 an hour."

106.     The 2014 NLJ survey, which contained information for 159 of the largest law firms in the U.S., found a median rate (half above/half below) for the highest partner billing rate category of $775 and a median high hourly rate for associates of $510.  Since then, rates at major law firms have risen.  The News Blog added that, in 2018, "top litigators at Morgan, Lewis & Bockius LLP, a Philadelphia-based firm, [were] asking as much as $1,200 an hour."

107.     Having considered a variety of sources, it is my opinion that the hourly rates charged by Class Counsel in this action are reasonable and that the total requested fee is reasonable as well.

---

[29] I calculated the blended hourly rate by dividing the lodestar basis ($1,125,294.50) by the number of hours worked (1,618.8).

**XI.     COMPENSATION**

108.    I received a flat fee of $50,000 for preparing this report.

**XII.    CONCLUSION**

109.    For the reasons set out above, I believe that the fee request made pursuant to the fee schedule negotiated by TIAA at the outset of the litigation is reasonable and appropriate.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed this 13th day of December, 2019, at Austin, Texas.

_____          _____

CHARLES SILVER

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 17, 2019, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service

to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Debra J. Wyman<br>DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  debraw@rgrdlaw.com

**Mailing Information for a Case 1:15-mc-00040-AKH In re American Realty Capital Properties, Inc. Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Simon Abraham**
  jabraham@aftlaw.com

- **Robin L. Alperstein**
  ralperstein@beckerglynn.com,esteckhan@beckerglynn.com,hhill@beckerglynn.com

- **Antonia Marie Apps**
  aapps@milbank.com,ggreen@milbank.com,AutoDocketECF@milbank.com

- **Adam M. Apton**
  aapton@zlk.com

- **Karim Basaria**
  kbasaria@sidley.com

- **Khristoph Becker**
  kbecker@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Stanley D Bernstein**
  bernstein@bernlieb.com,birkeland@bernlieb.com,ecf@bernlieb.com

- **Rebecca A. Beynon**
  rbeynon@kellogghansen.com

- **Brian Roger Blais**
  brian.blais@usdoj.gov,usanys.ecf@usdoj.gov,CaseView.ECF@usdoj.gov

- **Jeffrey Craig Block**
  jeff@blockesq.com,jason@blockesq.com,pacer-blockleviton-9062@ecf.pacerpro.com

- **Kristen Leigh Bokhan**
  kristen.bokhan@kirkland.com

- **Adam Jerrod Bookman**
  adam.bookman@weil.com,adam-bookman-4279@ecf.pacerpro.com

- **Bruce Roger Braun**
  bbraun@sidley.com,nyefiling@sidley.com,efilingnotice@sidley.com,catherine.stewart@sidley.com,kbasaria@sidley.com,ntygesso@sidley.com,nconrad@sidley.com,b
  braun-9612@ecf.pacerpro.com

- **Kristina Anne Bunting**
  kbunting@paulweiss.com,mao_fednational@paulweiss.com

- **Jennifer Nunez Caringal**
  jcaringal@rgrdlaw.com,SCaesar@rgrdlaw.com,kmccormack@rgrdlaw.com,JCaringal@ecf.courtdrive.com

- **Alexandra Rebecca Clark**
  aclark@pkbllp.com

- **Neil Harris Conrad**
  nconrad@sidley.com,efilingnotice@sidley.com,neil-conrad-4222@ecf.pacerpro.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com,smiller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jason Robert D'Agnenica**
  jasondag@ssbny.com

- **Glen DeValerio**
  gdevalerio@bermandevalerio.com,bdentremont@bermandevalerio.com,ecf@bermandevalerio.com,bmccarthy@bermandevalerio.com

- **Bruce Whitney Dona**
  bruce.dona@ksfcounsel.com

- **Michael Joseph Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,E_File_SD@rgrdlaw.com,tholindrake@rgrdlaw.com,DanD@ecf.courtdrive.com

- **H. Miriam Farber**
  mfarber@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,miriam-farber-
  7421@ecf.pacerpro.com,manattyoffice@shearman.com

- **Meagan Alicia Farmer**
  mfarmer@gardylaw.com

- **Reid Mason Figel**
  rfigel@kellogghansen.com,fli@kellogghansen.com,cparra@kellogghansen.com

- **Christopher Lee Filburn**
  cfilburn@paulweiss.com,mao_fednational@paulweiss.com

- **Robert Craig Finkel**
  rfinkel@wolfpopper.com,cdunleavy@wolfpopper.com,mgianfagna@wolfpopper.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_SD@rgrdlaw.com,JForge@ecf.courtdrive.com

- **Adam Fotiades**
  afotiades@zuckerman.com

- **Molly Bruder Fox**
  mbfox@steptoe.com

- **Christopher Louis Garcia**
  christopher.garcia@weil.com,mco.ecf@weil.com,evert.christensen@weil.com,christopher-garcia-1339@ecf.pacerpro.com,nymao@ecf.pacerpro.com

- **James Philip Gillespie**
  jgillespie@kirkland.com,kevin.mccarthy@kirkland.com,kenymanagingclerk@kirkland.com

- **Daniel Zachary Goldman**
  dgoldman@pkbllp.com

- **Andrew Edward Goldsmith**
  agoldsmith@kellogghansen.com,ecfnotices@kellogghansen.com,ggoldfeder@kellogghansen.com,ecf-2ff5a29c9f5d@ecf.pacerpro.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Douglas W. Greene**
  dgreene@bakerlaw.com,agougisha@bakerlaw.com,bhlitdocket@bakerlaw.com

- **Theresa Hsin-Yi Gue**
  tgue@pkbllp.com

- **John Gueli**
  jgueli@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,manattyoffice@shearman.com,john-gueli-5051@ecf.pacerpro.com

- **Adam Selim Hakki**
  ahakki@shearman.com,managing-attorney-5081@ecf.pacerpro.com,Courtalert@shearman.com,manattyoffice@shearman.com,adam-hakki-1816@ecf.pacerpro.com

- **John Louis Hardiman**
  hardimanj@sullcrom.com,john-hardiman-9552@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **David Charles Harrison**
  dharrison@lowey.com

- **Barbara J. Hart**
  bhart@lowey.com

- **Steven P. Harte**
  steven@blockesq.com,pacer-blockleviton-9062@ecf.pacerpro.com

- **James Ormerod Heyworth , V**
  jheyworth@sidley.com,nyefiling@sidley.com,james-heyworth-0340@ecf.pacerpro.com

- **William Scott Holleman**
  holleman@bespc.com,ecf@bespc.com

- **Geoffrey Coyle Jarvis**
  gjarvis@ktmc.com,9343632420@filings.docketbird.com,mswift@ktmc.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com

- **Rebecca M Katz**
  rkatz@katzlawnewyork.com,disaacson@motleyrice.com,dabel@motleyrice.com,lkorenblit@motleyrice.com,kweil@motleyrice.com

- **Christopher J. Keller**
  ckeller@labaton.com,5497918420@filings.docketbird.com,lpina@labaton.com,ElectronicCaseFiling@labaton.com

- **Michael Anthony Keough**
  mkeough@steptoe.com,ehartman@steptoe.com,docketadministrators@steptoe.com,rgillis@steptoe.com,ocorn@steptoe.com,cdecamp@steptoe.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Robert Klipper**
  rklipper@kellogghansen.com,jmarine@kellogghansen.com

- **Lawrence Paul Kolker**
  kolker@whafh.com

- **Alexia Dorothea Korberg**
  akorberg@paulweiss.com,mao_fednational@paulweiss.com

- **Daniel Jonathan Kramer**
  dkramer@paulweiss.com,mao_fednational@paulweiss.com

- **Larry Howard Krantz**
  lkrantz@krantzberman.com

- **Eric Albin Larson**
  elarson@mmmlaw.com,eeckard@mmmlaw.com

- **Angel P. Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,alau@ecf.courtdrive.com

- **Grace Jheeyoung Lee**
  grace.lee@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,grace-lee-3889@ecf.pacerpro.com,manattyoffice@shearman.com,stephen.ross@shearman.com,mariusz.jedrzejewski@shearman.com

- **Justin David Lerer**
  jlerer@paulweiss.com,mao_fednational@paulweiss.com

- **Michelle Lynn Levin**
  mlevin@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Daniel Craig Lewis**
  daniel.lewis@shearman.com,managing-attorney-5081@ecf.pacerpro.com,daniel-lewis-6070@ecf.pacerpro.com,CourtAlert@Shearman.com,manattyoffice@shearman.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Neil Robert Lieberman**
  nlieberman@hsgllp.com,crodriguez@hsgllp.com,Managingclerk@hsgllp.com

- **Howard Theodore Longman**
  tsvi@aol.com,hlongman@ssbny.com

- **Morgan Paige Lucas**
  mlucas@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **John Phillip MacNaughton**
  jpm@mmmlaw.com,wew@mmmlaw.com,elarson@mmmlaw.com

- **Michael David Margulies**
  mmargulies@carltonfields.com

- **Jerry Lee Marks**
  jmarks@milbank.com

- **Rita Kathleen Maxwell**
  rita.maxwell@bracewelllaw.com,mco@bracewelllaw.com

- **Francis Paul McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Glen Garrett McGorty**
  gmcgorty@crowell.com

- **Donald Alan Migliori**
  dmigliori@motleyrice.com,kdotson@motleyrice.com

- **Michael Campion Miller**
  mmiller@steptoe.com,spu@steptoe.com,ocorn@Steptoe.com,ehartman@steptoe.com

- **Mark Tamerlane Millkey**
  mmillkey@rgrdlaw.com,e_file_ny@rgrdlaw.com,MMillkey@ecf.courtdrive.com

- **Erin Jennifer Morgan**
  ejmorgan@paulweiss.com,mao_fednational@paulweiss.com

- **Christopher F. Moriarty**
  cmoriarty@motleyrice.com,sturman@sturman.ch

- **Daniel P. Moylan**
  dmoylan@zuckerman.com,jlinton@zuckerman.com,cvandergriff@zuckerman.com

- **Beth Mueller**
  beth.mueller@kirkland.com,lroberts@kirkland.com,kenymanagingclerk@kirkland.com

- **Mark Francis Murphy**
  mmurphy@steptoe.com

- **Sean Michael Nadel**
  snadel@kellogghansen.com

- **William H. Narwold**
  bnarwold@motleyrice.com,glevin@motleyrice.com,lmclaughlin@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Shawn Patrick Naunton**
  snaunton@zuckerman.com,lgehlbach@zuckerman.com

- **Gregory Mark Nespole**
  gnespole@zlk.com,jtash@zlk.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jonathan Ohring**
  johring@milbank.com,DMarcou@milbank.com,mprostko@milbank.com,TQuinn@milbank.com,JKammerman@milbank.com,milbank@ecf.courtdrive.com,jon-ohring-4945@ecf.pacerpro.com,dhooks1@milbank.com,klandis@milbank.com,AutoDocketECF@milbank.com,ggreen@milbank.com,MGrier@milbank.com,molsson@milb

- **Bradley E Oppenheimer**
  boppenheimer@kellogghansen.com,ecf-780f0d54d6a1@ecf.pacerpro.com,ggoldfeder@kellogghansen.com

- **Guy Petrillo**
  gpetrillo@pkbllp.com

- **Ashley M. Price**
  APrice@rgrdlaw.com,aprice@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **Kingdar Prussien**
  kprussien@milbank.com,autodocketecf@milbank.com

- **Arlen Pyenson**
  apyenson@crowell.com

- **Fei-Lu Qian**
  fqian@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Leah Margaret Quadrino**
  lquadrino@steptoe.com,pparker@steptoe.com

- **Daniel Brett Rehns**
  drehns@hrsclaw.com,efilings@hrsclaw.com

- **Kenneth Mark Rehns**
  krehns@saxenawhite.com,krehns@cohenmilstein.com,e-file@saxenawhite.com,cwallace@saxenawhite.com

- **Julie Goldsmith Reiser**
  jreiser@cohenmilstein.com

- **Lorin L. Reisner**
  LReisner@paulweiss.com,mao_fednational@paulweiss.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Ann Kimmel Ritter**
  aritter@motleyrice.com,glevin@motleyrice.com,kweil@motleyrice.com

- **Darren J. Robbins**
  e_file_sd@rgrdlaw.com,jcaringal@rgrdlaw.com

- **Lara Elizabeth Romansic**
  lromansic@steptoe.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com,RRothman@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Peter George Safirstein**
  psafirstein@safirsteinmetcalf.com,sfeerick@safirsteinmetcalf.com

- **Michael Gerard Scavelli**
  mscavelli@steptoe.com,spu@steptoe.com,ehartman@steptoe.com,ocorn@steptoe.com

- **Jed Mastren Schwartz**
  jschwartz@milbank.com,jed-schwartz-8050@ecf.pacerpro.com,milbank@ecf.courtdrive.com,ggreen@milbank.com,AutoDocketECF@milbank.com

- **Kevin S. Sciarani**
  ksciarani@rgrdlaw.com,KSciarani@ecf.courtdrive.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph R. Seidman**
  seidman@bernlieb.com

- **Jonathan Lucas Shapiro**
  jshapiro@kasowitz.com,courtnotices@kasowitz.com,autodocket@kasowitz.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com,JShinnefield@ecf.courtdrive.com,landracchio@rgrdlaw.com

- **Thomas Michael Skelton**
  tskelton@lowey.com

- **Richard William Slack**
  richard.slack@weil.com,mco.ecf@weil.com,richard-slack-7880@ecf.pacerpro.com,adam.bookman@weil.com,Patrick.Branson@weil.com,nymao@ecf.pacerpro.com,evert.christensen@weil.com,Raquel.Kellert@weil.com

- **Patrick Kevin Slyne**
  pkslyne@ssbny.com

- **Patrick C Smith**
  psmith@dehay.com

- **Audra Jan Soloway**
  asoloway@paulweiss.com,mao_fednational@paulweiss.com

- **Luigi Spadafora**
  spadafora.l@wssllp.com

- **Kendra L Stead**
  kstead@sidley.com,efilingnotice@sidley.com,jdent@sidley.com,kendra-stead-0480@ecf.pacerpro.com

- **Michael Howard Steinberg**
  steinbergm@sullcrom.com,michael-h-steinberg-5026@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **Christopher D. Stewart**
  cstewart@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Elizabeth Johnson Stewart**
  elizabeth.stewart@shearman.com,managing-attorney-5081@ecf.pacerpro.com,CourtAlert@Shearman.com,elizabeth-stewart-0821@ecf.pacerpro.com,manattyoffice@shearman.com

- **Ellen Anne Gusikoff Stewart**
  elleng@rgrdlaw.com

- **Daniel Ben Tehrani**
  Daniel.Tehrani@usdoj.gov,CaseView.ECF@usdoj.gov

- **Steven Jeffrey Toll**
  stoll@cohenmilstein.com,efilings@cohenmilstein.com

- **Matthew Tracy**
  tracy.m@wssllp.com

- **Nicholas Tygesson**
  ntygesso@sidley.com

- **Anil Karim Vassanji**
  avassanji@fklaw.com

- **Melanie Elizabeth Walker**
  mewalker@sidley.com,melanie-walker-7174@ecf.pacerpro.com,efilingnotice@sidley.com

- **Reid Weingarten**
  rweingarten@steptoe.com

- **Joseph Harry Weiss**
  jweiss@weisslawllp.com,infony@weisslawllp.com,joshua-rubin-1257@ecf.pacerpro.com,exec@weisslawllp.com

- **Theodore Von Wells , Jr**
  twells@paulweiss.com,mao_fednational@paulweiss.com

- **Collin White**
  cwhite@kellogghansen.com

- **Regis C. Worley , Jr**
  rworley@rgrdlaw.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,DebraW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **Genevieve Graeme York-Erwin**
  gyorkerwin@bakerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Ar Capital LLC
,

Dwight          Phillip Bostwick
Zuckerman Spaeder, LLP
1800 M Street, N.W.,  Ste. 1000
Washington, DC 20036-5802

Scott           Alexander Edelman
Milbank LLP
55 Hudson Yards
New York City, NY 10001-2163

Kevin Patton
,

William         Taylor
Zuckerman Spaeder LLP
1800 M Street, N.W
Washington, DC 20036

David           C. Walton
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101

Abby M. Wenzel
,
```